GEOKINETICS INC. AND THE COMPANIES LISTED BELOW HAVE NOT FILED FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AND THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR APPROVED BY THE BANKRUPTCY COURT OR THE SECURITIES AND EXCHANGE COMMISSION.   IN THE EVENT THAT THESE COMPANIES FILE PETITIONS FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND SEEK CONFIRMATION OF THE JOINT PREPACKAGED PLAN OF REORGANIZATION DESCRIBED HEREIN, THIS DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL.

## SOLICITATION AND DISCLOSURE STATEMENT FOR THE
## JOINT CHAPTER 11 PLAN OF GEOKINETICS INC., ET AL.



**Solicitation of Votes with Respect to the Joint Plan of Reorganization
Under Chapter 11 of the Bankruptcy Code of**

# GEOKINETICS INC., <u>et al.</u>,[1]

From Holders of GOK Holdings 9.75% Senior Secured Notes Due 2014;
GOK Series B-1 Senior Convertible Preferred Stock, par value $10.00 per share; and
GOK Series C-1 Senior Preferred Stock, par value $10.00 per share as of January 23, 2013

**THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS 12:00 P.M., PREVAILING EASTERN TIME,
ON MARCH 8, 2013, UNLESS EXTENDED**

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY</u> <u>RECEIVED</u> BY THE VOTING AND CLAIMS AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN. NOTEHOLDERS AND HOLDERS OF SENIOR PREFERRED EQUITY INTERESTS SHOULD REFER TO THE BALLOTS ENCLOSED FOR INSTRUCTIONS ON HOW TO VOTE ON THE PLAN OF REORGANIZATION. PLEASE NOTE THAT THE DESCRIPTION OF THE PLAN PROVIDED THROUGHOUT THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY PROVIDED FOR CONVENIENCE. IN THE CASE OF ANY INCONSISTENCY BETWEEN THE SUMMARY OF THE PLAN IN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN WILL GOVERN.[2]

The Debtors hereby solicit from Holders of Geokinetics Holdings USA, Inc.'s 9.75% Senior Secured Notes due 2014, Geokinetics Inc.'s Series B-1 Senior Convertible Preferred Stock, par value $10.00 per share, and Geokinetics Inc.'s

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, will be: Geokinetics Inc. (0082), Geokinetics Holdings USA, Inc. (6645), Geokinetics Services Corp. (1753), Geokinetics Processing, Inc. (9897), Geokinetics Acquisition Company (0110), Geokinetics USA, Inc. (7282), Geokinetics International Holdings, Inc. (8468), Geokinetics Management, Inc. (3414), Geokinetics International, Inc. (2143), and Advanced Seismic Technology, Inc. (9540). The Debtors' address is 1500 Citywest Boulevard, Suite 800, Houston, Texas 77042. The Debtors, together with their non-Debtor Affiliates, shall be referred to herein collectively as the *"Company."*

[2] Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meanings set forth in the Plan.

Series C-1 Senior Preferred Stock, par value $10.00 per share, as of January 23, 2013, votes to accept or reject the Debtors' Plan under chapter 11 of the Bankruptcy Code. A copy of the Plan is attached hereto as **Exhibit A**.

**IMPORTANT INFORMATION FOR YOU TO READ**

<u>THE DEADLINE TO VOTE ON THE JOINT CHAPTER 11 PLAN OF GEOKINETICS INC., ET AL. IS MARCH 8, 2013 AT 12:00 P.M. PREVAILING EASTERN TIME.</u>

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY</u> <u>RECEIVED</u> BY THE VOTING AND CLAIMS AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.

The Debtors are providing the information in this Disclosure Statement for the *Joint Chapter 11 Plan of Geokinetics Inc., et al.* and all exhibits, appendices and schedules thereto, including the Plan Supplement (as may be amended, modified, or supplemented from time to time, the *"Plan"*) to those Holders of Claims and Equity Interests entitled to vote on the Plan for the purpose of soliciting votes to accept the Plan. The Plan is comprised of ten sub plans, one for each Debtor. Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meanings given to those terms in the Plan, the terms of which are adopted and incorporated herein by reference. <u>Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose.</u>

The Plan is the result of extensive negotiations among the Debtors, the Consenting Noteholders, the Consenting Preferred Equity Holder and the Backstop DIP Lenders. The Debtors believe that the Plan provides the best possible result for all Holders of Claims and Interests in the Chapter 11 Cases and that acceptance of the Plan is in the best interests of the Debtors' creditors and equity Holders. The Debtors strongly urge all Noteholders and Holders of Senior Preferred Equity Interests to vote to accept the Plan.

This Disclosure Statement may not be deemed as providing any legal, financial, securities, tax, or business advice. The Debtors urge any Holder of a Claim or Equity Interest to consult with its own advisors for any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each of the proposed transactions contemplated thereby. The Bankruptcy Court has not approved the adequacy of the disclosure contained in this Disclosure Statement or the merits of the Plan. The Debtors have not authorized any entity to give any information about or concerning the Plan other than the information contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

The Debtors urge every Holder of a Claim or Equity Interest entitled to vote on the Plan to (1) read the entire Disclosure Statement and Plan carefully; (2) consider all of the information in this Disclosure Statement, including, importantly, the risk factors described in Article IV of this Disclosure Statement; and (3) consult with your own advisors with respect to reviewing this Disclosure Statement, the Plan, and all documents that are attached to the Plan and Disclosure Statement <u>before</u> deciding whether to vote to accept or reject the Plan.

This Disclosure Statement contains summaries of the Plan, certain statutory provisions, anticipated events in the Debtors' Chapter 11 Cases, and certain documents related to the Plan. Although the Debtors believe that these summaries are fair and accurate, they are all qualified in their entirety by reference to the Plan or such other referenced documents. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or other referenced documents, the Plan or other referenced documents will govern for all purposes. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtors' management. The Debtors do not represent or warrant that the information contained in or attached to this Disclosure Statement is without any material inaccuracy or omission.

Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information contained in, or incorporated by reference into, this Disclosure Statement, certain of that financial information has not been audited. The Debtors are generally making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof where feasible, unless otherwise specifically noted. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and parties reviewing this Disclosure Statement should be aware that, at the time of their review, the facts may have changed since this Disclosure Statement was initially distributed.

Neither this Disclosure Statement nor the Plan is or should be construed as an admission of fact, liability, stipulation, or waiver, and nothing stated herein shall be admissible in any proceeding involving the Debtors or any other person or be deemed conclusive evidence of the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Equity Interests. Rather, Holders of Claims and Equity Interests and other parties in interest should construe this Disclosure Statement as a statement made in settlement negotiations related to contested matters, adversary proceedings, and other pending or threatened litigation or actions. The Debtors or the Reorganized Debtors may seek to investigate, file, and prosecute Causes of Action and may object to Claims after the Confirmation or Effective Date irrespective of whether this Disclosure Statement identifies any such Causes of Action or objections to Claims.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with the United States Securities and Exchange Commission (the "*SEC*") or any state authority. The Plan has not been approved or disapproved by the SEC or any state securities commission, and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.

This Disclosure Statement has been prepared pursuant to Bankruptcy Code section 1125 and Bankruptcy Rule 3016(b). The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "*Securities Act*"), or any securities regulatory authority of any state under the applicable state securities law ("*Blue Sky Law*"). The Debtors intend to rely on Securities Act section 3(a)(9) and Bankruptcy Code section 1145(a), as applicable, and equivalent state law registration exemptions to exempt both the offer and issuance of new securities of GOK in connection with the solicitation and the Plan from registration under the Securities Act and Blue Sky Law. The solicitation of votes on the Plan is being made in reliance on the exemption requirements of the Securities Act provided by section 3(a)(9) thereof. This Disclosure Statement does not constitute an offer or solicitation with respect to the DIP Facility described herein.

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology, such as "may," "expect," "anticipate," "estimate," "continue," or the negatives thereof, as well as any similar or comparable language. You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The Liquidation Analysis, financial projections, and other projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims and Equity Interests, among other things, may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate.

**For New Hampshire Residents: Neither the fact that a registration statement or an application for a license has been filed under Chapter 421-B of the New Hampshire Revised Statutes ("Chapter 421-B") with the State of New Hampshire nor the fact that a security is effectively registered or a person is licensed in the State of New Hampshire constitutes a finding by the Secretary of State that any document filed under Chapter 421-B is true, complete and not misleading. Neither any such fact nor the fact that an exemption or exception is available for a security or a transaction means that the Secretary of State has passed in any way upon the merits or qualifications of, or recommended or given approval to, any person, security, or transaction. It is unlawful to make, or cause to be made, to any prospective purchaser, customer, or client any representation inconsistent with the provisions of this paragraph.**

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan, or any of the documents attached hereto or referenced herein, or if you have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact GCG by (i) calling (800) 761-8709, (ii) emailing GeokineticsInfo@gcginc.com, or (iii) visiting www.GOKRestructuring.com.

The Company files annual, quarterly, and other reports, proxy and information statements and other information with the SEC. You may read and copy any document the Company files at the SEC's Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for information regarding the Public Reference Room and its copying charges. You can also find Company filings on the SEC's website at http://www.sec.gov and on the Company's website at http://phx.corporate-ir.net/phoenix.zhtml?c=61990&p=irol-sec. Information contained on the Company's website, except for the SEC filings referred to below, is not a part of, and shall not be deemed to be incorporated by reference into, this Disclosure Statement.

By "incorporating by reference" the information the Company has filed with the SEC, the Company is disclosing information to you by referring you to those documents without actually including the specific information in this Disclosure Statement. The information incorporated by reference is an important part of this Disclosure Statement, and information that the Company files later with the SEC will automatically update and may replace this information and information previously filed with the SEC. Any statement contained in the filings (or portions of filings) incorporated by reference into this Disclosure Statement will be deemed to be modified or superseded for purposes of this Disclosure Statement to the extent that a statement contained in this Disclosure Statement or in any filing by the Company with the SEC prior to the completion of this solicitation modifies, conflicts with, or supersedes such statement.

The Company incorporates by reference into this Disclosure Statement the following documents:

- its Annual Report on Form 10-K, as amended, for the year ended December 31, 2011;

- its Definitive Proxy Statement on Schedule 14A filed with the SEC on June 22, 2012;

- its Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2012, June 30, 2012 and September 30, 2012; and

- its Current Reports on Form 8-K filed with the SEC on January 6, 2012, February 22, 2012, March 21, 2012, March 26, 2012, May 11, 2012; June 1, 2012, June 4, 2012, June 11, 2012, July 30, 2012, October 4, 2012, October 29, 2012, November 13, 2012, November 21, 2012, December 12, 2012, December 17, 2012, December 21, 2012, and January 17, 2013.

The Company also incorporates by reference into this Disclosure Statement any future filings made with the SEC under sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, other than information furnished to the SEC under Items 2.02 or 7.01, or the exhibits related thereto under Item 9.01, of Form 8-K, which information is not deemed filed under the Exchange Act and is not incorporated by reference into this Disclosure Statement.

TABLE OF CONTENTS

**Page**

I. EXECUTIVE SUMMARY ........................................................................................................1

    A.    Overview of this Disclosure Statement and Executive Summary ....................................1

    B.    Purpose and Effect of the Plan ........................................................................................1

    C.    Events Leading to Proposed Restructuring ......................................................................2

    D.    Summary of the Plan ........................................................................................................4

    E.    Summary of Treatment of Claims and Equity Interests and Description of Recoveries under the Plan ....................................................................................................4

    F.    Voting Deadline ..............................................................................................................10

    G.    Procedures for Voting on the Plan ..................................................................................10

    H.    Additional Plan-Related Documents ..............................................................................11

II. SOLICITATION AND VOTING PROCEDURES ................................................................12

    A.    General Provisions ..........................................................................................................12

    B.    Procedures for Casting Ballots ......................................................................................12

III. IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT .................14

IV. RISK FACTORS ...................................................................................................................15

    A.    Risks Relating to Confirmation of the Plan ...................................................................15

    B.    Risks that May Affect the Value of the Securities to Be Issued under the Plan ..............19

    C.    Risks Relating to the Debtors' Businesses .....................................................................20

    D.    Risks Relating to Government Regulations ....................................................................31

    E.    Risks Relating to Forward-Looking Statements ............................................................33

    F.    Risks Relating to Recovery Projections under the Plan ..................................................34

    G.    Disclosure Statement Disclaimer ..................................................................................35

V. THE DEBTORS' HISTORY ..................................................................................................37

    A.    Company Overview ........................................................................................................37

    B.    Business Segments ..........................................................................................................38

    C.    Industry Overview ..........................................................................................................40

    D.    Competition and Marketing ............................................................................................41

    E.    Backlog ..........................................................................................................................42

    F.    Regulation ......................................................................................................................42

    G.    Research and Development ..............................................................................................43

    H.    Properties ........................................................................................................................43

I. Employees ....................................................................................................... 43

J. The Debtors' Organizational Structure ......................................................... 43

K. The Debtors' Pre-petition Capital Structure ................................................. 44

L. Significant Pre-petition Contracts and Leases .............................................. 46

M. Pre-petition Litigation .................................................................................. 46

VI. DESCRIPTION OF THE JOINT PLAN OF REORGANIZATION ......................... 47

A. Overall Structure of the Plan ........................................................................ 47

B. General Rules of Classification ..................................................................... 47

C. Summary of Classification ............................................................................ 48

D. Treatment of Claims and Equity Interests .................................................... 48

E. Treatment of Administrative Expenses and Priority Tax Claims ................. 53

F. Settlement, Release, Injunction, and Related Provisions ............................. 55

G. Vesting of Assets ........................................................................................... 58

H. New Corporate Governance Documents ....................................................... 58

I. Cancellation of Securities, Agreements, and Liens ...................................... 59

J. Directors and Officers of the Reorganized Debtors ...................................... 59

K. Conditions Precedent to Confirmation ......................................................... 59

L. Conditions Precedent to the Effective Date .................................................. 59

VII. MEANS FOR IMPLEMENTATION OF THE PLAN ............................................. 60

A. No Substantive Consolidation ....................................................................... 60

B. Exit Facility ................................................................................................... 61

C. Sources of Consideration for Plan Distributions .......................................... 61

D. Issuance of New Securities ............................................................................ 61

E. Section 1145 Exemption ................................................................................ 62

F. Cancellation of Securities and Agreements .................................................. 62

G. Listing of the New Common Stock and Transfer Restrictions ...................... 63

H. Corporate Existence ...................................................................................... 63

I. New Certificate of Incorporation and New By-laws ..................................... 63

J. Directors and Officers of the Reorganized Debtors ...................................... 63

K. Management Incentive Plan .......................................................................... 64

L. Employee Benefits ......................................................................................... 64

M. Vesting of Assets in the Reorganized Debtors .............................................. 64

N. Restructuring Transactions ........................................................................... 64

O. Corporate Action ........................................................................................... 65

P. Effectuating Documents; Further Transactions ............................................ 65

Q. General Settlement of Claims and Equity Interests ...................................... 65

ii

|    | R. | Section 1146 Exemption from Certain Taxes and Fees | 66 |
|    | S. | D&O Liability Insurance Policies and Indemnification Provisions | 66 |
|    | T. | Preservation of Rights and Causes of Action | 66 |
|    | U. | Compromise of Controversies | 67 |

**VIII. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN** .......... 67

|    | A. | What is Chapter 11? | 67 |
|    | B. | Why are the Debtors sending me this Disclosure Statement? | 67 |
|    | C. | Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is consummated? | 67 |
|    | D. | If the Plan provides that I get a distribution, when do I get it, and what do you mean when you refer to "Confirmation," the "Effective Date," and "consummation"? | 68 |
|    | E. | What is included in the solicitation packages to be sent to creditors who are eligible to vote on the Plan? | 68 |
|    | F. | When is the deadline to vote on the Plan? | 68 |
|    | G. | How do I vote for or against the Plan? | 68 |
|    | H. | What is the effect of Confirmation on the Debtors' ongoing businesses? | 69 |
|    | I. | Do the Debtors recommend voting in favor of the Plan? | 70 |

**IX. DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN** .......... 70

|    | A. | Description of Exit Financing | 70 |
|    | B. | Description of Management Incentive Plan | 70 |

**X. POST-REORGANIZATION CAPITAL STRUCTURE** .......... 71

**XI. APPLICATION OF SECURITIES LAWS** .......... 71

|    | A. | Solicitation of Votes Prior to Commencement of Chapter 11 Cases and Securities Act Section 3(a)(9) | 71 |
|    | B. | Issuance and Resale of Securities under the Plan | 72 |
|    | C. | New Common Stock | 73 |

**XII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** .......... 73

|    | A. | Certain U.S. Federal Income Tax Consequences to the Reorganized Debtors | 74 |
|    | B. | Certain U.S. Federal Income Tax Consequences to the U.S. Holders under the Plan | 76 |
|    | C. | General U.S. Federal Income Tax Consequences to Non-U.S. Holders | 81 |
|    | D. | Importance of Obtaining Professional Tax Assistance | 83 |

**XIII. ANTICIPATED INITIAL MOTIONS OF THE CHAPTER 11 CASES AND CERTAIN RELATED RELIEF** .......... 83

|    | A. | "First-Day" Motions and Related Relief | 84 |
|    | B. | Motion to Schedule Hearing on the Disclosure Statement and Confirmation of the Plan | 85 |

iii

C.    Debtor-in-Possession Financing..................................................................................85

D.    The Claims Process......................................................................................................86

**XIV. CONFIRMATION OF THE PLAN**..........................................................................................86

A.    Requirements for Confirmation of the Plan ...............................................................86

B.    Best Interests of Creditors/Liquidation Analysis ......................................................87

C.    Feasibility/Financial Projections................................................................................87

D.    Acceptance by Impaired Classes................................................................................88

E.    Confirmation Without Acceptance by All Impaired Classes/Fair and Equitable Test...................88

F.    Valuation of the Debtors .............................................................................................89

G.    Effect of Confirmation and Consummation of the Plan .............................................90

**XV. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ...............................................90

A.    Modification and Amendments...................................................................................90

B.    Effect of Confirmation on Modifications ...................................................................90

C.    Revocation or Withdrawal of the Plan .......................................................................90

**XVI. RECOMMENDATION** ....................................................................................................91

## EXHIBITS

EXHIBIT A    Plan

EXHIBIT B    Organizational Chart of the Debtors and their Non-Debtor Affiliates

EXHIBIT C    Liquidation Analysis

EXHIBIT D    Financial Projections

EXHIBIT E    Valuation Analysis

EXHIBIT F    Plan Support Agreement

EXHIBIT G    Term Sheet for New Shareholders Agreement

**THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.**

**I.**
## EXECUTIVE SUMMARY

**THE DEBTORS HAVE NOT COMMENCED CHAPTER 11 CASES UNDER THE BANKRUPTCY CODE. THE DEBTORS ARE SUBMITTING THIS DISCLOSURE STATEMENT TO CERTAIN HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS BECAUSE THE DEBTORS ARE ASKING THOSE HOLDERS OF CLAIMS AND EQUITY INTERESTS TO ACCEPT THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT A, AND WHICH CONTAINS IMPORTANT INFORMATION RELEVANT TO YOUR DECISION WHEN VOTING ON THE PLAN. PLEASE READ THE PLAN COMPLETELY AND CAREFULLY.**

**A.     Overview of this Disclosure Statement and Executive Summary**

Although, as of the date hereof, none of the Debtors are under the jurisdiction of the Bankruptcy Court, the Debtors have commenced solicitation of acceptances with respect to a plan of reorganization. Shortly after the date hereof, the Debtors intend to file voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the **"Bankruptcy Court"**). As set forth in detail in Article XIII of this Disclosure Statement entitled "Anticipated Initial Motions of the Chapter 11 Cases and Certain Related Relief," immediately upon filing, the Debtors will request Bankruptcy Court approval to, among other things, pay employees, critical suppliers, subcontractors, landowners, and certain other vendors their pre-petition claims in the ordinary course of business. It is expected that all of the Debtors' customers will continue to be serviced without interruption. Although the Debtors intend to continue to provide products and services to customers in the normal course, there can be no assurances that counterparties will continue to conduct business with the Debtors while the Debtors are in chapter 11.

With respect to the Plan, and as set forth in detail below, the Debtors are soliciting acceptances from only the Holders of Note Claims and certain Preferred Equity Interests. The deadline for voting to accept or reject the Plan is 12:00 p.m. prevailing Eastern time on March 8, 2013, unless such deadline is extended. In addition, the Debtors intend to request that the Bankruptcy Court consider Confirmation of the Plan at a hearing in March 2013 and hope to exit chapter 11 shortly thereafter. Additional details with respect to Confirmation are provided in Article XIV of this Disclosure Statement, entitled "Confirmation of the Plan." Before soliciting acceptances of a proposed chapter 11 plan of reorganization, Bankruptcy Code section 1125 requires a debtor to prepare a disclosure statement that contains adequate information of a kind, and in sufficient detail, to permit a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization.

This Disclosure Statement contains, among other things, descriptions and summaries of certain provisions of, and financial transactions contemplated by, the Plan being proposed by the Debtors. Certain provisions of the Plan (and the descriptions and summaries contained herein) may be the subject of continuing negotiations among the Debtors and various parties, and therefore may be modified. In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other operative document thereunder, on the other hand, the terms of the Plan and other such operative document(s) are controlling.

This Executive Summary is only a general overview of this Disclosure Statement and the material terms of, and transactions proposed by, the Plan and is qualified in its entirety by reference to, and should be read in conjunction with, the more detailed discussions appearing elsewhere in this Disclosure Statement and the exhibits attached to this Disclosure Statement, including the Plan.

**B.     Purpose and Effect of the Plan**

The Debtors are seeking to reorganize under chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor may reorganize its business for the benefit of its stakeholders. Consummating a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth how a debtor will treat claims against, and equity interests in, the debtor.

A bankruptcy court's confirmation of a plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entity and person as may be ordered by a bankruptcy court to the terms of the confirmed plan, whether or not such creditor or equity security holder is impaired under, or has voted to accept, the plan or receives or retains any property under the plan.

For the Plan to be confirmed by the Bankruptcy Court pursuant to Bankruptcy Code section 1129, at least one class of Impaired Claims must accept the Plan, determined without including votes to accept the Plan cast by "insiders," as that term is defined in Bankruptcy Code section 101(31). A class of claims has accepted a plan if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors that have accepted or rejected such plan. A class of interests has accepted a plan if such plan has been accepted by interest holders that hold at least two-thirds in amount of the allowed interests of such class held by interest holders that have accepted or rejected such plan. The Consenting Noteholders and the Consenting Preferred Equity Holder (which hold over 70% in aggregate principal amount of the Notes and over two-thirds of the Senior Preferred Equity, respectively) support the Plan and have agreed to vote in favor of the Plan.

Even if the requisite classes accept the Plan, the Plan will be confirmed by the Bankruptcy Court only if all other requirements to confirmation are satisfied.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will discharge the Debtors from any debt arising before the Effective Date, substitute the obligations set forth in the Plan for those pre-bankruptcy claims, and terminate all of the rights and interests of pre-bankruptcy equity security Holders. Under the Plan, Claims and Equity Interests are divided into Classes according to their relative priority and other criteria.

Each of the Debtors is a proponent of the Plan within the meaning of Bankruptcy Code section 1129. As described throughout this Disclosure Statement, the Debtors believe that the Plan provides for a comprehensive restructuring of the Debtors' pre-bankruptcy obligations, preserves the going-concern value of Debtors, maximizes recoveries available to all constituents, and provides for an equitable distribution to the Debtors' stakeholders.

In developing the Plan, the Debtors, with the assistance of their professional advisors, conducted a careful review of their current operations, their prospects as ongoing businesses, financial projections included in the business plan developed by management, and estimated recoveries in a liquidation scenario. Following this review, the Debtors concluded that recoveries to the Debtors' stakeholders would be maximized by the Debtors' continued operations as a going concern and by the Debtors' emergence from chapter 11 with the structure proposed in the Plan.

The Company believes that the Debtors' businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part. Consistent with the valuation, liquidation, and other analyses prepared by the Company with the assistance of its advisors (see **Exhibits C, D, and E** attached hereto), the Debtors believe that the value of the Debtors is substantially greater as a going concern than in a liquidation. The Debtors also believe that any alternative to Confirmation, such as an attempt by another party to file a competing plan, would result in significant delays, litigation, and additional costs and could negatively affect the value of the Debtors' estates, which could ultimately lower the recoveries for all Holders of Allowed Claims and Allowed Equity Interests.

## C.    Events Leading to Proposed Restructuring

The following is a general description of factors that ultimately led the Debtors to propose and seek acceptance of a restructuring plan to restructure the Company's liabilities and maximize recoveries to Holders of claims and interests. Prior to solicitation, the Company incurred operating losses primarily due to delays in project commencements, low asset utilization, idle crew costs, and the Mexico liftboat incident (described below in Section V.M(i)), which resulted in serious concerns about the Company's liquidity beginning in 2011 and continuing into 2012. In an effort to address these liquidity issues, the Company's management instituted a number of steps, including the decision to close certain regional offices, sell certain non-core assets, and exit certain operations around the world where the long-term prospects for profitability were not in line with the Debtors' business goals.

Additionally, in 2011, the Company began working with a financial advisor regarding a possible right-sizing of the Company's capital structure, and management began focusing on improving liquidity by giving priority to generating cash flows while maintaining long-term commitments to providing high quality seismic data acquisition services. These actions included:

- the May 31, 2012 appointment of David Crowley as the President and Chief Operating Officer of GOK and his subsequent appointment as Chief Executive Officer on November 9, 2012;

- a focus on cost reductions;

- the rationalization of operating locations resulting in the decision to close some of the Company's Africa and Middle East regional offices and operations;

- the identification of additional assets for potential sale, including the sale of certain North American seismic data described below;

- the centralization of bidding and management services processes to provide a higher level of control over costs; and

- a focus on bidding for seismic acquisition services under careful consideration of required capital expenditures for additional equipment on the restrictions in cash required for bid or posting of performance or bid bonds.

In furtherance of the above, on March 15, 2012, GOK entered into an agreement to sell certain North American seismic data to Seismic Exchange, Inc. (*"SEI"*) for $10 million in cash, which closed on March 31, 2012. The data sold included 4,751 miles of 3D data and 644 linear miles of 2D data. In connection with this sale, GOK retained the right to receive 75% of the new revenues generated and collected on this seismic data until the earlier of such time as GOK receives $2.0 million or March 7, 2017. If GOK receives $2.0 million prior to March 7, 2017, then GOK will thereafter receive 50% of the net revenues generated from the applicable seismic data until March 7, 2017.

Despite the best efforts of the Company and its management, the Company's financial position continued to deteriorate during the third quarter of 2012. Consequently, with the assistance of its legal and financial advisors, during the fourth quarter of 2012, the Company entered into discussions with the Credit Facility Lenders, certain Holders of the Notes, and certain Holders of the Preferred Equity Interests regarding the restructuring of the Debtors' balance sheet. The parties were initially unable to reach an agreement regarding a consensual restructuring, and a confidentiality agreement terminated on or about December 14, 2012.

Around this same time, on December 17, 2012, GOK announced that it had elected not to make the approximately $14.6 million interest payment on the Notes that was due on December 15, 2012 and to operate under the 30-day grace period provided for in the Notes Indenture. The Company utilized the 30-day grace period to continue negotiations with its stakeholders and prepare for an in-court restructuring, which focused on a balance sheet restructuring designed to minimize the impact on operations.

To avoid contested and lengthy chapter 11 cases, the Debtors reengaged with (i) the Debtors' Credit Facility Lenders, (ii) Holders of in excess of 70% in aggregate principal amount of the Notes and (iii) the Holders of over two-thirds of the Senior Preferred Equity Interests to develop a chapter 11 plan that would pay the claims of the Credit Facility Lenders in full, in Cash, while providing the best possible distribution to the Debtors' other stakeholders and achieving the Debtors' stated goals. These parties engaged in constructive dialogue with the Debtors regarding potential structures for a comprehensive balance sheet restructuring, and after intensive good-faith and arms-length negotiations, certain parties and the Debtors reached an understanding. As a result, on January 15, 2013, the Debtors entered into the Plan Support Agreement with the Consenting Noteholders and the Consenting Preferred Equity Holder, which was subsequently amended on February 4, 2013. Under the terms of the Plan Support Agreement, the Debtors agreed to implement a financial restructuring of the Debtors, and the other parties to the Plan Support Agreement agreed to support and vote for either a pre-packaged or pre-negotiated plan of reorganization, in either case in accordance with the terms, and subject to the conditions, set forth in the Plan Support Agreement. The Plan reflects the agreements reached in connection with the Plan Support Agreement.

3

**D.      Summary of the Plan**

        The Plan provides that the Debtors will (i) repay $50 million in loans plus accrued interest outstanding under the Credit Facility from the proceeds of an Exit Facility, (ii) exchange the Notes for 100% of the New Common Stock, subject to dilution from the Management Incentive Plan and the DIP Equity Distribution, (iii) pay general unsecured claims in full either at the conclusion of the Chapter 11 Cases or in the ordinary course of business, and (iv) pursuant to the terms of the settlement embodied in the Plan Support Agreement among the Debtors, the Consenting Noteholders and the Consenting Preferred Equity Holder, make a cash payment to the Holders of the Senior Preferred Stock and cancel all of the Preferred Stock.  The existing Holders of Junior Preferred Equity Interests and the GOK Common Stock will not receive any distributions and their equity interests will be cancelled.  In addition, under the Plan, the Consenting Noteholders agreed to backstop the DIP Facility.  The Debtors intend to use up to $25 million of the DIP Facility, subject to certain conditions and availability, to fund the Debtors' working capital needs and general corporate purposes, including costs related to the Chapter 11 Cases, and for such other purposes as agreed by the Debtors and Backstop DIP Lenders.

        The Plan represents a settlement and consensual arrangement among the Debtors' significant creditor and equity constituencies.  Based on the valuation analysis prepared by the Debtors with the assistance of its advisors, the value of the Debtors is not sufficient to provide a full recovery to the Holders of Notes.  The Debtors have determined that the value of the New Common Stock that will be distributed on account of the Note Claims is approximately $224 million prior to any dilution from the DIP Equity Distribution, while the aggregate amount of the Notes outstanding is $300 million in principal, plus accrued and unpaid interest.  However, the Debtors and the Consenting Noteholders believe that a fully consensual and expedited Chapter 11 Cases are in the best interest of the Debtors and their stakeholders and will maximize the value and recoveries to be distributed to stakeholders.  Further, the Debtors and the Consenting Noteholders agree that in order to preserve and protect the Debtors' present and future operations, it is critical that trade creditors, vendors, suppliers and customers are unimpaired by and experience minimal interruption during the Chapter 11 Cases.  Therefore, in exchange for a fully consensual chapter 11 process, the Consenting Noteholders have agreed to support the settlement and compromise set forth in the Plan Support Agreement which provides for trade and other Unsecured Claims to be unimpaired and for the Senior Preferred Equity Holders to receive a cash payment.

**ACCORDINGLY, FOR ALL OF THESE REASONS AND FOR THE OTHER REASONS DESCRIBED IN THIS DISCLOSURE STATEMENT, THE DEBTORS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BEFORE THE VOTING DEADLINE.**

**E.      Summary of Treatment of Claims and Equity Interests and Description of Recoveries under the Plan**

        *(i)      Summary of Classification of Claims and Equity Interests under the Plan*

        The Plan organizes the Debtors' creditor and equity constituencies into groups called "Classes."  For each Class, the Plan describes, among other things, (a) the underlying Claim or Equity Interest, (b) the recovery available to the Holders of Claims or Equity Interests in that Class under the Plan, (c) whether the Class is "impaired" under the Plan, meaning that each Holder will receive less than the full value on account of its Claim or Equity Interest or that the legal rights of Holders will be altered in some way (such as receiving stock instead of holding a Claim), and (d) the form of consideration (e.g., cash, stock, or a combination thereof), if any, that such Holders will receive on account of their respective Claims or Equity Interests.

        The table below provides a description and summary of the classification of Claims and Equity Interests under the Plan.  Except for the Priority Claims and Administrative Expenses addressed in Section II.A of the Plan, all Claims and Interests against a particular Debtor are placed in classes for each of the Debtors (as designated by subclasses a through j for each of the ten Debtors).[3]  This information is provided in summary form below for

---

        [3] Specifically, such subclasses represent Claims against and Equity Interests in the Debtors as follows: GOK (subclass a), GOK Holdings (subclass b), GOK Services (subclass c), GOK Processing (subclass d), GOK Acquisition (subclass e), GOK USA (subclass f), GOK Intl Holdings (subclass g), GOK Management (subclass h), GOK International (subclass i), and AST (subclass j).

illustrative purposes only and is qualified in its entirety by reference to the provisions of the Plan. For a more detailed description of the treatment of Claims and Equity Interests under the Plan, see Article VI of this Disclosure Statement, entitled "Description of the Joint Plan of Reorganization."

| Class | Name of Class | Status | Description of Class |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Class 1 consists of Other priority Claims against each Debtor |
| 2 | Other Secured Claims | Unimpaired | Class 2 consists of Other Secured Claims against each Debtor |
| 3 | Credit Facility Claims | Unimpaired | Class 3 consists of Credit Facility Claims against GOK Holdings |
| 4 | Note Claims | Impaired | Class 4 consists of the Note Claims against GOK Holdings |
| 5 | Unsecured Claims | Unimpaired | Class 5 consists of Unsecured Claims against each Debtor |
| 6 | Intercompany Claims | Unimpaired | Class 6 consists of Intercompany Claims against each Debtor |
| 7 | Senior Preferred Equity Interests | Impaired | Class 7 consists of Senior Preferred Equity Interests in GOK |
| 8 | Junior Preferred Equity Interests | Impaired | Class 8 consists of Junior Preferred Equity Interests in GOK |
| 9a | Other Equity Interests in GOK | Impaired | Class 9a consists of Other Equity Interests in GOK |
| 9b-9j | Other Equity Interests in Remaining Debtors | Unimpaired | Class 9b-9j consists of the Other Equity Interests in each subsidiary Debtor |

In addition to the Classes identified above, as provided for under the Bankruptcy Code, the Plan provides for recoveries to certain types of Claims that are not separately classified under the Plan, as follows:

**Allowed Administrative Expenses and Allowed Priority Tax Claims.** Administrative Expenses include any right to payment constituting a cost or expense of administration of the Debtors' Chapter 11 Cases of the kind specified in Bankruptcy Code section 503(b). Priority Tax Claims include any Claim that is entitled to priority of payment under Bankruptcy Code section 507(a)(8).

**Allowed DIP Claims.** DIP Claims include Claims derived from or based upon the DIP Loan Agreement, including, without limitation, Claims for principal, interest, fees, and expenses, and claims with respect to the DIP Borrowing Obligations, DIP Interest Obligations and DIP Agent Fee.

**Payment of Statutory Fees.** Statutory fees include all U.S. Trustee quarterly fees payable under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717, on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' businesses until the entry of an order closing the Chapter 11 Cases pursuant to Bankruptcy Code section 350(a), dismissal of the Chapter 11 Cases, or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

Under the Plan, Holders of allowed Administrative Expenses, Allowed Priority Tax Claims, Allowed DIP Claims, and all statutory fees will be paid in full in Cash or will otherwise be left Unimpaired or granted such other treatment as agreed between the Debtors and the applicable creditor, all as further provided in Article II of the Plan and Article VI of this Disclosure Statement.

      (ii)    *Summary of Treatment, Estimated Range of Recoveries, and Voting Rights of Claims and Equity Interests under the Plan*

As described in further detail in the table below, the Plan provides that Holders of Allowed Unsecured Claims will retain their legal, equitable, and contractual rights or, if due and payable, will receive Cash equal to the amount of the Allowed Unsecured Claims in full satisfaction of their Claims, and that Holders of Senior Preferred Equity Interests in Class 7 will receive their Pro Rata share of $6 million Cash. The remaining value of the Reorganized Debtors (subject to dilution for a Management Incentive Plan and the DIP Equity Distribution) will be transferred to the Holders of Note Claims in the form of New Common Stock of Reorganized GOK. After taking into account the value to be distributed to unsecured creditors, the Debtors have determined that the value of the New Common Stock that will be distributed on account of the Note Claims is approximately $224 million prior to any dilution from the DIP Equity Distribution, while the aggregate amount of the Notes outstanding is $300 million in principal, plus accrued and unpaid interest. Although there is insufficient value in the Debtors' estates to provide the Holders of Unsecured Claims and Senior Preferred Equity Interests with a recovery, the Debtors and the Consenting Noteholders agree that to preserve and protect the value of the Debtors' businesses both during and after the Chapter 11 Cases, which will directly impact the value of the New Common Stock, the Debtors should render Holders of Unsecured Claims unimpaired and provide a recovery to Holders of the Senior Preferred Equity Interests in the nature of a settlement in exchange for a fully consensual and expedited chapter 11 process. Such distribution should not be construed as an admission by the Debtors or the Consenting Noteholders that the value of the Reorganized Debtors exceeds the value of the Note Claims.

The table below summarizes the classification, status, voting rights, treatment, and estimated range of recoveries of classified Claims and Equity Interests under the Plan. These summaries are described in the form below for illustrative purposes only and are qualified in their entirety by reference to the provisions of the Plan. The projected range of Unsecured Claims in this Disclosure Statement is based on anticipated Claims of certain parties against the Debtors' estates.

For a more detailed description of the treatment of Claims and Equity Interests under the Plan, see Article VI of this Disclosure Statement, entitled "Description of the Joint Plan of Reorganization."

**THE ESTIMATED PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ONLY ESTIMATES AND ARE THEREFORE SUBJECT TO CHANGE.**

**SUMMARY OF STATUS, TREATMENT, AND RECOVERY**

| Class | Status | Voting Rights | Plan Treatment of Class | Estimated Recovery | Estimated Amount of Claims |
|-------|--------|---------------|-------------------------|--------------------|----------------------------|
| 1 | Unimpaired | No (presumed to accept) | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the option of the Debtors and acceptable to the Majority Noteholders, be paid: (i) in | 100% | $0 |

| | | | | | |
|---|---|---|---|---|---|
| | | | Cash in an amount sufficient to render such Other Priority Claim unimpaired under Bankruptcy Code section 1124 on the later of (x) the Effective Date (or as soon as is reasonably practicable thereafter), or (y) the first Distribution Date after such Other Priority Claim becomes an Allowed Other Priority Claim, or (ii) on such other terms and conditions as may be agreed between the Holder of such Allowed Other Priority Claim and the Debtors and acceptable to the Majority Noteholders, provided, however, that Allowed Other Priority Claims representing obligations incurred in the ordinary course will be paid in full by the Debtors or Reorganized Debtors consistent with past practice. | | |
| 2 | Unimpaired | No (presumed to accept) | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Other Secured Claim, at the option of the Debtors and acceptable to the Majority Noteholders, on the Effective Date, (i) be paid in Cash in full on the earlier of (x) the Effective Date (or as soon as is reasonably practicable thereafter), or (y) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim; (ii) be paid in Cash on such other terms and conditions as may be agreed between the Holder of such Allowed Other Secured Claim and the Debtors (with the consent of the Majority Noteholders); (iii) the legal, equitable and contractual rights to which the Other Secured Claim entitles the Holder of such Claim will remain unaltered, and the Holder of such Claim shall retain any Liens and/or security interests securing such Claim, or (iv) the Debtors will provide other treatment that will render such Other Secured Claim Unimpaired under Bankruptcy Code section 1124. | 100% | $0 |
| 3 | Unimpaired | No (presumed to accept) | To the extent not satisfied prior to the Effective Date, and except to the extent that the Debtors, with the | 100% | $50,000,000 (plus accrued and unpaid |

7

| | | | | | |
|---|---|---|---|---|---|
| | | | consent of the Majority Noteholders, and a Holder of an Allowed Credit Facility Claim otherwise agree, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Credit Facility Claim, each Holder of an Allowed Credit Facility Claim shall be paid in Cash on the Effective Date (or as soon as is reasonably practicable thereafter) in an amount equal to such Credit Facility Claim, including all interest that may have accrued on account of such Allowed Credit Facility Claim as determined by the Bankruptcy Court. | | interest)[4] |
| 4 | Impaired | Yes | The Note Claims are Allowed. Except to the extent that the Debtors, with the consent of the Majority Noteholders, and a Holder of an Allowed Note Claim agrees to less favorable treatment, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Note Claim, each Holder of an Allowed Note Claim shall receive its Pro Rata share of the Class 4 Distribution on the Effective Date (or as soon as is reasonably practicable thereafter). | 70% | $300,000,000.00 (plus accrued and unpaid interest) |
| 5 | Unimpaired | No (presumed to accept) | Except to the extent that a Holder of an Allowed Unsecured Claim agrees to a less favorable treatment, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Unsecured Claim, (i) the legal, equitable and contractual rights to which the Allowed Unsecured Claim entitles the Holder of such Claim will remain unaltered, or (ii) if such Allowed Unsecured Claim is due and payable on or before the Effective Date, the Holder of such Allowed Unsecured Claim shall receive, payment in Cash in an amount | 100% | $9,086,579.23 - $13,239,148.30[5] |

---

[4] Plus any additional amounts Allowed by the Bankruptcy Court.

[5] The estimated range of Claims in Class 5 is based on the Debtors' best estimate of Claims against each Debtor. The high end of the range represents all Claims expected to be scheduled by the Debtors, including contingent, unliquidated, and disputed claims, and the low end of the range represents all Claims that the Debtors do not expect to dispute. The Debtors will evaluate whether claim objections may be appropriate that would reduce the estimated amount of Claims.

8

| | | | sufficient to render such Allowed Unsecured Claim Unimpaired under Bankruptcy Code section 1124, on the later of (x) the Effective Date (or as soon as is reasonably practical thereafter) or (y) the first Distribution Date after such Unsecured Claim becomes an Allowed Unsecured Claim. For avoidance of doubt, if an Unsecured Claim is not due and payable before the Effective Date, the Holder of such Unsecured Claim may be paid in the ordinary course of business consistent with past practices. | | |
|---|---|---|---|---|---|
| 6 | Unimpaired | No (presumed to accept) | Except to the extent that a Holder of an Allowed Intercompany Claim agrees to a less favorable treatment acceptable to the Majority Noteholders, in full satisfaction, settlement, release, and discharge of, and exchange for such Allowed Intercompany Claim, on the Effective Date the legal, equitable and contractual rights to which the Intercompany Claim entitles the Holder of such Claim will remain unaltered and treated in the ordinary course of business. | 100% | $269,486,241.52 |
| 7 | Impaired | Yes | Except to the extent that the Debtors, with the consent of the Majority Noteholders, and a Holder of an Allowed Senior Preferred Equity Interest in Class 7 agrees to less favorable treatment, in full satisfaction, settlement, release, and discharge of, any in exchange for such Allowed Senior Preferred Equity Interest, on the Effective Date (or as soon as is reasonably practicable thereafter) each Holder of an Allowed Senior Preferred Equity Interest shall receive its Pro Rata share of the Class 7 Distribution. | 4% | $141 million |
| 8 | Impaired | No (presumed to reject) | On the Effective Date, all Junior Preferred Equity Interests in Class 8 shall be deemed cancelled and extinguished, and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the Holders of Junior | 0% | N/A |

| | | | Preferred Equity Interests in Class 8. | | |
|---|---|---|---|---|---|
| 9a | Impaired | No (presumed to reject) | On the Effective Date, all Other Equity Interests in Class 9a shall be deemed cancelled and extinguished, and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the Holders of Other Equity Interests in Class 9a. | 0% | N/A |
| 9b-9j | Unimpaired | No (presumed to accept) | On the Effective Date, the legal, equitable and contractual rights to which the Subsidiary Debtor Other Equity Interests entitles the Holder of such Interest will remain unaltered. | 0% | N/A |

**F.    Voting Deadline**

The deadline to vote on the Plan is 12:00 p.m. (prevailing Eastern time) on March 8, 2013 (the "*Voting Deadline*").

**G.    Procedures for Voting on the Plan**

This Disclosure Statement, accompanied by a ballot to be used for voting on the Plan, is being distributed to those Holders of Claims and Equity Interests entitled to vote on the Plan. Accordingly, if you are a Holder of Claims or Equity Interests in Classes 4 or 7, you may vote for or against the Plan by completing the ballot and returning it in the envelope provided in accordance with the instructions provided on the ballot and in the procedures for casting ballots set forth in Section II.B herein.

The Debtors have engaged GCG to serve as the voting agent for claims and generally oversee the voting process (the "*Voting and Claims Agent*"). The Voting and Claims Agent will also process and tabulate ballots for each Class entitled to vote to accept or reject the Plan. The Voting and Claims Agent is overseeing the processing of votes and is not soliciting votes.

| **DELIVERY OF BALLOTS** |
| --- |
| Ballots must be **actually** **received** by the Voting and Claims Agent by the Voting Deadline of 12:00 p.m. (prevailing Eastern time) on March 8, 2013, provided that Holders of Note Claims who hold Claims through a Nominee must deliver their Note Ballot to such Nominee to provide sufficient time for the Nominee to compile and submit a Master Ballot to the Voting and Claims Agent on or before the Voting Deadline. |

Master Ballots and Ballots of Holders of Preferred Equity Interests must be delivered to the Voting and Claims Agent at the following addresses:

*Voting and Claims Agent:*

Correspondence sent via U.S. mail should be sent to:

GOK Case Administration
c/o GCG
P.O. Box 9956
Dublin, OH 43017-5956

Correspondence sent by hand delivery or overnight courier should be sent to:

GOK Case Administration
c/o GCG
5151 Blazer Parkway, Suite A
Dublin, OH 43017

The Voting and Claims Agent will **not** accept ballots submitted by facsimile or electronic means.

\* \* \* \* \* \* \*

If you have any questions on the procedure for voting on the Plan, please call the Voting and Claims Agent at the following telephone number:

(800) 761-8709

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to those Holders of Claims and Equity Interests that are entitled to vote on the Plan, as well as the procedures for casting ballots set forth in Section II.B herein. For your vote to be counted, your ballot must be completed, signed and **actually received** by the Voting and Claims Agent by 12:00 p.m. (prevailing Eastern Time) on the Voting Deadline, March 8, 2013, provided that Holders of Note Claims who hold Claims through a Nominee must deliver their Note Ballot to such Nominee to provide sufficient time for the Nominee to compile and submit a Master Ballot to the Voting and Claims Agent on or before the Voting Deadline.

Any ballot that is properly executed by the Holder of a Claim or Equity Interest, but that does not clearly indicate either an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan, will not be counted.

Each Holder of a Claim or Equity Interest may cast only one ballot for each Claim and each Equity Interest held. It is important to follow the specific instructions provided on each ballot. For information regarding voting, see the Article II of this Disclosure Statement entitled "Solicitation and Voting Procedures," which begins on page 12.

**H.     Additional Plan-Related Documents**

The Debtors will file the Plan Supplement with the Bankruptcy Court at least 7 days prior to the Confirmation Hearing, or such later date as may be approved by the Bankruptcy Court. The Voting and Claims Agent will serve the master service list with a notice that will inform parties that the Plan Supplement was filed, will list the information included therein, and will explain how copies of the Plan Supplement may be obtained. The Plan Supplement will include a compilation of documents and forms of documents, schedules, and exhibits to the Plan to be filed by the Debtors, including (a) the New Corporate Governance Documents; (b) the identity of the

11

known members of the New Boards and the nature and compensation for any director who is an "insider" under the Bankruptcy Code; (c) the Rejected Executory Contract and Unexpired Lease List; (d) the New Employment Agreements, if any; (e) the Exit Financing Term Sheet; (f) a description of the Restructuring Transactions; and (g) all exhibits, attachments, supplements, annexes, schedules, and ancillary documents related to each of the foregoing.

**THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE BANKRUPTCY CODE, INCLUDING SECTIONS 524 AND 1141 THEREOF, AND BY ALL OTHER APPLICABLE LAW.**

## II.
## SOLICITATION AND VOTING PROCEDURES

The following instructions are for voting to accept or reject the Plan, together with the instructions contained in the ballots for use by (a) Holders of Senior Preferred Equity Interests entitled to vote to accept or reject the Plan (the "*Senior Preferred Equity Ballots*"); (b) the beneficial owners of publicly traded securities who hold claims against the Debtors that are entitled to vote to accept or reject the Plan and hold such security through a bank or brokerage firm (each, together with the agent, if any, therefor, a "*Nominee*") maintaining a position through an account at the Depository Trust Company or other relevant security depository and/or applicable indenture trustee as of the Voting Record Date (the "*Note Ballots*"); and (c) the Nominees (the "*Master Note Ballots*" and together with the Senior Preferred Equity Ballots and the Note Ballots, the "*Ballots*").

To vote on the Plan, you must be a beneficial Holder of a Class 4 Note Claim or a Class 7 Senior Preferred Equity Interest as of the Voting Record Date. To vote, you must fill out and sign a Ballot (if you are not a Nominee) or Master Ballot (if you are a Nominee) enclosed herewith.

**For votes to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and delivered by first-class mail, overnight courier, or personal delivery to the Voting and Claims Agent; provided that Holders of Note Claims who hold Claims through a Nominee must deliver their Note Ballot to such Nominee to provide sufficient time for the Nominee to compile and submit a Master Ballot to the Voting and Claims Agent on or before the Voting Deadline. Ballots must actually be received by the Voting and Claims Agent by the Voting Deadline.**

A.    **General Provisions**

After carefully reviewing this Disclosure Statement and its exhibits, including the Plan, please indicate your acceptance or rejection of the Plan by completing the enclosed Ballot. Ballots should be returned to your Nominee or the Voting Agent as directed below.

If you did not receive a Ballot and you believe you are entitled to vote on the Plan, or if a Ballot is damaged or lost or if you have any questions regarding the procedures for voting on the Plan, you should contact the Voting and Claims Agent: (a) at www.GOKRestructuring.com; (b) by writing to GOK Case Administration, c/o GCG, Inc., P.O. Box 9956, Dublin, Ohio 43017-5956;[6] (c) by calling (800) 761-8709; or (d) by emailing GeokineticsInfo@gcginc.com.

B.    **Procedures for Casting Ballots**

**Please be advised that the Plan contains certain release, exculpation, and injunction provisions, which are found in Article IX of the Plan. You are advised and encouraged to carefully review and consider**

---

[6] Correspondence sent by hand delivery or overnight courier should be sent to: GOK Case Administration, c/o GCG, Inc., 5151 Blazer Parkway, Suite A, Dublin, Ohio 43017.

the Plan, including the release, exculpation, and injunction provisions, as your rights may be affected. If you do not wish to grant the releases contemplated by Section IX.A(ii) of the Plan, you should indicate such an election by checking the "Opt Out of the Releases" box on the Ballot. If you submit your Ballot without checking either the "Opt Out of the Releases" box or the "Not Opt Out of the Releases" box, then you will be deemed to consent to the releases contemplated by Article IX of the Plan.

(i)       *Note Ballots*

If you are the Holder of a Note that is held by a Nominee or registered in "street name," please complete the information requested on the Note Ballot, and return the Note Ballot to your Nominee in sufficient time for your Nominee to then forward your vote to the Voting and Claims Agent so that it is actually received by the Voting and Claims Agent on or before the Voting Deadline. To ensure your Nominee has sufficient time to cast your vote on your behalf, it is important that your Note Ballot be mailed or delivered to your Nominee well in advance of the Voting Deadline. If you are the Holder of a Note that is not held by a Nominee or registered in "street name," please complete the information requested on the Note Ballot, and return the Note Ballot to the Voting and Claims Agent at the address provided on the Note Ballot so that it is actually received by the Voting and Claims Agent before the Voting Deadline. Any Note Ballot or Master Note Ballot received after the Voting Deadline will not be included in any calculation to determine whether the parties entitled to vote on the Plan have voted to accept or reject the Plan.

If a Holder of a Note Claim casts more than one Note Ballot voting on the same Note Claim before the Voting Deadline, the Note Ballot which bears the latest date of receipt by the Voting and Claims Agent will supersede any prior Ballot. Holders of Note Claims must vote all of their Note Claims within a particular class to accept or reject the Plan and may not split their votes. A Note Ballot that partially rejects and partially accepts the Plan will not be counted. A Note Ballot that does not indicate an acceptance or rejection of the Plan or that indicates both an acceptance and rejection of the Plan will not be counted. Any Note Ballots or Master Note Ballots that are submitted after the Voting Deadline, illegible, submitted by a Holder of a claim or interest that is not entitled to vote on the Plan, unsigned, or not clearly marked, shall not be counted.

**The Voting and Claims Agent will not accept Ballots by facsimile or other means of electronic transmission.**

(ii)      *Senior Preferred Equity Ballots*

If you are the Holder of a Senior Preferred Equity Interest, please complete the information requested on the Senior Preferred Equity Ballot, and return the Senior Preferred Equity Ballot to the Voting and Claims Agent at the address provided on the Senior Preferred Equity Ballot so that it is actually received by the Voting and Claims Agent on or before the Voting Deadline. If a Holder of a Preferred Equity Interest casts more than one Senior Preferred Equity Ballot voting the same Preferred Equity Interest before the Voting Deadline, the Senior Preferred Equity Interest Ballot which bears the latest date of receipt by the Voting and Claims Agent shall supersede any prior Ballot. Holders of Preferred Equity Interests must vote all of their Equity Interests within a particular class to accept or reject the Plan and may not split their votes. A Senior Preferred Equity Ballot that partially rejects and partially accepts the Plan will not be counted. A Senior Preferred Equity Ballot that does not indicate an acceptance or rejection of the Plan or that indicates both an acceptance and rejection of the Plan will not be counted. Senior Preferred Equity Ballots that are submitted after the Voting Deadline, illegible, submitted by a Holder of a claim or interest that is not entitled to vote on the Plan, unsigned, or not clearly marked, shall not be counted.

**The Voting and Claims Agent will not accept Ballots by facsimile or other means of electronic transmission.**

(iii)     *Master Note Ballots*

A Nominee should transmit a Note Ballot with a copy of this Disclosure Statement and the Plan to each beneficial owner of Notes held in the name of such Nominee as of the Voting Record Date. A Nominee should deliver the Note Ballot to each beneficial owner, along with the Disclosure Statement and other materials requested to be forwarded in the Master Note Ballot, and take the necessary actions to enable such beneficial owner to (i)

13

complete and execute such Note Ballot voting to accept or reject the Plan with respect to its Claim(s) and electing to opt or not to opt out of the releases set forth in Article IX of the Plan and (ii) return the completed, executed Note Ballot to the Nominee in sufficient time to enable the Nominee to complete the Master Note Ballot and deliver it to the Voting and Claims Agent on or before the Voting Deadline. Each Nominee should complete and submit the Master Note Ballot in accordance with the instructions contained in the Master Note Ballot.

Any Master Note Ballot received after the Voting Deadline will not be included in any calculation to determine whether the parties entitled to vote on the Plan have voted to accept or reject the Plan. Any Note Ballots or Master Note Ballots that are submitted after the Voting Deadline, illegible, submitted by a Holder of a claim or interest that is not entitled to vote on the Plan, unsigned, or not clearly marked, shall not be counted.

**The Voting and Claims Agent will not accept Ballots by facsimile or other means of electronic transmission.**

All Note Ballots must be forwarded (along with the Nominee's Master Note Ballot) to the Voting and Claims Agent or retained in the Nominee's files for one year from the Voting Deadline and be made available for inspection upon written request by the Debtors. If a Nominee requires additional copies of this Disclosure Statement or Note Ballots, it should contact the Voting and Claims Agent: (a) at www.GOKRestructuring.com; (b) by writing to GOK Case Administration, c/o GCG, Inc., P.O. Box 9956, Dublin, Ohio 43017-5956;[7] (c) by calling (800) 761-8709; or (d) by emailing GeokineticsInfo@gcginc.com.

## III.
## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides important information regarding the Debtors' Plan, which the Debtors intend to seek to have confirmed by the Bankruptcy Court. The purpose of this Disclosure Statement is to provide sufficient information about the Debtors and about treatment of Claims and Interests under the Plan, including a description of the securities to be issued under the Plan in satisfaction of certain Claims, to enable the Holders of Impaired Claims against the Debtors to make an informed decision with respect to acceptance or rejection of the Plan. Each Holder of a Claim or Equity Interest or other party in interest is urged to carefully consider the Plan and this Disclosure Statement in their entirety and to consult with legal or other available counsel, if necessary, to understand the Plan and its effects, including possible tax consequences, before voting.

The Company believes that the Plan is in the best interests of all stakeholders. The Company urges all Holders of Claims and Equity Interests who are entitled to vote on the Plan to vote in favor of the Plan.

The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between the summary provided in this Disclosure Statement and the Plan, the Plan will govern.

The Debtors are submitting this Disclosure Statement in accordance with Bankruptcy Code section 1125 for the purposes of soliciting acceptances with respect to, and Confirmation of, the Plan. The Disclosure Statement and the information it contains may not be relied on for any other purpose. The Company believes that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to those documents.

No representations concerning the Company or the value of the Company's property have been authorized by the Company other than as set forth in this Disclosure Statement. Any other information, representations, or inducements made to obtain acceptance of the Plan should not be relied on by any Holder of a Claim or Equity Interest entitled to vote on the Plan.

---

[7] Correspondence sent by hand delivery or overnight courier should be sent to: GOK Case Administration, c/o GCG, Inc., 5151 Blazer Parkway, Suite A, Dublin, Ohio 43017.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been, and will not be, audited or reviewed by the Company's independent auditors unless explicitly stated otherwise herein.

For additional information about the Debtors' business operations, please refer to the introductory section entitled "Questions and Additional Information" beginning on page iv above.

## IV.
## RISK FACTORS

Holders of Claims and Equity Interests should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith, referred to or incorporated by reference herein, before voting to accept or reject the Plan. Although these risk factors are many, they should not be regarded as constituting the only risks present in connection with the Company's businesses or the Plan and its implementation. For purposes of the disclosure in this Article IV, references to the "Debtors" shall be read to include the Debtors together with their non-Debtor Affiliates, as the context requires.

A.      **Risks Relating to Confirmation of the Plan**

      (i)      *General*

The filing of bankruptcy petitions by the Debtors and the publicity attendant thereto may affect the Company's businesses adversely. Although the Debtors do not anticipate a protracted bankruptcy case, any such adverse effects may worsen during the pendency of a protracted bankruptcy case if the Plan is not timely confirmed and consummated as expected.

      (ii)     *Method of Solicitation*

Bankruptcy Code section 1126(b) provides that the holder of a claim against, or interest in, a debtor who accepts or rejects a plan of reorganization before the commencement of a chapter 11 case is deemed to have accepted or rejected such plan under the Bankruptcy Code so long as the solicitation of such acceptance was made in accordance with applicable non-bankruptcy law governing the adequacy of disclosure in connection with such solicitations, or, if such laws do not exist, such acceptance was solicited after disclosure of "adequate information," as defined in Bankruptcy Code section 1125.

In addition, Bankruptcy Rule 3018(b) states that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code shall not be deemed to have accepted or rejected the plan if the court finds that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with Bankruptcy Code section 1126(b).

To satisfy the requirements of Bankruptcy Code section 1126(b) and Bankruptcy Rule 3018(b), the Debtors are attempting to deliver this Disclosure Statement to all Holders of Notes and Senior Preferred Equity Interests as of the Voting Record Date. In that regard, the Debtors believe that the solicitation of votes to accept or reject the Plan is proper under applicable non-bankruptcy law, rules, and regulations. The Debtors cannot be certain, however, that their solicitation of acceptances or rejections will be approved by the Bankruptcy Court and, if such approval is not obtained, the confirmation of the Plan could be denied. If the Bankruptcy Court were to conclude that the Debtors did not satisfy the solicitation requirements, then the Debtors may seek to resolicit votes to accept or reject the Plan or to solicit votes to accept or reject the Plan from one or more Classes that were not previously solicited. The Debtors cannot provide any assurances that such a resolicitation would be successful.

      (iii)    *The Debtors May Not Be Able to Obtain Confirmation of the Plan*

To emerge successfully from chapter 11 as viable businesses, the Debtors, like any debtor, must obtain approval of a plan of reorganization and thereafter confirm and successfully implement the Plan. This process

requires the Debtors to (a) meet certain statutory requirements concerning the adequacy of disclosure with respect to any proposed plan, (b) solicit and obtain creditor acceptances of the proposed plan, and (c) fulfill other statutory conditions with respect to plan confirmation.

With regard to any proposed plan of reorganization, the Debtors may not receive the requisite acceptances to confirm the Plan. If the requisite acceptances of the Plan are received, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court, notwithstanding the dissent of certain Classes of Claims or Equity Interests pursuant to Bankruptcy Code section 1129(b).

The Debtors believe that seeking relief under the Bankruptcy Code other than in connection with the pre-packaged Plan, which is the plan that is the result of negotiations among the Debtors, the Consenting Noteholders and the Consenting Preferred Equity Holder, and which will be solicited prior to the filing of the Chapter 11 Cases and will therefore be "prepackaged," could materially and adversely affect the relationship between the Debtors and their existing and potential customers, employees, partners and other stakeholders. For example:

- such a filing may substantially erode customers' confidence and that as a result there could be a significant and precipitous decline in global revenues, profitability and cash flow;

- employees could be distracted from performance of their duties, or more easily attracted to other career opportunities;

- it may be more difficult to attract or replace key employees;

- lenders and other partners could seek to terminate their relationships with the Company, require financial assurances or enhanced returns, or refuse to provide credit on the same terms as prior to the reorganization case under chapter 11 of the Bankruptcy Code or at all;

- lenders to subsidiaries that are not subject to the bankruptcy proceedings could, in certain cases, terminate financing agreements, accelerate amounts due thereunder or otherwise claim an event of default has occurred thereunder;

- the Debtors could be forced to operate in bankruptcy for an extended period of time while they try to develop a reorganization plan that could be confirmed;

- if the Debtors were unable to obtain debtor in possession financing during the Chapter 11 Cases, the Debtors may need to consider liquidation under chapter 7 of the Bankruptcy Code;

- if the Debtors were not able to confirm and implement a plan, the Debtors may be forced to liquidate under chapter 7 of the Bankruptcy Code; and

- any distributions that you may receive under a liquidation or under a protracted reorganization case or cases under chapter 11 of the Bankruptcy Code would likely be substantially delayed and the value of any potential recovery likely would be adversely impacted by such delay.

The Bankruptcy Court may confirm the Plan pursuant to the cramdown provisions of the Bankruptcy Code, which allows the Bankruptcy Court to confirm a plan that has been rejected by an impaired class of claims or interests if it determines that the plan satisfies Bankruptcy Code section 1129(b). To confirm a plan over the objection of a dissenting class, a bankruptcy court also must find that at least one impaired class has accepted the plan, with such acceptance being determined without including the acceptance of any insider in such class.

(iv)     *The Bankruptcy Court Might Not Confirm the Plan as Proposed*

Even if the requisite acceptances of the Plan are received, the Bankruptcy Court might not confirm the Plan as proposed. A dissenting Holder of a Claim against or Equity Interest in the Debtors could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code. Further, even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. Specifically, Bankruptcy Code section 1129 sets forth the requirements for confirmation and requires, among other things, a finding by a bankruptcy court that (a) the debtor's plan does not unfairly discriminate and is fair and equitable with respect to any non-accepting classes, (b) confirmation of the debtor's plan is not likely to be followed by a

liquidation or a need for further financial reorganization, and (c) the value of distributions to non-accepting holders of claims within a particular class under the debtor's plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. A bankruptcy court may determine that a proposed plan does not satisfy one or more of these requirements, in which case the proposed plan would not be confirmed by the bankruptcy court.

If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether or when the Debtors would be able to reorganize their businesses and what, if any, distributions Holders of Claims or Equity Interests ultimately would receive on account of their Claims or Equity Interests. There also can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan of reorganization that is acceptable to the Bankruptcy Court and the Debtors' creditors and other parties in interest. Additionally, it is possible that third parties may seek and obtain approval to terminate or shorten the exclusive period under Bankruptcy Code section 1121 during which only the Debtors may propose and solicit votes on a plan of reorganization. Finally, the Debtors' emergence from bankruptcy is not ensured. Although the Debtors expect to emerge from bankruptcy, there can be no assurance that the Debtors will successfully reorganize or of when this reorganization will occur.

(v)     *Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests*

Bankruptcy Code section 1122 provides that a plan may place a claim or an interest in a particular class only if the claim or interest is substantially similar to the other claims or interests in that class. The Debtors believe that the classification of Holders of Claims against and Equity Interests in the Debtors under the Plan complies with the requirements set forth in the Bankruptcy Code because the Classes established under the Plan each encompass claims or interests that are substantially similar to similarly classified claims or interests. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(vi)    *The Conditions Precedent to the Effective Date of the Plan May Not Occur*

As more fully set forth in Article X of the Plan and described in Section VI.L herein, the Effective Date is subject to a number of conditions precedent. If these conditions precedent are not met or waived pursuant to the provisions of the Plan, the Effective Date will not occur.

(vii)   *Historical Financial Information of the Company May Not Be Comparable to the Financial Information of the Reorganized Debtors*

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Company's historical financial statements.

(viii)  *The Debtors May Object to the Amount or Classification of a Claim*

Except as otherwise provided in the Plan, the Debtors reserve the right to object (prior to or after the occurrence of the Effective Date) to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(ix)    *In the Event that the Company Is Unable to Reduce Its Indebtedness Through the Transactions Contemplated by the Plan, There Is Doubt About Its Ability to Continue as a Going Concern*

If the Company is unable to complete the transactions contemplated by the Plan, it may need to seek bankruptcy protection without the benefit of a plan supported by major creditors. The Company cannot guarantee that it can generate sufficient cash flow to continue to meet its obligations in the future, and if it cannot do so, it will not be able to continue as a going concern.

(x)     *The Company's Operations Will Be Subject to the Uncertainties of the Bankruptcy Process and the Plan is Subject to a Number of Termination Rights, Closing Conditions and Approvals*

While a substantial portion of the Debtors' creditors have contractually agreed to support the proposed voluntary restructuring and the Company expects to complete the chapter 11 process expeditiously, negative events or publicity associated with the Debtors' process and events during the proceedings could adversely affect the Company's relationships with customers, vendors, or employees, which in turn could adversely affect the Company's operations and financial condition. Further, the Debtors' ability to obtain Bankruptcy Court approval of routine motions that will allow the Debtors to operate their business normally is not within their control. The Plan Support Agreement is also subject to a number of termination rights, and the Plan is subject to a number of closing conditions and approvals, including those for the benefit of the Majority Noteholders under the Plan Support Agreement, the approval of the Bankruptcy Court, and the finalization of definitive documents, all of which conditions and approvals must be satisfied or obtained for the Debtors to emerge from the chapter 11 process. If the chapter 11 process continues beyond the anticipated timeline or the Company suffers a material adverse change to its assets, liabilities, business or prospects, the termination rights under the Plan Support Agreement may be triggered or all conditions to consummate the Plan may not be satisfied. In addition, if the Debtors commence the chapter 11 process before the solicitation contemplated by this Disclosure Statement is completed or if the Consenting Noteholders have not agreed upon the form of New Shareholders Agreement, the Plan Support Agreement may be terminated. Furthermore, the Company has not obtained any commitments to fund the Exit Facility. There can be no assurance that the Plan will be consummated on the terms described herein, or at all.

(xi)    *A Number of Agreements and Other Documents Relating to or Governing the Reorganized Debtors Have Not Been Negotiated or Finalized*

A number of agreements and other documents relating to or governing the Reorganized Debtors remain subject to documentation and/or further negotiations. The terms and conditions of these agreements and other documents may adversely affect the Company, its operations, its financial condition or results of operations and/or the holders of New Common Stock in a number of ways that cannot be predicted at this time. In addition, certain of the documents described in this Disclosure Statement have not been finalized, and the terms and provisions of the final agreements and other documents include other material terms not included in the summaries contained herein. Furthermore, failure to finalize or successfully negotiate these documents or obtain any required approvals, including any required approvals from the Majority Noteholders, may delay or prevent consummation of the Plan.

(xii)   *The DIP Facility May Not Be Available to the Debtors*

Funding under the DIP Facility is subject to completion of definitive documents and is subject to a number of conditions precedent, which the Debtors may not satisfy, in which case some or all of the DIP Facility may not be made available to the Debtors. In addition, the terms and provisions of the DIP Facility and related agreements may differ from, or include other material terms and conditions not included in, the debtor in possession financing term sheet attached as Exhibit 1 to the Plan Support Agreement (attached hereto as **Exhibit F**).

(xiii)  *If Holders of Notes Do Not Participate in the DIP Facility, the Percentage Ownership Interest in GOK that Such Holders Will Receive Pursuant to the Plan will be Diluted*

As part of the transactions contemplated by the Plan, the Backstop DIP Lenders have committed, subject to certain terms and conditions, to lend amounts under the DIP Facility to the extent other eligible Holders of Notes do not elect to participate in the DIP Facility. To be eligible to participate in the DIP Facility, a Noteholder must be an accredited investor within the meaning of the U.S. securities laws and be a Holder of at least $1 million in principal amount of the Notes. Holders of Notes who are not eligible to participate in the DIP Facility or who choose not to participate in the DIP Facility, will have their relative ownership interest in GOK diluted to the extent that the DIP Facility is converted into New Common Stock.

**B.    Risks that May Affect the Value of the Securities to Be Issued under the Plan**

      *(i)    A Liquid Trading Market for the New Common Stock May Not Develop*

      The New Common Stock will not be listed on a national securities exchange, and there can be no assurances that a liquid trading market for the New Common Stock will develop. The liquidity of any market for the New Common Stock will depend, among other things, upon the number of respective holders of New Common Stock, the Company's financial performance, and the market for similar securities, none of which can be determined or predicted. Therefore, the Company cannot provide assurances that an active trading market will develop, or if a market develops, what the liquidity or pricing characteristics of that market will be. If an active trading market does not develop, holders of New Common Stock may have difficulty selling their shares.

      *(ii)    The Resale of the New Common Stock May Be Restricted by Law and the New Shareholders Agreement*

      As described in Article XI of this Disclosure Statement, entitled "Application of Securities Laws," the Debtors intend to rely on the exemption from registration, pursuant to the exemptions contained in Bankruptcy Code section 1145, the Securities Act, and equivalent exemptions in state securities laws, as applicable. However, if a holder of New Common Stock is deemed to be an "underwriter" with respect to such securities (with certain exceptions for "ordinary trading transactions" by certain persons) or an "affiliate" of the issuer of such securities, resales of such securities by such holder would not be exempt from the registration requirements under the Securities Act and applicable state securities laws under Securities Act section 4(a)(1). Accordingly, such sales could be effected only pursuant to an effective registration statement or in reliance on another applicable exemption from these registration requirements, which may not be available to such holder. In addition, the New Shareholders Agreement will contain transfer restrictions limiting a stockholder's ability to dispose of its shares. See the term sheet attached as **Exhibit G** for a summary of the principal terms of the New Shareholders Agreement.

      *(iii)    GOK Intends to Suspend Its Reporting Requirements and/or Deregister Its Securities, Which Could Negatively Affect the Liquidity and Trading Prices of the New Common Stock and Result in Less Public Disclosure*

      GOK currently has (and as of January 1, 2013, had) less than 300 record holders of its common stock and Notes. Given the increasing cost and resource demands of being a public company, either prior to or in connection with the Effective Date, GOK intends to suspend its SEC reporting requirements and/or deregister its securities under the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), if it expects that there will be less than 300 holders of record of the New Common Stock following the Effective Date. Given the number of record holders of the Notes, the Company currently estimates that upon effectiveness of the Plan there will be less than 300 holders of record of the New Common Stock. In this event, GOK's obligations to file reports with the SEC, including periodic reports, will cease, and the Company expects that the liquidity of the New Common Stock will be materially and adversely affected even though it is possible that stockholders may still continue to trade GOK's common stock on over-the-counter markets. The Company, however, can provide no assurance that the New Common Stock will trade in over-the-counter markets or that market makers would make a market in the New Common Stock. In addition, companies with common stock quoted on the over-the-counter markets may not be required to meet the reporting requirements set forth under the Exchange Act depending on, among other things, the number of holders of record of the common stock. As a result, investors may find it more difficult to dispose of or obtain accurate quotes as to the market value of the New Common Stock, and the ability of GOK's stockholders to sell GOK securities in the secondary market may be materially limited.

      *(iv)    The Valuation of New Common Stock Is Not Intended to Represent the Trading Value of the Securities to Be Issued*

      The valuation of the Reorganized Debtors, set forth on **Exhibit E** hereto, is based on the assumption that holders of Notes will receive substantially all of the issued New Common Stock on behalf of their Claims and is not intended to represent the trading values of New Common Stock in public or private markets.

(v)       *The Reorganized Company May Not Achieve Projected Financial Results or Meet Post-reorganization Debt Obligations and May Not Be Able to Finance All Operating Expenses, Working Capital Needs, and Capital Expenditures*

The projected financial results of the Reorganized Company are based on numerous assumptions, including the timing, Confirmation, and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Company, general business and economic conditions, and other matters (including the terms of the Exit Facility), many of which are beyond the control of the Reorganized Company and which may not materialize.

Accordingly, the Reorganized Company may not be able to achieve the revenue or cash flow relied upon to make its projections or to otherwise meet its projected financial results. To the extent that the Reorganized Company does not meet its projected financial results or achieve projected revenues and cash flows, the Reorganized Company may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service its debt obligations as they come due, or may be unable to meet its operational needs. Any one of these failures may preclude the Reorganized Company from, among other things (a) taking advantage of future opportunities, (b) growing its businesses, or (c) responding to competitive pressures. Further, a failure of the Reorganized Company to meet its projected financial results or achieve its projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Reorganized Company to seek additional working capital. The Reorganized Company may not be able to obtain such working capital when it is required. Further, even if the Reorganized Company were able to obtain additional working capital, it may be available only on unreasonable terms. If any such required capital is obtained in the form of equity, the interests of the holders of the then-outstanding New Common Stock would be diluted. While the Reorganized Company's financial projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Company, there is no guarantee that the financial projections will be realized.

(vi)      *The Reorganized Debtors May Be Controlled by a Small Number of Holders and the New Shareholders Agreement Will Require Shareholder Approval for Certain Transactions*

Consummation of the Plan may result in a small number of holders owning a significant percentage of the outstanding shares of New Common Stock. These holders may, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors and have the power to elect directors and approve significant mergers, acquisitions, divestitures, and other material corporate transactions, including the sale of the Reorganized Debtors, or delay, prevent, or deter such transactions. The interests of such holders may differ from the interests of the other holders of New Common Stock. Under the New Shareholders Agreement, the Consenting Noteholders or their affiliates will initially have the right to elect three of five directors to the New Board. In addition, under the New Shareholders Agreement, approval of the holders of at least 60% of the New Common Stock will be required to sell the Company or its material subsidiaries, liquidate or dissolve, amend its charter documents, enter into certain affiliate transactions, or issue equity securities in certain circumstances. See the term sheet attached as **Exhibit G** for a summary of the principal terms of the New Shareholders Agreement. The Debtors can make no assurances regarding the future actions of the holders of New Common Stock and the impact such actions may have on the value of the New Common Stock.

## C.      Risks Relating to the Debtors' Businesses

(i)       *There Are Risks and Uncertainties Associated with the Chapter 11 Cases*

Although the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to the Company's business, the Debtors cannot be certain that this will be the case. The Plan is designed to minimize the length of the bankruptcy proceeding; however, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.

Even if the Plan is confirmed on a timely basis, for the duration of the Chapter 11 Cases, the Company's ability to execute its business strategy will be subject to the risks and uncertainties associated with bankruptcy. These risks include:

- the Debtors' ability to obtain approval of the Bankruptcy Court with respect to motions filed in the Chapter 11 Cases from time to time;

- the Company's ability to maintain contracts that are critical to its operations;

- the Company's ability to fund and execute its business plan; and

- the Debtors' ability to obtain creditor and Bankruptcy Court approval for, and then to consummate, the Plan and emerge from bankruptcy.

The Debtors will also be subject to risks and uncertainties with respect to the actions and decisions of the creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Company's restructuring and business goals.

These risks and uncertainties could affect the Company's business in various ways. For example, negative events or publicity associated with the Chapter 11 Cases could adversely affect the Company's operations and financial condition. In addition, pursuant to the Bankruptcy Code, the Debtors need approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit their ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot predict or quantify the ultimate impact that events occurring during the reorganization process will have on the Company's business, financial condition, and results of operations.

Upon filing the Chapter 11 Cases, the realization of assets and the satisfaction of liabilities are subject to uncertainty. While operating as debtors in possession, and subject to approval of the Bankruptcy Court, or otherwise as permitted in the normal course of business or by Bankruptcy Court order, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the condensed consolidated financial statements included in GOK's Form 10-Q for the quarterly period ended September 30, 2012. Further, the Plan could materially change the amounts and classifications of assets and liabilities reported in the historical consolidated financial statements.

*(ii)     The Company Will Have Indebtedness upon Emergence*

On the Effective Date, after giving effect to the transactions contemplated by the Plan, Debtors expect that the Reorganized Company will, on a consolidated basis, have an estimated $60 to $75 million in secured indebtedness and up to approximately $114 million in unsecured liabilities (including projected accounts payable and accrued liabilities projected as of April 2013). The total amount of the unsecured indebtedness will be a function of the total amount of ordinary course trade debt not due and owing on the Effective Date and of Unsecured Claims allowed against the Debtors in these Chapter 11 Cases, including, without limitation, Disputed Claims.

The Reorganized Company's indebtedness could have important consequences because:

- a portion of the Reorganized Company's cash flow from operations will be dedicated to debt service and will be unavailable to support operations, working capital, capital expenditures, expansion, acquisitions, or general corporate or other purposes;

- the Reorganized Company's ability to obtain additional financing in the future may be limited;

- the Reorganized Company's flexibility in planning for, or reacting to, changes in its business may be limited; and

- it may make the Reorganized Company more vulnerable in the event of a downturn in its business or the economy in general.

The Reorganized Company's ability to make payments on, and to refinance, its debt will depend on its ability to generate cash in the future. This, to a certain extent, is subject to general economic, business, financial, competitive, legislative, regulatory, and other factors that are beyond the control of the Reorganized Company.

There can be no assurance that the Reorganized Company will be able to generate sufficient cash flow from operations or that sufficient future borrowings will be available to pay off the Reorganized Company's debt obligations. The Reorganized Company may need to refinance all or a portion of its debt on or before maturity; however, there can be no assurance that the Reorganized Company will be able to refinance any of its debt on commercially reasonable terms or at all.

(iii)     *The Debtors May Require Funding After Emergence*

The seismic data acquisition services industry is capital intensive and sources of cash to finance the Debtors' capital expenditures may not always be available. If financing is not available, the Debtors' results of operations will be negatively affected. Seismic data acquisition equipment is continually being improved with new technology. In order to remain competitive, the Debtors must continue to invest additional capital to maintain, upgrade, and expand their seismic data acquisition capabilities. Seismic data acquisition equipment is expensive, and the Debtors' ability to operate and expand their business operations is dependent upon the availability of internally generated cash flow and financing alternatives. While the Debtors believe the Exit Facility will be sufficient to fund post-restructuring operations of the Reorganized Debtors, there can be no assurance that the Debtors will be successful in obtaining sufficient additional capital to upgrade and expand their current operations through cash from operations or additional financing or other transactions, if and when required, on acceptable terms. Due to the uncertainties surrounding the changing market for seismic services, increases in capital and technological requirements, and other matters associated with operations, the Debtors are unable to estimate the amount or terms of any financing that they may need to acquire, upgrade, and maintain seismic equipment. If the Debtors are unable to obtain such financing, if and when needed, they may be forced to curtail business objectives and to finance their business activities with only such internally generated funds as may then be available.

(iv)     *The Debtors' High Level of Fixed Costs Can Leave Them Vulnerable to Downturns in Revenues, Which Can Result in Losses*

The Debtors are subject to high fixed costs, which primarily consist of depreciation, maintenance expenses associated with their seismic data acquisition, processing and interpretation equipment, and certain crew costs. Extended periods of significant downtime or low productivity caused by reduced demand, weather interruptions, equipment failures, permit delays, or other causes could negatively affect the Debtors' operations and have a material adverse effect on their financial condition and results of operations because they will not be able to reduce fixed costs as fast as revenues decline.

(v)     *Even if the Debtors successfully consummate the Plan, the Reorganized Debtors will continue to face risks beyond their control*

Even if the Plan is consummated, the Reorganized Debtors will continue to face a number of risks, including certain risks that are beyond their control, including changes in economic conditions, changes in the industry, legislative changes, and changes in demand for the Company's services.

(vi)     *The Debtors Face Intense Competition that Could Result in Downward Pricing Pressure and the Loss of Market Share*

Competition among seismic contractors historically has been, and likely will continue to be, intense. Competitive factors have in recent years included price, crew experience, equipment availability, technological expertise, and reputation for quality and dependability. The Debtors also face increasing competition from nationally owned companies in various international jurisdictions that operate under less significant financial constraints than those the Debtors' experience. Additionally, the seismic data acquisition services business is extremely price competitive and has a history of protracted periods where seismic contractors under financial duress bid jobs below cost and therefore adversely impact industry pricing.

Competition from these and other competitors could result in downward pricing pressure and the loss of market share. The Debtors rely on a limited number of key suppliers for specific seismic services and equipment. Loss of any of these suppliers could have a material adverse effect on their businesses.

The Debtors depend on a limited number of third parties to supply them with specific seismic services and equipment. From time to time, increased demand for seismic data acquisition services has decreased the available supply of new seismic equipment, resulting in extended delivery dates on orders. Any delay in obtaining equipment could delay implementation of additional crews and restrict the productivity of existing crews, adversely affecting business and results of operations. In addition, any adverse change in the terms of the Debtors' supplier arrangements could adversely affect results of operations.

      (vii)    *Revenue May Not Be Sufficient to Cover Costs of Completing Projects or May Not Result in the Profit the Debtors Anticipated When Entering into the Contract*

The Debtors' revenue is determined, in part, by the price they receive for services, the productivity of their crew, and the accuracy of cost estimates. The crew's productivity is partly a function of external factors, such as weather and third-party delays, over which the Debtors have no control. In addition, cost estimates for projects may be inadequate due to unknown factors associated with the work to be performed and market conditions, resulting in cost over-runs. If the crew encounters operational difficulties or delays, or if they have not correctly priced their services, results of operations may vary and may be adversely affected.

Many of the Debtors' projects are performed on a turnkey basis where a defined amount and scope of work is provided for a fixed price, and additional work, which is subject to client approval, is billed separately. The revenue, cost, and gross profit realized on a turnkey contract can vary from the estimated amount because of changes in job conditions, variations in labor and equipment productivity from the original estimates, and the performance of subcontractors. Turnkey contracts may also cause the Debtors to bear substantially all of the risks of business interruption caused by weather delays and other hazards. These variations, delays, and risks inherent in billing clients at a fixed price may result in the Debtors experiencing reduced profitability or losses on projects.

      (viii)    *The Company's Clients Could Delay, Reduce, or Cancel Commitments or Service Contracts, Leading to Lower than Expected Demand and Revenue*

The Company's estimated backlog revenue consists of written orders or commitments for services that the Company believes to be firm. Specifically, as of September 30, 2012, the Company's estimated backlog consisted of approximately $40.0 million of proprietary seismic data acquisition projects, $29.7 million of multi-client seismic data acquisition business, and $10.3 million of seismic data processing and integrated reservoir geosciences business. In addition, the Company's international affiliated entities estimated a backlog of approximately $290.9 million as of the same date. Backlog levels vary during the year depending on the timing of the completion of certain projects and when new projects are awarded and contracts are signed. Because of potential changes in the scope or schedule of projects, the Company cannot predict with certainty when or if such backlog will be realized. In addition, the contracts in the Company's backlog are cancelable by the client. Material delays, payment defaults, or cancellations could reduce the amount of backlog currently reported and consequently could inhibit the conversion of that backlog into revenue, which may materially affect the Company's financial condition, results of operations, and cash flows.

      (ix)    *The Debtors' Agreements with Their Clients May Not Adequately Protect Them from Unforeseen Events or Address All Issues that Could Arise with Their Clients*

The occurrence of unforeseen events or disputes with clients not adequately addressed in the contracts could result in increased liability, costs, and expenses associated with any given project. The Debtors enter into master service agreements with many of their clients that allocate certain operational risks. For example, the Debtors seek to minimize the risk of delays through the inclusion of "standby rate" provisions, which provide for payment of a reduced rate to the Debtors for a limited amount of time if the weather conditions or certain other factors outside of the Debtors' control prevent them from recording data. Despite the inclusion of risk allocation provisions in their agreements, the Debtors' operations may be affected by a number of events that are unforeseen or not within their control. The Debtors cannot assure that such agreements will adequately protect them from each possible event. If an event occurs that the Debtors have not contemplated or otherwise addressed in an agreement, the Debtors, and not the client, will likely bear the increased cost or liability. To the extent that agreements do not adequately address these and other issues, or if the Debtors are not able to successfully resolve resulting disputes, the Debtors may incur increased liability, costs, and expenses.

(x)     *The Debtors May Be Held Liable for the Actions of Subcontractors*

The Debtors often work as the general contractor on seismic data acquisition surveys and consequently engage a number of subcontractors to perform services and provide products. While the Debtors obtain contractual indemnification and insurance covering the acts of these subcontractors and require the subcontractors to obtain insurance for the Debtors' benefit, there can be no assurance the Debtors will not be held liable for the actions of these subcontractors. In addition, subcontractors may cause damage or injury to the Debtors' personnel and property that is not fully covered by insurance.

(xi)    *The Company's Financial Results Could Be Significantly Affected by Currency Fluctuations*

Because the Company derives a substantial amount of revenue from sales internationally, it is subject to risks relating to fluctuations in currency exchange rates. Fluctuations in the exchange rate of the U.S. dollar against such other currencies may, in future periods, have a significant effect upon results of operations. While the Company attempts to reduce the risks associated with such exchange rate fluctuations, it may not be effective in doing so, and fluctuations in the value of the currencies in which the Company does business may materially affect results of operations in the future.

(xii)   *Operations Outside of the United States Are Subject to Additional Political, Economic, and Other Uncertainties*

The Company's operations outside of the United States are subject to political, economic, and other uncertainties that could adversely affect the Company's businesses, financial condition, results of operations, or cash flows, and exposure to such risks will increase as the Company expands international operations.

The Company's international proprietary operations are a significant part of total operations. For the years ended December 31, 2011, 2010, and 2009, 60%, 62%, and 81%, respectively, of total revenues were derived outside of the United States and Canada. The Company's operations outside of the United States are subject to risks inherent in foreign operations, including the following:

- government instability, which can cause investment in capital projects by potential clients to be withdrawn or delayed, reducing or eliminating the viability of some markets for the Debtors' services;

- potential expropriation, seizure, nationalization, or detention of assets;

- difficulty in repatriating foreign currency received in excess of local currency requirements;

- civil uprisings, riots, and war, which can make it unsafe to continue operations, adversely affect both budgets and schedules, and expose the Debtors to losses;

- availability of suitable personnel and equipment, which can be affected by government policy or changes in policy, and can limit the importation of qualified crewmembers or specialized equipment in areas where local resources are insufficient;

- decrees, laws, regulations, interpretation, and court decisions under legal systems that are not always fully developed and that may be retroactively applied and cause the Debtors to incur unanticipated and/or unrecoverable costs, as well as delays, which may result in real or opportunity costs;

- compliance with tax, employment, immigration, and labor laws for employees living abroad or traveling abroad;

- foreign taxes, including withholding of payroll taxes; and

- terrorist attacks, including personal harm to the Company's personnel.

As an example of the operational risks associated with international operations, as a result of the civil unrest in Libya, the Company was unable to operate its business or utilize its equipment in Libya.

(xiii)    *The Debtors Are Subject to the Foreign Corrupt Practices Act (the "FCPA") and the UK Bribery Act of 2010 (the "UK Bribery Act"), Which May Adversely Impact Their Businesses*

As U.S. corporations, the Debtors are subject to the regulations imposed by the FCPA, which generally prohibits U.S. companies and their intermediaries from making improper payments to foreign officials for the purpose of obtaining or keeping business. The UK Bribery Act, which became effective in 2011, is broader in scope than the FCPA, applies to public and private sector corruption, and contains no facilitating payments exception. As a company subject to compliance with the FCPA and the UK Bribery Act, the Debtors' businesses may suffer because of their efforts to comply with these laws. In addition, such laws could restrict the Debtors' ability to do business in foreign markets relative to their competitors who are not subject to them.

The Debtors and their local partners and Affiliates operate in many parts of the world that have experienced governmental corruption to some degree and, in certain circumstances, strict compliance with anti-bribery laws may conflict with local customs and practices. The Debtors may be subject to competitive disadvantages to the extent that their competitors are able to secure business, licenses, or other preferential treatment by making payments to government officials and others in positions of influence or using other methods that U.S. law and regulations prohibit them from using.

Any determination that the Debtors or their foreign agents or joint venture partners have violated the FCPA or the UK Bribery Act may adversely affect the Company's businesses and operations. In particular, the Debtors may be held liable for actions taken by their strategic or local partners even though their partners are not subject to the FCPA. Any such violations could result in substantial civil and/or criminal penalties and might adversely affect the Debtors' businesses, results of operations, or financial condition. In addition, the Debtors' ability to continue to work in such foreign markets could be adversely affected if they were found to have violated certain U.S. laws, including the FCPA.

(xiv)    *Financial Conditions of the Debtors' Customers Could Have an Adverse Impact If These Customers Are Unable to Pay for the Services Provided by the Debtors*

Some of the Debtors' customers are experiencing, or may experience in the future, severe financial problems that have had or may have a significant impact on their creditworthiness. Although the Debtors perform ongoing credit evaluations of their customers' financial conditions, they generally require no collateral from customers. One or more financially distressed customers could default on their obligations to the Debtors and may have a material adverse effect on the Debtors' businesses, financial position, results of operations, and cash flows. Furthermore, the bankruptcy of one or more of the Debtors' customers, or some other similar proceeding or liquidity constraint, might make it unlikely that the Debtors would be able to collect all or a significant portion of amounts owed. In addition, such events might force such customers to reduce or curtail their future use of the Debtors' products and services, which could have a material adverse effect on the Company's results of operations and financial condition.

(xv)    *The Debtors' Seismic Data Acquisition Services Revenues Are Subject to Seasonal Conditions*

The Debtors' seismic data acquisition services are performed outdoors and are therefore subject to seasonality. Shorter winter days and adverse weather negatively impact the Debtors' ability to provide services in certain regions. Additionally, while the Debtors plan for international operations to take place during favorable seasons, they have limited control over the actual timing of these operations due to the extensive planning, preparation, and permits required to perform a seismic survey in certain areas, which may cause operations to be delayed and result in additional costs.

(xvi)    *Significant Physical Effects of Climatic Change Could Damage the Debtors' Facilities, Disrupt Production Activities, and Cause the Debtors to Incur Significant Costs to Prepare for or Respond to Those Effects*

Climate change could have an effect on the severity of weather (including hurricanes and floods), sea levels, the arability of farmland, and water availability and quality. If such effects were to occur, the Debtors' seismic acquisition operations have the potential to be adversely affected. Potential adverse effects could include damages to facilities from powerful winds or rising waters in low-lying areas, disruption of production activities because of climate-related damages to facilities, increased costs of operation potentially arising from such climatic effects, less efficient or non-routine operating practices necessitated by climate effects, or increased costs for insurance coverage in the aftermath of such effects. Significant physical effects of climate change could also have an indirect effect on the Debtors' financing and operations by disrupting the transportation or process-related services provided by midstream companies, service companies, or suppliers with whom the Debtors have a business relationship. The Debtors may not be able to recover through insurance some or any of the damages, losses, or costs that may result from potential physical effects of climate change.

(xvii)    *The Debtors May Be Unable to Retain and Attract Management and Skilled and Technically Knowledgeable Employees*

The Debtors' future success depends upon retaining and attracting highly skilled employees. A number of the Debtors' employees possess many years of industry experience and are highly skilled, and an inability to retain such individuals could adversely affect the Debtors' ability to compete in the seismic data service industry. The Debtors historically have faced and expect to continue to face significant competition for such skilled personnel, particularly during periods of increased demand for seismic services. Although the Debtors utilize employment agreements, stock-based compensation, and other incentives to retain certain key employees, there is no guarantee that the Debtors will be able to retain these personnel.

(xviii)    *The Debtors Rely on Proprietary Information, Proprietary Software, Trade Secrets, and Confidentiality and Licensing Agreements to Conduct Operations*

The Debtors rely on certain proprietary information, proprietary software, trade secrets, and confidentiality and licensing agreements to conduct current operations. The Debtors are continuously working to improve technology and operating techniques, through internal development activities and working with vendors to develop new technologies to maintain pace with industry innovation. The Debtors' future success will be partly dependent on their ability to maintain and extend their technology base and preserve intellectual property without infringing on the rights of any third parties. There can be no assurance that the Debtors will be successful in protecting their intellectual property or that their competitors will not develop technologies that are substantially equivalent or superior to the Debtors' technologies.

(xix)    *The Debtors' Operating Results from Seismic Data Acquisition Services Can Be Significantly Impacted from Period to Period Due to a Change in the Timing of a Few Large Jobs Occurring at Any One Time*

The Company has the capacity to field up to 22 seismic data acquisition crews; however, in any given period, the Debtors could have idle crews, which results result in a significant portion of the Debtors' revenues, cash flows, and earnings coming from a relatively small number of crews. Additionally, due to location, service line, or particular job, some individual crews may achieve results that are a significant percentage of consolidated operating results. Should one or more of these crews experience significant changes in timing, the Debtors' financial results are subject to significant variations from period to period. Factors that may result in these changes in timing include, but are not limited to, weather, permits, customer requirements, and political unrest.

(xx)    *The Debtors' Operations Are Subject to Delays Related to Obtaining Land Access Rights from Third Parties, Which Could Affect Results of Operations*

The Debtors' seismic data acquisition operations could be adversely affected by their inability to timely obtain access to both public and private land included within a seismic survey. They cannot begin surveys on property without obtaining permits from certain governmental entities, as well as the permission of the parties who

26

have rights to the land being surveyed. In recent years, it has become more difficult, costly, and time-consuming to obtain access rights because drilling activities have expanded into more populated and protected areas. Additionally, while land owners generally are cooperative in granting access rights, some have become more resistant to seismic and drilling activities occurring on their property and stall or refuse to grant these rights for various reasons. In the Debtors' multi-client services business, they acquire data sets pertaining to large areas of land. Consequently, if they do not obtain land access rights from a specific land owner, the Debtors may not be able to provide a complete survey for that area. The failure to redact or remove the seismic information relating to mineral interests held by non-consenting third parties could result in claims against the Debtors for seismic trespass. In addition, governmental entities do not always grant permits within the time periods expected. Delays associated with obtaining such permits and with significant omissions from a survey as a result of the failure to obtain consents could have a material adverse effect on the Debtors' financial condition and results of operations.

(xxi)    The Debtors' Results of Operations Could Be Adversely Affected by Asset Impairments

The Debtors periodically review their portfolio of equipment and intangible assets, including their multi-client seismic data library, for impairment. If the future cash flows anticipated to be generated from these assets falls below net book value, the Debtors may be required to write down their value. If the Debtors are forced to write down the value of intangible assets or equipment, these non-cash asset impairments could negatively affect results of operations in the period in which they are recorded.

(xxii)   The Cyclical Nature of, or a Prolonged Downturn in, the Seismic Data Industry Can Affect the<br>Carrying Value of Long-Lived Assets and Negatively Impact the Debtors' Results of Operations

The Debtors are required to annually assess whether the carrying value of long-lived assets has been impaired, or more frequently if an event occurs or circumstances change which could indicate the carrying amount of an asset may not be recoverable. Recoverability is measured by a comparison of the carrying amount of an asset to future net cash flows expected to be generated by the asset. If management determines that the carrying value of long-lived assets may not be recoverable, the Debtors' results of operations could be impacted by non-cash impairment charges. As a result of the Company's September 30, 2011 goodwill impairment analysis, the Company recorded goodwill impairment charges totaling $132.4 million for the year ended December 31, 2012, which are included in asset impairments in the Company's consolidated statement of operations. At December 31, 2012, the Company had no goodwill.

(xxiii)  There are Inherent Limitations in All Control Systems, and Failure of the Debtors' Controls and<br>Procedures to Detect Error or Fraud Could Seriously Harm Their Business and Results of<br>Operations

The Debtors do not expect that their internal controls and disclosure controls will prevent all possible error and all fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. In addition, the design of a control system must reflect the fact that there are resource constraints and the benefit of controls must be relative to their costs. Because of the inherent limitations in all control systems, no evaluation of the Debtors' controls can provide absolute assurance that all control issues and instances of fraud, if any, will be detected. These inherent limitations include the realities that judgments in decision making can be faulty and that breakdowns can occur because of simple error or mistake. Further, controls can be circumvented by the individual acts of some persons or by collusion of two or more persons. The design of any system of controls is based in part upon the likelihood of future events, and there can be no assurance that any design will succeed in achieving its intended goals under all potential future conditions. Over time, a control may become inadequate because of changes in conditions or the degree of compliance with the Debtors' policies or procedures may deteriorate. Because of inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur without detection.

27

*(xxiv)    The Debtors Have Identified Material Weaknesses in Their Internal Controls. Such Material Weaknesses Adversely Affect the Debtors' Ability to Ensure Timely and Reliable Financial Reports and to Attest to the Effectiveness of Internal Controls*

A material weakness is a deficiency or a combination of deficiencies in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. The following material weakness was present at December 31, 2011 and September 30, 2012:

- Financial Close Process: Controls over the Company's financial close process were deficient in areas related to accrued liabilities, goodwill impairment and accounting for multi-client seismic data library. These deficiencies resulted from difficulties in the following:

    (a)    accumulating complete and accurate information to estimate certain liabilities,

    (b)    inadequate review of work performed by third parties, and

    (c)    material post-closing adjustments related to accounting for multi-client seismic data library resulting from difficulties in remediating deficiencies in time to allow the Company to assess the effectiveness of controls as of December 31, 2011.

To remediate this material weakness, during 2012, management continued executing the remediation program that began during 2011, which included assessing the adequacy of processes and procedures underlying the specific areas discussed above, expanding and strengthening the Company's controls surrounding the multi-client process, and strengthening their policies, procedures, and controls surrounding accrued expenses to ensure cooperation and coordination with departments outside of the accounting department.

The Debtors are committed to continuing to improve their internal control processes and will continue to diligently and vigorously review their financial reporting control and procedures. As the Debtors continue to evaluate and work to improve their internal control over financial reporting, they may decide to take additional measures to address their control environment. The Debtors, however, cannot be certain that the measures undertaken will be sufficient to address any deficiencies identified or ensure that their internal control over financial reporting is effective. If the Debtors are unable to provide reliable and timely internal and external financial reports, their business and prospects could suffer material adverse effects. In addition, the Debtors may in the future identify further material weaknesses or significant deficiencies in their internal control over financial reporting.

*(xxv)    The Current Weakening of U.S. Economic Conditions and Future Downturns or Changes in Consumer Spending Could Adversely Affect the Debtors' Financial Condition*

The United States has experienced an economic downturn, and spending by consumers has dropped. If this downturn and decrease in spending continues, the Debtors' businesses may be adversely affected. Specifically, demand for use of the seismic data may wane. A lack of demand could adversely affect the Debtors' ability to realize the full economic benefits of their customer contracts or enter into other strategic relationships.

*(xxvi)    The Debtors May Be Negatively Affected by Industry Consolidation*

Consolidation in the energy industry could adversely affect the Debtors by increasing the scale or scope of the Debtors' competitors, or by creating a competitor that is capable of providing services similar to those the Debtors intend to offer, thereby making it more difficult for the Debtors to compete. Industry consolidation also may impede the Debtors' ability to identify acquisition, joint venture, or other strategic opportunities.

*(xxvii)    A Decrease in Levels of Exploration and Development Activity in the Oil and Natural Gas Industry May Have an Adverse Effect on the Debtors' Businesses, Liquidity, and Results of Operations*

The Debtors' businesses are substantially dependent upon the condition of the oil and natural gas industry and, in particular, the willingness of oil and gas companies to make capital expenditures for exploration, development, and production operations. The level of capital expenditures generally depends on the prevailing views of future oil and natural gas prices, which are influenced by numerous factors, including, but not limited to, the following:

- changes in United States and international economic conditions, including the length and severity of the recent recession and the effect of such recession on economic activity;

- the demand for oil and natural gas;

- worldwide political conditions, particularly in significant oil-producing regions, such as the Middle East, West Africa, and Latin America;

- the actions taken by the Organization of Petroleum Exporting Countries (OPEC);

- the availability and discovery rate of new oil and natural gas reserves;

- the rate of decline of existing and new oil and gas reserves;

- the cost of exploration for, and production and transportation of, oil and natural gas;

- the ability of oil and gas companies to generate funds or otherwise obtain external capital for exploration, development, construction, and production operations;

- the sale and expiration dates of leases in the United States and overseas;

- technological advances affecting energy exploration, production, transportation, and consumption;

- weather conditions;

- environmental or other government regulations, both domestic and foreign;

- domestic and foreign tax policies; and

- the pace adopted by foreign governments for the exploration, development, and production of their oil and gas reserves.

Historically, demand for the Debtors' services has been sensitive to the level of exploration spending by oil and gas companies. A sustained period of low drilling and production activity, low commodity prices or reductions in industry budgets could reduce demand for the Debtors' services and would likely have a material adverse effect on the Debtors' businesses, financial condition, and results of operations.

*(xxviii)    The Debtors Operate under Hazardous Conditions that Subject the Debtors and their Employees to Risk of Damage to Property or Personal Injury, and Limitations on Insurance Coverage May Expose the Debtors to Significant Liability Costs*

The Debtors' activities are often conducted in dangerous environments with hazardous conditions, including operation of heavy equipment, detonation of explosives, and operations in remote areas of developing countries. Operating in such environments and under such conditions carries with it inherent risks, such as loss of human life or equipment, as well as the risk of downtime or reduced productivity resulting from equipment failures

29

caused by an adverse operating environment. These risks could cause the Debtors to experience equipment losses, injuries to their personnel, and interruptions in their businesses.

Although the Debtors maintain what they believe is prudent insurance protection, their insurance contains certain coverage exclusions and policy limits, and they cannot guarantee or warrant that the insurance will be sufficient or adequate to cover all losses or liabilities or that insurance will continue to be available to the Debtors or available on acceptable terms. Further, the Debtors may experience difficulties in collecting from insurers because such insurers may deny all or a portion of claims for insurance coverage. A successful claim for which the Debtors are not fully insured, or which is excluded from coverage or exceeds the policy limits of applicable insurance could have a material adverse effect on the Debtors' financial condition. Moreover, the Debtors do not carry business interruption insurance with respect to their operations.

(xxix)    *The Debtors Are Dependent on a Few Customers Operating in a Single Industry, and the Loss of One or More Customers Could Adversely Affect the Debtors' Financial Condition*

The Debtors' customers are engaged in the oil and natural gas drilling business throughout the world. Historically, the Company has been dependent upon a few customers for a significant portion of revenue. For the years ended December 31, 2011, 2010, and 2009, the Company's top ten customers collectively represented approximately 54%, 50%, and 70% of total revenues, respectively. The Company's three largest customers in 2011, 2010, and 2009 accounted for approximately 29%, 25%, and 45% of total revenues, respectively. This concentration of customers may increase the Company's overall exposure to credit risk, and customers will likely be similarly affected by changes in economic and industry conditions. If any of these significant clients were to terminate their contracts or fail to contract for the Company's services in the future because they are acquired, alter their exploration or development strategy, or for any other reason, the Company's financial results could be adversely affected.

(xxx)    *The Debtors Expect to Continue to Invest in Acquiring and Processing Seismic Data for Multi- Client Surveys and for Their Seismic Data Library Without Knowing How Much of This Seismic Data They Will Be Able to Sell or When and at What Price They Will Be Able to Sell Such Data*

Multi-client surveys and the resulting seismic data library are an increasingly important part of the Debtors' businesses and their future investments. The Debtors invest significant amounts of money in acquiring and processing seismic data that they own. By making such investments, the Debtors are exposed to the following risks:

- The Debtors may not fully recover their costs of acquiring, processing, and interpreting seismic data through future sales. The amounts of data sales are uncertain and depend on a variety of factors, many of which are beyond the Debtors' control.

- The timing of seismic data sales is unpredictable and can vary greatly from period to period. The costs of each survey are capitalized and then amortized over the expected useful life of the data. This amortization will affect the Debtors' earnings and, when combined with the sporadic nature of sales, will result in increased earnings volatility.

- Regulatory changes that affect the ability of oil and gas companies to drill, either generally or in a specific location where the Debtors have acquired seismic data, could materially adversely affect the value of the seismic data contained in the Debtors' library. Technology changes could also make existing data sets obsolete. Additionally, each individual survey has a limited book life based on its location and interest of oil and gas companies to explore in prospecting for reserves in such location, so a particular survey may be subject to a significant decline in value beyond the Debtors' initial estimates.

- The value of the Debtors' multi-client seismic data library could be significantly adversely affected if any material adverse change occurs in the general prospects for oil and gas exploration, development, and production activities.

- The cost estimates upon which the Debtors' base pre-commitments of funding could be wrong. The result could be losses that have a material adverse effect on the Debtors' financial condition and results of operations. These pre-commitments of funding are subject to the creditworthiness of the Debtors' clients. In the event that a client refuses or is unable to pay its commitment, the Debtors could lose a material amount of money.

Any reduction in the market value of such data will require the Debtors to write down the recorded value of such data, which could have a material adverse effect on results of operations.

> (xxxi)    *Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors*

Holders of Claims and Equity Interests should carefully review Article XII herein, titled "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Debtors' Chapter 11 Cases may adversely affect the Reorganized Debtors. Certain tax implications of the Debtors' bankruptcy and reorganization may increase the tax liability of the Reorganized Debtors.

**D.    Risks Relating to Government Regulations**

> (i)    *The Debtors' Businesses Are Subject to a High Degree of Government Regulation*

The energy industry is highly regulated by governmental entities and regulatory authorities. Failure to obtain or maintain necessary governmental authorizations would impair the Debtors' ability to continue to operate and would have a material adverse effect on their financial condition.

> (ii)    *The Debtors May Face Unforeseen Regulations with Which Compliance Is Difficult, Costly, or Impossible*

The provision of seismic data services is highly regulated. As providers of seismic data services in the United States, the Debtors will be subject to the laws and regulations of the United States. Violations of U.S. laws or regulations may result in various sanctions, including fines, loss of authorizations, and the denial of applications for new authorizations.

From time to time, U.S. governmental entities may impose new or modified conditions on the Debtors' authorizations, which could adversely affect their ability to generate revenues and implement their business plan. For example, the Debtors are currently required to pay certain fees, and it is possible that the Debtors may be subject to increased fees in the future.

> (iii)    *The Company is Subject to Compliance with Stringent Environmental Laws and Regulations that May Expose It to Significant Costs and Liabilities*

The Company's operations are subject to stringent federal, provincial, state, and local environmental laws and regulations in the United States and foreign jurisdictions relating to environmental protection. These laws and regulations may impose numerous obligations that are applicable to the Company's operations, including the following:

- the acquisition of permits before commencing regulated activities; and

- the limitation or prohibition of seismic activities in environmentally sensitive or protected areas such as wetlands or wilderness areas.

Numerous governmental authorities, such as the U.S. Environmental Protection Agency ("*EPA*") and analogous state agencies in the United States and governmental bodies with control over environmental matters in foreign jurisdictions have the power to enforce compliance with these laws and regulations and any permits issued under them, oftentimes requiring difficult and costly actions. Failure to comply with these laws, regulations, and

31

permits may result in the assessment of administrative, civil, and criminal penalties; the imposition of remedial obligations; and the issuance of injunctions limiting or preventing some or all of the Company's operations.

There is inherent risk of incurring significant environmental costs and liabilities in the Company's operations due to its controlled storage, use, and disposal of explosives. Although the Company believes that its safety procedures for handling and disposing of explosives comply with the standards prescribed by applicable laws and regulations, the risk of accidental injury from these materials cannot be completely eliminated. In the event of an accident, the Company could be held liable for any damages that result or could be penalized with fines, and any liability could exceed the limits of or fall outside of the Company's insurance coverage.

### (iv)    Climate Change Legislation or Regulations Could Result in Increased Operating Costs and Adversely Affect the Demand for the Debtors' Services

On December 15, 2009, the EPA published its findings that emissions of carbon dioxide, methane, and other greenhouse gases ("*GHGs*") present an endangerment to public health and the environment because emissions of such gases are, according to the EPA, contributing to warming of the earth's atmosphere and other climatic changes. These findings opened the door for the EPA to adopt and implement regulations that would restrict emissions of GHGs under existing provisions of the federal Clean Air Act. On October 30, 2009, the EPA published a final rule requiring the reporting of GHG emissions from specified large GHG emission sources in the United States beginning in 2011 for emissions occurring in 2010. On June 3, 2010, the EPA published its so-called GHG "tailoring rule," which begins the phase-in of federal Prevention of Significant Deterioration ("*PSD*") permit requirements, for newly constructed or modified major sources, and Title V operating permits, for all sources that have the potential to emit specific quantities of GHGs. The tailoring rule became effective in January 2011, although it remains the subject of several pending lawsuits filed by industry groups. In July 2011, the program began applying PSD permitting requirements to new sources with GHG emissions of at least 100,000 tons per year, and in subsequent phases the rule will require permits for a broader range of sources. On November 30, 2010, the EPA published amendments to the GHG reporting rule, expanding the rule to include onshore and offshore oil and natural gas production facilities and onshore oil and natural gas processing, transmission, storage, and distribution facilities, which may include facilities operated by that the Debtors' clients. Reporting of GHG emissions from such facilities is required on an annual basis beginning in 2012.

Although the federal government is unlikely to adopt legislation to reduce emissions of GHGs, a number of states have taken measures to reduce GHG emission levels, which may include the development of GHG emission inventories and cap and trade programs. Most of these cap and trade programs require major sources of emissions or major producers of fuels to acquire and surrender emission allowances. The number of allowances available for purchase is reduced each year in an effort to achieve the overall GHG emission reduction goal. These allowances would be expected to escalate significantly in cost over time.

The adoption and implementation of legislation or regulatory programs imposing reporting obligations on, or limiting emissions of GHGs from, the Debtors' customers' equipment and operations could curtail their activities, including the services provided by the Debtors.

### (v)    Federal Legislation and State Legislative and Regulatory Initiatives Relating to Hydraulic Fracturing Could Result in Increased Costs and Additional Operating Restrictions or Delays

Hydraulic fracturing is used to stimulate production of hydrocarbons, particularly natural gas, from tight formations. The process involves the injection of water, sand, and chemicals under pressure into formations to fracture the surrounding rock and stimulate production. The process is typically regulated by state oil and gas commissions, but is not currently subject to regulation at the federal level. The EPA has commenced a study of the potential environmental impacts of hydraulic fracturing activities, with results of the study anticipated to be available by 2014, and legislation has been introduced before Congress to provide for federal regulation of hydraulic fracturing and to require disclosure of the chemicals used in the fracturing process. In addition, some states have adopted, and other states are considering adopting, regulations that could restrict hydraulic fracturing in certain circumstances. For example, in December 2010, New York imposed a de facto moratorium on the issuance of permits for high-volume, horizontal hydraulic fracturing until state-administered environmental studies are finalized. The New York Department of Environmental Conservation ("*NYDEC*") issued a Revised Supplemental Generic

Environmental Impact Statement in September 2011, as well as proposed regulations for high-volume hydraulic fracturing. NYDEC accepted public comment on both, with the comment period for the regulations ending January 11, 2013. The final regulations are expected in 2013. Further, Pennsylvania has adopted a variety of regulations limiting how and where fracturing can be performed. Effective February 5, 2011, Pennsylvania requires operators to disclose all additives used in hydraulic fracturing fluids and the names and concentrations of chemicals subject to Occupational Safety and Health Administration Hazard Communication requirements.

On April 17, 2012, the EPA published in the Federal Register a proposed rule establishing new air emission controls for oil and natural gas production and natural gas processing operations. The final rule became effective October 15, 2012; however, a number of the requirements did not take immediate effect. The final rule established a phase-in period to allow for the manufacture and distribution of required emissions reduction technology. The rule requires owners and operators to either flare VOC emissions or use emissions reduction technologies (or "green completions") that allow the emissions to be recaptured and treated. On or after January 1, 2015, all newly fractured wells will be required to use green completions. Certain compressors, dehydrators, and other equipment must also comply with the final rule immediately or within up to three years and 30 days after publication of the final rule, depending on the construction date and nature of the unit. In addition, on October 20, 2011, the EPA announced its intention to develop federal pre-treatment standards for wastewater discharges associated with hydraulic fracturing activities. If adopted, the new pre-treatment rules will require coalbed methane and shale gas operations to pretreat wastewater before transferring it to treatment facilities. Proposed rules are expected in 2013 for coalbed methane and 2014 for shale gas.

A portion of the Debtors' seismic operations relate to the development of wells that will be subject to hydraulic fracturing. If new laws or regulations that significantly restrict hydraulic fracturing are adopted, the demand for the Debtors' services could be reduced.

## E.    Risks Relating to Forward-Looking Statements

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects, in all material respects, the financial results of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein is without inaccuracies.

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the financial projections that are, by their nature, forward-looking, and which projections are necessarily based on certain assumptions or estimates that may ultimately prove to be incorrect. The actual future financial results of the Reorganized Debtors may turn out to be different from the financial projections. The financial projections do not reflect emergence adjustments, including the impact of "fresh start" accounting.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning the following:

- the magnitude of the potential adverse impacts of the filing of the Chapter 11 Cases on the Debtors' businesses, financial condition, or results of operations;

- the Debtors' ability to obtain approval of the Bankruptcy Court with respect to motions in the Chapter 11 Cases prosecuted from time to time and to develop, prosecute, confirm, and consummate one or more plans of reorganization with respect to the Chapter 11 Cases and to consummate all of the transactions contemplated by one or more such plans or upon which consummation of such plans may be conditioned;

- the timing of confirmation and consummation of one or more plans of reorganization in accordance with its terms;

- the anticipated future performance of the Reorganized Debtors;

- general economic conditions in the markets in which the Debtors operate, including changes in interest rates or currency exchange rates;

- a decline in capital expenditures by oil and gas exploration and production companies;

- the Debtors' ability to convert backlog into revenues and realize higher margins and improved cash flows;

- market developments affecting, and other changes in, the demand for seismic data and related services;

- the timing and extent of changes in the price of oil and gas;

- the Debtors' future capital requirements and availability of financing on satisfactory terms;

- availability or increases in the price of seismic equipment;

- availability of crew personnel and technical personnel;

- the Debtors' competition;

- technological obsolescence of the Debtors' seismic data acquisition equipment;

- the condition of the capital markets generally, which will be affected by interest rates, foreign currency fluctuations, and general economic conditions;

- the effects of weather or other events that delay the Debtors' operations;

- cost and other effects of uncertainties inherent in legal proceedings, settlements, investigations, and claims, including liabilities which may not be covered by indemnity or insurance;

- governmental regulation;

- the political and economic climate in the foreign or domestic jurisdictions in which the Debtors conduct business, including civil unrest, wars, regime changes, and strikes;

- the financial condition of the Debtors' service providers; and

- other risks described herein and from time to time in the Debtors' SEC filings.

Due to inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

F.    **Risks Relating to Recovery Projections under the Plan**

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the financial projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates regarding the anticipated future performance of the Reorganized Debtors, including, without limitation, their ability to maintain or increase revenue and gross

margins, control future operating expenses, or make necessary capital, as well as assumptions concerning general business and economic conditions and overall industry performance and trends, which the Debtors are unable to control. Should any or all of these assumptions or estimates ultimately prove to be incorrect or not materialize, the actual future experiences of the Reorganized Debtors may turn out to be different from the financial projections.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. Also, because the liquidation analysis, distribution projections, and other information contained herein are estimates only, the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.

The Claims estimates set forth herein are based on various assumptions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumptions prove to be incorrect. Such differences may adversely affect the Debtors' ability to implement the Plan. Moreover, the estimated recoveries set forth herein are necessarily based on numerous assumptions, the realization of many of which are beyond the Debtors' control, including, without limitation, (a) the successful reorganization of the Debtors, (b) an assumed date for the occurrence of the Effective Date, (c) the Debtors' ability to achieve the operating and financial results included in the financial projections, (d) the Debtors' ability to maintain adequate liquidity to fund operations, and (e) the assumption that capital and equity markets remain consistent with current conditions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumptions prove to be incorrect, which could prevent the Plan from becoming effective. Also, the estimated recoveries to Holders of Allowed Claims are not intended to represent the private sale values of the Reorganized Debtors' securities.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders the subordination of any Allowed Claims to other Allowed Claims; whether the Debtors object to the amount or classification of any Claim; and whether, subject to the terms and conditions of the Plan, the Debtors are required to modify certain terms or conditions of the Plan to confirm the Plan. The occurrence of contingencies that could affect distributions available to Holders of Allowed Claims under the Plan, however, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

G.    **Disclosure Statement Disclaimer**

(i)    *No Representations Made Outside this Disclosure Statement Are Authorized*

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose. Except as otherwise provided herein or in the Plan, no representations relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court, the Bankruptcy Code, or otherwise. Any representations or inducements made to secure your acceptance or rejection of the Plan, other than as contained in or included with this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and, if applicable, the U.S. Trustee.

(ii)    *The Debtors Relied on Certain Exemptions from Registration under the Securities Act*

This Disclosure Statement has not been filed with the SEC or any state regulatory authority. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement or the exhibits or the statements contained herein, and any representation to the contrary is unlawful. This Disclosure Statement has been prepared pursuant to Bankruptcy Code section 1125 and Bankruptcy Rule 3016(b).

To the maximum extent permitted by Bankruptcy Code section 1145, the Securities Act, and other applicable non-bankruptcy law, the issuance of the New Common Stock, including the DIP Equity Distribution, will be exempt from registration under the Securities Act by virtue of Bankruptcy Code section 1145 as described herein.

(iii)     *The Information Herein Was Provided by the Debtors and Relied upon by Their Advisors*

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

The financial information contained in this Disclosure Statement has not been audited unless explicitly stated otherwise. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

(iv)     *No Legal or Tax Advice Is Provided to You by this Disclosure Statement*

This Disclosure Statement is not legal advice to you. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

(v)     *No Admissions Are Made by this Disclosure Statement*

The information and statements contained in this Disclosure Statement will neither constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interests or any other parties in interest. Except as otherwise provided in the Plan, the vote by a Holder of an Allowed Claim or Equity Interest for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim or Equity Interest, or recover any preferential, fraudulent, or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

In addition, no reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors may seek to investigate, file, and prosecute objections to Claims and Equity Interests and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

(vi)     *Forward-Looking Statements in this Disclosure Statement*

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the filing or
- results of litigation;

- pendency of the Chapter 11 Cases;
- the Company's expected future financial position, liquidity, results of operations, profitability, and cash flows;
- financing plans;
- competitive position;
- business strategy;
- budgets;
- projected cost reductions;
- projected and estimated environmental liabilities;
- other projected and estimated liability costs;

- disruption of operations;
- regulatory changes;
- plans and objectives of management for future operations;
- contractual obligations;
- off-balance-sheet arrangements;
- growth opportunities for existing services;
- projected price changes;
- projected general market conditions; and
- impacts from new technologies.

Statements concerning these and other matters are not guarantees of the Company's future performance. Such statements represent the Company's estimates and assumptions only as of the date such statements were made. There are risks, uncertainties, and other important factors that could cause the Company's actual performance or achievements to be materially different from those it may project, and the Company undertakes no obligation to update any such statement. These risks, uncertainties, and factors include:

- the Debtors' ability to confirm, and consummate the Plan;
- the Company's ability to reduce its overall financial leverage;
- the potential adverse impact of the Chapter 11 Cases on the Company's operations, management, and employees and the risks associated with operating the businesses during the Chapter 11 Cases;
- supplier and partner response to the Chapter 11 Cases;
- inability to have claims discharged or settled during the Chapter 11 Cases;
- general economic, business, and market conditions, including the recent volatility and disruption in the capital and credit markets and the significant downturn in the overall economy;

- interest rate fluctuations;
- exposure to litigation;
- dependence upon key personnel;
- ability to implement cost reduction and market share initiatives in a timely manner;
- efficacy of new technologies and facilities;
- adverse tax changes;
- limited access to capital resources;
- changes in laws and regulations;
- natural disasters; and
- inability to implement the Company's business plan.

## V.
## THE DEBTORS' HISTORY

### A.    Company Overview

GOK, a Delaware corporation incorporated on January 31, 1980, is based in Houston, Texas. The Company is a full-service, global provider of seismic data acquisition, processing and integrated reservoir geosciences services to the oil and natural gas industry. The Company also provides clients access, via licenses, to its multi-client seismic data library. The Company is an industry leader in land, transition zone and shallow water (down to 500 feet water depths) ocean bottom cable environments, and has the capacity to operate up to 22 seismic crews with approximately 200,000 channels of seismic data acquisition equipment worldwide and the ability to

process seismic data collected throughout the world. Crew count, configuration, and location can change depending upon industry demand and requirements.

The Company provides a suite of geophysical services including acquisition of 2D, 3D, time-lapse 4D, and multi-component seismic data surveys, data processing and integrated reservoir geosciences services for customers in the oil and natural gas industry, which include national oil companies, major international oil companies, and independent oil and gas exploration and production companies worldwide. Seismic data is used by customers to identify and analyze drilling prospects, maximize drilling success, optimize field development and enhance production economics. The Company also owns a multi-client seismic data library whereby it maintains full or partial ownership of data acquired; client access is provided via licensing agreements. The Company's multi-client data library consists of data covering various areas in the United States, Canada, and Brazil.

For the nine months ended September 30, 2012, the Company generated total revenues of $440.0 million. For the years ended December 31, 2011, 2010 and 2009, the Company generated total revenues of $763.7 million, $558.1 million, and $511.0 million, respectively.

## B.    Business Segments

The Company is currently organized into two reportable segments: seismic data acquisition and seismic data processing and integrated reservoir geosciences services. The Company further breaks down its seismic data acquisition segment into three reporting units: North America proprietary seismic data acquisition, international proprietary seismic data acquisition, and multi-client seismic data acquisition business. For the nine months ended September 30, 2012, the North America proprietary seismic data acquisition services represented 21%, international proprietary seismic data acquisition services represented 65%, multi-client seismic data acquisition business represented 12%, and seismic data processing and integrated reservoir geosciences services represented 2% of total revenues. For the fiscal years ended December 31, 2011, 2010, and 2009, North America proprietary seismic data acquisition services represented 22%, 23%, and 14%, international proprietary seismic data acquisition services represented 60%, 62%, and 81%, multi-client seismic data acquisition business represented 16%, 13%, and 2% and seismic data processing and integrated reservoir geosciences services represented 2%, 2%, and 3% of total revenues, respectively.

### (i)    Seismic Data Acquisition Services

The Company engages in seismic data acquisition services in land, transition zone, and shallow water environments on a contract basis. It acquires and processes data under two basic business models: proprietary and multi-client. Under the proprietary model, customers will typically bid or tender an acquisition and processing project and then award it based on factors such as price, safety record, and crew availability. When contracting proprietary services, clients are ultimately responsible to choose or approve the parameters of the project such as survey design and processing sequence and the Company acts on behalf and at the direction of its customer. Under the proprietary acquisition and processing services, customers own the field and the data processing products the Company delivers. Under the multi-client model, the Company performs the acquisition, processing, and interpretation services based on its own parameters. The Company owns the product and licenses the data to its customers under the terms and conditions of a data use agreement. In most circumstances, prior to collecting and processing such data, the Company sells the rights on a non-exclusive basis to one or more customers, also known as pre-funding. The Company then licenses the same data to other companies to generate additional revenues, referred to as "late sales." Multi-client projects have pre-funding levels of generally 80% to 100% of the estimated cash expenses.

The Company's equipment is capable of collecting 2D, 3D, time-lapse 4D, and multi-component seismic data. The Company owns approximately 200,000 channels of seismic data acquisition equipment that can be configured to operate up to twenty-two (22) crews worldwide. Most of the Company's seismic data acquisition services involve 3D surveys. The crews are scalable and specially configured for each project; the number of individuals on each crew is dependent upon the size and nature of the seismic survey requested by the customer.

On a typical land seismic survey, the seismic recording crew is supported by a surveying crew and a drilling crew. The surveying crew lays out the line locations to be recorded and identifies the sites for shot-hole placement. The drilling crew creates the holes for the explosive charges that produce the necessary acoustical

impulse. A mechanical vibrating unit is used in areas where explosives are not utilized. The seismic crew lays out the geophones and recording instruments, directs shooting operations and records the acoustical signal reflected from subsurface strata. In the United States and Canada, the survey crew and drill crew are typically provided by third parties and supervised by Company personnel. Outside the United States and Canada, the Company performs its own surveying and drilling. A fully staffed seismic land crew typically consists of at least one party manager, an observer, a head linesman, and crew laborers. The number of individuals on each crew is dependent upon the size and nature of the seismic survey and can be extensive in certain parts of the world. The Company uses helicopters to assist the crews in seismic data acquisition services in circumstances where such use will reduce overall costs and improve productivity. A typical transition zone or ocean bottom cable crew utilizes numerous support vessels and air guns as the energy source that produces the acoustical impulse needed to record seismic data.

Proprietary seismic data acquisition services contracts, whether bid or negotiated, provide for payment on either a turnkey or term (also referred to as "day-rate") basis, or on a combination of both methods. A turnkey contract provides for a fixed fee to be paid for data acquired. Such a contract causes the Company to bear varying degrees of business interruption risk caused by weather delays and other hazards. The Company's seismic data acquisition services are performed outdoors and are therefore subject to weather and seasonality. Term contracts provide for payments based on agreed rates per units of time, which may be expressed in periods ranging from days to months. This type of contract causes the customer to bear the majority of the business interruption risks. When a combination of both turnkey and term methods is used, the risk of business interruption is shared by the Company and the customer. In either case, progress payments are usually required unless it is expected the job can be accomplished in two weeks or less. The Company's contracts for proprietary seismic data acquisition services are predominantly turnkey contracts.

For the nine months ended September 30, 2012, seismic data acquisition services revenue totaled $433.5 million. Of these revenues, for the nine months ended September 30, 2012, international proprietary seismic data operations accounted for 66%, North America proprietary seismic data acquisition operations accounted for 22%, and multi-client seismic data acquisition operations accounted for 12%. For the years ended December 31, 2011, 2010, and 2009, seismic data acquisition services generated revenues of $755.1 million, $549.1 million, and $500.3 million, respectively. Of these revenues, for the year ended December 31, 2011, international proprietary seismic data acquisition operations accounted for 61%, North America proprietary seismic data acquisition operations accounted for 23%, and multi-client seismic data acquisition operations accounted for 16%.

(ii)     Seismic Data Processing and Integrated Reservoir Geosciences Services

The Company provides a full suite of onshore and offshore proprietary seismic data processing and integrated reservoir geosciences solutions to complement its seismic data acquisition services. Seismic data are processed to produce an accurate image of the earth's subsurface using proprietary computer software and internally developed technologies. The Company's seismic data processing and integrated reservoir geosciences activities are primarily undertaken at its centers in Houston, Texas, London, England, and Calgary, Canada, with operations at satellite in-field processing locations in Mexico and Angola in support of its acquisition activities. Advanced signal processing of 2D, 3D, time-lapse 4D, and multi-component seismic data acquired by the Company, other industry contractors, as well as reprocessing of previously acquired legacy data, provides oil and gas industry clients with detailed subsurface information essential to reducing risk in their exploration and production activities. The Company also offers its clients integrated reservoir services where its experts can combine the power of seismic, geologic, well, and petrophysical information to provide detailed information of rock lithologies and fluid content at the reservoir level. This integration of all sources of subsurface information has become particularly critical with the emergence of so-called resource, or shale, plays in North America and internationally since, in these plays, gross structural information is much less important than understanding physical rock properties such as fracture characterization and stress relationships at the reservoir formation level.

Projects are sourced worldwide with emphasis on 3D onshore and near-shore programs where the Company's technology leverage is most effectively exercised. North America resource plays and programs where multi-component data are acquired are particularly targeted so that both compressional and shear wave data components can be processed and integrated with complementary well and geologic data to extract extended subsurface information not available from compressional seismic data alone. To provide information meaningful to engineers, this information must, in the future, be delivered in depth (as opposed to travel-time domain). The

Company maintains an active program to provide accurate depth solutions. A strong bond exists between the Company's multi-client and processing businesses to assure that its clients receive both quality acquisition and processing that maximizes the utility of its programs in the exploitation efforts.

The seismic data processing sector relies on rapid technology development and implementation to provide the increasing resolution and detail demanded by today's complex hydrocarbon reservoirs. The Company maintains a strong team of geoscientists to continually extend its technical solutions for these difficult subsurface problems. The geoscientists are particularly active in development of customized solutions for improved signal-noise data content, 3D subsurface velocity modeling, and 3D imaging in time and depth, as well as, extending solutions for resource plays including multi-component processing, fracture characterization, and fluid and rock property estimation. As well as providing clients with effective solutions customized to their processing needs, the Company actively markets its seismic data processing and integrated reservoir geosciences services in conjunction with its seismic data acquisition services to enhance total value provided to customers.

## C.    Industry Overview

Seismic surveys enable oil and gas companies to determine whether subsurface conditions are favorable for finding oil and natural gas accumulations and to determine the size and structure of previously identified oil and natural gas deposits. Seismic surveys consist of the acquisition and processing of 2D, 3D, time-lapse 4D, and multi-component seismic data, which is used to produce computer-generated, graphic cross-sections, maps, and 3D images of the subsurface. These resulting images are then analyzed and interpreted by geophysicists and used by oil and gas companies to assist in acquiring prospective oil and natural gas drilling rights, select drilling locations on exploratory prospects, and manage and develop producing reservoirs.

Seismic data is acquired by crews operating on land and in transition zone and marine environments. Seismic data is generated by the propagation of sound waves near the earth's surface by controlled energy sources, such as dynamite or vibration equipment. The waves radiate into the earth and are reflected back to the surface and collected by data collection devices known in the industry as "geophones". Multiple geophones are strategically positioned, according to client requirements, and connected as a single recording channel or as multi-component recording channels to acquire data. For ocean bottom cable operations, an assembly of vertically oriented geophones and hydrophones connected by electrical wires typically is deployed on the sea floor to record and relay data to a seismic recording vessel. Such systems were originally introduced to enable surveying in areas of obstructions (such as production platforms) or shallow water inaccessible to ships towing seismic streamers (submerged cables). The data is subsequently processed by experienced and highly technically skilled geoscientists using advanced computing systems running proprietary software designed specifically to enhance the recorded signal by attenuating, to improve resolution and to produce an accurate image of the subsurface geological features. 3D seismic surveys collect far more information and generate significantly greater detail of the underlying reservoirs than 2D surveys.

The overall demand for seismic data and related seismic services is dependent upon spending by oil and gas companies for exploration, production, development, and field management activities, which, in turn, is driven largely by present and expected future prices for oil and natural gas and the need to replenish drilling prospects and reserves. This is impacted by supply and demand, global and local events, as well as political, economic, and environmental considerations. Demand for seismic data acquisition in North America is particularly driven by natural gas prices, with international demand typically driven by oil prices. The overall demand for seismic data and related seismic services is dependent upon spending by oil and gas companies for exploration, production, development, and field management activities, which, in turn, is driven largely by present and expected future prices for oil and natural gas and the need to replenish drilling prospects and reserves. This is impacted by supply and demand, global and local events, as well as political, economic, and environmental considerations. Demand for seismic data acquisition in North America has been primarily driven by natural gas prices, with international typically driven by oil prices.

### (i)    Global energy demand growth

The Company believes that long-term, overall global demand for energy will increase which will result in increased demand from oil and gas companies for seismic services.

(ii)     *Recent civil unrest in several of the Company's markets*

Several governments in oil producing regions in North Africa and the Middle East have recently experienced civil unrest. Prior to the fourth quarter of 2011, the Company actively conducted business and had equipment in several of these countries, including Libya, Tunisia, Algeria, and Egypt. This civil unrest, and the imposition of sanctions on some of these regimes by the United States in connection with the civil unrest, made the conduct of the Company's business in these locations more difficult, and in some cases impossible, and led to the inability to utilize its equipment and the loss of business opportunities.

(iii)     *E&P capital spending*

The need to replace depleting reserves should encourage capital expenditures by oil and gas companies, which the Company expects will benefit the seismic services industry. The Company believes that these companies, including many national oil companies, remain under pressure to increase or replenish reserves and are looking to unconventional resource plays, transition zones, international locations, and the optimization of current reserves with new technology to achieve these results. Seismic data acquisition services are a key component of oil and gas capital expenditure programs.

(iv)     *Technological development*

The application and utilization of seismic services have considerably increased over the last several years as a result of significant technological advancements, such as the move from 2D to 3D and single-component to multi-component seismic data recording and processing. Seismic services can now be applied to the entire sequence of exploration, development, and production, as opposed to exploration only, allowing for a greater range of use for the Company's services. Additionally, surveys previously shot in 2D or single-component are often being reshot with newer techniques to give greater clarity to the subsurface.

(v)     *Seasonality*

Weather patterns worldwide, such as hurricane and monsoon seasons, and certain environmental restrictions, such as those aimed at protecting endangered species, have an impact on asset utilization for seismic data acquisition services.

(vi)     *Regulatory environment*

In response to the oil spill in the Gulf of Mexico during 2010 and in connection with concerns raised related to the hydraulic fracturing ("fracking") of unconventional resource plays, the United States Congress continues to consider a number of legislative proposals relating to the upstream oil and gas industry both onshore and offshore that could result in significant additional laws or regulations governing operations in the United States. Additionally, governments around the world have become increasingly focused on similar regulatory matters which may result in significant changes in laws or regulations elsewhere. While the Company does not provide seismic services in deep-water areas, its customers include national and international oil companies involved in deep-water drilling projects. In the past the Company has conducted transition zone and OBC seismic acquisition surveys in the Gulf of Mexico, and may do so in the future. Although it is not possible at this time to predict whether proposed legislation or regulations will be adopted, or how legislation or new regulation that may be adopted would impact the Company's business, any such future laws and regulations could result in increased compliance costs or additional operating restrictions for its customers. Additional costs or operating restrictions associated with legislation or regulations could have a material adverse effect on the Company's customers' operating results and cash flows, which could also negatively impact the demand for the Company's services. Conversely, capital that would have been previously dedicated to the Gulf of Mexico may be redirected onshore, which could positively impact demand for the Company's services.

**D.     Competition and Marketing**

The acquisition and processing of seismic data for the oil and natural gas industry are highly competitive businesses. With low barriers to entry, the Company competes with various smaller local competitors in the various

markets in which it operates. Competition is based on the type and capability of equipment used to conduct seismic surveys and the availability of such equipment. In addition to these factors, price, experience, availability, technological expertise, reputation for dependability, and crew safety significantly affect a potential customer's decision to award a contract to the Company or one of its competitors. In addition, in the international markets in which the Company operates, its competes with various smaller local competitors.

The Company's seismic data acquisition services and seismic data processing and integrated reservoir geosciences services are marketed from various offices around the world. The Company currently maintains offices in North America, Latin America, Europe, Africa, the Middle East, and Asia Pacific, including its corporate headquarters in Houston, Texas, from which it markets and/or performs services.

Seismic data acquisition services and seismic data processing and integrated reservoir geosciences services contracts are obtained either through competitive bidding in response to invitations to bid, or by direct negotiation with a prospective customer. A significant portion of the Company's contracts result from competitive bidding. Contracts are awarded primarily on the basis of price, experience, availability, technological expertise, and reputation for dependability and safety.

The Company's regional personnel communicate directly with existing and target customers during the bid preparation process. With the involvement and review of senior management, bids are prepared by knowledgeable regional operations managers who understand their respective markets, customers, and operating conditions. Furthermore, the regional personnel are able to convey the superior technical services the Company provides and communicate the advantages of providing seismic data processing and interpretive services in conjunction with seismic data acquisition. Most of the Company's revenue is generated through repeat customer sales and new sales to customers referred by the Company's existing and past clients.

E.    Backlog

The Company's estimated backlog revenue at September 30, 2012 was $370.8 million. This backlog included $290.9 million, or approximately 78%, from international (excluding Canada) proprietary seismic data acquisition projects, $40.0 million, or approximately 11%, from North America (excluding Mexico) proprietary seismic data acquisition projects, $29.7 million, or approximately 8%, from multi-client seismic data acquisition business in the United States, and $10.3 million, or approximately 3%, from the seismic data processing & integrated reservoir geosciences business. Of the total international proprietary seismic data acquisition backlog, $168.2 million, or approximately 57%, is with national oil companies or partnerships including national oil companies. Furthermore, $46.8 million, or approximately 16%, of the international backlog is in shallow water transition zones and OBC environments. The Company anticipates that approximately 37% of the backlog at September 30, 2012 will be completed during 2012 and approximately 63% will be completed in 2013 and 2014. This backlog consists of written orders or commitments believed to be firm. Contracts for services are occasionally modified by mutual consent and in many instances can be cancelled by the customer on short notice without penalty. As such, the Company backlog at any particular date may not be indicative of its actual operating results for any succeeding fiscal period.

F.    Regulation

The Company's operations are subject to numerous international, federal, state, and local laws and regulations. These laws and regulations govern various aspects of operations, including the discharge of explosive materials into the environment, requiring the removal and clean-up of materials that may harm the environment, or otherwise relating to the protection of the environment and access to private and governmental land to conduct seismic surveys. The Company believes it has conducted its operations in substantial compliance with applicable laws and regulations governing its activities.

The Company's Quality, Health, Safety and Environmental ("QHSE") department is generally responsible for meeting, and remaining in compliance with, certain regulatory requirements. The Company has QHSE advisors who maintain and administer these programs for its field personnel. The costs of acquiring permits and remaining in compliance with environmental laws and regulations, title research, environmental studies, archeological surveys, and cultured resource surveys are generally borne by the Company's customers.

Although the direct costs of complying with applicable laws and regulations has historically not been material, the changing nature of such laws and regulations makes it impossible to predict the cost or impact of such laws and regulations on future operations. Additional United States or foreign government laws or regulations would likely increase the compliance and insurance costs associated with the Company's customers' operations. Significant increases in compliance expenses for the Company's customers could have a material adverse effect on the customers' operating results and cash flows, which could also negatively impact the demand for the Company's services.

## G.    Research and Development

The Company relies on certain proprietary information, proprietary software, trade secrets, and confidentiality and licensing agreements to conduct its current operations. The Company is continuously working to improve its technology and operating techniques, through internal development activities and working with its vendors to develop new technologies to maintain pace with industry innovation. Future success will be partly dependent on the Company's ability to maintain and extend its technology base and preserve its intellectual property without infringing on the rights of any third parties.

## H.    Properties

The Company leases administrative offices, operations centers, data processing centers, and warehouses throughout the world. No significant lease is scheduled to terminate in the near future, and the Company believes comparable space is readily obtainable should any lease expire without renewal. The Company believes its properties are generally well maintained and adequate for their intended use. As of December 31, 2012, the Company leased properties worldwide totaling approximately 4,560,000 square feet. Of this total, 340,000 square feet were located in North America and 4,206,000 square feet were located internationally.

During the twelve months ended December 31, 2012, the Company's leased facilities were as follows:

- Located in Houston, Texas in the United States, in Old Woking, Surrey in the United Kingdom, and in Calgary in Canada for seismic data processing.

- Located in Houston and Stafford, Texas; in Canonsburg, Pennsylvania; in Anchorage, Alaska; and in Calgary, Canada for North America seismic data acquisition.

- The Company's multi-client seismic data acquisition business also uses the facility in Canonsburg, Pennsylvania.

- Located in Rio de Janeiro, Brazil; Santa Cruz, Bolivia; Bogota, Colombia; Poza Rica, Miguel Hidalgo, Mexico City and General Bravo, Mexico; Lima, Peru; Paramaribo, Suriname; Brisbane, Australia; Singapore; Cairo, Egypt; Alger, Algeria; Luanda, Soyo, and Viana, Angola; Tripoli, Libya; Glasgow, Scotland; Tunis, Tunisia; and Dubai, United Arab Emirates, for international seismic data acquisition.

## I.    Employees

At September 30, 2012, the Company had approximately 5,695 full time equivalent employees. Some employees are a party to collective bargaining agreements in certain international locations. The Company considers relations with its employees to be satisfactory.

## J.    The Debtors' Organizational Structure

Attached as **Exhibit B** to this Disclosure Statement is an organizational chart summarizing the corporate structure of the Debtors and their Affiliates as of the Petition Date. Although the vast majority of the Company's equipment is owned by Advanced Seismic Technology, Inc., a U.S. entity, the Company stores equipment and maintains other property in the countries around the world where it does business.

In connection with the acquisition of PGS Onshore ("*PGS*") in February 2010, the Debtors acquired certain property and equipment in Libya. The Company entered into an agreement with PGS whereby PGS was to operate the business there on the Company's behalf. The Company subsequently completed the formation of a subsidiary and acquired certain required licenses to operate its seismic acquisition business. However, as a result of civil unrest in Libya, the Company's has been unable to operate its business or utilize its equipment in Libya since the first quarter of 2011. As such, during the second quarter of 2012, the Company began to transfer its equipment out of this area. The Company completed this transfer during the third quarter of 2012.

**K.    The Debtors' Pre-petition Capital Structure**

    *(i)    The Revolving Credit Facility*

On May 24, 2011, the Debtors' then revolving credit facility was assigned to WB Seismic, Ltd.; ECF Value Fund, L.P.; ECF Value Fund II, L.P.; and ECF Value Fund International, Ltd. Shortly thereafter, on August 12, 2011, the Debtors entered into an Amended and Restated Credit Agreement (the "*Credit Facility*") with Whitebox Advisors LLC, as administrative agent and collateral agent, and the lenders party thereto (together with any other lenders that may become party to the Credit Facility from time to time, the "*Credit Facility Lenders*"). Borrowings outstanding under the Credit Facility bear interest at 11.125%; the amount by which the total amount available of $50.0 million exceeds the amount outstanding is subject to an unused commitment fee of 11.125%. The Credit Facility does not provide for the issuance of letters of credit and matures on September 1, 2014. Borrowings under the facility are secured by the assets of GOK and certain assets of its current and future domestic subsidiaries (other than GOK Holdings, which is the borrower under the Credit Facility), including a portion of the stock of certain of the foreign subsidiaries held by such domestic subsidiaries and GOK Holdings. There are no scheduled amortization or commitment reductions prior to the maturity date. GOK Holdings is, however, required to prepay (with a corresponding reduction in commitment under) the facility with proceeds from certain asset sales and casualties. GOK Holdings has the option to terminate or permanently reduce the commitments under the facility upon the issuance of certain equity securities or after August 12, 2012, subject to a reduction fee schedule. The facility has no financial maintenance covenants. In the event of a change of control (as such term is used in the Credit Facility), each Credit Facility Lender may require GOK Holdings to terminate such Credit Facility Lender's commitment and repay such Credit Facility Lender its loans under the Credit Facility.

In connection with the Credit Facility, GOK Holdings paid the Credit Facility Lenders a closing fee of $1.7 million in cash on August 12, 2011 and a $4.0 million advisory fee by issuing an aggregate of 1,041,668 shares of GOK's common stock to the Credit Facility Lenders on August 29, 2011. The issuance of these shares triggered the anti-dilution provisions of (i) GOK's convertible preferred stock, (ii) the 2008 Warrants, and (iii) the 2010 Warrants.

    *(ii)    The Notes*

On December 23, 2009, GOK Holdings issued $300.0 million in aggregate principal amount of Notes in a private placement to institutional buyers at an issue price of $294.3 million or 98.093% of the principal amount. The stated interest rate on the Notes is 9.75%, and interest is payable semi-annually in arrears on June 15 and December 15 of each year, and the Notes mature in December 2014. The Notes are fully and unconditionally guaranteed by GOK and by each of GOK's current and future domestic subsidiaries (other than GOK Holdings, which is the issuer of the Notes). Pursuant to the terms of an inter-creditor agreement, the Notes are junior to the Credit Facility as to distributions from the proceeds of the collateral securing both the Credit Facility and the Notes. GOK Holdings may redeem all or part of the Notes at a prepayment premium that declines over time. In the event of occurrence of a change of control, GOK Holdings is required to make an offer to repurchase the Notes at 101% of the principal amount plus accrued interest. The Notes Indenture contains customary covenants for non-investment grade indebtedness, including restrictions on the Debtors' ability to incur indebtedness, to declare or pay dividends and repurchase its capital stock, to sell assets, and to engage in transactions with Affiliates.

    *(iii)    Preferred Stock and Warrants*

        a.    Series B-1 Senior Convertible Preferred Stock

On December 15, 2006, in connection with the repayment of a loan, GOK issued 228,683 shares of its Series B Senior Convertible Preferred Stock (the "*Series B Preferred Stock*"). Thereafter, on May 9, 2012, GOK

entered into the Series B Subscription and Exchange Agreement, pursuant to which all shares of Series B Preferred Stock were exchanged for Series B-1 Senior Convertible Preferred Stock (the "*Series B-1 Preferred Stock*"). Pursuant to the exchange, GOK issued each Holder of Series B Preferred Stock an equal number of shares of new Series B-1 Preferred Stock in exchange for the outstanding Series B Preferred Stock.

Each Holder of Series B-1 Preferred Stock is entitled to receive cumulative dividends at the rate of 9.75% per annum on the original issue price of $250 per share, compounded quarterly. At GOK's option through December 15, 2015, dividends may be paid in additional shares of Series B-1 Preferred Stock. After such date, dividends must be paid in cash if declared. Dividends on the Series B-1 Preferred Stock have been accrued or paid in kind exclusively. As of September 30, 2012, there were 360,008 shares of Series B-1 Preferred Stock outstanding and approximately $4.4 million of cumulated and/or accrued dividends.

The Series B-1 Preferred Stock contains certain anti-dilution provisions. Under these provisions, if GOK issues certain equity securities at a price lower than the conversion price of the Series B-1 Preferred Stock, the conversion price will be adjusted downward pursuant to a specific formula. The Series B-1 Stock has a liquidation preference over the Series D Preferred Stock (as defined below) and is pari passu with Series C-1 Preferred Stock.

> b.    Series C-1 Senior Preferred Stock and the 2008 Warrants

On July 28, 2008, GOK issued 120,000 shares of its Series B-2 Senior Convertible Preferred Stock (the "*Series B-2 Preferred Stock*") to Avista. In December 2009, GOK agreed to exchange its previously issued Series B-2 Preferred Stock for 133,982 shares of new Series C Senior Preferred Stock (the "*Series C Preferred Stock*"), plus 750,000 shares of common stock, which were issued to Avista. On May 9, 2012, GOK entered into a Series C Preferred Stock Subscription and Exchange Agreement pursuant to which all the shares of Series C Preferred Stock were exchanged for an equal number of shares of the new Series C-1 Senior Preferred Stock of GOK (the "*Series C-1 Preferred Stock*"). GOK is required to redeem the Series C-1 Preferred Stock on December 16, 2015. The Series C-1 Preferred Stock is not convertible or exchangeable for common stock, and it accrues dividends at a rate of 11.75% per annum on the original issue price of $250 per share. The Series C-1 Preferred Stock has a liquidation preference over the Series D Preferred Stock and is pari passu with Series B-1 Preferred Stock.

On July 28, 2008, GOK issued the 2008 Warrants to Avista in conjunction with the issuance of the Series B-2 Preferred Stock. The 2008 Warrants have a current exercise price of $9.05 per share. They expire on July 28, 2013 and contain anti-dilution provisions substantially similar to Series B-1 Preferred Stock such that, if GOK issues certain equity securities for a price that is lower than the warrant exercise price, the exercise price of the warrants will be adjusted downward pursuant to a specific formula.[8]

> c.    Series D Mandatorily Redeemable Junior Preferred Stock and the 2010 Warrants

On December 14, 2010, GOK issued 120,000 shares of Series D Mandatorily Redeemable Junior Preferred Stock (the "*Series D Preferred Stock*"). The Series D Preferred Stock was issued to related parties, including Avista and certain directors of GOK. Dividends on the Series D Preferred Stock accrue from the date of issuance and are paid in cash or accrued at the election of GOK at a rate of 10.5% per annum and compounded quarterly if paid in cash or 11.5% per annum and compounded quarterly if accrued but not paid. The Series D Preferred Stock is subject to mandatory redemption on December 15, 2016 and subject to redemption at the option of GOK (i) on or prior to December 31, 2013, at 110% of the liquidation preference; (ii) during 2014, at 105% of the liquidation preference; and (iii) after January 1, 2015 and prior to December 15, 2016, at 100% of the liquidation preference.

---

[8] On May 9, 2012, GOK amended the terms of the 2008 Warrants to provide, among other things, that (i) if the exercise price of the 2008 Warrants is adjusted as a result of the issuance, if any, of the warrants pursuant to the Commitment Letter, then the adjusted exercise price will not be lower than the closing price of GOK's common stock on the last trading day before such warrants are issued, and (ii) the issuance of the new Series B-1 Preferred Stock pursuant to the exchange of the Series B Preferred Stock will not result in adjustment to the exercise price of the 2008 Warrants.

On December 14, 2010, GOK also issued the 2010 Warrants. The 2010 Warrants expire on December 15, 2016 and contain anti-dilution provisions such that, if GOK issues certain equity securities on or prior to December 14, 2012 for a price that is lower than the warrant exercise price, the exercise price of the warrants will be adjusted to the price of the newly issued equity securities. After December 14, 2012, the exercise price adjusts in accordance with a similar formula as the Series B-1 Preferred Stock.[9]

(iv)    *The Avista Commitment Letter*

On March 16, 2012, GOK entered into a commitment letter (the "*Commitment Letter*") with Avista to obtain debt financing from Avista until January 1, 2013, subject to certain conditions. Pursuant to the terms of the Commitment Letter, from time to time at the election of GOK, Avista agreed to (i) purchase up to an additional $10 million in aggregate principal amount of Notes (the "*U.S. Avista Notes*") and (ii) enter into foreign loan facilities (the "*Foreign Avista Notes*" and, collectively with the U.S. Avista Notes, the "*Additional Avista Notes*") to be secured by the assets of certain of the Debtors' non-U.S. subsidiaries that would be drawn down from time to time concurrently with the purchase by Avista of any U.S. Avista Notes. Had the Debtors elected to exercise their right to have the Avista Financing Parties purchase any Additional Avista Notes, the Debtors would have been obligated to deliver U.S. Avista Notes with a principal amount equal to the amount of the purchase price and Foreign Avista Notes in an aggregate principal amount equal to 80% of such purchase price, allocated among the Foreign Avista Notes as directed by Avista.

In consideration of their obligations under the Commitment Letter, the Debtors paid Avista a fee of $300,000 at the time the Commitment Letter was executed, a fee of $300,000 on June 30, 2012, an additional commitment fee of $100,000 on June 30, 2012 in lieu of delivering warrants to purchase 190,000 shares of GOK's common stock, and an additional commitment fee of $70,000 on October 10, 2012 in lieu of delivering warrants to purchase 190,000 shares of GOK's common stock.

No financing was ever requested in connection with the Commitment Letter, in part because the Debtors did not believe it likely they would be able to access the financing provided for under the Commitment Letter without a restructuring of their indebtedness and capital structure, and on December 20, 2012, the Debtors terminated the Commitment Letter by providing notice of such termination to Avista.

L.    **Significant Pre-petition Contracts and Leases**

From time to time, the Debtors enter into capital leases and vendor financing arrangements to purchase certain equipment. The equipment purchased from these vendors is paid over a period of time. The amount due under all capital leases and vendor financing arrangements was approximately $5.2 million as of September 30, 2012. The net book value of the property and equipment acquired under all capital leases and vendor financing agreements at September 30, 2012 was approximately $7.6 million.

M.    **Pre-petition Litigation**

From time to time, the Company is subject to various claims and legal actions arising in the ordinary course of its operations. Certain of these claims and legal actions are summarized below, however, this summary is not intended to be a complete list of pending or potential claims and legal actions against the Company.

(i)    *Mexico Liftboat Incident*

The Company is a defendant in lawsuits arising out of the September 8, 2011 liftboat incident in the Bay of Campeche, Gulf of Mexico filed by two surviving crewmembers of the liftboat who were employees of the liftboat owner/operator, the heirs of two deceased crewmembers of the liftboat who were employees of the liftboat owner/operator, and the heirs of two decedents who were employees of a GOK operating company. The lawsuits

---

[9] On May 9, 2012, GOK amended the terms of the 2010 Warrants to provide, among other things, that the issuance of the new Series B-1 Preferred Stock pursuant to the exchange of the Series B Preferred Stock will not result in an adjustment to the exercise price of the 2010 Warrants.

filed were styled as *Randal Reed v. Trinity Lifeboat Services, LLC, Trinity Lifeboat Services No. 2 LLC*, filed in the United States District Court, Western District of Louisiana, Lafayette Division, C.A. No. 6:11-cv-01868 and *Ted Derise, Jr., et al. v. Advanced Seismic Technology, Inc.*, filed in the 11th Judicial District Court of Harris County, Texas, C.A. No. 2012-12812. This matter was covered by the Debtors' insurance and has been resolved. All cases have been dismissed.

> (ii)    *International Labor Claims*

The Debtors have received adverse verdicts with respect to several international labor claims and are currently appealing these verdicts. Although the vast majority of claims of this type relate to non-Debtor entities, the Debtors have occasionally been subject to international labor claims where they operate outside the United States.

> (iii)    *Other Contingencies*

The Debtors are party to various other claims and legal actions arising in the ordinary course of business. For example, the Debtors are frequently subject to claims for property damage and other torts related to the gathering of seismic data and to contractual disputes. While many of these claims are covered by insurance, the Debtors must occasionally make provisions for the payment of such claims.

In addition to those claims and legal actions set forth herein, the Debtors and their non-Debtor Affiliates may be subject to additional claims and liabilities arising out of their operations.

## VI.
## DESCRIPTION OF THE JOINT PLAN OF REORGANIZATION

This Article provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan, and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein). Certain provisions of the Plan (and the descriptions and summaries contained herein) may be the subject of continuing negotiations among the Debtors and various parties, and therefore may be modified. The Plan itself and the documents therein control the actual treatment of Claims against, and Equity Interests in, the Company under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Equity Interests in the Company, the Debtors' estates, the Reorganized Debtors, all parties receiving property under the Plan and other parties in interest. In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other operative document thereunder, on the other hand, the terms of the Plan and other such operative documents are controlling.

### A.    Overall Structure of the Plan

The Plan is comprised of ten sub plans, one for each Debtor. Under the Plan, Claims against and Equity Interests in the Debtors are divided into Classes according to the payment priority set forth in the Bankruptcy Code.

### B.    General Rules of Classification

Bankruptcy Code section 1123 provides that a Plan must classify the claims and interests of a debtor's creditors and equity interest holders subject to section 1122. Pursuant to Bankruptcy Code sections 1122 and 1123(a), set forth below is a designation of Classes of Claims against and Equity Interests in the Debtors. A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes. A Claim or Equity Interest is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is Allowed that Class and such Claim or Equity Interest has not been paid, released, or otherwise settled prior to the Effective Date.

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Expenses and Priority Tax Claims of the kinds specified in Bankruptcy Code sections 507(a)(2) and 507(a)(8) have not been classified and thus are excluded from the Classes of Claims and Equity Interests set forth in Article III of the Plan. The Plan constitutes a separate chapter 11 plan of reorganization for each of the ten Debtors, each of which shall include the classifications set forth below. For the avoidance of doubt, to the extent that a Class contains Allowed Claims or Equity Interests

with respect to a particular Debtor, such Class is designated with respect to such Debtor. To the extent that there are no Allowed Claims or Equity Interests in a Class with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor.

**C.      Summary of Classification**

The following chart represents the general classification of Claims against and Equity Interests in the Debtors pursuant to the Plan:

| Class | Claims | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| Class 3 | Credit Facility Claims | Unimpaired | No (presumed to accept) |
| Class 4 | Note Claims | Impaired | Yes |
| Class 5 | Unsecured Claims | Unimpaired | No (presumed to accept) |
| Class 6 | Intercompany Claims | Unimpaired | No (presumed to accept) |
| Class 7 | Senior Preferred Equity Interests | Impaired | Yes |
| Class 8 | Junior Preferred Equity Interests | Impaired | No (presumed to reject) |
| Class 9a | GOK Other Equity Interests | Impaired | No (presumed to reject) |
| Class 9b-9j | Subsidiary Debtor Other Equity Interests | Unimpaired | No (presumed to accept) |

**D.      Treatment of Claims and Equity Interests**

    (i)      *Class 1 – Other Priority Claims (Subclasses 1a-1j)*

        (a)      *Classification*: Class 1 consists of Other Priority Claims against each Debtor.

        (b)      *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall, at the option of the Debtors and acceptable to the Majority Noteholders, be paid: (i) in Cash in an amount sufficient to render such Other Priority Claim unimpaired under Bankruptcy Code section 1124 on the later of (x) the Effective Date (or as soon as is reasonably practicable thereafter), or (y) the first Distribution Date after such Other Priority Claim becomes an Allowed Other Priority Claim, or (ii) on such other terms and conditions as may be agreed between the Holder of such Allowed Other Priority Claim and the Debtors and acceptable to the Majority Noteholders, provided, however, that Allowed Other Priority Claims representing obligations incurred in the ordinary course will be paid in full by the Debtors or Reorganized Debtors consistent with past practice.

48

(c)     *Voting*: Class 1 is Unimpaired and the Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f). Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

(d)     *Full Settlement*: As more specifically set forth in, and without in any way limiting Section IX.A of the Plan, the distributions provided in this Section III.C.i to Holders of Other Priority Claims (when distributed to Holders of Other Priority Claims in accordance with the Plan) are in full settlement and release of each Holder's Other Priority Claim. Subclasses 1a through 1j are Unimpaired.

(ii)    *Class 2 – Other Secured Claims (Subclasses 2a-2j)*

(a)     *Classification*: Class 2 consists of Other Secured Claims.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Other Secured Claim, at the option of the Debtors and acceptable to the Majority Noteholders, on the Effective Date, (i) be paid in Cash in full on the earlier of (x) the Effective Date (or as soon as is reasonably practicable thereafter), or (y) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim; (ii) be paid in Cash on such other terms and conditions as may be agreed between the Holder of such Allowed Other Secured Claim and the Debtors (with the consent of the Majority Noteholders); (iii) the legal, equitable and contractual rights to which the Other Secured Claim entitles the Holder of such Claim will remain unaltered, and the Holder of such Claim shall retain any Liens and/or security interests securing such Claim, or (iv) the Debtors will provide other treatment that will render such Other Secured Claim Unimpaired under Bankruptcy Code section 1124.

(c)     *Voting*: Class 2 is Unimpaired and the Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f). Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

(d)     *Full Settlement*: As more specifically set forth in, and without in any way limiting Section IX.A of the Plan, the distributions provided in this Section III.C.ii to Holders of Other Secured Claims (when distributed to Holders of Other Secured Claims in accordance with the Plan) are in full settlement and release of each Holder's Other Secured Claims. Subclasses 2a through 2j are Unimpaired. For the avoidance of doubt, to the extent that applicable distribution includes the continued existence of the legal, equitable, and contractual rights of a Holder of an Allowed Other Secured Claim, the foregoing continued rights shall not be released.

(iii)   *Class 3 – Credit Facility Claims (Subclasses 3a-3j)*

(a)     *Classification*: Class 3 consists of the Credit Facility Claims.

(b)    *Treatment*: To the extent not satisfied prior to the Effective Date, and except to the extent that the Debtors, with the consent of the Majority Noteholders, and a Holder of an Allowed Credit Facility Claim otherwise agree, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Credit Facility Claim, each Holder of an Allowed Credit Facility Claim shall be paid in Cash on the Effective Date (or as soon as is reasonably practicable thereafter) in an amount equal to such Credit Facility Claim, including all interest that may have accrued on account of such Allowed Credit Facility Claim as determined by the Bankruptcy Court.

(c)    *Voting*: Class 3 is Unimpaired and the Holders of Credit Facility Claims are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f). Therefore, Holders of Credit Facility Claims are not entitled to vote to accept or reject the Plan.

(d)    *Full Settlement:*  As more specifically set forth in, and without in any way limiting Section IX.A of the Plan, the distributions provided in this Section III.C.iii to Holders of Credit Facility Claims (when distributed to Holders of Credit Facility Claims in accordance with the Plan) are in full settlement and release of each Holder's Credit Facility Claim.  Subclasses 3a through 3j are Unimpaired.

(iv)    *Class 4 – Note Claims (Subclasses 4a-4j)*

(a)    *Classification*: Class 4 consists of the Note Claims.

(b)    *Treatment*: The Note Claims are Allowed.  Except to the extent that the Debtors, with the consent of the Majority Noteholders, and a Holder of an Allowed Note Claim agrees to less favorable treatment, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Note Claim, on the Effective Date, the Class 4 Distribution shall be issued and distribution of the Class 4 Distribution shall commence such that each Holder of an Allowed Note Claim shall receive its *Pro Rata* share of the Class 4 Distribution on the Effective Date (or as soon as is reasonably practicable thereafter).

(c)    *Voting*: Class 4 is Impaired by the Plan.  Therefore, Holders of Note Claims are entitled to vote to accept or reject the Plan.

(d)    *Full Settlement:*  As more specifically set forth in, and without in any way limiting Section IX.A of the Plan, the distributions provided in this Section III.C.iv to Holders of Note Claims (when distributed to Holders of Note Claims in accordance with the Plan) are in full settlement and release of each Holder's Note Claim and all other Claims against any and all of the Debtors, if any, of such Holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Priority Claim was based.  Subclasses 4a through 4j are Impaired.

(v)    *Class 5 – Unsecured Claims (Subclasses 5a-5j)*

(a)    *Classification*: Class 5 consists of Unsecured Claims.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Unsecured Claim agrees to a less favorable treatment, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Unsecured Claim, (i) the legal, equitable and contractual rights to which the Allowed Unsecured Claim entitles the Holder of such Claim will remain unaltered, or (ii) if such Allowed Unsecured Claim is due and payable on or before the Effective Date, the Holder of such Allowed Unsecured Claim shall receive, payment in Cash in an amount sufficient to render such Allowed Unsecured Claim Unimpaired under Bankruptcy Code section 1124, on the later of (x) the Effective Date (or as soon as is reasonably practical thereafter) or (y) the first Distribution Date after such Unsecured Claim becomes an Allowed Unsecured Claim. For avoidance of doubt, if an Unsecured Claim is not due and payable before the Effective Date, the Holder of such Unsecured Claim may be paid in the ordinary course of business consistent with past practices.

(c) *Voting*: Class 5 is Unimpaired by the Plan. Therefore, Holders of Unsecured Claims in this Class are not entitled to vote to accept or reject the Plan.

(d) *Full Settlement*: As more specifically set forth in, and without in any way limiting Section IX.A of the Plan, the distributions provided in this Section III.C.iii to Holders of Unsecured Claims (when distributed to Holders of Unsecured Claims in accordance with the Plan) are in full settlement and release of each Holder's Unsecured Claim. Subclasses 5a through 5j are Unimpaired. For the avoidance of doubt, to the extent that applicable distribution includes the continued existence of the legal, equitable, and contractual rights of a Holder of an Allowed Unsecured Claim, the foregoing continued rights shall not be released.

(vi) *Class 6 – Intercompany Claims (Subclasses 6a-6j)*

(a) *Classification*: Class 6 consists of Intercompany Claims between and among the Debtors.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Intercompany Claim agrees to a less favorable treatment acceptable to the Majority Noteholders, in full satisfaction, settlement, release, and discharge of, and exchange for such Allowed Intercompany Claim, on the Effective Date the legal, equitable and contractual rights to which the Intercompany Claim entitles the Holder of such Claim will remain unaltered and treated in the ordinary course of business.

(c) *Voting*: Class 6 is Unimpaired, and the Holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f). Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

(d) *Full Settlement*: As more specifically set forth in, and without in any way limiting Section IX.A of the Plan, the distributions provided in this Section III.C.vi to Holders of Intercompany Claims (when distributed to Holders of Intercompany Claims in accordance with the Plan) are in full settlement and release of each Holder's Intercompany Claims. Subclasses 6a through 6j are Unimpaired. For the avoidance of doubt, to the extent that applicable distribution includes the continued existence of the legal, equitable, and contractual rights of a Holder of an Allowed Intercompany Claim, the foregoing continued rights shall not be released.

(vii) *Class 7 – Senior Preferred Equity Interests*

(a) *Classification*: Class 7 consists of Senior Preferred Equity Interests in GOK.

51

    (b)    *Treatment*: Except to the extent that the Debtors, with the consent of the Majority Noteholders, and a Holder of an Allowed Senior Preferred Equity Interest in Class 7 agrees to less favorable treatment, in full satisfaction, settlement, release, and discharge of, any in exchange for such Allowed Senior Preferred Equity Interest, on the Effective Date (or as soon as is reasonably practicable thereafter) each Holder of an Allowed Senior Preferred Equity Interest shall receive its *Pro Rata* share of the Class 7 Distribution.

    (c)    *Voting*: Class 7 is Impaired by the Plan. Therefore, Holders of Preferred Equity Interests in Class 7 are entitled to vote to accept or reject the Plan.

    (d)    *Full Settlement*: As more specifically set forth in, and without in any way limiting Section IX.A of the Plan, the distributions provided in this Section III.C.vii to Holders of Senior Preferred Equity Interests (when distributed to Holders of the Senior Preferred Equity Interests in accordance with the Plan) are in full settlement and release of each Holder's Senior Preferred Equity Interest and all other Claims against any and all of the Debtors, if any, of such Holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Senior Preferred Equity Interest was based.

  (viii)    *Class 8 – Junior Preferred Equity Interests*

    (a)    *Classification*: Class 8 consists of Junior Preferred Equity Interests in GOK.

    (b)    *Treatment*: On the Effective Date, all Junior Preferred Equity Interests in Class 8 shall be deemed cancelled and extinguished, and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the Holders of Junior Preferred Equity Interests in Class 8.

    (c)    *Voting*: Class 8 is Impaired by the Plan and the Holders of Junior Preferred Equity Interests in Class 8 are conclusively presumed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g). Therefore, Holders of Junior Preferred Equity Interests in Class 8 are not entitled to vote to accept or reject the Plan.

  (ix)    *Class 9a – Other Equity Interests*

    (a)    *Classification*: Class 9a consists of Other Equity Interests in GOK.

    (b)    *Treatment*: On the Effective Date, all Other Equity Interests in Class 9a shall be deemed cancelled and extinguished, and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the Holders of Other Equity Interests in Class 9a.

    (c)    *Voting*: Class 9a is Impaired and the Holders of Other Equity Interests in Class 9a are conclusively presumed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g). Therefore, Holders of Other Equity Interests in Class 9 are not entitled to vote to accept or reject the Plan.

  (x)    *Classes 9b-9j – Subsidiary Debtor Other Equity Interests*

    (a)    *Classification*: Classes 9b-9j consists of the Other Equity Interests in the Subsidiary Debtors.

(b)    Treatment: On the Effective Date, the legal, equitable and contractual rights to which the Subsidiary Debtor Other Equity Interests entitles the Holder of such Interest will remain unaltered.

(c)    *Voting*: Classes 9b-9j are Unimpaired and the Holders of Other Equity Interests in Classes 9b-9j are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(g). Therefore, Holders of Other Equity Interests in Classes 9b-9j are not entitled to vote to accept or reject the Plan.

## E.    Treatment of Administrative Expenses and Priority Tax Claims

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Expenses and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Equity Interests set forth in Article III and shall have the following treatment:

(i)    *Administrative Expenses*

a.    Administrative Expenses (excluding DIP Claims)

The Debtors or the Reorganized Debtors, as the case may be, will pay each allowed Administrative Expense against the Debtors in full, in Cash, on the later of (a) the Effective Date (or as soon thereafter as is practicable), (b) the date on which the Bankruptcy Court enters an order allowing such Administrative Expense, or (c) such other date to which the Debtors (with the consent of the Majority Noteholders) or the Reorganized Debtors, as the case may be, and the Holder of the allowed Administrative Expense agree; provided, however, that allowed Administrative Expenses representing (a) obligations incurred in the ordinary course of business or assumed by the Debtors or the Reorganized Debtors, as the case may be, will be paid in full or performed in the ordinary course of business, consistent with past practice and (b) obligations incurred to Professionals for services provided through the Confirmation Date will be paid in accordance with the applicable Bankruptcy Court order approving the fees and expenses of each such Professional; provided, further, however, that allowed Administrative Expenses incurred by the Debtors or the Reorganized Debtors, as the case may be, after the Confirmation Date, including claims for Professionals' fees and expenses, will not require application to the Bankruptcy Court and shall be paid by the Debtors or Reorganized Debtors, as the case may be, in the ordinary course of business and without further Bankruptcy Court approval.

b.    DIP Claims

All DIP Claims: (a) are Allowed in full; (b) shall not be subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether contractual, equitable, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under any applicable law or regulation by any person or entity; and (c) shall constitute Allowed Administrative Expenses. Commencing on the Effective Date, unless otherwise agreed to by the Backstop DIP Lenders, the DIP Equity Distribution shall be issued and distribution of the DIP Equity Distribution shall commence such that each Holder of a DIP Lender Claim shall receive its Pro Rata share of the DIP Equity Distribution in full settlement, release and discharge of its DIP Lender Claim on the Effective Date (or as soon as is reasonably practicable thereafter). On the Effective Date, the DIP Interest Obligations, DIP Financing Fees and Expenses, and DIP Agent Fees, each to the extent accrued and unpaid, shall be paid in full, in Cash, without the need for application to or approval from any court.

c.    Professional Compensation

i.    Final Application for Compensation and Reimbursement of Professionals' Fees and Expenses

All applications for final allowance of compensation and reimbursement of Professionals' fees and expenses must be filed no later than forty-five (45) days following the Effective Date and will be subject to the authorization and approval of the Court. Any objections to such applications shall be filed no later than forty-five (45) days following the date on which a final fee application is filed with the Court.

ii.     Post-Effective Date Fees and Expenses

Upon the Effective Date, any requirement that Professionals comply with Bankruptcy Code sections 327 through 331 and 1103 in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action (including, without limitation, the need to file a fee application), order or approval of the Bankruptcy Court.

d.     Administrative Expense Bar Date

Except with respect to requests for allowance of compensation and reimbursement of Professional fees and expenses and as otherwise provided in this Article, requests for payment of Administrative Expenses, if required, must be filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than 30 days after the Effective Date. Holders of Administrative Expenses that are required to, but do not, file and serve a request for payment of such Administrative Expenses by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Expenses against the Debtors or Reorganized Debtors or their property, and such Administrative Expenses shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be filed and served on the Reorganized Debtors and the requesting party no later than 75 days after the Effective Date or such later date as the Bankruptcy Court may approve. Notwithstanding the foregoing, no request for payment of an Administrative Expense need be filed with respect to: (i) a DIP Claim, or (ii) any other Administrative Expense made an allowed Administrative Expense by Final Order, including all Administrative Expenses expressly made allowed Administrative Expenses under the Plan.

e.     U.S. Trustee Fees

All Bankruptcy Fees will be paid by the Debtors on or before the Effective Date, or by the Reorganized Debtors as soon as practicable thereafter. All Bankruptcy Fees will be paid until the Bankruptcy Court enters a final decree closing the Chapter 11 Cases.

f.     Full Settlement

As more specifically set forth in, and without in any way limiting, Section IX.A of the Plan, the distributions provided for in and when paid pursuant to Section II.A of the Plan are in full settlement and release of all Administrative Expenses.

(ii)     *Priority Tax Claims*

a.     Treatment

With respect to each Allowed Priority Tax Claim against the Debtors, each Holder of an Allowed Priority Tax Claim shall be entitled to receive, at the option of the Majority Noteholders, from the Debtors or the Reorganized Debtors, as the case may be, and on account of such Claim on the later of (i) the Effective Date or as soon thereafter as is practicable, (ii) the date on which such Claim becomes an Allowed Priority Tax Claim, or (iii) the date on which the Debtors with the consent of the Majority Noteholders or the Reorganized Debtors and the Holder of such Allowed Priority Tax Claim otherwise agree:

i.     Cash payments in an amount equal to such Allowed Priority Tax Claim;

ii.     Cash payable in installment payments over a period of time not to exceed five years after the Petition Date with an aggregate value, as of the Effective Date, equal to the amount of such Allowed Priority Tax Claim, pursuant to Bankruptcy Code section 1129(a)(9)(C); or

54

iii.   Such other treatment agreed to by each Holder of such Allowed Priority Tax Claim and the Debtors, with the consent of the Majority Noteholders, or Reorganized Debtors, as the case may be.

b.   Full Settlement

As more specifically set forth in, and without in any way limiting, Section IX.A of the Plan, the distributions provided for in and when paid pursuant to this Section VI.E.(ii) of the Plan are in full settlement, release and discharge of all Priority Tax Claims.

F.   **Settlement, Release, Injunction, and Related Provisions**

(i)   *Discharge of All Claims and Interests and Releases.*

a.   General Discharge of All Claims and Interests and Releases

**Except as otherwise expressly provided in the Plan, the confirmation of the Plan (subject to the occurrence of the Effective Date) will discharge the Debtors and the Reorganized Debtors from any Claim that arose before the Confirmation Date and any Claim of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i), whether or not a Proof of Claim is filed or is deemed filed, whether or not such Claim is Allowed and whether or not the Holder of such Claim has voted on the Plan. Confirmation of the Plan will not discharge any DIP Lender Claims or other DIP Borrowing Obligations, DIP Interest Obligations, DIP Financing Fees and Expenses or DIP Agent Fees under the DIP Loan Agreement unless and until all such DIP Lender Claims and other DIP obligations are paid in full, in cash or receive the DIP Equity Distribution, as applicable.**

**Furthermore, but in no way limiting the generality of the foregoing, except as otherwise specifically provided by the Plan, the distributions and rights (which distribution and rights may include the continuation of pre-petition liens, security interests, or other rights) that are provided in the Plan will be in complete satisfaction, discharge and release, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date), of all Claims and Causes of Action against, liabilities of, liens on, obligations of and Equity Interests in GOK or Reorganized GOK or the direct or indirect assets and properties of the Debtors or the Reorganized Debtors, whether known or unknown, regardless of whether a Proof of Claim or interest was filed, whether or not Allowed and whether or not the Holder of the Claim or GOK Equity Interest has voted on the Plan, or based on any act or omission, transaction or other activity or security, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date that was or could have been the subject of any Claim or GOK Equity Interest, in each case regardless of whether a Proof of Claim or interest was filed, whether or not Allowed and whether or not the Holder of the Claim or GOK Equity Interest has voted on the Plan; provided, however, that notwithstanding the foregoing, nothing in the Plan or the Disclosure Statement is intended to release any insurer from having to provide coverage under any policy to which the Debtors, the Reorganized Debtors, and/or their current or former officers, directors, employees, representatives, or agents are parties or beneficiaries.**

**Additionally, except as otherwise specifically provided by the Plan or the Confirmation Order, the confirmation of the Plan (subject to the occurrence of the Effective Date) shall act as a discharge and release of all Causes of Action (including Causes of Action of a trustee and debtor in possession under the Bankruptcy Code) of the Debtors and Reorganized Debtors, whether known or unknown, against (in each case, only in the specified capacity): (a) their present and former directors, shareholders, officers and employees, agents, attorneys, accountants, financial advisors, and investment bankers; (b) the present and former Credit Facility Agent and the present and former Credit Facility Lenders, each in such capacity, and their respective present and former Affiliates, officers, directors, shareholders, advisory Affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); (c) the present and former Noteholders and their respective present and former Affiliates, officers, directors, shareholders, advisory Affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or**

entities); (d) the Notes Indenture Trustee and its present and former Affiliates, officers, directors, shareholders, advisory Affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); (e) the Collateral Trustee and its present and former Affiliates, officers, directors, shareholders, advisory Affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); (f) each of the Backstop DIP Lenders and each of the respective Backstop DIP Lenders' present and former Affiliates, officers, directors, shareholders, advisory Affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); (g) the DIP Agent, and the DIP Lenders and each of their respective present and former Affiliates, officers, directors, shareholders, advisory Affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); (h) the present and former Holders of the Senior Preferred Equity Interests and their respective present and former Affiliates, officers, directors, shareholders, advisory Affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); and (i) any Entity claimed to be liable derivatively through any of the foregoing. Notwithstanding the generality of the foregoing, unless expressly agreed to by the Debtors (with the consent of the Majority Noteholders) or the Reorganized Debtors, nothing in the Plan shall release any claims of any of the Debtors or Reorganized Debtors, as the case may be, against any Subsidiaries that are not Debtors or Reorganized Debtors, as the case may be; provided, however, that the foregoing releases shall not apply to any person or Entity who, in connection with any act or omission by such person or Entity in connection with or relating to the Debtors or their businesses, has been or is hereafter found by any court or tribunal by Final Order to have acted with gross negligence or willful misconduct.

      b.     Releases by Holders of Claims and Equity Interests

In addition, but in no way limiting the generality of the foregoing, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, for good and valuable consideration, including the contributions of the following parties to the facilitation and expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, each Holder of a Note Claim or Senior Preferred Equity Interest who does not opt out of the release provisions in the Plan on their ballot agrees to the release provisions of the Plan and is presumed conclusively to have unconditionally and forever released (a) the Debtors, (b) the Reorganized Debtors, (c) the present and former Credit Facility Lenders, (d) the Credit Facility Agent, (e) the DIP Lenders, (f) the DIP Agent, (g) the Backstop DIP Lenders, (h) the Collateral Trustee, (i) the Notes Indenture Trustee, (j) the Consenting Noteholders, (k) the Consenting Preferred Equity Holders, and (i) the Debtors' officers, directors, and employees who hold such positions on the Petition Date and any Entity claimed to be liable derivatively through any of the foregoing and with respect to each of the foregoing Entities in clauses (a) through (k), the present and former members of any such Entities (together with the advisory Affiliates and advised Affiliates of such members) (and each solely in their capacity as such), their respective successors, assigns, and each of their respective Affiliates officers, directors, shareholders, advisory Affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities) from any Cause of Action based on the same subject matter as the Claim or Interest on which the distribution is received; provided, however, that the foregoing releases shall not apply to any person or Entity who, in connection with any act or omission by such person or Entity in connection with or relating to the Debtors or their businesses, has been or is hereafter found by any Final Order or any court or tribunal to have acted with gross negligence or willful misconduct; provided, however that nothing herein shall be deemed a waiver or release of a Holder of a Claim or Equity Interest to receive the distribution as provided for under the Plan; provided, however, that the Consenting Noteholders and the Consenting Preferred Equity Holder have previously agreed to provide the releases set forth in this section and shall not have the ability to opt out of such release provisions. For the avoidance of doubt, if a Holder of a Note Claim or a Senior Preferred Equity Interest submits a ballot without checking either the "Opt Out of the Releases" box or the "Not Opt Out of the Releases" box, then it will be deemed to consent to the releases contemplated by Article IX of the Plan.

(ii)    *Exculpation*

Except as otherwise specifically provided in the Plan, each of: (a) the Debtors and the Reorganized Debtors, (b) the Creditors' Committee, if any, and the current and former members thereof, in their capacity as such, (c) the DIP Lenders, solely in such lenders' capacity as such, (d) the DIP Agent, solely in such agent's capacity as such, (e) the Credit Facility Agent, solely in its capacity as such, (f) the Notes Indenture Trustee, solely in its capacity as such, (g) the Collateral Trustee, solely in its capacity as such, (h) the Consenting Noteholders, and (i) the Consenting Preferred Equity Holders; with respect to each of the foregoing Entities in clauses (a) through (i), such Entities' Affiliates, members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners and representatives, in each case solely in their capacity as such, will have no liability for any act or omission in connection with, or arising out of, the formulation, negotiation, or pursuit of approval of the DIP Facility, the Disclosure Statement, the Plan, or the solicitation of votes for or confirmation of the Plan, or the consummation of the Plan, or the transactions contemplated and effectuated by the Plan or the administration of the Plan or the property to be distributed under the Plan, or any other act or omission during the administration of the Debtors' Estates or in contemplation of the Chapter 11 Cases except for gross negligence or willful misconduct as determined by a Final Order of the Bankruptcy Court, and in all respects, will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

(iii)    *Injunction*

Sections IX.A, IX.B, and IX.C of the Plan will also act as an injunction against any Entity commencing or continuing any action, employment of process, or act to collect, offset or recover any Claim, Interest or Cause of Action satisfied, released or discharged under the Plan. Notwithstanding any other provision of the Plan or the Confirmation Order, Confirmation of the Plan shall not enjoin or extinguish any Creditor's rights of setoff or recoupment, if any, to the extent that such Creditor has a valid Claim and a valid right of recoupment or setoff under applicable state or federal law (including, without limitation, the Bankruptcy Code). Without limiting the applicability of the foregoing, (a) mutuality shall be required for any setoff and (b) no creditor may setoff (i) any pre-petition Claim against any post-petition obligation owed to any of the Debtors or (ii) any post-petition claim against any pre-petition obligation owed to any of the Debtors. Nothing herein shall constitute any admission by any of the Debtors that any Creditor has a valid right of setoff or right of recoupment under applicable state or federal law (including the Bankruptcy Code); and, provided, further, that any and all defenses of the Debtors and/or Reorganized Debtors with respect to any such asserted right of setoff or right of recoupment and to challenge the assertion of any such right of setoff or recoupment are hereby preserved in their entirety.

(iv)    *Guarantees and Claims of Subordination*

a.    Guarantees

The classification and the manner of satisfying all Claims under the Plan take into consideration (i) the possible existence of any alleged guarantees by the Debtors of obligations of any Entity or Entities, and (ii) that the Debtors may be joint obligors with another Entity or Entities with respect to the same obligation. The Holders of Claims will be entitled to only one distribution with respect to any given obligation of the Debtors under the Plan.

b.    Claims of Subordination.

Except as specifically provided herein, to the fullest extent permitted by applicable law, all Claims and GOK Equity Interests, and all rights and claims between or among Holders of Claims or GOK Equity Interests relating in any manner whatsoever to Claims or GOK Equity Interests, based on any contractual, equitable or legal subordination rights, will be terminated on the Effective Date and discharged in the manner provided in the Plan, and all such Claims, GOK Equity Interests and rights so based and all such contractual, equitable and legal subordination rights to which any Entity may be entitled will be irrevocably waived upon the Effective Date. To the fullest extent permitted by applicable law, the rights afforded and the distributions that are made in respect of any Claims or Equity Interests under the Plan will not be subject to levy, garnishment, attachment or like legal process by any Holder of a Claim or Equity Interest by reason of any contractual, equitable or legal subordination rights, so

that, notwithstanding any such contractual, equitable or legal subordination rights, each Holder of a Claim or Equity Interest will have and receive the benefit of the rights and distributions set forth in the Plan; provided, however, that nothing in this Section IX.D.ii shall affect the Claims or contractual, equitable or legal subordination rights of the Holders of Claims that are Unimpaired under the Plan and this Section IX.D.ii shall not be deemed to Impair any Claims that are not otherwise Impaired pursuant to the Plan.

(v)      *Injunction Related to Releases and Exculpation*

**The Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released pursuant to the Plan, including but not limited to the Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities discharged or released in Sections IX.A and B of the Plan.**

(vi)     *Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is an Allowed Secured Claim as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns. For the avoidance of doubt, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court, or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

**G.      Vesting of Assets**

Except as otherwise provided in the Plan, the Plan Supplement, or any agreement, instrument or other document incorporated therein, on the Effective Date, any and all property in each Estate and all Causes of Action (except those released pursuant to the releases by the Debtors set forth in Section IX.A of the Plan) shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, granted to secure the Exit Facility). On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Equity Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**H.      New Corporate Governance Documents**

Pursuant to Bankruptcy Code section 1123(a)(6), the charter (or other similar constituent document) of each Debtor is required, after the Effective Date, to provide for (i) a prohibition on the issuance of non-voting equity securities and (ii) as to all of the classes of securities possessing voting power, an appropriate distribution of voting power among such classes, including, in the case of any class of equity securities that is preferred for dividend purposes, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of dividends. On or immediately before the Effective Date, each of the Reorganized Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states of incorporation in accordance with the corporate laws of the respective states of incorporation. Pursuant to Bankruptcy Code section 1123(a)(6), the New Certificates of Incorporation with respect to each Reorganized Debtor that is a corporation will prohibit the issuance of nonvoting equity securities. After the Effective Date, each of the Reorganized Debtors may amend and restate their respective New Certificates of Incorporation and New By-laws and other constituent documents as permitted by the laws of their respective states of incorporation, their respective New Certificates of Incorporation, and New By-laws and, in the case of Reorganized GOK, the New Stockholders Agreement.

I.      **Cancellation of Securities, Agreements, and Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is an Allowed Secured Claim as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates will be fully released and discharged and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests will revert to the Reorganized Debtor and its successors and assigns without any further action of any party.

J.      **Directors and Officers of the Reorganized Debtors**

Pursuant to Bankruptcy Code section 1129(a)(5), which requires, among other things, that the plan proponent disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director or officer of the debtor, the identity and affiliations of each proposed officer and member of the New Board of Directors of each of the Reorganized Debtors (and, to the extent such person is an insider, the nature of any compensation for such person) will be disclosed in the Plan Supplement.

The composition of the New Board of Directors of Reorganized GOK, which shall be selected by the Consenting Noteholders, will be identified in the Plan Supplement. On the Effective Date, the term of the current board of directors of the Debtors shall expire and the operation of the Reorganized Debtors shall become the responsibility of the New Board. Each director on the New Board shall serve from and after the Effective Date pursuant to the terms of the respective New Certificate of Incorporation and New By-laws of the Reorganized Debtor. Any subsequent Reorganized GOK Board of Directors will be elected, classified, and composed in a manner consistent with the New Corporate Governance Documents and applicable non-bankruptcy law.

Officers of the Reorganized GOK, as selected by the Majority Noteholders, shall be identified in the Plan Supplement. Such officers shall serve in accordance with applicable non-bankruptcy law and, to the extent applicable, the New Employment Agreements.

The existing officers and directors of the Subsidiary Debtors shall initially serve in their respective capacities as officers and directors of the Reorganized Debtors unless otherwise provided in the Plan Supplement.

K.      **Conditions Precedent to Confirmation**

It is a condition to Confirmation of the Plan that the following provisions, terms, and conditions shall have been satisfied or waived pursuant to the provisions of Section X.C of the Plan.

      *(i)*      The Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order shall have become a Final Order.

      *(ii)*      All of the documents contemplated by the Plan and the Disclosure Statement, including the Corporate Governance Documents, the Exit Facility Documents, the Rejected Executory Contract and Unexpired Lease List, the New Employment Agreements, and the list of the known members of the New Board, shall be in form and substance satisfactory to the Majority Noteholders.

L.      **Conditions Precedent to the Effective Date**

It is a condition to the Effective Date that the following provisions, terms, and conditions shall have been satisfied or waived in accordance with Section X.C of the Plan by the applicable Debtor, with the consent of the Majority Noteholders, or as applicable, the Majority Noteholders; provided, however, that the consent of Avista shall be required to waive the condition in (x) below.

      *(i)*      The Confirmation Order shall be a Final Order.

      *(ii)*      The Confirmation Order shall have been entered no later than 35 days after the Petition Date.

*(iii)*  Any amendments or modifications to the Plan made after entry of the Confirmation Order shall be in form and substance satisfactory to the Majority Noteholders.

*(iv)*  Each of the documents contemplated by the Plan and the Disclosure Statement, including, without limitation, the New By-Laws, the New Certificate of Incorporation, and the New Shareholders Agreement, have been executed and, to the extent modified or supplemented from the form previously approved pursuant to Section XI.A of the Plan, are in form and substance satisfactory to the Majority Noteholders.

*(v)*  All of the schedules, documents, supplements, and exhibits to the Plan shall have been filed in form and substance satisfactory to the Majority Noteholders.

*(vi)*  All authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents, if any, that are determined by the Debtors and the Majority Noteholders to be necessary to implement the Plan and that are required by law, regulation or order shall have been obtained and not revoked.

*(vii)*  All of the conditions referred to as the "Certain Closing and Other Conditions to the Restructuring" that are set forth in the Restructuring Term Sheet (attached to and part of the Plan Support Agreement) have occurred or been waived by the Majority Noteholders.

*(viii)*  The Exit Facility Agreement, in form and substance satisfactory to the Majority Noteholders, shall have been executed and delivered by all of the Entities that are parties thereto and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof.

*(ix)*  All of the Majority Noteholders' professional fees and out-of-pocket expenses incurred in connection with the Restructuring (as defined in the Plan Support Agreement) or any other matter in connection thereto, including, without limitation, those fees and expenses incurred during the Chapter 11 Cases, shall be paid by the Debtors.

*(x)*  Up to $75,000 in the aggregate of Avista's professional fees and out-of-pocket expenses incurred in connection with the Restructuring (as defined in the Plan Support Agreement) or any other matter in connection thereto, including without limitation, those fees and expenses incurred during the Chapter 11 Cases, shall be paid by the Debtors.

*(xi)*  The amount of all Claims against the Debtors, including, without limitation, all trade and other Unsecured Claims, but excluding Claims for amounts owed under the Credit Facility and the Notes, and excluding Claims for amounts typically accounted for as deferred revenue on the Debtors' balance sheet, reasonably projected by the Majority Noteholders to become Allowed Claims (including such Claims that at such date are already reasonably determined by the Majority Noteholders to be Allowed Claims) do not exceed in the aggregate $85.7 million.

*(xii)*  No Claims of the type described in Bankruptcy Code section 510(b) relating to the Notes shall have been asserted against the Debtors and not Disallowed by Final Order.

## VII.
## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.    No Substantive Consolidation**

The Debtors will request that the Chapter 11 Cases be consolidated for procedural purposes only. On the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated. Except as specifically set forth herein, nothing in the Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any claim against any other Debtor. Additionally, claimants