## EXHIBIT "A"

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>REVSTONE INDUSTRIES, LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 12-13262 (BLS) |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO APPOINT A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. §§ 1104(A)(1) AND 1104(A)(2)**

Dated: February 4, 2013

Steven K. Kortanek (DE Bar No. 3106)
Mark L. Desgrosseilliers (DE Bar No. 4083)
Matthew P. Ward (DE Bar No. 4471)
Womble Carlyle Sandridge & Rice, LLP
222 Delaware Avenue, Ste. 1501
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile: (302) 661-7738
E-mail: skortanek@wcsr.com
E-mail: mdesgrosseilliers@wcsr.com
E-mail: maward@wcsr.com

*Proposed Counsel for the Official Committee of Unsecured Creditors of Revstone Industries, LLC*

---

[1] The Debtor in this case is Revstone Industries, LLC (Tax I.D. No. 26-3837222).

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................ iii

PRELIMINARY STATEMENT ....................................................................................................1

FACTUAL BACKGROUND .........................................................................................................8

    A.    The Limbright Case: Mr. Hofmeister is found liable for acting as an alter ego of family trusts to divert corporate funds for his and his family's benefit. ............ 8

    B.    The Boston Finance Action: The court orders the appointment of a receiver based upon Mr. Hofmeister's mismanagement ....................................................... 12

    C.    The United States Department of Labor Litigation: The DOL alleges violations of ERISA, and Mr. Hofmeister pleads the Fifth in light of an ongoing criminal investigation. ........................................................................... 14

    D.    MPI Products, LLC Sale: Mr. Hofmeister disposes of a subsidiary at a reduced price, and then uses the proceeds to pay pension obligations, instead of paying creditors he promised. .................................................................................... 17

    E.    The Bankruptcy Case: Mr. Hofmeister selects a long-time advisor as the CRO, the Debtor is not progressing toward restructuring, and the Debtor has failed to comply with its statutory requirements. ..................................................... 20

    F.    The Proposed Metavation Sale: Mr. Hofmeister engineered and Huron apparently supported a sale to the former trustee for Hofmeister's children's trusts, which involves improper intercompany releases, and using proceeds for Mr. Hofmeister's personal benefit. ............................................................... 24

        1.    The Proposed Sale of Metavation to a Hofmeister Insider ...................... 24

        2.    The Metavation Sale Is Tainted with Disabling Self-Interest and Requires Improper Releases by the Debtor .............................................. 27

    G.    Summary. ..................................................................................................................... 30

RELIEF REQUESTED .................................................................................................................31

BASIS FOR RELIEF ....................................................................................................................31

    A.    Legal Standards Governing Appointment of a Chapter 11 Trustee ..................... 31

    B.    There Is Abundant "Cause" Within the Meaning of 11 U.S.C. § 1104(a)(1) to Support the Appointment of a Chapter 11 Trustee. ............................................. 33

|     |     |     |
| --- | --- | --- |
|     | 1.  | Mr. Hofmeister's Fraudulent Diversions of Assets Warrant Appointment of a Trustee. .................................................................................. 35 |
|     | 2.  | A Trustee Already has Standing to Assert Causes of Action for the Debtor. ..................................................................................................... 40 |
|     | 3.  | Mr. Hofmeister's Self-Dealing and Inherent Conflicts of Interest, and the CRO's Support of Such Practices Post-Petition, Constitute "Cause" for Appointment of a Trustee. ................................................................... 42 |
|     | 4.  | The Incompetence of Management and the Mismanagement of the Debtor Require the Appointment of a Trustee ........................................ 47 |
|     | 5.  | The Appointment of a CRO and Independent Directors is Not an Adequate Remedy Where Appointment of a Chapter 11 Trustee is Otherwise Required ............................................................................. 49 |
|     | 6.  | The Appointment of the Debtor's CRO and Independent Managers is Not an Adequate Remedy Because Such Individuals Remain Beholden to Mr. Hofmeister and Will Not Instill Confidence in Creditors ............... 51 |
|     | 7.  | The Confusion Over the Direction in This Case Warrants Appointment of a Chapter 11 Trustee ................................................................... 56 |
|     | 8.  | The Acrimony Between the Debtor and its Creditors Warrants Appointment of a Trustee. .................................................................. 56 |
| C.  | Additionally, the Court Should Appoint a Trustee under 11 U.S.C. § 1104(a)(2) Because Such Appointment Is In the Interests of the Estate and All Other Parties. ............................................................................................ 59 |     |
|     | 1.  | The Debtor Cannot Be Trusted to Carry Out its Fiduciary Duties ............. 60 |
|     | 2.  | The Creditors Lack Confidence in the Debtor. ....................................... 63 |
|     | 3.  | The Benefits of Appointing a Trustee Far Outweigh the Costs of Such Appointment. .......................................................................................... 64 |
| RESERVATION OF RIGHTS .................................................................................................. 66 |     |     |

## TABLE OF AUTHORITIES

**Cases**

CML V, LLC v. Bax, 6 A.3d 238 (Del Ch. 2010) ........................................................................... 43

Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343 (1985) ................................. 32

Crescive Landscape Mgmt. Inc. v. PHDC, LLC (In re PHDC, LLC), Case No. 03-93397,
2004 Bankr. LEXIS 1113 (Bankr. N.D. Ga. Apr. 28, 2004) ..................................................... 33

Gimbel v. Signal Cos., Inc., 316 A.2d 599 (Del. Ch. 1974), aff'd, 316 A.2d 619 (1974) ............ 55

Gourmet Center, Inc. v. Fox (In re Sage Enter., Inc.), Case No. 04-05548, 2006 Bankr.
LEXIS 1042 (Bankr. N.D. Ill. Apr. 28, 2006) ........................................................................... 43

Grogan v. Garner, 498 U.S. 279 (1991) ........................................................................................ 33

Hirsch v. Penn. Textile Corp., Inc. ............................................................................................... 44

Hollinger Inc. v. Hollinger Int'l Inc., 858 A.2d 342 (Del. Ch. 2004) ........................................... 55

In re Adelphia Commc'ns Corp., 336 B.R. 610 (Bankr. S.D.N.Y. 2006) ..................................... 53

In re Altman, 230 B.R. 6 (Bankr. D. Conn. 1999) (same), vacated in part on other
grounds, 254 B.R. 509 (D. Conn. 2000) ................................................................................... 33

In re Bowman, 181 B.R. 836 (Bankr. D. Md. 1995) ..................................................................... 44

In re Cardinal Indus., Inc., 109 B.R. 755 (Bankr. S.D. Ohio 1990) ........................................ 62, 66

In re Centennial Textiles, Inc., 227 B.R. 606 (Bankr. S.D.N.Y. 1998) ................................... 44, 64

In re Colby Constr., Inc., 51 B.R. 113 (Bankr. S.D.N.Y. 1985) .................................................... 36

In re Colo.-Ute Elec. Ass'n, Inc., 120 B.R. 164 (Bankr. D. Colo. 1990) ...................................... 35

In re Concord Coal Corp., 11 B.R. 552 (Bankr. S.D. W.Va. 1981) .............................................. 63

In re Deena Packaging Indus., Inc., 29 B.R. 705 (Bankr. S.D.N.Y. 1983) ................................... 35

In re Emerging Commc'ns, Inc., Case No. 06-30007 (JKF), 2007 Bankr. LEXIS 4763
(Bankr. D.V.I. Feb. 13, 2007) ......................................................................................... 51, 52, 53

In re Evans, 48 B.R. 46 (Bankr. W.D. Tex. 1985) ........................................................................ 63

In re Hotel Assocs., Inc., 3 B.R. 343 (Bankr. E.D. Pa. 1980) .................................................. 62, 63

In re Ionosphere Clubs, Inc., 113 B.R. 164 (Bankr. S.D.N.Y. 1990) ....................................... 32, 63

In re L.S. Good & Co., 8 B.R. 312 (Bankr. N.D. W. Va. 1980) .............................................. 63, 64

In re Lowenschuss, 171 B.R. 673 (9th Cir. 1999) ................................................................... 40, 45

In re Madison Mgmt., 137 B.R. 275 (Bankr. N.D. Ill. 1992) ........................................................ 63

In re Marvel Entm't Group, 140 F.3d 463 (3d Cir. 1998) ............................................... 33, 34, 59

In re McCorhill Publ'g, Inc., 73 B.R. 1013 (Bankr. S.D.N.Y. 1987) ............................................ 33

In re Microwave Prods. of Am., Inc., 102 B.R. 666 (Bankr. W.D. Tenn. 1989) .................. passim

In re Nartron Corp., 330 B.R. 573 (Bankr. W.D. Mich. 2005) ............................................. 45

In re Parker Grande Dev., Inc., 64 B.R. 557 (Bankr. S.D. Ind. 1986) .................................. 63

In re Pied Piper Casuals, Inc., 40 B.R. 723 (Bankr. S.D.N.Y. 1984) ................................... 44

In re PRS Ins. Group, Inc., 274 B.R. 381 (Bankr. D. Del. 2001) ............................... 36, 49, 64

In re Rivermeadows Assocs., Ltd., 185 B.R. 615 (Bankr. D. Wyo. 1995) ............................ 35

In re Sharon Steel Corp., 86 B.R. 455 (Bankr. W.D. Pa. 1988) ................................ 32, 50, 63

In re Sharon Steel Corp., 871 F.2d 1217 (3d Cir. 1990) ................................................. passim

In re Stratesec, Inc., 324 B.R. 158 (Bankr. D.D.C. 2004) ..................................................... 53

In re Suncruz Casinos, LLC, 298 B.R. 821 (Bankr. S.D. Fla. 2003) ..................................... 33

In re V. Savino Oil & Heating Co., Inc., 99 B.R. 518 (Bankr. E.D.N.Y. 1989) ......... 33, 34, 35, 39

In re Wings Digital Corp., Case No. 05-12117 (ALG), 2005 Bankr. LEXIS 3476 (Bankr. S.D.N.Y. May 16, 2005) ............................................................................................. 62

Katz v. Bregman, 431 A.2d 1274 (Del. Ch. 1981) ................................................................ 56

Koch Refining v. Farmers Union Cent. Exch., Inc., 831 F.2d 1339 (7th Cir. 1987) ............. 43

Limbright v. Hofmeister, C.A. No. 09-107 (KSF), 2011 U.S. Dist. LEXIS 131373 (E.D. Ky. Nov. 14, 2011) ........................................................................................................ passim

Oberly v. Kirby, 592 A.2d 445 (Del. 1991) .......................................................................... 56

Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548 (3d Cir. 2003) ....................................................................................................................... 43

Thorpe v. CERBCO, Inc., 676 A.2d 436 (Del. 1996) ........................................................... 56

Tradex Corp. v. Morse, 339 B.R. 823 (Bankr. D. Mass. 2006) ............................................ 33

**Statutes**

11 U.S.C. § 1104 ............................................................................................................. passim

29 U.S.C. § 1002(21)(A) ....................................................................................................... 14

29 U.S.C. §§ 1002(14)(A) and (H) ....................................................................................... 14

The Official Committee of Unsecured Creditors (the "Committee") of Revstone Industries, LLC (the "Debtor" or "Revstone"), by and through its proposed undersigned counsel, hereby files this memorandum of law (the "Memorandum") in support of its motion (the "Motion") pursuant to sections 1104(a)(1) and 1104(a)(2) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended and applicable to this bankruptcy case, the "Bankruptcy Code") to appoint a trustee in this chapter 11 case.

## PRELIMINARY STATEMENT

The legacy management of this Debtor, under the control of George Hofmeister, has exhibited disabling self-interest, incompetence, and gross mismanagement. The misconduct that led to the filing of this case – and that has continued post-petition – is all part of a continuing pattern of fraud and dishonesty with respect to the Debtor's creditors.

After the Debtor filed bankruptcy, this legacy management was relatively quick to concede[1] that it could not remain in control, and so it has recently installed (or still seeks to install) one person as Chief Restructuring Officer (the "CRO") and President, with hybrid reporting obligations: one line of authority for "Bankruptcy Decisions," and another for everything else – still with strings attached to Mr. Hofmeister. This new turn of the "Responsible Officer" concept is a proffered fiduciary cure for the Debtor's case, as well as for the management of its debtor and non-debtor affiliates. Yet the supposed cure has proven to be wholly ineffective due to disabling conflicts, evidenced by post-petition conduct. In terms of the proposed CRO and his team, the very people who are now to police the Debtor, provided material assistance to Mr. Hofmeister in his attempt – post-petition – to carry out a flawed, improper and self-interested sale, without proper disclosure, of a key part of the Debtor's

---

[1] The Committee was told on December 18, 2012 (day 2 of its existence) that an "independent manager" process was underway.

1

business, Metavation, LLC ("Metavation"), an $80 million Tier One supplier.

The Debtor is but one entity in a web of debtor and non-debtor entities that have operated under the absolute control of Mr. Hofmeister, save for the recent steps on his part to install new individuals in management roles alongside him. Under Mr. Hofmeister's control, the Debtor, its related entities, and its pension plans have been used as instrumentalities to siphon assets to the detriment of their creditors, and even each other, all to enrich Mr. Hofmeister and his family. Indeed, litigation continues to swirl around Mr. Hofmeister on numerous fronts, evidencing his pervasive misconduct and concealment. By way of example:

- A United States District Court Judge recently held that Mr. Hofmeister and his wife are alter egos of three trusts that were established for the benefit of their children and that the trusts – the same trusts that own the Debtor's parent entity – were used to avoid payment to their judgment creditors, evidencing an "actual intent to defraud creditors" by using the trusts to loot Mr. Hofmeister's companies through at least the year 2010. Limbright v. Hofmeister, C.A. No. 09-107 (KSF), 2011 U.S. Dist. LEXIS 131373, *29 (E.D. Ky. Nov. 14, 2011).

- In an action pending in the Circuit Court for the County of Grand Traverse, Michigan (the "Michigan Court"), captioned Boston Finance Group v. Power-Tec Manufacturing, LLC, Case No. 12-29875-CK (Circ. Ct. Mich., Cty. of Grand Traverse) (the "Boston Finance Action"), the plaintiff, Boston Finance Group, LLC ("Boston Finance") was awarded a significant judgment against the Debtor and a group of other Hofmeister entities that the Debtor and its co-defendants failed to satisfy. Thereafter, the Michigan Court granted a motion to appoint a receiver for the Debtor, immediately after which the Debtor commenced this bankruptcy case.

- The United States Department of Labor (the "DOL") has filed a complaint (the "DOL Complaint") against Mr. Hofmeister for alleged misuse of pension funds of the employees of Metavation, a downstream subsidiary of the Debtor. In response, Mr. Hofmeister invoked the Fifth Amendment right against self-incrimination to avoid answering the complaint, noting that he is the subject of a criminal investigation regarding the matters set forth in the complaint. See Solis v. Hofmeister, C.A. No. 12-250 (KKC) (E.D. Ky.) (the "DOL Action"), Answer to DOL Complaint, page 1 [Docket No. 21], a copy of which is attached hereto as Exhibit 1. The misconduct alleged in the DOL Complaint, and likely in the related criminal investigation as well, tie to at least two debtors – Revstone and

- Greenwood Forgings, LLC ("Greenwood")[2] – because Mr. Hofmeister indirectly used them as counterparties of the allegedly improper financing transactions with pension assets. At a minimum, this creates a fundamental and pervasive conflict of interest for Mr. Hofmeister that disables him from exercising any fiduciary role whatsoever for Revstone or Greenwood.

- At about the same time that he answered the DOL Complaint, Mr. Hofmeister began efforts to sell Metavation in a self interested transaction intended to back-fill the $34 million he is alleged to have diverted from the Metavation pension plans. ▌ ▌ for the nine (9) months ending September 2012.[3] The proposed buyer is ▌, whose principal, ▌ ▌, has a close relationship with the Hofmeisters and served as trustee of various Hofmeister trusts, and in such capacity *was found liable along with Mr. Hofmeister* in the Limbright case. Mr. Hofmeister brought in Huron Consulting Group ("Huron") apparently to help package this self-interested, insider transaction, and in particular to help broker a hoped-for accommodation from GM to finance Mr. Hofmeister's funding needs.

- In a pattern repeated many times over the years, in the weeks leading up to the filing of this case, Mr. Hofmeister disposed of one of the former affiliates of the Debtor, MPI Products, LLC ("MPI"), which disposition also appears to have been done with intent to defraud other creditors of MPI and ultimately the Debtor.

- There are ongoing exploratory discussions regarding a sale of all or part of the assets of Contech Castings, LLC ("Contech"), an operating indirect subsidiary of the Debtor that accounts for ▌ of the Revstone enterprise.[4] This too has the initial earmarks of a self-interested transaction designed to benefit Mr. Hofmeister, as opposed to having an articulated business rationale from the Debtor. Ten (10) weeks into this case, and despite the significant value of this business, the Committee's advisors know little more about it than the cursory mention by the Debtor's witness at the section 341(a) meeting (the "341 Meeting") on January 9, 2013.

These are only a few examples of the hopelessly conflicted or otherwise improper conduct that surrounds Mr. Hofmeister's control of the Debtor and its related entities – with a key assist from Huron in the attempted Metavation sale. These actions irreparably have destroyed the credibility of legacy management as well as proposed new executive management,

---

[2] On January 7, 2013, Greenwood commenced a case under Chapter 11 of the Bankruptcy Code. See In re Greenwood Forgings, LLC (Case No. 13-10027 (BLS)).
[3] The revenue shares of Metavation discussed herein are based on a pro forma analysis of the Revstone enterprise's revenues, after the November 2012 sale of MPI.
[4] The revenue shares of Contech discussed herein are based on a pro forma analysis of the Revstone enterprise's revenues, after the November 2012 sale of MPI.

3

by any measure, but particularly so with the creditors of the Debtor.

Mr. Hofmeister also has made misleading and untrue statements in his Court filings. For example, in Mr. Hofmeister's Objection to Motion of Creditors' Committee for Rule 2004 Examination [Docket No. 87], filed on January 7, 2013, Mr. Hofmeister affirmatively represented that "he has stepped aside from management of the Debtor for the duration of the bankruptcy case" and that "Debtor will be managed by an independent CRO, John DiDonato of Huron, and two independent members of Debtor's board of directors." Id. at page 1. However, when the Debtor later filed its Schedules [Docket No. 128] and Statement of Financial Affairs (the "SOFA") [Docket No. 129] on January 16, 2013, Mr. Hofmeister executed those documents in his capacity as Chairman of Revstone, showing Mr. Hofmeister's representation to the Court that he stepped aside from management of the Debtor to be false. Mr. Hofmeister's January 7 statement was also untrue because the proposed "fix" embodied in an amendment to Revstone's operating agreement reserves for Ascalon, LLC (another entity over which Mr. Hofmeister continues in control) the authority to control the sale, lease or exchange of all or substantially all of Revstone's property and assets. Moreover, on February 1, 2013, Mr. Hofmeister's counsel revealed to the Committee that Mr. Hofmeister "has also been actively pursuing various transactions to payoff [sic] the creditors and emerge from bankruptcy." See Sheldon Toll Email, attached hereto as Exhibit 2. Mr. Hofmeister's protestations to the contrary, it has been revealed that he continues his involvement with the Debtor, making the appointment of a chapter 11 trustee an urgent priority to ensure that this case is run by an effective fiduciary with integrity and appropriate controls.

Additionally, the Debtor, whether under Mr. Hofmeister's control, or the hybrid control now shared with the proposed CRO, has offered the Committee little insight into the Debtor's

strategy, if any, for the case. For instance, on January 7, 2013, without prior notice to the Committee, two (2) affiliates of the Debtor filed petitions for relief under chapter 11 of the Bankruptcy Code in this Court.[5] These affiliates filed for no other apparent purpose than to frustrate Boston Finance's collection efforts that included securing the appointment of a receiver for the Debtor, Greenwood, US Tool, and other affiliates.[6]

As another example, the Debtor did not seek comment or advice from the Committee regarding the selection of independent managers and the CRO. Instead, the Debtor only advised the Committee of the identities of the two (2) proposed independent managers it appointed to serve on the board of managers after they were hand-selected by Mr. Hofmeister.[7]

Critically, these cases have seen no meaningful progress towards an exit strategy, despite now entering their tenth week. There is no debtor-in-possession financing in place (or, indeed, the prospect of such funding as far as the Committee has been made aware) and no apparent means of attending to the financial demands of these cases and preserving the overall enterprise value of the Debtor and its related companies. The Debtor's case and those of its three (3) affiliates still appear to be in freefall. Although at the January 9, 2013 omnibus hearing in this case, counsel for the Debtor advised that replacement counsel would be appointed, it was not until January 17, 2013, that replacement counsel entered an appearance for Revstone and an

---

[5] See petitions of Greenwood Forgings, LLC (Case No. 13-10027 (BLS)) and US Tool & Engineering, LLC ("US Tool") (Case No. 13-10028 (BLS)).

[6] See January 9, 2013 hearing transcript 5:18–19 (Debtor's former counsel stating that "[t]hese entities filings were also precipitated by receivership action"); 7:13–16 (Debtor's former counsel stating that "Your Honor will recall this was a true free fall case, and it was filed in completely defensive posture in response to the appointment of receiver."); 60:12–24 (Greenwood and US Tool's former counsel stating that "I received a call from Mr. Smith . . . [at] 11:00 in the morning requesting that our firm file Chapter 11 pleadings in both of these cases due to the fact that there was a hearing scheduled at 1:30 I believe in Lansing, Michigan for the appointment of receivership as to each of these entities.") (attached hereto as Exhibit 3).

[7] The Committee has learned that one of the purported independent members of the Debtor's board of managers resigned within days of his selection, immediately following Mayer Brown's withdrawal, and was replaced by Mr. Shein.

5

affiliated entity, Spara, LLC ("Spara"),[8] but not for the other two affiliated debtors, Greenwood and US Tool. Moreover, it was not until January 28, 2013, that replacement counsel filed a notice of substitution of counsel in the Greenwood and US Tool cases, and filed a motion for joint administration of these affiliated debtor cases.

The Debtor's proposed fiduciary cure, in the form of the proposed CRO and independent managers, is merely a half-measure, which has taken place in a conspicuously slow manner. February 4, 2013 marks the beginning of Week 10 of the Debtor's case, yet the amended LLC operating agreements for the subsidiaries of the Debtor to lessen Mr. Hofmeister's control were delayed for about 2 ½ weeks from the original resolutions, and in fact, have not been provided to the Committee. Moreover, the proposed new CRO at the center of the revised management proposal, John DiDonato, suffers from disabling conflicts that preclude his proposed role as a disinterested fiduciary, and played a material role in the improper attempt to sell Metavation for Mr. Hofmeister's personal benefit.

Mr. DiDonato has long business ties to Mr. Hofmeister, which raises substantial questions in and of itself. The identification of Mr. DiDonato as proposed CRO was made at a point in time when Hofmeister was the only member of the Debtor's board of managers. Mr. DiDonato not only has prior business relationships with Mr. Hofmeister in other companies, he and others at Huron have been intimately involved with the Revstone operations for a lengthy period of time prior to the Debtor's bankruptcy case. At all relevant times during Huron's prepetition involvement, the line of authority was unmistakable, and led exclusively to Mr. Hofmeister.

Mr. Hofmeister recruited Huron prepetition in part apparently to help him carry out a

---

[8] The Debtor and Spara filed their chapter 11 petitions in this Court on the same day. Spara's case is pending under case number 12-13263 (BLS).

6

rushed sale of Metavation. Mr. Hofmeister's and Mr. DiDonato's post-petition efforts to sell Metavation merit very close scrutiny, given the criminal investigation/Fifth Amendment overhang with respect to Mr. Hofmeister, the fact that Hofmeister selected as his "pre-emptive bidder" an insider and/or close family ally. The transaction appears to have been orchestrated primarily as a means to return the funds alleged to have been improperly loaned from the Metavation pension plans to other Hofmeister-controlled entities.

Huron's role as an instrumentality for Mr. Hofmeister culminated in the two-week period just before Mr. DiDonato was installed as President and CRO on January 17, 2013. Indeed, the evidence to date suggests strongly that the Hofmeister-led rushed sale of Metavation may simply have been another move by Mr. Hofmeister in his continuing shell game. The attempt has failed (for now), but Huron's role in trying to consummate Mr. Hofmeister's Metavation deal shows far too much loyalty to Mr. Hofmeister, and disqualifies Huron and Mr. DiDonato from serving as a disinterested CRO while attempting to carefully earmark use of the proceeds (at least with respect to Metavation) to protect Mr. Hofmeister.

For all the artful engineering reflected in the independent management proposal, its architects left untouched Mr. Hofmeister's fiduciary control of the pension plans – the proverbial piggy banks allegedly looted by Mr. Hofmeister, whose missteps directly resulted (and may in the future result) in enormous claims risk to the Debtor and some or all of its affiliates. The failure of legacy management even to attempt to cure this fundamental flaw, and the major, ongoing risk it represents, is yet another fatal flaw in the proffered fiduciary cure.

The pervasive, complex, and fundamental governance problems for the Debtor can best be solved through the appointment of a chapter 11 trustee. A chapter 11 trustee with appropriate industry experience and relationships with key customers can best preserve and maximize

enterprise value, and faithfully investigate and pursue all potential estate causes of action.

If a chapter 11 trustee is not appointed, the Debtor and its creditors are in immediate danger of suffering severe and irreparable harm. Legacy management has certainly had its chance. As set forth in more detail herein, and as the Committee will demonstrate at the hearing on this matter, the Court should order the appointment of a chapter 11 trustee under Bankruptcy Code section 1104(a).

## FACTUAL BACKGROUND

The Debtor is owned by a non-debtor, Ascalon Enterprises, LLC, which, in turn, is owned by three trusts, the Scott R. Hofmeister Irrevocable Trust, the Megan G. Hofmeister Irrevocable Trust, and the Jamie S. Hofmeister Irrevocable Trust (collectively, the "Trusts"). See organizational chart attached to the Declaration of Jay N. Brown (the "Brown Declaration") in Support of the Debtor's First Day Pleadings as Exhibit A [Docket No. 10]. Mr. Hofmeister has controlled the Debtor and its non-debtor parents, subsidiaries, and affiliates as the sole director or manager of such entities.

The Trusts ostensibly exist for the benefit of Mr. Hofmeister's three (3) adult children. However, it has been established by a final judgment of the Limbright court that the Trusts are alter egos of Mr. Hofmeister and his wife, and are tools that Mr. Hofmeister uses to defraud creditors, strip his companies, and enrich himself and his family members.

A. **The Limbright Case: Mr. Hofmeister is found liable for acting as an alter ego of family trusts to divert corporate funds for his and his family's benefit.**

Mr. Hofmeister's fraudulent use of the Trusts and their subsidiary companies through conduct occurring as recently as 2010 was exposed in the decision of the United States District Court for the Eastern District of Kentucky (the "Kentucky Court") in the Limbright v. Hofmeister case. See Limbright v. Hofmeister, C.A. No. 09-107(KSF), 2011 U.S. Dist. LEXIS

131373 (E.D. Ky. Nov. 14, 2011). In that case, the plaintiff obtained a Michigan judgment against Mr. Hofmeister and his wife, Kay, based upon Mr. Hofmeister's failure to pay debts arising out of his purchase of the plaintiffs' business, Innovative Coating Technologies, Inc. Supplemental proceedings then followed in Kentucky.

Shortly after being sued, the Hofmeisters transferred assets to the Hofmeister Family Trust (the "HFT"), without consideration, while retaining control of certain of the assets transferred. Those assets included a condominium and AHD, a Hofmeister-controlled company, whose stock was transferred to the HFT. Limbright, 2011 U.S. Dist. LEXIS 131373, at **26–27.) The court found that Mr. Hofmeister, with actual intent to defraud, then caused assets of the HFT to be transferred to his children for no consideration and with Mr. Hofmeister remaining in control of these assets. Then, these same assets were transferred from the Hofmeister children to the Trusts, all in an attempt to hinder, delay, and defraud the plaintiffs. Id. at **27–28.

The Kentucky Court ruled in favor of the plaintiffs' motion for summary judgment on their alter ego and fraudulent transfer claims, finding, among other things, that Mr. Hofmeister and his wife were alter egos of the Trusts, that the Trusts were, in turn, alter egos of the HFT, and that Mr. Hofmeister and his wife were alter egos of the HFT. Specifically, the Kentucky Court found that "the transfers from the Hofmeisters to the HFT . . . . were made with *actual intent* to defraud creditors." Id. at *29 (emphasis added).

In so holding, the Kentucky Court made explicit findings of fraud and wrongdoing on the part of Mr. Hofmeister. Indeed, as the Kentucky Court expressly found, "*without question*, the Hofmeisters were using assets of the [Trusts] . . . as their own personal assets." Id. at *12 (emphasis added). The court further determined, inter alia, that:

> [t]here is extensive evidence that the trusts were used for lavish personal expenses, including a home valued at $25 million and the reduction of mortgages

9

> thereon. The trusts were also used to borrow additional funds and to provide those creditors superior liens against the assets of the Hofmeisters and the trusts. Meanwhile, the Limbrights have been attempting to collect the purchase price for their business since the lawsuit they initiated in March 2001.

Id. at *19.

One of the purposes of these frauds was apparently to avoid obligations to creditors, including the Limbright plaintiffs. For example, as the Kentucky Court found, the HFT owned a company called Entry Holdings, which had a checking account that Mr. Hofmeister and his wife used to pay their living expenses. Id. at *16. Mr. Hofmeister also pledged assets of the HFT to satisfy his personal obligations to a creditor, Parkwood Manor, even though at the time the HFT was illiquid and could not satisfy that debt. Id. at **16-17. The Kentucky Court also found that, with respect to the Limbright judgment, less than a week after arriving at a mediated settlement of the Limbright claims against the HFT, the HFT transferred tens of millions of dollars of assets to Mr. Hofmeister's children – 84 percent of the total value of the HFT – in contravention of the terms of the HFT, to avoid obligations to the Limbright creditors and others. Id. at **22-23.

Mr. Hofmeister was not the only party found liable in the Limbright case. During nearly all times relevant to the Kentucky Court's findings, ▇▇▇▇▇▇▇▇▇ served as trustee of the Trusts. Mr. ▇▇▇▇ has testified to the deep personal relationship that he shares with the Hofmeister family. When Mr. ▇▇▇▇ was deposed in the Limbright case, he testified that when Mr. Hofmeister asked Mr. ▇▇▇▇ to become trustee of the Trusts, Mr. Hofmeister told him "I trust you. You've been good for the family. Would you become trustee of my children[?]." Deposition of ▇▇▇▇▇▇▇▇▇, March 24, 2011, 86:20-21 (attached hereto as Exhibit 4). When asked about why he agreed to be trustee of the Trusts, Mr. ▇▇▇▇ answered that it was because "I care about the children." Id. at 87:2.

The Kentucky Court concluded that Mr. ▇▇▇▇ allowed Mr. Hofmeister control over the

10

Trusts, which were used by Mr. Hofmeister for improper purposes. The Limbright opinion details the extent to which Mr. ▇ facilitated Mr. Hofmeister's fraudulent use of the HFT and Trusts. For instance, the Kentucky Court found that:

> ▇ was Trustee of the HFT until March 2, 2007. George [Hofmeister] was the settlor of the HFT and, therefore, could not control disposition of its assets as trustee. Nonetheless, George arranged for ▇ to give George a Limited Durable Power of Attorney ("POA") for the HFT dated May 25, 2007, but effective April 30, 2007. With the POA, George signed a promissory note April 27, 2007 with Crestmark Bank for $2,650,000 and committed HFT as a guarantor.
>
> On April 3, 2007, George signed as Trustee of the HFT a Third Amendment to Investment and Loan Agreement with Airlie Opportunity Capital Management, L.P., regarding a loan of $3,606,671.58 to AMI. HFT was the guarantor on the loan. On October 29, 2007, George, as President of MW Monroe Plastics, borrowed $2,000,000 from Crestmark Bank and pledged the assets of the HFT to secure the loan. ▇ gave George a Limited Durable Power of Attorney as Trustee of the HFT on November 8, 2007.
>
> Notably, ▇ *had no authority to grant a POA to George after* ▇ *resignation as trustee on March 2, 2007. George admitted in his deposition that* ▇ *was not authorized to grant a POA.* ▇ *likewise admitted that he was not the trustee at that time.* George failed to tell Crestmark Bank that he had no authority to act on behalf of the HFT. The formalities of the HFT were blatantly disregarded while the Limbrights sought to collect under HFT's settlement agreement.

Id. at **15–16 (internal citations and cross-references omitted) (emphasis added). The court went on to find that "[u]nquestionably, the trusts' funds were used to pay the Hofmeisters' personal expenses and fully supported them in the style of their choosing. Funds were transferred from the trusts for the personal benefit of the Hofmeisters for little or no consideration. Additionally, there was little separation of trust and individual finances, and trust formalities were dishonored." Id. at **17–18 (internal citations omitted).

The Kentucky Court found that Mr. ▇ testimony was not credible. While Mr. ▇ alleged that assets of Hofmeister entities that were found to be fraudulently transferred to the Trusts to frustrate creditors were "worthless and 'under water,'" the court found that Mr.

▮ testimony "makes no sense." Id. at **22-23. Given the extent of Mr. ▮ involvement in this pervasive fraudulent scheme, the court entered judgment against Mr. ▮. See Judgment, dated Nov. 14, 2011 (Limbright Docket No. 223), attached hereto as Exhibit 5.

The facts found in the Limbright opinion, and the conduct at issue in the decision, continued over a course of a number of years, and specifically included misconduct occurring as recently as 2010. See, e.g., id. at *11 (noting that the Hofmeisters paid their living expenses in 2007 through 2010 with funds that Mr. Hofmeister directed to be distributed from a company owned by the Trusts); id. at **13–14 (discussing Mr. Hofmeister's use of the Trusts' funds in 2010 "to buy his personal obligations").

### B. The Boston Finance Action: The court orders the appointment of a receiver based upon Mr. Hofmeister's mismanagement

On or about April 9, 2012, the Michigan Court entered a substantial final judgment of approximately $27 million in favor of the plaintiff and against the Debtor and other Hofmeister entities in the Boston Finance Action. However, the Debtor and other affiliated judgment debtors failed to satisfy that judgment and also evaded compliance with its obligation to participate in discovery and otherwise cooperate in collection of the judgment.

In the course of the Boston Finance Action, depositions of the Controller and the Treasurer of the Debtor demonstrated a lack of financial controls and pervasive mismanagement of the Debtor. On August 29, 2012, the plaintiff deposed the Controller of the Debtor, Mr. Jan Owczarzak. A copy of the transcript of the deposition is attached hereto as Exhibit 6. In his deposition, Mr. Owczarzak demonstrated a lack of knowledge about the finances of the Debtor that belied his role as Controller. For example, Mr. Owczarzak could not identify the bank accounts where the Debtor was alleged to have on deposit approximately $2,900,000,

erroneously testifying that this money was in accounts that were found to have little more than $1,000. Owczarzak Tr. at 45:17-25; 46:1-10; filed garnishee disclosures attached hereto as Exhibit 7. Mr. Owczarzak further incorrectly testified that the Debtor, which is merely a holding company, funds its own payroll. Id. at 15:18–19.

Mr. Owczarzak testified that he was not aware of any such transfers since 2008 (notwithstanding that the Limbright opinion demonstrates an ongoing and systematic diversion of assets to Hofmeister, the Trusts, and the HFT through 2010). Id. 76:7–20. Mr. Owczarzak's deposition testimony makes clear that the Debtor's Controller lacks basic knowledge of the Debtor's financial condition.

On September 26, 2012, the plaintiff also deposed Nelson Clemmens, who, when he started traveling to the deposition, was the Trustee of the Trusts – the ultimate owners of the Debtor. However, when Mr. Clemmens appeared for the deposition, his counsel announced that while traveling to and because of the deposition, Mr. Clemmens had resigned as trustee of the Trusts. See Clemmens Transcript, a true and correct copy of which is attached hereto as Exhibit 8, at 7:10–20.

The plaintiff thereafter filed a motion to appoint a receiver to assume control of the finances and management of certain of the Hofmeister entities. On December 3, 2012, the Michigan Court held a hearing on the plaintiff's motion for appointment of a receiver. At the receivership hearing, at which Mr. Hofmeister appeared, the Michigan Court approved the appointment of a receiver, after finding that conditions justified that extraordinary remedy, and ordered the parties to agree on the details of the receivership by the end of the business day on December 4, 2012.

Instead, within moments after the Michigan court ordered the receivership, Mr.