Hofmeister caused the Debtor to file this bankruptcy case; in fact, Debtor's counsel in the receivership action announced the chapter 11 filing on the record, having effected the petition filing immediately upon the oral ruling that a receiver would be appointed.

C. **The United States Department of Labor Litigation: The DOL alleges violations of ERISA, and Mr. Hofmeister pleads the Fifth in light of an ongoing criminal investigation.**

On or about August 9, 2012, the United States Department of Labor filed the DOL Complaint naming Mr. Hofmeister, Metavation,[9] the Hillsdale Hourly Pension Plan (also known as the Metavation Hourly Pension Plan) and the Hillsdale Salaried Pension Plan (also known as the Metavation Salaried Pension Plan) (together, the "Plans"), and others as defendants, and seeking, among other things, to enjoin acts in violation of the Employee Retirement Income Security Act ("ERISA"), and to obtain equitable relief for violations of fiduciary duty under ERISA. A true and correct copy of the DOL Complaint is attached hereto as Exhibit 9.

As alleged in the DOL Complaint, Mr. Hofmeister was the sole trustee of the Plans; a named fiduciary of the Plans; the chairman and director of Metavation; an officer of the Debtor; a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A); and a party in interest to the Plans within the meaning of ERISA §§ 3(14)(A) and (H), 29 U.S.C. §§ 1002(14)(A) and (H). DOL Complaint ¶ 9. Myriad other Hofmeister-controlled entities were parties in interest of the Plans. In general, the DOL Complaint alleges a multi-faceted scheme in which Mr. Hofmeister improperly and illegally transferred pension plan assets to Hofmeister-controlled entities. Specifically, the DOL Complaint alleges that beginning in November 2010, Mr. Hofmeister was a member of the Revstone Pension Investment Committee and had discretionary authority and control over the administration of the Plans. Id. ¶ 10. The DOL has

---

[9] Metavation, a down-stream subsidiary of the Debtor, is scheduled as owing a debt to the Debtor of $3,668,995. See Schedule B.

further alleged that in this role, Mr. Hofmeister took or caused to be taken, or misappropriated, approximately $34 million from the Plans.

The DOL Complaint details how the transfers from the Plans were effectuated. As alleged in the DOL Complaint, on behalf of one of the Plans, Mr. Hofmeister executed "Non-Negotiable Secured Promissory Notes" and "Commercial Security Agreements" with Revstone Plastics, an affiliate of the Debtor, pursuant to which one Plan loaned $1.5 million of plan assets to Revstone Plastics and another loaned $2 million of plan assets to Revstone Plastics. Id. ¶¶ 29–30. The following year, Revstone Plastics ceased interest repayments to the Plans. Id. ¶ 32. Mr. Hofmeister allegedly engineered similar schemes under which the Plans loaned assets to Timco, LLC and Triem Motors, LLC without obtaining repayment. Id. ¶¶ 38–42, 48–52.

Certain of the alleged pension plan diversions relate directly to entities that have filed for chapter 11 protection in Delaware. The Debtor received a $1 million indirect loan from the Plans (loaned through another entity, Timco, LLC). Id. ¶ 40. In another allegedly improper transaction, on July 27, 2010, the Debtor carried out a multi-step sale leaseback transaction that caused the transfer of $3.4 million from the Plans to Greenwood. In that combined transaction, the Debtor purchased real property in South Carolina and transferred title to Greenwood.[10] Then, Greenwood purportedly sold the South Carolina property to the Plans and contemporaneously leased it back from the Plans – all on the same day, July 27, 2010. Id. ¶¶ 58, 59, 62. The Greenwood sale-leaseback may be nothing more than a disguised financed purchase of the real estate from the Plans.

A third alleged unlawful diversion of the Plans' funds carried out by Mr. Hofmeister also

---

[10] Although not identified as a former name of Greenwood on the Greenwood petition, Greenwood was formerly known as Contech Forgings, LLC. The allegations in the DOL Complaint identify Greenwood as Contech Forgings, LLC. Corporate documentation from the Delaware Secretary of State's office demonstrating the name change is attached hereto as Exhibit 10.

15

involved Greenwood. Mr. Hofmeister allegedly caused $3.35 million in customer notes in which Greenwood was the debtor to be sold by MIDS, LLC, another subsidiary of the Debtor, to the Plans. Id. at ¶¶ 69, 81, 85(d). Reflecting the Greenwood sale-leaseback and the $3.35 million note sale to the Plans, Greenwood's bankruptcy petition identifies the Plans as two of its top twenty creditors.

The DOL also alleges that all of the above-described transactions, and the other transactions alleged in the DOL Complaint, were in direct violation of prohibitions against the transfer, directly or indirectly, of assets of the Plans for the use or benefit of a party in interest. The DOL has alleged that Mr. Hofmeister dealt with assets of the Plans for his own interests in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1). Id. at ¶ 86.

The allegations of Mr. Hofmeister's fraud and pension misappropriation directly affect the Debtor and its estate because the Debtor is under common control with the sponsor of the Plans. According to the PBGC, the Plans are underfunded and, if terminated, could result in a claim of $46 million against the Debtor and all other members of the controlled group, jointly and severally. See Docket No. 92. Moreover, one of the obligors on one such loan, Greenwood, is now a debtor in this Court.[11]

Mr. Hofmeister chose not to answer the allegations set forth in the DOL Complaint. Instead, on November 5, 2012, Mr. Hofmeister responded that he is now the subject of an ongoing criminal investigation, and asserted his right against self-incrimination under the Fifth Amendment of the United States Constitution in response to all the allegations in the DOL

---

[11] Additionally, PBGC takes the position that minimum funding requirements are joint and several liabilities of the plan's contributing sponsor and each member of its controlled group. If the Debtor is found to be a member of a "controlled group" in common with the Plans, then the Debtor could be liable for any liabilities of Metavation with respect to the Plans. See ERISA §§ 302(c)(11)(B); IRC § 412(c)(11)(B). The Committee reserves its right to contest this position in any proceeding.

Complaint. Specifically, in the answer jointly filed on behalf of Mr. Hofmeister, Metavation, MIDS, LLC, and the Plans, states that "[b]ecause there is an ongoing criminal investigation related to the matters at issue in the Complaint, Defendant George Hofmeister, on the advice of counsel, invokes his privilege against self-incrimination as provided by the Fifth Amendment to the United States Constitution." Answer to DOL Complaint, page 1.

D. **MPI Products, LLC Sale**: **Mr. Hofmeister disposes of a subsidiary at a reduced price, and then uses the proceeds to pay pension obligations, instead of paying creditors he promised.**

On or about November 15, 2012, only ten (10) days after invoking the Fifth Amendment in the DOL Action, Mr. Hofmeister completed a transaction for the sale of a former affiliate of the Debtor, MPI. The MPI sale was consistent with Mr. Hofmeister's pattern of disposing of assets to favor certain creditors and defraud others. The Debtor represented to the Michigan Court that it was exploring a sale of MPI as a means of satisfying the judgment entered in the Boston Finance Action. That representation proved false, however, as none of the proceeds of the sale of MPI were distributed to Boston Finance, the plaintiff and judgment creditor in that case.

Concerned that the proceeds of any sale of MPI would be diverted to other uses, on July 25, 2012, Boston Finance filed a Motion for Affirmative Injunctive Relief to Satisfy Judgment (the "Boston Finance Injunctive Motion") (attached hereto as <u>Exhibit 11</u>), seeking an order requiring that any proceeds of a sale of assets such as MPI to be retained to satisfy Boston Finance's judgment.

During the August 1, 2012 hearing on the Boston Finance Injunctive Motion, Daniel Smith, Esq., General Counsel and Secretary of Revstone, represented to the Court that proceeds from the MPI sale would be used to satisfy the obligation to Boston Finance, stating that:

To the extent that there are proceeds that are leftover from MPI that are

17

> transferred to the shareholder, being Revstone Transportation, we agree that, at that point those proceeds would be available for [Boston Finance] to attach to or whatever the appropriate remedy.

Transcript of August 1, 2012 hearing, 12:6–11 (attached hereto as Exhibit 12).

The court then stated:

> So in other words, if MPI's assets are sold, MPI can pay its creditors. And any proceeds that remain after the creditors are paid, are not to be distributed to anyone other than its shareholders. And those shareholders, or shareholder, Revstone, one of the Revstone entities, which is a judgment debtor here, Revstone is restrained and ordered not to distribute those proceeds, other than to Boston Finance, until such time as Revstone comes back here, explains exactly who was paid. Why they were paid. Where they were in the order of priority. And can make an argument as to why they should be allowed to keep or use any of those proceeds for purposes other than paying Boston Finance.

Id., 30:18–31:6.

The proposed purchase price under the original MPI asset purchase agreement, dated October 19, 2012 (the "Original MPI APA"), was ███████████████████████████[12] See Original MPI APA, attached hereto as Exhibit 13 at § 2.6(a). Less than one month after the Original MPI APA was executed, an amended asset purchase agreement (the "Amended MPI APA") was executed. Under the Amended MPI APA, the proposed purchase price ██████ ████████████████████████████████ See Amended MPI APA, attached hereto as Exhibit 14, ¶¶ 3-4. There is no apparent reason for ████████████ ████████████████████████████████████████████████████ ████████████████████████

Moreover, the Funds Flow Memorandum for the MPI sale, attached hereto as Exhibit 15, shows ████████████████████████████████████████████████ ████████████████████████ under the Amended MPI APA. Of that amount, almost

---

[12] The Estimated Assumed Indebtedness (as defined in the Original MPI APA) and ████████ ████████████████████████████████ (as defined in the Original MPI APA) were to be added to the sale price. See Original MPI APA § 2.6(a).

18

███████ went to pay off secured debt owed to another lender.

As suggested by UBS in the MPI confidential information memorandum (the "MPI CIM"), attached hereto as Exhibit 16, ███████████[13] MPI CIM § 4.10. However, funds of ████████████████████████████████████████████████████ that the DOL Complaint alleges Mr. Hofmeister to have looted. Regardless of whether the sale was primarily driven by MPI's secured lender or Mr. Hofmeister's efforts at self-preservation, it was Mr. Hofmeister's improper conduct and self-interest that drove the end result: a fire sale of MPI that left less value for the Revstone enterprise than would have otherwise been available absent such pressures.

Even though, immediately following the Committee's appointment, the Committee made written requests to the Debtor for information regarding the MPI sale and the valuation of the business, the Debtor delayed for over a month before furnishing "off the shelf," readily-available documents to the Committee, such as the MPI CIM and the MPI sale agreements. The Debtor still has not provided other critical information to the Committee regarding the MPI sale. Accordingly, the Debtor has prevented the Committee from evaluating that sale and determining, among other things, whether the sale was part of a fraudulent scheme or was constructively fraudulent, so as to prevent the Committee to assert avoidance or other claims against the purchaser of MPI.

Based on the little information that the Committee has received, it appears that the sale was not for adequate consideration. The median trading level of guideline public companies (the "Trading Level Guideline") can be used to provide a reasonable range of the expected purchase price for a company based on how comparable companies are trading in the market. In fact,

---

[13] Upon information and belief, MPI may have been jointly and severally liable for any pension plan shortfalls as part of a controlled group. Nonetheless, ███████████

Huron utilized the ▮▮▮▮▮ in the materials it prepared for the sale of Metavation ▮▮▮▮▮ In the Metavation sale materials, Huron identified ▮▮▮▮▮ See Metavation Process Update page 7, attached hereto as <u>Exhibit 17</u>. MPI, like Metavation, fits the description of a small cap automotive supplier. Using the ▮▮▮▮▮ see MPI CIM § 6.2, the MPI sale should have yielded ▮▮▮▮▮ [14]

 E. <u>The Bankruptcy Case</u>: **Mr. Hofmeister selects a long-time advisor as the CRO, the Debtor is not progressing toward restructuring, and the Debtor has failed to comply with its statutory requirements.**

On December 3, 2012, the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. As the Debtor has indicated, the filing of this case was directly caused by the Michigan Court's decision on December 3, 2012, to appoint a receiver over, among other entities, the Debtor. The Debtor undertook some planning to commence a bankruptcy case in preparation for the Michigan receivership hearing, as the Debtor caused the filing of this bankruptcy case during those proceedings.

The Debtor's initial monthly operating report also shows planning in the form of moving money around from Hofmeister entities to meet the retainer requirements of Debtor's counsel at the time. The Debtor's former counsel were paid their retainers on the same day that the case was commenced. Initial Monthly Operating Report, Schedule of Retainers Paid to Professionals [Docket No. 71]. Those retainers for Debtor's former counsel came from four (4) different

---

[14] Although estimated market value and actual market value may differ based on the facts of each case, ▮▮▮

Hofmeister entities—none of which is the Debtor.[15]

On December 17, 2012, the United States Trustee for Region 3 appointed the Committee, which consists of the following members: Boston Finance; Schoeller Arca Systems, Inc.; Patrick J. O'Mara; Thule Holding, Inc.; and Pension Benefit Guaranty Corp. On that same date, the Committee selected Womble Carlyle Sandridge & Rice, LLP, as its counsel. On December 19, 2012, the Committee selected FTI Consulting, Inc. ("FTI") as its financial advisor.

The Debtor, now more than two (2) months into its case, has no postpetition financing, apparently no progress toward any such financing, and no apparent means of funding the chapter 11 process it initiated. The Debtor's lack of liquidity is so acute that it moved approximately forty (40) employees from its payroll to payrolls of affiliates to reduce its payroll burden. Neither the Committee nor its professionals have been provided with financial information necessary to assess liquidity needs and a path forward. For example, finalized cash flow forecasts for the Debtor, on a non-consolidated basis, reflecting the aforementioned reduced headcount and, more importantly, chapter 11 administrative costs, have still not been provided to the Committee or submitted to the Court. Furthermore, the Debtor has only provided on February 2, 2013, limited evidence that it has a consolidated view, or perspective, of the liquidity position and forecast for the Debtor and its subsidiaries. This is particularly important as the Debtor does not have operations and relies solely upon management fees to be earned from operating subsidiaries that make payments on the Debtor's behalf. Without having visibility into the cash flows at the operating entities, it is impossible to have a point of view on the funding of these cases other than that this case is administratively insolvent. Instead, the Debtor has ignored

---

[15] One of the companies providing funds for the retainers is HSC Equipment, LLC. This company does not appear on the organizational charts for Revstone and Spara, and it is unclear to the Committee where this entity sits within the Hofmeister group of companies. Further, these retainer payments appear to be but a mere continuation of actual fraudulent transfers designed to hinder, delay, or defraud creditors of the paying entities and certainly to hinder and delay Boston Finance.

until recently the Committee's requests for information, delayed providing information, or provided incomplete or potentially incorrect information.

As of the date hereof, the Debtor has not filed applications to retain counsel. Further, the Debtor has not filed an application to retain Huron as the CRO despite the representation to the Court on January 7, 2013 that Huron would be serving in such capacity.[16] This is especially problematic as Huron and Mr. DiDonato in particular have connections to Mr. Hofmeister that may prevent Mr. DiDonato from serving as the CRO and Huron from serving the Debtor in any capacity.

After seeking and obtaining an extension, the Debtor filed its Schedules and SOFA on January 16, 2013. Notably, Mr. Hofmeister signed these documents in his capacity as Chairman of the Debtor, contradicting assertions made by the Debtor and Mr. Hofmeister that Mr. Hofmeister is no longer running the Debtor.

In addition, even though Mr. Hofmeister signed the Debtor's petition, Schedules, and SOFA under penalty of perjury, there are a number of discrepancies between the Debtor's amended top twenty creditors list (the "Creditor List"), filed on December 5, 2012, and its Schedule F, filed on January 16, 2013, including the following:

- GE CF Mexico, S.A. de C.V. is listed on the Creditor List with an $8.8 million debt. That debt is not identified in Schedule F.

- RI SPC is listed on the Creditor List with an $8,524,145.09 million debt. That debt is not identified in Schedule F.

- Comvest Capital II, L.P. is listed on the Creditor List with a $2.6 million debt. That debt is not identified in Schedule F.

- Nexteer is listed on the Creditor List with a $841,359.49 debt. That debt is not identified in Schedule F.

- Cabot II-TX1L01, L.P. is listed on the Creditor List with a $669,123 debt. That debt

---

[16] It was not until January 17, 2013 that Huron was retained as CRO for the Debtor.

is not identified in Schedule F.

- General Motors is listed on the Creditor List with a $618,152 debt. That debt is not identified in Schedule F.

- SAPA Group is listed on the Creditor List with a $547,738.26 debt. That debt is not identified in Schedule F.

- Loeb Financial Services, LLC is listed on the Creditor List with a $538,318.06 debt. That debt is not identified in Schedule F.

- Schedule H likewise has discrepancies. For example, the Debtor and Mr. Hofmeister are guarantors for the Greenwood Forgings' obligations to Bridgeport Capital. Such obligation is omitted from both Schedules F and H.

Section 3 of the SOFA requires disclosure, in relevant part, of (i) "each payment or other transfer to any creditor made within 90 days immediately preceding the commencement of the case . . ." and (ii) "all payments made within one year immediately preceding the commencement of this case to or the benefit of creditors who were insiders." SOFA, §§ 3(b) and (c). The Debtor evaded responding to those requirements by stating that "[the Debtor] does not make disbursements. Any obligations settled with cash are made from its subsidiary(ies) on the Debtors [sic] behalf and recorded as intercompany amounts due. Obligations to subsidiaries are disclosed in Schedule F." Id.

Although the Debtor was required by no later than January 21, 2013, to file its monthly operating report for December 2012, it still has not done so, depriving the Committee and other interested parties of the financial transparency required of a debtor.

On January 3, 2013, the Debtor filed an incomplete report under Rule 2015.3 (the "2015.3 Report") of the Federal Rules of Bankruptcy Procedure. The 2015.3 Report did not include the required statement of income (loss), statement of cash flows, and statement of changes of equity. The 2015.3 Report has not been amended to correct these deficiencies.

F. **The Proposed Metavation Sale:** Mr. Hofmeister engineered and Huron apparently supported a sale to the former trustee for Hofmeister's children's trusts, which involves improper intercompany releases, and using proceeds for Mr. Hofmeister's personal benefit.

1. The Proposed Sale of Metavation to a Hofmeister Insider

The Committee's advisors were first told about the possibility of a Metavation sale on or about December 28, 2012, in a conversation with Myra Moreland, who, at that time, was the Debtor's President. Metavation's operations accounted for ▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇ (on a pro forma basis after removing MPI's results from the Revstone family of companies).[17] Accordingly, Metavation is a significant asset of the Debtor.

Ms. Moreland advised (paraphrasing unless otherwise noted) that a "preemptive bid" had been received from a "financial buyer" based in Lexington, and that the Debtor liked the offer enough that it was taking the offer to GM to see if GM liked the buyer. In that conversation, and multiple times at frequent intervals thereafter, FTI pressed the Debtor's management for basic, fundamental information about the proposed Metavation sale, including the buyer's identity, pricing, a description of the marketing process, and timing. An FTI team spent two days on-site with Debtor's management immediately following the holidays, on December 27 and 28, 2012, and met with Mr. DiDonato on January 4, 2013. Despite the lengthy time spent in discussions seeking essential business and financial information, including a request from FTI for information about potential sales or other disposition of assets, there was no further disclosure of any meaningful information regarding Metavation.

On January 9, 2013, at the 341 Meeting, the Debtor's witness, its then treasurer and acting CFO, Jay Brown, testified that a sale of Metavation was underway. Mr. Brown further

---

[17] At the 341 Meeting, Mr. Brown also revealed that Mr. Hofmeister is considering a sale of Contech Castings, LLC, ▇▇▇▇▇▇▇▇▇▇▇▇ ended September 30, 2012 (pro forma results adjusted to remove MPI). The Debtor has provided the Committee with very little information regarding this sale process.

24

testified that he was unaware of any outside marketing process for Metavation. However, he failed to disclose that <u>as of two (2) days earlier, there was already a fully-executed membership purchase agreement already in place</u>. This was the first public disclosure of the plans to sell hastily Metavation.

On January 14, 2013, the Debtor, Huron, and Mr. DiDonato made a presentation to General Motors regarding progress on the sale of Metavation, all without informing or involving the Committee. <u>See</u> Metavation Process Update. It was only the next day, January 15, 2013, that the Committee learned there was a commitment to sell Metavation through a sale process support agreement (the "Metavation SPSA") by and between General Motors, LLC ("GM"), Metavation, and Wells Fargo Capital Finance, LLC ("Wells Fargo Capital"), entered into on our about January 11, 2013, and executed for Metavation by Mr. Hofmeister. A copy of the Metavation SPSA is attached hereto as <u>Exhibit 18</u>. The Metavation SPSA, among other things, obligated Metavation to enter into a definitive purchase agreement with a buyer by no later than January 31, 2013, and to close such sale by no later than March 31, 2013. <u>See</u> Metavation SPSA, § 3.

On January 16, 2013, driven by the Debtor's failure fully to cooperate in the Committee's requests for information and the deadlines identified in the Metavation SPSA, the Committee filed its Emergency Motion for 2004 Examination Directing Debtor, Revstone Transportation, LLC, Metavation, LLC and Contech Castings, LLC to Produce Documents and to Appear for Deposition Upon Oral Examination Regarding any Proposed Sale of Metavation, LLC, and/or Contech Castings, LLC [Docket No. 125] (the "Metavation 2004 Motion"). In connection with the Metavation 2004 Motion, the Committee also filed its Motion for Expedited Hearing and Shortened Notice Regarding the Metavation 2004 Motion [Docket No. 126] (the "Motion to Shorten").

On January 21, 2013, the Debtor filed its objection to the Motion to Shorten, asserting, inter alia, that the Debtor had been sharing information with the Committee regarding the proposed sale of Metavation. See Debtor's Response to the Motion to Shorten [Docket No. 137]. Notwithstanding the Debtor's representations to this Court about its cooperation with the Committee, it was not until late in the afternoon on January 22, 2013, that the Debtor furnished the Committee an executed copy of the Membership Interest Purchase Agreement by and among ▓▓▓▓▓▓▓▓▓▓, Revstone Transportation, LLC, and Metavation, LLC (the "Sale Agreement"). A copy of the Sale Agreement is attached hereto as Exhibit 19. Thus, despite having been executed on January 7, 2013, the same day Debtor's original counsel informed the Committee of its withdrawal from the case and two days before the 341 Meeting, the Committee was not provided with the executed Sale Agreement until over two (2) weeks later.

The Sale Agreement identifies ▓▓▓ as the proposed purchaser. ▓▓▓ was formed on January 4, 2013, and its principals are ▓▓▓▓▓▓ and ▓▓▓▓▓▓▓. As detailed above, ▓▓▓▓▓▓ was hand-picked by Mr. Hofmeister to serve as trustee of HFT and each of the Trusts. While serving in those fiduciary capacities, ▓▓▓▓▓▓ was a defendant and found liable in the Limbright litigation. ▓▓▓▓▓▓ testified to the deep personal relationship that he shares with the Hofmeister family. See, e.g., Deposition of ▓▓▓▓▓▓▓▓, March 24, 2011, 86:20–21; 87:2. Despite being the trustee, ▓▓▓▓▓▓ permitted Mr. Hofmeister's control over the Trusts, which were found by the Limbright court to have been used by Mr. Hofmeister for improper purposes.

Neither the Debtor nor its advisors has ever informed the Committee that the proposed purchaser is a Hofmeister insider. In light of ▓▓▓▓▓▓ complicity in the Limbright case and the Kentucky Court's finding of liability against ▓▓▓▓▓▓, the Debtor's failure to disclose

26

relevant information about the proposed Metavation purchaser underscores the inability of the Debtor, and its advisors, including Huron and Mr. DiDonato, to act as estate fiduciaries.

        2.    <u>The Metavation Sale Is Tainted with Disabling Self-Interest and Requires Improper Releases by the Debtor</u>

The Debtor's former president, Ms. Moreland, characterized the ▮▮▮ bid as "a pre-emptive bid," and indeed the offer appears to dwarf the asset purchase offers of the other bidders.[18] ▮▮▮, the hand-picked "pre-emptive" bidder in this instance (through ▮▮▮), has already aided Mr. Hofmeister in defrauding creditors. The proposed sale of Metavation to a ▮▮▮-controlled entity appears to be more of the same. The sale bears all the hallmarks of a scheme of the type exposed in <u>Limbright</u> designed to scramble assets, and to evade creditors of the Debtor and other non-debtor entities, by, in this instance (among other things) causing such entities to release claims against Metavation without receiving consideration for such releases and assuming additional liabilities for which there was no basis. The ▮▮▮ equity bid for Metavation consists of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

According to the Metavation Process Update slides (prepared by Huron), on or about December 17, 2012, ▮▮▮▮▮▮, an entity related to ▮▮▮, executed a letter of intent to purchase the equity of Metavation. <u>See</u> Metavation Process Update, page 4. Under that letter of intent, the cash component of this transaction was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[18] The Sale Agreement contemplates that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████ Yet Huron's (and presumably Hofmeister's) presentation was misleading: upon information and belief, ███████ in GM accommodations sought by Mr. Hofmeister and pursued by Huron was only added to boost the value of the ███ bid (and its multiple), and not to the other bids supposedly listed as comparables. However, if the proposed ███████ GM Accommodation is available to other bidders, those third party, disinterested bids would have been fairly presented as more comparable to the ███ bid. Id.

Not only is the ███ bid not as high as it appears on the surface, but the sources and uses of the Metavation deal indicate that ████████████████████████████ ████████████████████████████████████████████████████████████ In short, the ███ bid is an audacious attempt, in the Hofmeister mold, to delay, buy time, and continue to play the string out on his fraudulent schemes against creditors. The Sale Agreement provides that the purchase price is ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ Sale Agreement, § 2.2.

The Sale Agreement is conditioned upon the Debtor releasing the inter-company receivable of $3,668,995 owed to the Debtor by Metavation. See Sale Agreement § 2.4(b)(x). Other affiliates are also required to release Metavation from debts. Specifically, at closing,

28

Metavation is required to deliver "Release Letters, evidencing *release of [Metavation] from any obligations under any and all inter-company payables,* including without limitation payables in the aggregate of approximately $7,000,000 payable to Fairfield Castings, LLC, T Cast Holdings, LLC and Contech Castings, LLC." Id. § 2.4(b)(10) (emphasis added).

Moreover, Metavation is required to deliver, at closing, "[a] Release Letter evidencing release by [Metavation] of any claim, including but not limited to approximately $4,000,000 in payables, owed by [non-debtor affiliate] EPTEC Sa. De. C.V. or any Affiliate of [Revstone Transportation, LLC] to [Metavation]." Id. § 2.4(c). It appears there is no consideration being given to the Debtor and other non-debtor affiliates in exchange for releasing this large amount of debt. Revstone Transportation is also required to continue to defend the DOL Action and pay all costs associated with such litigation. Id. § 5.6(d). By this provision, Mr. Hofmeister seeks to shift the cost of his defense and Metavation's defense of the DOL Action from Metavation up to the Debtor's wholly-owned subsidiary, Revstone Transportation. It is unclear whether Revstone Transportation has a prior obligation to furnish that defense and what, if any, consideration will be granted to Revstone Transportation for being saddled with these defense obligations.

Metavation also is required to cause non-debtor subsidiary Contech Castings Real Estate Holdings, LLC ("Contech RE") at closing to issue a promissory note in favor of MIDS, LLC – a defendant in the DOL Complaint – in the original principal amount of $5,987,000. Id. § 5.16. Accordingly, Contech RE is being caused to extend credit to MIDS, LLC – another defendant in the DOL Action – for reasons that appear to lack any legitimate connection to the Metavation sale and without adequate consideration.

Upon information and belief, GM declined to commit to providing ▊▊▊▊ GM Accommodation pursued by Huron and Mr. Hofmeister. GM's rejection appears to have

29

stalled the sale of Metavation to ▇▇▇ for the time being. Despite the halt to the Metavation sale to Mr. ▇▇▇ entity, the fact remains that Mr. Hofmeister, with material assistance from Mr. DiDonato and Huron, made a concerted effort to close the deal. In fact, it appears that Mr. Hofmeister used Huron to deliver what was perhaps the single element of the multi-faceted transaction that Mr. Hofmeister himself did not control: a much-needed funding element from GM to help fill the alleged pension-related liability.

Mr. Hofmeister and the future CRO have failed to faithfully carry out the duties of a fiduciary to Metavation's direct and indirect stakeholders to maximize value, and to sell only when a valid business purpose and objective exists to do so. For this reason as well, the Committee believes that the appointment of the CRO is an inadequate remedy, and, instead respectfully requests that the Court order the appointment of a chapter 11 trustee.

### G. Summary.

At base, the stripping away of more than half of the revenue generation capacity of the Revstone companies in largely undisclosed processes is no surprise. For many years, Mr. Hofmeister has recklessly disposed of assets to enrich himself and his family, without regard to the best interests of the enterprise. Now, as Mr. Hofmeister's legal problems are swirling out of control -- with Boston Finance's massive judgment, the DOL Action, and the criminal investigation of his looting of pensions funds, just to name a few of the problems -- Mr. Hofmeister is desperately trying to unload assets, without regard to his fiduciary duties and solely for his own self-interest. To do so, he has selected a CRO that has a long-standing tie to him and his businesses -- a CRO who immediately before being appointed CRO (but after Mr. Hofmeister publicly announced that Mr. DiDonato would be CRO) took steps to support the sale of Metavation to a Hofmeister ally on terms that appear highly unfavorable to creditors and seemingly would work for Mr. Hofmeister's personal benefit. Given the vast extent of Mr.