Hofmeister's potential criminal and civil liability, and the future CRO's failure to act in an independent fashion that comports with his fiduciary duties, the Committee respectfully requests that this Court order the United States Trustee to appoint a chapter 11 trustee.

## RELIEF REQUESTED

By the motion, and for the reasons set forth herein, the Committee respectfully requests that the Court enter an order, in substantially the form filed contemporaneously herewith, (i) granting the Motion; (ii) ordering the United States Trustee, after consultation with the Committee, to appoint one disinterested person as chapter 11 trustee in this case under Bankruptcy Code section 1104(a); (iii) ordering the United States Trustee to seek approval of such appointment from this Court in accordance with Bankruptcy Code section 1104(d) and Bankruptcy Rule 2007.1(c); and (iv) ordering the Debtor to cooperate with the chapter 11 trustee and immediately turn over to the chapter 11 trustee all records and property of the estate in its possession or control as directed by the chapter 11 trustee.

## BASIS FOR RELIEF

### A. Legal Standards Governing Appointment of a Chapter 11 Trustee.

Bankruptcy Code section 1104(a) provides as follows:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

31

11 U.S.C. § 1104(a).

Bankruptcy Code section 1104, therefore, establishes two independent grounds for the appointment of a trustee. Bankruptcy Code section 1104(a)(1) provides for the mandatory appointment of a trustee when "cause" exists. See 11 U.S.C. § 1104(a)(1). Additionally, Bankruptcy Code section 1104(a)(2) affords the Court a flexible standard whereby the Court has discretion to appoint a trustee in the absence of cause when such appointment is in the best interests of the parties. See 11 U.S.C. § 1104(a)(2).

The presumption that a debtor should remain in possession of its estate and in control of its affairs holds only if management "can be depended upon to carry out the fiduciary responsibilities of a trustee." Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985); see also In re Ionosphere Clubs, Inc., 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) ("a debtor-in-possession must act as a 'fiduciary of his creditors' to 'protect and to conserve property in his possession for the benefit of creditors,' and to refrain [ ] from acting in a manner which could damage the estate ..." (citing In re Sharon Steel Corp., 86 B.R. 455, 457 (Bankr. W.D. Pa. 1988), aff'd, 871 F.2d 1217 (3d Cir. 1990)).

When a debtor-in-possession is incapable of performing its fiduciary duties, or when creditors' confidence in management evaporates, a chapter 11 trustee must be appointed.[19]  See

---

[19]Although the Bankruptcy Code itself does not define the level of proof necessary for appointment of a trustee under Bankruptcy Code section 1104, the Third Circuit Court of Appeals has employed a "clear and convincing evidence" standard upon the party seeking appointment of a trustee. See Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.), 385 F.3d 313, 319 (3d Cir. 2004), citing In re Marvel Entm't Group, 140 F.3d 463, 471 (3d Cir. 1998). Case law following the Supreme Court's 1991 decision in Grogan v. Garner, 498 U.S. 279, 286–91 (1991) ("preponderance of the evidence" standard as the general level of proof required in bankruptcy cases) calls that standard into question. See Tradex Corp. v. Morse, 339 B.R. 823, 829–32 (D. Mass. 2006) (rejecting clear and convincing evidentiary standard in context of a motion to appoint a trustee in favor of following the Grogan rationale that a heightened standard of review should not be applied when "Congress has not explicitly adopted a standard different from the traditional preponderance standard"); see also In re Altman, 230 B.R. 6, 16-17 (Bankr. D. Conn. 1999) (same), vacated in part on other grounds, 254 B.R. 509 (D. Conn. 2000). The distinction here is immaterial given that the evidence to be presented by the Committee will be more than enough to meet either standard. See, e.g., Crescive Landscape Mgmt. Inc. v. PHDC, LLC (In re PHDC, LLC), Case No. 03-93397, 2004 Bankr. LEXIS 1113, at *7 (Bankr. N.D. Ga. Apr. 28, 2004).

In re McCorhill Publ'g, Inc., 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987); Marvel Entm't Group, 140 F.3d at 473. "[I]n the appropriate case, the appointment of a trustee is a power which is critical for the Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served." In re Suncruz Casinos, LLC, 298 B.R. 821, 828 (Bankr. S.D. Fla. 2003) (quoting In re Intercat, 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000)); see also In re V. Savino Oil & Heating Co., 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989) ("Section 1104(a) represents a potentially important protection that courts should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession").

As explained more fully below, the appointment of a chapter 11 trustee is appropriate under the circumstances, pursuant to either Bankruptcy Code section 1104(a)(1) or 1104(a)(2).

B.    **There Is Abundant "Cause" Within the Meaning of 11 U.S.C. § 1104(a)(1) to Support the Appointment of a Chapter 11 Trustee.**

While Bankruptcy Code section 1104(a)(1) expressly identifies four bases upon which "cause" may be found – fraud, dishonesty, incompetence, and gross mismanagement (all of which exist in this case) – those enumerated grounds are not exclusive. Additional grounds may be determined on a case-by-case basis. See Savino Oil, 99 B.R. at 525; Sharon Steel Corp., 871 F.2d at 1226. Cause also may be established by the (i) materiality of the misconduct of the debtor's management, (ii) evenhandedness or lack of same in dealings with insiders or affiliated entities vis-à-vis other creditors, (iii) existence of prepetition voidable preferences or fraudulent transfers, (iv) unwillingness or inability of management to pursue estate causes of action, (v) conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor, and (vi) self-dealing by management or waste or squandering of corporate assets. See In re Marvel Entm't Group, Inc., 140 F.3d at 472–73; Sharon Steel Corp., 871 F.2d at 1228; Intercat, 247 B.R. at 920–21.

33

Once a court finds that "cause" exists, a trustee shall be appointed under the clear language of Bankruptcy Code section 1104. See 11 U.S.C. § 1104(a). In that event, a bankruptcy court has no discretion to deny the requested relief. See Savino Oil, 99 B.R. at 525; In re Deena Packaging Indus., Inc., 29 B.R. 705, 706 (Bankr. S.D.N.Y. 1983).

Prepetition conduct alone, of the type that occurred here, is sufficient to warrant the appointment of a trustee. See 11 U.S.C. § 1104(a)(1) (the relevant "cause" for appointment of a trustee may exist "either before or after the commencement of the case"); In re Rivermeadows Assocs., Ltd., 185 B.R. 615, 619 (Bankr. D. Wyo. 1995) ("the Code is clear that the prepetition conduct of the debtor's management may be the sole deciding factor" in the appointment of a chapter 11 trustee); see also Savino Oil, 99 B.R. at 526 ("[t]his pre-petition course of conduct, in and of itself, constitutes 'cause' for the appointment of a Chapter 11 trustee.").

A party's effort to have an independent fiduciary take charge of the debtor's affairs at an early stage of a bankruptcy case is not premature. A party seeking appointment of a trustee need not, and indeed should not, delay filing a motion for such relief until after the debtor has had an opportunity to prove its suitability (or lack thereof) as debtor-in-possession. See In re Colorado-Ute Elec. Ass'n, Inc., 120 B.R. 164, 175 (Bankr. D. Colo. 1990) ("if the facts and circumstances warrant the appointment of a trustee, it is not appropriate to wait to file the motion. . . . Such a deferral will only further delay the progress toward the effective rehabilitation and reorganization of the debtor").

Thus, the Committee's effort to have an independent trustee appointed for the Debtor's affairs at this stage is not premature, and in fact, is a prudent and necessary step given the facts of this case. It would harm the interests of the Debtor's estate and its creditors to allow the Debtor further opportunity to operate the business as debtor-in-possession.

1.     Mr. Hofmeister's Fraudulent Diversions of Assets Warrant Appointment
of a Trustee.

"Diversion of funds and misuse of corporate assets constitute fraud or dishonesty sufficient to warrant appointment of a trustee under section 1104(a)(1)." In re PRS Ins. Group, Inc., 274 B.R. 381, 385 (Bankr. D. Del. 2001) (appointing trustee because either diversion of funds was fraudulent or because inability to explain diversion showed incompetence); Sharon Steel Corp., 871 F.2d at 1228 (systemic siphoning of debtor's assets to other companies under shareholder's common control constituted cause for appointment of a trustee); In re Colby Constr., Inc., 51 B.R. 113, 116 (Bankr. S.D.N.Y. 1985) (majority shareholder's "deliberate, unabashed conversion of corporate assets to acquire another company in his own name indicates the scienter implicit in fraud as that term is used in § 1104(a)(1) or at least the dishonesty contemplated by that section"). As described above, Mr. Hofmeister has repeatedly diverted assets of companies under his control for his own purposes. His attempts to do so have continued well into the post-petition period, in the form of the attempt to sell Metavation, apparently with the support of Huron.

In the Limbright case, the Kentucky Court found that Mr. Hofmeister raided the assets of one of the Hofmeister entities for his own purposes, with actual intent to defraud creditors. See Limbright v. Hofmeister, 2011 U.S. Dist. LEXIS 131373, at **16–28. Specifically, the Hofmeisters transferred a condominium and a Hofmeister-controlled company to the HFT, without consideration, while retaining control of certain of the assets transferred. Id. at **26–27. The court found that, with actual intent to defraud, Mr. Hofmeister then caused assets of the HFT to be transferred to his children, but with no consideration given and with Mr. Hofmeister remaining in control of these assets. Then, these same assets were transferred from the Hofmeister children to the Trusts, all in an attempt to hinder, delay, and defraud the Limbrights.

35

Id. at **27–28.

The court held that "[a]ll of these transfers exhibit badges of fraud. Accordingly, *the Court holds that all of these transfers were made with actual intent to hinder, delay or defraud the Limbrights* under M.C.L. 566.34 and should be set aside. . . As a result, judgment in favor of the Limbrights will also be entered against all Defendants in this action, including the Children and the [Trusts]." Id. at *28 (internal citations omitted) (emphasis added).

The Limbright opinion's discussion of Mr. Hofmeister's bad acts includes misconduct occurring recently. In its 2011 opinion, the Limbright court made findings about Mr. Hofmeister's wrongful conduct running up to the time of the opinion. For example, the Limbright court found that the Hofmeisters paid their living expenses in 2007 through 2010 with funds that Mr. Hofmeister directed to be distributed from a company owned by the Trusts. Id. at *11. The Limbright court even held that this misconduct was ongoing at the time of the opinion, finding that "George Hofmeister *is* using [the Trusts'] assets to buy his personal obligations and those of the companies he manages and controls." Id. at **13–14 (emphasis added).

The Limbright opinion is a compelling accounting of Mr. Hofmeister's fraudulent use of entities controlled by him – and, like the Debtor, ultimately owned by the Trusts – over an extensive period of time. In addition, it teaches an important lesson that should resonate here: even in the face of litigation and judicial scrutiny, Mr. Hofmeister is not one to be dissuaded from continuing his fraudulent activities.

Moreover, as the DOL Complaint and Mr. Hofmeister's answer thereto demonstrate, Mr. Hofmeister may well be criminally liable for raiding the assets of the Plans for illegal purposes. At least some of these allegations are substantiated by Greenwood's petition in which it identifies the Plans as two of its top twenty creditors.

36

In the Boston-Finance Action, the Michigan Court ordered the appointment of a receiver of the Debtor and other Hofmeister entities because of Mr. Hofmeister's mismanagement which, as recently as mid-November, potentially has included improperly disposing of assets to defraud creditors.

Nor has the belated appointment of a CRO for the Debtor cured these problems. The Debtor, even under the CRO, is seeking once again to dispose of assets to the potential detriment of creditors. Despite not conducting adequate marketing or involving the Committee in the sale process, the Debtor, with Huron, was planning to sell Metavation by no later than March 2013, in a transaction that Mr. Hofmeister initiated before the CRO's appointment and that appears to be largely motivated to serve Mr. Hofmeister's self-interest. Notwithstanding the Committee's specific request for information relating to any sale of this entity, it was not until Saturday, January 19, 2013, that meaningful information began to be provided to the Committee. Prior to January 15, 2013, all relevant details of the sale process itself were concealed from the Committee and its professionals.

Similarly, the Committee has learned, primarily through the Debtor's revelations at the 341 Meeting, that the sale of Contech Castings is also progressing. It was not until January 24, 2013, however, that the Debtor provided any information regarding the Contech Castings sale. What information the Debtor has provided gives the Committee little insight into the progress of this sale, the identities of potential buyers, and the possible consideration to be received in such a sale.

Congress' willingness to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee. See, e.g., In re V. Savino Oil & Heating, 99 B.R. 518 at 526. In Savino Oil, creditors obtained a

state court judgment to foreclose upon the collateral of V. Savino Oil & Heating Co., Inc. ("Savino I"). Id. at 521. Savino I responded by appealing the state court's decision, but also formed a new legal entity named V. Savino Oil Co., Inc. ("Savino II"). Id. at 521–22. As the court explained, a central purpose of the debtor's scheme was to transfer Savino I's assets to Savino II before Savino I filed for bankruptcy, thereby placing them beyond the reach of the Savino I's creditors. Id. at 523. The court therefore held that Savino I's prepetition course of conduct, in and of itself, constituted "cause" for the appointment of a Chapter 11 trustee. Id.

Similarly, Mr. Hofmeister has, prepetition, engaged in far-reaching schemes to place assets of the various Revstone entities beyond the reach of creditors, as shown in the Limbright case, the Boston Finance Litigation, the sale of MPI, and the DOL Complaint, all to benefit himself and his family. Now, postpetition, Mr. Hofmeister has tried to do the same with Metavation and Contech Castings. The Court should not countenance it.

In Lowenschuss, the bankruptcy court appointed a chapter 11 trustee because of the debtor's history of manipulating a pension plan and his control over the pension plan's nominal trustee supported the bankruptcy court's finding that it would be in the best interests of the creditors to have an independent and disinterested trustee to administer the estate and to pursue debtor's unauthorized transfers of property. See In re Lowenschuss, 171 F.3d 673, 685 (9th Cir. 1999). After ten years of litigation, a Pennsylvania court entered an order for the equitable distribution of the marital property of the debtor and his ex-wife. Id. at 676. The divorce decree awarded the ex-wife 38.7% of assets of a pension plan. Id. The debtor was the sole owner of the company funding the plan and the sole beneficiary. Id. at 680. To evade transferring to his ex-wife her share of the pension plan, the debtor transferred over $8 million in pension plan assets outside Pennsylvania to avoid the jurisdiction of the Pennsylvania courts. Id. at 677. The

debtor then relocated to Nevada where he filed a chapter 11 petition. Id.

The United States Court of Appeals for the Ninth Circuit held that the prepetition transfer of pension plan assets, the debtor's personal flight out of Pennsylvania to Nevada, and his control over the pension plans were good cause to appoint a chapter 11 trustee. Id. at 685. Moreover, the debtor's appointment of his son as a nominal trustee over the pension plans did not resolve the need for an independent and disinterested trustee to administer the estate and to pursue the debtor's unauthorized transfers of property because of the debtor's control over the son. Id.

The concerns that warranted appointment of a trustee in Lowenschuss are also present in this case. Mr. Hofmeister has a history of concealing and transferring assets to avoid paying creditors. Further, the DOL Complaint alleges a number of improper prepetition transfers of assets of the Plans for which, if the Plans default, the Debtor may be liable. These allegations, if true, may result in the Debtor having causes of action against Mr. Hofmeister. Mr. Hofmeister cannot be expected to investigate and initiate causes of action against himself nor can the CRO in this instance.[20]

When pieced together, it is plain that Mr. Hofmeister's wrongful uses of the Revstone enterprise's assets are not isolated acts, but are pervasive and ongoing. Based on actual (and quite recent) findings of fact as to the fraudulent activities of current management of the Debtor compounded with the troubling allegations with respect to Mr. Hofmeister's diversion of pension assets of non-Debtor affiliates, that if Mr. Hofmeister continues to manage the affairs of the Debtor, the Debtor and its subsidiaries are in danger of immediate and irreparable harm. Mr.

---

[20] The Debtor has not yet filed a motion to retain the CRO, despite being two months deep into this case. The disclosures that the CRO will be required to make in support of retention likely will shed further light on the extent of the CRO's prior involvement with Mr. Hofmeister's businesses and his role in the Metavation and Contech Castings sale processes.

Hofmeister simply cannot be trusted to act as a fiduciary for the estate of the Debtor. For these reasons, the Committee respectfully requests that the Court grant this Motion as soon as practicable under Bankruptcy Code section 1104(a)(1).

        2.      <u>A Trustee Already has Standing to Assert Causes of Action for the Debtor</u>.

The proposed sale of Metavation bears all the hallmarks of a scheme of the type exposed in <u>Limbright</u> designed to scramble assets, and to evade creditors of the Debtor and other non-debtor entities. Among other things, the proposed equity sale of Metavation to ▮▮▮▮ is conditioned upon the Debtor's release of its inter-company claim of at least $3,668,995 for no consideration. Other affiliates are also required to release Metavation from debts. Specifically, at closing, Metavation is required to deliver "Release Letters, evidencing *release of [Metavation] from any obligations under any and all inter-company payables*, including without limitation payables in the aggregate of approximately $7,000,000 payable to Fairfield Castings, LLC, T Cast Holdings, LLC and Contech Castings, LLC." Sale Agreement § 2.4(b)(10) (emphasis added). It appears there is no consideration being given to the Debtor and other non-debtor affiliates in exchange for releasing this large amount of debt. Revstone Transportation is also required to continue to defend the DOL Action and pay all costs associated such litigation. <u>Id.</u> § 5.6(d). By this provision, Mr. Hofmeister seeks to shift the cost of his defense and Metavation's defense of the DOL Action from Metavation up to the Debtor's wholly-owned subsidiary, Revstone Transportation, again for no apparent consideration.

Metavation also is required to cause non-debtor subsidiary Contech Castings Real Estate Holdings, LLC ("Contech RE") at closing to issue a promissory note in favor of MIDS, LLC – a defendant in the DOL Complaint – in the original principal amount of $5,987,000. <u>Id.</u> § 5.16. Accordingly, Contech RE is being caused to extend credit to MIDS, LLC – another defendant in the Department of Labor litigation – for reasons that appear to lack any legitimate connection to

the Metavation sale and without adequate consideration.

The estate likely has causes of action against Mr. Hofmeister, its board of managers, and its officers and directors for breaches of fiduciary duty among others. However, the Debtor is unlikely to pursue any such causes of action with Mr. DiDonato in place as the CRO. Moreover, it may be problematic for the Committee to obtain standing to pursue derivative causes of action against the Debtor. The Debtor is a Delaware limited liability company. Under section 18-1002 of 6 Del. C. §§ 101–1109 (as amended, the "LLC Act"), only a member or assignee of a limited liability company may sue on behalf of the company. 6 Del. C. § 18-1002. On November 2010, the Delaware Court of Chancery, in an opinion affirmed by the Delaware Supreme Court in 2011, held that creditors of an insolvent Delaware limited liability company do not have standing under Delaware law to sue derivatively. CML V, LLC v. Bax, 6 A.3d 238 (Del. Ch. 2010), aff'd, 28 A.3d 1037 (Del. 2011). Although not a settled issue of law, this prohibition may carry over to a creditors' committee because the causes of action pursued by such committees can be characterized as derivative in nature. See, e.g., Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548 (3d Cir. 2003).

These potential standing limitations do not apply to a trustee. If a trustee is appointed, then the trustee, in asserting the estate's claims, would be exercising its authority under the Bankruptcy Code to operate the company's assets, including prosecuting estate causes of action. See, e.g., Koch Refining v. Farmers Union Cent. Exch., Inc., 831 F.2d 1339, 1343 (7th Cir. 1987) (the debtor's causes of action become property of the estate which the trustee alone has the right to pursue upon the filing of a bankruptcy petition); Gourmet Center, Inc. v. Fox (In re Sage Enter., Inc.), Case No. 04-05548, 2006 Bankr. LEXIS 1042, at *42 (Bankr. N.D. Ill. Apr. 28, 2006) (once a company filed bankruptcy, the trustee becomes the representative of the estate

41

with standing to pursue actions that the debtor could have commenced pre-petition). Appointment of a trustee resolves any potential issues related to standing and exponentially increases the likelihood that the Debtor's causes of action including, without limitation, breach of fiduciary duty claims, fraudulent transfer claims, fraud claims, and unjust-enrichment claims against Mr. Hofmeister, the board of managers, and officers and directors, would be prosecuted for the benefit of creditors.

> 3. Mr. Hofmeister's Self-Dealing and Inherent Conflicts of Interest, and the CRO's Support of Such Practices Post-Petition, Constitute "Cause" for Appointment of a Trustee.

Among the fiduciary duties of a debtor-in-possession is the primary goal of the bankruptcy process: "to get the creditors paid." In re Ionosphere Clubs, 113 B.R. 164, 169 (quoting In re Pied Piper Casuals, Inc., 40 B.R. 723, 727 (Bankr. S.D.N.Y. 1984)). Importantly, "because the [debtor-in-possession's] fiduciary obligation is to the estate, and not to one group, the [debtor-in-possession] *must act to benefit the estate as a whole.*" In re Microwave Prods. of Am., Inc., 102 B.R. 666, 671 (Bankr. W.D. Tenn. 1989) (emphasis added); Hirsch v. Penn. Textile Corp., Inc. (In re Centennial Textiles, Inc.), 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998) (a chapter 11 debtor and its managers owe fiduciary duties to the estate). Moreover, a debtor-in-possession's fiduciary duties also "include a duty of care to protect the assets, a duty of loyalty and a duty of impartiality." In re Bowman, 181 B.R. 836, 843 (Bankr. D. Md. 1995). To fulfill its duty of loyalty, a debtor-in-possession must "avoid self-dealing, conflicts of interest and the appearance of impropriety." Id.

Self interest, self-dealing, and the existence of actual impropriety consistently have marked Mr. Hofmeister's management of the Debtor and its non-Debtor affiliates. Mr. Hofmeister has been found, among other things, to have upstreamed assets from the Debtor and its non-Debtor affiliates for his own use. See, e.g., Limbright v. Hofmeister, 2011 U.S. Dist.

LEXIS 131373 at **22–23. Moreover, Mr. Hofmeister knowingly used an unauthorized and invalid power of attorney, given by Mr. ▮▮▮▮ to obtain $2.65 million, $3.6 million, and $2.0 million loans for himself and two entities he controlled. Id. at **15–16. In addition, as detailed above, allegations that may be entitled to an adverse inference with respect to Mr. Hofmeister have been made that he improperly diverted, or orchestrated the improper diversion of pension trust funds. Such practices have continued post-petition with a future CRO who has taken steps to support the sale of Metavation to a Hofmeister ally, with the result that proceeds of such sale would be used to pay down pension liabilities for which Mr. Hofmeister may face personal liability.

In light of the circumstances, Mr. Hofmeister and the CRO lack the requisite "trustworthiness" necessary to control the Debtor's management. See In re Lowenschuss, 171 F.3d 673, 685 (debtor's history of manipulating a pension plan and his control over the pension plan's nominal trustee supported the bankruptcy court's finding that it would be in the best interests of the creditors to have an independent and disinterested trustee to administer the estate and to pursue debtor's unauthorized transfers of property). Moreover, in this instance, Mr. Hofmeister has already been found by courts to have committed actual fraud and mismanagement. Such prior bad acts are grounds to seek the appointment of a trustee. See In re Nartron Corp., 330 B.R. 573, 583 (Bankr. W.D. Mich. 2005)( when ordering that a chapter 11 trustee be appointed, "[t]he findings regarding . . . behavior in the various state and federal court cases and the conclusions made therein . . . formed the basis for various courts' decisions and are binding in this proceeding").

In Nartron, as here, the debtor's business was controlled by a CEO, Norman Rautiola, who had a history of fraud and mismanagement, and was involved in years of litigation.

43

Significantly, the Nartron court pointed to the findings of various courts about Rautiola's lack of veracity. Id. The Limbright court has similarly made numerous factual findings about Mr. Hofmeister's fraudulent conduct of his businesses.

The Nartron court also ordered the appointment of a chapter 11 trustee because of the debtor's failure to provide proper reporting of its financial activities. Id. at 583–84. Just as the Debtor has done here, in Nartron, the debtor did not fully disclose payments that should have been revealed in the debtor's schedules and statement of financial affairs. Id. at 586–87. Similarly, this Debtor has had numerous reporting deficiencies, as noted previously, which have not been cured by the CRO. These deficiencies include, for example, (i) failing to identify adequately transfers made to insiders and creditors (instead simply stating that such transfers are reflected as intercompany transfers); (ii) failing to correct or explain inconsistencies between its various disclosures of debts owed to the Debtor; (iii) withholding information required to be disclosed in its 2015.3 Report; and (iv) failing to file its January 2013 monthly operating report.

Likewise, in In re Rivermeadows Assocs., Ltd., 185 B.R. 615 (Bankr. D. Wyo. 1995), the court appointed a chapter 11 trustee for cause under Bankruptcy Code section 1104(a)(1) based largely upon the prepetition business practices of the debtor's controlling party, Donald M. Albrecht. Id. at 617. The Court noted three specific areas of concern to justify its appointment of a trustee: (i) Mr. Albrecht's disregard for the judicial process, even at the expense of the debtor, (ii) the unbelievably complicated history of Mr. Albrecht's business dealings (demonstrating Mr. Albrecht's disregard for the structure and requirements of legal entities and a lack of sound fiduciary practice), and (iii) the inconsistencies in the Debtor's bankruptcy filings. Id. at 617–19.

These factors apply equally to Mr. Hofmeister, the CRO, and this Debtor. For example,

in findings that could double for those compelled in this case, the Rivermeadows court determined that the bankruptcy estate was jeopardized by haphazard records and Mr. Albrecht's disregard for the separate legal entities involved with the debtor. Id. at 619. The court found that Mr. Albrecht's pattern of intermingling funds and of expedient transfers, and the absence of proper record keeping, demonstrated a lack of sound business management. Id. The Court emphasized that "[s]uch conduct is adverse to the chapter 11 process and is a detriment to the ongoing business of this chapter 11 case." Id.

The Rivermeadows debtor argued that its postpetition financial practices were exemplary, and indeed no evidence of any postpetition breach of fiduciary duty was presented to the court. Id. The court pointed out, however, that the Bankruptcy Code clearly provides that the prepetition conduct of the debtor's management may be the sole deciding factor in appointing a trustee, and therefore concluded that the facts before it were "demonstrative that a trustee is warranted on that basis alone." Id.

As was true in Rivermeadows, this Debtor, its past and present affiliates throughout the Revstone enterprise, and its creditors have been harmed by Mr. Hofmeister's disregard for the separateness of the Revstone-related entities. There is also extensive evidence of "expedient transfers" among entities, without regarding to the effect of the pillaging of one entity's assets at the expense of others. Further, there is also a significant history of mismanagement, as described infra.

The CRO has taken steps that suggest that the same mismanagement and overriding self-interest will continue to be true under his supervision. Among other things, the proposed Metavation sale contemplates intercompany releases of millions of dollars of claims (see Sale Agreement, at § 2.4(b)(10) & 2.4(c)), and the incurrence of intercompany loans without any

business explanation (see id. § 5.16). Moreover, the purported "pre-emptive" buyer is an entity whose principal, Mr. ███ has a history of cooperating with Mr. Hofmeister in fraud, conflicted transactions, and extensive self-dealing to the detriment of creditors. The Limbright court found that Mr. ███ permitted Mr. Hofmeister control over the Trusts, which were then used by Mr. Hofmeister for improper purposes. Based on these findings, the Court held that "[w]ithout question, the Hofmeisters were using assets of the [Trusts] as their own personal assets" at a time when ███ was trustee of the Trusts. Id. at *12. Similarly, at the time when Mr. ███ was trustee of the HFT, the court held that the Mr. and Mrs. Hofmeister were alter egos of the HFT, and that the HFT and the Trusts "were used to avoid payment to judgment creditors. . ." Id. at **14–23. The court found that "[u]nquestionably, the trusts' funds were used to pay the Hofmeisters' personal expenses and fully supported them in the style of their choosing. Funds were transferred from the trusts for the personal benefit of the Hofmeisters for little or no consideration. Additionally, there was little separation of trust and individual finances, and trust formalities were dishonored." Id. at **17–18 (internal citations omitted).

The court also found Mr. ███ testimony in the case to lack credibility. While Mr. ███ alleged that assets of Hofmeister entities that were fraudulently transferred to the Trusts to frustrate creditors were "worthless and 'under water,'" the court determined that Mr. ███ testimony didn't make any sense. Id. at *23.

As discussed supra, Mr. ███ also testified to the deep personal relationship that he shares with the Hofmeister family. Despite the obvious concerns it would raise, the Debtor and Huron never informed the Committee that Mr. ███ was one of ███ principals and did not disclose the relationship between Mr. ███ and Mr. Hofmeister. Given this history between Mr. ███ and the Hofmeisters, the sale of Metavation to ███ hardly can be viewed with

46

anything other than intense distrust and skepticism. That the Debtor would attempt to enter into such a brazen, self-interested transaction is ample evidence that there is cause to appoint a chapter 11 trustee in this case.

The estate likely holds numerous causes of action against Mr. Hofmeister, which potential causes of action the Committee and its professionals are investigating and will continue to investigate, including, claims for actual fraud, breach of fiduciary duty, corporate waste, alter ego, preferences, constructive trust, conversion, and fraudulent transfers. Courts have held that management's position as a potential target of estate causes of action warrants appointment of a trustee. See, e.g., Sharon Steel Corp., 871 F.2d at 1220–21 (current management unable to fulfill their fiduciary duty to pursue prepetition voidable transfers because the debtor corporation and transferee corporations had common management and those managers had conflicting duties to the debtor and to the recipients of the voidable transfers); PRS Ins. Group, 274 B.R. at 387–88 (where there was evidence of significant transfers of assets to the debtor's president and sole shareholder, current management was unable to investigate and prosecute the potential causes of action and grounds existed for appointment of a trustee); Intercat, 247 B.R. at 923 (appointing a trustee because the debtor's CEO was not able to prosecute estate claims in a disinterested manner when he, his family, and his other companies were the targets of the estate causes of action). For this reason as well, cause exists to appoint a trustee for the Debtor under Bankruptcy Code section 1104(a)(1).

4.     The Incompetence of Management and the Mismanagement of the Debtor Require the Appointment of a Trustee

Numerous instances of Mr. Hofmeister's mismanagement have been detailed herein and likely will come to light as this case progresses. Given Mr. Hofmeister's apparent continuing control over certain of the affairs of the Debtor, his demonstrated mismanagement alone

47

demands the appointment of a trustee for the Debtor. See Sharon Steel Corp., 86 B.R. at 458 (gross mismanagement and incompetence are the most common grounds for the appointment of a trustee under Bankruptcy Code section 1104(a)(1)).

Moreover, as set forth above, as shown through his testimony in the Boston Finance Action, Mr. Owczarzak, the person at the Debtor responsible for the management and movement of funds in and through the Debtor's accounts, lacks basic knowledge of the finances of the Debtor, including, significantly, where the Debtor's assets are located. Mr. Owczarzak is either incompetent or ill-informed with respect to the finances of the Debtor, further evidencing, in either instance, the lack of competence of those currently charged with managing the Debtor.

This mismanagement is further evidenced by apparent deficiencies in the reporting made by the Debtor discussed infra. The Debtor also has not provided critical and accurate information to the Committee's financial advisors regarding the Debtor's bank accounts and financial condition. For instance, on December 28, 2012, FTI received a bank account listing from the Debtor which included 78 different bank accounts across various entities. It was immediately apparent that this list was inaccurate. The Debtor and Huron have advised they are working on providing a more accurate version; however, more than a month later, it has not been forthcoming.

The Debtor also has not filed with the Court an accurate organizational chart. The organizational chart filed with the Brown Declaration omits a number of affiliated entities, namely: (1) Revstone Hong Kong (BVI) Holding Limited; (2) Revstone Industries (Hong Kong) Company Limited; (3) Revstone Automotive Lighting (BVI) Holding Limited; (4) Revstone Industries Company Limited; (5) Revstone Aero LLC; (6) Revstone Realty LLC; (7) Revstone Energy, LLC; (8) Timco, LLC; (9) Eptec Fabrication S. de R.L. de C.V.; and (10) Revstone

Industries Burlington, Inc.[21]

These significant problems with the Debtor's basic disclosures of its assets and liabilities (and other reporting deficiencies), further undermine the competence and honesty of the Debtor's management.

     5.     The Appointment of a CRO and Independent Directors is Not an Adequate Remedy Where Appointment of a Chapter 11 Trustee is Otherwise Required

When circumstances warrant the appointment of a chapter 11 trustee, as they do here, inserting a "responsible person" such as a CRO into the company is not a basis upon which to decline to order the appointment of a chapter 11 trustee. See In re Emerging Commc'ns, Inc., Case No. 06-30007 (JKF), 2007 Bankr. LEXIS 4763 (Bankr. D.V.I. Feb. 13, 2007). Even if Mr. Hofmeister were truly to step aside from the management of the Debtor, Mr. Hofmeister ultimately would remain in control of the Debtor through his control of the Debtor's immediate parent, Ascalon. Accordingly, a CRO could never truly be independent of Mr. Hofmeister. Moreover, only a truly independent fiduciary could gain the trust of the creditor community for whose benefit this bankruptcy case must be run. Huron as the proposed CRO is a product of Mr. Hofmeister's influence and is beholden to Mr. Hofmeister.

In Emerging Communications, the debtors filed a motion to appoint a responsible officer to manage the affairs of the debtors (the "Responsible Officer Motion"). Id. at *10. The Office of the United States Trustee filed a motion to appoint a chapter 11 trustee. Id. at *13. The court denied the debtors' motion and granted the motion to appoint a chapter 11 trustee. Id. at *22.

Emerging Communications, like this case, was marked by distrust between the

---

[21] The organizational chart filed in the Spara case is also inaccurate. It omits (1) Arrow Racing and Engineering; (2) Revstone Health Services; (3) Transportation of Indiana; (4) Speedlab; (5) Commando Lock Company; (6) IDC; (7) Tactical; (8) US Tool; (9) Seville Bronze; (10) W. Pat Crow Forgings; (11) Valley; and (12) General Aluminum Forgings.