constituencies and the debtors' inability to manage their cases. Id. at *13. The <u>Emerging Communications</u> cases had their origin in a failed privatization plan that resulted in judgments against the debtors in amounts exceeding $56,000,000. Id. at **7–11. The court found that by filing the Responsible Officer Motion, the debtors "confirmed the need for the appointment of an independent fiduciary in the corporate Debtors' cases." Id. at *13.

The United States Trustee opposed the Responsible Officer Motion and instead sought appointment of a chapter 11 trustee, contending that "that there is but one remedy established by Congress to supplant management with a court appointed fiduciary while allowing the case to remain in chapter 11 and that is the appointment of a trustee pursuant to 11 U.S.C. § 1104(a)." Id. at **13–14. Indeed, as the United States Trustee argued, the only basis upon which one might seek the appointment of a "responsible officer" in lieu of a trustee would be under equitable principles. However, that would circumvent the plain requirements of Bankruptcy Code section 1104(a) and Congressional intent in enacting that section, and therefore would be impermissible. Id. at *14 (cited authority omitted).

The <u>Emerging Communications</u> court denied the Responsible Officer Motion, and ordered the appointment of a chapter 11 trustee, noting that "[i]n more recent cases, courts have opined that use of a responsible officer ought to be limited to extraordinary circumstances, especially in light of § 1104 that requires appointment of a trustee where a fiduciary is needed to take control of the estate." Id. at **16–17 (citing In re Stratesec, Inc., 324 B.R. 158 (Bankr. D.D.C. 2004) (receiver for chapter 11 debtor corporation not appointed as responsible officer where proof did not exist that all creditors, among others, supported motion and one creditor objected; extraordinary circumstances not shown); In re Adelphia Commc'ns Corp., 336 B.R. 610 (Bankr. S.D.N.Y. 2006) (questioning court's authority under § 1107 to appoint non-trustee

fiduciary to act on behalf of the estate, particularly where the major issues involved inter-debtor disputes in a multi-debtor case even though the appointment seemingly would not breach pending agreements for purchase of assets; duties of non-trustee fiduciary would have to be defined by the court and court should not exercise such discretion except in unusual circumstances)).

Here, like in <u>Emerging Communications</u>, the Debtor has already confirmed the need for a fiduciary by purporting to have Mr. Hofmeister step away from management of the Debtor, appointing a CRO, and adding two independent managers. As recognized by the <u>Emerging Communications</u> court, however, an independent officer selected by a debtor is not the proper procedure to implant independence into a bankruptcy case (particularly when creditors lack confidence in the candidate or when the candidate will lack the freedom to act without the appointing authority's influence, both of which are true in this case, as explained below). For this reason as well, the appointment of a chapter 11 trustee is the proper way to ensure there is an independent fiduciary in place to oversee the Debtor's estate.

      6.    <u>The Appointment of the Debtor's CRO and Independent Managers is Not an Adequate Remedy Because Such Individuals Remain Beholden to Mr. Hofmeister and Will Not Instill Confidence in Creditors</u>

The Debtor first indicated to the Committee in mid-December 2012 that it was going to appoint two (2) independent managers to serve with Mr. Hofmeister on the Debtor's board of managers. On January 7, 2013, in Mr. Hofmeister's Objection to Motion of Creditors' Committee for Rule 2004 Examination, Mr. Hofmeister represented that he has "stepped aside from management of the Debtor for the duration of the bankruptcy case" and that "Debtor will be managed by an independent CRO, John DiDonato of Huron Consulting Group, and two independent members of Debtor's board of directors." <u>Id.</u> at page 1. However, two days later, at the 341 Meeting, the Debtor's agent testified that Mr. Hofmeister remained in charge of the

51

Debtor. Moreover, Mr. Hofmeister has verified the Debtor's Schedules and SOFA in his capacity as Chairman of the Debtor, made the decision to sell a significant assert of the Debtor, and on or about January 11, 2013, executed the Metavation SPSA on behalf of Metavation.

The Committee now understands that the two "independent" managers are Mr. Richard E. Newsted and Mr. James Shein.[22] However, the independent board of managers' authority is so limited in scope as to render any independence meaningless in significant respects. For instance, the Debtor's Second Amended and Restated Operating Agreement (the "Current Operating Agreement") provides that Ascalon, under Hofmeister's control, is a member of the Debtor. Current Operating Agreement, § 3.1. The Current Operating Agreement is attached hereto as Exhibit 20. The Current Operating Agreement provides for the creation of a Board of Managers consisting of at least three (3) members, two (2) of whom are to be Independent Managers. Id. at § 5.2. However, the Current Operating Agreement sets forth strict limitations on the powers of the Board of Managers:

> 5.15 Limitation of Authority. Notwithstanding anything in this Agreement to the contrary, the Board of Managers may not cause the Company to do any of the following without the consent of holders of a Majority in Interest:
>
> (a) Amend the Certificate of Formation;
>
> (b) Approve a merger to which the Company is a party or a plan or agreement providing for a membership interest exchange;
>
> (c) Approve or authorize the sale, lease or exchange of all or substantially all of the Company's property and assets;
>
> (d) Approve or authorize the dissolution of the Company or a revocation of a dissolution; or
>
> (e) Amend this Agreement.

Id. at § 5.15.

---

[22] Under the Current Operating Agreement (defined below), an "Independent Manager" need not necessarily be independent of Mr. Hofmeister. See Current Operating Agreement § 1.6(g).

Therefore, for example, the independent managers appear unable to authorize the Debtor to enter into an agreement for debtor-in-possession financing if that financing required a commitment to sell substantially all[23] of the Debtor's assets, or even would include granting a lien on substantially all the Debtor's assets because the consent of a Majority in Interest — defined as Ascalon — would be required. It also is unclear whether the provision in the Current Operating Agreement regarding the need for consent of the Majority in Interest means that only Ascalon can approve a sale of the Debtor, Metavation, Contech Castings, or any other directly or indirectly owned assets of the Debtor. If Ascalon's consent is required for any such sale(s), it is all but certain that Mr. Hofmeister will remain intimately involved in the Debtor's strategy for the case.

Moreover, the Current Operating Agreement provides for the creation of a Restructuring Committee with limited authority. Id. at § 5.14(c). The Initial Chief Restructuring Officer and President of the Company is Mr. DiDonato. Id. at Ex. A. The Current Operating Agreement also provides, that the President, Mr. DiDonato, "shall be the chief executive officer of the Company and shall have the general powers of supervision and management of the business and

---

[23] Delaware courts have eschewed a definitional approach to "substantially all" in favor of a contextual approach that focuses upon whether a transaction involves the sale "of assets quantitatively vital to the operation of the corporation and is out of the ordinary and substantially affects the existence and purpose of the corporation." Gimbel v. Signal Cos., Inc., 316 A.2d 599, 606 (Del. Ch. 1974), aff'd, 316 A.2d 619 (1974). As the court noted, this interpretive choice favors "doing equity in specific cases over the value of providing clear guidelines for transactional lawyers." Hollinger Inc. v. Hollinger Int'l Inc., 858 A.2d 342, 377-78 (Del. Ch. 2004). The courts have clearly indicated that whether a sale constitutes all or substantially all is not to be measured by the size of the sale alone, but also by the qualitative effect upon the company. Oberly v. Kirby, 592 A.2d 445, 464 (Del. 1991); Hollinger Inc., 858 A.2d at 377 (a "determination of whether there is a sale of substantially all assets . . . depends upon the particular qualitative and quantitative characteristics of the transaction at issue").

As a result, transactions involving various asset percentages have been found to constitute a sale of substantially all of a company's assets. See, e.g., Thorpe v. CERBCO, Inc., 676 A.2d 436, 444 (Del. 1996) (affirming a finding that a sale of stock comprising 68% of a company's assets and constituting its primary income generating asset was a sale of all or substantially all assets); Katz v. Bregman, 431 A.2d 1274, 1275-76 (Del. Ch. 1981) (sale of assets constituting 51% of assets, 45% of sales, and 52.4% of pre-tax net operating income was sale of all or substantially all assets).

affairs of the Company usually vested in the chief executive officer of a Delaware limited liability company and shall see that all orders and resolutions of the Board of Managers are carried into effect." Id. at § 6.8. Section 5.1 provides, in part, that all decisions regarding the management and administration of the Company shall be made by, and the business and affairs of the Company shall be managed under the direction of, the Board of Managers. Id. at § 5.1. Section 6.1, however, delegates the power and authority of the Board of Managers "to manage the affairs of the Company and to make all decision and take all actions for the Company" to the officers. Id. at § 6.1. Under section 6.8, Mr. DiDonato, as President, is vested with the general powers of supervision and management of the business and affairs of the Company. Id. at § 6.8. By default, Mr. DiDonato will preside at all Members' and Board of Managers' meetings. Accordingly, Mr. DiDonato, Mr. Hofmeister's hand-picked CRO, retains broad powers under the Current Operating Agreement.

However, it is unclear whether Huron and Mr. DiDonato can be retained as the Debtor's CRO. The Debtor has not filed an application to approve Huron's retention. However, Mr. DiDonato has acknowledged a twenty-year relationship with Mr. Hofmeister. Moreover, upon information and belief, Huron has been employed by Mr. Hofmeister and Hofmeister entities at various times over a period of many years, and may lack the disinterestedness required for retention and to serve as a true fiduciary. For instance, Huron assisted with the Hofmeister-engineered proposed sale of Metavation (which owes a significant amount of money to the Debtor) and Contech. Huron demonstrated its lack of independence in the proposed Metavation sale. Huron did not disclose that the proposed purchaser was a Hofmeister insider with a history of participating with Mr. Hofmeister in fraud. Huron also failed to disclose that the ▓▓▓ purchase proposal was subject to the proposed GM Accommodation (which had not

yet been approved by GM). Instead, Huron affirmatively represented in Huron's materials that the ▮▮▮ proposal was the highest offer, at ▮▮▮ See Metavation Process Update page 4.

The Committee also does not know if Mr. DiDonato was selected for his role by Mr. Hofmeister, or if he was selected by the independent managers. The Committee is aware that Mr. Hofmeister identified Mr. DiDonato as the CRO in his January 7, 2013 Objection to Motion of Creditors' Committee for Rule 2004 Examination, which was ten days prior to the Debtor's retention of the independent managers on January 17, 2013. Further, the announcement regarding the selection of Mr. DiDonato as CRO was made before one of the independent managers had even been identified as a candidate for the position. The Committee is also unaware of what disclosures, if any, regarding Mr. DiDonato's history with Mr. Hofmeister and various Hofmeister entities were made to the independent managers. Just as ▮▮▮ was being proposed as the purchaser of Metavation despite Mr. ▮▮▮ long standing ties to the Hofmeister family, and the finding of liability with Mr. Hofmeister in the Limbright case, it appears Mr. Hofmeister is attempting to set up a thinly veiled appearance of independence at the Debtor level by bringing in Huron and Mr. DiDonato, a long trusted advisor.

Finally, Mr. Hofmeister still controls the Debtor's purse strings. Among other things, the Debtor has provided to the Committee a resolution dated January 25, 2013 that shows that Mr. DiDonato as CRO, Laura Marcero as Deputy CRO, and John Owens, as Treasurer of the Debtor, are now authorized persons to enter into certain banking transactions for the Debtor. See January 25, 2013 resolution, attached hereto as Exhibit 21. However, there is no evidence that Mr. Hofmeister has been divested of that same authority.

7. <u>The Confusion Over the Direction in This Case Warrants Appointment of a Chapter 11 Trustee</u>

On January 9, 2013, Debtor's former attorneys announced to the Court that they were being substituted out of the case in favor of new counsel. New counsel only appeared in the case over a week later, and did not appear in the Greenwood and US Tool cases until January 28, 2013. The Debtor has indicated that additional entities may file petitions, that it is possible that the Debtor will obtain postpetition financing, and that the Debtor is exploring asset sales, but has not given the Committee any insight into how any such plans might be implemented. It is clear that there is no direction or plan for the bankruptcy case even as administrative expenses continue to accrue.

Therefore, the mismanagement and apparent lack of competence of the Debtor's current management warrant the immediate appointment of a chapter 11 trustee for cause under Bankruptcy Code section 1104(a)(1).

8. <u>The Acrimony Between the Debtor and its Creditors Warrants Appointment of a Trustee</u>

The acrimony between the Debtor and its most significant creditors also provides sufficient "cause" for the appointment of a trustee in this instance. Courts have appointed trustees in circumstances where the conflicts between creditors and the debtor have escalated beyond those conflicts that generally exist to acrimony or lack of cooperation that jeopardizes the reorganization process. See, e.g., <u>Marvel Entm't Group, Inc.</u>, 140 F.3d at 472–73. In <u>Marvel Entertainment</u>, the Third Circuit Court of Appeals upheld the appointment of a trustee due to the "deep-seeded conflict and animosity" between the debtors and its creditors. <u>Id.</u> at 473. The Third Circuit Court of Appeals stated, "[t]he intense and high stakes bickering between the [debtor] interests and the Lenders does not instill confidence that the [debtor] interests could fairly negotiate with the creditors to whom they owe [fiduciary] duties, nor that reorganization

will occur effectively." Id. at 474; In re Nartron Corp., 330 B.R. 573, 590-91 (in light of "parties' inability to reach a consensus about anything," the court concluded that there was "no reasonable likelihood of any cooperation between the parties in the near future" and ordered the appointment of a trustee).

The creditor-debtor acrimony in this case is pervasive. Indeed, the Debtor's actions are riven with antipathy toward its own creditors. This antipathy takes many forms. The Debtor is running an insolvent case with little hope of obtaining financing. The Debtor, time and time again, has failed to reveal material information, and has sacrificed a focus on agreed key deliverables and milestones, like debtor-in-possession financing or a reasoned case plan, to persistent obstruction of to the Committee's reasonable inquiries.

The supposed changing of the guard at the CRO and board level has all the earmarks of Mr. Hofmeister's not-so-invisible hand. It is hard to conceive that there can be animus towards creditors of the type demonstrated by the Debtor, after installation of new board members and a CRO who supposedly are fresh to the situation and not under Mr. Hofmeister's influence. Mr. Hofmeister's continuing control of the case is evident, if nothing else, through the lack of cooperation that the Debtor has provided to the Committee to date.

Mistrust of Mr. Hofmeister and his management of the Debtor and its affiliates is endemic among the Debtor's creditors, well beyond the acrimony that generally accompanies a bankruptcy case filing. The Limbright case is not an isolated occurrence or anomaly. Mr. Hofmeister and the Debtor have spent the past several years embroiled in litigation with creditors seeking payment for acquisition obligations and other debts. See, e.g., Thule Holding, Inc. v. Revstone Indus., C.A. No. 3:11-cv-01978-JBA (D. Conn. 2011) (complaint for breach of contract and unjust enrichment in connection with Revstone's failure to comply with terms of

asset purchase agreement (litigation stayed by Revstone's bankruptcy filing)); Eaglepicher Automotive, LLC v. George S. Hofmeister, C.A. No. 2:09-cv-14501-PJK, D.I. 24 (E.D. Mich. 2009) ($534,189.84 consent judgment entered against Mr. Hofmeister in lawsuit alleging breach of obligation to make payments under purchase agreement); see also Patrick O'Mara v. Revstone Indus., Case No. 11-1348 (Mich. Cir. Ct. 2011), Michael F. Shields v. Revstone Indus., Case No. 11-012105 (Mich. Cir. Ct. 2011); Boston Fin. Group v. Power-Tec Mfg., LLC, Case No. 12-29875-CK (Circ. Ct. Mich., Cty. of Grand Traverse); Schoeller Arca Sys. Inc. v. Revstone Indus., Case No. 2011-121614-CK (Circ. Ct. Mich. Cty. of Oakland).[24]

These cases are just a few examples that help demonstrate the creditor community's lack of confidence in Mr. Hofmeister or the Debtor's ability to act appropriately as debtor-in-possession. Instead, there is deep mistrust and antipathy that would likely make it impossible for the Debtor successfully to reorganize under Mr. Hofmeister's continued control, even were management competent to take this case as far as a reorganization, which seems highly unlikely.

Despite the Debtor's insistence that Mr. Hofmeister is not control of the Debtor, Mr. Hofmeister's own counsel contradicted that position in an email sent to the Committee as late as February 1, 2013. In that email, Mr. Sheldon Toll informed Committee's proposed counsel that Mr. Hofmeister "has also been actively pursuing various transactions to payoff [sic] the creditors and emerge from bankruptcy." There could be no more explicit admission that Mr. Hofmeister is still directing the conduct of these cases and no greater evidence of Mr. Hofmeister's disdain for this process and the rights of creditors.

Nonetheless, the Committee has sought to work with the Debtor to obtain information and develop protocols that would rebuild trust between the Debtor and its creditors. However,

---

[24] In the related Spara case, this acrimony is evidenced by the litigation over Boston Finance's Motion for Modification of the Automatic Stay and for Adequate Protection [Spara Docket No. 33], where the Debtor has filed a number of notices of deposition of Boston Finance.

58

mistrust has only deepened as the Debtor continued to delay basic administrative decisions, failed to develop basic financial analysis necessary to obtain debtor-in-possession financing, failed to properly disclose the potential sale of Metavation to a Hofmeister insider – indeed, only producing documents in any significant amount after a 2004 motion was filed – and delayed the implementation of replacing Mr. Hofmeister and the Debtor's current management with disinterested parties. Mr. Hofmeister has used this bankruptcy case to delay further efforts by creditors to end finally the fraud, incompetence, and gross mismanagement by current management of the Debtor that has to date caused significant damage to the Debtor and its non-Debtor affiliates.

    C.    <u>**Additionally, the Court Should Appoint a Trustee under 11 U.S.C. § 1104(a)(2) Because Such Appointment Is In the Interests of the Estate and All Other Parties.**</u>

Even when "cause" to appoint a trustee is not established under Bankruptcy Code section 1104(a)(1), Bankruptcy Code section 1104(a)(2) creates a flexible standard that authorizes the Court to appoint a trustee when it is in the best interests of the creditors and the estate to do so. See 11 U.S.C. § 1104(a)(2); <u>Sharon Steel Corp.</u>, 871 F.2d at 1226; <u>In re Cardinal Indus., Inc.</u>, 109 B.R. 755, 767 (Bankr. S.D. Ohio 1990); <u>Microwave Prods. of Am., Inc.</u>, 102 B.R. at 675. In determining the best interests of creditors and the estate, courts "resort to [their] broad equity powers . . . equitable remedies are a special blend of what is necessary, what is fair and what is workable." <u>In re Hotel Assocs., Inc.</u>, 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980); see <u>In re Wings Digital Corp.</u>, Case No. 05-12117 (ALG), 2005 Bankr. LEXIS 3476, at *14 (Bankr. S.D.N.Y. May 16, 2005) (section 1104(a)(2) is a "lesser standard" than section 1104(a)(1)). In exercising these broad equitable powers to appoint a trustee under Bankruptcy Code section 1104(a)(2), courts "eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests." <u>Hotel Assocs., Inc.</u>, 3 B.R. at 345.

Courts consider numerous factors when determining whether to appoint a trustee under Bankruptcy Code section 1104(a)(2), including (i) the trustworthiness of the debtor, In re Evans, 48 B.R. 46, 48 (Bankr. W.D. Tex. 1985); (ii) the debtor-in-possession's past and present performance and prospects for the debtor's rehabilitation, see In re Parker Grande Dev., Inc., 64 B.R. 557, 561 (Bankr. S.D. Ind. 1986); In re L.S. Good & Co., 8 B.R. 312, 315 (Bankr. N.D. W. Va. 1980); (iii) the confidence – or lack thereof – of the business community and of creditors in present management, see In re Concord Coal Corp., 11 B.R. 552, 554 (Bankr. S.D. W. Va. 1981); and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment, see Microwave Prods. of Am., Inc., 102 B.R. at 675; see also Sharon Steel Corp., 86 B.R. at 466 ("[i]n a case of this magnitude, the cost of having a trustee in place is insignificant when compared with the other costs of administration and when compared with the enormous benefit to be achieved by the establishment of trust and confidence in . . . management."); Ionosphere Clubs, 113 B.R. at 168; In re Madison Mgmt., 137 B.R. 275, 282 (Bankr. N.D. Ill. 1992).

Each of these factors is satisfied here, as explained below. Accordingly, the Court should appoint a trustee.

1. <u>The Debtor Cannot Be Trusted to Carry Out its Fiduciary Duties.</u>

A chapter 11 debtor and its managers owe fiduciary duties to the estate. See Centennial Textiles, Inc., 227 B.R. at 612. An independent trustee should be appointed under Bankruptcy Code section 1104(a)(2) when a debtor and/or its management and insiders suffer(s) from material conflicts of interest, and cannot be trusted to conduct independent investigations of questionable transactions in which they were involved. See, e.g., PRS Ins. Group, Inc., 274 B.R. at 389 (appointment of trustee appropriate under section 1104(a)(2) where causes of action against insiders are a significant asset of the estate); Microwave Prods. of Am., Inc., 102 B.R. at

676 (chapter 11 trustee appointed where debtor was not in a "strong posture" to pursue possible claims due to conflicts of interest and fraudulent transfers, and "a trustee would likely be able to investigate claims that could result in additional sums of money coming into the estate"); L.S. Good & Co., 8 B.R. at 315 (appointing trustee under section 1104(a)(2) where "[t]he magnitude of the number of inter-company transactions places current management of [the debtor] in a position of having grave potential conflicts of interest and the presumption arises that the current management of [the debtor] will be unable to make the impartial investigations and decisions demanded in evaluating and pursuing inter-company claims on behalf of [the debtor]").

The facts here are analogous to those found in the bankruptcy case of Ondova Limited Company, where a chapter 11 trustee was appointed. In re Ondova Ltd. Co., Case No. 09-34784 (SGJ) (Bankr. N.D. Tex.). In issuing an order to show cause why a chapter 11 trustee should be appointed, the court indicated its concern about a number of facts, including that the debtor attempted to terminate its counsel early in the case and had a history of playing "musical lawyers" in other litigation. Order for Debtor to Appear and Show Cause Why: (A) a Chapter 11 Trustee Should Not Be Appointed, or Alternatively, (B) the Case Should Not Be Converted to a Case Under Chapter 7 and Chapter 7 Trustee Appointed (the "Show Cause Order"), In re Ondova Ltd. Co., Case No. 09-34784 (SGJ), Docket No. 56 (Bankr. N.D. Tex. Sept. 2, 2009), page 3–4 (attached hereto as Exhibit 22).

The Ondova court also was troubled by its perception that "that the goal of Ondova in this Chapter 11 case (while under the direction of [the debtor's principal] Mr. Baron and the current management team) may not be centered around reorganizing a viable company (or providing a soft landing to a financially-stressed company), for the benefit of creditors and other parties-in-interest, but more geared toward protecting the personal interests of Mr. Baron and his

61

affiliates, and/or attempting to relitigate issues already decided or settled in other fora." Id. at pages 4-5. The court also had concerns "about complex, prepetition transactions among various companies in which Mr. Baron has some interest or control, which transactions may affect the Debtor (and the value available/reachable for creditors), that need investigating by an independent fiduciary." Id.

These concerns likewise are present in this case. The Debtor (even following the appointment of the CRO) appears motivated only to protect Mr. Hofmeister and put off the day when Mr. Hofmeister's entire fraudulent enterprise collapses. Moreover, the Debtor has engaged in numerous suspect prepetition transactions (and appears to be planning similarly suspect postpetition transactions) that require a truly independent fiduciary to step in to manage the Debtor, investigate its affairs, and put a halt to the ongoing harm to creditors.

In addition, the Ondova court noted that Mr. Baron, the debtor's principal was invoking Fifth Amendment rights regarding basic questions about the debtor. Ondova, Transcript of Sept. 11, 2009 hearing, 34:20-35:9. The Ondova Transcript is attached hereto as Exhibit 23. This fact also required appointment of a chapter 11 trustee. Id. Mr. Hofmeister's ability to manage the Debtor is similarly compromised. Mr. Hofmeister has invoked his Fifth Amendment rights in his answer to the DOL Complaint, and likely would be unable to fully and truthfully answer all inquiries regarding the assets, liabilities, and affairs of the Debtor and its subsidiaries.

This Debtor cannot be trusted to act in accordance with its fiduciary duties to creditors because its management continually has breached those duties and instead chosen to act in Mr. Hofmeister's best interest, as detailed above. Nor can management be trusted to investigate the numerous breaches and potential breaches of duty by that management, and other potential claims arising from the actions and/or inactions of that management. Finally, based on the

findings of the Kentucky Court alone, it seems likely that there will be numerous inter-company transactions and potential inter-company claims between and among the Debtor and its non-Debtor affiliates. For these reasons, appointment of a trustee is also appropriate under Bankruptcy Code section 1104(a)(2).

        2.    <u>The Creditors Lack Confidence in the Debtor.</u>

Courts also recognize that when creditors' confidence in a debtor's management has eroded, and creditors have "lost faith" in the debtor's intentions and ability to reorganize, the appointment of a trustee may be in the best interests of all parties. <u>See, e.g.</u>, <u>Cardinal Indus., Inc.</u>, 109 B.R. at 767 (appointing trustee under section 1104(a)(2) where debtors' self-dealing and breach of fiduciary duties resulted in a serious erosion of trust and confidence by creditors and where benefits of potential claims against insiders of estate outweighed any cost of appointing a trustee); <u>Microwave Prods. of Am., Inc.</u>, 102 B.R. at 673 (same).

The evidence of the loss of confidence by creditors in this Debtor and its management is abundant, and includes the numerous lawsuits against Mr. Hofmeister and related entities, where Mr. Hofmeister's fraud has been alleged. This mistrust has been substantiated, as evidenced by the appointment of the receiver in the Boston Finance Action, and the findings by the Kentucky Court in the <u>Limbright</u> case of actual fraud.

The Debtor could have, if it had chosen to do so, attempted to restore trust by ensuring the effective flow of information to the Committee. Instead, it ignored critical information requests, delayed finalizing a confidentiality agreement that would allow the Committee's proposed counsel to share information with the Committee, refused to identify the candidates for the independent director position until after two (2) had been selected (one of which quickly resigned only to be replaced), and, perhaps most importantly, concealed and delayed providing information regarding the proposed insider sale of Metavation. Equally troubling is the Debtor's

failure to advise the Committee that two of its affiliates, Greenwood and US Tool, were commencing bankruptcy cases of their own. The Committee learned of these filings only when they appeared on the public record. That information of this magnitude was withheld from the Committee evidences the unwillingness or inability of the Debtor to serve as an honest broker in its dealings with the Committee and as confirmation of Mr. Hofmeister's ongoing total domination of the Debtor.

Accordingly, the Court should appoint a trustee under Bankruptcy Code section 1104(a)(2) because the creditors lack confidence in the Debtor.

        3.      <u>The Benefits of Appointing a Trustee Far Outweigh the Costs of Such Appointment.</u>

As this stage of the bankruptcy case, the appointment of a trustee will not be an unduly burdensome expense for the Debtor's estates. The Debtor is a holding company with few employees in comparison with the number of people employed by the non-Debtor affiliates. As a holding company, the Debtor presumably manages the affairs of such non-Debtor affiliates, for which it, in turn, receives a management fee, but has no other operations. Although the structure of the entire chain of Debtor and non-Debtor companies is somewhat complex, the capital structure of the Debtor is not. What is complex, and what will require effort to untangle, is, instead, the web of transactions that management of the Debtor, including Mr. Hofmeister, has created to thwart creditors of the Debtor and its non-Debtor affiliates. Unlike the Debtor's management, a chapter 11 trustee would be uniquely situated to untangle this web in a manner that is fair to all creditors, including those of the Debtor and its non-Debtor affiliates.

The Debtor's current counsel only appeared in this case on January 17, 2013, and the Debtor has not yet sought approval of counsel's retention. New counsel has repeatedly cited its recent retention and corresponding lack of knowledge as cause for further delay. For instance,

the Debtor's new counsel has cited these circumstances in seeking a significant delay in adjudication of the Metavation 2004 Motion, filed on January 16, 2013. Also, it appears that the Debtor's CRO is also still working to gather all the information it needs to operate in this case. The Debtor has similarly still not filed a motion to approve the CRO's retention. As the Court will note from the Metavation 2004 Motion, the Debtor was unable or unwilling to produce to the Committee many categories of significant information and/or documents until late during the week of January 14, 2013 – one (1) month after the Committee was appointed and despite repeated requests for information from the Committee's counsel and its financial advisors.

In addition, and critically, the progress of this case would not be impeded if the Court promptly appoints a trustee, as requested by the Committee herein. As set forth above, creditors generally lack confidence in the management of the Debtor. Mr. Hofmeister earned this mistrust over the past several years through self-dealing, dishonesty, and fraudulent activities, as alleged in the DOL Complaint and as established by the factual findings made by the Kentucky Court after years of litigation. The CRO has failed to take steps to suggest that he will act any differently. Instead, Huron has apparently supported a sale of a major division of the Debtor's business to a Hofmeister ally for Mr. Hofmeister's personal benefit.

The benefit of the appointment of a chapter 11 trustee to creditors of the Debtor and its affiliates would greatly outweigh the burden to the Debtor from such appointment. As discussed above, the Committee believes that the Debtor possesses numerous and valuable causes of action that are not likely to be prosecuted if current management retains control of the Debtor. These causes of action may result in significant recoveries to the Debtor's estate. Such causes of action will need to be investigated and pursued, and the Debtor, for obvious reasons, will be unable to conduct this investigation. By contrast, a chapter 11 trustee will be able to undertake the

independent investigation needed and pursue any necessary litigation. Furthermore, the appointment of a trustee would provide creditors with the reassurance that a fair fiduciary was at long last managing the Debtor. This result, in turn, would go a considerable distance in allowing an efficient and equitable resolution of this bankruptcy case for all parties in interest.

### RESERVATION OF RIGHTS

The Committee reserves its right to amend or supplement, through and including the date of any hearing on the Motion, any of the factual recitations or legal arguments contained herein, in light of the Committee's ongoing investigation of the affairs of the Debtor.

WHEREFORE, the Committee respectfully requests that the Court enter an order substantially in the form of the annexed hereto: (i) directing the Office of the United States Trustee to appoint a chapter 11 trustee; and (ii) granting the Committee such further relief as the Court deems just and proper.

Dated: February 4, 2013        **WOMBLE CARLYLE SANDRIDGE & RICE, LLP**

/s/ Matthew P. Ward
Steven K. Kortanek (DE Bar No. 3106)
Mark L. Desgrosseilliers (DE Bar No. 4083)
Matthew P. Ward (DE Bar No. 4471)
222 Delaware Avenue, Ste. 1501
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile: (302) 661-7738
E-mail: skortanek@wcsr.com
E-mail: mdesgrosseilliers@wcsr.com
E-mail: maward@wcsr.com

*Proposed Counsel for the Official Committee of Unsecured Creditors of Revstone Industries, LLC*

WCSR 7642691v1

## LIST OF EXHIBITS

| | |
|---|---|
| EXHIBIT 1 | Answer to Complaint - Solis v. Hofmeister, C.A. No. 12-250 (KKC) (E.D. Ky.) |
| EXHIBIT 2 | February 1, 2013 Email from Sheldon Toll |
| EXHIBIT 3 | January 9, 2013 Hearing Transcript Excerpts |
| EXHIBIT 4 | March 24, 2011 Deposition Excerpts of ▓▓▓▓▓ |
| EXHIBIT 5 | November 14, 2011 Judgment Against ▓▓▓▓▓ (Limbright Docket No. 223) |
| EXHIBIT 6 | August 29, 2012 Deposition Transcript of Mr. Jan Owczarzak |
| EXHIBIT 7 | Garnishee Disclosures |
| EXHIBIT 8 | September 26, 2012 Deposition Transcript of Nelson Clemmens |
| EXHIBIT 9 | Complaint - Solis v. Hofmeister, C.A. No. 12-250 (KKC) (E.D. Ky.) |
| EXHIBIT 10 | Greenwood Forgings, LLC Certificate of Name Change |
| EXHIBIT 11 | Boston Finance Injunctive Motion - Boston Finance Group, LLC v. Power-Tec Manufacturing, LLC et al. – C.A. No. 12-28975 (Michigan) |
| EXHIBIT 12 | August 1, 2012 Transcript Excerpts - Boston Finance Group, LLC v. Power-Tec Manufacturing, LLC et al. – C.A. No. 12-28975 (Michigan) |
| EXHIBIT 13 | MPI Asset Purchase Agreement, dated October 19, 2012 |
| EXHIBIT 14 | Amended MPI Asset Purchase Agreement, dated November 15, 2012 |
| EXHIBIT 15 | Funds Flow Memorandum for the MPI Sale |
| EXHIBIT 16 | MPI Confidential Information Memorandum |
| EXHIBIT 17 | Metavation Process Update |
| EXHIBIT 18 | Metavation Sale Process Support Agreement |
| EXHIBIT 19 | Membership Interest Purchase Agreement by and among ▓▓▓▓▓, Revstone Transportation, LLC, and Metavation, LLC |
| EXHIBIT 20 | Debtor's Second Amended and Restated Operating Agreement |

| | |
|---|---|
| EXHIBIT 21 | January 25, 2013 Board Resolution |
| EXHIBIT 22 | Show Cause Order entered in - <u>In re Ondova Ltd. Co.</u>, Case No. 09-34784 (SGJ), Docket No. 56 (Bankr. N.D. Tex. Sept. 2, 2009) |
| EXHIBIT 23 | September 11, 2009 Hearing Transcript - <u>In re Ondova Ltd. Co.</u>, Case No. 09-34784 |

WCSR 7642957v1