IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| REVSTONE INDUSTRIES, LLC, et al.,[1] | ) Case No. 12-13262 |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Related to Docket No. 198** |

## DEBTORS' OMNIBUS REPLY IN SUPPORT OF MOTION OF THE DEBTORS TO EMPLOY AND RETAIN HURON CONSULTING SERVICES LLC TO: (I) PROVIDE A CHIEF RESTRUCTURING OFFICER AND ADDITIONAL PERSONNEL FOR THE DEBTORS PURSUANT TO 11 U.S.C. § 363(B), *NUNC PRO TUNC* TO JANUARY 17, 2013; AND (II) PROVIDE FINANCIAL ADVISORY SERVICES TO THE DEBTORS PURSUANT TO 11 U.S.C. § 327(A), *NUNC PRO TUNC* TO THE PERIOD BETWEEN DECEMBER 17, 2012 AND JANUARY 16, 2013

The above-captioned debtors and debtors in possession (collectively, the

"Debtors") file this omnibus reply in support of the *Motion of the Debtors to Employ and Retain*

*Huron Consulting Services LLC to: (I) Provide a Chief Restructuring Officer and Additional*

*Personnel for the Debtors Pursuant to 11 U.S.C. § 363(b), Nunc Pro Tunc to January 17, 2013;*

*and (II) Provide Financial Advisory Services to the Debtors Pursuant to 11 U.S.C. § 327(a),*

*Nunc Pro Tunc to the Period Between December 17, 2012 and January 16, 2013* [Docket No.

198] (the "Motion").[2]  The following parties have filed objections to the Motion:  (a) the Official

Committee of Unsecured Creditors (the "Committee") of Revstone Industries, LLC

("Revstone"), (b) the United States Trustee for Region 3 (the "UST"); and (c) General Motors,

LLC ("GM").  Boston Finance Group, LLC ("BFG"), the Debtors' primary litigation adversary

---

[1]  The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's federal tax identification numbers are: Revstone Industries, LLC (7222); Spara, LLC (6613); Greenwood Forgings, LLC (9285); and US Tool & Engineering, LLC (6450).  The location of the Debtors' headquarters and the service address for each of the Debtors is 2250 Thunderstick Dr., Suite 1203, Lexington, KY 40505.
[2]  Capitalized terms not defined herein shall have the meanings set forth in the Motion.

1

and chair of the Committee, has joined in the Committee's objection.  For the reasons set forth

below, each of the objections lack merit.

## Preliminary Statement

1.      Huron Consulting Services LLC ("Huron") began its postpetition

representation of the Debtors on December 17, 2012, at a time when the Debtors and many of

their subsidiaries were facing crises on various fronts, including liquidity events, creditor

garnishments, and customer defections, in addition to the many strains and requirements imposed

by virtue of the bankruptcy filings.[3]  The Debtors (which had filed their bankruptcy cases

without the benefit of professional financial advisors in place) required an experienced,

independent, and highly competent financial advisory firm to immediately assist in providing the

expertise necessary to navigate the bankruptcy process.  Huron stepped in to fill this role and did

so promptly and efficiently, initially in a financial advisor capacity as a stopgap measure during

the first month of the case, and thirty days later in the nature of an independent management role

when circumstances so warranted.

2.      On January 17, 2013, the Debtors formally effectuated a governance

change.  Two independent managers (Richard E. Newsted and James B. Shein) were appointed

to the three member boards of Revstone and Spara, and John C. DiDonato of Huron was

appointed as Chief Restructuring Officer (the "CRO").  Other Huron personnel were appointed

to officer positions. Messrs. Newsted and Shein are highly qualified individuals with extensive

backgrounds serving on boards of directors, including significant experience in bankruptcy

matters.  A listing of each independent manager's qualifications is attached hereto as **Exhibit A**.

---

[3]  Although only Debtors Revstone and Spara, LLC ("Spara") had commenced bankruptcy cases as of December 17, 2012, Huron was engaged to represent the "Company," which consists of Revstone, Spara and their respective direct and indirect subsidiaries.

2

3.      The independent managers together constitute a majority of the managers on the boards of Revstone and Spara.  The independent managers also were appointed to a restructuring committee of the boards (the "Restructuring Committee"), which was specifically charged with the task of overseeing the CRO and all bankruptcy-related actions of the Debtors and their non-Debtor subsidiaries.[4]  Although various candidates were considered, the Restructuring Committee ultimately made the decision to retain Mr. DiDonato as the CRO, effective January 17, 2013.  Since then, the Restructuring Committee and the CRO have functioned as independent fiduciaries who are focused on maximizing the value of the Debtors' estates and the enterprise as a whole.

4.      Notwithstanding the foregoing circumstances, each of the objections to Huron's retention revolves around the single overarching theme that Huron is not sufficiently independent from the Debtors' former control person, George Hofmeister, and therefore, Mr. Hofmeister continues to control the Debtors.  Nothing could be further from the truth.  As Mr. Hofmeister put it at his recent deposition in this matter:  "[T]he CRO and his staff are running all of the businesses . . . I have been taken out of all activities except for those where I'm directed by the CRO to work on something."  Transcript of Deposition of George Hofmeister dated March 13, 2013 ("Hofmeister Transcript"), at pg. 45, ln. 14-15, 18-20.[5]  Moreover, the Restructuring Committee "[has] full authority on everything . . . [T]hey have control[.] . . . They basically make all the decisions."  Hofmeister Transcript at p. 124, ln. 20-23; p. 125, ln. 15-22; pg. 137, ln. 21-24.

---

[4]  Effective February 1, 2013, Mr. DiDonato became CRO of Debtors US Tool & Engineering, LLC and Greenwood Forgings, LLC and non-Debtors Revstone Transportation, LLC and Revstone Tool & Engineering, LLC. Subsequently, Mr. DiDonato became President or CRO at three additional non-Debtor subsidiaries of Revstone, consisting of MPI, LLC, Cerion MPI Mexico, LLC, and Revstone Plastics, LLC. The CRO is subject to oversight by the Restructuring Committee at each of these entities.

[5]  Excerpts of the deposition transcripts cited herein have been filed separately under a notice of submission.

5.      For all of the reasons set forth below, the objections to the Motion should be overruled.

### The CRO and the Restructuring Committee Govern the Debtors and Their Subsidiaries

6.      The Debtors have taken careful and diligent steps to ensure that the CRO and the Restructuring Committee control all key management aspects of the Debtors' postpetition activities, as well as those of their non-Debtor subsidiaries.  In fact, Huron's engagement as CRO and the appointment of the independent managers was conditioned upon Mr. Hofmeister removing himself from control positions with the Debtors and their non-Debtor subsidiaries.

7.      This is not an unusual step taken by the Debtors to ensure transparency and fairness in the estates' and their subsidiaries' governance structure.  The Delaware Supreme Court has "repeatedly held that any board process is materially enhanced when the decision is attributable to independent directors." *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1243 (Del. 2012).  "Accordingly, judicial review for entire fairness of how the transaction was structured, negotiated, disclosed to the directors, and approved by the directors will be significantly influenced by the work product of a properly functioning special committee of independent directors." *Id.* at 1243-44.

8.      Although Mr. Hofmeister remains the titular "Chairman" of certain Revstone entities, he has agreed to cede authority to the CRO and the Restructuring Committee through amendments to the "charters" or operating agreements governing the Debtors and any subsidiaries where necessary to ensure that the CRO and the Restructuring Committee have control.  The resulting structure is summarized below.

4

- Revstone and Spara are the parent companies of their respective corporate groups. *See* organizational charts attached hereto as **Exhibit B**. Revstone and Spara are owned by Ascalon Enterprises, LLC ("Ascalon"), an entity controlled by Mr. Hofmeister.

- Mr. DiDonato is the CRO and President of Revstone and Spara. He was interviewed and hired as CRO by two independent manager candidates, not Mr. Hofmeister, following a thorough selection process. *See* Hofmeister Transcript at pg. 153-154, 157-158; Transcript of Deposition of John DiDonato dated March 12, 2013 ("DiDonato Transcript") at pg. 257, ln. 23 – pg. 258, ln. 1. The CRO primarily reports to, and operates under, the supervision of the Restructuring Committee. DiDonato Transcript at page 327, ln. 14-17 ("I report to the restructuring committee.").

- The Debtors are controlled by the CRO and the Restructuring Committee. This structure was duplicated as to two non-Debtor intermediate subsidiary holding companies Revstone Transportation, LLC ("Revstone Transportation") and Revstone Tool & Engineering, LLC ("Revstone Tool & Engineering") to ensure that the CRO and the Restructuring Committee would be in a position to effectively control the Debtors' subsidiaries, including any sales of assets or ownership interests or financing activities involving operating subsidiaries.

- Each of the principal operating subsidiaries of Revstone, Revstone Transportation, Revstone Tool & Engineering, and Spara is controlled by the CRO and the Restructuring Committee because each subsidiary is either a member-managed limited liability company controlled by its member or a corporation controlled by its sole shareholder. In each instance, the member or sole shareholder of every operating subsidiary (directly or indirectly) is either Revstone, Revstone Transporation, Revstone Tool & Engineering or Spara.[6] There is no board of managers at the limited liability company subsidiaries. The member or owner of each subsidiary is charged with the task of managing each such entity. The members of each subsidiary are ultimately controlled by the CRO and the Restructuring Committee of Revstone and Spara, respectively. Neither Ascalon nor Mr. Hofmeister have any management authority over either the Debtors or their subsidiaries. *See* Hofmeister Transcript at pg. 208, ln. 23 – pg. 209, ln. 2. Hence, for instance, non-Debtor operating subsidiaries Metavation, LLC ("Metavation") and Contech Castings, LLC ("Contech") are controlled by the CRO and the Restructuring Committee by virtue of their positions at Revstone Transportation, which is the sole member of both Metavation and Contech.

- Each of Revstone and Spara has a three-person board of managers. The three individual board members are Mr. Hofmeister, plus independent managers Messrs. Newsted and Shein. However, as noted above, board decisions regarding bankruptcy or restructuring affecting the Debtors and their subsidiaries, including sales of assets, have been delegated to the CRO and the Restructuring Committee. Ascalon does not have any input or control over bankruptcy restructuring decisions. Ascalon does retain typical consent rights in the case of a sale of Revstone's or Spara's membership interest in a

---

[6] As an example, non-Debtor operating subsidiary MW Texas Die Casting, Inc. is a corporation that is wholly owned by Revstone Transportation. Mr. Hofmeister has been removed as Chairman and Director of MW Texas Die Casting, Inc. He was replaced by David Jaeger. The CRO and the Restructuring Committee control this entity by virtue of their positions at Revstone Transportation, the sole shareholder of MW Texas Die Casting, Inc.

direct subsidiary, which are themselves holding companies. No sales of a membership interest in a direct subsidiary of Revstone or Spara are currently contemplated, and in any case, any such sale would require Court approval. Sales involving indirect subsidiaries of Revstone or Spara, which includes all operating companies, do not require Ascalon consent. Indeed, the focus of the CRO's and the Restructuring Committee's efforts to date have been on effectuating transactions at the indirect subsidiary levels, which as noted above, are controlled exclusively by the CRO and the Restructuring Committee.

9.      To implement the foregoing changes, the operating agreements of each of the four Debtors and two non-Debtor intermediate holding companies were amended. The amended operating agreement for Revstone is attached hereto as **Exhibit C** (the "Revstone Operating Agreement").[7] Under section 5.14(c) of the Revstone Operating Agreement, the board of managers at each of these entities has made an exclusive delegation of power and authority to the Restructuring Committee with respect to the employment of the CRO and all "Bankruptcy Decisions." Hence, only the CRO and the Restructuring Committee, and not Mr. Hofmeister, can make decisions related to the chapter 11 cases, the restructuring of the Debtors, or the operation and management of the Debtors while in a chapter 11 case, or any and all other related matters.[8] *See* Revstone Operating Agreement at section 1.6(c) (definition of term "Bankruptcy Decisions").

10.      Consistent with the foregoing, the Restructuring Committee of Revstone and Spara has consolidated cash management authority in the CRO and other Huron staff. By resolution taken on January 31, 2013, Huron was authorized to take any action necessary or

---

[7] Similar forms of operating agreements are in place for the remaining Debtors, Revstone Transportation, and Revstone Tool & Engineering.

[8] Although Mr. Hofmeister remains the Chairman of various non-Debtor affiliates, the position of Chairman does not have any: (i) voting or consent rights, (ii) authority to conduct business on behalf of the company, (iii) authority to execute documents or instruments, (iv) authority to enter into agreements, or (v) other authority to participate in the management of the company, without express prior authorization of the member. *See, e.g.,* Section 5.8 of the *Second Amended and Restated Operating Agreement for Metavation, LLC* attached as Exhibit A to GM's objection to the Motion and Exhibit F hereto referenced below.

6

appropriate to carry on the banking and treasury activities of the Debtors and their subsidiaries. *See* resolution of Restructuring Committee dated January 31, 2013 attached hereto as **Exhibit D**.

11.    The Restructuring Committee also has approved a detailed asset disposition protocol (the "Sales Protocol") attached hereto as **Exhibit E** that outlines the process employed by the Debtors and their subsidiaries in effectuating asset sales.  The Sales Protocol provides that the CRO, subject to the supervisory authority of the Restructuring Committee, will manage the sales process, including marketing and due diligence efforts, negotiation of sale agreements (with the assistance of Debtors' counsel), and consummation of any transactions. The CRO is required to present any final asset purchase agreement to the Restructuring Committee for approval before execution. *See* Sales Protocol at p. 3.  As reflected in the Sales Protocol, neither Mr. Hofmeister nor Ascalon play any role in the sale process as to either the Debtors or their subsidiaries.

### The Debtors' Operating Subsidiaries are Either Member-Managed LLCs or Otherwise Controlled by the CRO and the Restructuring Committee

12.    Each of the Debtors' operating subsidiaries is either member-managed or otherwise controlled by the CRO and the Restructuring Committee.  As an example, the amended operating agreement for Metavation is attached hereto as **Exhibit F** (the "Metavation LLC Agreement").[9]  Section 4.1 of the Metavation LLC Agreement provides that, subject to certain exceptions not at issue here, "all decisions regarding the management and administration of the Company shall be made by, and the business and affairs of the Company shall be managed under the direction of, the Members."  The sole member of Metavation is Revstone Transportation.  Hence, by virtue of the CRO's and the Restructuring Committee's control of

---

[9]  Similar forms of operating agreements are in place for the Debtors' other operating limited liability company subsidiaries.

Revstone Transportation, the CRO and the Restructuring Committee control Metavation, and similarly control the Debtors' other limited liability company subsidiaries.

13. Like a corporation or a partnership, a limited liability company (a "LLC") is a legal entity. 6 Del. Code Sec. 18-101(6); *Great Lakes Chem. Corp v. Monsanto Co.*, 96 F. Supp. 2d 376 (D. Del. 2000). Like other legal entities, it can own assets, operate businesses, and enter into contracts. 6 Del. Code Sections 18-106. The equity owners of an LLC, who are analogous to the shareholders of a corporation or the partners of a partnership, are called "members." 6 Del. Code Sec. 18-101(11). An LLC is managed either by its members or by one or more other persons, who are then called "managers." 6 Del. Code Secs. 18-402 and 18-101(10).

14. In a member-managed LLC, the LLC is managed by its members, all of whom participate in management. 6 Del. Code Sec. 18-402. As a result, a member-managed LLC somewhat resembles a general partnership. In contrast, in a manager-managed LLC, the LLC is managed by one or more managers or board of managers designated in the limited liability company agreement, who may (but need not be) members of the LLC. 6 Del. Code Secs. 18-101(10) and 18-401. A manager-managed LLC is therefore like a corporation, which is managed by its director(s) or a board of directors. Delaware law expressly authorizes the delegation of the managers' power and authority. 6 Del. Code Sec. 18-407.

15. When an LLC has only one member, it is often referred to as "single-member LLC." Single member LLCs are expressly authorized under Delaware law. 6 Del. Code Sec. 18-101(7). Single member LLCs can have managers, but if they do not, the LLC is managed by its sole member, who exercises full power and authority to manage the business and

8

affairs of the LLC unless otherwise provided in the limited liability company agreement. 6 Del. Code Sec. 18-402. In this respect, the sole member of a single member LLC controls the LLC in much the same manner as a corporation is controlled by its board of directors and sole shareholder combined.

16.     When the sole managing member (the "parent") is itself an LLC, then the parent's management of the subsidiary is in the hands of either (A) the parent's managers (if the parent is a manager-managed LLC) or (B) the parent's member or members (if the parent is a member-managed LLC). Such is the case, as mentioned above, with non-Debtor Metavation, which is a single-member LLC of which Revstone Transportation is the sole managing member. As sole managing member, Revstone Transportation has the exclusive power and authority to manage the business and affairs of Metavation. Under the limited liability company agreement of Revstone Transportation, the power and authority of the board of managers, including the power and authority to manage the business and affairs of Metavation, has been delegated to a CRO, and the Restructuring Committee has oversight responsibility over the CRO. Hence, neither Ascalon nor Mr. Hofmeister have any authority over management decisions involving Metavation. The same holds true for the Debtors' remaining limited liability company subsidiaries.

17.     As a result of the foregoing governance structure or analogous control provisions applicable to wholly-owned corporate subsidiaries, for each of the companies in the Revstone and Spara corporate groups, the Restructuring Committee and the CRO firmly control the Debtors and, by reason of their control position as to the parent entities, have control at each non-Debtor subsidiary. Mr. Hofmeister has been relegated to a background role without any

9

authority to effectuate transactions, whether as to Revstone, Spara, or their respective subsidiaries.[10] *See* Hofmeister Transcript at pg. 209, ln. 15-16 ("I don't have any authority anymore at the debtors."); pg. 222, ln. 21-24 ("Everything that involves the management of the debtors and all of the subsidiaries . . . is under the control of the CRO.").

### Huron Plays a Critical Fiduciary Role in These Cases

18.    The CRO and Huron, under the supervision of the Restructuring Committee, have asserted their management authority over the Debtors and are currently engrained in the operational and financial aspects of the Debtors and their subsidiaries. The CRO and Huron are acting independent of any influence from Mr. Hofmeister. The CRO looks to the Restructuring Committee for guidance, and not Mr. Hofmeister.

19.    The Committee suggests that Huron's role has not substantively changed between the one-month interim period beginning on December 17, 2013 when Huron acted as financial advisor for the Debtors and the time from and after January 17, 2013 when Huron assumed management posts. This short-sighted view ignores that, in addition to the many routine tasks that typically fall within the purview of both a financial advisor and internal management employees, the CRO and his staff have affirmatively taken over executive management of the Debtors and their subsidiaries, subject only to the supervision of the Restructuring Committee. To date, Huron has accomplished the following critical substantive tasks in its role as CRO:

---

[10] Huron is drawing on Mr. Hofmeister's background and knowledge base as a resource in connection with Huron's ongoing sale and financing efforts. In this context, Mr. Hofmeister's travel expenses must be approved in advance by Huron and he is reimbursed for any reasonable, authorized expenses incurred for services provided at the behest of the CRO. There is nothing sinister in the estates reimbursing such travel expenses. Further, to clarify a point made by the Committee in its supplemental objection to the Motion, the Debtors' estates are not paying Mr. Hofmeister's personal counsel fees. That point was mis-stated by Mr. Hofmeister at his deposition.

- Assumed control of the Debtors' day-to-day business operations through the appointment of Mr. DiDonato as CRO and other Huron personnel as Deputy Chief Restructuring Officers, Chief Financial Officer, and Treasurer.

- Secured the Debtors' and their subsidiaries' cash accounts and financial records, and implemented appropriate controls on the Debtors' and subsidiaries' finance and treasury functions, including liquidity, budgeting and cash flow management.

- Established lines of communication with original equipment manufacturers ("OEMs") and other customers of the Debtors' operating subsidiaries, including negotiation of OEM funding accommodations and management of customer relationships. As to operating non-Debtor Metavation, major customers have agreed to pull forward payment terms from approximately 45 days to 10 days generating substantial liquidity, plus customers have agreed to provide up to $4.4 million of junior participation funding. With respect to operating non-Debtor Contech, major customers have agreed to 10-day terms, which have translated into collection of $10 million of outstanding receivables. Customers have also agreed to backstop collateral, make cash infusions, and pay specific capital expenditures. Huron is currently negotiating longer term customer accommodation agreements (inclusive of an additional $4 million of funding at Metavation and $2 million of funding at Contech) and pricing assistance to support the sale process for Metavation and Contech. Such funding accommodations are tremendous accomplishments that provide the necessary financial support for the Debtors' operating affiliates and stabilize liquidity.

- Identified and implemented cost reduction initiatives, including certain reductions in force and other cost saving measures. Specifically, Huron has worked to implement over $6 million in annualized labor-related cost reductions. These efforts began in late January 2013 and will continue through the April 2013. Huron has identified and eliminated functional responsibilities that are not core to existing operations, eliminated certain management roles, and handled attrition with existing resources. Further labor reduction efforts have centered around expediting the closure of non-profitable facilities in an effort to ameliorate cash burn and effectuate asset sales.

- Prepared necessary statutory filings in the Debtors' cases and assembled information in response to requests from parties in interest, including schedules of assets and liabilities and statements of financial affairs. Huron has also fulfilled the information requests of the U.S. Trustee.

- Opened and maintained robust lines of communication with the Committee and its advisors, including ongoing document flow and frequent meetings, conferences and/or correspondence. The CRO and his team are also continually updating the Restructuring Committee on the status of these cases through frequent board meetings, and obtaining approvals of the Restructuring Committee where necessary. The Restructuring Committee has been playing an active and assertive role in these cases to date.

11

20.    The following items currently handled by Huron remain in process, all of which are extremely important and will help determine whether the Debtors are able to successfully reorganize in these cases:

- Assisting the Debtors and their subsidiaries with eight separate asset sale processes and the development of a strategy regarding the potential divestiture of additional operating assets. *See* Sales Protocol. Huron has advised the Debtors and their subsidiaries on potential buyers; assisted in the development of financial and business analyses and positioning strategies for assets to be divested; created appropriate marketing materials and populated data sites for potential buyers' due diligence; arranged facility visits and on-site diligence; and solicited, analyzed, and negotiated offers to purchase on the Debtors' and their subsidiaries' behalf.

- Assisting the Debtors and their subsidiaries in raising capital through a debtor in possession loan facility and/or exit financing. Huron has created materials for prospective lenders, including populating a data room to house due diligence materials; contacting prospective lenders; and coordinating the execution of confidentiality agreements. Several competing financing proposals have been received and are currently being refined.

- Continuing to function as the Debtors' independent day-to-day management through the CRO and the Additional Personnel, including a supervisory role in all operational and finance activities of the Debtors and their subsidiaries. Huron has been (and continues to be) instrumental in maintaining employee, customer, and OEM relationships, and negotiating customer accommodations.

21.    In sum, Huron is playing a critical fiduciary role in the Debtors' reorganization efforts and ongoing operations at various subsidiaries that far exceeds any role that Huron assumed when it was a financial advisor during the first month of these cases. As the evidence to be presented at the March 19 hearing on Huron's retention will show, the Debtors and their subsidiaries are currently managed by Huron under the supervision of the Restructuring Committee and Huron has taken a role significantly beyond the one it performed during the one month stopgap period at the outset of the case.

22.    Hence, Huron's engagement should be approved so that the firm can continue its work for the benefit of all constituents. *See, e.g.,* *In re Harold & Williams Dev. Co.,*

977 F.2d 906, 910 (4th Cir. 1992) (bankruptcy court's discretion in approving retention of

processionals must be exercised in a way that considers "the protection of the interests of the

bankruptcy estate and its creditors, and the efficient, expeditious, and economical resolution of

the bankruptcy proceeding.").

### Huron is Not Conflicted

23.     The Motion and the Declaration of John C. DiDonato in support thereof

fully disclose Huron's connections to the Debtors and their affiliates, and establish that nothing

in Huron's prior engagements constitutes a conflict of interest with respect to these cases, much

less a disqualifying conflict. The Committee and GM assert that the CRO and Huron lack the

independence to serve as "true" fiduciaries based on their prior engagements involving the

Debtors, their affiliates, Mr. Hofmeister and/or his family trusts. In effect, the Committee and

GM appear to take the position that a professional, whether that be Mr. DiDonato, Huron, or the

independent managers, cannot be trusted to comply with their duties if the professional has

worked "too often" with a person or entity previously. They further insinuate (without evidence

that any such thing has happened) that in such a situation the professional would willingly

sacrifice his duties and reputation. There is no legal or factual basis for this position, especially

given the relatively modest fees collected by Huron in connection with its prior relationships

with the Debtors and their affiliates. *See* DiDonato Transcript at pg. 82, ln. 13-23; pg. 83, ln. 9-

20; pg. 84, ln. 18 – pg. 85, ln. 1-13 (Huron is a "$600 million public company[,]" with a financial

consulting business generating $40 million in revenues in 2011 and $25 million in revenues in

2012; whereas "the fees collected from Revstone-related entities from the period 2010 through

2012 were $2.9 million.").

24.     The CRO and Huron are currently acting as true fiduciaries for the Debtors. As outlined above, the CRO and Huron, under the supervision of the Restructuring Committee, have taken significant steps to assume management control of the Debtors and their subsidiaries, including operational and finance functions. The CRO and Huron also have achieved significant tangible benefits for the Debtors in terms of obtaining OEM funding accommodations, managing customer relationships, and implementing cost saving measures. In addition, Huron is intimately involved in the Debtors' ongoing sale and financing efforts.

25.     The CRO and the other Huron professionals involved in these cases are independent, consummate professionals with extensive restructuring experience, including multiple prior involvements in automotive and manufacturing sectors. Mr. DiDonato has over twenty-five years of restructuring experience, including operational turnarounds, troubled debt restructurings and capital raising, mergers and acquisitions, and many other bankruptcy advisory engagements. Mr. DiDonato also has previously served in the capacity of Chief Restructuring Officer and occupied other executive management positions in various companies in the past. Further, Mr. DiDonato has significant experience in the automotive industry. For instance, he is currently the Chief Restructuring Officer and President of New United Motor Manufacturing, Inc. and previously served as CRO for Dura Automotive Systems. Over the last ten years, Mr. DiDonato has been involved in numerous automotive restructurings.

26.     The activities of the CRO and Huron in these cases are subject to the supervisory authority of Messrs. Newsted and Shein, the two independent managers on the Restructuring Committee of the Debtors' board. Both independent managers have significant experience serving on boards. Mr. Newsted was also President and Chief Executive Officer of

14

Meridian Automotive Systems, Inc. ("Meridian"), a privately-held tier one automotive supplier of front and rear end modules, exterior and interior thermoplastics, composites and lighting systems with annual sales of nearly $800 million, from October 2005 to September 2009. During 2009, Mr. Newsted developed and executed an orderly liquidation strategy which involved selling the business in three primary transactions, retaining employment for 90% of their associates, realizing senior secured creditors' recovery of nearly 100%, with no customer disruptions. Mr. Newsted guided Meridian through a chapter 11 reorganization during 2005 and 2006 and upon emergence was elected a director of the Company.

27.     Mr. Shein is a professor of management and strategy at the Kellogg School of Management at Northwestern University. He also provides corporate renewal consulting services to a variety of clients, and has executive management experience in the manufacturing business. Mr. Shein was formerly an attorney at McDermott, Will & Emery where he advised clients on corporate matters, including in the context of financial and operating restructurings.

28.     Messrs. Newsted and Shein bring a high level of integrity and independence to their roles as members of the Restructuring Committee and have reputations for getting things done. The Restructuring Committee ultimately has consent rights over any bankruptcy-related actions taken by the CRO, subject of course to the approval of this Court where appropriate.

29.     Under these circumstances and given all of the layers of protection currently in place, there is no credible basis for the Committee to suggest that the CRO, Huron, or the independent managers lack independence.

15

## Huron's Employment as CRO Should Be Approved Under 11 U.S.C. § 363

30.     In the exercise of their sound business judgment, the Debtors seek approval of the employment of the CRO and Huron pursuant to section 363 of the Bankruptcy Code, effective January 17, 2013.  The mere fact that Mr. DiDonato and Huron performed services for the Debtors or their non-debtor affiliates prepetition does not disqualify him or Huron from assuming management positions with the Debtors under section 363 of the Bankruptcy Code.

31.     Section 363(b)(1) of the Bankruptcy Code provides in relevant part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Further, pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a).

32.     Under applicable case law, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use should be approved.  *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, the court defers to the trustee's judgment so long as there is a "legitimate business justification"); *In re Del. & Hudson R. R. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b); *see also In re Adelphia Communications Corp.*, 2003 WL 22316543, at *30 (Bankr. S.D.N.Y. Mar. 4, 2003) (adopting section 363(b) business judgment standard in approving the post-petition retention of officers for the debtors).

16

33.     Bankruptcy courts have analyzed the propriety of a debtor's employment of corporate restructuring officers, restructuring advisors, and restructuring professionals under section 363 on numerous occasions and have determined that it is an appropriate exercise of business judgment. *See, e.g., In re Southern Air Holdings, Inc.*, Case No. 12-12690 (CSS) (Bankr. D. Del. Jan. 28, 2013); *In re Vertis Holdings, Inc.*, Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 20. 2012); *In re CHL, LTD.*, Case No. 12-12437 (KJC) (Bankr. D. Del. Sept. 24, 2012); *In re AFA Investment, Inc.*, Case No. 12-11127 (MFW) (Bankr. D. Del. Apr. 24, 2012); *In re Harry & David Holdings, Inc.*, Case No. 11-10884 (MFW) (Bankr. D. Del. Apr. 27, 2011); *In re Lyondell Chemical Company*, Case No. 09-10023 (Bankr. S.D.N.Y. Jan. 6, 2009); In re *PRC, LLC*, Case No. 08-1.0239 (MG) (Bankr. S.D.N.Y. Feb. 27, 2008); *In re Bally Total Fitness of Greater NY, Inc.*, Case No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 1, 2007).

34.     Notwithstanding the foregoing precedent and the fact that it is standard practice in this District to employ crisis managers as officers under section 363 of the Bankruptcy Code, the Committee argues that Huron is a "professional" that must be employed under section 327(a) of the Bankruptcy Code.  By logical extension, the Committee's position would appear to be that any management employee of a debtor, such as a Chief Executive Officer or Chief Financial Officer, who performs specialized tasks also must be considered a "professional" subject to section 327(a).

35.     In support of its position, the Committee relies on *In re First Merchants Acceptance Corp.*, 1997 WL 873551 (D. Del. Dec. 15, 1997), a case that has no direct bearing on the matter at hand.  The debtor in *First Merchant* sought court approval of a consultation agreement under section 363 that would have effectively out-sourced the debtor's loan servicing

17

operations to an outside consultant. *Id.* at *1. The U.S. Trustee objected on the basis that the debtor was trying to employ a "professional" under 327. *Id.* The district court found that the buyer was a professional because of (1) the overlap between debtor's ordinary business operations and the debtor's estate administration in the case, (2) the fact that the servicing business comprised the bulk of the remaining estate, and (3) the wide discretion given the consultant as to servicing the receivables (essentially not requiring any debtor approval). *Id.* at *3-4.

36.     Here, the facts are clearly distinguishable:  (1) Huron has been engaged to replace Debtors' executive management; it is not an outside consultant hired to service some receivables; (2) Huron is not servicing/administering the sole asset remaining in the estate; it is providing restructuring services to a corporate family, many of which are independent operating businesses with different functions, and (3) Huron does not have unfettered discretion to make decisions about the assets; the CRO acts subject to the supervision of the Restructuring Committee.  Hence, the CRO and Huron are not "professionals" for purposes of their proposed engagement as management employees of the Debtors.

37.     The Debtors have decided in the exercise of their sound business judgment to employ the CRO and Huron on the terms set forth in the Motion under section 363 of the Bankruptcy Code.  The Debtors are comfortable based on the disclosures made by Mr. DiDonato that Huron is well-positioned to fill the roles of CRO and management on a going forward basis.

18

**Huron's Employment as Financial Advisor Should Be Approved Under 11 U.S.C. § 327**

38.    As to Huron's initial financial advisory role between December 17, 2012 and January 16, 2013, this engagement was merely a stopgap measure to get a financial advisor on-site as soon as possible in order to assist the Debtors in stabilizing operations and preserving value while a process was being undertaken to identify and select a chief restructuring officer. During this limited period, Huron met the standard applicable to professionals retained under section 327 of the Bankruptcy Code because it was disinterested and did not represent an adverse interest.

39.    Under sections 327 and 328 of the Bankruptcy Code, a trustee, debtor in possession and committee appointed under section 1102 of the Bankruptcy Code may employ one or more professionals, that do not hold or represent an interest adverse to the estate and that are disinterested persons, to assist such parties in carrying out their duties under the Bankruptcy Code.

40.    Specifically, § 327(a) of the Bankruptcy Code provides that a debtor, subject to Court approval:

> may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor] in carrying out the [debtor's] duties under this title.

11 U.S.C. § 327(a).

41.    Section 1107(b) of the Bankruptcy Code provides that:

> Notwithstanding section 327(a) of this title, a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case.

19

11 U.S.C. § 1107(b); *see In re Pillowtex, Inc.*, 304 F.3d 246, 251 (3d Cir. 2002) ("Prior

representation of a debtor does not, of itself, merit disqualification.").

      42.     Courts have routinely rejected attempts to disqualify firms that previously

represented a debtor or non-debtor affiliate because such representations frequently do not

create a conflict of interest.  In fact, bankruptcy courts recognize that it is quite common for a

single firm "to represent a parent company and all of its subsidiaries either when they are all

debtors or when only the parent is a debtor." *In re Mulberry Phosphates, Inc.*, 142 B.R. 997,

998 (Bankr. M.D. Fla. 1992) (no conflict of interest where the law firm previously represented

and continued to represent principals of the debtor, a wholly-owned non-debtor subsidiary, and

other parties with a potential adverse interest to the debtor).  And similarly, the mere existence

of an intercompany claim does not create a conflict of interest. *See, e.g., In re Global Marine,

Inc.*, 108 B.R. 998, 1003 (Bankr. S.D. Tex. 1987) (finding no conflict of interest requiring

disqualification when law firm represented both parent holding company and its subsidiaries in

consolidated chapter 11 cases, despite existence of $170 million intercompany claim); *In re

O.P.M. Leasing Services*, 16 B.R. 932, 936 (Bankr. S.D.N.Y. 1982) (finding no impermissible

conflict of interest and allowing trustee to be appointed as disinterested trustee of both subsidiary

and parent corporation in separate reorganization cases, despite intercompany claim).

      43.     Moreover, on facts analogous to those here, the District of Delaware in *In

re Northwestern Corp.*, 346 B.R. 84 (D. Del. 2006), found that a chapter 11 debtor's counsel

was disinterested and not suffering from an actual conflict of interest where the firm previously

represented the debtor and its subsidiary in a prepetition asset transfer transaction that the

objecting party alleged was fraudulent.  The objecting party attempted to disqualify the debtor's

20

law firm by arguing that (a) the firm was not disinterested because the firm's previous representation of the debtor and its subsidiary in the prepetition asset transfer prevented the firm from approaching the bankruptcy in an unbiased manner given the firm's motivation to protect the transaction that it had structured; and (b) the firm had an actual conflict of interest because it was likely that it would favor one creditor over another. *Id.* at 86. The court rejected both arguments. First, the court found that the law firm was disinterested because the interrelationship between the debtor, the subsidiary, and the law firm was not so prevalent or problematic as to warrant disqualification and the mere fact that the objecting party was challenging the prepetition asset transfer did not strip the law firm of its disinterestedness. *Id.* at 87-88. Second, the court found no actual conflict based on the bankruptcy court's conclusion that (a) neither party to the challenged transaction complained about the law firm's representation, (b) the objecting party was not a creditor of either party at the time of the transaction, and (c) the law firm had disclosed the transaction to the satisfaction of the United States Trustee. *Id.* at 88.

44. Similarly here, Huron's connections to the Debtors, their affiliates, and principals have been fully disclosed, and the Committee has failed to identify a single example of any conflict or adverse interest held by Mr. DiDonato or Huron. Yes, Mr. DiDonato and Huron represented the Debtors and their non-Debtor affiliates in the past. Yes, Mr. DiDonato and Huron represented Mr. Hofmeister-affiliated entities in the past. All of these connections have been thoroughly disclosed. How does that translate into a disqualifying conflict or an adverse interest? It simply does not.

21

45.     In fact, given the extent of the background knowledge possessed by the CRO and Huron by virtue of their prior engagements, they were the best and most logical candidates to urgently fill the role of financial advisor during the initial stages of these cases when the Debtors desperately needed help and while the Debtors, which filed their bankruptcy cases without the benefit of professional financial advisory assistance or a selected chief restructuring officer, undertook a process to select and engage such a chief restructuring officer and independent managers.

46.     Courts have long recognized that debtors in possession should be able to choose their own professionals, including those who have been employed prepetition, because it keeps administrative expenses low in that such professionals "do not have to spend significant time and resources becoming familiar with the debtor's operations." *In re Talsma*, 436 B.R. 908, 916 (Bankr. N.D. Tex. 2010) (citing *In re Roberts*, 75 B.R. 402, 406 (D. Utah. 1987)).  The Debtors urge the Court to allow them to exercise their sound business judgment when it comes to Huron's retention during the interim one-month period from December 17, 2012 through January 16, 2013.

### Huron's Role in the Metavation Sale is No Bar to Huron's Employment

47.     The Committee focuses on a proposed sale of a non-Debtor subsidiary, Metavation, to an entity controlled by individuals who had prior relationships with George Hofmeister (the "Proposed Buyer")[11] as an example of Huron's and Mr. DiDonato's alleged allegiance to Mr. Hofmeister.  The Committee's reliance on the Metavation sale is a complete red herring.  Here are the facts:

---

[11] The identity of the Proposed Buyer is disclosed on pages 4-8 of the unredacted version of the Committee's preliminary objection to the Motion provided to the Court.

22

- First, neither Huron nor Mr. DiDonato filled any management role or position of control with the Debtors, Metavation, or any of their affiliates when the purchase agreement for Metavation was executed with the Proposed Buyer on January 7, 2013 (the "Metavation SPA"). Revstone negotiated the terms of the Metavation SPA without Huron's involvement. *See* DiDonato Transcript at pg. 212, ln. 3-10; pg. 214, ln. 18-24 ("Huron has not been involved with the negotiation of the [Metavation SPA]."). Huron was retained in October 2012 to market Metavation. In December 2012, Revstone proceeded on its own with discussions with the Proposed Buyer. Huron was acting solely as a financial advisor to the Debtors at the time and its role as to Metavation was limited to preparing a presentation dated January 14, 2013 (the "Presentation"),[12] which summarized the sale process and the bids received by the company, and attending a meeting with Metavation's largest customer, General Motors ("GM"). The Presentation was prepared for purposes of the meeting with GM. *See* DiDonato Transcript at pg. 190, ln. 11-20 ("Huron was making a presentation as the financial advisor only . . . There was no recommendation. This was a presentation and exchange of information. There is no implied recommendation here.").

- Second, the Metavation SPA was contingent on certain financial accommodations from GM, which have not been obtained. Hence, the sale has not been consummated.

- Third, now that Mr. DiDonato and Huron fill management roles and the Restructuring Committee is in place, any proposed sale of Metavation is subject to the CRO's and the Restructuring Committee's review and approval. Specifically, the Metavation SPA has not been approved by the CRO or the Restructuring Committee, nor is it even being considered at this time. The CRO does not support this bid, so it "is irrelevant in terms of the forward-looking analysis." *See* DiDonato Transcript at pg. 192, ln. 4-10.

- Fourth, the Presentation summarizing the bids received was not misleading and did not unfairly favor the bid of the Proposed Buyer. The Presentation was prepared for GM (not the Committee) and it merely recites facts. The Proposed Buyer's bid was objectively the highest offer at the time, assuming that the required accommodation from GM was obtained. This requirement of a customer accommodation is clearly set forth on slide 5 of the Presentation and it was fully disclosed to GM as a component of the sale to the Proposed Buyer (as it had to be for GM to agree to the accommodation). Further, the proposed bid included significant cash consideration and the assumption of pension liabilities, whereas other bids either had a lower cash component or did not assume the pension obligations. The Proposed Buyer also required a waiver of intercompany claims, but that is a standard provision given that the Metavation SPA contemplated a sale of stock in the company. In any event, Huron was not involved in the negotiation of the Metavation SPA.

- Fifth, the Committee incorrectly assumes that the Proposed Buyer is an insider. Although one of the principals of the Proposed Buyer has pre-existing relationships with Mr. Hofmeister, that does not mean that the Proposed Buyer is an insider or should be

---

[12] The Presentation is attached as Exhibit C to the unredacted version of the Committee's preliminary objection to the Motion provided to the Court.

foreclosed from submitting a bid for Metavation, especially if such bid were to be determined to be the highest and best bid.

- Last, as of late January 2013, Huron re-started its efforts to complete a sale of Metavation. This process is ongoing and Huron is currently leading negotiations with prospective third party buyers. The Proposed Buyer is not currently involved in active dialogue for the purchase of Metavation and a different transaction has been identified as the likely lead bid for Metavation.

48.    Ultimately, the Committee offers nothing more than conjecture and

innuendo to suggest that Huron acted improperly in connection with the Metavation sale effort.

As the evidence will show, Huron had a limited role in connection with the Proposed Buyer and

the Metavation SPA, and acted appropriately and independently throughout the process. Now,

Huron is in the midst of negotiating an alternative sale transaction involving Metavation. Hence,

there is no basis whatsoever for the Committee to suggest that Huron should not be retained on

the basis of a Metavation sale that has yet to be consummated and may never be.

## Huron Was Disinterested Through January 16, 2013

49.    The Committee argues that Huron was not disinterested during its role as

financial advisor for the Debtors through January 16, 2013, given Huron's prepetition

affiliations with the Debtors and their affiliates, and the nature and length of Huron's prepetition

engagements. The UST argues that Huron is not disinterested by virtue of its subsequent

employment as CRO. In fact, as stated in Mr. DiDonato's Declaration in support of the Motion,

prior to January 17, 2013, Huron and Mr. DiDonato were "disinterested persons" for purposes

of section 327(a) of the Bankruptcy Code.

50.    Courts examining a proposed retention for disinterestedness have

generally used a single test combining the definition of disinterested person with the overlapping

adverse interest requirement in section 327(a) of the Bankruptcy Code. *In re JMK Constr.*

24

*Group, Ltd.*, 441 B.R. 222, 229 (Bankr. S.D.N.Y. 2010).   The term "disinterested person"

means a person that:

> (A)    is not a creditor, an equity security holder, or an insider;
>
> (B)    is not and was not, within 2 years before the date of filing
> of the petition, a director, officer, or employee of the debtor; and
>
> (C)    does not have an interest materially adverse to the interest
> of the estate or of any class of creditors or equity security holders,
> by reason of any direct or indirect relationship to, connection with,
> or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14).   A party has an "adverse interest" to the estate if such party (1) possesses or

asserts any economic interest that would tend to lessen the value of the bankruptcy estate or that

would create either an actual or potential dispute in which the estate is a rival claimant; or (2)

possesses a predisposition under circumstances that render such a bias against the estate.  *In re*

*West Delta Oil Co.*, 432 F.3d 347, 356 (5th Cir. 2005).  But the determination of an adverse

interest "must be made with an eye to the specific facts of each case."  *In re American Int'l*

*Refinery Inc.*, 676 F.3d 455, 461-62 (5th Cir. 2012) (internal quotation omitted).

   51. As disclosed in Mr. DiDonato's declaration in support of the Motion,

Huron satisfied each of the foregoing categories of disinterestedness during the period

December 17, 2012 through January 16, 2013.  As of December 17, 2012, Huron was not a

creditor, equity holder, or insider of any of the Debtors or their affiliates.  Indeed, Huron waived

payment of all unpaid amounts by the Debtors and their non-debtor subsidiaries owing prior to

the petition date.  Further, as of December 17, 2012, Huron was not, within 2 years before the

date of filing of the petitions, a director, officer, or employee of the Debtors.  Finally, as

addressed above and in Mr. DiDonato's prior disclosures, Huron has no adverse interest to the

Debtors' estates or any class of creditors or equity holders in these cases.

52.     Once Mr. DiDonato and other Huron representatives were appointed to management positions with the Debtors as of January 17, 2013, there was no longer a need for them to be disinterested persons in order to be employed under section 363 of the Bankruptcy Code.  Contrary to the UST's position, subsequent engagement of an officer does not disqualify such person from *prior* employment under section 327 of the Bankruptcy Code.  *Cf. In re AroChem Corp.*, 176 F.3d 610, 623-24 (noting that section 327(a) is phrased in the present tense and Congress intended only to proscribe those who presently have an adverse interest from representing a debtor under section 327(a)); *JMK Constr. Group*, 441 B.R. at 229 ("The test is not retrospective; courts only examine present interests when determining whether a party has an adverse interest.").

53.     The Committee's objection also suggests a blanket approach to disqualification that would render all professionals not disinterested as "too beholden" if they served a debtor, its affiliates, or the debtor's principals at various points over a long period of time or if they were engaged on several different matters before the bankruptcy filing.  That kind of broad rule would impermissibly impede on a debtor's prerogative to retain the professionals most knowledgeable about its business when such knowledge is most needed – during a bankruptcy case.  *See In re BH & P, Inc.*, 949 F.2d 1300, 1315 (3d Cir. 1991) ("[C]ourts have generally declined to formulate bright-line rules concerning the criteria for disqualification but have favored instead an approach which gives the bankruptcy court discretion to evaluate each case on the facts, taking all circumstances into account."); *see also Harold & Williams Dev. Co.*, 977 F.2d at 909-10 (beyond the few absolute disqualifications in the Bankruptcy Code, bankruptcy court "must not abdicate the equitable discretion granted to it

26

by establishing rules of broad application which fail to take into account the facts of a particular case and the overall objectives of the bankruptcy system.").

54.     In the instant cases, the Debtors turned to Huron on December 17, 2012 for interim services because Huron had the knowledge, independence, and expertise needed to provide financial advisory services to the Debtors. Huron was disinterested at the time and remained so until the CRO's appointment on January 17, 2013.

### Huron's Engagement is Consistent with the Goals of the Jay Alix Protocol

55.     Given that the Debtors required immediate financial advisory assistance during the early stages of these cases and the fact that the Debtors' governance structure had not yet been finalized, Huron's engagement does not violate the underlying goals of the Jay Alix Protocol of avoiding conflicts by virtue of a firm assuming different roles in the same case. *See In re Harnischfeger Indus.*, Case No. 99-2171 (Bankr. D. Del. July 30, 1999); *In re Safety-Kleen Corp.*, Case No. 00-2303 (Bankr. D. Del. Oct. 4, 2001) (establishing the "Jay Alix Protocol"). There is no risk of any conflicts here.

56.     Between December 17, 2012 and January 16, 2013, Huron acted as financial advisor to the Debtors on an interim basis, a role necessitated by the various crises facing the Debtors at the time and the fact that there was an ongoing process to engage a CRO. On January 17, 2013, the Restructuring Committee made the decision to appoint Mr. DiDonato as CRO. From that point forward, Mr. DiDonato and other representatives of Huron have filled officer positions with the Debtors, and Huron has provided additional staff to assist the Debtors in their reorganization efforts. Contrary to the Committee's and the UST's assertions, Huron is not wearing (and has never worn) "two hats" in these cases at the same time. Huron fulfilled

27

one role on an interim and emergency basis as financial advisor during the first month of these cases, and then when the circumstances warranted, stepped into management positions from and after January 17, 2013.

57.    The Committee's principal argument on this point is that Huron is not disinterested under the Jay Alix Protocol because it is not capable of examining its own performance as financial advisor or the compensation it will seek as financial advisor to the Debtors for the first month of its engagement. This argument ignores the fact that the Restructuring Committee will review and approve Huron's fees. The members of the Restructuring Committee are fully capable of independently reviewing Huron's performance. *Cf. In re United Companies Fin. Corp.*, 241 B.R. 521, 529 (Bankr. D. Del. 1999) (in addressing U.S. Trustee's objection to financial advisors' retention based on, *inter alia*, financial advisors' failure to disclose marketing relationship with Jay Alix when Jay Alix personnel were acting as management of the debtors, court held that agreement by the debtors to assure that no Jay Alix personnel will be involved in the review or approval of the fee applications for the financial advisors was an "appropriate resolution" of the objection). Presumably, the Committee and the UST will review Huron's fees as well. Any issues with Huron's compensation can be addressed when Huron submits its fee application for any financial advisory services, and the Committee and the UST of course will have an opportunity to object at that time. In addition, the Court has its own independent obligation to review fee applications, *see, e.g., In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833 (3d Cir. 1994), so parties in interest and the Court are not without appropriate recourse if necessary.

DOCS_SF:82678.9 73864-001

### *Nunc Pro Tunc* Approval is Appropriate

58.     By the Motion filed on February 13, 2013, Huron seeks *nunc pro tunc* approval of its employment as financial advisor to December 17, 2012, and for the one month period thereafter ending January 16, 2013. Huron also seeks *nunc pro tunc* approval of its engagement as CRO from and after January 17, 2013.

59.     A decision to grant *nunc pro tunc* approval is in the discretion of the bankruptcy court. *In re Indian River Homes, Inc.*, 108 B.R. 46, 50 (D. Del. 1989). Courts considering *nunc pro tunc* approval of employment in the Third Circuit apply a two-part test: first, the court must find that the applicant satisfies the disinterestedness requirements of section 327(a); and, second, the court must, in the exercise of its discretion, determine that the particular circumstances presented are extraordinary enough to warrant retroactive approval. *In re Arkansas Co., Inc.*, 798 F.2d 645, 650 (3d Cir. 1986). In exercising discretion under the second part, bankruptcy courts must consider several factors: (a) whether the applicant or some other person bore responsibility for applying for approval; (b) whether the applicant was under time pressure to begin service without approval; (c) the amount of delay after the applicant learned that initial approval had not been granted; (d) the extent to which compensation to the applicant will prejudice innocent third parties; and (e) other relevant factors. *Id.* Not all of the foregoing factors must be present or need be considered, depending on the circumstances.

60.     Here, Huron did not file its application until nearly two months following its original engagement given: (a) the dynamic nature of the Debtors' cases (two Debtors originally filed on December 3, 2012, with two additional Debtor filings to follow on January 7, 2013); (b) the urgent need to address the Debtors' and their subsidiaries' operational status; (c)

29

the additional work load created by Revstone Industries' and Spara's filing on December 3,

2012 without a financial advisor engaged from that time until Huron's engagement two weeks

later on December 17, 2012, typically the busiest time in a bankruptcy case;  (d) the interim

nature of Huron's initial engagement which was necessary on an emergency basis in order to

stabilize the Debtors' affairs while governance issues could be addressed; (e) the extensive level

of detail that Huron provided in Mr. DiDonato's Declaration in support of the Motion that

required time to assemble; and (f) the constant barrage of information requests and contested

filings from the Committee and its chair, BFG.  In the midst of all these events, Huron filled a

much needed role as financial advisor for the Debtors, which then progressed into the

Restructuring Committee's decision to appoint Mr. DiDonato as CRO on January 17, 2013.  The

Motion was filed less than thirty days after Huron's appointment to management positions with

the Debtors.

61.    Although the Committee and the UST are correct that retroactive

approval of an engagement is usually reserved for "extraordinary circumstances," other factors

enumerated by the Third Circuit weigh in favor of granting *nunc pro tunc* relief to Huron,

including the "time pressure to begin service" and absence of prejudice to other parties.

62.    Moreover, the seminal Third Circuit cases rejecting *nunc pro tunc*

approval involve much more egregious circumstances, which caused those courts to deny such

relief.  For example, in *In re Arkansas Co.*, the law firm that sought *nunc pro tunc* approval had

rendered legal services for *thirteen months* before discovering that it had failed to obtain

requisite court approval, and where there was no time pressure and only a delay by reason of

neglect.  *In re Arkansas Co.*, 798 F.2d at 646.  Likewise, in *In re F/S Airlease II, Inc. v. Simon*,

30

844 F.2d 99 (3d Cir. 1988), the professional did not seek approval of his retention until a full *seven months* after he had completed his services, *nine months* after the petition date, and almost *a year* from when he commenced services. *F/S Airlease II*, 844 F.2d at 107.  In addition, the Third Circuit held that the professional in *F/S Airlease II* was not truly under time pressure to begin service (i.e., locating another lessee for the debtor's aircraft) that caused an actual delay in seeking court approval because he began negotiating with other lessees in the month before the petition date. *Id.*; *see also In re ACandS, Inc.*, 297 B.R. 395, 404 (Bankr. D. Del. 2003) (no evidence that firm was under time pressure to process asbestos-related personal injury claims; nine-month delay in seeking approval of employment); *compare In re United Companies Fin. Corp.*, 241 B.R. at 527 (denying *nunc pro tunc* approval because delay was caused by accounting firm's insistence on unusual terms of its engagement).

63.     Courts in this district have granted *nunc pro tunc* relief beyond the typical thirty days, under appropriate circumstances.  For example, in *In re ICG Communications, Inc.*, 2001 WL 1820319 (Bankr. D. Del. Aug. 2, 2001), Judge Walsh granted a financial advisor's *nunc pro tunc* request retroactively to approximately three months prior to the filing of the retention application. The delay in *ICG* was caused by the firm's negotiation with the creditors' committee over the terms of its retention, including compensation arrangements.  The court found that requiring the firm to immediately file an application could "adversely impact" the negotiations.  At the same time, the committee needed "immediate professional assistance" in order to play an effective role in the case.  *Id.* at *5.  Notably, in reaching this decision, Judge Walsh stated that the Third Circuit's interpretation of the "extraordinary circumstances"

31

standard "suggests a flexible approach which requires bankruptcy courts to consider the circumstances in each case in light of equitable factors." *Id.* at *4.

64.    Given the unique sequence of events in these cases, the significant time pressures facing the Debtors, the fact that Huron only seeks approval of its engagement as financial advisor for a one-month period, and the complete lack of prejudice to any party, particularly the Committee and the UST both of which were well aware of Huron's involvement in these cases from the start, the Debtors submit that circumstances warrant *nunc pro tunc* approval of Huron's engagement as financial advisor to December 17, 2012.

### The Committee's and GM's Fee Objections are Premature

65.    In addition to the foregoing, the Committee and GM object to Huron's employment on the basis of: (a) Huron's failure to allocate its fees amongst the Debtors and non-Debtors, and (b) alleged intercompany claims that could exist amongst the Debtors and non-Debtor affiliates, including fraudulent transfer claims against Huron for retainer funds received from non-Debtors. The Committee also seeks disclosure of Huron's compensation as financial advisor.

66.    In terms of allocating Huron's fees amongst the Debtors and non-Debtors, and disclosure of Huron's compensation as financial advisor, these issues are not relevant to the Motion which merely seeks to employ Huron on hourly terms. Allocation issues and the amount of fees sought will be addressed when Huron submits its fee applications and fee notices. To the extent that the Committee or GM have any issues with Huron's fees when payment of such fees is sought, these issues can be addressed at that time. There is no legal basis for the Committee to insist that Huron be required file a fee application now just to be

32

employed as financial advisor, or for GM to insist that all intercompany claims need to be fully disclosed and presumably reconciled before Huron can be employed.[13]

67.     The same issue as to timing applies to any alleged avoidable payments made to Huron by non-Debtor subsidiaries. To the extent that any such claims exist, they can be addressed at a later date. The Committee assumes that the non-Debtor subsidiaries that funded Huron's retainers: (a) are insolvent, and (b) have not received any value for the funding.[14] It is not unusual, however, to have affiliated entities funding retainers for professionals, particularly where (as here) the professionals are providing services to the corporate group. And bankruptcy courts have previously upheld similar payment arrangements under a totality of circumstances approach. *See American Int'l Refinery Inc.*, 676 F.3d at 462 (adopting totality of circumstances approach for deciding whether third-party payment of a retainer creates a disqualifying interest and finding no disqualifying conflict in creditor's payment of retainer to chapter 11 debtor's counsel); *see also In re Pinebrook, LLC*, 441 B.R. 67 (Bankr. E.D. Va. 2009) (mere fact that counsel's retainer was paid, at least in part, by entities related to debtor and that had possible claims against debtor did not render counsel per se "nondisinterested"). In any event, this is a hypothetical question that can be addressed at the appropriate time if and when a non-Debtor subsidiary actually commences a bankruptcy case of its own.

68.     Finally, GM asserts that the Motion may not disclose all compensation payable by non-Debtor affiliates to Huron. Specifically, "GM believes that Huron may assert

---

[13] Huron estimates that its fees as financial advisor during the first month of these cases total less than $300,000.

[14] The Committee also asserts that the postpetition funding of Huron's retainer by non-Debtor Contech violated the cash management order in these cases by not providing advance notice to the Committee. That is incorrect. There is no requirement of notice to the Committee for a disbursement to be made by a non-Debtor to a third party located in the United States.

entitlement to receive a transaction fee related to any prospective sale of Metavation." This is

simply wrong. All compensation payable to Huron by the Debtors or their non-Debtor affiliates

has been fully disclosed in the Motion. In fact, Mr. DiDonato has already testified on this point

at deposition in response to questions from GM's counsel, as set forth below:

> BY MR. SILVER (GM's Counsel):
>
> Q. Mr. DiDonato, is it your understanding that Metavation --
> that Huron will collect a transaction fee in connection with the
> sale of the Metavation business?
>
> A. It's my understanding Huron will not collect a transaction fee
> in the sale, in relationship of the sale of Metavation.
>
> Q. It will not collect a transaction fee from any entity.
>
> A. There is no transaction fees proposed in the Huron
> engagement.

Transcript of Deposition of John DiDonato (March 12, 2013), at p. 334, ln. 6-16.

### Conclusion

69.     In sum, there is no legitimate basis raised by the Committee, the UST or

GM for the Court to deny the Debtor's engagement of Huron, first as financial advisor during

the period December 17, 2012 through January 16, 2013, and then as CRO and management

during the period from and after January 17, 2013. The Debtors continue to have an ongoing

and urgent need for the experience and knowledge uniquely possessed by Huron, and therefore

urge the Court to approve the Motion as filed.

WHEREFORE, the Debtors respectfully request that the Court enter an order

granting the Motion and providing such other and further relief as the Court deems just and

proper.

34

Dated:  March 18, 2013                PACHULSKI STANG ZIEHL & JONES LLP

/s/ Timothy P. Cairns
Laura Davis Jones (Bar No. 2436)
Alan J. Kornfeld (CA Bar No. 130063)
David M. Bertenthal (CA Bar No. 167624)
Maxim B. Litvak (CA Bar No. 215852)
Timothy Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:  ljones@pszjlaw.com
        akornfeld@pszjlaw.com
        dbertenthal@pszjlaw.com
        mlitvak@pszjlaw.com
        tcairns@pszjlaw.com

[Proposed] Counsel for Debtors and Debtors in
Possession