## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| REVSTONE INDUSTRIES, LLC, et al.,[1] | ) Case No. 12-13262 (BLS) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |

**Requested Hearing Date: June 26, 2013 at 1:30 p.m. Eastern Time**
**Requested Objection Deadline: June 21, 2013 at 4:00 p.m. Eastern Time**

**DEBTORS' MOTION FOR ORDER PROVIDING LIMITED RELIEF OF
(A) AUTHORIZING THE DEBTOR REVSTONE INDUSTRIES, LLC TO (I) CONSENT
TO AND (II) TAKE ACTIONS THAT IT DETERMINES ARE REASONABLY
NECESSARY TO CONSUMMATE THE SALE OF CERTAIN OF THE ASSETS OF
ITS NON-DEBTOR INDIRECT SUBSIDIARIES
CONTECH CASTINGS, LLC AND CONTECH CASTINGS
REAL ESTATE HOLDINGS, LLC; AND (B) GRANTING RELATED RELIEF**

Revstone Industries, LLC, *et al.*, the above-captioned debtors and debtors in possession (collectively, the "Debtors"), file this motion (this "Motion") for entry of an order:

(a) authorizing the Debtor Revstone Industries, LLC ("Revstone Industries") to (i) consent to and (ii) take actions that it determines are reasonably necessary to consummate the sale of certain of the assets of Revstone Industries' non-debtor, indirect subsidiaries, Contech Castings, LLC and Contech Castings Real Estate Holdings, LLC ("Contech" or the "Sellers"); and (b) granting related relief.

Although the Debtors do not believe that Court approval is necessary for the Sellers to undertake the Sale (defined below), out of an abundance of caution since Revstone Industries is a Debtor, the Debtors hereby seek authorization for Revstone Industries to provide any consents

---

[1] The Debtors in these cases and the last four digits of each Debtor's federal tax identification number are: Revstone Industries, LLC (7222); Spara, LLC (6613); Greenwood Forgings, LLC (9285); and US Tool and Engineering, LLC (6450). The location of the Debtors' headquarters and service address for each of the Debtors is 2250 Thunderstick Dr., Suite 1203, Lexington, KY 40505.

and to take other actions that it determines are reasonably necessary to cause the Sale by the

Sellers of non-estate assets to be consummated.

More specifically, by this Motion, the Debtors seek the limited relief of authorization for

Revstone Industries to consent to and take actions that it determines are reasonably necessary to

consummate the sale of Contech's lightweight die cast automotive components business (the

"Sale") to Shiloh Die Cast Midwest, LLC (the "Stalking Horse Purchaser"), or the highest or

otherwise best bidder or bidders (a "Successful Bidder").  The Stalking Horse Purchaser is

neither an affiliate nor otherwise an insider of Contech and the Debtors.  The Debtors also

hereby request that the order provide that Revstone Industries' consent to the Sale and the

consummation of the Sale by Contech is a proper exercise of the Revstone Industries' business

judgment.

In support of this Motion, the Debtors respectfully state as follows:

## Preliminary Statement

1.      By this Motion, the Debtor Revstone Industries seeks authorization to

consent to and take actions that it determines are reasonably necessary to consummate the sale of

the assets of the Sellers, which are non-Debtor indirect subsidiaries of Revstone Industries, in a

competitive bid process.  The proposed transaction documents contemplate that Contech's assets,

which are not property of the bankruptcy estates of the Debtors (the "Estates"), will be sold in a

non-bankruptcy sale free and clear of liens, claims, encumbrances, rights and other interests to

the extent provided for in the Agreement after an extensive marketing and bidding process.  The

material uses of the proceeds of Sale are described below.   As explained below, the proposed

Sale is an integral part of a broader plan – including multiple transactions such as the marketing

and contemplated separate sale of the assets of another non-Debtor affiliate (Metavation LLC),

anticipated customer support agreements and other accommodations, the contemplated resolution

of certain claims and other matters with key parties like the Pension Benefit Guaranty

Corporation (which, among other things, asserts certain liens by virtue of alleged control group

liability) subject to further negotiation, and other arrangements – that collectively will provide

tangible, as well as indirect, substantial benefits and value to the Debtors and the Estates.  The

proposed Sale of the Sellers' assets to the Stalking Horse Purchaser, subject to an overbidding

process, represents the highest and best offer received for Contech's assets after a thorough

marketing and negotiation process, and presents the most viable and best option currently

available to maximize the value of Contech's assets for the benefit of creditors and stakeholders.

Together with the other contemplated transactions and arrangements, the Sale is in the best

interest of the Debtors and Estates.

2.    The Debtors do not believe that approval is necessary for the Sale itself,

but out of an abundance of caution since Revstone Industries is a Debtor, and at the Stalking

Horse Purchaser's request, the Debtors hereby seek authorization for Revstone Industries to

provide any consents and to take other actions that may be necessary to cause the Sale by

Contech of non-Estate assets to close.

### Jurisdiction

3.    This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This proceeding is a core proceeding within the meaning of 28 U.S.C.

§§ 157(b)(2)(A), (M), and (O).

4.      Venue of these proceedings and this Sale Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief sought herein are sections 105, 363, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 9006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Background

6.      On December 3, 2012, Debtors Revstone Industries, LLC and Spara, LLC commenced their cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On January 7, 2013, Debtors Greenwood Forgings, LLC and US Tool and Engineering, LLC commenced their cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

7.      On December 18, 2012, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") in the case of Revstone Industries, LLC. No committee has been appointed in the cases of Spara, LLC, Greenwood Forgings, LLC, and US Tool and Engineering, LLC.  No trustee or examiner has been appointed in any of the Debtors' chapter 11 cases.

8.    The Debtors and their affiliates (collectively referred to herein as the "Company") are premier designers and manufacturers of highly engineered components for automotive and other industrial sectors focusing on case and formed metals, tooling and high-performance products and processes.  The Company is also a premier designer, manufacturer and supplier of components for the global aerospace, energy, military, defense and transportation industries.  The Company's portfolio of products includes components for automotive powertrains, drivetrains, and chassis for engine transmissions, suspension chassis, chassis sub frames and exhaust suspension systems.

9.    Even though the Company is strategically placed to be a key supplier of parts to tomorrow's cars, the reverberations and transitions in the automobile industry since 2008 have had a lasting impact on the Company's operations.  The Company has been negatively impacted by the continued lack of liquidity in the credit market for middle market borrowers.  As a result, the Company has only been able to obtain one-off financings at relatively high interest rates to fund its operations, as opposed to having a global financing facility that would encompass all holdings of the Debtors and would dramatically lower overall financing costs for the Debtor.

## The Assets to Be Sold and the Business Decision to Sell the Assets

10.    Contech Castings, LLC ("Contech") is a leading designer and manufacturer of highly-engineered, fully-machined, lightweight die cast components for the automotive industry.  With over 60 years in precision die casting, Contech is a leader in lightweight aluminum rack and pinion housings, structural body-in-white parts, steering column

components, axle carriers, suspension components and transmission parts. Contech is one of the largest producers of steering housings in North America, providing the leading technology for these housings in both hydraulic and electronic steering components. Contech has launched the next generation of die cast technology, ThinTech®, which offers maximum weight reduction and strength to complex transmissions which are defining today's automotive powertrain agenda.

11.    Contech was acquired by Marathon Asset Management in 2007 and filed for Chapter 11 bankruptcy protection on January 30, 2009 during the economic downturn. Contech emerged from bankruptcy, and the U.S. Casting division was acquired by Revstone Industries on June 15, 2009. Contech operates its manufacturing business in four plants in Michigan, Indiana, and Tennessee.

12.    Based on the marketing of the Sellers' assets by Contech, the Debtors have determined that a process for the sale of certain assets owned by non-Debtor Contech (as further described in the Agreement as the "Purchased Assets") (herein, the "Assets") to the Stalking Horse or to an overbidder, while the business is still operating as a going concern, will maximize the value of the Assets for the benefit of Contech's creditors and stakeholders, and for ultimately the Debtors' creditors. The Assets are not property of the Debtors' Estates and are composed of certain equipment, contracts, intellectual property, real estate, and other assets that are utilized exclusively in Contech's die cast operations all as more particularly described below and in the Asset Purchase Agreement attached hereto as Exhibit A.

13.    The Sellers and the Debtors believe that the proposed going concern Sale –a result of extensive marketing and negotiation and subject to an overbidding process– is the

best option to maximize value under all of the circumstances. The Sellers are in default under their secured lender arrangements, and have been relying upon customer funding for certain contracts. Specifically, the major customers of Contech have been providing significant financial and other assistance to Contech, including (as applicable to a given customer) supplemental working capital financing, purchasing of MRO (maintenance, repair and operating) supplies, funding of capital expenditures and employee incentive bonuses, and other ancillary financial assistance. In light of Contech's financial difficulties, Contech's customers have now restricted such funding and assistance (which typically amount to several millions of dollars for each applicable customer), as well as Contech's setoffs (against amounts owed to the customers), and have insisted on a going concern sale of Contech's business; otherwise, they will switch to alternative suppliers. The Debtors understand that, under such circumstances of significant assistance by the customers, it is fairly common for the major customers to insist on a sale or they will move their business elsewhere. If the Sellers and the Debtors were not to proceed with a Sale, these major customers could end their relationships with Contech, thus jeopardizing the going concern value of Contech. Further, the proposed Sale is part of a series of anticipated transactions, including (i) the contemplated separate sale of the businesses or assets of other non-Debtor affiliates such as Metavation LLC,[2] (ii) customer support agreements or other accommodations that have been or are expected to be negotiated with certain important customers, pursuant to which agreements the customers would provide certain funding, release certain claims at the non-Debtor subsidiary level and/or provide other assistance, value or

---

[2] Metavation LLC is a non-Debtor, indirect subsidiary of Revstone Industries.

support, and (iii) the anticipated resolution of certain claims and other matters with key parties such as the Pension Benefit Guaranty Corporation, subject to further negotiation and documentation.  Collectively, the Sale and other anticipated transactions will provide significant value and benefits to the Debtors, the Estates and their creditors.  Based on all of the foregoing, in order to maximize the value of the Sellers' business and assets for all creditors, stakeholders and parties in interest, the sound business decisions were made by the Debtors and Contech to embark on the competitive sale process that was undertaken and to accept the Sale terms proposed by the Stalking Horse Purchaser which comprised the highest and best offer for the Assets, subject to a fair and reasonable overbidding process.

14.     The Debtors understand that, after the payment of professionals, brokers and other closing fees/expenses, the Sellers will use the net Sale proceeds to pay, among other liabilities, valid secured claims against the Sellers' property (including in relation to capital leases and property taxes) and various other liabilities not assumed by the Stalking Horse Purchaser, as well as Contech employee incentive bonuses and health insurance premiums and related payments (including funding for payment of accrued health insurance claims and for reserves).  In respect to the Contech employee incentive bonuses, the Debtors understand that such bonuses will be paid by Contech to approximately ten Contech employees, including certain management level personnel (including Contech's President and CEO), certain operations-level directors, and plant managers.  All such bonuses will aggregate to approximately $753,000 and will be paid by Contech upon the closing of the Sale.

**Marketing Process**

15.     Significant efforts have been undertaken by Contech and its investment

banker, Angle Advisors Investment Banking ("Angle"), to market the Assets.  Contech formally

commenced that process on April 15, 2013.  Between April 15th and April 19th, Angle sent out a

summary informational memorandum highlighting the Assets to approximately 132 industry

participants, strategic investors and financial investors.  To those parties who signed

nondisclosure agreements, Angle provided a confidential offering memorandum ("COM"),

access to a preliminary data room, and additional information.  Sixty-three parties returned

executed non-disclosure agreements.  As of May 6, 2013, Angle received 23 written letters of

intent.  To those parties submitting indications of interest that demonstrated reasonable

assurances of being able to consummate a transaction on acceptable terms, Angle provided

additional, more detailed information about Contech, access to Contech's facilities and

customers, and scheduled meetings with Contech's management.  Contech, with Angle's

assistance, subsequently engaged in negotiations with five parties submitting offers on the details

of a sale.

16.     On June 11, 2013, after extensive negotiations, Contech entered into the

*Asset Purchase Agreement* with the Stalking Horse Purchaser, a copy of which is attached

hereto, without schedules or exhibits, as Exhibit A (the "Agreement").  As noted, the Stalking

Horse Purchaser is neither an affiliate nor otherwise an insider of Contech and the Debtors.  The

material terms of the Agreement are set forth below.  Pursuant to the terms of the Agreement the

Debtors seek entry by the Court of an order substantially in the form attached hereto as Exhibit B

(the "Order").  Upon satisfaction of the conditions to closing contained in the Agreement, the

Stalking Horse Purchaser, subject to higher or better bids, will purchase the Assets and assume

certain contracts and leases.

17.    All parties that have expressed to Contech an interest in acquiring the

Assets have been provided with a copy of the Agreement and have been informed that overbids

will be considered.  Additionally, notice of the Motion and bid procedures will be sent to all

parties that Contech believes may be potentially interested in acquiring the Assets, as well as all

known creditors of Contech.

18.    As described above, the Debtors believe that the consummation of the Sale

by Contech to the Stalking Horse Purchaser or to a successful overbidder will provide the

Debtors' Estates, creditors and other stakeholders with the best opportunity possible for

maximizing value by realizing upon the Sellers' Assets through a sale as a going concern.

Together with the other contemplated transactions and arrangements, the Sale and other relief

requested by this Motion are in the best interest of the Debtors and Estates.

### Agreement With Stalking Horse Purchaser

19.    The key terms of the Stalking Horse Purchaser's Agreement and the Order

are summarized below.[3]  The description below only summarizes certain provisions of the

Agreement and the Order as a convenience to the Court and parties in interest, and the terms of

the Agreement or Order, as applicable, control in the event of any inconsistency.

a.    **Purchase Price**.  The purchase price payable for all the Assets shall be
$54.4 million (the "Purchase Price") less any Working Capital Purchase Price Adjustments

---

[3] All capitalized terms in this section of the Motion, which are not defined, have the meanings ascribed to
them in the Agreement.

identified in Section 2.6(c), the Chrysler Equipment Purchase Adjustment identified in Section 2.6(d), and all other adjustments and charges as set forth in Section 2.6(b). *See* Agreement § 2.6(b). The Agreement provides for various escrows including a Working Capital Escrow (section 2.6(c)), a Tax Escrow (section 6.13), and a General Escrow (section 6.14).

      b.    **Assets**. All of Contech's right, title and interest in and to all of the following assets of the Business (which is defined as the business of die casting and machining motor vehicle parts, and further producing engineered high pressure aluminum die cast and machined parts for the automotive industry, as conducted by Contech at the Facilities, including the Dowagiac facility, as of the date of the Agreement), except to the extent that the same are Excluded Assets, free and clear of all Liens other than Permitted Liens: (a) all machinery, equipment, furniture, fixtures, office furnishings, cranes, tools and dies, molds, fixtures and parts, capital spares, vehicles, computer hardware and software, and other tangible personal property owned by Contech currently used in operations of the Business at the Facilities; (b) to the extent assignable, all rights in all warranties of any manufacturer or vendor in connection with the Purchased Equipment; (c) all contracts and agreements, licenses, purchase orders, customer orders, and other contracts for the operation of the Business, but only to the extent expressly identified on Section 2.1(c) of the Disclosure Schedule; (d) all Acquired Inventories; (e) all Owned Real Property (subject to certain specified Liens); (f) the Acquired Real Property Leases; (g) the Acquired Personal Property Leases; (h) to the extent assignable, the Permits and Licenses; (i) certain books and records; (j) the Open Customer Orders; (k) the Open Supplier Orders; (l) all receivables related to the Business, but only to the extent identified in Section 2.1(1) of the Disclosure Schedule; (m) the Acquired Intellectual Property Rights, and (n) certain other specified assets of Contech. *See* Agreement, at § 2.1.

      c.    **Excluded Assets.** The assets that are excluded from the sale include, among other items: (i) except for the assets used for the Business at the Facilities, or elsewhere as identified in the Disclosure Schedules, any of Contech's assets, including but not limited to, intellectual property, technology, books and records which are not located at the Facilities and not related to the Business, including office equipment, computers and receivables not related to the Business; (ii) all claims, including, but not limited to, commercial claims of Contech against third parties, intercompany claims and/or claims against Affiliates, including but not limited to, any such claims arising out of Contech's conduct of the Business at the Facilities on or before the Closing Date, and any indemnification rights of Contech relating thereto; (iii) the minute books, Tax Returns, books of account and other records having to do with Contech's corporate organization; (iv) the basic books and records of all account and all supporting vouchers, invoices and other records and materials relating any or all Taxes of Contech or Business; (iv) all claims for refunds due to Contech for Taxes of any nature paid by Contech with respect to any period ending on or prior to the Closing Date; (v) all insurance policies and performance bonds covering the Purchased Assets and any rights and claims arising from such bonds or policies after Closing; (vi) all insurance proceeds arising in connection with property damage to the Purchased Assets occurring prior to the Closing Date; (vii) Benefit Plan and all related assets; (viii) all claims of Contech that are not directly related to the ongoing operation of the Business at the Facilities, including all potential claims against directors and officers, intercompany claims and/or claims against Affiliates; (ix) except for assets primarily used for the Business, any assets

which are not specifically listed as Purchased Assets, including Contech's name(s); and (x) certain additional assets, as set forth in the Agreement. *See* Agreement, at § 2.2.

      d.    **Assumed Liabilities**. The Stalking Horse Purchaser shall assume all the following liabilities and obligations of the Sellers: (i) liabilities incurred and arising after the Closing, on or after the Closing Date, in connection with or from the use of the Purchased Assets or operation of the Business at the Facilities by the Purchaser after the Closing Date; (ii) all specifically identified obligations of Contech to deliver products or services pursuant to Open Customer Orders outstanding as of the Closing, but only to the extent identified in Section 2.3(c) of the Disclosure Schedule; (iii) all specifically identified accounts payable of Contech outstanding as of the Closing, to the extent identified in Section 2.3(d) of the Disclosure Schedule and related to any Purchased Assets, or any assets that will be delivered after Closing pursuant to Open Supplier Orders; (iv) all liabilities in respect of the Acquired Contracts, the Acquired Real Property Leases or the Acquired Personal Property Leases, to the extent that such liabilities thereunder are required to be performed after the Closing Date and do not relate to any failure to perform or other breach by Contech prior to the Closing; (v) any obligations of Contech under the WARN Act or similar state statutes as a result of the hiring of Hired Employees and the consummation of the transaction contemplated under the Agreement; and (vi) certain other specified liabilities. *See* Agreement, at § 2.3.

      e.    **Closing, Related Deadlines and Other Conditions.** The Closing shall take place on a date that is no later than three Business Days after the satisfaction or waiver of certain conditions precedent as set forth in Articles VI and VII, or on such other date as may be agreed upon by Contech and the Purchaser. Agreement at § 2.8 (a). Conditions precedent to the Purchaser's obligations at Closing under the Agreement include, without limitation, the following: (i) Contech shall cause Revstone Industries, within two Business Days of execution of the Agreement, to move the Bankruptcy Court for entry of an order in substantially the same form and substance as set forth in a motion and related order attached to the Agreement, and Contech and Revstone Industries shall use diligent and commercially reasonable efforts to obtain such Bankruptcy Order on or before July 18, 2013; the issuance of a final non-appealable Bankruptcy Order, unless waived in writing by the Purchaser, is a condition to Closing, subject in all respects to Section 6.16; if the Bankruptcy Court, based on a decision on the merits, rules against entry of the Bankruptcy Order or expressly disapproves of the relief requested in the Bankruptcy Order, then either at Sellers' or Purchaser's option, the Agreement may be terminated and the Deposit immediately returned to Purchaser; if the Bankruptcy Court, on or before July 18, 2013, does not issue the Bankruptcy Order, materially changes the Bankruptcy Order from the form and substance of the Bankruptcy Order, or otherwise abstains from ruling with respect to the Agreement or the Bankruptcy Order, then at either Purchaser's option or Sellers' option, unless the Sellers and the Purchaser otherwise agree in writing, the Agreement shall be terminated and the Deposit immediately returned to Purchaser; and (ii) Contech and its Affiliates shall have received all consents of Contech's and its Affiliates' secured lenders and other third parties required for Contech to consummate the contemplated transactions. Additionally, Sellers and certain of its Affiliates shall have obtained a definitive, enforceable and executed settlement agreement with the PBGC ("PBGC Agreement") that is acceptable to Sellers, and with respect to Purchaser, acceptable as to the release provisions only, as provided in the Agreement, with respect to the PBGC Obligations and the sale and/or disposition of the

Purchased Assets pursuant to the Agreement, on or before July 16, 2013. The PBGC Agreement must fully, unconditionally and completely release any claims and/or liens of the PBGC against the Purchaser and the Purchased Assets, which release, provided in the PBGC Agreement, must be acceptable to Purchaser. Upon and after Closing, Sellers shall not use or disburse any of the proceeds of the sale of the Purchased Assets in contravention of the terms of the PBGC Agreement. *See* Agreement, at Articles VI and VII. Further, the Agreement may be terminated by either Contech or Purchaser if the Closing shall not have occurred by August 2, 2013, or if the Bankruptcy Order is not issued by the Bankruptcy Court on or before July 18, 2013. *See* Agreement, at Article IX.

Pursuant to Section 6.16 of the Agreement, in the event a party objects to the motion filed by Revstone seeking entry of the Bankruptcy Order pursuant to Section 6.4 ("Objection"), and the Bankruptcy Court enters the Bankruptcy Order, in substantially the same form and substance as the proposed Bankruptcy Order attached to the Agreement, over any such Objection, and the entered Bankruptcy Order is timely appealed by the party that filed the Objection, then the Purchaser shall have the option, to be expressed in writing to Sellers made within two (2) Business Days after the filing of the appeal, to either (a) timely Close the sale of the Purchased Assets under the Agreement notwithstanding the existence of such appeal, or (b) terminate the Agreement. In the event Purchaser opts to terminate the Agreement in accordance with subsection (b), above, then Purchaser shall immediately forfeit to the Sellers the sum of $1,400,000 (the "Forfeiture") from the Deposit, which Forfeiture amount shall be immediately paid to Sellers by the Escrow Holder, and the balance of the Deposit refunded to Purchaser.

Pursuant to Section 7.5, Sellers shall have obtained agreements with its customers Chrysler, Ford and Nexteer, satisfactory to Sellers, in their sole discretion, with respect to the sales support of Sellers ("Customer Agreements") on or before the Bankruptcy Court hearing date with respect to the Bankruptcy Order. If Sellers fail to obtain the Customer Agreements on or before the Bankruptcy Court hearing date, then Sellers have the option to, in writing, either (a) waive this condition to Closing, or (b) terminate the Agreement, at which time the Deposit shall be refunded to Purchaser.

      f.     **Good Faith Deposit.** The Purchaser deposited $5.44 million into escrow as the 10% deposit required under the Agreement. *See* Agreement, at § 2.6(a).

      g.     **Representations, Warranties and Covenants**. Contech has made various representations including those relating to due authorization, title to the Purchased Assets, consents, litigation, operation of the Business, and numerous other matters, and the Purchaser has made certain representations including regarding due authorization and available funds. Contech also agreed to various covenants including regarding preservation of the Business until the Closing Date, employee and benefits matters, and non-competition. *See* Agreement, Arts. III, IV & V.

      h.     **Indemnification.** Contech and Purchaser have each agreed to certain indemnification obligations. *See* Agreement, at Article X.

i.    **Record Retention.** From and after Closing, Purchaser agrees to provide Contech with access to the books and records of the Business as Contech shall request in connection Contech's reasonable need for such records, and Purchaser agrees to maintain applicable records for a period of seven years after the Closing Date. *See* Agreement, at §§ 5.4 & 11.19. The Debtors believe that the proposed access period for Contech to retain access to books and records that are transferred in the Sale is sufficient for Contech to be wound up and dissolved.

j.    **Limited Shop Period and Overbid Protections.** The Agreement permits Contech, through June 20, 2013, to solicit proposals from other parties to purchase all or part of the Business and the Purchased Assets, and after this period, if there are no higher and better offers (as determined under Section 8.1(a)), the Agreement will be named the Successful Bid, and the Purchaser shall have exclusivity under the Agreement related to the contemplated transactions through the earlier of the Closing Date or the termination of the Agreement. Any Alternative Transaction must guarantee and confirm financing of the Purchase Price with no financing contingency therein, provide for the payment of an aggregate purchase price exceeding 5% of the Purchase Price with Purchaser of $54.4 million, after accounting for the purchase price adjustments set forth in Section 2.6 of the Agreement, and provide a refundable deposit related thereto of 10% of the "Purchase Price" (the "Initial Overbid"). In evaluating whether an Alternative Bid, or an aggregate of Alternative Bids, meets the 5% value threshold, above, to constitute a qualified Initial Overbid, Sellers may, in their sole and absolute discretion, assign a reasonable monetary value to non-monetary provisions or omissions in such Alternative Bid or Alternative Bids. If during the Limited Shop Period, Contech receives an Alternative Bid that qualifies as an Initial Overbid, thereafter Contech may, in Contech's absolute and sole discretion, hold an auction on June 25, 2013, at which subsequent bids shall be in increments of $500,000 over and above the Initial Overbid purchase price. At Sellers' sole and absolute discretion, Sellers shall have the right to terminate the acceptance of Subsequent Bids and declare the party, or the parties with the highest and best bid for the purchase of all or substantially all of the Purchased Assets the successful bidder ("Successful Bidder"). Simultaneously thereafter, Seller shall be permitted to enter into a definitive agreement with the Successful Bidder in accordance with the terms of its bid and which includes a non-refundable deposit as similarly provided herein, equivalent to 10% of the final purchase price agreed to by such Successful Bidder. The Purchaser will be entitled to a Break-Up Fee of $2 million under certain circumstances. *See* Agreement, at §§ 5.14, 8.1.

20.    Revstone Industries seeks authorization to consent to and take actions that it determines are reasonably necessary to consummate the Sale to the Stalking Horse Purchaser, or to a higher or otherwise better bidder or bidders, pursuant to the terms of the Agreement and the Order.

21. The Debtors believe that the sale of the Assets by Contech as a going concern to the Stalking Horse Purchaser or a higher or otherwise better bidder is far preferable to a piecemeal liquidation of the Assets. The Debtors further believe that the Sellers' obtaining the Stalking Horse Purchaser as a stalking horse bidder, marketing the Assets with the assistance of Angle and its other professionals, and selling the Assets to the highest or otherwise best bidder that emerges from the sale process will result in the highest or otherwise best consideration for the Assets.

22. As discussed above, the Sellers and the Debtors have examined the alternatives to a going concern sale of the Assets and have determined that, in light of the Sellers' financial situation, liquidity needs, and value of the Assets as an operating unit, a viable alternative to the Sale does not exist. If the Sale were not to proceed and the Sellers' major customers, which have been providing substantial financial and other assistance to Contech, were to switch to alternative suppliers, the going concern value of Contech would be jeopardized; a forced liquidation would provide substantially less value for creditors, stakeholders and parties in interest. Further, the proposed overbidding process may potentially foster additional and higher bids that may lead to even more value than currently proposed under the Agreement.

23. For the reasons stated above, and in light of the benefits to the Estates, Revstone Industries has determined, in the exercise of its business judgment, to consent to and take actions that it determines are reasonably necessary to consummate the Sale by Contech to consummate the proposal submitted under the Agreement with the Stalking Horse Purchaser or,

if applicable, another bidder in the event that Contech receives a higher or otherwise better bid to the transaction set forth in the Agreement.

### Relief Requested

24.     The Debtors are requesting that this Court, *inter alia*, (a) authorize Revstone Industries to consent to and take actions that it determines are reasonably necessary to consummate the sale of the Assets, which are not property of the Debtors' Estates, to the Stalking Horse Purchaser pursuant to the Agreement, or, alternatively, to the other Successful Bidder(s) pursuant to such competing agreement(s) with such other Successful Bidder(s); and (b) grant such other relief as may be necessary or appropriate.

### Basis for Relief

25.     Section 105(a) provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

26.     A sound business purpose exists for the Debtors to consent to and to take whatever actions are necessary to consummate the Sale which represents the highest or otherwise best value for the Assets of the Sellers.  In the context of a sale of a debtor's assets, the court in *In re Delaware & Hudson Railway Co.*, observed:

> A non-exhaustive list of factors to consider in determining if there
> is a sound business purpose for the sale include:  the proportionate
> value of the asset to the estate as a whole; the amount of elapsed
> time since the filing; the likelihood that a plan of reorganization
> will be proposed and confirmed in the near future; the effect of the
> proposed disposition of the future plan of reorganization; the
> amount of proceeds to be obtained from the sale versus appraised
> values of the Property; and whether the asset is decreasing or
> increasing in value.

124 B.R. 169, 176 (D. Del. 1991).

27.    While Revstone Industries is only indirectly interested in the Sale, the

Debtors submit that Revstone Industries' exercise of its business judgment in consenting to the

Sale meets the above-referenced standards.  Revstone Industries has decided to support the Sale

of the Assets by Contech after thorough consideration of all viable alternatives and have

concluded that the Sale by Contech is supported by many sound business reasons.

28.    Contech has extensively marketed the Assets and has pursued a sale

process designed to maximize the purchase price realized from the Sale.  As a result of the

marketing efforts that have been undertaken and that Contech will continue to undertake, the

highest or otherwise best offer(s) obtained through the sale process will provide maximum value

to the Debtors under the current circumstances.  Other potential buyers will be served with this

Motion and/or notice thereof.  The fairness and reasonableness of the consideration to be paid by

the Successful Bidder(s) is demonstrated by the marketing efforts that Contech has undertaken,

followed by a fair and reasonable sale process, and culminating in one or more proposed sales.

Additionally, as discussed above, certain customer support agreements have been or are expected

to be negotiated with certain important customers in connection with the Sale and other

transactions anticipated by the Debtors, which together will provide more benefit and value to

the Debtors and Estates.

29.    The Sale is supported by sound business reasons and is in the best interests

of the Debtors and their Estates.  Accordingly, the Debtors also request approval under

Bankruptcy Code section 363(b) of Revstone Industries' proposed consent to and taking of any

other actions that it determines are reasonably necessary for non-Debtor Contech to consummate

the proposed Sale of the Assets to the Successful Bidder(s), to the extent applicable.  To the

extent that § 363(b) is not applicable, Revstone Industries' consent to and taking of actions to

ensure that the proposed Sale is consummated should be authorized as necessary and appropriate

actions of Revstone Industries based on the circumstances described herein.

### Notice

30.    Notice of this Motion has been provided to (a) the Office of the United

States Trustee; (b) counsel to the Committee; (c) all entities who executed non-disclosure

agreements with Contech in connection with a potential acquisition of any or all of the Assets, or

who otherwise have expressed an interest or may potentially have an interest in purchasing the

Assets; (d) the Stalking Horse Purchaser and its counsel; (e) all parties who have timely filed

requests for notice under Bankruptcy Rule 2002; (f) all parties who are known by the Debtors to

assert liens with respect to the Assets; and (g) all known creditors of Contech.  The Debtors

respectfully submit that such notice is sufficient, and request that the Court find that no further

notice of the relief requested herein is required.

### Conclusion

31.    The proposed Sale as described in this Motion is supported by sound

business reasons, as set forth herein.  The proposed Sale is proper, necessary and serves the best

interests of the Debtors, their Estates and creditors and all parties in interest.  The Debtors thus

request that the Court authorize Revstone Industries to consent to and take actions that it

determines are reasonably necessary for non-Debtor Contech to consummate the proposed Sale

of the Assets, as requested, to the Stalking Horse Purchaser or other Successful Bidder.

**No Prior Request**

32.    No prior request for the relief sought in this Motion has been made to this

or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and

authorize Revstone Industries to consent to and take actions that it determines are reasonably

necessary for non-Debtor Contech to consummate the Sale of the Assets to the Stalking Horse

Purchaser or other Successful Bidder pursuant to the Agreement or other agreement that is in

substantially the form attached to this Motion as Exhibit A, pursuant to the attached proposed

order; (ii) approve the form and manner of notice of this Motion, and of the proposed Sale; and

(iii) grant such other and further relief as is just and proper.


Dated: June 11, 2013            PACHULSKI STANG ZIEHL & JONES LLP


                                Laura Davis Jones (Bar No. 2436)
                                David M. Bertenthal (CA Bar No. 167624)
                                Timothy P. Cairns (Bar No. 4228)
                                919 N. Market Street, 17th Floor
                                Wilmington, DE 19801
                                Telephone:  302/652-4100
                                Facsimile:  302/652-4400
                                Email:  ljones@pszjlaw.com
                                        dbertenthal@pszjlaw.com
                                        tcairns@pszjlaw.com

                                Counsel for the Debtors and Debtors in Possession