## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| REVSTONE INDUSTRIES, LLC, <u>et al.</u>[1] | Case No. 12-13262 (BLS) |
| Debtors. | Jointly Administered |
| | **Hearing Date: December 11, 2013 at 10:00 a.m. ET**<br>**Objections Due: December 4, 2013 at 4:00 p.m. ET** |

### MOTION OF THE OFFICIAL COMMITTEE
### OF UNSECURED CREDITORS TO (I) APPOINT A
### CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. §§ 1104(a)(1)
### AND 1104(a)(2); OR, ALTERNATIVELY, (II) CONVERT CASE TO
### CHAPTER 7 PURSUANT TO 11 U.S.C. §§ 1112(b)(1) AND 1112(b)(4)(A)

The Official Committee of Unsecured Creditors (the "Committee") of

Revstone Industries, LLC ("Revstone"), by and through its undersigned counsel,

hereby moves pursuant to sections 1104(a)(1) and 1104(a)(2) of title 11 of the United

States Code §§ 101-1532 (as amended and applicable hereto, the "Bankruptcy

Code") and Rule 2007.1 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") to appoint a trustee in Revstone's chapter 11 case, or,

alternatively, to convert Revstone's chapter 11 case to a chapter 7 case, pursuant to

Bankruptcy Code sections 1112(b)(1) and 1112(b)(4)(A) and Bankruptcy Rules

1017(f) and 1019, if the Court determines that such conversion is in the best interests

---

[1]      The debtors in the chapter 11 cases jointly administered with Revstone Industries, LLC and the last four digits of each such debtor's federal tax identification numbers are: Revstone Industries, LLC (7222); Spara, LLC (6613) ("Spara"); Greenwood Forgings, LLC (9285) ("Greenwood"); and US Tool and Engineering, LLC (6450) ("US Tool"). The location of the Debtors' headquarters and the service address for each of the Debtors is 2250 Thunderstick Dr., Suite 1203, Lexington, KY 40505.

of the Revstone's estate and the most efficient and expeditious means of resolving

the remaining issues in the Revstone bankruptcy case.  In support of this Motion, the

Committee states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28

U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).

2.      Venue of these cases and this Motion in this district is proper

under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are

Bankruptcy Code sections 1104(a)(1), 1104(a)(2), 1112(b)(1) and 1112(b)(4)(A).

## BACKGROUND

**A.      The Bankruptcy Cases of Revstone and Its Affiliates**

4.      On December 3, 2012 (the "Petition Date"), Revstone and

Spara filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

Following the Petition Date, Greenwood, US Tool, and TPOP, LLC f/k/a

Metavation, LLC ("Metavation" and, together with Revstone, Spara, Greenwood,

and US Tool, collectively, the "Debtors"), also filed petitions under chapter 11 of the

Bankruptcy Code.

5.      The Debtors are operating their businesses as debtors-in-

possession pursuant to Bankruptcy Code sections 1107 and 1108.  To date no trustee

or examiner has been appointed in the Revstone bankruptcy case.

6.      On December 17, 2012, the Office of the United States Trustee appointed the Committee pursuant to Bankruptcy Code section 1102(a)(1) in the Revstone bankruptcy case.  The Committee selected and authorized the employment of Womble Carlyle Sandridge & Rice, LLP ("WCSR") as its counsel and FTI Consulting, Inc. as its financial advisor.  To date, no committee has been appointed in any of the Debtors' cases other than in the Revstone bankruptcy case.

7.      On February 6, 2013, the Court entered an Order authorizing the joint administration of the Revstone, Spara, Greenwood, and US Tool chapter 11 cases.  See Docket No. 173.

**B.      Corporate Changes to Certain of the Debtors and Retention of Chief Restructuring Officer**

8.      Since the Petition Date, the Debtors' cases have been marked by acrimony between the Debtors and their creditors (and at times, their customers). As set forth herein, and as evidenced by the docket of the Revstone bankruptcy case (and the bankruptcy case separately administered for Metavation), such acrimony has not abated over the course of the almost one full year that has passed since Revstone filed its bankruptcy case.

9.      Until January 17, 2013, Revstone was under the control of George Hofmeister, the sole manager on Revstone's board of managers.  Once the Committee was appointed, the Committee worked to ensure that there was sufficient oversight and that proper financial controls were established in the Revstone

bankruptcy case due to findings of fraud and numerous allegations of

misappropriated or mismanaged funds, including the following litigation:

- On November 14, 2011, a United States District Court Judge held that Mr. Hofmeister and his wife were alter egos of the Children's Trusts – the same trusts that own the Revstone's parent entity Ascalon Enterprises, LLC ("Ascalon") – were used to avoid payment to their judgment creditors, evidencing an "actual intent to defraud creditors" by using the trusts to loot Mr. Hofmeister's companies through at least the year 2010. Limbright v. Hofmeister, No. 09-107 (KSF), 2011 U.S. Dist. LEXIS 131373, at *29 (E.D. Ky. Nov. 14, 2011), aff'd, 2013 U.S. App. LEXIS 3333 (6th Cir. Feb. 13, 2013).

- On August 9, 2012, the United States Department of Labor (the "DOL") filed a complaint (the "DOL Complaint") against Mr. Hofmeister for alleged misuse of pension funds of the employees of Metavation. In response, Mr. Hofmeister invoked the Fifth Amendment right against self-incrimination to avoid answering the complaint, noting that he is the subject of a criminal investigation regarding the matters set forth in the complaint. See Solis v. Hofmeister, Case No. 5:12-cv-00250-KKC (E.D. Ky. Nov. 5, 2012), Answer to DOL Complaint, page 1 (Docket No. 21). On June 18, 2013, the DOL filed a request for a preliminary injunction seeking to remove Mr. Hofmeister (among others) as fiduciaries to the various pension plans. See id. at Docket No. 53. Prior to the hearing on the injunction motion, Mr. Hofmeister agreed to his removal as plan fiduciary, and the District Court for the Eastern District of Kentucky entered an order granting the preliminary injunction motion. Id. at Docket No. 73. Cross-motions for summary judgment have been filed and remain pending. Id. at Docket Nos. 91 and 92.

- On August 23, 2013, the Pension Benefit Guaranty Corporation ("PBGC") filed a complaint (as amended, the "PBGC Complaint") against Metavation and Fairfield Castings, LLC seeking to terminate various pension plans due, in part, to underfunding. See PBGC v. Metavation, LLC, Case No. 5:13-cv-00273 (E.D. Ky. Aug. 23, 2013). On October 17, 2013, both defendants filed answers. Id. at Docket Nos. 16 and 17.

10.     On or about January 17, 2013, Revstone amended its operating

agreement to add two independent managers and to establish a restructuring

committee consisting of such independent managers to make bankruptcy-related decisions. The amended operating agreement also contemplated the retention of Mr. John DiDonato, of Huron Consulting Services, LLC ("Huron"), as Revstone's chief restructuring officer. In part to implement these corporate restructurings, Revstone thereafter, on February 28, 2013, filed an application seeking approval of the retention of Huron to provide a chief restructuring officer and additional personnel and to serve as financial advisors to the Debtors (Docket No. 198) (the "Huron Retention Application").

11.    The Committee objected to the Huron Retention Application, as did Boston Finance Group, LLC ("BFG"), the chair of the Committee, the Office of the United States Trustee, and General Motors, LLC (a significant customer of certain affiliates of Revstone, including Metavation, and a Revstone creditor). After significant discovery and a contested hearing, the Committee, Revstone, and BFG, resolved their disputes with respect to the retention of Huron in the Revstone bankruptcy cases and the then pending Trustee Motion (as defined and discussed further herein). Thereafter, on March 21, 2013, the Bankruptcy Court entered an order approving the retention of Huron to provide a chief restructuring officer and additional personnel, but not as financial advisor to the Debtors (Docket No. 428).

C.    **Prior Trustee Motion and Committee Co-Exclusivity**

12.    As noted above, to date, no trustee has been appointed in the Revstone bankruptcy case. On February 4, 2013, however, the Committee filed a Motion to Appoint a Chapter 11 Trustee (Docket No. 163) (the "Trustee Motion")

with respect to Revstone.  By the Trustee Motion, the Committee sought

appointment of a chapter 11 trustee because it felt that an independent fiduciary was

necessary to impose proper financial controls for the Debtors and rebuild creditor

confidence.  The Committee further believed that Mr. Hofmeister's proposed

management changes pursuant to the amended operating agreement were insufficient

because, in part, the proposed chief restructuring officer was too beholden to Mr.

Hofmeister to truly be an independent fiduciary to the Company's creditors due to

his business relationship with Mr. Hofmeister that spanned almost twenty years.

Additionally, Mr. Hofmeister remained one of three managers on the board of

managers of Revstone and certain other affiliated companies, able to exercise voting

rights regarding all non-restructuring related matters.

      13.     The Committee and the Company engaged in extensive

negotiations regarding the Trustee Motion and case progress, and subsequently

reached an agreement to establish certain milestones.  The settlement terms were

sealed, but the resolution also addressed the Committee's objections to any extension

of the exclusive periods in the Revstone bankruptcy case to file and solicit a plan or

plans under the Bankruptcy Code.

      14.     On April 1, 2013, the Revstone filed a motion to extend the

period under Bankruptcy Code section 1121(b) during which Revstone would have

the exclusive right to file a chapter 11 plan, and to extend the period under

Bankruptcy Code section 1121(c)(3) during which Revstone has the exclusive right

to solicit acceptances of a chapter 11 plan (Docket No. 446) (the "Exclusivity

Motion"). The Committee thereafter raised certain objections to Revstone's

requested extension.

15.     On May 16, 2013, the Bankruptcy Court entered a modified

order (Docket No. 578) (the "Exclusivity Order") granting Revstone's Exclusivity

Motion, subject to limitations granting potential termination of exclusivity in favor

of the Committee. Specifically, the Exclusivity Order provided that, in the event that

the Debtors breached any of the Milestones (as defined in the Confidential

Settlement Communication filed under seal at Docket No. 573), and failed to cure

any such breach within the grace period provided in the Confidential Settlement

Communication following receipt of a notice from the Committee asserting such

breach, Revstone's exclusive periods to file and solicit acceptances of a chapter 11

plan would terminate with respect to the Committee upon expiration of the grace

period without cure of the breach by the Debtors, and the Committee would

thereafter have the immediate right to file and solicit acceptances of a plan of

reorganization. The Exclusivity Order further provided that the order and the

Confidential Settlement Communication resolved the Trustee Motion, which was

deemed withdrawn without further order of the Bankruptcy Court.

**D.     Contested Disclosure Statements and Chapter 11 Plans**

16.     Revstone subsequently breached one or more of the

Milestones and failed to cure such breach. Accordingly, in accordance with the

terms of the Exclusivity Order, upon such failure to cure any such breach, the

Committee had the immediate right to file a proposed plan of reorganization and

7

thereafter did, in fact, file a plan of reorganization, along with an accompanying

disclosure statement, on July 18, 2013. See Docket No. 736. On July 22, 2013,

Revstone also filed both a chapter 11 plan and a disclosure statement. See Docket

Nos. 774, 775. On August 18, 2013, Revstone objected to the Committee's

disclosure statement. See Docket No. 922. The Committee objected to Revstone's

plan and disclosure statement on August 19, 2013 (Docket No. 939), and the PBGC

thereafter joined the Committee's objection (Docket No. 941). On August 28, 2013,

the Committee filed an amended disclosure statement and plan. See Docket No. 989.

On August 28, 2013, Revstone filed an amended plan (Docket No. 985).

   17. Both the Committee plan and the Revstone plan remain

unsolicited. Indeed, the hearing to schedule solicitation of such plans has been

continued for several months to allow Revstone and the Committee to attempt to

work out the issues between their competing plans and to address certain other issues

that currently prevent both plans from proceeding to confirmation. Rather than carve

a path for the efficient resolution of the Revstone bankruptcy case and the transfer of

control of Revstone to its creditors (a path that all parties have acknowledged must

eventually occur), the attempted resolution of the plan gridlock has not produced

results, and additional time is unlikely to thaw this iceberg of gridlock.

   18. Specifically, as set forth during the omnibus hearing held on

October 16, 2013, in light of the professional fees that Revstone has accrued to date

in the Revstone bankruptcy case,[2] and the massive claims that have been asserted by the PBGC at each Debtor and at each of their non-Debtor affiliates within the corporate control group, confirmation of either plan is currently not possible. See Transcript of October 16, 2013 Hearing at 67-70 (excerpts of which are attached hereto as Exhibit A). Indeed, the PBGC has raised issues with respect to the size of its claims, estimated with the separately asserted claims of the DOL to total approximately $100 million, and with respect to the purported joint and several liability of Debtor and non-Debtor entities alike since the early days of the Revstone bankruptcy case. See Transcript of January 9, 2013, Hearing at 46-47 (excerpts of which are attached hereto as Exhibit B). Notwithstanding this and notwithstanding repeated assertions by the Debtors that progress is being made with the PBGC, to date, no progress has in fact been made by Revstone or any of the Debtors to resolve the significant disputes with the PBGC and the DOL. Instead, Revstone and its affiliates have continued fruitless litigation apparently designed only to further delay the ability of creditors, in this case the DOL and the PBGC, to obtain recovery on their claims. Moreover, as evidenced by the lack of any progress in reconciling the issues between the Debtor and the PBGC, earlier on the day of the filing of this Motion, the PBGC moved to convert Metavation's bankruptcy case.

---

[2] As set forth below, the Committee and BFG have objected to certain of the fees asserted on, among other grounds, proper allocation of such fees among the various Debtors and non-Debtor entities.

**E.       Objections to Retentions of Professionals and Fees of Professionals**

19.       The acrimony and litigation that have marked the Revstone bankruptcy case from its inception have led to numerous objections to professionals retentions and fee applications.  Indeed, on January 15, 2013, the Committee's request to retain WCSR as counsel met with an objection from Mr. George Hofmeister (Docket No. 145).  Following the Court's entry of an order approving the retention of WCSR (Docket No. 252) (the "WCSR Retention Order"), Mr. Hofmeister thereafter filed an appeal of the WCSR Retention Order.  Such appeal currently remains pending in the United States District Court for the District of Delaware.

20.       As noted above, on February 22, 2013, the Committee objected to the Debtors' retention of Huron as Revstone's financial advisor and chief restructuring officer.  Thereafter, both the United States Trustee and General Motors also objected to the retention of Huron.  Although the objections were ultimately resolved in the context of an attempted resolution of the then-pending issues in the Revstone bankruptcy cases, such resolution came only after extensive discovery and in the midst of a two day evidentiary hearing.

21.       Following the filing of the Metavation bankruptcy case, the Committee objected to the retention of all proposed professionals by Metavation. BFG joined in the Committee's objections with respect to the proposed engagement of Huron and Pachulski Stang Ziehl & Jones LLP ("Pachulski").  No orders have yet been entered with respect to such proposed professional retentions.

22.    Moreover, almost all of the fees of professionals retained in the Revstone case have been opposed.  Specifically, objections have been filed with respect to the following:

- To date, Pachulski has filed five (5) monthly fee applications (Docket Nos. 647, 663, 746, 982, and 1100) and two (2) quarterly fee applications (Docket Nos. 758 and 1117).  An objection has been filed to each and every Pachulski fee application.  Specifically, BFG has objected to every application.  See Docket Nos. 718, 853, 1048, 1147, and 1157.  The Committee has objected to Pachulski's third through fifth monthly fee applications and both quarterly fee applications.  See Docket Nos. 852, 896, 1052, 1146, and 1159.

- Huron has filed three (3) monthly staffing reports (Docket Nos. 958, 1075, 1089) and three (3) quarterly fee compensation reports (Docket Nos. 532, 1080 and 1161).  BFG has objected to all of Huron's monthly staffing reports filed since August 22, 2013 (Docket Nos. 1008, 1093 and 1124).  BFG has also objected to one of Huron's quarterly fee compensation reports (Dockets No. 1110).  The Committee also objected to one of Huron's quarterly compensation reports (Docket No. 1114) and the PBGC joined the Committee's objection (Docket No. 1115).  Objections to Huron's most recent quarterly fee compensation report (Docket No. 1161) are not due until December 4, 2013.

- To date, WCSR has filed ten (10) monthly fee applications and three (3) quarterly fee applications.  See Docket Nos. 512, 513, 514, 642, 643, 679, 828, 831, 832, 1050, 1077, 1101, and 1102.  Each WCSR fee application that has been filed since August 2013 has been objected to by the Debtor.  See Docket Nos. 918, 1084, 1123, 1165, and 1166.

23.    On October 22, 2013, the Court entered an order appointing a fee examiner (Docket No. 1122) (the "Fee Examiner Order").  However, the Debtors and the Committee could not agree on the terms of the Fee Examiner Order and it was only after a contested hearing that the Fee Examiner Order was entered.  See

Transcript of October 16, 2013 Hearing at 13-21 (excerpts of which are attached

hereto as Exhibit A).

**F.     Sale Objections and Cash Management Issues**

           24.     In the jointly administered Revstone bankruptcy case, four

sale motions were filed by the Debtors (Docket Nos. 241, 558, 652 and 797).  All of

these sale motions were contested.  Ultimately, the Court entered orders approving

the Debtors' requested sales of Greenwood and Metavation.  See Docket No. 634

(approving the sale of Greenwood); Transcript of August 30, 2013 Hearing at

37:16-18 (excerpts of which are attached hereto as Exhibit C) (approving the sale of

Metavation).  The Court denied the Debtors' requested appointment of an auctioneer

to sell assets of US Tool and also denied the Debtor's request for sale of non-debtor

Contech after holding two contested hearings on the Contech sale motion.  See

Transcript of March 1, 2013 Hearing at 46:10-12 (excerpts of which are attached

hereto as Exhibit D) (denying motion for appointment of auctioneer for US Tool);

Transcript of July 17, 2013 Hearing at 19:8-9 (excerpts of which are attached hereto

as Exhibit E)  (denying motion for the sale of Contech for the reasons stated on the

record at the June 26, 2013 hearing).

           25.     On December 5, 2012, Revstone filed a motion to maintain its

cash management system and bank account (Docket No. 6). At the first day hearing

on December 6, 2012, the Court entered an interim order authorizing Revstone to

maintain its cash management system and bank account (Docket No. 56).  On

January 7, 2013, the Committee objected to Revstone's motion to maintain its cash

management system and bank account (Docket No. 83) seeking, inter alia, to add

controls to payments made by the Debtors to Mr. Hofmeister and/or his family

members. On January 10, 2013, the Court entered a final order authorizing Revstone

to maintain its cash management system and bank account but only incorporating

certain pre-notice and objection periods for direct or indirect payments made to Mr.

Hofmeister and/or any of his family members. See Docket No. 102. On June 28,

2013, the Court entered an amended cash management order that permitted the

Debtors to reimburse Mr. Hofmeister for valid business expenses to the extent that

such expenses remained under $10,000.00 per month (Docket No. 711).[3]

26.    Revstone and certain of its debtor and non-debtor affiliates in

the above-captioned bankruptcy case have contributed funds (the "Health Care

Funds") to the Ascalon Health Plan and the Ascalon Dental Plan (collectively, the

"Health Care Plans"), both of which are controlled by Ascalon. As a result of its

investigation,[4] the Committee learned that Mr. Hofmeister caused certain of the

Health Care Funds to be used for purposes other than payments related to the Health

Care Plans.

27.    The first of the illegal transfers uncovered by the Committee

were three checks (dated February 15, 2013, February 20, 2013, and March 21,

---

[3]     Similar cash management orders were entered in the Greenwood and Metavation bankruptcy cases after the Committee requested the inclusion of the reimbursement controls language. See Revstone Docket No. 714 and Metavation Docket No. 246.

[4]     The Committee insisted on the right to review transfers to these accounts from the Debtors and to review transfers from these accounts in connection with Revstone's cash management order over the objection of the Debtors.

2013) with a collective value exceeding ten thousand dollars and made payable to

Triton Farms, LLC ("Triton Farms"), a non-Debtor affiliate of Ascalon, at the

direction of Mr. Hofmeister.  The Committee was subsequently informed by

professionals employed by the Debtors that these payments were made by Mr.

Hofmeister to pay tuition for his son at Harvard Business School and were not

related to the Health Care Funds.  Counsel for the Debtors subsequently informed the

Committee's professionals of additional improper and/or potentially improper post-

petition transfers from the Plan Accounts, including for individuals employed by

Triton Farms, LLC, upon information and belief, a non-debtor affiliate of the

Debtors, which total in excess of tens of thousands of dollars.  Upon further

information and belief, Mr. Hofmeister has yet to return the misappropriated Health

Care Funds.

       28.     Despite the fact that Mr. Hofmeister diverted Health Care

Funds, the Debtors have not initiated any litigation against Mr. Hofmeister to recover

those funds, nor have the Debtors apparently opened an investigation into any other

potential causes of action against Mr. Hofmeister.  Indeed, Mr. John C. DiDonato,

Revstone's Chief Restructuring Officer, admitted that there has been no investigation

with respect to claims that Revstone, Spara, Greenwood, or US Tool might hold

against Mr. Hofmeister or Ascalon.  See Transcript of September 16, 2013 Hearing

at 16:2-13; 24:8-18 (excerpts of which are attached hereto as Exhibit F); Deposition

of John C. DiDonato, September 12, 2013 at 17:19-22 (excerpts of which are

attached hereto as Exhibit G).

14

29.     Accordingly, the Committee filed a motion to reconsider (the "Motion to Reconsider") the cash management orders seeking, inter alia, to make clear that neither Mr. Hofmeister nor any of his family members should receive any compensation from the Debtors unless and until Mr. Hofmeister has restored all of the funds that were misappropriated from the Health Care accounts. See Docket No. 1071. Mr. Hofmeister objected to the Committee's Motion to Reconsider. See Docket No. 1085. Rather than agree that Mr. Hofmeister should not continue to be reimbursed by the Debtors while he still owed money for the misappropriated funds from the Health Care accounts, the Debtors also objected to the Motion to Reconsider arguing, inter alia, that the Motion to Reconsider was moot. See Docket No. 1090. On October 28, 2013, the Court entered a further amended cash management order prohibiting Revstone and/or its direct and indirect subsidiaries from making any further payments to Mr. Hofmeister or his family members. See Docket No. 1134.

## G.     BFG Motion to Convert and Numerous 2004 Requests

30.     On July 16, 2013, BFG filed a Motion to covert Greenwood and US Tool's chapter 11 cases to cases under chapter 7 of the Bankruptcy Code (Docket No. 760) (the "BFG Conversion Motion"). Thereafter, both the Debtors and the Hillsdale Salaried Pension Plan and Hillsdale Hourly Pension Plan objected to the conversion motion. After discovery, including depositions of Messrs. DiDonato and Lukenda and document discovery served on the Debtors, on September 17,

2013, the Court entered an order (Docket No. 1052) denying the BFG Conversion

Motion without prejudice.

31.     Not only has discovery been conducted with respect to

specific motions filed in the cases, the parties in interest, including the Debtors, the

Committee, and other significant creditors, have engaged in a series of examinations

under Bankruptcy Rule 2004, including the following:

- On January 2, 2013, the Committee filed an expedited motion for Rule 2004 examination of George Hofmeister to produce documents and appear for deposition upon oral examination (Docket No. 75) (the "Hofmeister Rule 2004 Motion"). On January 7, 2013, Mr. Hofmeister filed an objection to the Hofmeister Rule 2004 Motion. On January 8, 2013, the PBGC joined in the Committee's Hofmeister Rule 2004 Motion (Docket No. 92), and on January 14, 2013, the Court entered an order authorizing a Rule 2004 examination of Mr. Hofmeister (Docket No. 120).

- On January 16, 2013, the Committee filed under seal an emergency motion for Rule 2004 examination seeking entry of an order directing Revstone, Revstone Transportation, LLC, Metavation, and Contech Castings, LLC to produce documents and appear for deposition upon oral examination (Docket No. 125). Subsequent events rendered this Rule 2004 Motion moot and the Committee did not prosecute such motion.

- On January 18, 2013, the Committee filed a motion for Rule 2004 examination seeking entry of an order directing the Scott R. Hofmeister Irrevocable Trust, the Megan G. Hofmeister Irrevocable Trust, and the Jamie S. Hofmeister Irrevocable Trust to produce documents and appear for deposition upon oral examination (Docket No. 134) (the "Children's Trust Rule 2004 Motion"). On January 30, 2013, the trustee filed an objection to the Children's Trust Rule 2004 Motion (Docket No. 146). On February 6, 2013, the Court entered an order granting the Children's Trust Rule 2004 Motion (Docket No. 174).

- On January 18, 2013, the Committee also filed a motion for Rule 2004 examination of Ascalon (Docket No. 135) (the "Ascalon Rule 2004 Motion"). On January 30, 2013, Ascalon Enterprises, LLC filed an objection to the Ascalon Rule 2004 Motion (Docket No. 147). On

February 6, 2013, the Court entered an order granting the Ascalon Rule
2004 Motion (Docket No. 175).

- On March 12, 2013, Spara filed an expedited motion for Rule 2004
  examination of Sandeep Gupta, John Fernando, and Boston Finance
  Group, LLC (Docket No. 356) (the "BFG Rule 2004 Motion").  On
  March 18, 2013, BFG filed an objection to the BFG Rule 2004 Motion.
  On March 20, 2013, the Court entered a consensual order granting the
  BFG Rule 2004 Motion (Docket No. 411).

- On July 31, 2013, Revstone and US Tool filed a motion for Rule 2004
  examination of Patrick O'Mara and Seaboard Manufacturing, LLC
  (Docket No. 854) ("the "Seaboard Rule 2004 Motion").  On August 19,
  2013, Mr. O'Mara and Seaboard Manufacturing, LLC filed an objection
  to the Seaboard Rule 2004 Motion (Docket No. 933).  On August 23,
  2013, the Court entered an order granting the Seaboard Rule 2004 Motion
  (Docket No. 966).

- On September 17, 2013, Spara filed a motion for Rule 2004 examination
  of BFG (Docket No. 1053) (the "Lexington Rule 2004 Motion").  On
  October 9, 2013, the Committee filed a limited objection to the Lexington
  Rule 2004 Motion (Docket No. 1086).  On October 9, 2013, BFG
  objected to the Lexington Rule 2004 Motion (Docket No. 1088).  On
  October 15, 2013, the Debtors filed replies to the Committee and BFG's
  objections (Docket Nos. 1095 and 1096).  On October, 16, 2013, the
  Court granted, in part, the Lexington Rule 2004 Motion.  See Transcript
  of October 16, 2013 Hearing at 61:15-17 (excerpts of which are attached
  hereto as Exhibit A).

- On September 27, 2013, Patrick O'Mara filed a motion for Rule 2004
  examination of Revstone and US Tool (Docket No. 1072) (the "O'Mara
  Rule 2004 Motion").  On October 9, 2013, the Debtors filed an objection
  to the O'Mara Rule 2004 Motion (Docket No. 1087).  On October, 22,
  2013, after reconsidering the initial denial of the O'Mara Rule 2004
  Motion at the October 16, 2013 hearing, the Court partially granted the
  O'Mara Rule 2004 Motion (Doc No. 1121).

## RELIEF REQUESTED

32.     As evidenced by the docket of the Revstone bankruptcy case

and as outlined above, the Revstone bankruptcy case is mired in litigation.  By the

17

Motion, and for the reasons set forth herein, the Committee respectfully requests the

Court to enter an order pursuant to Bankruptcy Code section 1104(a) ordering

(A) the United States Trustee (i) after consultation with the Committee, to appoint

one disinterested person as chapter 11 trustee in this case under Bankruptcy Code

section 1104(a); and (ii) to seek approval of such appointment from this Court in

accordance with Bankruptcy Code section 1104(d) and Bankruptcy Rule 2007.1(c);

and (B) ordering Revstone to cooperate with the chapter 11 trustee and immediately

turn over to the chapter 11 trustee all records and property of the estate in its

possession or control as directed by the chapter 11 trustee.  In the alternative, and to

the extent that the Court determines that conversion of the Revstone bankruptcy case

is in the best interests of creditors and will lead to a more efficient resolution of the

Revstone bankruptcy case and the related disputes detailed herein, the Committee

respectfully requests that the Court enter an order pursuant to Bankruptcy Code

section 1112(b) and Bankruptcy Rules 1017 and 1019 converting Revstone's chapter

11 case to a case under chapter 7 of the Bankruptcy Code.

<strong>ARGUMENT</strong>

I.     **IN LIGHT OF THE CONTINUED AND OVERWHELMING ACRIMONY, THE COURT SHOULD APPOINT A CHAPTER 11 TRUSTEE.**

    A.     **Legal Standards Governing Appointment of a Chapter 11 Trustee**

        33.     Bankruptcy Code section 1104 establishes grounds for the

appointment of a trustee.  Specifically, section 1104(a) provides as follows:

18

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

34.    Bankruptcy Code section 1104, therefore, establishes two independent grounds for the appointment of a trustee. Bankruptcy Code section 1104(a)(1) provides for the mandatory appointment of a trustee when "cause" exists. See 11 U.S.C. § 1104(a)(1). Additionally, Bankruptcy Code section 1104(a)(2) affords the Court a flexible standard whereby the Court has discretion to appoint a trustee in the absence of cause when such appointment is in the best interests of the parties. See 11 U.S.C. § 1104(a)(2).

35.    While Bankruptcy Code section 1104(a)(1) expressly identifies four bases upon which "cause" may be found – fraud, dishonesty, incompetence, and gross mismanagement – those enumerated grounds are not exclusive, and the Bankruptcy Code grants courts discretion in the decision whether "cause" exists to appoint a trustee to protect creditors while also affording debtors a chance of reorganizing. See Marvel Entm't Grp., Inc., 140 F.3d at 472-73 (noting

19

that it is within discretion of the bankruptcy court to appoint a trustee for reasons not enumerated in Bankruptcy Code).  Courts determine whether such additional grounds for the appointment of a chapter 11 trustee exist on a case-by-case basis. See In re V. Savino Oil & Heating Co., 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989) ("Under § 1104(a)(1), the words "including" and "or similar cause" before and after the enumerated examples of cause and 11 U.S.C. § 102(3) indicate that the grounds for appointing a reorganization trustee are not even limited to the derelictions specifically enumerated."); In re Sharon Steel Corp., 871 F.2d 1217, 1226 (3d Cir. 1989) (finding the decision to appoint a trustee "must be made on a case-by-case basis" and that the bankruptcy court has discretion "to appoint a trustee when to do so would serve the parties' and estate's interests.").

36.     Once a court finds that "cause" exists, a trustee shall be appointed under the clear language of Bankruptcy Code section 1104.  See 11 U.S.C. § 1104(a).  In that event, a bankruptcy court has no discretion and must grant the requested relief.  See Savino Oil, 99 B.R. at 525 (holding that a trustee must be appointed if cause is shown); In re Deena Packaging Indus., Inc., 29 B.R. 705, 706 (Bankr. S.D.N.Y. 1983) ("appointing a trustee for cause is not a discretionary function").

37.     For the reasons set forth more fully below, the appointment of a chapter 11 trustee is appropriate under the circumstances, pursuant to either Bankruptcy Code section 1104(a)(1) or Bankruptcy Code section 1104(a)(2).

Accordingly, the Committee respectfully requests that the Court grant the Motion and appoint a chapter 11 trustee in the Revstone bankruptcy case.

**B.**     **The Acrimony In The Revstone Bankruptcy Case Justifies The Appointment Of A Chapter 11 Trustee.**

38.     The acrimony that exists between Revstone, on the one hand, and its most significant creditors and the Committee, on the other hand, provides sufficient "cause" for the appointment of a trustee.  That acrimony is evident from even a cursory review of the docket of the Revstone bankruptcy case and from the transcripts of the hearings in such case, as set forth above.  Moreover, that acrimony has only increased and the positions of the parties have only hardened as the case has continued and as the prospect for any recovery for Revstone's unsecured creditors has become increasingly dim.

39.     As noted above, and as this Court has already observed, where there is sufficient "acrimony" between the creditors and a debtor, courts have not hesitated to appoint a trustee.  See, e.g., Marvel Entm't Grp., Inc., 140 F.3d at 472-73; In re Plaza de Retiro, Inc., 417 B.R. 632, 640-41 (Bankr. D.N.M. 2009) ("[t]he Court has observed that acrimony between a debtor-in-possession's management and the creditors that impedes the reorganization effort has routinely been found to constitute a ground for appointing a trustee."); Petit v. New England Mortg. Servs., Inc. (In re Petit), 182 B.R. 64, 70 (D. Me. 1995) ("deep-seeded conflict and animosity between a debtor and its creditors provides a basis for the appointment of a trustee."); In re Biolitec, Inc., Case No. 13-11157 (DHS), 2013 WL

1352302, at *13 (Bankr. D.N.J. Apr. 3, 2013) (appointing trustee due to deep-seeded conflicts between the parties and their inability to resolve such conflicts). Acrimony exists "when the inherent conflicts extend beyond the healthy conflicts that always exist between debtor and creditor, or . . . when the parties begin working at cross-purposes" and that acrimony or lack of cooperation jeopardizes the reorganization process. Id.; see also In re Bellevue Place Assocs., 171 B.R. 615, 625 (Bankr. N.D. Ill. 1994) (parties were at a standstill on reorganization efforts and a "disinterested trustee was required to unfreeze and facilitate the decision making process"); In re Emerging Commc'n, No. 06-30007-JKF, 2007 Bankr. LEXIS 4763, at *26-27 (Bankr. D.V.I. Feb. 13, 2007) (appointing a trustee where "the parties [were] embarked on a course of litigation in [the] cases which, coupled with the acrimony between them, clearly and convincingly demonstrate[d] to the court that a neutral party [was] needed to investigate and determine whether or not to pursue (or defend, as the case may be) actions on behalf of the estates.").

      40.    In Marvel Entertainment, the Third Circuit Court of Appeals affirmed the appointment of trustee due to the "deep-seeded conflict and animosity," between the debtors and its creditors. 140 F.3d at 473. The Court of Appeals stated, "[t]he intense and high stakes bickering between the [debtor] interests and the Lenders does not instill confidence that the [debtor] interests could fairly negotiate with the creditors to whom they owe [fiduciary] duties, nor that reorganization will occur effectively." Id. at 474; see also In re Nartron Corp., 330 B.R. 573, 590-91 (Bankr. W.D. Mich. 2005) (ordering the appointment of a trustee in light of "the

parties' inability to reach a consensus about anything; the flinging of accusations at

each other; and the failure to demonstrate any ability to resolve matters

cooperatively, [the Court] conclude[s] that there is no reasonable likelihood of any

cooperation between the parties in the near future").

       41.     In <u>Petit</u>, the Court stated that "[w]hile some degree of

antagonism and animosity between a debtor and creditor can be expected in any

bankruptcy proceeding, it has reached a particular intensity [in this case] which is

complicating efforts to 'reorganize' the Debtor." <u>Petit</u>, 182 B.R. at 70.

Accordingly, the <u>Petit</u> court found that appointment of a trustee may have been the

only way to ensure reorganization would proceed and affirmed the bankruptcy

court's appointment of a chapter 11 trustee.  <u>Id.</u>  Likewise, in <u>The Bible Speaks</u>, the

Bankruptcy Court for the District of Massachusetts appointed a chapter 11 trustee in

a case when the court found that "[f]riction [had] developed between the Debtor and

the Creditors' Committee which threaten[ed] to engulf [the] estate in costly and

legalistic bickering over the entire range of the reorganization process." <u>In re The</u>

<u>Bible Speaks</u>, 74 B.R. 511, 512 (Bankr. D. Mass. 1987).  The court concluded that

the need for a neutral party to mediate the disputes between the parties was ground

for appointment of a trustee.  <u>Id.</u> at 513.

       42.     The acrimony that supported the appointment of a trustee in

<u>Marvel</u>, <u>Petit</u>, and <u>The Bible Speaks</u> is, unfortunately, present in the Revstone

bankruptcy case as well.  Moreover, such acrimony shows no signs of abating.

Indeed, such acrimony has recently devolved into a "maelstrom of litigation" that "in

23

the grand scheme of things . . . is a sideshow." Transcript of October 16, 2013

Hearing at 53-54 (excerpts of which are attached hereto as Exhibit A). While such

litigation may not be advancing the ball in the Revstone case by furthering the ability

of any party to confirm either of the pending plans in the near term, such litigation

certainly is increasing an already exorbitant amount of accrued professional fees in

the Revstone bankruptcy case. Such fees will only continue to increase as parties

litigate over pending fee requests, arguably speculative causes of action, additional

exclusivity requests, and two pending plans, neither of which can currently be

confirmed.

43.     The disputes between and among the Debtors, the Committee,

the Debtors' customers, significant creditors, regulatory agencies, and other parties

in interest, are out of proportion to the claims and assets at issue in the Revstone

bankruptcy case. Nonetheless, these disputes continue, the Revstone case gets no

closer to a resolution, and the recoveries for unsecured creditors of Revstone, if any,

continue to fade.

44.     Based on the unabated acrimony and litigation that has

plagued the Revstone bankruptcy case from its inception, as summarized above,

"cause" exists for the appointment of a chapter 11 trustee. The Committee,

therefore, respectfully requests that the Court enter an order, substantially in the form

contemporaneously filed herewith providing for the immediate appointment of a

chapter 11 trustee in the Revstone bankruptcy case in accordance with the terms of

such order.

C.    **The Court Also Should Appoint A Trustee Under 11 U.S.C.
§ 1104(a)(2) Because Such Appointment Is In The Interests Of
The Estate And All Other Parties.**

45.    Even when "cause" to appoint a trustee is not otherwise
established under Bankruptcy Code section 1104(a)(1), Bankruptcy Code section
1104(a)(2) creates a flexible standard that authorizes the Court to appoint a trustee
when it is in the best interests of the creditors and the estate to do so.  See 11 U.S.C.
§ 1104(a)(2); Sharon Steel Corp., 871 F.2d at 1226; In re Cardinal Indus., Inc., 109
B.R. 755, 767 (Bankr. S.D. Ohio 1990); Microwave Prods. of Am., Inc., 102 B.R.
666, 675 (Bankr. W.D. Tenn. 1989).

46.    In determining the best interests of creditors and the estate,
courts "resort to [their] broad equity powers . . . equitable remedies are a special
blend of what is necessary, what is fair and what is workable."  In re Hotel Assocs.,
Inc., 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980); see In re Wings Digital Corp., Case
No. 05-12117 (ALG), 2005 Bankr. LEXIS 3476, at *14 (Bankr. S.D.N.Y. May 16,
2005) (section 1104(a)(2) is a "lesser standard" than section 1104(a)(1)).  In
exercising these broad equitable powers to appoint a trustee under Bankruptcy Code
section 1104(a)(2), courts "eschew rigid absolutes and look to the practical realities
and necessities inescapably involved in reconciling competing interests."  Hotel
Assocs., 3 B.R. at 345.

47.    Courts consider numerous factors when determining whether
to appoint a trustee under Bankruptcy Code section 1104(a)(2), including: (i) the
trustworthiness of the debtor, In re Evans, 48 B.R. 46, 48 (Bankr. W.D. Tex. 1985);

(ii) the debtor-in-possession's past and present performance and prospects for the debtor's rehabilitation, see In re Parker Grande Dev., Inc., 64 B.R. 557, 561 (Bankr. S.D. Ind. 1986); In re L.S. Good & Co., 8 B.R. 312, 315 (Bankr. N.D. W. Va. 1980); (iii) the confidence – or lack thereof – of the business community and of creditors in present management, see In re Concord Coal Corp., 11 B.R. 552, 554 (Bankr. S.D. W. Va. 1981); and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment, see Microwave Prods. of Am., 102 B.R. at 675; see also In re Sharon Steel Corp., 86 B.R. 455, 466 (Bankr. W.D. Pa 1988) ("[i]n a case of this magnitude, the cost of having a trustee in place is insignificant when compared with the other costs of administration and when compared with the enormous benefit to be achieved by the establishment of trust and confidence in . . . management."); In re Ionosphere Clubs, Inc., 113 B.R. 164, 168; In re Madison Mgmt., 137 B.R. 275, 282 (Bankr. N.D. Ill. 1992).

48.     Besides placing the Revstone bankruptcy case in the hands of an able and trusted fiduciary, the appointment of a trustee in such case will likely decrease litigation and control costs and increase the confidence of creditors and other parties in interest.  See In re Colorado-Ute Elec. Ass'n, Inc., 120 B.R. 164, 177 (Bankr. D. Colo. 1990); see also Microwave Prods. of Am., 102 B.R. at 676 (appointing trustee under Bankruptcy Code section 1104(a)(2) "[b]ecause of the erosion of confidence in the debtor, there is likely to be increased litigation which will result in escalating legal costs to the estate").

26

49.     Here, the benefits of the appointment of a chapter 11 trustee to creditors of Revstone would greatly outweigh the burden to Revstone from such appointment.  Among other things, the appointment of a trustee to resolve remaining disputes and address the recovery of claims (including the pursuit, if appropriate, of causes of action against insiders).  Revstone would provide critical creditor parties, including the PBGC, with the assurance that a truly independent fiduciary was managing Revstone.  This assurance would, in turn, likely open up channels of communication between such trustee and significant creditors, including PBGC, the DOL, the fiduciaries for the pension plans, and BFG, that have been closed in this case for a significant period of time.

50.     In short, the Committee believes that the appointment of a chapter 11 trustee would also allow for an unbiased evaluation of the prospects for recovery for unsecured creditors of Revstone.  Moreover, and critically, such an appointment would reassure creditors of Revstone that valuable causes of action available to Revstone and its subsidiaries would be impartially evaluated and, if appropriate, promptly pursued.  Finally, a trustee appointed at Revstone could also take any necessary steps to preserve value for creditors of Revstone, including, as necessary, causing bankruptcy cases to be filed for non-Debtor subsidiaries and addressing various intercompany issues and disputes, including disputes and potential disputes between and among Spara, Revstone, and Metavation.

51.     The appointment of a trustee would also decrease litigation and help control costs.  The two competing plans that have been filed by the

27

Committee and Revstone are currently unable to be confirmed because of the amount of professional fees in this case.  See Transcript of October, 16, 2013 Hearing, at 66-73 (excerpts of which are attached hereto as Exhibit A).  Further, as this Court has observed before, "the costs of prosecuting the case impair[s] everyone's ability to move forward and get out."  See Transcript of October 16, 2013 Hearing, at 78:7-11 (excerpts of which are attached hereto as Exhibit A).  If the parties continue to litigate issues further, the already nearly insurmountable professional fees in this case will only continue to grow and become an even larger obstacle to a successful conclusion of the Revstone bankruptcy case.  For these reasons as well, the Court should appoint a chapter 11 trustee.

## II.    REVSTONE'S CASE SHOULD BE CONVERTED TO A CHAPTER 7 CASE.

52.    To the extent that the Court does not believe that the appointment of a trustee in the Revstone bankruptcy case would further the efficient resolution of such bankruptcy case and facilitate a prompt distribution to creditors of Revstone, the Court should convert the Revstone bankruptcy case to a case under chapter 7 of the Bankruptcy Code.

### A.    Legal Standards Governing the Conversion of a Chapter 11 Case to a Chapter 7 Case

53.    Bankruptcy Code section 1112(b) governs motions to convert. That section provides that:

> [O]n request of a party in interest, and after notice and hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best

> interests of creditors and the estate, the court shall convert a case
> under this chapter to a case under chapter 7 or dismiss a case under
> this chapter, whichever is in the best interests of creditors and the
> estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1).

54.     While chapter 11 provides "a medium for negotiation and an opportunity to better accommodate the interests of a broad range of constituents by potentially preserving the value of the debtor as a going concern" the Bankruptcy Code through section 1112(b) "does not guarantee this result or even require its pursuit beyond the point at which the costs are not justified or the intended benefits of the process are unlikely to be obtained." See Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶ 1112.04[5b],(16th ed. rev. 2013).

55.     Moreover, "Congress has purposefully limited the role of this Court in deciding issues of conversion or dismissal, such that the Court has no choice, and no discretion, in that it 'shall' dismiss or convert a case under Chapter 11 if the elements for 'cause' are shown under 11 U.S.C. § 1112(b)(4)." In re TCR of Denver, LLC, 338 B.R. 494, 498 (Bankr. D. Colo. 2006) (emphasis in original); see also In re Am. Capital Equip., LLC, 688 F.3d 145, 161 n. 9 (3d Cir. 2012) ("The 2005 and 2010 amendments to the statute require that in given circumstances 'the court shall' convert or dismiss a case.") (emphasis in the original).

56.     In determining whether to covert a case, Bankruptcy Code section 1112(b) requires the Court to undertake a two-step process in which the Court first determines whether there is "cause" to convert or dismiss, and next

decides whether appointment of a trustee, conversion, or dismissal furthers "the best interest of creditors and the estate." See In re SGL Carbon Corp., 200 F.3d 154, 159 n. 8 (3d Cir. 1999). Although "cause" is not defined, Bankruptcy Code section 1112(b) identifies sixteen examples of conduct that constitute cause. Importantly, a party requesting conversion of a case need not demonstrate that all sixteen enumerated examples of cause exist. See In re Jayo, Case No. 06 200051 (TLM), 2006 Bankr. LEXIS 1996, at *21, 23-24 (Bankr. D. Idaho July 28, 2006) (finding that the "and" at the end of section 1112(b)(4) "must be read as an 'or'" because, among other things, "reading the 'and' in § 1112(b)(4)(O) as written would negate the opening language of § 1112(b)(4)" which says that cause "includes" the enumerated circumstances). Instead, it is sufficient for a movant to demonstrate that just one of the types of conduct described in that section has occurred. See 7 Collier on Bankruptcy ¶ 1112.04[4] ("If one of the enumerated examples of cause set forth in section 1112(b)(4) is proven by the movant by a preponderance of the evidence, the court must find that movant has established cause. The court may have discretion in determining what additional circumstances, not enumerated in section 1112(b)(4), constitute cause.").

57.    Moreover, the list is not exhaustive. Am. Capital Equip., 688 F.3d at 161-62 (3d Cir. 2012) (holding that section 1112(b) "provides a non-exhaustive list of grounds for finding 'cause' to convert" and that "inability to effectuate a plan" is valid cause). As set forth herein, to the extent that the Court

does not appoint a trustee to take control of the Revstone bankruptcy cases, the Court

should convert such case for cause.

      **B.**     **"Cause" To Convert The Revstone Bankruptcy Case Exists
Because The Estate Is Suffering A Substantial And Continuing
Loss and Has No Reasonable Likelihood of Rehabilitation.**

      58.     The Bankruptcy Code mandates the conversion of a chapter 11

case where there is: (1) "substantial or continuing loss to or diminution of the

estate;" and (2) "the absence of a reasonable likelihood of rehabilitation." 11 U.S.C

§ 1112(b)(4)(A); see also In re AdBrite Corp., 290 B.R. 209, 215 (Bankr. S.D.N.Y.

2003) (holding that cause existed to convert a chapter 11 case where the debtor had

no employees, no contracts to provide advertising services, and its only asset was a

patent). In this case, as set forth herein, the Revstone estate continues to hemorrhage

funds through ever increasing professional fees while advancing no closer to

confirmation of either of the plans proposed by the Committee and Revstone,

respectively. Thus, absent the appointment of an independent fiduciary who can

evaluate both pending plans, the various claims and causes of action that have been

asserted by and against Revstone, and the prospects for recovery by unsecured

creditors of Revstone under any conceivable scenario, Revstone likely cannot

reorganize. Moreover as set forth herein, there is no reasonable likelihood that

Revstone can at this point ever be rehabilitated.

      59.     In order to show a "substantial or continuing loss to or

diminution of the estate" the moving party must show that debtor is operating with a

sustained negative cash flow or diminution in asset value after the commencement of

the case.  In re Gateway Solutions, Inc., 374 B.R. 556, 564 (Bankr. M.D. Pa. 2007)

(emphasis added).  A debtor's limited amount of cash on-hand and lack of a reliable

source of income combined with the costs and expenses related to the bankruptcy

case, including the professional fees, can and in this case does establish a substantial

and continuing loss to or diminution of the estate.

       60.     The second prong of Bankruptcy Code section 1112(b)(4)(A)

requires the absence of a reasonable likelihood of rehabilitation.  "Rehabilitation"

does not mean "reorganization" and does not include liquidation.  Loop Corp. v.

United States Trustee, 379 F.3d 511, 515-16 (8th Cir. 2004).  Instead, in order to be

"rehabilitated," a Debtor's viability as a business enterprise must be restored.  Id.  A

debtor "should not continue in control of its business beyond a point at which

reorganization no longer remains realistic," at the expense of creditors.  AdBrite

Corp., 290 B.R. at 215.

       61.     There is no set of reasonable circumstances under which

Revstone can return to a functioning business enterprise.  Indeed, both filed plans

contemplate nothing other than the liquidation of substantially all of the assets of

Revstone's subsidiaries.  Moreover, in this instance, the Revstone estate and its

creditors continue to suffer a "substantial and continuing loss to or diminution of the

estate" as professional fees continue to accrue while the revenues required to pay

these claims fail to materialize.  Specifically, to date, Revstone's professionals

(Huron and Pachulski) have accumulated more than $12,207,024.13 in fees.[5]  While

Revstone's estate does own membership interests in subsidiaries, it has not generated

sufficient income from those subsidiaries on an ongoing basis to cover the

professional fees.[6]

        62.     Moreover, with respect to direct and indirect subsidiaries of

Revstone, the proceeds from any sales of such subsidiaries have not been distributed

upstream to Revstone because of the unsecured claims asserted against those

subsidiaries, including those claims asserted by the PBGC.  Indeed, the Committee

and Revstone agree that at this point continuing to negotiate the terms of a

liquidating plan and acceptable disclosure statement, while the prospects for funding

such plan in the face of an unresolved series of claims by the PBGC and the DOL

and increasing professional fees, is an unproductive task that only contributes to the

ever-growing expenses in this case.  See Transcript of October 16, 2013 Hearing, at

66:6-24; 69:17-25; 70:1-15 (excerpts of which are attached hereto as Exhibit A).

Absent resolution of these issues, which resolution appears impossible, allowing the

---

[5]     This figure only reflects the requested fees for Revstone's professionals, i.e., Pachulski and Huron.  Pachulski has sought $2,767,814.25 in compensation, which reflects services performed only through May 31, 2013 (the last month for which Pachulski has filed a fee application).  See Various Pachulski Fee Applications (Docket Nos. 647, 663, 745, 982, and 1100).  Huron has sought $9,439,209.88 in compensation with respect to services performed from January 17, 2013, through September 30, 2013.  See Various Huron Staffing Reports (Docket Nos. 562, 1080, and 1161).

[6]     Fee applications that have been filed to date in this case reflect an accumulation of an average of approximately $2,132,000.00 in professional fees per month, i.e., almost $70,000.00 per day, accounting for fees of the various professionals employed in the Revstone bankruptcy case.

Revstone bankruptcy case to continue as a chapter 11 case only further impairs the ultimate recovery that Revstone unsecured creditors may realize on their claims.

63.    Thus, because the growing tab for professional fees and expenses nominally incurred at Revstone diminishes the Revstone estate each day and there is no likelihood of rehabilitation, the Revstone bankruptcy case should be converted to a case under chapter 7 of the Bankruptcy Code.

C.    **Cause To Convert The Case Exists Because Revstone Has Been Unable To Effectuate A Confirmable Plan.**

64.    Cause for conversion also exists under Bankruptcy Code section 1112(b) when the Court finds that a proposed plan is unworkable or that the proposal of an effective plan is impossible.  See Am. Capital Equip., 688 F.3d at 162 ("The Bankruptcy Court did not abuse its discretion in determining that there was cause to convert on the basis that Appellants have been unable to propose a confirmable plan, and will be unable to do so in the future."); In re 3 Ram, Inc., 343 B.R. 113, 117-18 (Bankr. E.D. Pa. 2006) ("While no longer an enumerated ground under amended § 1112, conversion or dismissal of a [c]hapter 11 bankruptcy case is appropriate where the court finds that the proposed plan is not feasible and that a feasible plan is not possible.") (internal citations omitted).

65.    Further, if a "[c]hapter 11 case cannot achieve reorganization within the statutory requirements of the Code, then there is no point in expending estate assets on administrative expenses, or delaying creditors in the exercise of their nonbankruptcy law rights." 3 Ram, 343 B.R. at 118.  Debtors do not have an

34

unlimited amount of time to propose a confirmable plan. In re L.B.G. Props., 72 B.R. 65, 68 (Bankr. S.D. Fla. 1987) ("Chapter 11 offers a beleaguered debtor an opportunity to attempt reorganization of its debts. It does not guarantee success nor does it provide an unlimited opportunity to seek a successful solution.").

66.      In this case, two plans have been proposed, one by Revstone and one by the Committee. Neither plan is confirmable because allowed administrative claims, including professionals' fees, must be paid in full in order to confirm a plan, unless the holder of the claim has agreed to different treatment. Although the majority of professional fees in the Revstone bankruptcy case are subject to pending objections, the delay and cost in litigating such objections would serve only to further the administrative insolvency of the Revstone estate.

67.      In addition, although the Committee's professionals are willing to waive the requirement that their fees and expenses be paid in full (or reserved in full) in order for the Committee's plan to be confirmed and become effective, professionals employed by Revstone have not agreed to any such delayed or otherwise reduced payment. This has resulted in a standstill where attempts to even negotiate a consensual plan have ceased. See Transcript of October 16, 2013 Hearing, at 66:21-25 ("And I think Mr. Desgrosseilliers and I agree, that, you know, going forward with disclosure statements at this point, before we see more where the case is going, probably doesn't make sense.") (excerpts of which are attached hereto as Exhibit A). Notwithstanding that negotiations have ended regarding any possible consensual or joint plan, parties in the Revstone bankruptcy case continue to litigate

35

issues, and professional fees continue to accrue, making a confirmable plan less and less likely each day.

68.     Both Revstone and the Committee have had ample time to negotiate towards a workable reorganization under the Bankruptcy Code.  The Committee and Revstone have failed to do so successfully.  Because Revstone has failed to effectuate a feasible plan and because the formulation of a confirmable plan appears impossible, if the Court will not appoint a trustee to take charge of the Revstone bankruptcy case, the Committee believes that it is in the best interests of the Revstone estate and its creditors to convert this chapter 11 case to a case under chapter 7 of the Bankruptcy Code.

## RESERVATION OF RIGHTS

69.     The Committee reserves its right to amend or supplement, through and including the date of any hearing on the Motion, any of the factual recitations or legal arguments contained herein.

36

WHEREFORE, the Committee requests that the Court enter an order substantially in one of the forms annexed hereto, (i) either appointing a chapter 11 trustee, or, in the alternative, converting this case from a chapter 11 case to a chapter 7 case; and (ii) granting the Committee such further relief as the Court deems just and proper.

Dated:  November 20, 2013

**WOMBLE CARLYLE SANDRIDGE & RICE, LLP**

/s/ Mark L. Desgrosseilliers
Mark L. Desgrosseilliers (DE Bar No. 4083)
Matthew P. Ward (DE Bar No. 4471)
Ericka F. Johnson (DE Bar No. 5024)
222 Delaware Avenue, Ste. 1501
Wilmington, DE  19801
Telephone:  (302) 252-4320
Facsimile:  (302) 661-7738
E-mail: mdesgrosseilliers@wcsr.com
E-mail: maward@wcsr.com
E-mail: erjohnson@wcsr.com

Counsel for the Official Committee of Unsecured Creditors of Revstone Industries, LLC

37