IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVSTONE INDUSTRIES, LLC, et al.,[1] | ) | Case No. 12-13262 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Related Docket No. 1167** |

**Objection Deadline: December 4, 2013, at 4:00 p.m. (prevailing Eastern time)**
**Hearing: December 11, 2013 at 10:00 a.m. (prevailing Eastern time)**

**OPPOSITION OF REVSTONE INDUSTRIES, LLC TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO (I) APPOINT A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. §§ 1104(a)(1) OR 1104(a)(2); OR, ALTERNATIVELY, (II) CONVERT CASE TO CHAPTER 7 PURSUANT TO 11 U.S.C. §§ 1112(b)(1) AND 1112(b)(4)(A)**

Revstone Industries, LLC (the "Debtor" or "Revstone"), one of the above-captioned debtors and debtors in possession, hereby submits this objection to the *Motion of the Official Committee of Unsecured Creditors to (I) Appoint a Chapter 11 Trustee Pursuant to 11 U.S.C. §§ 1104(a)(1) and 1104(a)(2) or, Alternatively, (II) Convert Case to Chapter 7 Pursuant to 11 U.S.C. §§ 1112(b)(1) and 1112(b)(4)(A)* [Docket No. 1167] (the "Trustee Motion") filed by the Official Committee of Unsecured Creditors (the "Committee") on November 20, 2013.[2] In response to the Trustee Motion, the Debtor respectfully represents as follows:

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's federal tax identification number are: Revstone Industries, LLC (7222); Spara, LLC (6613); Greenwood Forgings, LLC (9285); and US Tool & Engineering, LLC (6450). The location of the Debtors' headquarters and the service address for each of the Debtors is 2250 Thunderstick Dr., Suite 1203, Lexington, KY 40505.

[2] Unless otherwise noted, capitalized terms used herein have the meanings ascribed in the Motion.

1

**Preliminary Statement**

1.      This is the Committee's second motion for appointment of a chapter 11 trustee or conversion.  The first was filed on February 4, 2013, shortly after the Committee was organized.  It was, transparently, a continuation of the dispute between the Chair of the Committee, Boston Financial Group, LLC ("BFG"), and the Debtor's principal, George Hofmeister ("Hofmeister").  Since that time, despite Hofmeister's removal and the transfer of management authority and duties to an independent Chief Restructuring Officer and independent managers, the Committee and/or BFG have reflexively opposed actions for which the Debtor has sought approval, no matter how routine.  Ironically, the Committee now renews its request for the appointment of a trustee based on its serial objections (and those of certain of its members), many of which were not filed in this case and most of which are not even pending.  If that were sufficient, a creditor's formula for obtaining a trustee would be simple: object incessantly in order to create a track record of acrimony.

2.      Under sections 1104(a)(1) and 1104(a)(2) of the Bankruptcy Code, the Committee bears the burden of proving by clear and convincing evidence that "cause" exists for the appointment of a chapter 11 trustee or that such appointment is in the best interests of the estate.  The Committee does not remotely satisfy this high standard.  Its objections to the employment and payment of professionals, its prior trustee motion, sale objections by or for BFG and a handful of Rule 2004 examinations do not resemble the level of acrimony and gridlock found in cases such as *Marvel Entertainment Group*.  Unlike cases where acrimony arises from

incompatible agendas, the Debtor's goal in this case is virtually identical to the Committee's: the sale of assets and confirmation of a plan that distributes the available proceeds to creditors and transfers corporate governance control to the creditors' representatives. Present management has already completed or is in the midst of the necessary work, and it is beyond dispute that it can be completed most efficiently and competently by present management and counsel. The Committee cannot identify any savings occasioned by the appointment of a trustee that would outweigh the administrative expenses of a trustee and newly retained professionals, particularly at this advanced stage of the case. In particular, appointment of a trustee would not solve the plan funding issue that the Committee concedes is the real impediment to confirmation of a plan. In fact, this newest bout of litigation has no apparent utility, other than to expose the Debtor's professionals to greater risk in the furtherance of the Committee's and BFG's demands for dramatic fee discounts to facilitate plan confirmation. This cynical play for leverage should not be countenanced by the Court.

### Background

3.      On December 3, 2012, Debtors Revstone and Spara, LLC ("Spara") commenced their cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On January 7, 2013, Debtors Greenwood Forgings, LLC ("Greenwood") and US Tool and Engineering, LLC ("US Tool") commenced their cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in

DOCS_LA:273463.9 73864/001

the possession of their property and have continued to operate and manage their business as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.[3]

4.      On December 18, 2012 the United States Trustee appointed an Official

Committee of Unsecured Creditors in the case of Revstone Industries, LLC (the "Committee").

No committee has been appointed in the cases of and Spara, LLC, Greenwood Forgings, LLC

and US Tool and Engineering, LLC.  No trustee or examiner has been appointed in any of the

Debtors' chapter 11 cases.

5.      The Debtor and its affiliates (collectively referred to herein as the

"Company") are or were premier designers and manufacturers of highly engineered components

for the automotive, aerospace, energy, military, defense and transportation industries.  Certain

affiliates specialize in thermoform plastics, forging, casting, fabricating and molding of various

types of ferrous and non-ferrous metals, as well as the performance of precision machining and

fabrication.

6.      In the Trustee Motion, the Committee recites its allegations of improper

conduct by Hofmeister pre-dating current management, including (a) transfers of assets to or

from his children's trusts, (b) misuse of pension funds, (c) objections to BFG's collection

actions; or (d) efforts to dispose of assets of the Debtor's subsidiaries and affiliates for self-

interested purposes.

---

[3] On July 22, 2012, Debtors' affiliate TPOP, LLC f/k/a Metavation, LLC ("Metavation") commenced its cases by
filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Metavation chapter 11 case is not
administratively consolidated with the Debtors' cases.

4

7.      On January 17, 2013, the Debtor amended its operating agreement to replace Hofmeister (formerly President) with John DiDonato of Huron Consulting Group ("Huron"), as Chief Restructuring Officer ("CRO"). Most other senior officers of the Debtor also were replaced by professionals from Huron. At about the same time, Pachulski Stang Ziehl & Jones LLP ("PSZJ") substituted into the case as Debtor's bankruptcy counsel. Pursuant to the amendment, the boards of managers of the Debtor and its affiliates were replaced with two independent board members (James Shein and Richard Newsted) who have sole authority over all bankruptcy and restructuring-related decisions. Hofmeister has now resigned altogether from the boards of Revstone and Spara. As to the latter, a Hofmeister proxy (a trustee of the family trusts) has filed a motion to appoint a replacement and remove DiDonato and Huron, to be heard concurrently herewith. Such motion, presumably resulting from equity's dissatisfaction with the actions of the CRO under the oversight of the independent managers taken in accordance with their independent business judgment and taking into account their duties, belies the Committee's allegations that DiDonato and Huron lack independence from Hofmeister.

8.      The Debtor's management and its counsel have been and continue to be actively engaged in comprehensive efforts to sell or maintain and preserve for sale the value of the assets of the Debtor and its non-debtor subsidiaries. Among other things, management has undertaken the following:

- Negotiated with significant OEM customers of Metavation, LLC (a Revstone indirect subsidiary) and developed a sale transaction support agreement whereby the OEM customers contributed significant resources to support a sale of Metavation and other affiliates and subsidiaries. Placed Metavation into chapter 11 on July 22, 2013 to facilitate the sale and obtained court approval over the

objections of the Committee, BFG and the PBGC. The sale resulted in net purchase price consideration of $22.3 million. Metavation's remaining asset, the Vassar Foundry, is currently being marketed and negotiations for its sale are underway.

- Completed the marketing, auction and sale of the assets of Greenwood Forging (a Revstone subsidiary) to Angstrom Automotive Group for $4.1 million – substantially more than the stalking horse bid – and negotiated with BFG for an agreement that permitted an immediate distribution of approximately 85% of the proceeds to BFG in partial satisfaction of BFG's secured claim, and the retention by the estate of $575,000. The Court approved the sale on May 30, 2013.

- Developed alternatives for the auction of assets of US Tool (a Revstone subsidiary), negotiated the retention of an auctioneer for the assets, litigated BFG's relief from stay motion seeking to foreclose on US Tool assets and cooperated with BFG to support the auction of the US Tool assets. US Tool and BFG agreed to the disposition of BFG's collateral and BFG agreed to reduce its unsecured deficiency claim against US Tool and Revstone by $675,000. The Debtors have been advised by BFG that the assets were sold at auction by BFG on April 16, 2013 for $631,305 net of expenses.

- Through Revstone's subsidiary Revstone Transportation, LLC, negotiated and closed the sale of Contech Castings, LLC to Shiloh Industries for a purchase price of $54.4 million, resulting in net purchase price consideration of $35.0 million. The proceeds of the Contech sale were used, in part, to satisfy significant claims (asserted on an administrative basis as to debtor entities) asserted by the Hillsdale Hourly Pension Plan and Hillsdale Salaried Pension Plan against Revstone and other members of the pension plan controlled group (including Contech).

- Retained ordinary course professionals to wind down a German subsidiary and advise the Debtor on various tax matters, obtaining approval of such employment over the Committee's objection.

- Finalized a settlement with Ford whereby the estate received a $2,000,000 cash payment in return for a release of claims against Ford; obtained Court approval of the settlement under Rule 9019 over the objection of the PBGC.

- Huron, along with selected investment bankers, is heavily involved in marketing and sale processes at differing stages of advancement for various non-debtor subsidiaries, including Eptec, Aarkel Tool & Die, Texas Die Casting, Dowagiac, and Revstone San Luis Potosi (a/k/a Fabrication Facility), with cumulative projected gross sale proceeds of over $44 million.

9.      In addition to the afore-referenced sale and asset disposition activity, and

contrary to the Committee's allegations of inaction (and as the Committee is aware), the CRO

has demanded that Hofmeister return unauthorized transfers of funds from Ascalon health care

accounts (which accounts were not under the control of the CRO). The Debtor has implemented

disbursement controls and Hofmeister is receiving no payments or reimbursements from the

Debtor. Hofmeister has returned one of the transfers. The Debtor is reviewing the use of

healthcare funds as well as the Debtor's use of funds generally to assess what recourse it may

have and what transfers may be recoverable. In contrast, the Committee has apparently made no

progress despite having allegedly been investigating Hofmeister for over ten months. Regardless,

there is no imminent statute of limitations and no risk that such claims will not be prosecuted.

10.     The Court has extended the Debtor's exclusive periods for filing and

confirming a plan on two previous occasions, by orders entered on May 16, 2013[4] and August

19, 2013.[5] The first such order also resolved the Committee's first motion to appoint a trustee.

It provided that exclusivity would terminate in the event that the Debtor breached any of the

Milestones (as defined in the Confidential Settlement Communication filed under seal at Docket

No. 573), and failed to cure any such breach within the grace period provided therein. On June

5, 2013, the Committee delivered a notice asserting a breach of certain Milestones to the Debtor

and declared that the exclusive periods terminated on June 19, 2013 as to the Committee.

11.     On July 8, 2013, the Committee filed a disclosure statement and plan

[Docket No. 736], which it amended on August 28, 2013 [Docket No. 983] (as amended, the

---

[4] *Order (I) Granting Debtors' Motion for an Order Extending the Time Periods During Which the Debtors Have the Exclusive Right to File a Plan and Solicit Acceptances Thereof and (II) Resolving the Motion of Official Committee of Unsecured Creditors for the Appointment of a Chapter 11 Trustee* [Docket No. 578].
[5] *Order Granting Debtors' Motion for an Order Pursuant to 11 U.S.C. § 1121(d) Further Extending the Time Periods During Which the Debtors Have  the Exclusive Right to File a Plan and Solicit Acceptances Thereof* [Docket No. 935].

"Committee Plan"). On July 22, 2013, the Debtor filed a plan and disclosure statement [Docket

Nos. 774 and 775], which were amended on August 20 and August 28, 2013 [Docket Nos., 949,

950, 985-988] (as amended, the "Debtor's Plan").

12.     Both the Debtor's Plan and the Committee Plan are effectively liquidating

plans under which the sale process would continue and litigation rights would pass to the

Committee. The Debtor has negotiated with the Committee with the goal of achieving a single,

mutually acceptable plan. Although the Committee vaguely suggests otherwise, there are very

few outstanding issues between the plans. Certainly, there is no fundamental difference

concerning the exit strategy for the Debtors and their affiliates.

13.     The factual basis for the Committee's contention that acrimony in the case

warrants the appointment of a trustee or conversion of the case boils down to the following

disputes:

- The Committee objected to the application to retain Mr. DiDonato and Huron.
  Trustee Motion at 5. As the Committee notes, this was resolved and Huron's
  retention to provide the CRO and other personnel, but not to act as financial
  advisor, was approved by order entered March 21, 2013 [Docket No. 428].

- The Committee filed a trustee motion on February 4, 2013, based on allegations
  of prepetition improprieties by Hofmeister and assertions that the CRO would not
  be independent of Hofmeister. Trustee Motion at 6. As the Committee notes, its
  motion was resolved in the context of the Debtor's motion to extend exclusivity.

- The Committee opposed the Debtor's motion to extend exclusivity, filed April 1,
  2013. Trustee Motion at 6-7. As noted, this was resolved in combination with the
  Committee's first trustee motion by an order which conditioned exclusivity on
  achieving certain milestones. Trustee Motion at 7.

- After the Debtor and the Committee filed plans, each objected to the other's
  disclosure statement. Trustee Motion at 7-8. Each filed amended plans and
  disclosure statements, proceedings on which have been continued to permit

negotiations "and to address certain other issues that currently prevent both plans from proceeding to confirmation." *Id.* at 8. As the Committee notes, *all parties have acknowledged that each respective plan contemplates that there will be a transfer of control from the Debtor to its creditors*. While the Committee states vaguely that "the attempted resolution of the plan gridlock has not produced results, and additional time is unlikely to thaw this iceberg of gridlock," *id.*, it is the Committee that has been requesting the Debtor to agree to continuances of the disclosure statement hearing.

- The Committee contends that confirmation is prevented by "the professional fees that Revstone has accrued to date in the Revstone bankruptcy case." Trustee Motion at 8-9. As it notes, objections have been filed to most professional fees, on account of which the Court has appointed a fee examiner. *Id.* at 11. Needless to say, the Committee's and BFG's scorched earth tactics has much to do with the amount of fees generated in these cases. <u>The Debtor requested that the Committee stipulate that all current fee objections become standing objections to fees going forward to avoid the unnecessary costs associated with the filing of duplicative fee objections. The Committee refused the request.</u>

- The Committee also contends that confirmation is prevented by "the massive claims that have been asserted by the PBGC at each Debtor and at each of their non-Debtor affiliates within the corporate control group." Trustee Motion at 9. It criticizes the Debtor for "fruitless litigation apparently designed only to further delay the ability of creditors, in this case the DOL and the PBGC, to obtain recovery on their claims." *Id.* Given its acknowledgement that the PBGC claim prevents confirmation, the accusation is disingenuous. The Committee does not suggest an alternative, even though its own constituency's recovery is jeopardized by the PBGC's claims. If the PBGC was as tractable as the Committee implies, the Committee would have negotiated its own resolution.

- The Committee states that "[t]he acrimony and litigation that have marked the Revstone bankruptcy case from its inception have led to numerous objections to professionals retentions and fee applications." Trustee Motion at 10. It cites Hofmeister's unsuccessful objection to the retention of the Committee's counsel, which is irrelevant to the relationship between the Debtor and its creditors. The Committee cites its objections to Huron's retention, which were resolved. And it cites its own pointless, wasteful objection to the employment of Debtor's counsel and Huron in the Metavation case, which is (a) in a different case and (b) is under submission. *Id.*

- Four sale motions have been brought that were contested, three of which were in other cases. Trustee Motion at 12. Two were approved (Greenwood and Metavation). One (U.S. Tool) was denied whereupon an agreement was worked out with BFG. The only contested sale in this case (the Contech sale) was objected to simply because it involved a non-debtor subsidiary, whereupon the sale was consummated without court approval.

9

- The Committee objected to the Debtor's cash management motion, which was approved with minor conditions. Trustee Motion at 12-13.

- The Committee points to improper use by Hofmeister of certain funds paid to the Ascalon Health Plan and Ascalon Dental Plans, administered by non-debtor Ascalon Enterprises, and complains that the Debtor has taken no action against Hofmeister. Trustee Motion at 13-14. There is no acrimony with the Debtor on the issue: as the Committee acknowledges, the Debtor has been forthcoming with information. As the Committee is aware, the Ascalon healthcare accounts were not in the CRO's control, and disbursement controls have been implemented. Hofmeister receives no payments or reimbursements from the Debtor. The Debtor demanded the return of the transfers. Hofmeister partially complied, and the Debtor is reviewing the use of healthcare funds, as well as the Debtor's general use of funds, to assess what recourse and rights of recovery may exist. Regardless, there is no dispute that under both filed plans creditors would have the right to prosecute such claims post-confirmation.

- BFG moved to convert the Greenwood and U.S. Tool chapter 11 cases on July 16, 2013. Two depositions were taken and written discovery served. The motions were denied. Trustee Motion at 15.

- The Committee's final evidence of acrimony and litigation is that there has been "a series of examinations under Bankruptcy Rule 2004." Trustee Motion at 16-17. The Committee points to its Rule 2004 examinations of Hofmeister, the Children's Trusts, and Ascalon, none of which involve acrimony with the Debtor. It cites another early Rule 2004 motion [Docket No. 125] that it did not pursue. It cites two Rule 2004 applications by Spara (one in March and one in September 2013) and one by Revstone/U.S. Tool in July 2013, all of which involved BFG, and one by Patrick O'Mara that was initially denied and then granted only in part. The Debtor offered to stay its Rule 2004 investigations against Committee members BFG and Patrick O'Mara in return for BFG's and O'Mara's agreement to stay their own discovery and Rule 2004 investigations. BFG and O'Mara refused the request.

### Applicable Standard

14.    Section 1104(a) of the Bankruptcy Code authorizes the appointment of a trustee (1) "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor," (2) "if such appointment is in the best interests of creditors, any equity security holders, and other interests of the estate," or (3) if grounds exist for dismissal of the case

or conversion to chapter 7, but the court determines that the appointment of a trustee is in the best interests of creditors and the estate.  11 U.S.C. § 1104(a).

15.    "It is settled that the appointment of a trustee should be the exception, rather than the rule." *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989) (citations omitted); *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998).  The "standard for § 1104 appointment is very high." *Smart World Techs., LLC. v. Juno Online Servs., Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166, 176 (2d Cir. 2005).  The appointment of a chapter 11 trustee represents an "extraordinary remedy." *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990); *In re Adelphia Communications Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006).  Accordingly, the movant "must prove the need for a trustee by clear and convincing evidence." *Sharon Steel*, 871 F.2d at 1226; *see also Marvel*, 140 F.3d at 471 (same); *Adelphia*, 336 B.R. at 656 (same); *Official Committee of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 385 F.3d 313, 317-318 (3d Cir. 2004) (same).

16.    Moreover, there is "a strong presumption" against the appointment of a trustee. *Ionosphere*, 113 R.R. at 167; *Marvel*, 140 F.3d at 471.  This "strong presumption" is based on the fact that there is no need for a trustee in most cases because the debtor-in-possession is already a fiduciary for the estate and has an obligation to refrain from acting in a manner that could damage the estate. *Marvel*, 140 F.3d at 471.  "The strong presumption also finds its basis in the debtor-in-possession's usual familiarity with the business it had already been

DOCS_LA:273463.9 73864/001

managing at the time of the bankruptcy filing, often making it the best party to conduct operations during the reorganization." *Id.*

17.    Under section 1104(a)(1), the appointment of a trustee is mandatory upon a finding of "cause," but a determination of whether "cause" exists is within the discretion of the court. *Sharon Steel*, 871 F.2d at 1226 (citations omitted). "[T]he language of section 1104(a)(1) does not promulgate an exclusive list of causes for which a trustee must be appointed, but rather provides that a trustee shall be appointed 'for cause, including fraud, dishonesty, incompetence, or gross mismanagement[.]'" *Marvel*, 140 F.3d at 472.

18.    In the instant case, the Committee has not come close to demonstrating by clear and convincing evidence that the extraordinary remedy of appointing a chapter 11 trustee is warranted.

### There is No Basis for Appointing a Trustee Based on "Acrimony"

19.    The Committee contends that acrimony between the Debtor and creditors warrants appointment of a trustee. The cases cited by the Committee, however, bear little resemblance to this case.

20.    Of these cases, the Third Circuit's decision in *Marvel* is most important. The conflict was between interests controlled by Carl Icahn (the "Icahn interests") which had purchased substantial amounts of prepetition debt at a steep discount, and lenders holding over $600 million of secured debt (the "Lenders"). The Icahn interests and the Lenders were in litigation over control of Marvel, with the Icahn interests attempting to vote pledged stock and take control of the Marvel board. The bankruptcy court issued a temporary restraining order

barring the Icahn interests from voting the stock.  Six months after the case commenced, the

district court vacated the restraining order, and the Icahn interests gained control of the debtor.

"Thus, an anomaly arose. The Icahn interests began to wear two hats — one as creditors of the

holding companies that controlled Marvel; the other as the debtor-in-possession of Marvel."

*Marvel*, 140 F.3d at 467.  After two attempted settlements failed, the Icahn-controlled debtor

sued the Lenders, the Perelman holding companies and other creditors, asserting 19 claims

including breach of fiduciary duty based on "an alleged conspiracy between Toy Biz, the former

Marvel board and the Lenders to "sabotage" the new Icahn-controlled debtor-in-possession's

reorganization efforts." *Id*. at 468.  The creditors' committee described the relationship between

the Icahn interests and the Lenders as having reached an "impasse." *Id*.

21.    In affirming the decision to appoint a trustee, the Third Circuit emphasized

that it was not just acrimony between the Icahn interests and other parties in interest that justified

the appointment of a trustee, but the dissonance between the Icahn interests' role as creditors in

litigation with other creditors, and their simultaneous role as debtor-in-possession with a

fiduciary responsibility to act on behalf of all creditors.

> We expressly hold that there is no per se rule by which mere
> conflicts or acrimony between debtor and creditor mandate the
> appointment of a trustee. In this case, rather, we are faced with
> circumstances in which the Icahn interests, themselves creditors of
> the Perelman holding companies, are currently in control of the
> debtor at the same time that the debtor proposes reorganization
> plans. In this position, although the Icahn interests are technically
> and officially fiduciaries to all creditors, they would also be placed
> in an awkward position of evaluating their own indenture and debt
> claims. Having found that this unhealthy conflict of interest was
> manifest in the "deep-seeded conflict and animosity" between the
> Icahn-controlled debtor and the Lenders and in the lack of
> confidence all creditors had in the Icahn interests' ability to act as
> fiduciaries, the district court did not depart from the proper
> exercise of discretion when it determined sufficient cause existed

13

under § 1104(a)(1) to appoint a neutral trustee to facilitate
reorganization.

*Marvel*, 140 F.3d at 473.

22.     This case does not resemble *Marvel* in any respect.  Neither the CRO of

the Debtors, Mr. DiDonato, nor the members of the Restructuring Committee of the Board of

Managers, are creditors of the Debtors or in litigation with other creditors.  Nothing impedes the

CRO or Restructuring Committee from fulfilling the Debtor's fiduciary responsibilities.  There is

not even a serious allegation that the Debtor, *sans* Hofmeister, is not or is not capable of

faithfully discharging such responsibilities.  The "acrimony" cited by the Committee is no more

than a litany of garden variety bankruptcy disputes, which the Committee describes as a

"maelstrom of litigation" even though few of the cited disputes are even extant and fewer yet are

in this case.  The oppositional posture adopted by the Committee and its members, BFG, the

PBGC and Patrick O'Mara, is unfortunate and has driven up fees, but it does not arise from any

failure of the Debtor to discharge its fiduciary responsibilities.  Indeed, the vast majority of the

actions for which the Debtor has sought Court approval have, in fact, been approved.

23.     Furthermore, the Debtor and the Committee have the same exit strategy:

both of the filed plans provide for the liquidation of remaining assets and the distribution of the

proceeds to creditors, with a transfer of corporate governance powers to creditors.  While there

are impediments to this common goal, not one of them is the product of any conflict of interest

that would warrant displacing the debtor-in-possession with a trustee.  *Compare Marvel*, 140

F.3d at 473 (noting that the Icahn interests and the Lenders "take dramatically different stances

on many issues.").  Indeed, the Committee candidly acknowledges later in the Trustee Motion

14

that the hold-up is funding, not conflicting interests. Trustee Motion at 33. Appointment of a

trustee does absolutely nothing to solve this problem.

   24. The other cases relied upon by the Committee are also plainly distinct.

Like *Marvel*, the "acrimony" derives from gross misconduct or mismanagement and/or

substantive disputes that lead a court to conclude that the debtor will not or cannot fulfill its

fiduciary responsibilities. *In re Plaza de Retiro, Inc.*, 417 B.R. 632 (Bankr. D. N.M. 2009)

involved gross mismanagement in the operation of a health care facility, including the lapse of

insurance and its concealment, absence of cash reserves, lack of credibility, and demonstrably

inadequate business plan. *Petit v. New England Mortgage Services, Inc. (In re Petit)*, 182 B.R.

64 (D. Me. 1995) involved the debtor's refusal to comply with discovery, failure to account for

funds and maintain bank accounts and records, leading the court to find that the debtor was

"obstructionistic and evasive" and "cannot be properly entrusted with the fiduciary duties of a

trustee." *Id.* at 70. *In re Biolitec, Inc.*, 2013 WL 1352302 (Bankr. D.N.J. Apr. 3, 2013) involved

litigation in federal and state courts in three states involving, in part, allegations the debtor was

"systematically funneling assets ... to make any potential judgment uncollectible" that were a

sufficient basis for injunctive relief (*id.* at *3), leading the bankruptcy court to "question[] the

current management's ability to fulfill its fiduciary duty to pursue these claims since [the debtor]

shares common management with the recipients of the transfers, who also owe conflicting

fiduciary duties to recipients." *Id.* at *9. *In re Bellevue Place Associates*, 171 B.R. 615 (Bankr.

N.D. Ill. 1994) involved a management agreement between the debtor and a hotel manager that

the court found "deprived [the debtor] of the ability to discharge duties, particularly its fiduciary

duties, to all creditors and equity security holders as a debtor in possession." *Id.* at 623. *In re*

*Nartron Corporation*, 330 B.R. 573 (Bankr. W.D. Mich. 2005) involved the appointment of a

trustee with limited powers to oversee the debtor's financial management and litigation rights

where the debtor's principal paid prepetition creditors, hired attorneys without court approval

and made avoidable transfers to himself. *Id.* at 593. *In re The Bible Speaks*, 74 B.R. 511 (Bankr.

D. Mass. 1987) involved a debtor driven into bankruptcy by a single claim that the debtor vowed

to fight to the end, the debtor's frivolous objections to a committee plan that paid creditors in full

immediately (*id.* at 513), findings of "dishonesty and deceit" against an insider (*id.* at 514), a

finding that the insider "lacks the necessary maturity and administrative experience" and that

collective leadership was inadequate. *Id.*

      25.    The "acrimony" in this case pales in comparison to such cases. Most

importantly, it does not implicate the Debtor's ability to discharge its fiduciary responsibilities.

The facts do not remotely constitute "cause" for the appointment of a chapter 11 trustee.

### Appointing a Chapter 11 Trustee is Decidedly Not in the Best Interests of the Estate

      26.    Section 1104(a)(2) envisions a "flexible standard" for the appointment of a

trustee when to do so would serve the "the interests of the creditors, equity security holders, and

other interests of the estate." *Sharon Steel*, 871 F.2d at 1226; *Marvel*, 140 F.3d at 474; *In re G-I*

*Holdings, Inc.*, 385 F.3d 313, 320 (3d Cir. 2004) ("As *Sharon Steel* stated, the party asking for

appointment of a trustee bears the burden of persuasion by clear and convincing evidence. This

burden does not shrink or shift.").

27.    In reconciling the "interests" standard with the "cause" standard, Collier

notes:

> "the 'interests' standard may initially seem less stringent than the 'cause' standard. After all, no showing of wrongful behavior on the part of management is required, as long as interested parties can show a meaningful benefit from the appointment of a trustee. However, it is important to remember that the 'interests' standard requires a finding that appointment of a trustee would be in the interest of essentially **all interested constituencies**."

7 *Collier on Bankruptcy* ¶1104.02 at 1104-14 (Alan N. Resnick & Henry J.Sommer eds., 16th

ed.) (emphasis added).  Creditors cannot on their own obtain the appointment of a trustee under

this provision in order to disenfranchise other interests.  Instead, appointment of a trustee must

be in the interest of the estate generally in order to satisfy the statutory "interests" standard.

28.    Courts often consider the following factors, among others, in determining

whether to appoint a chapter 11 trustee under section 1104(a)(2) of the Bankruptcy Code: (a) the

trustworthiness of the debtor; (b) the debtor in possession's past and present performance, (c) the

confidence – or lack thereof – of the business community and of creditors in present

management; and (d) the benefits derived by the appointment of a trustee, balanced against the

cost of the appointment.  *In re Adelphia Communications Corp.*, 336 B.R. 610, 658 (Bankr.

S.D.N.Y. 2006); *In re Eurospark Indus., Inc.*, 424 B.R. 621, 627 (Bankr. S.D.N.Y. 2010).

29.    The Trustee Motion falls woefully short of its mark.  The Committee

cannot legitimately identify *any* benefit to the estate from the appointment of a trustee.  The

Committee asserts that appointing a trustee will:

- "likely decrease litigation and control costs and increase the confidence of creditors and other parties in interest." Trustee Motion at 426.

- "provide critical creditor parties, including the PBGC, with the assurance that a truly independent fiduciary was managing Revstone" and "open up channels of communication between such trustee and significant creditors … that have been closed in this case for a significant period of time." *Id.* at 27.

- "reassure creditors of Revstone that valuable causes of action available to Revstone and its subsidiaries would be impartially evaluated and, if appropriate, promptly pursued." *Id.*

- "take any necessary steps to preserve value for creditors of Revstone, including, as necessary, causing bankruptcy cases to be filed for non-Debtor subsidiaries and addressing various intercompany issues and disputes, including disputes and potential disputes between and among Spara, Revstone, and Metavation." *Id.*

30.     The arguments have a false premise: there is <u>already</u> a "truly independent fiduciary [] managing Revstone." Mr. DiDonato, the controlling board members and Huron are "truly independent." Indeed, the Committee does not even offer any argument or evidence that they are not.

31.     Reflecting the fact that the Debtor is indeed managed by independent fiduciaries, there is no allegation or evidence that Mr. DiDonato has failed to "take any necessary steps to preserve value for creditors of Revstone." As set forth above, management has concluded several sales of debtor and non-debtor subsidiaries, and is in the midst of conducting or overseeing sale processes for numerous other subsidiaries. Where appropriate, bankruptcies have been filed to facilitate such sales, which practice will continue. Consistent with his independence, Mr. DiDonato has no reason <u>not</u> to take such actions, except to the extent he concludes in the exercise of his business judgment that the costs outweigh the benefits.

32.     There is also no need to appoint a trustee to "reassure creditors" that causes of action will be evaluated and pursued. Under either of the proposed plans, creditors will succeed to such claims. There is no danger whatsoever that they will not be pursued. Indeed,

given the Committee's purported level of distrust, it is surprising that it would entrust this task to

the Debtor's professionals. Notably, the Committee has apparently made no material progress of

its own, despite its alleged "investigation" of Hofmeister since its appointment.

33.     Nor is there a need for a new "truly independent fiduciary" to "open

channels of communication." There is an independent fiduciary now, and he is attempting to

negotiate with the PBGC. Those efforts are ongoing; while they have not yet been successful, it

is not because of any lack of independence. The Committee is free to suggest alternatives or

negotiate a solution with respect to its plan. The same critique applies to the Committee's claim

that appointing a trustee would decrease litigation and control costs. How?  The only litigation it

*might* reduce is the stream of objections that have been filed by the Committee and BFG in

furtherance of an obtuse game-plan that they have not articulated. The dispute over professional

fees would still need to be resolved. Furthermore, most other disputes that remain outstanding

relate to other Debtors, not Revstone (*e.g.*, the Metavation sale appeal and employment dispute).

34.     While there are no obvious benefits associated with the appointment of a

chapter 11 trustee, there are real and substantial reasons why the appointment of a trustee for the

Debtor is not in the best interests of the estate.  The Debtor and the other Debtors have an

effective and experienced CRO in place and knowledgeable professionals, who have engaged in

a lengthy process of becoming familiar with the business and finances of the Debtors and their

subsidiaries. Complex agreements have been reached with OEMs and creditors that facilitated

the disposition of assets, and continuity in management is important to resolving ongoing issues

arising under such agreements, and to avoid disrupting the sale processes that are being

conducted at numerous subsidiaries in accord with such agreements. The replacement of

management and professionals at Revstone would be incredibly disruptive, costly and inefficient,

resulting in a massive duplication of effort and wasteful bifurcation of management

responsibilities vis-à-vis other Debtors. There is no discernible corresponding benefit, much less

one that would outweigh these detriments. In short, the interests of the estate weigh heavily

against the appointment of a chapter 11 trustee.

### The Case Should Not be Converted to Chapter 7

35.    The Committee argues that cause exists to convert the Revstone case to

chapter 7 under section 1112(b)(4)(A) of the Bankruptcy Code, based on a "substantial or

continuing loss to or diminution of the estate and the absence of a reasonable likelihood of

rehabilitation." 11 U.S.C. § 1112(b)(4)(A). "This requirement is in the conjunctive, and it

clearly is the burden of the Movant to prove both of these elements." *In re Lykes Bros. S.S. Co.,*

*Inc.*, 196 B.R. 586 (Bankr. M.D. Fla. 1996). The Committee also asserts that cause exists based

on the Debtor's alleged inability to effectuate a confirmable plan. On either basis, the movant

carries a heavy burden: "Conversion or dismissal...is a drastic measure...the harshness of

conversion or dismissal mandates that it result only upon a strong evidentiary showing." *In re*

*Dark Horse Tavern*, 189 B.R. 576, 580 (Bankr. N.D.N.Y. 1995).

36.    Furthermore, under 11 U.S.C. § 1112(b)(2), a court must not convert a

case to chapter 7 "if the court finds and specifically identifies unusual circumstances establishing

that converting or dismissing the case is not in the best interests of creditors and the estate, and

20

the debtor ... establishes that – (A) there is a reasonable likelihood that a plan will be confirmed ... within a reasonable period of time fixed by the court."

## The Committee Does Not Establish That There is No Reasonable Likelihood of Rehabilitation And Substantial or Continuing Losses

37.     The concept of "rehabilitation" under section 1112(b) encompasses a liquidating debtor's efforts to maximize the value of the estate, and the law does not support conversion where, as here, a debtor is best suited to achieve that purpose.  Displacing the management and professionals for one of five commonly managed Debtors is grossly inefficient and needlessly expensive, particularly in cases that the Committee insists are already administratively insolvent. There is no evidence of continuing losses after the asset dispositions, and certainly none as large as that which would result from the retention of new professionals. Conversion would decrease the size of the estates.

38.     The Committee argues that "the Revstone estate continues to hemorrhage funds through ever increasing professional fees while advancing no closer to confirmation of either of the plans proposed by the Committee and Revstone, respectively." Trustee Motion at 31. "A debtor's limited amount of cash-on-hand and lack of a reliable source of income combined with the costs and expenses related to the bankruptcy case, including the professional fees, can and in this case does establish a substantial and continuing loss to or diminution of the estate." *Id.* at 32.

39.     What the Committee fails to acknowledge, however, is that appointment of a trustee would only worsen that situation.  It is virtually beyond dispute that the appointment

21

of a chapter 7 trustee would generate substantial administrative priority fees that are not currently

being generated in the chapter 11 cases.  There are presently five Debtors that are being

commonly managed and jointly represented.  The cost of educating a new trustee and

professionals regarding matters with which current management and professionals are already

knowledgeable, and the disruption and duplication of effort that would result, would be far more

costly than any savings.  Furthermore, the main administrative expense that the Committee

specifically identifies is legal fees expended litigating with the PBGC, yet the Committee does

not offer any less costly alternative, even as it candidly asserts that the PBGC claims block

confirmation of either plan.  Trustee Motion at 33.  A chapter 7 trustee would also have to

contest the PBGC claims if other creditors are to achieve a material recovery.

40.    The Committee also fails to establish the other required element for

conversion under section 1112(b)(4)(A) – that there is no "reasonable likelihood of

rehabilitation."  A debtor may liquidate under chapter 11 (as opposed to liquidating under

chapter 7) if the overall value to creditors would be maximized under a chapter 11 liquidation.

"Rehabilitation has a different meaning than 'reorganization', because a Chapter 11

'reorganization' may include orderly liquidation. Thus, a liquidating Chapter 11 plan does not

serve as ground for conversion or dismissal.").  Norton Bankr. L. & Prac. 2D § 82:4 at p. 5125.

*See also In re Klein/Ray Broadcasting*, 100 B.R. 509, 511 (9th Cir. BAP 1987) (affirming denial

of motion to convert, because "the Bankruptcy Code contemplates that a debtor corporation may

be liquidated in a Chapter 11."); *In re Cooper Properties Liquidating Trust, Inc.*, 61 B.R. 531

(Bankr. W.D. Tenn. 1986) (holding that a bankruptcy petition should not be dismissed where a

liquidating plan would benefit all creditors and the bankruptcy served the purpose of allowing the debtor to wind up its affairs and confirm a liquidating plan that would benefit all creditors). Numerous courts have cautioned that the term "reorganization" should not be confused with the term "rehabilitation," and that the term "reorganization" includes liquidation. *See In re Ionosphere Clubs, Inc.*, 184 B.R. 648, 654 (S.D.N.Y. 1995) (collecting cases holding that liquidation is encompassed under and permissible in reorganization plans).[6] Were the law otherwise, every non-operating case would present mandatory "cause" for conversion under section 1112(b).[7]

      41.    The Committee cites an Eighth Circuit decision for the proposition that "[r]ehabilitation does not mean 'reorganization' and does not include liquidation." Trustee Motion at 32 (citing *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 516 (8th Cir. 2004)). However, while the Eighth Circuit found that a chapter 11 debtor's intent to liquidate satisfies one prong of the "cause" requirement, the court expressly declined to state a rule that a liquidating chapter 11 cases must be converted, indicating instead that courts have discretion to deny conversion notwithstanding the existence of cause. *Id.* at 516. Either way, the result in this case is the same. First, the Committee does not establish the requisite "substantial or continuing loss to or

---

[6] *See also In re Clinton Centrifuge, Inc.*, 72 B.R. 900, 908 (Bankr. E.D. Pa. 1987) ("In evaluating the pending motion to dismiss, my narrow function is to determine whether movant lacks a plausible, legitimate reorganization (or liquidation) purpose."); *In re Enron Corp.*, 284 B.R. 376, 406 n.13, n.14 (Bankr. S.D.N.Y. 2002) ("the concept of reorganization includes liquidation"); *In re Western Pacific Airlines, Inc.*, 218 B.R. 590 (Bankr. D. Colo. 1998) (court denied motion to dismiss a liquidating chapter 11 case because liquidation will proceed more expeditiously and less expensively under the control of the debtor); *In re GP A Technical Consultants, Inc.*, 106 B.R. 139 (Bankr. S. D. Ohio 1989) (motion to dismiss denied where chapter 11 debtor had ceased all business operations and proposed a liquidating plan).
[7] The Committee focuses on the liquidating nature of the plans, rather than the likelihood that they can be confirmed. On this latter point, it acknowledges that confirmation is blocked by the PBGC and DOL claims, and proffers the naked assertion that "resolution appears impossible." Trustee Motion at 33.

diminution of the estate." Second, the Debtor's (and the Committee's) intent to confirm a

liquidating plan does not equate to "cause," or even if it did, the Court can and should exercise

its discretion to deny conversion, given the cost and lack of any benefit to replacing the existing

fiduciaries.

42.    As numerous courts have recognized, a chapter 11 debtor's participation

in its liquidation may generate greater returns and be more efficient than a Chapter 7. *See, e.g.,*

*In re Deer Park, Inc.*, 10 F.3d 1478, 1481 (9th Cir. 1993) ("a debtor's continuing participation in

a planned liquidation may be necessary to bring about maximum recovery..."); *In re Copy*

*Crafters Quickprint, Inc.*, 92 B.R. 973, 986 (Bankr. N.D.N.Y. 1988) ("In certain instances, a

Chapter 11 liquidating plan is preferable to a Chapter 7 proceeding because the disposition of

assets will be conducted in a less expensive, swifter and more orderly manner by a debtor-in-

possession, as opposed to a trustee, who, while disinterested, is still a third party unfamiliar with

the property of the estate.") (citing additional cases).

**There is No Cause to Convert Based on Inability to "Effectuate a Confirmable Plan"**

43.    Finally, the Committee contends that the Debtor cannot "effectuate a

confirmable plan" and argues that this may serve as an independent basis for finding cause to

convert the case to chapter 7. Trustee Motion at 34.

44.    The cited authority, *In re 3 Ram, Inc.*, 343 B.R. 113 (Bankr. E.D. Pa.

2006), was the second of successive filings by a debtor attempting to protect a liquor license

from foreclosure, which the court dismissed in part on the basis that the debtor's proposed plan

predicated on refinancing his house was not feasible and a feasible plan was not possible, and because the case was a two party dispute. *Id.* at 118-19.

45.     Here, the Committee contends that neither its plan nor the Debtor's is confirmable because of the requirement that allowed administrative claims be paid in full.  It notes that the fees are subject to objection, but states that "the delay and cost in litigating such objections would serve only to further the administrative insolvency of the Revstone estate." Trustee Motion at 35.  Conversion, however, does not eliminate the need to address the objections. The Committee also states that there is no agreement to defer payment, and that "[t]his has resulted in a standstill where attempts to even negotiate a consensual plan have ceased." *Id.*  But the implication of gridlock is misleading: the Committee asserts just two pages earlier that confirmation is blocked by the unresolved claims of the PBGC and the DOL, as to which, according to the Committee, "resolution appears impossible."  The Court should not accept the Committee's naked assertion that resolution is impossible, nor the current absence of agreement on the treatment of administrative expenses, as satisfying the Committee's burden of establishing that a feasible plan is impossible.

25

## Conclusion

WHEREFORE, the Debtor respectfully requests that this Court enter an order denying the Trustee Motion and issuing such other and further relief as is just and proper under the circumstances.

Dated:  December 4, 2013

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
Alan J. Kornfeld (CA Bar No. 130063)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (Bar No. 4228)
Colin R. Robinson (Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
Email:  ljones@pszjlaw.com
        dbertenthal@pszjlaw.com
        tcairns@pszjlaw.com
        crobinson@pszjlaw.com

Counsel for Debtor Revstone Industries, LLC