## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| REVSTONE INDUSTRIES, LLC, <u>et al.</u>,[1] | Case No. 12-13262 (BLS) |
| Debtor. | **Related to Docket No. 1167** |

### RESPONSE AND JOINDER OF ASCALON ENTERPRISES, LLC TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO (I) APPOINT A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. §§ 1104(a)(1) OR 1104(a)(2) OR, ALTERNATIVELY, (II) CONVERT THE CASE TO CHAPTER 7 PURSUANT TO 11 U.S.C. §§ 1112(B)(1) AND 1112(B)(4)(a)

Ascalon Enterprises, LLC ("<u>Ascalon</u>") hereby submits this response and joinder to the Motion of the Official Committee of Unsecured Creditors to (I) Appoint a Chapter 11 Trustee Pursuant to 11 U.S.C. §§ 1104(a)(1) and 1104(a)(2) or, Alternatively, (II) Convert Case to Chapter 7 Pursuant to 11 U.S.C. §§ 1112(b)(1) and 1112(b)(4)(A) [Docket No. 1167] (the "<u>Trustee/Conversion Motion</u>") filed by the Official Committee of Unsecured Creditors (the "<u>Committee</u>") on November 20, 2013 [Docket No. 1167], and respectfully represents as follows:

1.      Ascalon, the one hundred percent (100%) owner and sole member of the debtor Revstone  Industries, LLC ("<u>Revstone</u>"), has determined that conversion of Revstone's case to chapter 7 or appointment of a chapter 11 trustee for Revstone is preferable to the  case's present status.  Ascalon takes this position reluctantly, and admits that conversion or appointment of trustee is not its first preference.  The Committee's motion describes the troubled history of this case, including its extreme litigiousness and resulting extraordinary professional charges. Ascalon has recently sought to convince Revstone's current management and independent board

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's federal tax identification number are: Revstone Industries, LLC (7222); Spara, LLC (6613); Greenwood Forgings, LLC (9285); and US Tool & Engineering, LLC (6450).  The location of the Debtors' headquarters and the service address for each of the Debtors is 2250 Thunderstick Dr., Suite 1203, Lexington, KY 40505.

members that appointment of Lawrence J. Ramaekers as replacement Chief Restructuring

Officer ("CRO") in this case is a solution to avoid the need for conversion or the appointment of

a trustee. Mr. Ramaekers, who is known to this Court, is a highly respected turnaround

professional who has served ably as an independent fiduciary in other matters. Revstone's

management and board, however, have declined to appoint Mr. Ramaekers or any other

acceptable replacement CRO. Ascalon thus joins in the Committee's motion seeking conversion

of the Revstone case to chapter 7 or for the appointment of a chapter 11 trustee.

I.      **Ascalon Has the Right to Convert This Case to Chapter 7.**

2.      Ascalon has the right to convert Revstone's case to chapter 7 pursuant to Revstone's

governance documents. In January of 2013, in response to the Committee's then request for the

appointment of a chapter 11 trustee and the Committee's opposition to the continued

management of Revstone by George Hofmeister, Ascalon and Revstone entered into an amended

operating agreement, which was then further amended as of July 22, 2013 (as presently

constituted, the "Operating Agreement").[2] The Operating Agreement, which in amended form

was principally drafted by Revstone's present lead counsel, provided, among other things, for

Mr. Hofmeister to resign from his management of Revstone and for the appointment of a CRO

and independent board members to make "Bankruptcy Decisions" without involvement by Mr.

Hofmeister.[3] Operating Agreement, § 1.6(c). The Operating Agreement defines "Bankruptcy

Decisions" to mean only those decisions pertaining to the Revstone's "case under Chapter 11 of

---

[2] The current operative version of the Operating Agreement is the Third Amended and Restated Operating
Agreement for Revstone Industries, LLC, dated as of July 22, 2013, which is attached hereto as Exhibit A.

[3] Mr. Hofmeister thereafter also ceased having any direct or indirect governance role with Ascalon. Ascalon is
presently governed by its Manager, Homer W. McClarty, Esq., a member of the Michigan Bar and a member of the
panel of Bankruptcy Trustees in the United States Bankruptcy Court for the Eastern District of Michigan. Mr.
McClarty is the Trustee of the Hofmeister Children's Trusts (the "Trusts"). The Trusts are the members of Ascalon.

the United States Bankruptcy Code" (emphasis supplied).  Id.  The Operating Agreement further

provides that the holders of the majority of membership interests in Revstone – *i.e.*, Ascalon –

not the CRO or the Revstone board of managers, have the right to decide if and when Revstone

should dissolve or wind up its affairs.  Specifically, Section 8.1 of the Operating Agreement

provides:

> The Company shall dissolve and its affairs shall be wound up upon
> the decision of holders of a Majority in Interest to dissolve the
> Company or any other event that, under the Act, requires the
> dissolution of the Company. [Operating Agreement, § 8.1]

The Operating Agreement states that, "[u]pon dissolution, the Company shall cease carrying on

its business and affairs and shall commence the winding up of the Company's business and

affairs and the liquidation of its assets."  Operating Agreement, § 8.2.  A conversion of

Revstone's chapter 11 reorganization case to a chapter 7 liquidation case is a means to dissolve

and wind up Revstone's affairs.  See, e.g., Official Comm. of Unsecured Creditors of

Cybergenics Corp. v. Chinery, 330 F.3d 548, 579 (3d Cir. 2003) (likening a chapter 7 liquidation

proceeding to a dissolution of the company); Ohio v. Kovacs, 469 U.S. 274, 286 (1985)

(O'Connor, J., concurring) ("In a chapter 7 proceeding under the Bankruptcy Code, a corporate

debtor transfers its property to a trustee for distribution among the creditors who hold cognizable

claims, and then generally dissolves under state law.").

    3.    Based upon the terms of the Operating Agreement, Ascalon alone has the authority

to dissolve and wind-up Revstone's business and affairs, and Ascalon is exercising such right by

seeking the conversion of Revstone's reorganization case to a chapter 7 liquidation.

II.    **Appointment of a Chapter 11 Trustee is in the Interests of Both Creditors and Equity Securities Holders, and thus Section 1104(a)(2) is also Satisfied.**

4.    If, for any reason, Ascalon's request for conversion of this case to chapter 7 is denied, Ascalon also joins in the Committee's request that the Court order the appointment of a chapter 11 trustee.  Ascalon has concluded that the appointment of a chapter 11 trustee is preferable to the continued management of Revstone by the current CRO and that such appointment is in the best interest of equity.

5.    Ascalon's support for the appointment of a trustee mandates such appointment under section 1104(a)(2) of the Bankruptcy Code.  Under section 1104(a)(2), the issue of whether "cause" has been established under section 1104(a)(1) is not implicated, and the Court need only consider whether a trustee is in the interests of Revstone's creditors and equity holders.  See 11 U.S.C. § 1104(a)(2) (the court "shall order the appointment of a trustee – (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate.").  The creditors of Revstone have made clear in the Trustee/Conversion Motion they have determined that appointment of a trustee is in the interests of creditors.  For much the same reasons, Ascalon concurs that the appointment of a trustee is in its own interest as the equity security holder.  There is no reason for the Court to second guess a determination by each of these constituencies as to what is in their own interest.  The Committee has set forth in its Trustee/Conversion Motion justifiable reasons for it and Ascalon to have come to this conclusion.  Further, the interest of the CRO is not legally relevant under section 1104(a)(2).  Because both the creditor constituency and the equity holder have determined that the

appointment of a chapter 11 trustee is in their own respective best interests, the requirements of

section 1104(a)(2) are satisfied, and a trustee must be appointed.[4]

III.    **Conclusion**

6.    Given the current troublesome administration of Revstone's chapter 11 case,

Ascalon joins the Committee in requesting the relief set forth in the Trustee/Conversion Motion.

As previously expressed to Revstone, Ascalon's preference would be to have the estate

voluntarily hire Mr. Ramaekers or another acceptable person to replace the CRO rather than

obtain the relief sough in the Committee's motion.  Ascalon is convinced Mr. Ramaekers is the

best person to clean up the mess, run the Revstone case cost effectively, and maximize the value

of Revstone's estate for the benefit of both creditors and equity.  However, given Revstone's

failure to appoint an acceptable replacement CRO, Ascalon respectfully requests that the Court

convert this case to chapter 7 or, in the alternative, if such conversion is for any reason denied,

appoint a chapter 11 trustee.


Dated:  January 26, 2014

Respectfully submitted,

**SHELDON S. TOLL PLLC**

By: _____/s/  S. S. Toll_____
Sheldon S. Toll (Mich Bar No. P-21490)
3000 Town Center, Suite 1700
Southfield, MI 48075
(248) 351-5480
lawtoll@comcast.net

*Counsel to Ascalon Enterprises, Inc.*

---

[4] Ascalon also joins in the Committee's motion for appointment of a trustee for "cause" under section 1104(a)(1).

**Exhibit "A"**

# THIRD AMENDED AND RESTATED OPERATING AGREEMENT

## FOR

## REVSTONE INDUSTRIES, LLC

**THIS OPERATING AGREEMENT** ("*Agreement*") is made as of the 22nd day of July, 2013, by Ascalon Enterprises, LLC, as a member of Revstone Industries, LLC, a Delaware limited liability company (the "*Company*").

### Recitals

**A.**    This Third Amended and Restated Operating Agreement hereby amends and restates the First Amended and Restated Operating Agreement dated January 17, 2013 in its entirety.

**B.**    This Agreement may be relied upon by any party seeking to do business with the Company with respect to the matters set forth herein.

**C.**    Ascalon Enterprises, LLC acquired 100% of the membership interest of the Company on July 1, 2011.

**D.**    This Agreement has been adopted by the Managers (as defined below) and executed and agreed to by the Members (as defined below).

**THEREFORE,** the Members hereby agree and state as follows:

## ARTICLE I
## ORGANIZATION

**1.1**    **Formation.**    The Company was organized as a Delaware limited liability company pursuant to the Delaware Limited Liability Company Act ("*Act*") by the filing of a Certificate of Formation with the Secretary of State of the State of Delaware on December 2, 2008.

**1.2**    **Name.**    The name of the Company is "Revstone Industries, LLC." The Company may also conduct its business under one or more assumed names.

**1.3**    **Purposes.**    The purposes for which the Company was formed are to engage in any activity or business within the purposes for which a limited liability company may be formed under the law of the State of Delaware.

**1.4**    **Duration.**    The Company shall continue in existence until it is dissolved and its affairs wound up in accordance with the Act or this Agreement.

    **1.5**    **Offices and Resident Agent.**  The principal office of the Company shall be located in the City of Lexington in the State of Kentucky or at such place within or without Kentucky as the Board of Managers from time to time determines.  The Registered Office and the Resident Agent of the Company shall be as designated in the Certificate of Formation or any amendment thereof.

    **1.6**    **Definitions.**  The terms set forth below shall have the following meanings when used in this Agreement:

        (a)    ***"Act"*** has the meaning set forth in Section 1.1 above.

        (b)    ***"Agreement"*** has the meaning set forth in the introductory paragraph of this Agreement.

        (c)    ***"Bankruptcy Decisions"*** means any decision related to any aspect of the Company's voluntary case under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), captioned Case No. 12-13262 (BLS), currently pending in the United States Bankruptcy Court for the District of Delaware (the "Chapter 11 Case"), the Company's Chapter 11 process, the restructuring of the Company, the operation and management of the Company while a debtor in the Chapter 11 Case, and any and all related matters, including but not limited to: (a) determining and implementing the overall strategy in the Chapter 11 Case; (b) determining which subsidiaries of the Company should file voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, and the directing of such subsidiaries to file same and to amend their governance documents and/or act as necessary to provide for substantially similar governance structures as provided for herein with regard to the management of the subsidiaries' Chapter 11 cases by the Chief Restructuring Officer and the Independent Managers and/or to otherwise manage such subsidiaries as may be necessary; (c) addressing the day-to-day responsibilities of the Company as a debtor in the Chapter 11 Case; (d) the marketing and sale of the Company's assets; (e) the borrowing of funds from, and provision of guaranties to, and the undertaking of related financing transactions, including the use of cash collateral with such lenders and on such terms as may be reasonably necessary for the continuing conduct of the affairs of the Company and the paying of related fees and granting of security interests in and liens upon some, all or substantially all of the Company's assets, as may be deemed necessary by the Chief Restructuring Officer in connection with such borrowings; (f) organizing and directing the Company's professionals to pursue designated goals in the Chapter 11 Case; and (g) making any other decisions or performing any other such acts consistent with operating the Company in the Chapter 11 Case.

        (d)    ***"Board of Managers"*** means the board of managers of the Company as provided in Article V hereof.

        (e)    ***"The Company"*** has the meaning set forth in the introductory paragraph of this Agreement.

        (f)    ***"Covered Matters"*** has the meaning set forth in Article VIII below.

DOCS_LA:269922.3 73864/001

(g)    *"Independent Manager"* means a Manager that is not an affiliate of, or otherwise subject to the control or influence of, any Member or officer of the Company or any affiliate of the foregoing.

(h)    *"Majority in Interest"* shall be a majority of the Membership Interests of the Members.

(i)    *"Manager"* means a member of the Board of Managers.

(j)    *"Member"* means a member of the Company within the meaning of the Act and *"Members"* means all of the Members collectively.

(k)    *"Membership Interest"* means the interest of a Member in the Company, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information and to consent or approve.

(l)    *"Percentage Interest"* means the percentage of the aggregate Membership Interests held by a Member.  The Percentage Interests are as follows:

| Member | Percentage Interest |
|---|---|
| Ascalon Enterprises, LLC | 100% |

(m)    *"GM Observer"* shall have the meaning set forth in Section 5.14(c)(i).

(m)    *"Support Agreement"* means that certain Automotive Sale Transactions Support Agreement dated as of July 9, 2013 by and among the Company, Revstone Transportation, LLC, Aarkel Tool & Die Inc., Contech Castings, LLC, Contech Castings Real Estate Holdings, LLC, Metavation, LLC, Metavation Mexico, LLC, Eptec S.A. De C.V., Creative Lighting Solutions, LLC, General Motors, LLC, and Chrysler Group, LLC, and, for purposes of Section 7.7 thereof only, Fairfield Casting, LLC.

## ARTICLE II
## BOOKS, RECORDS AND ACCOUNTING

**2.1    Books and Records.**  The Company shall maintain complete and accurate books and records of its business and affairs as required by the Act and such books and records shall be kept at the Company's principal office.  The Company shall keep its books and records on a fiscal year, January 1 to December 31.  For purposes of tax reporting, the Company shall file its tax returns on a calendar year basis.

**2.2    Accounting.**  The particular accounting methods and principles to be followed by the Company shall be chosen by the Company.

## ARTICLE III
## MEMBERSHIP; CAPITAL CONTRIBUTIONS AND DISTRIBUTIONS

**3.1    Membership.**    The Members of the Company shall consist of Ascalon Enterprises, LLC and each person hereafter admitted to the Company as a member as provided in this Agreement, but shall not include any person who has ceased to be a member in the Company.  Additional persons may be admitted to the Company as Members and Membership Interests may be created and issued to those persons and to existing Members at the direction of the Board of Managers with the consent of holders of a Majority in Interest.  Membership Interests shall be uncertificated.

**3.2    Additional Capital Contributions.**    The Company may hereafter accept additional capital contributions from such Members and on such terms as may be approved by the Board of Managers.  No Member shall be required to make any capital contribution to the Company other than any contribution that the Member has agreed to make in a written commitment with the Company.

**3.3    Loans.**    In the event that the Company requires additional funds to meet its obligations, the Company may borrow such funds from any party including, without limitation, the Members.

**3.4    Distributions.**    Distributions of the Company shall be made to the Members at such times and in such aggregate amounts as the Board of Managers shall determine.  Distributions to the Members shall be made pro rata, based on the respective Percentage Interests, and may be paid in cash, in property, in obligations of the Company or in Membership Interests.  The Board of Managers may, by resolution, set apart out of any funds of the Company available for distributions, a reserve or reserves for any proper purpose and may, by resolution, abolish any such reserve.

## ARTICLE IV
## MEETINGS OF MEMBERS

**4.1    Time and Place.**    All meetings of the Members shall be held at such place and time as the Members determine.

**4.2    Special Meetings.**    Special meetings of the Members, for any purpose, (a) may be called by the Company's President or the Board of Managers, and (b) shall be called by the President or Secretary upon written request (stating the purpose for which the meeting is to be called) of the holders of a Majority in Interest entitled to vote at the meeting.

**4.3    Notice of Meetings.**    Written notice of each Members' meeting, stating the place, date and time of the meeting and the purposes for which the meeting is called, shall be given (in the manner described in Section 7.1 below) not less than 10 nor more than 60 days before the date of the meeting to each Member of record entitled to vote at the meeting.  Notice of adjourned meetings is governed by Section 4.6 below.  Attendance of a Member at a meeting, in person or by proxy, shall constitute a waiver of such notice, except when attendance is for the

express purpose of objecting to the transaction of any business, at the commencement of the meeting, because the meeting was not lawfully called or convened.

**4.4    List of Members**.  The Secretary shall make and certify, at least 10 days before each meeting, a complete list of the Members entitled to vote at a Members' meeting or any adjournment of the meeting.  The list shall be arranged alphabetically within each class and series and shall show the address of, and the Percentage Interest held by, each Member.  The list shall be produced at the time and place of the meeting and may be inspected by any Member at any time during the meeting.

**4.5    Quorum; Adjournment**.  At all Members' meetings, the Members present in person or represented by proxy who, as of the record date for the meeting, were holders of a Majority in Interest shall constitute a quorum.  Once a quorum is present at a meeting, all Members present in person or represented by proxy at the meeting may continue to do business until adjournment, notwithstanding the withdrawal of enough Members to leave less than a quorum.  Regardless of whether a quorum is present, a Members' meeting may be adjourned to another time and place by a vote of the membership interest present in person or by proxy without notice other than announcement at the meeting; provided, that (a) only such business may be transacted at the adjourned meeting as might have been transacted at the original meeting and (b) if the adjournment is for more than 60 days or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting must be given to each Member of record entitled to vote at the meeting.

**4.6    Voting**.  Each Member shall at every meeting of the Members be entitled to vote in person or by proxy on each matter submitted to a vote.  A vote may be cast either orally or in writing.  Except as otherwise provided herein, when an action is to be taken by vote of the Members, it shall be authorized by the affirmative vote of holders of a Majority in Interest.

**4.7    Proxies**.    A Member entitled to vote at a meeting of Members or to express consent or dissent without a meeting may authorize other persons to act for him or her by proxy. Each proxy shall be in writing and signed by the Member or the Member's authorized agent or representative and shall be filed with the Secretary before or at the time of the meeting.  A proxy is not valid after the expiration of three years after its date unless otherwise provided in the proxy.

**4.8    Questions Concerning Elections**.    The Board of Managers may, in advance of the meeting, or the presiding officer may, at the meeting, appoint one or more inspectors to act at a Members' meeting or any adjournment thereof.  If appointed, the inspectors shall determine the Percentage Interest represented at the meeting, the existence of a quorum, and the validity and effect of proxies, and shall receive votes, ballots or consents, hear and determine challenges and questions arising in connection with the right to vote, count and tabulate votes, ballots or consents, determine the result, and do such acts as are proper to conduct the election or vote with fairness to all Members.

**4.9    Telephonic Attendance**.  Members may participate in any Members' meeting by means of conference telephone or similar communications equipment through which all persons

participating in the meeting may communicate with the other participants. All participants shall be advised of the communications equipment and the names of the participants in the conference shall be divulged to all participants. Participation in a meeting pursuant to this Section 4.9 constitutes presence in person at such meeting.

**4.10    Action by Written Consent.**  Any action required or permitted to be taken at any Members' meeting may be taken without a meeting, prior notice and a vote, by written consent of Members holding not less than the minimum Percentage Interest that would be necessary to authorize or take action at a meeting at which all Membership Interests entitled to vote thereon were present and voted.

**ARTICLE V**
**MANAGERS**

**5.1    Management by Managers.**  Except as otherwise provided by this Agreement (including Sections 5.14(c) and 6.13 hereof) and except as otherwise required by law, all decisions regarding the management and administration of the Company shall be made by, and the business and affairs of the Company shall be managed under the direction of, the Board of Managers. Without the direction, approval or authorization of the Board of Managers, no Member acting in his or her capacity as a Member shall (i) act for or bind the Company, or (ii) take, or purport to take, any action on behalf of the Company.

**5.2    Number and Residence.**  The Board of Managers shall consist of at least three (3) members and at least two (2) members of the Board of Managers shall at all times be Independent Managers. As of the date of this Agreement the number of members on the Board of Managers shall be three (3). The initial Independent Managers are: Richard E. Newsted and James B. Shein and the member of the Board of Managers that is not an Independent Manager shall be George S. Hofmeister. Subject to the first sentence of this Section 5.2, the number of Managers may be increased or decreased from time to time and shall be determined by the Board of Managers during the pendency of the Chapter 11 Case, and at all other times shall be determined by the Members. Managers need not be Members of the Company.

**5.3    Election and Term.**  Except as provided in Section 5.6 below, Managers shall be elected by the Members. Each Manager elected shall hold office until his or her successor is elected and qualified or until his or her resignation or removal.

**5.4    Resignation.**  A Manager may resign by written notice to the Company. A Manager's resignation is effective upon its receipt by the Company or a later time set forth in the notice of resignation.

**5.5    Removal.**  During the pendency of the Chapter 11 Case a Manager may only be removed by vote of the Board of Managers, with or without cause, at a special meeting of the Board of Managers called for the purpose of removing such Manager. At all other times, Managers shall be removed, with or without cause, by vote of the Members.

DOCS_LA:269922.3 73864/001

**5.6** **Vacancies**. Vacancies, including vacancies resulting from an increase in the number of Managers, may be filled by the Board of Managers, by the affirmative vote of a majority of all the Managers remaining in office (if the Managers remaining in office constitute a quorum) or by the Members (if the Managers remaining in office constitute less than a quorum). Each Manager so chosen shall hold office until the next annual election of Managers by the Members and until his or her successor is elected and qualified, or until his or her resignation or removal.

**5.7** **Place of Meetings**. The Board of Managers may hold meetings at any location. The location of annual and regular Board of Managers' meetings shall be determined by the Board and the location of special meetings shall be determined by the person calling the meeting.

**5.8** **Regular Meetings**. A regular meeting of the Board of Managers shall be held promptly after the annual Members' meeting for the purposes of electing officers and transacting such other business as may properly come before the meeting. No notice shall be necessary in order to legally constitute the meeting, provided a quorum is present. Additional regular meetings of the Board of Managers or Board committees may be held by resolution, without further notice, at such places and times as the Board or Board committee determines.

**5.9** **Special Meetings**. Special meetings of the Board of Managers may be called by or at the request of the President or any Manager, and shall be called by the President or Secretary on 24 hours notice by mail or by any other means provided in Section 7.1. The notice must specify the place, date and time of the special meeting, but need not specify the business to be transacted at, nor the purpose of, the meeting. Special meetings of Board committees may be called by the Chairperson of the committee or a majority of committee members pursuant to this Section 5.9.

**5.10** **Quorum**. At all meetings of the Board or a Board committee, a majority of the Managers then in office, or of members of such committee, constitutes a quorum for transaction of business, unless a higher number is otherwise required by the Certificate of Formation, this Agreement or the Board resolution establishing such Board committee. If a quorum is not present at any Board or Board committee meeting, a majority of the Managers present at the meeting may adjourn the meeting to another time and place without notice other than announcement at the meeting. Any business may be transacted at the adjourned meeting which might have been transacted at the original meeting, provided a quorum is present.

**5.11** **Voting**. The vote of a majority of the members present at any Board or Board committee meeting at which a quorum is present constitutes the action of the Board of Managers or of the Board committee, unless a higher vote is otherwise required by the Act, the Certificate of Formation, this Agreement, or the Board resolution establishing the Board committee.

**5.12** **Telephonic Participation**. Members of the Board of Managers or any Board committee may participate in a Board or Board committee meeting by means of conference telephone or similar communications equipment through which all persons participating in the meeting can communicate with each other. Participation in a meeting pursuant to this Section 5.12 constitutes presence in person at such meeting.

**5.13**    **Action by Written Consent**.  Any action required or permitted to be taken under authorization voted at a Board or Board committee meeting may be taken without a meeting if, before or after the action, members of the Board then in office or of the Board committee consent to the action in writing holding not less than the minimum number of votes that would be necessary to authorize or take action at a meeting at which all Managers of the Board or the committee were present and voted.  Such consents shall be filed with the minutes of the proceedings of the Board or committee and shall have the same effect as a vote of the Board or committee for all purposes.

**5.14**    **Committees**.

(a)    The Board of Managers may, by resolution passed by a majority of the Managers then in office, designate one or more committees, each consisting of one or more Managers.  The Board may designate one or more Managers as alternate members of a committee, who may replace an absent or disqualified member at a committee meeting.   In the absence or disqualification of a member of a committee, the committee members present and not disqualified from voting, regardless of whether they constitute a quorum, may unanimously appoint another member of the Board of Managers to act at the meeting in place of such absent or disqualified member.  Any committee, to the extent provided in the resolution of the Board, may exercise all powers and authority of the Board of Managers in management of the business and affairs of the Company, except a committee does not have power or authority to:

(i)    Fill vacancies in the Board.

(ii)    Unless the resolution designating the committee or a later Board of Manager's resolution expressly so provides, declare a distribution or dividend or authorize the issuance of membership interest.

(iii)    Fix the compensation of the Board of Managers or committees.

(iv)    Amend the Certificate of Formation or this Agreement.

(b)    Each committee and its members shall serve at the pleasure of the Board, which may at any time change the members and powers of, or discharge, the committee.  Each committee shall keep regular minutes of its meetings and report them to the Board of Managers when required.

(c)    A committee of the Board of Managers is hereby established and designated as the "Restructuring Committee."  The Independent Managers appointed as members of the Board of Managers from time to time shall constitute the entire membership of the Restructuring Committee and, notwithstanding Section 5.14(b), the Board of Managers shall not alter the composition or powers of the Restructuring Committee, disband the Restructuring Committee, or alter or modify the rights of GM set forth in Section 5.14(c)(i).  The Restructuring Committee shall determine the manner in which such committee shall function.   The Restructuring Committee is hereby authorized on behalf of the Company to interview, hire, determine the

compensation of, appoint, cause the Company to make payments to, remove and terminate the Chief Restructuring Officer and to take any and all actions that are related or incidental to the accomplishment of such actions. The Initial Chief Restructuring Officer of the Company shall be John Didonato. Notwithstanding anything to the contrary in this Agreement (including Section 5.1), the Restructuring Committee is authorized to oversee the day-to-day making of any Bankruptcy Decisions and the actions of the Chief Restructuring Officer, and the Board of Managers is not authorized to oversee the day-to-day making of any Bankruptcy Decisions or the Chief Restructuring Officer.

(i)    General Motors, LLC ("GM") shall be permitted to appoint an observer (the "GM Observer") to attend and observe meetings of the Restructuring Committee related to the ongoing sales processes of the Company's direct and indirect subsidiaries or the Company's restructuring process, so long as 1) the Restructuring Committee confirms in writing that such appointee is reasonably acceptable prior to such appointment becoming effective, and 2) the GM Observer agrees, in writing, to appropriate confidentiality obligations set forth by the Restructuring Committee with respect to information obtained while serving as the GM Observer. The Restructuring Committee, in its reasonable discretion, may, from time to time, recuse the GM Observer from such meetings. The GM Observer shall not have any additional rights or obligations pursuant to this Agreement, and shall not have: i) voting or consent rights, ii) authority to conduct business on behalf of the Company, iii) authority to execute documents or instruments, iv) authority to enter into agreements, or v) otherwise have authority to participate in the management of the Company, except as follows:

(A)    Upon the occurrence of an Event of Default pursuant to that certain Automotive Sales Transactions Support Agreement dated July __, 2013, the GM Observer shall have the right to i) make a motion at any meeting of the Restructuring Committee that the then incumbent Chief Restructuring Officer of the Company be replaced, and ii) to cast a vote, together with the Independent Managers, for or against any proposed replacement Chief Restructuring Officer. The appointment of a replacement Chief Restructuring Officer pursuant to this subparagraph (A) shall be accomplished by the affirmative vote of a simple majority of the Independent Managers and the GM Observer.

**5.15    Limitation of Authority.** Notwithstanding anything in this Agreement to the contrary, the Board of Managers may not cause the Company to do any of the following without the consent of holders of a Majority in Interest:

(a)    Amend the Certificate of Formation;

(b)    Approve a merger to which the Company is a party or a plan or agreement providing for a membership interest exchange;

(c)    Approve or authorize the sale, lease or exchange of all or substantially all of the Company's property and assets;

(d)     Approve or authorize the dissolution of the Company or a revocation of a dissolution; or

(e)     Amend this Agreement.

**5.16     Compensation**.    By resolution passed by a majority of the Managers then in office, the Managers may be paid their expenses, if any, of attendance at each meting of the Board of Managers and may establish reasonable compensation of Managers for services to the Company as Managers, officers or members of a Board committee.  No such payment shall preclude any Manager from serving the Company in any other capacity and receiving compensation for such service.

**5.17     Presumption of Assent**.    A Manager who is present at a meeting of the Board of Managers or a committee thereof at which action on any matter is taken shall be presumed to have assented to the action taken unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as the Secretary of the meeting before the adjournment thereof or shall forward such dissent by registered mail to the Secretary immediately after the adjournment of the meeting.  Such right to dissent shall not apply to a Manager who voted in favor of such action.

## ARTICLE VI
## OFFICERS

**6.1     Delegation to Officers**.    The power and authority of the Board of Managers to manage the affairs of the Company and to make all decisions and take all actions for the Company are hereby delegated to the officers to the extent described below, except such power and authority that has been delegated to the Restructuring Committee

**6.2     Officers and Agents**.    The Board of Managers elects the persons listed on Exhibit A as officers of the Company.  The Board of Managers may also from time to time appoint such other officers and agents as it deems advisable.  Any number of offices may be held by the same person, but an officer shall not execute, acknowledge or verify an instrument in more than one capacity if the instrument is required by law to be executed, acknowledged or verified by two or more officers.  An officer has such authority and shall perform such duties in the management of the Company as provided in this Agreement, or as may be determined by resolution of the Board of Managers not inconsistent with this Agreement, and as generally pertain to their offices, subject to the control of the Board of Managers (except as provided in Section 5.14(c) and Section 6.14).

**6.3     Compensation**.    Except as provided in Section 5.14(c), the compensation of all officers and employees of the Company shall be fixed by the Board of Managers and no officer shall be prevented from receiving such compensation by reason of the fact that he or she is also a Manager.

**6.4    Term**.    Each officer of the Company shall hold office for the term for which he or she is elected or appointed and until his or her successor is elected or appointed and qualified, or until his or her death, resignation or removal.  The election or appointment of an officer does not, by itself, create contract rights.

**6.5    Removal**.  An officer elected or appointed by the Board of Managers may be removed by the Board of Managers whenever in its judgment the best interests of the Company would be served thereby.  The removal of an officer shall be without prejudice to his or her contract rights, if any.

**6.6    Resignation**.    An officer may resign by written notice to the Company.  The resignation is effective upon its receipt by the Company or at a subsequent time specified in the notice of resignation.

**6.7    Vacancies**.  Any vacancy occurring in any office of the Company shall be filled by the Board of Managers.

**6.8    President**.  The President shall be the chief executive officer of the Company and shall have the general powers of supervision and management of the business and affairs of the Company usually vested in the chief executive officer of a Delaware limited liability company and shall see that all orders and resolutions of the Board of Managers are carried into effect.  In the absence of the Chairperson of the Board, the President shall preside at all Members' and Board of Managers' meetings.  He shall have the authority, subject to such rules as may be prescribed by the Board of Managers, to appoint such agents and employees of the Company as he shall deem necessary to prescribe their powers, duties and compensation, and to delegate authority to them.  Such agents and employees shall hold office at the discretion of the President. He shall have authority to sign, execute and acknowledge, on behalf of the Company, all deeds, mortgages, bonds, stock certificates, contracts, leases, reports and all other documents or instruments necessary or proper to be executed in the course of the Company's regular business, or which shall be authorized by resolution of the Board of Managers; and, except as otherwise provided by law or the Board of Managers, he may authorize any Vice President or other officer or agent of the Company to sign, execute and acknowledge such documents or instruments in his place and stead.  In general he shall perform all duties incident to the office of President and such other duties as may be prescribed by the Board of Managers from time to time.

**6.9    Vice President**.    In the absence of the President or in the event of his death, inability or refusal to act, the Vice President shall perform the duties of President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President.  The Vice President shall perform such other duties as from time to time may be assigned to him by the President or by the Board of Managers.  When more than one Vice President has been selected by the Board of Managers only one Vice President shall be required to be a Manager, but only a Vice President who is a Manager may perform the duties of the President as provided in this Agreement.

**6.10    Secretary**.    The Secretary shall act under the direction of the Company's President or the Board of Managers.  The Secretary shall attend all Members' and Board of

Managers' meetings, record minutes of the proceedings and maintain the minutes and all documents evidencing Company action taken by written consent of the Members and Board of Managers in the Company's minute books. The Secretary shall perform these duties for Board committees when required. The Secretary shall see to it that all notices of Members' meetings and special Board of Managers' meetings are duly given in accordance with applicable law, the Certificate of Formation and this Agreement. The Secretary shall have custody of the Company's seal and, when authorized by the Company's President or the Board of Managers, shall affix the seal to any instrument requiring it and attest such instrument.

**6.11    Treasurer**.    The Treasurer shall act under the direction of the Company's President. The Treasurer shall have custody of the Company funds and securities and shall keep full and accurate accounts of the Company's assets, liabilities, receipts and disbursements in books belonging to the Company. The Treasurer shall deposit all moneys and other valuables in the name and to the credit of the Company in such depositories as may be designated by the Board of Managers. The Treasurer shall disburse the funds of the Company as may be ordered by the Company's President or the Board of Managers, taking proper vouchers for such disbursements, and shall render to the Company's President, and the Board of Managers (at its regular meetings or whenever they request it) an account of all his or her transactions as Treasurer and of the financial condition of the Company. If required by the Board of Managers, the Treasurer shall give the Company a bond for the faithful discharge of his or her duties in such amount and with such surety as the Board prescribes.

**6.12    Assistant Secretaries and Treasurers and Acting Officers**.    The Assistant Secretaries and Assistant Treasurers, if any, shall act under the direction of the President, the Board of Managers and the officer they assist. In the order of their seniority, the Assistant Secretaries shall, in the absence or disability of the Secretary, perform the duties and exercise the authority of the Secretary. The Assistant Treasurers, in the order of their seniority, shall, in the absence or disability of the Treasurer, perform the duties and exercise the authority of the Treasurer. The Board of Managers shall have the power to appoint any person to perform the duties of an officer whenever for any reason it is impracticable for such officer to act personally. Such acting officer so appointed shall have the powers of and be subject to all the restrictions upon the officer to whose office he is so appointed except as the Board of Managers may by resolution otherwise determine.

**6.13    Chief Restructuring Officer**.    The Chief Restructuring Officer, if any, shall be appointed by and may be removed by the Restructuring Committee. Notwithstanding any contrary provision of this Agreement (including Section 5.1 hereof) but subject to the oversight of the Restructuring Committee, at any time an individual has been designated as the Chief Restructuring Officer, (i) the Chief Restructuring Officer shall make all Bankruptcy Decisions and decisions regarding the management and administration of the Bankruptcy Decisions and (ii) the Board of Managers and the other Officers shall have no authority to make Bankruptcy Decisions and any decisions regarding the management and administration of the Bankruptcy Decisions. In furtherance of such actions, but subject to the oversight of the Restructuring Committee, the Chief Restructuring Officer shall have the power to do any and all acts on behalf of the Company that are necessary or convenient to or in furtherance of any Bankruptcy Decisions and to take any and all actions that are related or incidental to the accomplishment of

such actions, all without the consent of any other person or entity. The Chief Restructuring Officer shall not take any action that is inconsistent with a direction issued by the Restructuring Committee.

**6.14    Execution of Contracts and Instruments**. Except as otherwise designated by the Board of Managers, generally, all officers of the company have authority to execute contracts or other instruments in the name of and on the Company's behalf, and may affix the Company's seal to such document or instrument.

**6.15    Voting of Shares and Securities of Other Companies and Entities**. Subject always to the specific directions of the Board of Managers, (a) any shares or other securities issued by any other corporation and owned or controlled by the Company may be voted at any meeting of security holders of such other corporation by the President of the Company or by proxy appointed by him, or in the absence of the President and his proxy by the Treasurer of the Company or by proxy appointed by him, or in the absence of the President and Treasurer, by the Secretary of the Company or by proxy appointed by him. Such proxy or consent in respect to any shares or other securities issued by any other corporation and owned by the Company shall be executed in the name of the Company by the President, the Treasurer or the Secretary of the Company without necessity of any authorization by the Board of Managers. Any person or persons designated in the manner above stated as the proxy or proxies of the Company shall have full right, power and authority to vote the shares or other securities issued by such other corporation and owned by the Company the same as such shares or other securities might be voted by the Company.

**6.16    Loans.** No loans shall be contracted on behalf of the Company and no evidences of indebtedness shall be issued in its name unless authorized by a resolution of the Board of Managers. Such authority may be general or confined to specific instances. No loan or advance to or overdraft or withdrawal by an officer, Manager or Member of the Company otherwise than in the ordinary and usual course of the business of the Company, and on the ordinary and usual terms of payment and security shall be made or permitted unless each such transaction shall be approved by a vote of two-thirds (2/3) of the members of the Board of Managers excluding any Manager involved in such transaction and a full and detailed statement of all such transactions and any payments shall be submitted at the next annual meeting of Members and the aggregate amount of such transactions less any repayments shall be stated in the next annual report to Members.

**ARTICLE VII**
**NOTICES AND WAIVERS OF NOTICE**

**7.1    Delivery of Notices**. All written notices to Members, Managers and Board committee members shall be given personally or by mail (registered, certified or other first class mail, with postage pre-paid), addressed to such person at the address designated by him or her for that purpose or, if none is designated, at his or her last known address. Written notices to Managers or Board committee members may also be delivered at his or her office on the Company's premises, if any, or by overnight carrier, telegram, telex, telecopy, radiogram, cablegram, facsimile, computer transmission or similar form of communication, addressed to the

{*}13

address referred to in the preceding sentence.  Notices given pursuant to this Section 7.1 shall be deemed to be given when dispatched, or, if mailed, when deposited in a post office or official depository under the exclusive care and custody of the United States postal service.  Notices given by overnight carrier shall be deemed "dispatched" at 9:00 a.m. on the day the overnight carrier is reasonably requested to deliver the notice.  The Company shall have no duty to change the written address of any Manager, Board committee member or Member unless the Secretary receives written notice of such address change.

     **7.2**   **Waiver of Notice**.  Action may be taken without a required notice and without lapse of a prescribed period of time, if at any time before or after the action is completed the person entitled to notice or to participate in the action to be taken or, in the case of a Member, his or her attorney-in-fact, submits a signed waiver of the requirements, or if such requirements are waived in such other manner permitted by applicable law.  Neither the business to be transacted at, nor the purpose of, the meeting need be specified in the written waiver of notice.  Attendance at any Members' meeting (in person or by proxy) will result in both of the following:

     (a)   Waiver of objection to lack of notice or defective notice of the meeting, unless the Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting.

     (b)   Waiver of objection to consideration of a particular matter at the meeting that is not within the purpose or purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

A Manager's attendance at or participation in any Board or Board committee meeting waives any required notice to him or her of the meeting unless he or she, at the beginning of the meeting or upon his or her arrival, objects to the meeting or the transacting of business at the meeting and does not thereafter vote for or assent to any action taken at the meeting.

## ARTICLE VIII
## DISSOLUTION AND WINDING UP

     **8.1**   **Dissolution.**  The Company shall dissolve and its affairs shall be wound up upon the decision of holders of a Majority in Interest to dissolve the Company or any other event that, under the Act, requires the dissolution of the Company.

     **8.2**   **Winding Up.**  Upon dissolution, the Company shall cease carrying on its business and affairs and shall commence the winding up of the Company's business and affairs and the liquidation of its assets.  Upon the winding up of the Company, the assets of the Company shall be distributed first to creditors to the extent permitted by law, in satisfaction of the Company's debts, liabilities and obligations, and then to the Members.  Any remaining proceeds shall be paid to the Members pro rata in accordance with their Percentage Interest within ninety (90) days after the date of winding up.

## ARTICLE IX
## GENERAL PROVISIONS

**9.1** **Checks and Funds**.   All checks, drafts or demands for money and notes of the Company must be signed by such officer or officers or such other person or persons as the Board of Managers from time to time designates.  All funds of the Company not otherwise employed shall be deposited or used as the Board of Managers from time to time designates.

**9.2** **Fiscal Year**.  The fiscal year of the Company shall begin on the 1st day of January in each year.

**9.3** **Company Seal**.  The Board of Managers may adopt a company seal for the Company.   The Company seal, if adopted, shall be circular and contain the name of the Company and the words "Company Seal Kentucky" or words of similar meaning.  The seal may be used by causing it or a facsimile of it to be impressed, affixed, reproduced or otherwise.

**9.4** **Books and Records**.  The Company shall keep within or outside of Delaware books and records of account and minutes of the proceedings of its Members, Board of Managers and Board committees, if any.  The Company shall keep at its registered office or at the office of its transfer agent within or outside of Delaware records containing the names and addresses of all Members, the number, class and series of Membership Interest held by each and the dates when they respectively became record holders of Membership Interest.  Any of such books, records or minutes may be in written form or in any other form capable of being converted into written form within a reasonable time.

**9.5** **Article and Section Headings.**  The Article and Section headings contained in this Agreement have been inserted only as a matter of convenience and for reference, and in no way shall be construed to define, limit or describe the scope or intent of any provision of this Agreement.

**9.6** **Entire Agreement.**  This Agreement constitutes the entire operating agreement of the Company.

**9.7** **Governing Law.**  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to application of conflict of laws principles.

## ARTICLE X
## OTHER

**10.1** **Indemnification.**   The Company shall, to the fullest extent authorized or permitted by the Act, (a) indemnify any person, and his or her heirs, personal representatives, executors, administrators and legal representatives, who was, is, or is threatened to be made, a party to any threatened, pending or completed action, suit or proceeding (whether civil, criminal, administrative or investigative) by reason of the fact that such person is or was a Manager or officer of the Company or is or was serving at the request of the Company as a Manager, officer,

employee or agent of another corporation, partnership, joint venture, trust or other enterprise (collectively, "***Covered Matters***"); and (b) promptly pay or reimburse the reasonable expenses incurred by such person and his or her heirs, executors, administrators and legal representatives in connection with any Covered Matter in advance of final disposition of such Covered Matter. The Company shall provide indemnification to its Managers and Officers, by appropriate insurance, and in such additional manner as may be permitted by law and authorized by the Board of Managers.    The Company may also provide indemnification to its employees, representatives, and agents by insurance, contract, or otherwise as may be permitted by law and authorized by the Board of Managers.

**10.2    Amendment.**  During the pendency of the Chapter 11 Case this Agreement may be amended or repealed, or a new operating agreement may be adopted, by action of the Board of Managers.   At all other times, this Agreement may be amended or repealed, or a new operating agreement may be adopted, by action of holders of a Majority in Interest. Notwithstanding any other provision of this Agreement, during the term of the Support Agreement (a) the Restructuring Committee shall consist of two (2) Independent Managers and (b) no amendment or adoption of any new operating agreement shall alter or modify the rights or powers of the Restructuring Committee, the rights of GM, or Section 5.14(c) of this Agreement other than with the express prior written consent of GM or pursuant to a confirmed chapter 11 plan of reorganization of the Company.

**10.3    Scope of Agreement.**  This Agreement governs the regulation and management of the affairs of the Company to the extent that they are consistent with applicable law and the Certificate of Formation; to the extent they are not consistent, applicable law and the Certificate of Formation shall govern.

[Remainder of page intentionally left blank]

DOCS_LA:269922.3 73864/001

**IN WITNESS WHEREOF,** the Member makes and executes this Agreement as of the date first above written.

ASCALON ENTERPRISES, LLC

By: _____

Name: George Hofmeister

Title:  Chairman

**EXHIBIT A**

**Officers**

| | |
|---|---|
| John Didonato | President & CRO |
| Laura Marcero | Executive Vice President & Deputy CRO |
| James Lukenda | Deputy CRO |
| Brian Linscott | Deputy CRO |
| Daniel V. Smith | Secretary & General Counsel |
| James O'Toole | Assistant Secretary & Deputy General Counsel |
| John Owens | Treasurer |