## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVSTONE INDUSTRIES, LLC, <u>et al.</u>,[1] | ) | Case No. 12-13262 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered |
| | ) | |

**Objection Deadline: March 13, 2014, at 4:00 p.m. (prevailing Eastern time)**
**Hearing: March 20, 2014 at 10:00 a.m. (prevailing Eastern time)**

## MOTION OF REVSTONE INDUSTRIES, LLC, ET AL. FOR ORDER PURSUANT TO 11 U.S.C. §§ 105 & 363 AND BANKRUPTCY RULE 9019 AUTHORIZING AND APPROVING SETTLEMENT AGREEMENT WITH PENSION BENEFIT GUARANTY CORPORATION

Debtors Revstone Industries, LLC ("Revstone"), Spara, LLC ("Spara"),

Greenwood Forgings, LLC ("Greenwood"), and US Tool & Engineering LLC ("US Tool"),

debtors and debtors in possession in the above captioned proceedings (collectively, the

"Debtors"), hereby submit this motion (the "Motion") for entry of an order, pursuant to sections

105 and 363 of the United States Bankruptcy Code (the "Bankruptcy Code") and Rule 9019 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing and approving

the *Settlement Agreement* dated as of February 11, 2014 (the "Settlement Agreement") by and

among (i) the Debtors, (ii) non-Debtor Fairfield Castings, LLC ("Fairfield"), (iii) Debtor TPOP,

LLC ("TPOP")[2] and certain of Revstone and Spara's non-debtor subsidiaries (together with the

Debtors, TPOP, and Fairfield, the "PBGC Obligors"), and (iv) the Pension Benefit Guaranty

---

[1]  The Debtors in these Chapter 11 Cases and the last four digits of their respective federal tax identification numbers are: Revstone Industries, LLC (7222); Spara, LLC (6613); Greenwood Forgings, LLC (9285); and US Tool & Engineering, LLC (6450).  The location of the Debtors' headquarters and the service address for the Debtors is 230 N. Limestone St., Ste. 100, Lexington, KY 40507.

[2]  TPOP has concurrently filed a separate motion to approve the Settlement Agreement in its proceeding, Bankr. Case No. 13-11831.

Corporation (the "PBGC").  A copy of the Settlement Agreement is attached hereto as **Exhibit 1**.
Capitalized terms not otherwise defined herein shall have the meaning set forth in the Settlement
Agreement.  In support of this Motion, the Debtors respectfully state as follows:

### Preliminary Statement

The Debtors, TPOP, and certain non-debtor affiliates, together with the largest
creditor of these estates, the PBGC, have agreed to a settlement that, if approved by this Court,
will represent a critical turning point in these proceedings.  After several months of extensive
negotiation, the Debtors and the PBGC have reached agreement on a global resolution of the
PBGC's substantial claims (which dwarf the other claims in the estates) that will provide for the
release of funds from subsidiary levels to the Revstone and Spara estates and a path to a
confirmable chapter 11 plan (or plans) that is expected to yield meaningful recoveries by
unsecured creditors.  The principal parties in these cases, including the Official Committee of
Unsecured Creditors in Revstone's case (the "Committee"), have previously acknowledged that a
resolution of disputes with the PBGC is a necessary prerequisite to moving these cases to final
disposition.  That time is now at hand through the proposed settlement between the Debtors and
the PBGC.

As noted, the PBGC is by far the largest creditor in these cases with claims in
excess of $95 million against each of the Debtors and their various non-debtor affiliates within
the control group.  As such, PBGC's claims are structurally senior to other claims asserted at the
Revstone and Spara parent levels.  Given the size of these claims, the PBGC swamps the creditor
pool at every level of Revstone's and Spara's organizational structure.  Thus, resolution of the

2

PBGC's claims is the essential ingredient necessary for the Revstone and Spara estates to realize value derived from their respective holdings in subsidiaries and to move these cases to confirmation of a plan.

As stated by the PBGC in its withdrawal of support for the Committee's Trustee Motion (as defined below) filed on February 10, 2014:

> In the absence of this Settlement, there would be no value available for distribution to the Debtors' estates as PBGC's large claims at the Debtors' subsidiary entities, including the TPOP estate and non-debtor subsidiaries, overwhelmingly exceed the amount of assets available to pay creditors, leaving no value for equity or for upstreaming to the Debtors' estates. In particular, the Revstone estate, which is the subject of the Trustee Motion, would be administratively insolvent if the PBGC's claims remain unresolved.

> Furthermore, absent the Settlement, prolonged and protracted litigation would continue in the bankruptcy court and non-bankruptcy courts that would significantly, if not completely, deplete the Debtors' assets.

Withdrawal of PBGC Joinder and Objection to Trustee Motion [Docket No. 1312] at ¶2-3. The Debtors wholeheartedly agree. The proposed settlement represents the best opportunity for creditors to maximize recoveries by resolving the PBGC's otherwise overwhelming claims at all levels of the Debtors' organizational structure.

Along with addressing the PBGC's claims and related non-bankruptcy pension litigation, the settlement will resolve pension-related claims asserted by the U.S. Department of Labor (the "DOL") against TPOP and Fairfield, and provide (a) the framework for the payment of allowed administrative expenses and priority claims and (b) the means for distributions to be made to unsecured creditors in the Revstone and Spara bankruptcy cases pursuant to a chapter 11

3

plan. Based on current projections, if the settlement with the PBGC is consummated and a chapter 11 plan proposed by the Debtors is confirmed, unsecured creditors stand to receive recoveries in each of the Revstone and Spara cases out of the liquidation of subsidiary assets (in each cash with upside and downside potential).

The highlights of the settlement are as follows:

- The PBGC will have an allowed general unsecured, non-priority claim against the Debtors and its domestic affiliates in the amount of $95 million.

- The PBGC will accept a projected recovery of $82 million on account of the Allowed PBGC Claim, but in no event less than $80 million.

- Distributions will be made to the PBGC, on the one hand, and Revstone and its sister company, Spara, as applicable, on the other hand, or into an escrow, out of the net available proceeds realized from asset sales at various Revstone and Spara subsidiaries in accordance with an agreed funding schedule. The PBGC will agree to allow payments to be made to the Revstone and Spara estates so that creditors of these estates (other than the PBGC) can receive distributions, including administrative claimants.

- Certain reserves will be created to cover post-confirmation expenses and litigation costs.

- All pending bankruptcy litigation between the parties will be dismissed with prejudice, including the PBGC's joinder in the Trustee Motion (as defined below), and the PBGC will agree to support Revstone's amended chapter 11 plan (as well as plans for the other debtors), which will incorporate the terms of the settlement.

- TPOP and Fairfield will consent to termination of the Pensions Plans (as defined below) and the PBGC's trusteeship of the Pension Plans. Upon termination of the Pension Plans under 29 U.S.C. § 1342, any claims filed by the Pension Plans against the Debtors' bankruptcy estates shall be deemed withdrawn.

- The DOL, TPOP, and Fairfield will seek entry of consent judgments in the DOL Litigation, which shall state the amounts each of TPOP and Fairfield owes to the Pension Plans, concluding the litigation as to those two defendants only, and releasing all DOL claims against those two defendants, except as necessary to give effect to the consent judgments and the settlement.

4

Approval of this Motion is in the best interests of the Debtors' estates because it represents a "win-win" for all parties. The settlement: (a) resolves the claims of the PBGC, the key creditor in these cases, (b) settles and avoids further litigation over various pension liabilities, and (c) provides for distributions to unsecured creditors through a chapter 11 plan that will have the support of the PBGC. The Committee previously admitted that resolution of the PBGC's issues was a critical prerequisite to confirming a plan in Revstone's case, and further asserted (wrongly) that a resolution with the PBGC "appears impossible." *See* Trustee Motion (as defined below) at ¶62, pp. 33-34. In fact, the Debtors have reached a deal with the PBGC that clearly benefits the estates and will provide the springboard for a confirmable plan in these cases.

For the foregoing reasons, and as set forth below, approval of the Settlement Agreement is in the best interests of the Debtors and their estates and should be approved.

### Jurisdiction and Venue

1.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

2.     On December 3, 2012, Revstone and its sister company, Spara, commenced their respective cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On January 7, 2013, Revstone subsidiaries, Greenwood and US Tool, commenced their respective cases by filing voluntary petitions for relief under chapter 11 of the

Bankruptcy Code.  On July 22, 2013, Revstone subsidiary, TPOP, commenced its case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors and TPOP have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     On December 18, 2012, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") in the Revstone case.  No committee has been appointed in the cases of Spara, Greenwood, US Tool, or TPOP.  No trustee or examiner has been appointed in any of the Debtors' chapter 11 cases.

4.     Certain of Revstone's affiliates sponsor defined benefit pension plans. Specifically, TPOP sponsors the Hillsdale Hourly Pension Plan and the Hillsdale Salaried Pension Plan.  Fairfield sponsors the Revstone Casting Fairfield GMP Local 359 Pension Plan.[3] The Hillsdale Hourly Pension Plan, the Hillsdale Salaried Pension Plan, and the Revstone Casting Fairfield GMP Local 359 Pension Plan are collectively referred to herein as the "Pension Plans."  Issues and disputes with the PBGC involve or are related to (a) termination of the Pension Plans, and (b) the amounts, calculation, and priority of the PBGC's claims against the Debtors and the various non-debtor subsidiaries and affiliates.  The PBGC asserts "controlled group" liability against every entity within the Revstone and Spara umbrella of companies.  The

---

[3]  Another non-Debtor affiliate called Fourslides, Inc. sponsors the Fourslides, Inc. Pension Plan, which is not affected by the Settlement Agreement.

DOL has also asserted claims against the Debtors relating to the Pension Plans, as have the Pension Plans themselves.

### The Claims of the PBGC, DOL, and Pension Plans and Related Litigation

5.     As mentioned above, the PBGC asserts, under 29 U.S.C. § 1301(a)(14), that the sponsor of a pension plan and members of its controlled group are financially responsible for the pension plan. The PBGC further asserts that the responsibilities of the plan sponsor and controlled-group members to a pension plan include, *inter alia*: (1) paying the statutorily required minimum funding contributions to the pension plan; (2) paying insurance premiums to the PBGC; and (3) paying any unfunded benefit liabilities to the PBGC if the pension plan terminates. The PBGC asserts that liabilities of the plan sponsor and controlled-group members with regard to the pension plan are joint and several.

6.     On or about June 26, 2013, the PBGC filed 13 proofs of claim against the Debtors as follows: (1) four claims against Revstone related to the due and unpaid minimum funding contributions due to the Pension Plans under 26 U.S.C. §§ 412, 430 and 29 U.S.C. § 1082 in the amounts of $3,364,321 [Claim No. 204], $1,138,674 [Claim No. 207], an unliquidated amount [Claim No. 209], and $559,356 [Claim No. 203], respectively, (2) four claims against Revstone related to premiums due to the PBGC by the Pension Plans under 29 U.S.C. § 1307 in the amounts of $4,342,500 [Claim No. 202], $1,380,000 [Claim No. 208], $172,500 [Claim No. 205], and $1,185,000 [Claim No. 206], respectively, (3) four claims against Revstone related to the unfunded benefit liabilities of the Pension Plans under 29 U.S.C. § 1362 and 1368 in the amounts of $38,600,000 [Claim No. 213], $7,500,000 [Claim No. 211], $87,822

7

[Claim No. 214], and $8,927,262 [Claim No. 210], respectively, and (4) a claim against Greenwood for unpaid obligations due to the Hillsdale Hourly Pension Plan and the Hillsdale Salaried Pension Plan under certain promissory notes made by Greenwood in an unliquidated amount [Claim No. 212].

7.    On or about August 23, 2013, the PBGC filed a complaint in the United States District Court for the Eastern District of Kentucky against Metavation and Fairfield, styled *Pension Benefit Guaranty Corporation v. Metavation LLC et al.*, No. 5:13-cv-273 (the "PBGC Litigation"), seeking termination of the Pension Plans.

8.    The DOL has filed three proofs of claim on behalf of the Pension Plans against Revstone totaling $41.49 million for alleged breach of fiduciary duty obligations and prohibited transactions under ERISA [Claim Nos. 498, 499, 501].  Specifically, the DOL asserts (i) on behalf of the Hillsdale Hourly Pension Plan, an unsecured claim in the amount of $5,881,193.48 and a secured claim in the amount of $18,735,289.99 [Claim No. 498]; (ii) on behalf of the Hillsdale Salaried Pension Plan, an unsecured claim in the amount of $3,647,285.44 and a secured claim in the amount of $8,942,450.00 [Claim No. 499]; and (iii) on behalf of the Revstone Casting Fairfield GMP Local 359 Pension Plan, an unsecured claim in the amount of $1,463469.40 and a secured claim in the amount of $2,820,000 [Claim No. 501].

9.    The DOL also has commenced litigation relating to the Pension Plans.  In *Perez v. Hofmeister*, U.S.D.C. Case No 12-cv-250 (E.D.Ky.) and the lawsuits consolidated therewith (Case Nos. 13-cv-156) (the "DOL Litigation"), the DOL asserted claims against certain of the PBGC Obligors and others, relating to, *inter alia*, the management and

8

administration of the Pension Plans, the transfer, use, and investment of the Pension Plans'

assets, and the payment and allocation of fees and expenses.

      10.    The Pension Plans have also filed claims for unpaid contributions against

Revstone, including: (i) a priority proof of claim for $1,656,893 [Claim No. 242]; (ii) a priority

proof of claim of $670,904 [Claim No. 247]; (iii) an administrative expense claim for unpaid

minimum contributions in the amount of $1,501,172 [Docket No. 712]; and (iv) an

administrative expense claim for unpaid minimum contributions $329,163 [Docket No. 713].

The Pension Plans have also filed two contingent termination claims against all the Debtors for

underfunding in the event that the Pension Plans are terminated in the aggregate amount of

$46,100,000 [Docket Nos. 712, 713].  The Debtors believe that these claims are duplicative of

the claims asserted by the PBGC, or have been paid during the course of this case through

payments by one or more non-debtor affiliates with respect to the unpaid contribution claims.

      11.    Like the PBGC, the Pension Plans' claims are asserted as joint and several

as to all entities within the controlled group.  Accordingly, to the extent that the Pension Plans

are terminated, the Pension Plans assert that any resulting liabilities would become fixed and

liquidated in respect of all entities within the controlled group.

      12.    On November 20, 2013, the PBGC filed its *Motion of Pension Benefit

Guaranty Corporation for the Entry of an Order Pursuant to 11 U.S.C. § 1112(B) Converting the

Bankruptcy Case of TPOP, LLC from Chapter 11 of the Bankruptcy Code to a Case Under

Chapter 7 of the Bankruptcy Code* [TPOP Docket No. 307] (the "Conversion Motion").  The

PBGC also joined (the "PBGC Joinder") in the *Motion of the Official Committee of Unsecured*

9

*Creditors to (I) Appoint a Chapter 11 Trustee Pursuant to 11 U.S.C. § § 1104(a)(1) and*

*1104(a)(2) or, Alternatively, (II) Convert Case to Chapter 7 Pursuant to 11 U.S.C. §§ 1112(b)(1)*

*and 1112(b)(4)(A)* [Revstone Docket No. 1167] (the "Trustee Motion").  On February 10, 2014,

in light of the pending settlement, the PBGC withdrew the Conversion Motion and the PBGC

Joinder.

### The Proposed Settlement Agreement

13.     As noted above, the proposed Settlement Agreement resolves the universe

of PBGC, DOL, and Pension Plan claims and associated litigation as it relates to the Debtors and

their non-Debtor subsidiaries, and provides the framework for payment of allowed administrative

and priority claims and distributions to unsecured creditors under a chapter 11 plan proposed by

the Debtors.

14.     The parties to the Settlement Agreement are (a) the Debtors and TPOP; (b)

Fairfield; (c) certain Revstone and Spara related non-debtor subsidiaries, including Revstone

Transportation, LLC, Revstone Tool & Engineering, LLC, T Cast Holdings, LLC, Fairfield

Castings, LLC, CC Liquidation, LLC f/k/a Contech Castings, LLC, MWTDC, Inc. f/k/a MW

Texas Die Casting, Inc., MPI, LLC, Revstone Wallaceburg Canada Inc., Aarkel Tool & Die Inc.,

and Eptec S.A. De C.V.; and (d) the PBGC.  Although not a party to the settlement, a resolution

of disputes with the DOL will be accomplished through the entry of a separate consent judgment.

15.     The primary terms of the Settlement Agreement are as follows:[4]

---

[4]  While the summary of the principal terms herein is intended to be accurate, if there is any discrepancy between
this summary and the Settlement Agreement, the terms of the Settlement Agreement shall control.

a.     The PBGC will have an allowed general unsecured, non-priority, joint and several claim against each of the PBGC Obligors in the amount of $95,000,000 (the "Allowed PBGC Claim"). The total amount the PBGC is to receive for the Allowed PBGC Claim is to be no less than $80,000,000 (the "PBGC Minimum Recovery"), with a targeted amount of $82,000,000. Amounts paid by the PBGC Obligors since the Revstone Petition Date to the Pension Plans shall be credited toward the PBGC Minimum Recovery. To date, the PBGC Obligors have paid $21,693,767 to the Pension Plans. As a result, the additional amount necessary to reach the PBGC Minimum Recovery is $58,306.233. The PBGC is also entitled to receive additional funds if Net Proceeds exceed $116,000,000 (the "PBGC Upside Recovery"), which funds shall be distributed equally between the PBGC and the Revstone and Spara estates. The PBGC Upside Recovery is in addition to the PBGC Minimum Recovery, but the PBGC shall not receive an amount greater than the PBGC Maximum Recovery. A final reconciliation of the amounts distributed shall occur once the material assets of the PBGC Obligors have been liquidated and the amount of Net Proceeds determined.

b.     The PBGC has agreed for distributions to be made to Revstone's and Spara's bankruptcy estates consistent with the Funding Schedule attached as Exhibit A to the Settlement Agreement, and for Revstone and Spara to utilize such distributions for the payment of allowed creditor claims against their respective estates (other than the Allowed PBGC Claim), to the extent consistent with the PBGC Minimum Recovery and the PBGC Upside Recovery. Until such time that the PBGC receives the PBGC Minimum Recovery, the estates of Revstone and Spara shall retain 50% of the amount that would otherwise be distributed to those estates'

11

unsecured creditors, but in no event less than $2,072,000 at Revstone and $928,000 at Spara. Additionally, each of the Debtors may use available cash in their respective estates to pay any allowed administrative or priority claims.

   c. The PBGC shall withdraw any and all notices of federal liens with respect to any filed 430(k) Liens and not assert any non-filed or additional 430(k) Liens against each of the PBGC Obligors.

   d. TPOP and Fairfield shall consent to immediate termination of the Pension Plans, and shall execute agreements acceptable to the PBGC effecting plan termination and the PBGC's trusteeship pursuant to 29 U.S.C. § 1342.  Upon termination, all claims of the Pension Plans against the Debtors shall be deemed withdrawn.

   e. All pending litigation, including the PBGC Action and DOL Litigation will be resolved.  The DOL, TPOP, and Fairfield will seek entry of consent judgments in the DOL Litigation, which shall state the amounts each of TPOP and Fairfield owes to the Pension Plans, concluding the litigation as to those two defendants only, and releasing all DOL claims against those two defendants, except as necessary to give effect to the consent judgments and the settlement.  The PBGC has already withdrawn the Conversion Motion in TPOP's case and the PBGC Joinder to the Trustee Motion in Revstone's case, and will withdraw the PBGC's objections to fee requests of the Debtors' professionals.

   f. The Parties shall enter into a Plan Support Agreement (attached as Exhibit C to the Settlement Agreement) that reflects the Parties' support of Revstone's previously filed chapter 11 plan, to be amended as necessary consistent with the terms of the

12

Settlement Agreement and/or supplemented by separate plans of Spara or the other Debtors in conformity with the Settlement Agreement. The PBGC shall support current management of the Debtors through the effective date of a chapter 11 plan or plans and thereafter through the Debtors' proposed designees or successors.

        g.      Upon the effective date of a chapter 11 plan in the Revstone and Spara bankruptcy cases, certain Reserves shall be created for (i) post-effective date administrative expenses, excluding litigation expenses, in the amount of $1,000,000 at Revstone and $750,000 at Spara, and (ii) litigation expenses in the amount of $1,500,000 at Revstone and $500,000 at Spara. If insufficient funds are available to fund the litigation reserves on the effective date of a chapter 11 plan or plans, then (A) 50% of the applicable litigation reserve amount shall be funded on the date that the applicable Revstone or Spara estate receives 75% of its recoveries contemplated by the Funding Schedule, and (B) the remaining 50% of the applicable reserve amount shall be funded on the date that the applicable Revstone or Spara estate receives 85% of its recoveries contemplated by the Funding Schedule.

        h.      On the Applicable Release Date, the PBGC, on behalf of itself and the Pension Plans following the PBGC's trusteeship, agrees to grant general releases to the PBGC Obligors to the extent set forth more fully in the Settlement Agreement. Such releases expressly exclude George Hofmeister, his relatives, and affiliates or trusts of George Hofmeister or his family.

        i.      The Settlement Agreement becomes effective upon execution of the Settlement Agreement by the Parties, the entry of an order approving the Settlement

13

Agreement by the Bankruptcy Court in each of the Debtors' cases, which order has not been stayed, and resolution of disputes with the DOL through a consent order.

**Relief Requested**

16.    By this Motion, the Debtors request the entry of an order, pursuant to sections 105, 362 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019, substantially in the form attached hereto as **Exhibit 2**, approving the Settlement Agreement with the PBGC, effective immediately, and granting such other relief as is just and proper.

**Basis for Relief**

17.    As noted above, the Settlement Agreement represents the culmination of lengthy, good faith, and arms' length negotiations between the Debtors and the PBGC, the key creditor in these cases.  The settlement will address the PBGC's claims at all debtor and non-debtor subsidiary levels and allow distributions to be made to the Revstone and Spara estates. As all parties have previously acknowledged, a settlement with the PBGC was a critical condition to confirmation of a plan.  The proposed Settlement Agreement provides the resolution that everyone was waiting for in order to move these cases towards plan confirmation.

18.    Approval of the Settlement Agreement constitutes a reasonable exercise of the Debtors' business judgment under Bankruptcy Code section 363(b).  This provision states that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  In interpreting this provision, courts have held that a transaction involving property of the estate generally should be approved so long as the trustee can demonstrate "some articulated business justification for using, selling,

14

or leasing property outside of the ordinary course of business." *In re Continental Airlines, Inc.*, 780 F. 2d 1223, 1226 (5th Cir. 1986); *accord In re Lionel Corp.*, 722 F. 2d 1063, 1071 (2nd Cir. 1983. Approval of the Motion should be further authorized pursuant to section 105 of the Bankruptcy Code, which authorizes the Court "to issue any order, process or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code." *See* 11 U.S.C. § 105(a).

19.     The proposed Settlement Agreement also should be approved as a compromise or settlement under Bankruptcy Rule 9019, which provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  "To minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'" *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 COLLIER ON BANKRUPTCY ¶ 9019.03[1] (15th ed. 1993)).

20.     Approving a settlement "is within the discretion of the bankruptcy court." *In re World Health Alt., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006).  "In exercising this discretion, the bankruptcy court must determine whether the compromise is fair, reasonable, and in the best interests of the estate." *Key3Media Group, Inc. v. Pulver.com, Inc. (In re Key3Media Group, Inc.)*, 336 B.R. 87, 92 (Bankr. D. Del. 2005).

21.     In determining whether the proposed settlement is fair and equitable, two principles should guide this Court.  First, "[c]ompromises are favored in bankruptcy," 10 Lawrence P. King, *Collier on Bankruptcy*, ¶ 9019.01, at 9019-2 (15th ed. rev. 1997) (citing *In re Sassalos,* 160 B.R. 646, 653 (D. Ore. 1993)), and are "a normal part of the reorganization

15

process." *Protective Committee for Independent Stockholder of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S. Ct. 1157, 1163 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130, 60 S.Ct. 1, 14 (1939)); *In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986) ("The law favors compromise and not litigation for its own sake...."); *Michael*, 183 B.R. at 232 (Bankr. D. Mont. 1995) ("[I]t is also well established that the law favors compromise."); *In re Best Prods. Co.*, 168 B.R. 35, 50 (Bankr.S.D.N.Y 1994); *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994) (Court recognizes "the general rule that settlements are favored ....").

22.    Second, settlements should be approved if they fall above the lowest point on the continuum of reasonableness. "[The] responsibility of the bankruptcy judge . . . is not to decide the numerous questions of law and fact raised by the appellants but rather to canvass the issues and see whether the settlement fall[s] below the lowest point in the range of reasonableness." *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Planned Protective Servs., Inc.*, 130 B.R. 94, 99 n.7 (Bankr. C.D. Cal. 1991). *See generally In re Blair*, 538 F.2d 849, 851 (9th Cir. 1976) (Court should not conduct a "mini-trial" on the merits of a proposed settlement). Thus, the question is not whether a better settlement might have been achieved or a better result reached if litigation pursued. Instead, the court should approve settlements that meet a minimal threshold of reasonableness. *Nellis*, 165 B.R. at 123; *In re Tech. for Energy Corp.*, 56 B.R. 307, 311-312 (Bankr. E.D. Tenn. 1985); *In re Mobile Air Drilling Co., Inc.*, 53 B.R. 605, 608 (Bankr. N.D. Ohio 1985); 10 COLLIER ON BANKRUPTCY ¶ 9019.02, at 9019-4.

16

23.     The Third Circuit has enumerated four factors to be considered when evaluating a proposed settlement: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Martin*, 91 F.3d at 393; *accord In re Nutraquest, Inc.*, 434 F.3d 639 644 (3d Cir. 2006).

24.     The Debtors contend that the proposed settlement with the PBGC is a more than reasonable compromise that satisfies the applicable standards and should be approved.

### Argument

**A.     The Settlement Agreement Satisfies Sections 105 and 363(b) of the Bankruptcy Code and Should Be Approved**

25.     The proposed Settlement Agreement should be approved by the Court as a proper exercise of the Debtors' business judgment under sections 105 and 363(b) of the Bankruptcy Code.

26.     The Settlement Agreement is the result of the Debtors' extensive, arms' length negotiations with the PBGC.  The benefits of the settlement from the perspective of these estates are numerous and multi-faceted.  The two critical elements are, first, resolution of the PBGC's claims and pension-related non-bankruptcy litigation that dwarf the other claims and litigation in these proceedings (and at all subsidiary levels) and, second, the implementation of a framework for meaningful distributions to administrative claimants and unsecured creditors in the Revstone and Spara bankruptcy cases pursuant to a chapter 11 plan proposed by the Debtors.

17

27.     The Settlement Agreement will resolve disputes with the PBGC through the Allowed PBGC Claim against each of the PBGC Obligors.  Although the Settlement Agreement contemplates that the PBGC may recover significantly less than the full amount of the Allowed PBGC Claim (the PBGC Minimum Recovery is $80 million), the PBGC will consent to payments from subsidiary levels to the Revstone and Spara estates for the benefit of those estates' creditor constituents (other than PBGC).

28.     The Settlement Agreement also provides a framework for unsecured creditor recoveries through a chapter 11 plan proposed by the Debtors.  As a result of the settlement, unsecured creditors stand to receive recoveries in each of the Revstone and Spara cases out of the liquidation of subsidiary assets (in each cash with upside and downside potential).

29.     In sum, the Settlement Agreement definitively resolves the various disputes between the Debtors and their subsidiaries with the PBGC and avoids further litigation with the PBGC, the Pension Plans, and the DOL over the many complex issues that have been raised with respect to the Pension Plans.  The PBGC also has withdrawn its support of the Trustee Motion and withdrawn the Conversion Motion in TPOP's case.

30.     Given the cost and delay of litigation and the benefits of the contemplated settlement, the Debtors firmly believe that the Settlement Agreement is in the best interests of their respective estates, creditors, and all parties in interest.

18

B.   **The Settlement Agreement Satisfies the *Martin* Factors**
     **and Should Be Approved Under Bankruptcy Rule 9019**

31.     For the same reasons noted above, the Debtors submit that the terms and
conditions of the Settlement Agreement are fair and reasonable and in the best interests of their
estates for purposes of Bankruptcy Rule 9019.

32.     The PBGC is the single largest creditor in these cases, and asserts joint
and several claims against the Debtors' various subsidiaries.  While the Debtors have made
significant progress in these cases through the conclusion of various subsidiary asset sales that
have generated significant proceeds, the fact remains that no final resolution of these cases can
be accomplished without addressing the PBGC's claims against the Debtors and their
subsidiaries.

33.     In terms of the *Martin* factors, the probability of success in litigation and
the complexity of disputes at issue both weigh strongly in favor of the proposed Settlement
Agreement.  As discussed above, the Settlement Agreement avoids further litigation over the
PBGC's claims and the actions initiated by the PBGC and the DOL currently pending in non-
bankruptcy courts.  This litigation and the process to determine the amount of the PBGC's claims
through contested proceedings would be a prohibitively long and costly endeavor.  Absent
settlement, litigation with the PBGC and the DOL could take years to resolve.  The difficulty of
collection also weighs heavily in favor of settlement because it is unclear whether and when the
Revstone and Spara estates would be able to recover any proceeds of subsidiary sales so long as
the PBGC's claims hang over the entire Revstone and Spara family of companies.

34.    With respect to the paramount interest of creditors, the Debtors believe that the terms and conditions of the Settlement Agreement are in the best interests of creditors because the settlement provides for not only a resolution of the PBGC's claims, but also a mechanism for making distributions to unsecured creditors under a chapter 11 plan(s) proposed by the Debtors.

35.    As even the Committee has previously acknowledged, a settlement with the PBGC was a key component to confirming a plan and resolving these cases.  The Debtors have now achieved that goal on terms that provide a clear path to recoveries by administrative and unsecured creditors and confirmation of a chapter 11 plan(s).

36.    Therefore, in light of the costs, risks, and delay associated with a protracted dispute with the PBGC, DOL and Pension Plans, the Debtors believe that the terms of the Settlement Agreement are fair and reasonable, satisfy the standard promulgated by the Third Circuit governing compromises of controversies under Bankruptcy Rule 9019, and should be approved.

## Notice

37.    Notice of this Motion has been provided by first-class mail to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) counsel to the Committee in the Revstone Case; (c) the PBGC; and (d) those parties that have requested service under Bankruptcy Rule 2002.

WHEREFORE, the Debtors respectfully request entry of a final order approving the Settlement Agreement and granting such other and further relief as this Court deems just and proper.

Dated:  February 14, 2014

PACHULSKI STANG ZIEHL & JONES LLP

/s/Laura Davis Jones
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Maxim B. Litvak (CA Bar No. 215852)
Timothy P. Cairns (Bar No. 4228)
Colin R. Robinson (Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:  ljones@pszjlaw.com
         dbertenthal@pszjlaw.com
         mlitvak@pszjlaw.com
         tcairns@pszjlaw.com
         crobinson@pszjlaw.com

Counsel to Debtors and Debtors in Possession