## EXHIBIT 1

**Settlement Agreement**

## SETTLEMENT AGREEMENT

This Settlement Agreement (this "Agreement") is made and entered into as of February 11, 2014 by and among the following "Parties": (a) Revstone Industries, LLC ("Revstone"), Spara, LLC ("Spara"), TPOP, LLC f/k/a Metavation, LLC ("Metavation"), Fairfield Castings, LLC ("Fairfield"), (b) chapter 11 debtors U.S. Tool & Engineering LLC ("U.S. Tool") and Greenwood Forgings, LLC ("Greenwood" and together with chapter 11 debtors Revstone, Spara, Metavation, and U.S. Tool, the "Debtors"), (c) those subsidiaries of Revstone and Spara as reflected in the signature page(s) attached hereto (together with the Debtors and Fairfield, the "PBGC Obligors"), (d) the Pension Benefit Guaranty Corporation (the "PBGC"), and (e) any other required parties as determined by the foregoing Parties as reflected in the signature page(s) attached hereto.

## RECITALS

WHEREAS, the Debtors each commenced chapter 11 cases (the "Bankruptcy Cases") under title 11 of the United States Code (the "Bankruptcy Code") that are presently pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Bankruptcy Cases of all Debtors except Metavation are being jointly administered.

WHEREAS, the PBGC has filed proofs of claims in the Bankruptcy Cases relating to the Hillsdale Hourly Pension Plan, the Hillsdale Salaried Pension Plan, and the Revstone Casting Fairfield GMP Local 359 Pension Plan (together, the "Pension Plans").

WHEREAS, the PBGC has filed an action against Metavation and Fairfield, styled *Pension Benefit Guaranty Corporation v. Metavation LLC et al.*, No. 5:13-cv-273 (E.D. Ky. filed Aug. 23, 2013) (the "PBGC Litigation"), seeking termination of the Pension Plans.

WHEREAS, the PBGC has asserted or may assert liens on behalf of the Pension Plans under section 430(k) of the Internal Revenue Code of 1986, as amended, against certain assets of the PBGC Obligors (the "430(k) Liens").

WHEREAS, the PBGC has asserted or may assert claims against the PBGC Obligors relating to unpaid contributions due to the Pension Plans, the Pension Plans' unfunded benefit liabilities, and termination premiums.

WHEREAS, in the litigation styled *Perez v. Hofmeister*, No. 12-cv-250 (E.D.Ky. filed Aug. 9, 2012) and the lawsuits consolidated therewith (*Perez v. Hofmeister et. al.*, no. 13-cv-156 (E.D.Ky. filed May 30, 2013) (the "DOL Litigation"), the United States Department of Labor ("DOL") has asserted against certain of the PBGC Obligors and others, claims relating to, *inter alia*, the management and administration of the Pension Plans, the transfer, use, and investment of the Pension Plans' assets, and the payment and allocation of fees and expenses.

WHEREAS, there are disputes amongst the Parties as to the PBGC's claims against the PBGC Obligors, and the allegations the PBGC and the DOL asserted in the PBGC Litigation and the DOL Litigation.

WHEREAS, the Parties have reached an agreement to resolve their disputes on the terms set forth herein.

## AGREEMENT

NOW, THEREFORE, after good faith, arms' length negotiations without collusion, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the following terms:

1.    Effective Date.  The term "Effective Date" shall mean the first date by which each of the following conditions has occurred:  (a) this Agreement is executed by each of the Parties; (b) the Bankruptcy Court enters orders in each of the Bankruptcy Cases approving this Agreement in a form acceptable to the Parties, provided that no such orders have been stayed; and (c) the satisfaction of all obligations in paragraph 14(a) of this Agreement.  Within five (5) business days following execution of this Agreement, the Debtors shall file motions with the Bankruptcy Court in each of their Bankruptcy Cases requesting approval of this Agreement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

2.    Allowed PBGC Claim and Claims against Non-Debtor PBGC Obligors.  On the Effective Date, (a) subject to paragraph 7 below, the PBGC shall have an allowed general unsecured, non-priority claim against each of the Debtors in the amount of $95,000,000 (the "Allowed PBGC Bankruptcy Claim"), and (b) the PBGC shall have undisputed joint and several claims in the amount of $95,000,000 against all non-Debtor PBGC Obligors that are organized in the United States (the "Undisputed PBGC Non-Debtor Claim", and collectively with the Allowed PBGC Bankruptcy Claim, the "Allowed PBGC Claim").  For the avoidance of doubt, the Allowed PBGC Claim is $95,000,000.

3.    PBGC Recovery.  Subject to the provisions of paragraph 7 below, total distributions on account of the Allowed PBGC Claim (the "PBGC Recovery") are targeted at $82,000,000, but shall in no event be less than $80,000,000 (the "PBGC Minimum Recovery"), or more than the Allowed PBGC Claim (the "PBGC Maximum Recovery") in the aggregate.

4.    Distributions to the Parties.  Distributions to the PBGC, Revstone, and Spara shall be made in accordance with the Funding Schedule attached hereto as **Exhibit A** and incorporated herein by reference.  Payments will be made to the PBGC or the Pension Plans, as directed by the PBGC, and to Revstone and Spara, as directed by their bankruptcy estates or any successors thereto.  The term "Net Proceeds", as the term is used in this Agreement, refers to the projected "Net Proceeds for PBGC & Estates" specified in the first column of the Funding Schedule and as defined therein.

(a)    The amounts specified in the Funding Schedule columns designated "PBGC" and "Revstone" and the rows captioned "Revstone Escrows" shall be paid to or as directed by the PBGC or Revstone, as applicable, within five (5) business days of the Effective Date.

(b)    The amounts specified in the Funding Schedule columns designated "PBGC," "Revstone," and "Spara" and the rows captioned "Revstone Sales in Process" and "Spara Sales to be Initiated" shall be paid to or as directed by the PBGC, Revstone, or Spara, as

applicable, at the closing of each sale. Revstone and Spara shall use their best efforts to close on such sales of substantially all of their subsidiaries' assets as expeditiously as possible.

(c)     Funds in Metavation's estate shall be distributed in accordance with the Bankruptcy Code and the Funding Schedule. All amounts paid to the PBGC or the Pension Plans from Metavation's estate, regardless of whether such payments are made with respect to claims filed by the PBGC, the DOL, or the Pension Plans, shall be credited toward the PBGC Minimum Recovery.

(d)     If the actual amount of Net Proceeds differs from the amounts specified in the first column of the Funding Schedule captioned "Net Proceeds for PBGC & Estates," the proceeds shall be allocated to the distributees in the remaining columns in the same proportion as the amounts specified.

(e)     Upon the final reconciliation described in paragraph 9 below, to the extent aggregate actual Net Proceeds are less than projected in the Funding Schedule by up to $2,000,000, distributions to the PBGC shall be reduced dollar for dollar, but in no event to less than the PBGC Minimum Recovery. See **Exhibit B**, Example 1.

(f)     If aggregate actual Net Proceeds are less than projected in the Funding Schedule by more than $2,000,000, the PBGC shall be paid from the "Hold Back/Escrows" specified in the last two columns of the Funding Schedule up to the PBGC Minimum Recovery.

(g)     If the Hold Back/Escrows do not have sufficient assets for the PBGC to reach the PBGC Minimum Recovery, Revstone's and Spara's estates shall be jointly and severally liable for paying the PBGC such deficiency unless and until PBGC receives the PBGC Minimum Recovery.

5.     Credit Against PBGC Minimum Recovery. Amounts paid or caused to be paid to the Pension Plans subsequent to Revstone's bankruptcy petition by the PBGC Obligors, by any other person or entity within the controlled group (as described in 29 U.S.C. § 1301(a)(14)) of Metavation or Fairfield, or by other third parties on account of payments directed to the Pension Plans or the PBGC on behalf of the Pension Plans shall be credited toward the PBGC Minimum Recovery. To date, this amount is $21,693,767 in the aggregate. Accordingly, as of the date of this Agreement, the additional amount necessary to reach the PBGC Minimum Recovery is $58,306,233.

6.     PBGC Upside Recovery. As set forth in the Funding Schedule, total Net Proceeds are targeted at $113,500,000 in the aggregate. If actual Net Proceeds exceed this amount by up to $2,500,000, such excess shall be distributed entirely to the Revstone and Spara estates and allocated amongst them based on the estate generating the excess proceeds. If actual Net Proceeds exceed $116,000,000, then any such excess proceeds shall be distributed fifty percent (50%) to the PBGC (the "PBGC Upside Recovery") and fifty percent (50%) to the Revstone and Spara estates and allocated amongst the estates based on the estate generating the excess proceeds. Any PBGC Upside Recovery will be in addition to the PBGC Minimum

- 3 -

Recovery. In no case will the PBGC Upside Recovery and the PBGC Minimum Recovery, together, exceed the PBGC Maximum Recovery. *See* **Exhibit B**, Example 2.

7.     PBGC Consent.

(a)     Subject to paragraph 7(b), the PBGC agrees to allow distributions to be made to Revstone's and Spara's bankruptcy estates consistent with the Funding Schedule, and for Revstone and Spara to utilize such distributions for the payment of allowed creditor claims against their respective estates (other than the Allowed PBGC Bankruptcy Claim), except to the extent necessary to: (a) compensate the PBGC consistent with paragraph 3 as it relates to the PBGC Minimum Recovery and paragraph 6 as it relates to the PBGC Upside Recovery, and (b) allow the Allowed PBGC Claim to participate in net litigation recoveries (as described in paragraph 12 below).

(b)     Until the PBGC receives the PBGC Minimum Recovery, the estates of Revstone and Spara shall retain 50 percent of the amount that would otherwise be distributed to those estates' general unsecured creditors in accordance with the Funding Schedule, but in in no event less than $2.072 million at Revstone and $0.928 million at Spara. After such time as PBGC receives the PBGC Minimum Recovery, the amount retained by the estates under the previous sentence can be distributed to the general unsecured creditors of the Revstone and Spara bankruptcy estates as is consistent with the Funding Schedule and the Bankruptcy Code.

(c)     So long as there is no material breach of the terms of this Agreement, the PBGC will take no action in the Bankruptcy Cases that is inconsistent with this Agreement. The PBGC will take such steps, in the Bankruptcy Cases and otherwise, as are reasonably necessary to give effect to the terms hereof.

8.     PBGC Lien Release.   Following the Effective Date, the PBGC shall: (a) promptly file a withdrawal of notice of federal lien with respect to each filed 430(k) Lien, (b) not assert any non-filed 430(k) Lien against the assets of any PBGC Obligor, and (c) not assert any additional liens against the assets of any of the PBGC Obligors. The PBGC shall also provide any releases reasonably requested by the PBGC Obligors that are necessary to consummate asset sales.

9.     Final Reconciliation.   Once the material assets of the PBGC Obligors have been liquidated and the amount of actual Net Proceeds determined, the Parties shall reconcile the amounts distributed, and/or to be distributed, to the Parties consistent with the recoveries to the PBGC, Revstone, and Spara required by this Agreement and the Funding Schedule. Any funds not needed to provide the PBGC with the PBGC Minimum Recovery, or the PBGC Upside Recovery, as applicable, shall be immediately distributed from the HoldBack/Escrow to the Revstone and Spara estates in a manner consistent with the Funding Schedule. In the event that the PBGC receives distributions out of the Hold Back/Escrow or the Revstone or Spara estates in order to reach the PBGC Minimum Recovery, any subsequent asset recoveries, will be distributed to the Revstone and Spara estates up to the amount distributed to the PBGC out of the Hold Back/Escrow or from the estates, subject to full payment of the PBGC Minimum Recovery.

10.     Pension Plan Terminations.   On the Effective Date, Metavation and Fairfield shall consent to immediate termination of the Pension Plans by executing agreements acceptable

to the PBGC effecting (a) termination of the Hillsdale Hourly Plan and Hillsdale Salaried Plan with a termination date under 29 U.S.C. § 1348 of March 1, 2013 and of the Revstone Casting Fairfield GMP Local 359 Pension Plan with a termination date under 29 U.S.C. § 1348 of August 29, 2013, and (b) the PBGC trusteeship of the Pension Plans pursuant to 29 U.S.C. § 1342.    Promptly after execution of such agreements, the PBGC will dismiss the PBGC Litigation, with each Party bearing its own fees and costs.   The Parties shall take any and all appropriate actions to effectuate the foregoing terminations and dismissal.    Upon such terminations of the Pension Plans under 29 U.S.C. § 1342, any claims filed by the Pension Plans against the Debtors' bankruptcy estates shall be deemed withdrawn.  For the avoidance of doubt, the preceding sentence does not apply to, or affect the validity of, the Allowed PBGC Claim.

11.    <u>Payment of Administrative and Priority Claims</u>.  From and after the Effective Date, each of the Debtors may use available cash in their respective estates to satisfy any allowed administrative or priority claims, including funding of the Reserves (as defined below) at Revstone and Spara.

12.    <u>Plan/Litigation Reserves</u>.

(a)    The chapter 11 plan or plans in the Revstone and Spara bankruptcies as described in <u>paragraph 16</u> below will provide that the following reserves (the "<u>Reserves</u>") shall be created to the extent of available cash:

(1)    at Revstone, a reserve for post-effective date administrative expenses (excluding litigation expenses) in the amount of $1,000,000;

(2)    at Spara, a reserve for post-effective date administrative expenses (excluding litigation expenses) in the amount of $750,000;

(3)    at Revstone, a reserve for litigation expenses in the amount of $1,500,000; and

(4)    at Spara, a reserve for litigation expenses in the amount of $500,000.

(b)    Creation of Reserves.

(1)    The reserves described in <u>clauses 12(a)(1) and (2)</u> will be created on the effective date of the chapter 11 plan(s).

(2)    The reserves described in <u>clauses 12(a)(3) and (4)</u> will be created either:

(i) subject to <u>clause 12(b)(2)(ii)</u>, on the effective date of a chapter 11 plan or plans in the Revstone and Spara bankruptcies as described in <u>paragraph 16</u> below, or

(ii) if such funds are not available on the effective date of such chapter 11 plan or plans, then (A) 50% of the applicable reserve amount on the date that the applicable Revstone or Spara estate receives 75% of its recoveries contemplated by the Funding Schedule, and (B) the remaining 50% of the applicable reserve

amount on the date that the applicable Revstone or Spara estate receives 85% of its recoveries contemplated by the Funding Schedule.

(c)     Subject to the payment of any amounts required under the last sentence of paragraph 9 hereof, any net recoveries on litigation claims prosecuted by the Revstone or Spara estates, including the post-confirmation estates, shall be distributed fifty percent (50%) to the PBGC, up to the PBGC Maximum Recovery, and fifty percent (50%) to the Revstone and Spara estates and allocated amongst the estates based on the estate generating such litigation recoveries.

13.     PBGC Releases and Exculpation.  The following release shall be effective (a) as to each PBGC Obligor that has already sold its assets and whose proceeds are currently in escrow as reflected in the Funding Schedule, upon the Effective Date, (b) as to each PBGC Obligor that has assets to sell as reflected in the Funding Schedule, upon the consummation of the sale of such assets and distribution to the PBGC of the proceeds in accordance with the Funding Schedule and this Agreement, and (c) as to the remaining PBGC Obligors, upon the consummation of the sale of the assets reflected on the Funding Schedule and distribution to the PBGC of the proceeds in accordance with the Funding Schedule and this Agreement (as to each PBGC Obligor as applicable, the "Applicable Release Date").  Upon the Applicable Release Date, except as to the Allowed PBGC Claim and the other rights and obligations of the Parties under this Agreement, the PBGC, on behalf of itself and the Pension Plans following the PBGC trusteeship (the "PBGC Releasors"), shall be deemed to have irrevocably waived, released and discharged all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, causes of action, and liabilities that the PBGC Releasors have, may have or are entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity, or otherwise, against each applicable PBGC Releasee (as defined below), based in whole or in part upon any act or omission, transaction, or occurrence taking place on or prior to the Effective Date with respect to the Pension Plans or the Bankruptcy Cases, excluding any claims arising under Title I of ERISA.

The term "PBGC Releasee" means, except as otherwise provided herein, each of the PBGC Obligors, and each of their respective employees, directors, officers, members, agents, advisors or counsel (each in their capacity as such).  Notwithstanding anything to the contrary in this Agreement, the PBGC Releasees do not include (a) George Hofmeister; (b) any relatives of George Hofmeister (by blood or otherwise); (c) any affiliates or trusts of George Hofmeister or such relatives (other than the PBGC Obligors); and (d) any person or entity, other than a PBGC Obligor, that is named as a defendant in DOL Litigation.  As will be further provided in the Plan Support Agreement described in paragraph 16 below, the Parties will support a chapter 11 plan or plans for each of the Debtors that will include customary exculpatory provisions for the respective officers, directors, employees, members, agents, representatives and professionals of each of the Debtors from any matters arising out of or relating to the Pension Plans or the Bankruptcy Cases, excluding the persons and entities described in the preceding sentence.

14.     Resolution of DOL Litigation.

(a)     The DOL, Metavation, and Fairfield shall seek entry of consent judgments in the DOL Litigation, which shall state the amounts each of Metavation and Fairfield owes to the Pension Plans, concluding the litigation as to those two defendants only, and releasing

- 6 -

all DOL claims against those two defendants, except as necessary to give effect to the consent judgments and this Agreement   The consent judgments shall be acceptable in form and substance to all other Parties hereto.

(b)    Upon the Effective Date, the DOL shall have an allowed general unsecured claim in the Metavation bankruptcy in the amount set forth in the consent judgment. In addition, the DOL shall retain the right to (1) file a subordinated penalty claim in the Metavation bankruptcy under 29 U.S.C. § 502(l), and (2) assess a penalty under 29 U.S.C. § 502(l) against Fairfield.

(c)    Any amounts recovered by the DOL against any of the PBGC Obligors, including any section 502(l) penalty paid by Fairfield, will reduce, dollar for dollar, the PBGC Minimum Recovery.  Further, the consent judgments shall provide that the DOL shall withdraw, and shall not assert, any objections to the Debtors' efforts to sell assets or to confirm a chapter 11 plan(s) consistent with this Agreement.

15.    <u>Management of Debtors</u>.  The PBGC shall support the continued management of the Debtors by the current Chief Restructuring Officer and the Restructuring Committee through the effective date of a chapter 11 plan or plans, and thereafter through the designees or successors thereto proposed by the Debtors in a chapter 11 plan or plans.

16.    <u>Plan Support Agreement</u>.  Upon the Effective Date, the Parties shall execute a Plan Support Agreement in substantially the form attached hereto as **Exhibit C** (the "<u>Plan Support Agreement</u>"), which reflects the Parties' support of the chapter 11 plan that was previously filed by Revstone in the Bankruptcy Cases in all material respects, as such plan shall be amended to the extent necessary to be consistent with this Agreement, or as otherwise may be modified by Revstone or supplemented by separate plans of Spara or the other Debtors in conformity with this Agreement.  The Parties agree to support the Debtors' proposed chapter 11 plan or plans so long as such plan(s) are consistent with this Agreement.

17.    <u>Sources and Uses</u>.  Prior to the closing of each such sale, the entity selling its assets will provide to PBGC a schedule of sources and uses in connection with that sale.

18.    <u>Withdrawal of PBGC Motions</u>.   Upon the Debtors' filing of motions to approve this Agreement as described in <u>paragraph 1</u> above, the PBGC shall promptly withdraw its:  (a) motion to convert Metavation's chapter 11 case to chapter 7, (b) joinder to the motion of the Official Committee of Unsecured Creditors to appoint a chapter 11 trustee in Revstone's case, and (c) objections to any fee requests of the Debtors' professionals.  Further, the PBGC shall take such other action as reasonably necessary to support the Debtors' efforts to obtain approval of this Agreement and to confirm a chapter 11 plan or plans consistent with this Agreement.

19.    <u>Party Representations</u>.  Each Party hereby represents and warrants that: (a) such Party and the signatory hereto has the power and authority to execute, deliver and perform this Agreement; (b) such Party has taken all necessary actions to authorize the execution, delivery and performance of this Agreement; (c) this Agreement has been duly executed and delivered by such Party and, subject to the occurrence of the Effective Date, constitutes the legal, valid, and binding obligations of such Party, enforceable against it in

- 7 -

accordance with their respective terms; (d) such Party's execution, delivery, and performance of this Agreement does not and will not conflict with, or constitute a violation or breach of, or constitute a default under any obligation of such Party and will not violate any applicable law, or any order or decree of any court or government instrumentality applicable to such Party; and (e) such Party has entered into this Agreement in reliance on its own independent investigation and analysis of the facts underlying the subject matter of this Agreement, and no representations, warranties, or promises of any kind have been made directly or indirectly to induce it to execute this Agreement other than those that are expressly set forth in this Agreement.

20.    <u>Further Representation and Warranty</u>.    Each Party hereby represents and warrants that, to the best of its knowledge, each of the Pension Plans have no outstanding liabilities other than to the plan participants, to PBGC or to the plan professionals.

21.    <u>Continuing Bankruptcy Court Jurisdiction</u>.    Each Party agrees that, with respect to disputes involving the Debtors, the Bankruptcy Court shall have exclusive jurisdiction over any disputes regarding the validity, interpretation, or performance of this Agreement so long as the Bankruptcy Cases are pending, and each of the Parties consents to personal jurisdiction and venue in the Bankruptcy Court in connection with any such disputes; <u>provided, however</u>, that if the Bankruptcy Cases are no longer pending, or if the Bankruptcy Court cannot or does not exercise jurisdiction, such jurisdiction and venue shall belong to the federal courts in the District of Delaware. Each Party further agrees that, with respect to disputes solely involving non-Debtors, the federal courts in the District of Delaware shall have exclusive jurisdiction over any disputes regarding the validity, interpretation, or performance of this Agreement.

22.    <u>Specific Performance; Damages</u>.    The exact nature and extent of damages resulting from a breach of this Agreement are uncertain at the time of entering into this Agreement and breach of this Agreement would result in damages that would be difficult to determine with certainty. Money damages would not be a sufficient remedy for any breach of this Agreement, and the Parties shall each be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach. Notwithstanding anything to the contrary set forth above, the remedy of specific performance shall not be the exclusive remedy of the Parties under this Agreement in the event of a breach of this Agreement by another Party hereto.

23.    <u>Voluntary Agreement</u>.    Each Party acknowledges that it has read all of the terms of this Agreement, has had an opportunity to consult with counsel of its own choosing or voluntarily waived such right and enters into this Agreement voluntarily and without duress.

24.    <u>Further Assurances</u>.    Each Party agrees, without further consideration, to execute and deliver such other documents and to take such other action as may be necessary to consummate the purposes of this Agreement.

25.    <u>No Admission</u>.    This Agreement is for settlement purposes only and shall not be construed or deemed an admission by any Party to this Agreement of wrongdoing, liability, fault, or the validity of any claims.

26.    <u>Valid Provisions Remain Effective</u>.    If any provision in this Agreement shall be invalid, inoperative or unenforceable, the remaining provisions of this Agreement shall remain in

effect if both the economic and legal substance of the terms contemplated hereby are not materially affected in any manner adverse to any Party. Otherwise, the Parties shall negotiate in good faith to rewrite any such provision so as to, as nearly and fairly as possible, approach the economic and legal substance originally intended.

27.      Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against either Party.   Nor will any rule of construction that favors a non-draftsman be applied.   A reference to any statute will be deemed also to refer to all rules and regulations promulgated under the statute, unless the context requires otherwise.   Unless specifically otherwise provided or the context otherwise requires, the singular includes the plural and the plural the singular; the word "or" is deemed to include "and/or", the words "including", "includes" and "include" are deemed to be followed by the words "without limitation", and references to sections are to those of this Agreement. Headings in this Agreement are included for convenience of reference only and do not constitute a part of this Agreement for any other purpose.

28.      Advice of Counsel.  Each Party represents that it has had the opportunity to obtain advice of counsel in connection with this Agreement and all matters covered hereby, and that each Party has been fully advised by those attorneys with respect to its rights and obligations under this Agreement.

29.      Counterparts.    This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement. Delivery of a signature page to this Agreement by facsimile or other electronic means shall be effective as delivery of the original signature page to this Agreement.

30.      Joint Drafting.  This Agreement shall be deemed to have been jointly drafted by the Parties, and in construing and interpreting this Agreement, no provision shall be construed and interpreted for or against any Party because such provision or any other provision of the Agreement as a whole is purportedly prepared or requested by such Party.

31.      Applicable Law.     The validity, interpretation, and performance of this Agreement shall be construed and interpreted according to the laws of the State of Delaware, except to the extent that (a) provisions of the Bankruptcy Code apply, in which event the Bankruptcy Code shall control, or (b) applicable federal law preempts state law.

32.      Attorneys' Fees, Costs and Expenses. Each Party agrees to bear its own costs and expenses, including attorneys' fees, arising out of the matters addressed by this Agreement.

33.      Entire Agreement.  This document contains the entire Agreement between the Parties as to the matters addressed herein, and may only be modified in writing signed by the Parties or their duly appointed agents.   All prior agreements and understandings between the Parties concerning the subject matter hereof are superseded by the terms of this Agreement.

34.      Inconsistency.  In the event of any inconsistency between this Agreement and the Plan Support Agreement, the terms of this Agreement shall govern.

35.     <u>Successors and Assigns</u>.  This Agreement shall be binding on and inure to the benefit of the Parties and their respective agents, employees, affiliates, successors, and, with the consent of all Parties, assigns.

36.     <u>Notices</u>.  All notices, consents, waivers, and other communications under this Agreement must be in writing and shall be deemed to have been duly given when:  (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of receipt), or (c) received by the addressee, if sent by email, in each case to the appropriate addresses, representative (if applicable) or if sent by telecopier to telecopier numbers set forth in the signature page(s) attached hereto (or to such other addresses, representative and telecopier numbers as a Party may designate by notice to the other Parties in accordance with this paragraph).

[signature page(s) follow]

DOCS_SF:84697.2 73864/001

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date written in the opening paragraph hereof.

**Revstone Industries, LLC**
**Spara, LLC**
**TPOP, LLC f/k/a Metavation, LLC**
**Greenwood Forgings, LLC**
**US Tool & Engineering, LLC**

**Pension Benefit Guaranty Corporation**

John C. DiDonato
Chief Restructuring Officer
c/o Huron Consulting Group Inc.

Dana Cann
Acting Deputy Director
Corporate Finance and Restructuring
Department
1200 K Street NW, Suite 340
Washington, D.C. 20005
Fax: (202) 326-4112
Email: Cann, dana@pbgc.gov

599 Lexington Ave., 25th Floor
New York, NY 10022
Fax: (212) 785-1313
Email: jdidonato@huronconsultinggroup.com

**Fairfield Castings, LLC**
**T Cast Holdings, LLC**

By:    Spara, LLC,
       A Delaware limited liability company

By:    John C. DiDonato
       Chief Restructuring Officer

- 11 -

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date written in the opening paragraph hereof.

**Revstone Industries, LLC**
**Spara, LLC**
**TPOP, LLC f/k/a Metavation, LLC**
**Greenwood Forgings, LLC**
**US Tool & Engineering, LLC**

**Pension Benefit Guaranty Corporation**

_____
John C. DiDonato
Chief Restructuring Officer
c/o Huron Consulting Group Inc.

_____
Dana Cann
Acting Deputy Director
Corporate Finance and Restructuring
Department
1200 K Street NW, Suite 340
Washington, D.C. 20005
Fax: (202) 326-4112
Email: _____

599 Lexington Ave., 25th Floor
New York, NY 10022
Fax: (212) 785-1313
Email: jdidonato@huronconsultinggroup.com

**Fairfield Castings, LLC**
**T Cast Holdings, LLC**

By:    Spara, LLC,
       A Delaware limited liability company

By:    _____
       John C. DiDonato
       Chief Restructuring Officer

- 11 -

**Revstone Transportation, LLC**
**Revstone Tool & Engineering, LLC**

_____
John C. DiDonato
Chief Restructuring Officer


**MWTDC, Inc. f/k/a MW Texas Die Casting, Inc.,**
A Delaware corporation


_____
Daniel V. Smith
Secretary


**CC Liquidation, LLC f/k/a Contech Castings, LLC,**
A Delaware limited liability company

By:     Revstone Transportation, LLC,
        A Delaware limited liability company,
        Its Sole Member

        By:     _____
                John C. DiDonato
                Chief Restructuring Officer


**CCREH Liquidation, LLC f/k/a/ Contech Castings Real Estate Holdings, LLC,**
A Delaware limited liability company

By:     CC Liquidation, LLC f/k/a Contech Castings, LLC
        A Delaware limited liability company,
        Its Sole Member

        By:     Revstone Transportation, LLC,
                A Delaware limited liability company,
                Its Sole Member

                By:     _____
                        John C. DiDonato
                        Chief Restructuring Officer

- 12 -

**MWTDC, Inc. f/k/a MW Texas Die Casting, Inc.,**
A Delaware corporation

Daniel V. Smith
Secretary


**CC Liquidation, LLC f/k/a Contech Castings, LLC,**
A Delaware limited liability company

By:    Revstone Transportation, LLC,
       A Delaware limited liability company,
       Its Sole Member


       By:
               John C. DiDonato
               Chief Restructuring Officer


**CCREH Liquidation, LLC f/k/a/ Contech Castings Real Estate Holdings, LLC,**
A Delaware limited liability company

By:    CC Liquidation, LLC f/k/a Contech Castings, LLC
       A Delaware limited liability company,
       Its Sole Member

       By:    Revstone Transportation, LLC,
              A Delaware limited liability company,
              Its Sole Member

              By:
                      John C. DiDonato
                      Chief Restructuring Officer

**Revstone Lighting, LLC,**
A Delaware limited liability company

By:    Revstone Industries, LLC,
       A Delaware limited liability company,
       Its Sole Member


       By:
               John C. DiDonato
               Chief Restructuring Officer

12

**Revstone Lighting, LLC,**
A Delaware limited liability company

By:   Revstone Industries, LLC,
      A Delaware limited liability company,
      Its Sole Member

     By:   _____
          John C. DiDonato
          Chief Restructuring Officer

**Creative Lighting Solutions, LLC,**
A Delaware limited liability company

By:   Revstone Lighting, LLC
      A Delaware limited liability company,
      Its Sole Member

     By:   Revstone Industries, LLC,
          A Delaware limited liability company,
          Its Sole Member

         By:   _____
             John C. DiDonato
             Chief Restructuring Officer

**MPI, LLC,**
A Delaware limited liability company

By:   Revstone Transportation, LLC,
      A Delaware limited liability company,
      Its Sole Member

     By:   _____
          John C. DiDonato
          Chief Restructuring Officer

**Revstone Wallaceburg Canada Inc.**

Joseph Bianco
President

Mary Van Santvoort
Secretary -Treasurer

**Aarkel Tool & Die Inc.**

Joseph Bianco
President

Mary Van Santvoort
Secretary-Treasurer

**Eptec S.A. De C.V.**

Robert Carney
Sole Administrator

- 14 -

**Revstone Wallaceburg Canada Inc.**

_____

Joseph Bianco
President


_____

Mary Van Santvoort
Secretary -Treasurer


**Aarkel Tool & Die Inc.**

_____

Joseph Bianco
President


_____

Mary Van Santvoort
Secretary-Treasurer


**Eptec S.A. De C.V.**

_____

Robert Carney
Sole Administrator

DOCS_SF:84697.2 73864/001

## EXHIBIT A

**Funding Schedule**

## EXHIBIT A - Funding Schedule

| Recovery Source | Net Proceeds For PBGC & Estates | Distribution of Net Proceeds | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Estates | | Hold Back/Escrow | |
| | | PBGC | Revstone | Spara | Revstone | Spara |
| **Plan Funding** | $ 21,694 | $ 21,694 | - | - | | - |
| | | | | | | |
| **Revstone Escrows** | | | | | | |
| Contech PBGC Escrow | 12,263 | 4,905 | 4,905 | - | 2,453 | - |
| Contech General Escrow | 613 | 245 | 245 | - | 123 | - |
| Texas Die PBGC Escrow | 2,399 | 960 | 960 | - | 480 | - |
| Texas Die Cash on Hand | 379 | 151 | 151 | - | 76 | - |
| CLS PBGC Escrow | 2,609 | 1,044 | 1,044 | - | 522 | - |
| Dowagiac | - | - | - | - | - | - |
| Subtotal | 18,263 | 7,305 | 7,305 | - | 3,653 | - |
| Allocation % | | 40% | 40% | 0% | 20% | 0% |
| **Revstone Industries Surplus** | 2,123 | 849 | 849 | - | 425 | - |
| Allocation % | | 40% | 40% | 0% | 20% | 0% |
| **Interim Recovery Total** | $ 93,860 | $ 60,155 | $ 17,183 | $ 4,718 | $ 7,087 | $ 4,718 |
| | | | | | | |
| **TPOP f/k/a Metavation** | | | | | | |
| PBGC Recovery | 19,000 | 19,000 | - | - | - | - |
| Allocation | | 100% | 0% | 0% | 0% | 0% |
| Revstone Industries GUC Recovery | 639 | 256 | 256 | - | 128 | - |
| Allocation % | | 40% | 40% | 0% | 20% | 0% |
| Subtotal | 19,640 | 19,256 | 256 | - | 128 | - |
| | | | | | | |
| **Pre-Escrow Distribution Recovery** | 113,500 | 79,411 | $ 17,439 | $ 4,718 | $ 7,215 | $ 4,718 |
| | | | | | | |
| **Baseline Target Recovery** | $ 113,500 | $ 82,000 | $ 24,131 | 7,369 | $ - | $ - |
| Excess (Shortfall) | - | (2,589) | (6,692) | (2,652) | 7,215 | 4,718 |
| | | | | | | |
| Target Adjusted for Excess (Shortfall) | | | | | | |
| Revised Target | | 82,000 | 24,131 | 7,369 | | |
| Excess (Shortfall) to Revised Target | | (2,589) | (6,692) | (2,652) | 7,215 | 4,718 |
| | | | | | | |
| **Assumed Escrow Distribution "true up"** | | | | | | |
| Spara Entity Escrows | | 2,066 | | 2,652 | | (4,718) |
| Revstone Entity Escrows | | 523 | 6,692 | | (7,215) | |
| | | | | | | |
| **Recovery** | | $ 82,000 | $ 24,131 | $ 7,369 | $ - | $ - |

**ESTIMATED ALLOCATION OF ESTATE PROCEEDS:**

| | Net Proceeds for Estates | Litigation Reserve | Post Eff Reserve | Admin/Priority Est. | | Unsecured Est. | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Claim | Distri | Claim | Distr |
| Revstone | $ 24,131 | $ 1,500 | $ 1,000 | $ 20,349 | $ 17,297 | $ 33,000 | $ 4,334 |
| Recovery % | | | | | 85.0% | | 13% |
| Spara | $ 7,369 | $ 500 | $ 750 | $ 4,749 | $ 4,179 | $ 8,400 | $ 1,940 |
| Recovery % | | | | | 88.0% | | 23% |

Notes:
"Net Proceeds For PBGC & Estates" means sale proceeds net of reasonable and ordinary transaction costs, payments to non-PBGC creditors of the non-debtors, and payments of post-petition professional fees at TPOP f/k/a Metavation.

Estimated distributions to unsecured creditors reflected above are subject to the terms of a confirmed chapter 11 plans proposed by the Debtors. Distributions to unsecured creditors are also subject to reduction by 50% pending receipt of the PBGC Minimum Recovery.

**EXHIBIT B**

**Example 1**

**Example 2**

**EXHIBIT B – Example 1**

Net Proceeds result in $10 million less than Target Scenario

| | Net Proceeds For PBGC & Estates | Distribution of Net Proceeds | | | | |
| | | PBGC | Revstone | | Spara | |
| | | | Estate | Escrow | Estate | Escrow |
|---|---|---|---|---|---|---|
| Plan Funding to Date | $ 21,694 | $ 21,694 | $ - | $ - | $ - | $ - |
| Revstone Net Proceeds | 49,064 | 29,411 | 13,689 | 5,965 | - | - |
| Spara Net Proceeds | 32,742 | 24,556 | - | - | 4,093 | 4,093 |
| True Up | - | 4,339 | 4,501 | (5,965) | 1,217 | (4,093) |
| Total | $ 103,500 | $ 80,000 | $ 18,190 | $ - | $ 5,310 | $ - |

**ESTIMATED ALLOCATION OF ESTATE PROCEEDS:**

| | Net Proceeds for Estates | Litigation Reserve | Post Eff Reserve | Admin/Priority Est. | | Unsecured Est. | |
| | | | | Claim | Distri | Claim | Distr |
|---|---|---|---|---|---|---|---|
| Revstone | $ 18,190 | $ 1,500 | $ 1,000 | $ 20,349 | $ 15,690 | $ 33,000 | $ - |
| Recovery % | | | | | 77.1% | | 0% |
| Spara | $ 5,310 | $ 500 | $ 750 | $ 4,749 | $ 4,060 | $ 8,400 | $ - |
| Recovery % | | | | | 85.5% | | 0% |

Notes:

"Net Proceeds For PBGC & Estates" means sale proceeds net of reasonable and ordinary transaction costs, payments to non-PBGC creditors of the non-debtors, and payments of post-petition professional fees at TPOP f/k/a Metavation.

Estimated distributions to unsecured creditors reflected above are subject to the terms of a confirmed chapter 11 plans proposed by the Debtors. Distributions to unsecured creditors are also subject to reduction by 50% pending receipt of the PBGC Minimum Recovery.

EHXHIBIT B – Example 2

Net Proceeds result in $10 million more than the Target Scenario

| | Net Proceeds For PBGC & Estates | Distribution of Net Proceeds | | | | |
| | | PBGC | Revstone | | Spara | |
| | | | Estate | Escrow | Estate | Escrow |
|---|---|---|---|---|---|---|
| Plan Funding to Date | $    21,694 | $    21,694 | $         - | $         - | $         - | $         - |
| Revstone Net Proceeds | 59,064 | 29,411 | 21,189 | 8,465 | - | - |
| Spara Net Proceeds | 42,742 | 32,056 | - | - | 5,343 | 5,343 |
| True Up | - | 2,589 | 7,484 | (8,465) | 3,734 | (5,343) |
| Total | $    123,500 | $    85,750 | $    28,673 | $         - | $    9,077 | $         - |

**ESTIMATED ALLOCATION OF ESTATE PROCEEDS:**

| | Net Proceeds for Estates | Litigation Reserve | Post Eff Reserve | Admin/Priority Est. | | Unsecured Est. | |
| | | | | Claim | Distri | Claim | Distr |
|---|---|---|---|---|---|---|---|
| Revstone | $    28,673 | $    1,500 | $    1,000 | $    20,349 | $    20,349 | $    33,000 | $    5,824 |
| Recovery % | | | | | 100.0% | | 18% |
| Spara | $    9,077 | $    500 | $    750 | $    4,749 | $    4,749 | $    8,400 | $    3,078 |
| Recovery % | | | | | 100.0% | | 37% |

Notes:

"Net Proceeds For PBGC & Estates" means sale proceeds net of reasonable and ordinary transaction costs, payments to non-PBGC creditors of the non-debtors, and payments of post-petition professional fees at TPOP f/k/a Metavation.

Estimated distributions to unsecured creditors reflected above are subject to the terms of a confirmed chapter 11 plans proposed by the Debtors.  Distributions to unsecured creditors are also subject to reduction by 50% pending receipt of the PBGC Minimum Recovery.

# EXHIBIT C

**Plan Support Agreement**

## PLAN SUPPORT AGREEMENT

This *Plan Support Agreement* (this "Agreement"), dated as of _____, 2014 is entered into by and among Revstone Industries, LLC ("Revstone"), Spara, LLC, TPOP, LLC f/k/a Metavation, LLC, U.S. Tool & Engineering LLC, and Greenwood Forgings, LLC (together, the "Debtors"), on the one hand, and the Pension Benefit Guaranty Corporation (the "PBGC"), on the other hand. The Debtors and the PBGC are referred to herein as the "Parties" and each individually as a "Party."

**THIS AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF VOTES WITH RESPECT TO ANY CHAPTER 11 PLAN. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS WITH RESPECT TO A CHAPTER 11 PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

### RECITALS

A.     The Debtors each commenced chapter 11 cases (the "Bankruptcy Cases") under title 11 of the United States Code (the "Bankruptcy Code") that are presently pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

B.     On February 10, 2014, the Parties (along with other signatories) executed that certain Settlement Agreement (the "Settlement Agreement") resolving various disputes amongst the Parties. Pursuant to an order dated _____, 2014, the Bankruptcy Court approved the Settlement Agreement under Rule 9019 of the Federal Rules of Bankruptcy Procedure.

C.     Pursuant to the Settlement Agreement, the PBGC has agreed to support the amended chapter 11 plan that will be filed by Revstone in the Bankruptcy Cases in all material respects, provided that such shall amended plan is consistent with the Settlement Agreement, or as otherwise may be modified by Revstone or supplemented by separate plans of the other Debtors in conformity with the Settlement Agreement and to reflect the circumstances, including governance, relating to such other Debtors. Such chapter 11 plan or plans proposed, or to be proposed, by the Debtors together or individually are collectively referred to herein as the "Proposed Plan," and the disclosure statement or disclosure statements in support thereof are collectively referred to herein as the "Disclosure Statement."

D.     The Parties have agreed to facilitate confirmation and consummation of the Proposed Plan and the transactions described therein.

E.     To ensure an orderly confirmation process, the Parties are prepared to perform their obligations hereunder subject to the terms and conditions of this Agreement, including, without limitation, to support the Debtors' efforts to: (a) seek the Bankruptcy Court's approval of the Disclosure Statement prior to soliciting votes on the Proposed Plan in accordance with section 1125 of the Bankruptcy Code; (b) obtain Bankruptcy Court approval and confirmation of

the Proposed Plan; and (c) achieve the applicable effective date provided for under the Proposed Plan.

F.    In expressing their support for the Proposed Plan (pursuant to the terms and conditions of this Agreement), the Parties do not desire and do not intend in any way to derogate or diminish the solicitation requirements of applicable securities or bankruptcy law, nor the respective fiduciary, statutory, or other duties of the Parties.

## AGREEMENT

In consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>Recitals</u>.  The Recitals set forth above are incorporated herein and form an integrated part of this Agreement.

2.    <u>Effectiveness of Agreement</u>.  Subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, upon the execution of this Agreement by the Parties, this Agreement will constitute a legally binding and enforceable agreement of the Parties, effective as of the date first written above.

3.    <u>Agreements</u>.  The Parties agree to the following:

(a)    <u>Proposed Plan</u>.  The Parties agree to all material terms in the Proposed Plan, as such plan may be modified or supplemented, and to support confirmation and consummation of the Proposed Plan, *provided* that the Proposed Plan is in conformity with the Settlement Agreement.

(b)    <u>Further Modifications</u>.  The Parties agree to any modifications or amendments made by the Debtors with respect to the Proposed Plan, and to support confirmation and consummation thereof, *provided* that such modifications and amendments do not materially and adversely affect the rights and benefits under the Settlement Agreement of any Party that does not expressly consent thereto.  All commitments and obligations arising under this Agreement with respect to the Proposed Plan shall also be effective and binding as to any amendments to the Proposed Plan that comply with the requirements of this paragraph 3(b).

(c)    <u>Bankruptcy Filings</u>.  All material pleadings and other documents that the Debtors file in connection with the Chapter 11 Cases with the Bankruptcy Court shall be consistent in all material respects with this Agreement, the Settlement Agreement, and the Proposed Plan.

(d)    <u>Disclosure Statement</u>.  The Parties will support entry of the order of the Bankruptcy Court approving the Disclosure Statement, *provided* that such order is in form and substance consistent with this Agreement, the Settlement Agreement, and the Proposed Plan.

4.    <u>Further Support</u>.  Provided that the Proposed Plan and the information in the Disclosure Statement have not been modified, altered, amended, or supplemented in a manner that would materially and adversely affect the rights, recoveries, or obligations of the Parties under the Settlement Agreement, each Party hereto will:

> (a)    support entry of the order approving the Disclosure Statement and (after thereof) the Confirmation Order;

> (b)    not withhold, withdraw, qualify, or modify its approval of the Proposed Plan;

> (c)    not commence any proceeding or prosecute, join in, or otherwise support any action to oppose or object to approval of the Proposed Plan or the Disclosure Statement or (after approval thereof) the Confirmation Order (provided the Disclosure Statement is consistent in all material respects with the Proposed Plan);

> (d)    not encourage any other person or entity to object to, delay, impede, appeal, or take any other action to interfere with entry of the Disclosure Statement Order or (after approval thereof) the Confirmation Order;

> (e)    not seek, solicit, negotiate, support, or enter into an agreement related to any other chapter 11 plan in these chapter 11 cases (an "<u>Alternative Plan</u>") unless the Parties have agreed, in writing, to pursue such Alternative Plan; or

> (f)    not seek to materially modify, revise, amend or renegotiate the terms of the Proposed Plan without the consent of the Parties.

5.    <u>Appearing in the Bankruptcy Court</u>.  Nothing in this Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Bankruptcy Court so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement or the Settlement Agreement.

6.    <u>Common Interest and Confidentiality</u>.  The Parties have, on and following January 31, 2014, shared and exchanged, and will continue to share and exchange, documents and information pertaining to the formulation, funding and confirmation of the Proposed Plan ("<u>Confidences</u>") among themselves and their respective counsel for purposes of their common interest and joint defense in support of such plan.  The Parties have agreed to reveal certain Confidences within this arrangement upon the express condition that no Party or its counsel will disclose to any third party, other than as expressly provided for herein, any Confidences without the written consent, in advance, of the Parties to this Agreement.  This Agreement shall not extend to Confidences which are now in, or hereafter enter, the public domain, or are not otherwise protected from disclosure, except that it shall continue to apply to any Confidences disclosed by wrongful act or in violation of this Agreement.  Notwithstanding anything herein to the contrary, PBGC may disclose the Confidences to the Executive Branch of the United States, the PBGC and PBGC Board of Directors, officials, advisors, consultants, and representatives who have a need to know the information as part of their job responsibilities, and to others as

required by law or as may be necessary in connection with any court or administrative proceedings, request of Congress or any committee, joint committee or subcommittee thereof, or request of the Comptroller General.

7.    <u>Representations and Warranties of the Parties</u>.   Each Party represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(a)    it has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and, subject to any necessary Bankruptcy Court approval, carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of the Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(b)    the execution, delivery, and, subject to any necessary Bankruptcy Court approval, performance by such Party of this Agreement does not and shall not violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(c)    the execution, delivery, and performance by such Party of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body; and

(d)    this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms.

8.    <u>Termination of this Agreement</u>.  This Agreement shall automatically terminate if:

(a)    all Parties agree in writing to terminate this Agreement;

(b)    any of the Chapter 11 Cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, but the termination of this Agreement shall only extend to those Debtors that have had their cases dismissed on converted;

(c)    the Bankruptcy Court has entered an order in any of the Chapter 11 Cases appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, but the termination of this Agreement shall only extend to those Debtors that have had a trustee appointed;

(d)    the Bankruptcy Court denies confirmation of the Proposed Plan with prejudice and without leave to amend, but the termination of this Agreement shall only extend to those Debtors that have had confirmation denied in their respective cases; or

(e)    the Bankruptcy Court has not entered an order confirming the Proposed Plan by August 15, 2014, provided that such outside date shall be extended so long as the Proposed Plan is pending and the Bankruptcy Court has not denied confirmation with prejudice.

Each event described in items (a) through (e) above shall be a "Termination Event." The foregoing Termination Events are intended solely for the benefit of the Parties to this Agreement; provided that no Party may seek to terminate this Agreement based upon a material breach or a failure of a condition (if any) in this Agreement arising out of its own actions or omissions. Upon occurrence of a Termination Event, this Agreement shall be of no further force and effect and each Party hereto shall be released from its commitments, undertakings, and agreements under or related to this Agreement; provided, however, that no such termination shall relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the date of termination.

9.    Cooperation; Further Assurances; Acknowledgment; Definitive Documents. The Parties shall cooperate with each other and shall coordinate their activities (to the extent practicable and consistent with each of the Parties' respective fiduciary or statutory duties) in respect of all actions commercially reasonably necessary to timely consummate the Proposed Plan. The Parties shall execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be commercially reasonably appropriate or necessary, from time to time, to effectuate the Proposed Plan.

10.    Amendments. This Agreement may not be modified, amended or supplemented except in a writing signed by the Parties hereto.

11.    GOVERNING LAW; JURISDICTION. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE AND THE BANKRUPTCY CODE, AS APPLICABLE, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER, OR ARISING OUT OF, OR IN CONNECTION WITH, THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT, OR PROCEEDING.

12.    Specific Performance; Damages.    The exact nature and extent of damages resulting from a breach of this Agreement are uncertain at the time of entering into this Agreement and breach of this Agreement would result in damages that would be difficult to determine with certainty. Money damages would not be a sufficient remedy for any breach of

this Agreement, and the Parties shall each be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach. Notwithstanding anything to the contrary set forth above, the remedy of specific performance shall not be the exclusive remedy of the Parties under this Agreement in the event of a breach of this Agreement by another Party hereto.

13.    Headings. The headings of the Sections, paragraphs and subsections of this Agreement are inserted for convenience only, and shall not affect the interpretation hereof.

14.    Assignment; Successors and Assigns; Severability; Several Obligations.    No rights or obligations of the Parties under this Agreement may be assigned or transferred to any other entity. This Agreement is intended to, and shall, bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives. The invalidity or unenforceability at any time of any provision hereof shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof.

15.    No Third-Party Beneficiaries.    Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall have any right hereunder.

16.    Prior Negotiations; Entire Agreement.    This Agreement (along with the Settlement Agreement) constitutes the entire agreement of the Parties related to the Proposed Plan, and supersedes all other prior negotiations with respect to the subject matter hereof, except that the Parties agree and acknowledge that the Proposed Plan shall continue in full force and effect, subject to entry of an order confirming the Proposed Plan.

17.    Counterparts.    This Agreement and any amendments, joinders, consents or supplements hereto, may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement. Facsimile or scanned signatures on this Agreement shall be treated as originals for all purposes.

18.    Construction; Consideration.    This Agreement shall be deemed to have been negotiated and prepared at the joint request, direction and construction of the Parties, at arm's length and be interpreted without favor to any Party. The Parties hereby acknowledge that no consideration, other than that specifically described herein and in the Settlement Agreement and the Proposed Plan shall be due or paid to any of the Parties for their agreement to support confirmation of the Proposed Plan in accordance with the terms and conditions of this Agreement.

19.    Time of the Essence. Time shall be of the essence with respect to each and every of the various undertakings and obligations set forth in this Agreement.

20.    Notices. All notices, consents, waivers and other communications under this Agreement must be in writing and shall be deemed to have been duly given when: (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of receipt), or (c) received by the addressee, if sent by email, in each case to the appropriate addresses, representative (if applicable) and telecopier numbers set forth in the signature page attached hereto (or to such other addresses, representative and telecopier numbers as a Party may designate by notice to the other Parties in accordance with this paragraph).

21.    <u>Acknowledgement</u>.  THIS AGREEMENT, THE PROPOSED PLAN, AND THE TRANSACTIONS CONTEMPLATED HEREIN AND THEREIN, ARE THE PRODUCT OF NEGOTIATIONS     BETWEEN     THE     PARTIES     AND     THEIR     RESPECTIVE REPRESENTATIVES.    EACH  PARTY  HEREBY  ACKNOWLEDGES  THAT  THIS AGREEMENT IS NOT AND SHALL NOT BE DEEMED TO BE A SOLICITATION OF VOTES FOR THE ACCEPTANCE OF A CHAPTER 11 PLAN FOR THE PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR OTHERWISE.    THE DEBTORS WILL NOT SOLICIT ACCEPTANCES OF THE PROPOSED PLAN FROM ANY PERSON OR ENTITY UNTIL THE PERSON OR ENTITY HAS BEEN PROVIDED WITH A COPY OF A DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. EACH PARTY FURTHER ACKNOWLEDGES THAT NO SECURITIES OF ANY DEBTOR ARE BEING OFFERED OR SOLD HEREBY AND THAT THIS AGREEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OF ANY DEBTOR. NOTWITHSTANDING THE FOREGOING PROVISIONS, NOTHING IN THIS AGREEMENT SHALL REQUIRE ANY PARTY TO TAKE ANY ACTION PROHIBITED BY THE BANKRUPTCY CODE, THE SECURITIES ACT OF 1933 (AS AMENDED), THE SECURITIES EXCHANGE ACT OF 1934 (AS AMENDED), ANY RULE OR REGULATIONS PROMULGATED THEREUNDER, OR BY ANY OTHER APPLICABLE LAW OR REGULATION OR BY AN ORDER OR DIRECTION OF ANY COURT OR ANY STATE OR FEDERAL GOVERNMENTAL AUTHORITY.

22.    <u>Agreement Not a Plan</u>.    This  Agreement  does  not  constitute  a  plan  of reorganization or confirmation thereof under the Bankruptcy Code.  Any plan will not become effective unless and until the Bankruptcy Court enters a confirmation order and the Proposed Plan becomes effective in accordance with its terms.

23.    <u>No Waiver of Participation and Preservation of Rights</u>.    If  the  transactions contemplated  by  this  Agreement  or  otherwise  set  forth  in  the  Proposed  Plan  are  not consummated as provided herein or therein, or if this Agreement is terminated for any reason, except as otherwise provided for herein, the Parties each fully reserve any and all of their respective rights, remedies and interests.

[signature page follows]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date written in the opening paragraph hereof.

**Revstone Industries, LLC**                    **Pension Benefit Guaranty Corporation**
**Spara, LLC**
**TPOP, LLC f/k/a Metavation, LLC**
**Greenwood Forgings, LLC**
**US Tool & Engineering, LLC**


———————————————                    ———————————————
John C. DiDonato                                Dana Cann
Chief Restructuring Officer                      Acting Deputy Director
c/o Huron Consulting Group Inc.                  Corporate Finance and Restructuring
                                                Department
                                                1200 K Street NW, Suite 340
599 Lexington Ave., 25th Floor                   Washington, D.C. 20005
New York, NY 10022                               Fax: (202) 326-4112
Fax: (212) 785-1313                              Email: _____
Email: jdidonato@huronconsultinggroup.com