IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVSTONE INDUSTRIES, LLC, et al.,[1] | ) | Case No. 12-13262 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**Hearing Date: May 15, 2014 at 11:30 a.m.**
**Objection Deadline: May 8, 2014 at 4:00 p.m.**

**DEBTOR'S MOTION FOR ORDER: (A) APPROVING BID PROCEDURES
FOR THE SALE OF THE DEBTOR'S EQUITY INTEREST IN REVSTONE
WALLACEBURG CANADA, INC. OUTSIDE THE ORDINARY COURSE OF
BUSINESS; (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE
SALE AND APPROVE THE FORM AND MANNER OF NOTICE RELATED
THERETO; (C) APPROVING PAYMENT OF
A BREAK-UP FEE; AND (E) GRANTING RELATED RELIEF**

Revstone Industries, LLC, the debtor and debtor in possession herein ("Revstone" or

the "Debtor"), files this motion (this "Bidding Procedures Motion") for entry of an order:

(a) approving bid procedures and break-up fee in connection with the sale of the equity of

Revstone Wallaceburg Canada, Inc. ("RWCI") owned by the Debtor; (b) scheduling an auction

and hearing to consider the sale of the equity interest and approve the form and manner of

notices related thereto; and (c)  granting related relief.

Concurrently herewith, the Debtor is filing the *Debtor's Motion for Order (A) Approving*

*Share Purchase Agreement and Authorizing the Sale of the Debtor's Equity Interest in Revstone*

*Wallaceburg Canada, Inc. Outside the Ordinary Course of Business; (B) Authorizing the Sale of*

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtors' federal tax identification numbers are:  Revstone Industries, LLC (7222); Spara, LLC (6613); Greenwood Forgings, LLC (9285); and US Tool & Engineering, LLC (6450).  The location of the Debtors' headquarters and the service address for the Debtors is 230 N. Limestone St., Ste. 100, Lexington, KY 40507.

*Assets Free and Clear of All Liens, Claims, Rights, Encumbrances and Other Interests Pursuant to Bankruptcy Code Sections 105, 363(b), 363(f) And 363(m); and (C) Granting Related Relief* (the "Sale Motion"), which seeks authorization of the sale of substantially all of the Debtor's equity interest in RWCI (the "Shares") to (i) Zynik Capital Corporation ("Zynik") (the "Stalking Horse Bidder") pursuant to that certain agreement between the Debtor and the Stalking Horse Bidder dated as of March 13, 2014 a copy of which agreement, without schedules and exhibits, is attached to the Sale Motion as Exhibit A (the "Agreement"),[2] or (ii) the highest or otherwise best bidder or bidders for such assets determined in accordance with the proposed bid procedures. As discussed below and in the Sale Motion, the sale process is in the best interests of the Debtor, its estate and creditors, and is necessary to meet the deadlines established in the Agreement. As set forth in the Agreement, the Debtor is required to obtain an order approving the Bidding Procedures Motion (the "Bidding Procedures Order") no later than May 16, 2014, conduct an auction within forty-five (45) days after the Bid Procedures Motion is filed, obtain an order approving the Sale no later than three (3) Business Days after the date of the Auction and close such sale no later than fourteen (14) days after the entry of the Sale Order.

In support of this Bidding Procedures Motion, the Debtor respectfully states as follows:

## Jurisdiction and Venue

1.      This Court has jurisdiction over this Bidding Procedures Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2] All capitalized terms not defined herein have the meaning ascribed to them in the Agreement.

2

3.      The statutory predicates for the relief sought herein are sections 105, 363, 365, 503, 1107 and 1108 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b) and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Background

4.      On December 3, 2012, Revstone and its sister company, Spara, LLC ("Spara"), commenced their respective cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On January 7, 2013, Revstone subsidiaries, Greenwood Forgings, LLC ("Greenwood") and US Tool & Engineering, LLC ("US Tool", and with Revstone, Spara and Greenwood, the "Debtors"), commenced their respective cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On December 18, 2012, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") in the Revstone case.  No committee has been appointed in the cases of Spara, Greenwood, or US Tool.  No trustee or examiner has been appointed in any of the Debtors' chapter 11 cases.

6.      The factual background relating to the commencement of the Debtor's chapter 11 case is set forth in detail in the *Declaration of John C. DiDonato in Support of First Day Motions of Revstone Industries, LLC* and incorporated herein by reference.

7.      Pursuant to the *Order Authorizing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only* (Docket No. 173), the Debtors' chapter 11 cases are jointly administered and consolidated for procedural purposes.

## Aarkel Operations and the Assets to Be Sold

8.      Pursuant to the Sale Motion, the Debtor seeks approval of the sale of the Shares of RWCI owned by the Debtor, which consist of one hundred (100) shares of common stock of RWCI owned by the Debtor, which represent one-hundred percent (100%) of the issued and outstanding equity interests of RWCI.  RWCI itself conducts no active business and is a holding company that owns twenty five million nine hundred fifty three thousand one twenty eight (25,953,128) shares of common stock of Aarkel Tool & Die, Inc. ("Aarkel").  Aarkel is one of the leading manufacturers in North America of diecast tooling, plastic injection tooling and aluminum production/prototype tooling products.  Aarkel designs and manufactures a wide variety of diecast, plastic injection and aluminum tooling products in a wide assortment unique to the material handling needs of its customers.  Aarkel operates out of two plants with a combined 110,000 square feet of space in Wallaceburg, Ontario, Canada.  This facility provides ready access to key customers throughout central Canada and the Midwest United States.

9.      In light of the extensive marketing process already undertaken, and the additional efforts that will be made during the proposed sale process, the timing of the sale proposed herein

4

is reasonable under the circumstances to effectuate a sale to the Stalking Horse Bidder under the terms of the Agreement. Pursuant to the Agreement, the Debtor must obtain an order approving the Bidding Procedures Motion (the "Bidding Procedures Order") no later than May 16, 2014, conduct an auction within forty-five (45) days after the Bid Procedures Motion is filed, obtain an order approving the Sale no later than three (3) Business Days after the date of the Auction and close such sale no later fourteen (14) days after the entry of the Sale Order.

### Marketing Process

10.    Significant efforts were undertaken by both Revstone and Aarkel to market Revstone's equity interest in RWCI or the assets of Aarkel as each structure provided different benefits to prospective buyers and to the Revstone estate. To market RWCI's equity interest in Aarkel and the assets of Aarkel, the investment bank of Stout Risius Ross, Inc. ("SRR") was retained. Revstone and Aarkel formally commenced that process in September 26, 2013. Marketing materials, including an executive summary ("Teaser") and a Confidential Informational Memorandum (the "CIM") were prepared, an online data site with diligence materials was created, and potential buyers were identified. Approximately two-hundred eighty nine (289) industry participants, strategic and financial investors, and other potential buyers were contacted by SRR, with the approval and input of the Debtor's and Aarkel's management. SRR distributed approximately two-hundred sixty (260) Teasers. Approximately sixty-five (65) parties returned executed confidentiality agreements and were provided with the CIM. By November 15, 2013, Revstone and Aarkel had received thirteen (13) non-binding expressions of interest, and subsequently Revstone and Aarkel negotiated with certain of the interested parties.

5

Based on various factors, the original list was reduced to nine (9) potential bidders who were then given access to the online data site. Five (5) of these bidders submitted letters of intent. The Debtor ultimately focused on a potential transaction with one of the parties that had submitted a letter of intent.

11.     On December 18, 2013, the Stalking Horse Bidder submitted to the Debtor a non-binding letter of intent ("LOI"). After extensive review and consideration, the Debtor selected the Stalking Horse Bidder's offer as set forth in its LOI as the best alternative for Revstone to maximize its equity interest in RWCI and indirect interest, through RWCI, in Aarkel, and proceeded to negotiate with the Stalking Horse Bidder the terms and conditions of a definitive share purchase agreement. After extensive negotiations, Revstone, RWCI and Aarkel entered into the Agreement with the Stalking Horse Bidder, which is attached to the Sale Motion as Exhibit A.

12.     The Stalking Horse Bidder is not an "insider" or "affiliate" of the Debtor as those terms are defined in the Bankruptcy Code.

13.     While the prepetition marketing and sale process was thorough, as discussed above, the Debtor will send, or will have sent, notice of the Sale Motion and Bidding Procedures to all parties that the Debtor believes may be potentially interested in acquiring the Shares (and, indirectly, control of Aarkel). The Debtor also created an electronic data room with key documents and company-specific information in order to streamline the due diligence process going forward. The data room has been, and will be, available to interested parties who have, or

will, execute confidentiality agreements acceptable to the Debtor. The Debtor will continue to respond to inquiries from prospective buyers through the bid deadline.

14.    The Debtor believes that the consummation of the Sale of the Shares to the Stalking Horse Bidder or other Successful Bidder will provide its creditors and other stakeholders with the best opportunity possible for maximizing value in the Debtor's interest in RWCI and Aarkel.

### Relief Requested

15.    Pursuant to this Bidding Procedures Motion, the Debtor requests that the Court, among other things:

(a.)    approve the Stalking Horse Bidder's status as the stalking horse bidder;

(b.)    approve the proposed bidding procedures (the "Bidding Procedures"), including the break-up fee, attached hereto as Exhibit A;

(c.)    approve, pursuant to the terms of the Agreement, the requested break-up fee in the amount of $500,000[3] (or approximately 3.55% of the proposed $14,100,000 purchase price (the "Break-Up Fee")), which Break-Up Fee will (i) have super-priority administrative claim status in the Debtor's case pursuant to Bankruptcy Code section 507(b), senior to all administrative expense priority claims and (ii) be paid to the Stalking Horse Bidder in full upon consummation of an Alternative Transaction (as defined in the Agreement)

---

[3] Currency denominations are in Canadian dollars and all amounts reflected in the Agreement and all exhibits and schedules thereto refer to Canadian dollars unless otherwise specified.

occurring within the nine month period following the Auction, pursuant to the terms and conditions set forth in the Agreement, including sections  thereof;

(d.)    approve, pursuant to all the terms and conditions of the Agreement, the potential stalking horse expense reimbursement in the amount of $500,000 (the "Stalking Horse Reimbursement"), which Stalking Horse Expense Reimbursement will be paid to the Stalking Horse Bidder, in the event the transaction fails to close within nine (9) months of the Agreement, if (i) the Stalking Horse Bidder is not in material breach of the Agreement and the Seller Parties (as defined in the Agreement) elect to terminate this transaction for any reason set forth in Section 9.1 of the Agreement (other than 9.1(a) and (e)), and (ii) the Seller Parties are not in breach of any of their obligations under this Agreement and there is no Alternative Transaction that closes within 9 months after the Auction.

(e.)    establish a date for potentially holding an auction (the "Auction") and approve certain procedures in connection therewith;

(f.)    schedule the hearing to approve any sale transaction(s) to the Stalking Horse Bidder or to such other party that makes the highest or otherwise best offer for the assets (the "Successful Bidder") and establish deadlines for objections and responses to the relief requested in the Sale Motion; and

(g.)    approve the form and manner of notice to be served upon certain parties, including:  (i) the form of notice, substantially in the form attached hereto as Exhibit B, to be served on the Sale and Bid Procedures Notice Parties (defined below); and (ii) the form of

8

notice, substantially in the form attached hereto as <u>Exhibit C</u>, to be served on all known creditors

of the Debtor (the "<u>Creditor Notice</u>").

## Sale Hearing

16.    The Debtor requests that the Court schedule a Sale Hearing no later than June 10,

2014 in order to allow timely entry of the Sale Order and for completion of the closing

transactions set forth in the Agreement, and that objections, if any, to the Sale Motion be filed no

later than 4:00 p.m. prevailing Eastern Time within seven (7) business days of the Sale Hearing

(thus, for example, if the Sale Hearing were set for June 10, 2014 the objection deadline would

be 4:00 p.m. on June 3, 2014).

## Proposed Bidding Procedures

17.    The Bidding Procedures are attached hereto as <u>Exhibit A</u>.  The Bidding

Procedures are summarized as follows:[4]

(a.)    <u>Assets to be Sold</u>:  The Debtors are offering for sale all of the

Debtor's equity interest in RWCI.

(b.)    <u>Participation Requirements</u>.  Any person that may be interested in

all or portions of the Shares (a "<u>Potential Bidder</u>") must deliver to the Debtor, at the addresses

specified below (unless a particular document has been previously delivered or the Debtor

waives a particular requirement), not later than five (5) business days before the Bid Deadline

(defined below):

---

[4]  Nothing in this summary shall be construed in any way to limit or alter any of the provisions of the Bidding
Procedures, or to guide in the interpretation of the Bidding Procedures in any other proceeding.  This summary is
provided merely as a convenience to the Court and parties in interest evaluating the Bidding Procedures.

i. An executed confidentiality agreement ("Confidentiality Agreement") in form and substance acceptable to the Debtor;

ii. identification of the Potential Bidder, its principals, and the representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated transaction;

iii. written disclosure of any connections or agreements with the Debtor, the Stalking Horse Bidder, any other known Potential Bidder or Qualified Bidder, and/or any officer, director, manager or direct or indirect equity security holder of the Debtor;

iv. a letter of indication stating that such bidder is prepared to enter into a legally binding share purchase agreement or similar agreement for the acquisition of such Shares on terms and conditions no less favorable in the aggregate to the Debtor than the terms and conditions contained in the Agreement, indicating (a) that such bidder will post the required Bid Deposit (defined below), and (b) total cash consideration expected to be provided to the Debtor at Closing; and

v. sufficient information, as may be requested by the Debtor in its discretion, to allow the Debtor to determine that the bidder has the operational and financial capability to close a sale of the Shares (which may include, but is not limited to, a bank account statement showing the ability of a Potential Bidder to pay cash for the Shares, current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Debtor) of the Potential Bidder or those entities that will guarantee in full the payment obligations of the Potential Bidder, proof of any debt or equity funding commitments that are needed to close the contemplated transaction, and/or operational information).

As provided below, only Potential Bidders who satisfy the foregoing requirements may participate in the due diligence process.

A "Qualified Bidder" is a Potential Bidder that delivers the documents and information described in subparagraphs (i) – (v) above and who satisfies the following additional requirement, as to be determined by the Debtor in its discretion, subject to consultation with the Committee and PBGC:

- The Debtor has determined the Potential Bidder is reasonably likely (based on, among other things, operational and financial information submitted by the Potential Bidder, the Potential Bidder's operational and financial capability to

10

close a sale of the Shares, experience, and other non-monetary considerations, such as ability to obtain any required regulatory approvals, including, if applicable, under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR"), to submit a <u>bona fide</u> offer, and be able to consummate a sale if selected as the Successful Bidder (as defined below).

As set forth further below, only a Qualified Bidder may submit a Qualified Bid, and the Qualified Bidder's bid must meet certain requirements as described below to constitute a Qualified Bid. So long as it is not in breach of the Agreement, the Stalking Horse Bidder shall be deemed a Qualified Bidder.

Not later than three (3) business days after a Potential Bidder delivers all of the materials and information that may be required by the Debtor in preceding subparagraphs (i) through (v) above, the Debtor shall determine, subject to consultation with the Committee and PBGC, and shall notify the Potential Bidder upon such determination, if such Potential Bidder is a Qualified Bidder.

(c.)    <u>Due Diligence</u>:    Only Qualified Bidders are eligible to receive due diligence access and/or certain non-public information. If the Debtor determines that a Potential Bidder no longer constitutes a Qualified Bidder, then such Potential Bidder's access to due diligence or other non-public information shall terminate. The Debtor is not responsible for, and will bear no liability with respect to, any information obtained by Potential Bidders or Qualified Bidders in connection with the sale of the Shares.

Notwithstanding the foregoing, neither the Debtor nor its representatives shall be obligated to furnish information of any kind to any person that the Debtor determines not to be a Qualified Bidder. The Debtor will afford any Qualified Bidder the time and opportunity to conduct reasonable due diligence; <u>provided</u>, <u>however</u>, that the Debtor shall not be obligated to

DOCS_DE:192574.2 73864/001

furnish any due diligence information after the Bid Deadline.  The Debtor will designate an

employee or other representative to coordinate all reasonable requests for additional information

and due diligence access from Qualified Bidders.

      (d.)    <u>Bid Requirements</u>:  All bids, other than the Stalking Horse Bid,

shall be made by Qualified Bidders in writing and include the following terms, conditions,

information and documents (the "<u>Required Bid Materials</u>"):

i.       A Qualified Bid must have similar or better terms and conditions as the Stalking Horse Bid (as determined by the Debtor in its business judgment), with higher or better consideration by having an aggregate value (as determined by the Debtor in its discretion) of not less than (x) the sum of (i) $14,100,000.00, and (ii) $500,000 (which amount is the Break-Up Fee (defined below) plus an initial bid increment of $150,000.00, followed by additional bid increments of $50,000; provided, however, that each Qualified Bid must provide for the payment of the Break-Up Fee in cash upon the closing of the applicable transaction; provided, however, in its discretion, the Debtor may aggregate bids and consider other value provided to the Debtor's estate in connection with a bid to determine the highest or otherwise best bid (the "<u>Minimum Bid Amount</u>").  A bid should propose a contemplated transaction involving all or substantially of the Shares, provided, however, that the Debtor, in its discretion, may consider proposals for less than substantially all the Shares; provided further that the Debtor will evaluate all bids, in its sole discretion, to determine whether such bid or combination of bids maximizes the value of the Debtor's estate as a whole.

ii.     A letter stating and agreeing that the Qualified Bidder's offer is irrevocable until the earlier of (i) the second business day after the Shares on which the Qualified Bidder is submitting a bid have been sold pursuant to the closing of the sale or sales or (ii) up to and including the close of business on the date that is three (3) Business Days after the Termination Date, and that such offer will serve as a Back-Up Bid if so selected by the Debtor.

iii.    An executed copy of a share purchase agreement and a redline of the Qualified Bidder's proposed share purchase agreement reflecting variations from the Agreement (the "<u>Marked Agreement</u>").  All Qualified Bids must provide (a) a commitment to close within the same (or shorter) time period set forth in the Agreement; (b) a representation that the Qualified Bidder will, if applicable, (1) make all necessary filings under the HSR or any other applicable similar regulatory filing, and pay the fees associated with such filings and (2) submit all

necessary filings under HSR (or similar regulatory filing) within the same (or shorter) time period, if any, set forth in the Agreement.

iv.  A cash deposit in the amount of $500,000, in the form of a wire transfer, certified check or such other form acceptable to the Debtor (the "Bid Deposit"), which shall be placed in an escrow account or other segregated account acceptable to the Debtor, the "Escrow Account").

v.  A representation of the bidder and written evidence acceptable to the Debtor that the Qualified Bidder has the financial wherewithal to consummate the proposed transaction, provided that if a bid is based partly or completely on financing, written evidence of the commitment for financing and the appropriate contact information for such financing source must be provided unless waived by the Debtor.

vi.  A Qualified Bid cannot request or entitle the Qualified Bidder to any transaction or break-up fee, expense reimbursement, termination or similar type of fee or payment, and shall include an acknowledgement and representation of the Qualified Bidder that it has had an opportunity to conduct any and all due diligence regarding the Shares prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Shares in making its bid, and that it did not rely upon any written or oral statements, representations, warranties, or guarantees, express, implied, statutory or otherwise, regarding the Shares, the financial performance of the Shares, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures or the Marked Agreement.

vii.  A Qualified Bid cannot contain any due diligence, financing, or regulatory contingencies of any kind (other than a condition that any applicable waiting period under HSR (if applicable) shall have expired or been terminated), though the bid may be subject to the satisfaction of specific conditions in all material respects at Closing.

viii.  A Qualified Bid shall fully disclose the identity of each entity that will be bidding for the Shares or otherwise participating in connection with such bid, and the complete terms of any such participation.

ix.  A Qualified Bid shall state that the offering party consents to the core jurisdiction of the Bankruptcy Court and waives any right to a jury trial in connection with any disputes relating to the Auction and the construction and enforcement of the bidder's contemplated transaction documents.

x.  A Qualified Bid shall provide that the Qualified Bidder party shall be bound as a "Back-Up Bidder" as provided below.

xi.    The bid shall include evidence of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the submitted purchase agreement of the bidder.

A bid received from a Qualified Bidder that includes all of the Required Bid Materials to the satisfaction of the Debtor in its discretion, subject to consultation with the Revstone Committee and PBGC and is received by the Bid Deadline is a "Qualified Bid." The Debtor reserves the right to determine the value of any Qualified Bid, and which Qualified Bid (or combination of Qualified Bids) constitutes the highest or best offer (subject to Bankruptcy Court approval). The Debtor shall notify the Stalking Horse Bidder within twenty-four (24) hours after the Bid Deadline if one or more Qualified Bids are received and the identity of the bidders making any such Qualified Bids, and shall provide the Stalking Horse Bidder with a copy of any Marked Agreement constituting a Qualified Bid.

(e.)    Bid Deadline: The deadline for submitting Qualified Bids by a Qualified Bidder shall be the date that is two business days before the Auction or three calendar days before the Auction, whichever is later (the "Bid Deadline").[5]

(f.)    Auction: If a Qualified Bid other than that submitted by the Stalking Horse Bidder has been received by the Debtor by the Bid Deadline, the Debtor may conduct an auction (the "Auction") of the Shares. The Debtor shall provide Qualified Bidders that submitted Qualified Bids with a copy of the share purchase agreement(s) relating to the other Qualified Bids at least twenty-four (24) hours prior to the Auction. The Auction shall be conducted at the offices of Pachulski, Stang, Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19899 at 10:00 a.m. (prevailing Eastern time) two business days prior to the Sale Hearing, or such other place and time as the Debtor shall notify all Qualified Bidders who have submitted Qualified Bids and expressed their intent to participate in the

---

[5] For example, if the Auction is scheduled for a Monday, the Bid Deadline would be at 4:00 p.m. Eastern on the preceding Friday (three calendar days before the scheduled Auction).

Auction as set forth above.  The Auction will be governed by various procedures, as proposed in the attached Bidding Procedures.

(g.)    <u>Acceptance of Qualified Bids</u>: The Debtor shall sell the Shares to any Successful Bidder (or the party(ies) who submitted the Back-Up Bid(s) ("<u>Back-Up Bidder(s)</u>") should such Qualified Bidder's become the Successful Bidder as described further in the Bidding Procedures) only upon the approval of such Qualified Bidder's Qualified Bid by the Bankruptcy Court after the Sale Hearing.  The Debtor's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtor's acceptance of the bid.  The Debtor will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

(h.)    <u>Return of Bid Deposits</u>:  The Bid Deposits shall not be subject to the claims, liens, security interests, or encumbrances of Debtor's creditors.  The Bid Deposits of Qualified Bidders (others than the Stalking Horse Bidder) shall be disbursed from the Escrow Account only as follows: (i) if the Qualified Bidder becomes the Successful Bidder, its Bid Deposit will be released to the Debtor or applied as provided under any asset purchase agreement between the Debtor and such Successful Bidder, and (ii) if such Qualified Bidder is not the Successful Bidder at the Auction, then its Bid Deposit shall treated as set forth below.  The Bid Deposit of the Stalking Horse Bidder shall be disbursed as provided for under the Agreement and the Escrow Agreement, if any, governing such Bid Deposit.  Other than the Bid Deposits of the Successful Bidder(s) and the Back-Up Bidder(s), Bid Deposits of all other Qualified Bidders shall be returned as soon as practicable after entry of the order approving the sale of the US

15

Acquired Assets.  In addition to any other remedies available to the Debtor, the Debtor may retain the Bid Deposit of any Qualified Bidder who breaches or fails to perform any of its obligations pursuant to these Bidding Procedures or its Qualified Bid.  The treatment of the Stalking Horse Bidder's Bid Deposit by the Debtor shall be in accordance with the terms of the Agreement.

### Notice of Sale Hearing

18.     As noted above, based on the Agreement's requirement that an Auction occur within forty-five (45) days after the Bid Procedures Motion is filed and a sale order be entered no later than three (3) Business Days after entry of the Bidding Procedures Order, the Debtor requests that the Court schedule the Sale Hearing no later than June 10, 2014 which date is three Business Days after the Auction.  The Debtor proposes that objections, if any, to the Sale Motion be filed on or before 4:00 p.m. no later than seven (7) days prior to the Sale Hearing.

19.     The Debtor requests that the Court approve the manner of notice of the Sale Motion, the Bidding Procedures, the Auction, and the Sale Hearing, substantially in the form attached hereto as Exhibit B (the "Sale and Bid Procedures Notice"), which the Debtor will serve on the following parties:

> (a.)     the U.S. Trustee;
>
> (b.)     counsel to the Committee in Revstone's chapter 11 case;
>
> (c.)     all parties known by the Debtor to assert a lien on any of the Shares, if any;

(d.)    all entities who executed non-disclosure agreements with the Debtor in

connection with a potential acquisition of any or all of the Shares or whom

the Debtor believes may have an interest in bidding

(e.)    the Stalking Horse Bidder and its counsel; and

(f.)    all parties who have timely filed requests for notice under Rule 2002 of

the Federal Rules of Bankruptcy Procedure as of the date of entry of the Bidding

Procedures Order (collectively, the "Sale and Bid Procedures Notice Parties").

20.    Additionally, the Debtor proposes to serve the Creditor Notice substantially in the

form attached hereto as Exhibit C on all known creditors of the Debtor.

21.    The Debtor proposes to serve the Sale and Bid Procedures Notice and the Creditor

Notice within three (3) Business Days from the date of entry of the Bidding Procedures Order,

by first-class mail, postage prepaid, on the appropriate parties.  Both the Sale and Bid Procedures

Notice and the Creditor Notice will provide that any party that has not received a copy of the

Sale Motion or the Bidding Procedures Order that wishes to obtain a copy of such documents

may make such a request, in writing, to Pachulski Stang Ziehl & Jones LLP, 919 North Market

Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899-8705 (Courier 19801), Attn:

Laura Davis Jones and Colin R. Robinson or by email to ljones@pszjlaw.com and

crobinson@pszjlaw.com.

## Sale Hearing

22.    At the Sale Hearing, the Debtor will seek Bankruptcy Court approval of the Sale

of the Shares to the Successful Bidder, free and clear of all liens, claims and encumbrances

17

pursuant to section 363(f) of the Bankruptcy Code (other than the liens and interests permitted

under the Agreement) with all such liens, claims and interests to attach to the proceeds of the

Sale of the Shares, except as otherwise provided with the same validity and in the same order of

priority as they attached to the Shares prior to the Sale.

### Closing

23.     The closing shall take place in accordance with terms of the Agreement, or in

accordance with the terms of such other agreement approved by the Bankruptcy Court at the Sale

Hearing.

### Approval of Bid Protections Is Appropriate

24.     As indicated above, the Debtor hereby requests that the Court approve the Break-

up Fee and Bidding Procedures in their entirety, as is customary in similar circumstances.  To

compensate the Stalking Horse Bidder whose bid will be subject to higher or better offers, the

Debtor seeks approval of the Break-Up Fee, as well as the Stalking Horse Reimbursement (if

applicable pursuant to the terms of the Agreement), in accordance with the terms of the

Agreement.

25.     The Debtor and Stalking Horse Bidder believe that the amount of the Break-Up

Fee is reasonable, given the benefits to the Debtor's estate of having a "stalking horse" bidder by

virtue of the definitive share purchase agreement with the Stalking Horse Bidder, and the risk to

the Stalking Horse Bidder that a third-party offer may ultimately be accepted, and that approval

of the Break-Up Fee under the terms of the Agreement (including the super-priority

administrative claim status thereof) are necessary to preserve and enhance the value of the

18

Debtor's estate.  The Debtor believes that the agreement to pay the Break-Up Fee on the terms of the Agreement is necessary to induce the Stalking Horse Bidder to enter into the transactions encompassed by the Agreement and thus to enable the Debtor to obtain the highest and best possible price for the Shares.

26.    Further, the Debtor believes that the Stalking Horse Reimbursement is fair and reasonable provision under all the circumstances.  This provision is triggered only if (i) the Seller Parties (as defined in the Agreement) elect to terminate this transaction for any reason set forth in Section 9.1 (other than 9.1(a) and (e), the Stalking Horse Bidder is not in material breach of any of its undertakings under the Agreement and (ii) the Seller Parties are not in breach of any of their obligations under the Agreement and there is no Alternative Transaction that closed within nine months after the Auction.  Additionally, in no event shall the Stalking Horse Bidder be entitled to the Stalking Horse Reimbursement if it receives the Break-Up Fee or the other fees set forth in Section 9.1 of the Agreement.

27.    The Bidding Procedures are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values.  The Break-Up Fee and Bidding Procedures will encourage competitive bidding, and will potentially lead to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured.

28.    Bidding incentives encourage a potential purchaser to invest the requisite time, money and effort to negotiate with the Debtor and perform the necessary due diligence attendant to the acquisition of the Debtor's assets, despite the inherent risks and uncertainties of the

chapter 11 process.  Historically, bankruptcy courts have approved bidding incentives similar to the Break-Up Fee, under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.  *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

29.    The Third Circuit has established standards for determining the appropriateness of bidding incentives in the bankruptcy context.  *In Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999), the court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code § 503(b) govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must provide some benefit to the Debtor's estate.  *See id.* at 533.

30.    The *O'Brien* court identified at least two instances in which bidding incentives may provide benefit to an estate.  First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537.  Second, where the availability of bidding incentives induces a bidder to research the value a debtor's assets and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

20

31.     Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Break-Up Fee pass muster.  The Agreement and the Debtor's agreement to pay the Break-Up Fee pursuant to the terms thereunder is the product of good faith, arm's-length negotiations between the Debtor and the Stalking Horse Bidder.  The Break-Up Fee is fair and reasonable in amount, and are reasonably intended to compensate for the risk to the Stalking Horse Bidder of being used as a stalking horse bidder.

32.     Further, the Break-Up Fee has already encouraged competitive bidding in that the Stalking Horse Bidder would not have entered into the Agreement without this provision.  The Break-Up Fee thus has "induc[ed] a bid that otherwise would not have been made and without which bidding would [be] limited."  *O'Brien*, 181 F.3d at 537.  Similarly, the Stalking Horse Bidder's offer provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [Property will be] sold will reflect [its] true worth."  *Id.*

33.     Finally, the Bidding Procedures are fair and reasonable procedures reasonably intended to encourage competitive bidding, and the Break-Up Fee will permit the Debtor to insist that competing bids for the Shares, made in accordance with the Bidding Procedures, be materially higher or otherwise better than the Agreement (or competing agreement), which is a clear benefit to the Debtor's estate.

34.     Furthermore, the Break-Up Fee, in the amount of $500,000, or approximately 3.55% of the Purchase Price under the Agreement, is within the spectrum of termination fees approved by bankruptcy courts in chapter 11 cases.  *See, e.g., In re Global Motorsport Group, Inc., et al.*, (Case No. 08-10192 (KJC) (Bankr. D. Del. February 14, 2008) (Court approved a

break-up fee of approximately 4%, or $500,000 in connection with sale); *In re Global Home Products*, Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (Court approved a break-up fee of 3.3%, or $700,000, in connection with sale); *In re Ameriserve*, Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (Court approved a break-up fee of 3.64%, or $4,000,000, in connection with $110,000,000 sale); *In re Montgomery Ward Holding Corp., et al.*, Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (Court approved termination fee of 2.7%, or $3,000,000, in connection with $110,000,000 sale of real estate assets); *In re Medlab, Inc.*, Case No, 97-1893 (PJW) (Bankr. D. Del. April 28, 1998) (Court approved termination fee of 3.12%, or $250,000, in connection with $8,000,000 sale transaction); *In re FoxMeyer Corp. et al.*, Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (Court approved termination fee of 7.47%, or $6,500,000, in connection with $87,000,000 sale of substantially all of debtors' assets); *In re Edison Bros. Stores. Inc., et al.*, Case No. 95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (Court approved termination fee of 3.5%, or $600,000, in connection with $17,000,000 sale of debtors' entertainment division); *In re NetEffect, Inc.*, Case No. 08-12008 (KJC) (Bankr. D. Del., Sept. 11, 2008) (Court approved break-up fee of 3%, or $240,000.00 in connection with sale of debtor's assets for purchase price of $8,000,000); *In re Champion Enterprises, et al.*, Case No. 09-14019 (KG) (Bankr. D. Del., Feb. 8, 2010) (Court approved break-up fee of less than credit bid or $3,000,000.00 in connection with sale of debtor's assets for purchase price of approximately $80,000,000); *In re Filene's Basement, Inc., et al.*, Case No. 09-11525 (MFW) (Bankr. D. Del., May 15, 2009) (Court approved break-up fee and expense reimbursement of 3.68%, or $810,000 in connection with sale of debtor's assets for purchase

22

price of $22,000,000); *In re Western Nonwovens, Inc., et al.*, Case No. 08-11435 (PJW) (Bankr. D. Del., July 28, 2009) (Court approved break-up fee and expense reimbursement of $250,000 in connection with sale of debtor's assets for purchase price of $4,000,000 to $6,500,000 purchase price); and *In re Point Blank Solutions, Inc., et al.*, Case No. 10-11255 (PJW) (Bankr. D. Del, Oct. 5, 2011) (Court approved break-up and expense reimbursement of 3.75% or $750,000 in connection with sale of debtor's assets for purchase price of $20,000,000).

## No Prior Request

35.     No prior request for the relief sought in this Bidding Procedures Motion has been made to this or any other court.

## Notice

36.     Notice of this Motion and a copy of this Motion will be provided to (a) the Office of the United States Trustee; (b) counsel to the Committee; (c) all parties who are known by the Debtor to assert liens with respect to the Shares, if any; (d) all entities who executed non-disclosure agreements with the Debtor in connection with a potential acquisition of any or all of the Shares or whom the Debtor believes may have an interest in bidding; (e) the Stalking Horse Bidder and its counsel; and (d) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure.  Upon approval of this Motion, the Debtor will serve notice of the  Sale Hearing, Bidding Procedures and related matters on all of the foregoing service parties and all other creditors of the Debtor known by it (as proposed herein, subject to Court approval). The Debtor respectfully submits that such notice is sufficient, and request that the Court find that no further notice of the relief requested herein is required.

DOCS_DE:192574.2 73864/001

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order, substantially in the form filed contemporaneously with this Bidding Procedures Motion, granting the relief requested herein and such other and further relief as this Court deems appropriate.

Dated: April 21, 2014

PACHULSKI STANG ZIEHL & JONES LLP

_____
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (Bar No. 4228)
Colin R. Robinson (Bar No. 5524)
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone:  302/652-4100
Facsimile:  302/652-4400
Email: ljones@pszjlaw.com
        dbertenthal@pszjlaw.com
        tcairns@pszjlaw.com
        crobinson@pszjlaw.com

Counsel for the Debtor and Debtor in Possession

DOCS_DE:192574.2 73864/001