IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVSTONE INDUSTRIES, LLC, <u>et al.</u>,[1] | ) | Case No. 12-13262 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**Hearing Date: TBD**
**Objection Deadline: TBD**

**DEBTOR'S MOTION FOR ORDER (A) APPROVING SHARE
PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF
THE DEBTOR'S EQUITY INTEREST IN REVSTONE WALLACEBURG CANADA,
INC. OUTSIDE THE ORDINARY COURSE OF BUSINESS; (B) AUTHORIZING THE
SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, RIGHTS,
ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO BANKRUPTCY CODE
SECTIONS 105, 363(b), 363(f) AND 363(m); AND (C) GRANTING RELATED RELIEF**

Revstone Industries, LLC, the debtor and debtor in possession herein ("<u>Revstone</u>" or the

"<u>Debtor</u>"), files this motion (this "<u>Sale Motion</u>") for entry of an order:  (a) approving the *Share*

*Purchase Agreement* dated March 13, 2014 between the Debtor, as seller, and Zynik Capital

Corporation (the "<u>Purchaser</u>" or the "<u>Stalking Horse Bidder</u>"), as buyer (the "<u>Agreement</u>", a

copy of which, without exhibits or schedules, is attached hereto as **<u>Exhibit A</u>**),[2] authorizing the

sale of the equity of Revstone Wallaceburg Canada, Inc. ("<u>RWCI</u>") owned by the Debtor;

(b) authorizing the sale of the equity of RWCI free and clear of all liens, claims, rights,

encumbrances and other interests pursuant to sections 105, 363(b), 363(f) and 363(m) of the

Bankruptcy Code; and (c) granting related relief.

---

[1]  The Debtors in these Chapter 11 Cases and the last four digits of each Debtors' federal tax identification numbers are:  Revstone Industries, LLC (7222); Spara, LLC (6613); Greenwood Forgings, LLC (9285); and US Tool & Engineering, LLC (6450).  The location of the Debtors' headquarters and the service address for the Debtors is 230 N. Limestone St., Ste. 100, Lexington, KY 40507.

[2]  All capitalized terms not defined herein have the meaning ascribed to them in the Agreement.

Concurrently herewith, the Debtor is filing the *Debtor's Motion for Order (A) Approving Bid Procedures for the Sale of the Debtor's Equity Interest in Revstone Wallaceburg Canada, Inc.; (B) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notice Related Thereto; (C) Approving Payment of a Break-Up Fee; and (D) Granting Related Relief* (the "Bidding Procedures Motion"), which seeks approval of certain sale and bidding procedures for the sale, as more particularly set forth therein (the "Bidding Procedures").

In support of this Sale Motion, the Debtor respectfully states as follows:

## Preliminary Statement

1.     By this Sale Motion, the Debtor seeks approval of the sale of the shares of RWCI owned by the Debtor, which consist of one hundred (100) shares of common stock of RWCI and which represent one-hundred percent (100%) of the issued and outstanding equity interests of RWCI (the "Shares"), to the Purchaser pursuant to the Agreement or the highest or otherwise best bidder or bidders for such assets at the auction provided for in the Bidding Procedures Motion and the Bid Procedures (the "Auction"), to take place in accordance with the order to be entered by the Court on the Bidding Procedures Motion (the "Bidding Procedures Order").  The proposed Agreement contemplates that the Shares will be sold free and clear of liens, claims, encumbrances, rights and other interests other than those liens and interests expressly permitted under the Agreement.

2.     As discussed below, the Debtor's sale process is in the best interests of the Debtor, its estate and creditors.

**Jurisdiction**

3.      This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157

and 1334.  This proceeding is a core proceeding within the meaning of 28 U.S.C.

§§ 157(b)(2)(A), (M), (N) and (O).

4.      Venue of these proceedings and this Sale Motion is proper in this District

pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief sought herein are sections 105, 362, 363,

364, 365, 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules

2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), and Rules 2002-1(b) and 6004-1 of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules").

**Background**

6.      On December 3, 2012, Revstone and its sister company, Spara, LLC ("Spara"),

commenced their respective cases by filing voluntary petitions for relief under chapter 11 of the

Bankruptcy Code.  On January 7, 2013, Revstone subsidiaries, Greenwood Forgings, LLC

("Greenwood") and US Tool & Engineering, LLC ("US Tool", and with Revstone, Spara and

Greenwood, the "Debtors"), commenced their respective cases by filing voluntary petitions for

relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued in the possession

of their property and have continued to operate and manage their business as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      On December 18, 2012, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") in the Revstone case.  No committee has been appointed in the cases of Spara, Greenwood, or US Tool.  No trustee or examiner has been appointed in any of the Debtors' chapter 11 cases.

8.      The factual background relating to the commencement of the Debtor's chapter 11 case is set forth in detail in the *Declaration of John C. DiDonato in Support of First Day Motions of Revstone Industries, LLC* and incorporated herein by reference.

9.      Pursuant to the *Order Authorizing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only* (Docket No. 173), the Debtors' chapter 11 cases are jointly administered and consolidated for procedural purposes.

## Aarkel Operations and the Shares to Be Sold

10.      The Debtor seeks approval of the sale of the Shares of RWCI, the parent of Aarkel Tool & Die, Inc. ("Aarkel").  RWCI is a subsidiary of Revstone that conducts no active business and is a holding company that owns twenty five million nine hundred fifty three thousand one twenty eight (25,953,128) shares of Aarkel (the "Aarkel Shares").  Aarkel is one of the leading manufacturers in North America of diecast tooling, plastic injection tooling and aluminum production/prototype tooling products.  Aarkel designs and manufactures a wide variety of diecast, plastic injection and aluminum tooling products in a wide assortment unique to the material handling needs of its customers.  Aarkel operates out of two plants with a combined 110,000 square feet of space in Wallaceburg, Ontario, Canada.  This facility provides ready access to key customers throughout central Canada and the Midwest United States.  Aarkel

4

serves many of the largest automotive customers, suppliers, and platforms in the United States and Canada.

11.    In light of the extensive marketing process already undertaken, and the additional efforts that will be made during the proposed sale process, the timing of the sale proposed herein is reasonable under the circumstances to effectuate a sale to the Stalking Horse Bidder under the terms of the Agreement.  Pursuant to the Agreement, the Debtor must obtain an order approving the Bidding Procedures Motion (the "Bidding Procedures Order") no later than May 16, 2014, conduct an auction within forty-five (45) days after the Bid Procedures Motion is filed, obtain an order approving the sale no later than three (3) Business Days after the date of the Auction and close such sale no later than fourteen (14) days after the entry of the Sale Order.

DOCS_DE:191730.1 73864/001

**Marketing Process**

12.     Significant efforts were undertaken by both Revstone and Aarkel to market both Revstone's equity interest in RWCI or the assets of Aarkel as each structure provided different benefits to prospective buyers and to the Revstone estate.  To market RWCI's equity interest in Aarkel and the assets of Aarkel, the investment bank of Stout Risius Ross, Inc. ("SRR") was retained.  Revstone and Aarkel formally commenced that process in September 26, 2013. Marketing materials, including an executive summary ("Teaser") and a Confidential Informational Memorandum (the "CIM") were prepared, an online data site with diligence materials was created, and potential buyers were identified.  Approximately two-hundred eighty nine (289) industry participants, strategic and financial investors, and other potential buyers were contacted by SRR, with the approval and input of the Debtor's and Aarkel's management.  SRR distributed approximately two-hundred sixty (260) Teasers.  Approximately sixty-five (65) parties returned executed confidentiality agreements and were provided with the CIM.  By November 15, 2013, Revstone and Aarkel had received thirteen (13) non-binding expressions of interest, and subsequently Revstone and Aarkel negotiated with certain of the interested parties. Based on various factors, the original list was reduced to nine (9) potential bidders who were then given access to the online data site.  Five (5) of these bidders submitted letters of intent. The Debtor ultimately focused on a potential transaction with one of the parties that had submitted a letter of intent.

13.     On December 18, 2013, the Stalking Horse Bidder submitted to the Debtor a non-binding letter of intent ("LOI").  After extensive review and consideration, the Debtor selected

6

the Stalking Horse Bidder's offer as set forth in its LOI as the best alternative for Revstone to maximize its equity interest in RWCI and indirect interest, through RWCI, in Aarkel, and proceeded to negotiate with the Stalking Horse Bidder the terms and conditions of a definitive share purchase agreement. After extensive negotiations, Revstone entered into the Agreement with the Stalking Horse Bidder, which is attached hereto as Exhibit A.

14.     The Stalking Horse Bidder is not an "insider" or "affiliate" of the Debtor as those terms are defined in the Bankruptcy Code.

15.     While the prepetition marketing and sale process was thorough, as discussed above, the Debtor will send, or will have sent, notice of the Sale Motion and Bidding Procedures to all parties that the Debtor believes may be potentially interested in acquiring the Shares. The Debtor also created an electronic data room with key documents and company-specific information in order to streamline the due diligence process going forward. The data room has been, and will be, available to interested parties who have, or will, execute confidentiality agreements acceptable to the Debtor. The Debtor will continue to respond to inquiries from prospective buyers through the bid deadline.

16.     The Debtor believes that the consummation of the Sale to the Stalking Horse Bidder or other Successful Bidder will provide its creditors and other stakeholders with the best opportunity possible for maximizing the Debtor's equity ownership in RWCI and, indirectly, Aarkel through the sale of the Shares of RWCI, Aarkel's parent company.

17.     The material terms of the Agreement with the Stalking Horse Bidder are set forth below. Pursuant to the terms of the Agreement and subject to entry by the Court of an order

7

substantially in the form attached hereto as **Exhibit B** (the "Sale Order"), the Stalking Horse

Bidder, subject to higher or better bids, will purchase all of the Debtor's shares of RWCI which,

in turn, will allow it to obtain ownership of Aarkel.

### Agreement With Stalking Horse Bidder

18.     The key terms of the Agreement and the Sale Order are summarized below. The

description below only summarizes certain provisions of the Agreement and the Sale Order as a

convenience to the Court and parties in interest, and the terms of the Agreement or Sale Order, as

applicable, control in the event of any inconsistency.

a.     **Purchase Price**. The purchase price payable for the Shares shall be an amount equal to the sum of Fourteen Million One Hundred Thousand and 00/100 Dollars ($14,100,000) (the "Purchase Price"),[3] less (i) an amount equal to the aggregate of the WFCU Debt, the RBC Debt and the Reimbursable Capital Expenditure Debt, (ii) the amount of the RWCI Shareholder Loan, plus (iii) an amount equal to the amount by which the Net Working Capital as of Closing exceeds the sum $12,000,0000, if applicable, less, an amount equal to the amount by which the Net Working Capital as of Closing is less than the sum of $12,000,000, plus the amount of the Reimbursable Capital Expenditures, provided, however, that any individual Reimbursable Capital Expenditure exceeding One Hundred Thousand Dollars and not listed on Schedule 1.1(d), shall not be added to the Purchase Price unless the Purchaser shall have first consented to the same prior to such expenditure being included in the Purchase Price (the "Purchase Price"). *See* Agreement, § 3.1.

b.     **Purchased Assets**. One hundred percent (100%) of the issued and outstanding shares of RWCI owned by Revstone. *See* Agreement, at Recitals.

c.     **Closing and Related Deadlines**. The consummation of the transactions contemplated by the Agreement (the "Closing") shall take place no later than five (5) days following the satisfaction or waiver by the appropriate Party or Parties of all the conditions contained in Article VII (other than those to be satisfied at the Closing) or on such other date or at such other place and time as may be mutually agreed to by the Parties in writing. *See* Agreement, at § 2.2. Either the Purchaser or the Debtor may terminate the Agreement if the Bid Procedures Order has not been entered by May 16, 2014; an Auction, if necessary, has not taken place within forty-five (45) days of the filing of the Bid Procedures Motion; the Sale Order has

---

[3] Currency denominations are in Canadian dollars and all amounts reflected in the Agreement and all exhibits and schedules thereto refer to Canadian dollars unless otherwise specified.

not been entered no later than three (3) Business Days after the Auction; or the Closing has not occurred no later than fourteen days (14) after the Sale Order is entered. *See* Agreement, at § 9.1(d) & (f).

   d.   **Deposit.**  The Purchaser deposited $500,000 with the Shareholder to be held in escrow pending Closing in accordance with the instructions in Schedule 3.2. *See* Agreement, at §3.2(a).

   e.   **Break Up Fee, Expense Reimbursement, Breach Fee and Commitment Fee Reimbursement.**  Subject to approval of the Bankruptcy Court, in consideration for the Purchaser having expended considerable time and expense in connection with the Agreement and the negotiation thereof and to compensate Purchaser as a stalking-horse bidder, in the event that the Debtor consummates an Alternative Transaction within the nine (9) month period immediately following the Auction, subject to the conditions of the Agreement, Seller shall pay and Purchaser shall receive, in addition to the refund of its Deposit, a breakup fee equal to Five Hundred Thousand Dollars ($500,000) (the "Break Up Fee"). *See* Agreement, § 6.9(c).

   Subject to approval of the Bankruptcy Court and subject to Purchaser's right to he Seller's Parties' Breach Fee under 6.9(h) of the Agreement, in consideration for the Purchaser having expended considerable time and expense in connection with the Agreement and the negotiation thereof and to compensate Purchaser as a stalking-horse bidder, in the event that the sale fails to close within nine (9) months of the date of the Agreement, the Purchaser shall be entitled to reimbursement of its stalking horse expenses (consisting of actual commitment and related bank fees, attorney's fees, accounting and consulting expenses and reasonable travel expenses to conduct due diligence and participate in the bankruptcy process, in an amount up to Five Hundred Thousand Dollars ($500,000) (the "Stalking Horse Reimbursement") if: (i) Purchaser is not in material breach of any of its undertaking under the Agreement and Seller Parties elect to terminate this transaction for any reason set forth in Section 9.1 (other than 9.1(a) and (e)), and (ii) the Seller Parties are not in breach of any of their obligations under this Agreement and there is no Alternative Transaction that closes within nine (9) months after the auction. *See* Agreement, § 6.9(g).

   In the event that the sale fails to close following the Auction, other than for a reason arising under section 6.9(g), Seller Parties shall be deemed to have breached their obligations under the Agreement and the Purchaser shall be entitled to receive a breach fee equal to Five Hundred Thousand Dollars ($500,000) (the "Breach Fee"), so long as (a) the Shares are not sold to an Alternative Purchaser who will be responsible for payment of a Break Up fee of $500,000 to Purchaser and (b) Purchaser is not in material default of any of its undertakings under the Agreement. *See* Agreement, ¶ 6.9(h).

   In the event that the Bankruptcy Court refuses to approve the Bid Procedures and the Agreement is terminated as a result of such refusal, the Purchaser shall be entitled to reimbursement by Aarkel of its fees in consideration of the time and expense, and payment of certain bank commitment, work and similar fees in an amount up to One Hundred Thousand

9

Dollars ($100,000) ( the "Commitment Fee Reimbursement"). The Purchaser shall not be entitled to receive the Commitment Fee Reimbursement from Aarkel if (i) Purchaser is in default of any of its undertakings under the Agreement, or (ii) there is any contingency to Purchaser's obligations that have not been satisfied or waived by Purchaser in writing prior to the hearing on the Bid Procedures Motion. *See* Agreement, 6.9(j).

Purchaser acknowledges that in no event shall it be entitled to receive more than one of the (i) Break Up Fee, (ii) the Stalking Horse Expense Reimbursement, (iii) the Breach Fee, or (iv) the Commitment Fee Reimbursement and the rights granted Purchaser under section 6.9 shall be the Purchaser's sole recourse and remedy in the event of the termination of the Agreement.

f.    **Representations, Warranties and Covenants**. The Seller Parties made various representations customary for a transaction of this kind including, but not limited to, those relating to organization and good standing, authorization and validity, financial statements, absence of liabilities, absence of changes, authorized capitalization, compliance with laws, licenses, environmental matters, real property, machinery and equipment, title to assets, contracts, litigation, intellectual property, taxes, employees, employee benefits, insurance, accounts receivable, broker's and finder's fees, customer list, no misstatement or omissions, and residency. *See* Agreement, at Article 4. The Purchaser has made certain representations, among others, relating to organization and good standing, authorization, broker's and finder's fees, investment representations, and qualified buyer. *See* Agreement, at Article 5. The Seller Parties also agreed to various covenants including, but not limited to, actions before closing, conduct of business, preservation of documents, access to information, payment of transfer taxes, and employee matters. *See* Agreement, at Art. 6.

g.    **Conditions.** The Closing is conditioned upon the occurrence of certain events customary for transactions of this kind, including the truthfulness of all representations and warranties, no material adverse change in the Business, and all consents and approvals, including approvals of the Bankruptcy Court, having been obtained. *See* Agreement, at Art. 7.

h.    **Rules 6004/6006 Waiver**. The proposed Sale Order provides that, upon entry, the Sale Order will be immediately enforceable, notwithstanding Bankruptcy Rules 6004 and 6006. *See* Sale Order ¶ 27. As discussed herein, the sale and prompt consummation thereof are in the best interest of the Debtor and its estate in order to maximize the going concern value of the Debtor's assets for the benefit of the estate and its stakeholders and to comply with certain timing deadlines as discussed above.

19.    The Debtor seeks authority to sell the Shares to the Stalking Horse Bidder, or to a

higher or otherwise better bidder or bidders, pursuant to the terms of the Agreement and the Sale

Order.

DOCS_DE:191730.1 73864/001

20.     The Debtor believes that the sale of the Shares as a going concern to the Stalking

Horse Bidder or a higher or otherwise better bidder determined in accordance with the Bidding

Procedures ("Successful Bidder") is preferable to a sale of substantially all the assets of the

Aarkel.  The Debtor further believes that obtaining the Stalking Horse Bidder as a stalking horse

bidder, marketing the Shares with the assistance of SRR, and holding the Auction on the date

specified by the Court, will result in the highest or otherwise best consideration for the Shares.

21.     The Debtor has examined the alternatives to a sale of the Shares and has

determined that, in light of the Debtor's financial situation, liquidity needs, and value of the

Shares (which entails ownership of Aarkel), a more viable alternative to sale of the Shares does

not exist.  Specifically, the Debtor examined the sale of the Shares in contrast to the sale of the

assets of Aarkel as a going concern and determined that the sale of the Shares optimizes value

for the estate and its creditors.

22.     For the reasons stated above, and in light of the obvious benefits to the estate, the

Debtor has determined, in the exercise of its business judgment, to consummate the proposal

submitted under the Agreement with the Stalking Horse Bidder or, if applicable, another bidder

in the event that the Debtor receives a higher or otherwise better bid to the transaction set forth in

the Agreement.

### Relief Requested

23.     The Debtor is requesting that this Court, *inter alia*, (a) authorize the sale of the

Shares to the Stalking Horse Bidder pursuant to the Agreement, or alternatively, to the other

Successful Bidder(s) pursuant to such competing agreement(s) with such other Successful

11

Bidder(s) entered into in accordance with the Bidding Procedures Order, (b) authorize such sale

of the Shares to be free and clear of all liens, claims, rights, encumbrances or other interests

pursuant to sections 105, 363(b), 363(f) and 363(m) and 365 of the Bankruptcy Code, with such

liens, claims, rights, encumbrances and interests (collectively, the "Liens, Claims and

Encumbrances") attaching to the sale proceeds of the Shares (the "Sale Proceeds") with the same

validity (or invalidity), priority and perfection as existed immediately prior to such sale; and

(c) grant such other relief as may be necessary or appropriate.

### Basis for Relief

24.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice

and a hearing, may use, sell or lease, other than in the ordinary course of business, property of

the estate." 11 U.S.C. § 363(b)(1).  Section 105(a) provides in relevant part that "[t]he Court

may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title." 11 U.S.C. § 105(a).

25.     A sale of the debtor's assets should be authorized pursuant to section 363 of the

Bankruptcy Code if a sound business purpose exists for doing so.  *See, e.g.*, *Meyers v. Martin (In*

*re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re*

*Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788

F.2d 143 (3d Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In*

*re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Titusville Country Club*, 128 B.R. 396

(W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991).

The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or "compelling

12

circumstances" standard, finding the "sound business purpose" standard applicable and, discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the Property; and whether the asset is decreasing or increasing in value.  124 B.R. at 176.

26.     The *Delaware & Hudson Railway* court further held that "[o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the Buyer is proceeding in good faith." *Id.*

27.     The Debtor has proposed the sale of the Shares after thorough consideration of all viable alternatives, including the sale of Aarkel as a going concern, and has concluded that the sale is supported by many sound business reasons.  The Debtor has extensively marketed the Shares (and the assets of Aarkel) as described above and has proposed Bidding Procedures designed to maximize the purchase price realized from the sale of the Shares.

28.     The Debtor's need for an expedited sale process is also necessary to meet the deadlines set forth in the Agreement.  As set forth in the Agreement, the Debtor is required to obtain an order approving the Bidding Procedures no later than May 16, 2014, conduct an auction within forty-five (45) days after the filing of the Bid Procedures Motion and obtain and

an order approving a sale within three (3) Business Days after the date of the Auction, and to close such sale by no later than fourteen (14) days after the Sale Order is entered.

29.     The Debtor has articulated sound business reasons, set forth above, for a sale of the Shares on the proposed schedule. *See, e.g.*, *In re Tempo Tech.*, 202 B.R. 363, 369-70 (D. Del. 1996) (approving a sale of all of the debtor's assets, within a month after the petition date, where the debtor faced a cash shortfall, operated in an industry where there were few potential buyers, and anticipated continuing losses and a decline in value of the bankruptcy estates); *Delaware & Hudson Railway*, 124 B.R. at 177 (affirming the bankruptcy court's approval of a sale of substantially all of the debtor's assets where the debtor would have been "in liquidation mode if required to delay a sale until after filing a disclosure statement and obtaining approval for a reorganization plan"); *Titusville Country Club*, 128 B.R. at 400 (granting an expedited hearing on a motion to approve a sale as a result of "deterioration" of the debtor's assets); *Coastal Indus., Inc. v. Internal Revenue Service (In re Coastal Indus., Inc.)*, 63 B.R. 361, 366-69 (Bankr. N.D. Ohio 1986) (approving an expedited sale pursuant to section 363(b) five weeks after the petition date where the debtor was suffering operating losses).

30.     The Debtor believes that, as a result of the marketing efforts that have been undertaken and that it will continue to undertake, the highest or otherwise best offer(s) obtained through the proposed Bidding Procedures and Auction will provide maximum value to the Debtor under the current circumstances.  Other potential buyers and parties that have expressed interest in the acquisition of Aarkel, whether by an Asset Purchase or by acquiring the Shares, will be served with this Sale Motion and/or notice thereof.  The fairness and reasonableness of

14

the consideration to be paid by the Successful Bidder(s) is demonstrated by the marketing efforts

that the Debtor has undertaken, and will continue to undertake, followed by a fair and reasonable

sale process including a potential auction, and culminating in the sale of the Shares.  As noted

herein, notice of this Sale Motion, as well as of the Bidding Procedures Motion, will be served

by the Debtor on or shortly after the Petition Date on potential bidders, as well as known putative

lienholders,

31.     The sale of the Shares is supported by sound business reasons and is in the best

interests of the Debtor and its estate.  Accordingly, the Debtor requests approval under

Bankruptcy Code section 363(b) of the Sale to the Stalking Horse Bidder or other Successful

Bidder(s), as set forth herein.

### The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code For a Sale Free and Clear of Liens, Claims, and Interests

32.     Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such Property of an entity other than the estate, only if –
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in a bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

33.     Section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests." The term "any interest," as used in section 363(f), is not defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000). In *Folger Adam*, the Third Circuit specifically addressed the scope of the term "any interest." 209 F.3d at 258. The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only *in rem* interests in Property," the trend in modern cases is toward "a broader interpretation which includes other obligations that may flow from ownership of the Property." *Id. at 258* (citing 3 *Collier on Bankruptcy* ¶ 363.06[1]). As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger Adam*, the scope of 11 U.S.C. § 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger Adam* made clear that debtors "could sell their assets under §363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

34.     Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Shares free and clear of all of the applicable Liens, Claims and Encumbrances, except with respect to any Liens, Claims and Encumbrances permitted under the Agreement. *See Citicorp Homeowners Services, Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988). The Debtor submits that each Lien, Claim and Encumbrance that is not an assumed liability satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such Lien, Claim or Encumbrance will be adequately protected by either being paid in full at the time of closing, or by having it attach to

16

the Sale Proceeds, subject to any claims and defenses the Debtor may possess with respect thereto.  The Debtor accordingly requests authority to convey the Shares to the Stalking Horse Bidder or other Successful Bidder(s), free and clear of all Liens, Claims and Encumbrances except for the Liens, Claims and Encumbrances that expressly permitted under the terms of the Agreement, with such Liens, Claims and Encumbrances to attach to the Sale Proceeds, with the same validity (or invalidity), priority and perfection as existed immediately prior to the Sale, subject to the terms of the Agreement and the Sale Order.

35.    The Debtor has conducted a UCC search and other lien searches of purported lienholders of RWCI in conjunction with the proposed sale of the Shares.  The Debtor has served such purported lienholders with notice of this Sale Motion, and will serve notice of the Sale Order if and when such order is entered by the Court.  Any remaining secured creditors, if any, either:  (a) also do not oppose the sale, (b) are out of the money such that applicable nonbankruptcy law permits sale of the Shares free and clear of such creditors' claims, or (c) could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of their claims.

36.    Accordingly, this Court should approve the sale of the Shares to the Successful Bidder(s) free and clear of Liens, Claims and Encumbrances under Bankruptcy Code section 363(f), and any potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims.

17

**Good Faith Under Section 363(m) of the Bankruptcy Code;**
**Sale Not In Violation of Section 363(n) of the Bankruptcy Code**

37.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of Property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such Property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(n) of the Bankruptcy Code, among other things, provides, in

turn, that a trustee may avoid a sale under such section if the sale price was controlled by an

agreement among potential bidders as the sale.  *See* 11 U.S.C. § 363(n).  Although the

Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of*

*Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), held that:

> [t]he requirement that a Buyer act in good faith . . speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a Buyer's good faith
> status at a judicial sale involves fraud, collusion between the Buyer
> and other bidders or the trustee, or an attempt to take grossly unfair
> advantage of other bidders.

788 F.2d at 147 (citations omitted).

38.    The Agreement is a negotiated, arms' length transaction, in which the Stalking

Horse Bidder has acted in good faith, without collusion or fraud of any kind, and in compliance

with the *Abbotts Dairies* standards.  The Stalking Horse Bidder is not an "insider" or "affiliate"

of the Debtor as those terms are defined in the Bankruptcy Code.  Neither the Debtor nor the

Stalking Horse Bidder (to the best of the Debtor's knowledge) has engaged in any conduct that

would prevent the application of section 363(m) of the Bankruptcy Code or otherwise implicate

18

section 363(n) of the Bankruptcy Code with respect to the consummation of the Sale or the

transfer of the Shares to the Stalking Horse Bidder.  In addition, if a party other than the Stalking

Horse Bidder is the Successful Bidder, the Debtor intends to make an appropriate showing at the

Sale Hearing that the purchase agreement with the other Successful Bidder is a negotiated, arms'

length transaction, in which the Successful Bidder at all times has acted in good faith under and

otherwise in accordance with such standards.

39.    The Debtor thus requests that the Court find that the Stalking Horse Bidder or the

Successful Bidder has purchased the Shares in good faith within the meaning of section 363(m)

of the Bankruptcy Code, and is entitled to the protections of sections 363(m) and (n) of the

Bankruptcy Code.

## Notice

40.    Notice of this Sale Motion and a copy of this Sale Motion will be provided to (a)

the Office of the United States Trustee; (b) the Official Committee of Unsecured Creditors of

Revstone Industries, LLC; (c) all parties who are known by the Debtor to assert liens with

respect to the Shares; (d) all entities who executed non-disclosure agreements with the Debtor in

connection with a potential acquisition of any or all of the Shares or whom the Debtor believes

may have an interest in bidding; (e) the Stalking Horse Bidder and its counsel; and (f) all parties

who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy

Procedure.  Upon approval of the Bidding Procedures Motion, the Debtor will serve notice of

this Sale Motion (as proposed in the Bidding Procedures Motion, subject to Court approval) on

all other known creditors of the Debtor, and serve supplemental notice including of applicable

deadlines and hearing dates to the parties previously served with notice of the Sale Motion (as proposed in the Bidding Procedures Motion, subject to Court approval). The Debtor respectfully submits that such notice is sufficient, and request that the Court find that no further notice of the relief requested herein is required.

41.    The Debtor requests, pursuant to Bankruptcy Rules 6004(h) and 6006(d), that the order approving this Sale Motion become effective immediately upon its entry.

### Conclusion

42.    The Debtor's proposed sale of the Shares as described in this Sale Motion is supported by sound business reasons, as set forth herein. The proposed sale is proper, necessary and serves the best interests of the Debtor, its estate and creditors and all parties in interest. The Debtor thus requests that the Court approve the proposed Sale of the Shares free and clear of all interests, liens, claims, and encumbrances including successor liabilities, as requested, to the Stalking Horse Bidder or other Successful Bidder.

### No Prior Request

43.    No prior request for the relief sought in this Sale Motion has been made to this or any other court.

[Remainder of Page Intentionally Left Blank]

WHEREFORE, the Debtor respectfully requests that this Court (i) grant this Sale Motion and authorize the sale of the Shares to the Stalking Horse Bidder or other Successful Bidder and approve the Agreement, pursuant to the attached proposed order; (ii) approve the form and manner of notice of this Sale Motion, and of the proposed sale and assumptions and assignments; and (iii) grant such other and further relief as is just and proper.

Dated: April 21, 2014

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Maxim Litvak (CA Bar No. 4228)
Colin R. Robinson (Bar No. 5524)
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone:  302/652-4100
Facsimile:  302/652-4400
Email: ljones@pszjlaw.com
        dbertenthal@pszjlaw.com
        mlitvak@pszjlaw.com
        crobinson@pszjlaw.com

Counsel for the Debtor and Debtor in Possession

DOCS_DE:191730.1 73864/001