IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVSTONE INDUSTRIES, LLC, <u>et al.</u>,[1] | ) | Case No. 12-13262 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date:  TBD** |

## <u>DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION</u>

<div style="border:1px solid">

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Maxim B. Litvak (CA Bar No. 215852)
919 Market Street, 17th Floor | P.O. Box 8705
Wilmington, Delaware  19899-8705
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

Counsel to Debtors and Debtors in Possession

</div>

Dated:  December 10, 2014

---

[1]  The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's federal tax identification numbers are:  Revstone Industries, LLC (7222); Spara, LLC (6613); Greenwood Forgings, LLC (9285); and US Tool and Engineering, LLC (6450).  The location of the Debtors' headquarters and the service address for each of the Debtors is: Revstone Industries, LLC, et al., c/o Huron Consulting Group Inc., 900 Wilshire Drive, Suite 270, Troy, MI 48084.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. DEFINED TERMS, RULES OF INTERPRETATION,  COMPUTATION OF TIME, AND GOVERNING LAW ....................................................................... 4

    A.    Rules of Interpretation, Computation of Time, and Governing Law ..................... 4

    B.    Defined Terms ......................................................................... 6

III. TREATMENT OF ADMINISTRATIVE EXPENSES AND TAX CLAIMS ....................... 25

    A.    Introduction ........................................................................... 25

    B.    Administrative Expenses ........................................................ 26

    C.    Tax Claims ............................................................................. 28

IV. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS 29

    A.    Summary ............................................................................... 29

    B.    Classification and Treatment of Claims and Interests ......................... 29

V. ACCEPTANCE OR REJECTION OF PLAN ....................................................... 36

    A.    Identification of Unimpaired Classes ....................................... 36

    B.    Identification of Impaired Classes ........................................... 36

    C.    Classes Permitted and Not Permitted to Vote ......................... 36

    D.    Effect of Non-Voting ............................................................. 37

    E.    Nonconsensual Confirmation ................................................. 37

    F.    Postpetition Interest ............................................................... 37

VI. MEANS FOR IMPLEMENTATION OF THE PLAN ........................................ 38

    A.    PBGC Settlement ................................................................... 38

    B.    No Substantive Consolidation ................................................ 38

    C.    Intercompany Settlement Between Revstone and Spara ................... 38

    D.    Continued Corporate Existence and Vesting of Assets ................... 39

    E.    Corporate Action ................................................................... 41

    F.    Corporate Governance ........................................................... 42

G.      Chief Restructuring Officer Duties ........................................................ 45

H.      Source of Funding ................................................................................... 47

I.      Retained Rights of Action of the Debtors ............................................... 48

J.      Establishment of Revstone/Spara Litigation Trust and Vesting of Revstone/Spara Litigation Trust Assets ................................................................................ 49

K.      Purpose of Revstone/Spara Litigation Trust ......................................... 51

L.      Funding of Revstone/Spara Litigation Trust .......................................... 52

M.      Revstone/Spara Litigation Trustee ........................................................ 52

N.      Revstone/Spara Litigation Trust Committee .......................................... 59

O.      Interests in Affiliates and Subsidiaries ................................................. 61

P.      Payment of Plan Expenses ..................................................................... 61

Q.      Dissolution of Creditors' Committee ..................................................... 62

R.      Final Decree ........................................................................................... 62

VII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............. 62

A.      Rejection of Executory Contracts and Unexpired Leases ...................... 62

B.      Bar Date for Rejection Damages ............................................................ 63

VIII. DISTRIBUTIONS AND RELATED MATTERS ......................................................... 64

A.      Dates of Distribution .............................................................................. 64

B.      Cash Distributions .................................................................................. 65

C.      Rounding of Payments ............................................................................ 65

D.      Disputed Claims ..................................................................................... 65

E.      Undeliverable and Unclaimed Distributions .......................................... 66

F.      Compliance with Tax Requirements ....................................................... 67

G.      Record Date in Respect to Distributions ................................................ 67

H.      Reserves ................................................................................................. 67

IX. LITIGATION, OBJECTIONS TO CLAIMS, AND DETERMINATION OF TAXES ........ 68

A.      Litigation; Objections to Claims; Objection Deadline ........................... 68

B.      Temporary or Permanent Resolution of Disputed Claims ...................... 69

| | | |
|---|---|---|
| C. | Setoffs | 70 |
| D. | Preservation of Retained Rights of Action | 71 |

X. RELEASES, INJUNCTIONS AND EXCULPATION PROVISIONS ... 72

| | | |
|---|---|---|
| A. | Injunctions | 72 |
| B. | Discharge of the Debtors | 73 |
| C. | Exculpation | 73 |
| D. | Debtors' Release of CRO, Independent Managers, Creditors' Committee and Other Parties | 75 |
| E. | Release by Creditors | 76 |
| F. | Release by Debtors' Non-Debtor Affiliates of the Restructuring Committee | 78 |

XI. NO REGULATED RATE CHANGE WITHOUT GOVERNMENT APPROVAL ... 78

XII. EXEMPTION FROM CERTAIN TRANSFER TAXES ... 78

XIII. RETENTION OF JURISDICTION AND MISCELLANEOUS MATTERS ... 79

| | | |
|---|---|---|
| A. | Retention of Jurisdiction | 79 |
| B. | Miscellaneous Matters | 82 |

XIV. CONDITIONS TO EFFECTIVENESS ... 88

XV. EFFECT OF CONFIRMATION ... 89

| | | |
|---|---|---|
| A. | Binding Effect of Confirmation | 89 |
| B. | Good Faith | 89 |
| C. | No Limitations on Effect of Confirmation | 90 |

XVI. MODIFICATION OR WITHDRAWAL OF PLAN ... 90

| | | |
|---|---|---|
| A. | Modification of Plan | 90 |
| B. | Withdrawal of Plan | 91 |

XVII. CONFIRMATION REQUEST ... 92

EXHIBIT A – PBGC Settlement Agreement

DOCS_SF:84821.10 73864/001

The above-captioned debtors and debtors in possession hereby propose the following *Debtors' Joint Chapter 11 Plan of Reorganization* pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*  This Plan supersedes all prior chapter 11 plans filed by Revstone Industries, LLC and Spara, LLC in these cases.  Capitalized terms used in this Plan shall have the meanings set forth in Article II hereof.

## I.

## <u>INTRODUCTION</u>

The Plan effectuates a reorganization of the Debtors.  Under the Plan, each of the Debtors will be revested with its respective assets, excluding litigation claims in Revstone's and Spara's cases that will be transferred to a newly-created Revstone/Spara Litigation Trust.  The Plan incorporates the Court-approved settlement between the Debtors and each of their respective debtor and non-debtor subsidiaries, the PBGC, the Creditors' Committee, and BFG, and a separate intercompany settlement among Revstone and Spara and each of their respective debtor and non-debtor subsidiaries.  The Plan does not contemplate a substantive consolidation of the Debtors.  Creditors with Allowed Claims against each of the Debtors will receive distributions on account of such claims out of available assets of each of the Debtors' respective estates, subject to the priorities of the Bankruptcy Code and, to the extent applicable, subject to and in accordance with the terms of the PBGC Settlement Agreement and this Plan.

Aside from the Revstone/Spara Litigation Trust Assets, which include Revstone's and Spara's litigation claims, all assets of each Debtor, including interests in any non-debtor subsidiaries, will be liquidated or retained for the benefit of creditors under the supervision of the

Chief Restructuring Officer, as set forth herein.  The initial Chief Restructuring Officer under the

Plan will be John C. DiDonato, who is also the current Chief Restructuring Officer of the

Debtors.  As to Reorganized Revstone, the Chief Restructuring Officer will be primarily

responsible for certain core tasks as outlined in the Plan and will act under the supervision of the

Reorganized Revstone Board.

Revstone's and Spara's litigation claims will be vested in the Revstone/Spara

Litigation Trust and prosecuted or otherwise liquidated under the supervision of the

Revstone/Spara Litigation Trustee, the Revstone/Spara Litigation Trust Committee and, in

instances described in Article VI.M.5 below and the Revstone/Spara Litigation Trust Agreement,

the Chief Restructuring Officer of Reorganized Spara.  Reorganized Revstone, Reorganized

Spara, and Holders of Allowed PBGC Claims will be the sole beneficiaries of the

Revstone/Spara Litigation Trust.

Under the Plan, except as otherwise set forth in the Plan, all Holders of Allowed

Administrative Expenses, Priority Non-Tax Claims, and Tax Claims against the Debtors will be

paid in full on the Effective Date out of cash on hand (unless otherwise agreed by applicable

claimants consistent with the PBGC Settlement Agreement and, as provided in the Plan, the

applicable Debtor elects to provide payment over time as to Allowed Tax Claims).  Holders of

Miscellaneous Secured Claims, if any, will receive the benefit of their collateral.

After the payment of or reserve for higher priority claims, Holders of Allowed

General Unsecured Claims against each Debtor (other than intercompany claims that are released

pursuant to Article VI.C below) will receive their respective *pro rata* share of available net

proceeds of the applicable Debtor's assets consistent with the PBGC Settlement Agreement, including for Holders of Allowed General Unsecured Claims against Revstone and Spara and Holders of Allowed PBGC Claims a share of the proceeds of the Revstone/Spara Litigation Trust as set forth herein.  Pursuant to the PBGC Settlement Agreement:  (1) to the extent that the sub-Class of Holders of Allowed General Unsecured Claims against Revstone votes in favor of the Plan, the sum of $3,000,000 will be set aside from the proceeds of the disposition of non-debtor subsidiaries' assets in order to provide an up-front recovery to the Holders of Allowed General Unsecured Claims against Revstone (excluding BFG); (2) the first $2,000,000 of litigation proceeds realized by the Revstone/Spara Litigation Trust and otherwise allocable to the PBGC will be distributed to Reorganized Revstone and made available to Holders of Allowed General Unsecured Claims against Revstone (excluding BFG) and Holders of Allowed Administrative Expenses against Revstone in accordance with, and subject to the terms of, the PBGC Settlement Agreement; and (3) certain Holders of Professional Fee Claims have agreed to accept reduced recoveries out of available assets in order to allow increased distributions to be made to creditors under the Plan consistent with the PBGC Settlement Agreement.

BFG will share in distributions to Holders of Allowed General Unsecured Claims against Revstone to the extent provided in the PBGC Settlement Agreement.   BFG does not have any General Unsecured Claims against Spara.

Holders of Allowed PBGC Claims will receive the treatment provided by the PBGC Settlement Agreement.

3

All membership interests in the Debtors, and any associated management rights held by interest holders, will be suspended and of no force and effect as of the Effective Date; interest holders against each Debtor will have a contingent interest in any remaining cash (if any) after all allowed claims and administrative expenses have been paid or otherwise satisfied in full by such Debtor (unless otherwise agreed to by the applicable creditor) in accordance with the Plan.

The Disclosure Statement, distributed with this Plan, contains a discussion of the Debtors' history, a summary of the Debtors' assets and liabilities, a summary of what Holders of Claims and Interests will receive under the Plan, a discussion of certain alternatives to the Plan, and a summary of the procedures and voting requirements necessary for Confirmation of the Plan. The Disclosure Statement is intended to provide Holders of Claims and Interests with information sufficient to enable such Holders to vote on the Plan. All Claim Holders entitled to vote on this Plan are encouraged to carefully read the Disclosure Statement and this Plan before voting to accept or reject this Plan. No solicitation materials, other than the Disclosure Statement and related materials transmitted therewith and approved by the Bankruptcy Court, have been authorized for use in soliciting acceptance or rejection of this Plan.

## II.

### DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

**A.** **Rules of Interpretation, Computation of Time, and Governing Law**

For purposes of the Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural,

4

and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or exhibit Filed, or to be Filed, shall mean such document or exhibit, as it may have been or may be amended, modified or supplemented; (d) unless otherwise specified, all references in the Plan to sections and exhibits are references to sections and exhibits of or to the Plan; (e) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form in the Plan that is not defined in the Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning set forth in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

Except to the extent that the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, and subject to the provisions of the Plan or any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in

5

accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

**B.**    **Defined Terms**

The following definitions shall apply to capitalized terms used in the Plan:

1.    "Administrative Expense" means an unpaid administrative expense of the kind described in sections 503(b) and 507(a)(2) of the Bankruptcy Code against each Debtor, including, without limitation, (i) the actual, necessary costs and expenses of preserving the Estate of each Debtor, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Cases, (ii) compensation and reimbursement of expenses of professionals to the extent allowable under sections 327, 328, 330(a), 331, 503(b) and/or 1103 of the Bankruptcy Code and actually Allowed pursuant to a Final Order of the Bankruptcy Court, and (iii) all fees and charges assessed against each Estate under 28 U.S.C. § 1930, including the fees, if any, due to the United States Trustee.

2.    "Administrative Expense Objection Deadline" has the meaning set forth in Article XIII.B.3 of this Plan.

3.    "Allowed" means with respect to any Claim, Administrative Expense or Interest, except as otherwise provided herein:  (a) a Claim that has been scheduled by each Debtor in its Schedules as other than disputed, contingent or unliquidated which has not been superseded by a filed proof of claim and which scheduled Claim has not been amended; (b) a Claim or Administrative Expense that has been allowed by a Final Order; (c) a Claim that is allowed by each Reorganized Debtor, as the case may be, on or after the Effective Date and, if

6

and to the extent necessary, approved by the Bankruptcy Court; (d) a Claim or Administrative

Expense that has been timely filed by the applicable Bar Date for which no objection has been

filed by the applicable Objection Deadline or the Administrative Expense Objection Deadline; or

(e) a Claim or Administrative Expense that is allowed pursuant to the terms of this Plan.

4.        "Avoidance Claims" means any Rights of Action for the recovery of

avoidable transfers arising under chapter 5 of the Bankruptcy Code or applicable federal or state

law and the proceeds thereof.

5.        "Ballot" means the form distributed to each Holder of an Impaired Claim

entitled to vote on the Plan, on which is to be indicated, among other things, acceptance or

rejection of the Plan.

6.        "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as

amended, as set forth in title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as now in

effect or hereafter amended.

7.        "Bankruptcy Court" means the United States Bankruptcy Court for the

District of Delaware or such other court of competent jurisdiction as may be administering the

Chapter 11 Cases or any part thereof.

8.        "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure

promulgated pursuant to 28 U.S.C. § 2075, as now in effect or hereinafter amended, together

with the Local Rules of the Bankruptcy Court.

9.        "Bar Date" means (i) June 28, 2013, for General Unsecured Claims and

those Administrative Expenses covered by the Bar Date Order, (ii) July 8, 2013, for Claims of

Governmental Units; or (iii) such other date as the Bankruptcy Court may set by Order for other

Administrative Expenses or any other Claims not covered in the Bar Date Order.

10.     "Bar Date Order" means the order of the Bankruptcy Court at docket

number 523 in the Chapter 11 Cases.

11.     "BFG" means Boston Finance Group, LLC, and any successors thereto or

assigns thereof.

12.     "Business Day" means any day, other than a Saturday, a Sunday or a

"legal holiday," as defined in Bankruptcy Rule 9006(a).

13.     "Cash" means currency of the United States of America and cash

equivalents, including, but not limited to, bank deposits, immediately available or cleared

checks, drafts, wire transfers and other similar forms of payment.

14.     "Chapter 11 Cases" means the jointly-administered cases commenced

under chapter 11 of the Bankruptcy Code by the Debtors on the applicable Petition Date and

pending before the Bankruptcy Court.

15.     "Chief Restructuring Officer" means John C. DiDonato, or any successor

thereto appointed pursuant to the Reorganized Debtor Operating Agreement.

16.     "Claim" means any claim against each Debtor within the meaning of

section 101(5) of the Bankruptcy Code that is not an Administrative Expense, including, without

limitation, claims of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy

Code.

17.    "Claims Agent" means Rust Consulting/Omni Bankruptcy in its capacity as claims agent for the Debtors.

18.    "Class" means each category of Claims or Interests classified in Article IV of the Plan pursuant to section 1122 of the Bankruptcy Code.

19.    "Confirmation" means the approval by the Bankruptcy Court of the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code, as effectuated by the Confirmation Order.

20.    "Confirmation Date" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

21.    "Confirmation Hearing" means the hearing(s) on Confirmation of the Plan, to be held on the date or dates established by the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code, as it may be adjourned or continued from time to time.

22.    "Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code, in form and substance reasonably acceptable to the Debtors.

23.    "Consummation" means substantial consummation of the Plan as that term is used in section 1127(b) of the Bankruptcy Code.

24.    "Creditor" means any Person who is the Holder of a Claim or an Administrative Expense against the Debtors.

25.    "Creditor-Releasor" has the meaning set forth in Article X.E of this Plan.

9

26.     "Creditors' Committee" means the Official Committee of Unsecured Creditors appointed in Revstone's Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code.

27.     "CRO Core Tasks" has the meaning set forth in Article VI.G of this Plan.

28.     "Debtor Retained Professionals" has the meaning set forth in Article X.C of this Plan.

29.     "Debtors" means Revstone, Spara, Greenwood, and US Tool, either in each entity's capacity as debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code in the Chapter 11 Cases or otherwise from and after the Effective Date.

30.     "Disallowed" means, with respect to a Claim, Interest, Administrative Expense, or portion thereof, that is either a Disputed Claim, or it is determined that the Claim, Interest, Administrative Expense, or portion thereof is not allowed under the Bankruptcy Code by any of a Final Order, the Plan, or a stipulation or settlement with the Debtors, the Reorganized Debtors, or the Revstone/Spara Litigation Trust, as applicable.

31.     "Disclosure Statement" means the *Disclosure Statement in Respect of Debtors' Joint Chapter 11 Plan of Reorganization*, as it may be amended, modified or supplemented from time to time, submitted pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances of the Plan.

32.     "Disputed Claim" means (i) a Claim, Interest or Administrative Expense that is subject to a pending objection filed by the Objection Deadline or the Administrative Expense Objection Deadline, as applicable, or for which the Bankruptcy Court's order allowing

10

or disallowing such Claim, Interest or Administrative Expense is on appeal; (ii) a Claim, on account of which a proof of Claim was filed or which has been otherwise asserted, (a) for which a corresponding Claim has not been listed in the Debtors' Schedules or for which the corresponding Claim is listed in the Debtors' Schedules with a lower amount, with a differing classification, or as disputed, contingent, or unliquidated, and (b) which has not been allowed either by a Final Order, the Plan, or under a stipulation or settlement with the Debtors, the Reorganized Debtors, or the Revstone/Spara Litigation Trust, as applicable; (iii) any contingent or unliquidated Claim; or (iv) a Claim that is not Allowed.

33.    "Distributable Assets" means, except as otherwise noted below, any and all real or personal property of the Debtors of any nature, including, without limitation, any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, work in process, inventory, accounts, chattel paper, Cash (including Cash that may be upstreamed or paid to the Debtors or the Reorganized Debtors by the Debtors' direct and indirect subsidiaries and other corporate affiliates, derived from the sale or other disposition of such entities' assets), deposit accounts, reserves, deposits, contractual rights, intellectual property rights, Claims, Retained Rights of Action, books and records, any other general intangibles of the Debtors, and any and all proceeds of the foregoing, as the case may be, of any nature whatsoever (whether liquidated or unliquidated, matured or unmatured, or fixed or contingent), including, without limitation, property of the Estates within the scope of section 541 of the Bankruptcy Code.  Notwithstanding

11

the foregoing, the term "Distributable Assets" does not include any property that has been abandoned by the Estates pursuant to a Final Order of the Bankruptcy Court.

34.    "Effective Date" means the first Business Day after the Confirmation Date immediately following the first day upon which all of the conditions to the occurrence of the Effective Date as to each Debtor have been satisfied or waived in accordance with the Plan.  The Effective Date need not occur on the same day as to each Debtor.  Each Debtor shall have the right to declare the Effective Date as to such Debtor whenever such Debtor determines that such declaration is appropriate under this Plan.

35.    "Entity" and "Entities" mean an entity as defined in section 101(5) of the Bankruptcy Code or more than one thereof.

36.    "Equity Security" means any equity security as defined in section 101(16) of the Bankruptcy Code in a Debtor.

37.    "Estates" means the estates created pursuant to section 541(a) of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

38.    "Federal Judgment Rate" means the interest rate on federal judgments, in effect for the calendar week of the Petition Date, and is based on the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System.

39.    "Fee Applications" mean applications of Professional Persons under sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Chapter 11 Cases.

40.     "File" or "Filed" means filed of record and entered on the docket in the

Chapter 11 Cases or, in the case of a proof of claim, delivered to the Claims Agent.

41.     "Final Order" means a judgment, order, ruling or other decree issued and

entered by the Bankruptcy Court or by any state or other federal court or other tribunal which

judgment, order, ruling or other decree has not been reversed, stayed, revoked, modified,

supplemented or amended and as to which (a) the time to appeal or petition for review, rehearing

or certiorari has expired and as to which no appeal or petition for review, rehearing or certiorari

is pending, or (b) any appeal or petition for review, rehearing or certiorari has been finally

decided and no further appeal or petition for review, rehearing or certiorari can be taken or

granted.

42.     "Final Resolution Date" means the date on which all Disputed Claims of

Creditors shall have been resolved by Final Order or otherwise finally determined.

43.     "General Unsecured Claim" means a Claim against any of the Debtors

other than (a) an Administrative Expense, (b) a Tax Claim, (c) a Priority Non-Tax Claim, (d) a

Miscellaneous Secured Claim, or (e) a PBGC Claim.  For the avoidance of doubt, a General

Unsecured Claim includes any intercompany claims asserted against the Debtors by another

Debtor or any non-debtor affiliates of the Debtors, which claims are subject to the intercompany

settlement set forth in Article VI.C below.  BFG will share in distributions to Holders of Allowed

General Unsecured Claims against Revstone to the extent provided in the PBGC Settlement

Agreement and this Plan.  BFG does not have any General Unsecured Claims against Spara.

13

44.    "George Hofmeister Parties" means (i) George S. Hofmeister, (ii) George S. Hofmeister's immediate and extended family members, (iii) The George S. Hofmeister Family Trust FBO Megan G. Hofmeister, (iv) The George S. Hofmeister Family Trust FBO Scott R. Hofmeister, (v) The George S. Hofmeister Family Trust FBO Jamie S. Hofmeister, (vi) The Megan G. Hofmeister Irrevocable Trust, (vii) The Scott R. Hofmeister Irrevocable Trust, (viii) The Jamie S. Hofmeister Irrevocable Trust, (ix) Ascalon Enterprises, LLC, and (x) each of the foregoing party's respective trustees, managers, affiliates, successors, or assigns (other than the Debtors and their direct and indirect subsidiaries and the Restructuring Committee thereof).

45.    "Governmental Unit" has the meaning set forth in section 101(27) of the Bankruptcy Code.

46.    "Greenwood" means Greenwood Forgings, LLC, either in its capacity as debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code in the Chapter 11 Cases or otherwise from and after the Effective Date.

47.    "Holder" means the beneficial owner of any Claim, Interest, or Administrative Expense.

48.    "Huron" means Huron Consulting Services LLC.

49.    "Huron Parties" means those employees and other personnel of Huron, who have been or may be provided by Huron prior to the Effective Date to provide services and support to the Debtors, including, without limitation, John C. DiDonato in his capacity as Chief Restructuring Officer of the Debtors, Laura A. Marcero in her capacity as Deputy Chief Restructuring Officer, James M. Lukenda in his capacity as Deputy Chief Restructuring Officer,

14

Brian M. Linscott in his capacity as Interim Chief Financial Officer, Geoffrey S. Frankel in his

capacity as Vice President, John M. Owens in his capacity as Interim Treasurer, and John A.

Hemingway in his capacity as Interim Assistant Treasurer.

        50.     "Independent Managers" has the meaning set forth in Article X.B of this

Plan.

        51.     "Impaired" has the meaning set forth in section 1124 of the Bankruptcy

Code.

        52.     "Interest" means (i) any Equity Security, including all membership

interests, shares or similar securities, whether or not transferable or denominated "stock" and

whether issued, unissued, authorized or outstanding; (ii) any warrant, option, or contractual right

to purchase, sell, subscribe or acquire such Equity Securities at any time and all rights arising

with respect thereto; and (iii) any similar interest in the Debtors.

        53.     "IRS" means the Internal Revenue Service.

        54.     "Lien" means any charge against or interest in property to secure payment

or performance of a Claim, debt, or obligation.

        55.     "Miscellaneous Secured Claim" means any Secured Claim.

        56.     "Net Distributable Assets" means the Distributable Assets of each of the

Debtors from and after the Effective Date, including as to Revstone and Spara, the

Revstone/Spara Litigation Trust Interests consistent with the terms of the PBGC Settlement

Agreement, once all such assets have been reduced to Cash, net of amounts necessary to fund the

payment of Allowed Administrative Expenses (except as otherwise agreed by the Holders of

Allowed Administrative Expenses or provided by the PBGC Settlement Agreement), Tax

Claims, Priority Non-Tax Claims, Miscellaneous Secured Claims, and Plan Expenses of each

Debtor and the Revstone/Spara Litigation Trust, as applicable, and/or reserves established for

any of the foregoing, and excluding those Distributable Assets of the Debtors that are subject to

any Liens until such time that such Liens are satisfied in full.  Pursuant to and subject to the

limitations of the PBGC Settlement Agreement and the intercompany settlement embodied

herein, the Net Distributable Assets of Revstone shall include (a) twenty-five percent (25%) of

the first $2,000,000 of litigation proceeds realized by the Revstone/Spara Litigation Trust and

otherwise allocable to Holders of the PBGC Claims; and (b) twenty-five percent (25%) of the

remaining litigation proceeds available to Revstone under the PBGC Settlement Agreement.  The

remaining seventy-five (75%) of each of the foregoing categories of litigation proceeds shall be

allocated to the payment of Allowed Administrative Expenses, until paid in full, in accordance

with the terms of the PBGC Settlement Agreement.

57. "Non-Professional Administrative Expense Account" has the meaning set

forth in Article III.B of this Plan.

58. "Objection Deadline" means the deadline to object to Claims and/or

Interests specified in Article IX.A of the Plan, as may be extended pursuant thereto.

59. "PBGC" means the Pension Benefit Guaranty Corporation, and any

successors thereto or assigns thereof.

60. "PBGC Claims" means any Claim asserted by PBGC against any of the

Debtors in accordance with the terms of the PBGC Settlement Agreement.  The PBGC Claims

16

consist of non-priority, unsecured claims in the amount of $95 million against each of the

Debtors, which shall be treated in accordance with the terms of the PBGC Settlement

Agreement, plus to the extent that the PBGC Minimum Recovery (as defined in the PBGC

Settlement Agreement) is not reached, joint and several claims against the Revstone and Spara

Estates for any deficiency, all in accordance with the terms of the PBGC Settlement Agreement.

61.     "PBGC Funding Schedule" means that certain *Modified Funding Schedule*

attached as Exhibit B to the PBGC Modification Agreement, subject to upward or downward

adjustment based on actual sale results consistent with the PBGC Settlement Agreement.

62.     "PBGC Modification Agreement" means that certain *Modification of*

*PBGC Settlement Agreement and Global Resolution of Disputes* dated as of May 1, 2014,

between the Debtors, the PBGC, the Creditors' Committee, and BFG.

63.     "PBGC Settlement Agreement" means that certain *Settlement Agreement*

dated as of February 11, 2014, between the Debtors, certain subsidiaries of Revstone and Spara,

and the PBGC, as modified by the PBGC Modification Agreement, including the PBGC Funding

Schedule, which was approved by the Bankruptcy Court pursuant to the PBGC Settlement Order.

The PBGC Settlement Agreement is attached as **Exhibit A** to this Plan.

64.     "PBGC Settlement Order" means the order of the Bankruptcy Court dated

May 9, 2014 at docket number 1494, approving the PBGC Settlement Agreement.

65.     "Person" means an individual, partnership, corporation, limited liability

company, business trust, joint stock company, trust, unincorporated association, joint venture,

governmental authority, governmental unit or other entity of whatever nature.

66.     "Petition Date" means the date on which each Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code.

67.     "Plan" means this *Debtors' Joint Chapter 11 Plan of Reorganization*, as it may be further amended or modified from time to time.

68.     "Plan Expenses" means the expenses incurred or payable by each Reorganized Debtor or the Revstone/Spara Litigation Trust, as applicable, following the Effective Date (including the reasonable fees and costs of attorneys and other professionals) relating to implementation of the Plan, which as to Reorganized Revstone shall be set forth in a budget filed as part of the Plan Supplement, as such budget may be amended by the Chief Restructuring Officer following the Effective Date subject to the approval of the Reorganized Revstone Board, for the purpose of (i) monetizing any assets of the Debtors; (ii) prosecuting the Retained Rights of Action, (iii) resolving Claims and effectuating distributions to Creditors under the Plan, (iv) otherwise implementing the Plan and closing the Chapter 11 Cases, or (v) undertaking any other matter relating to the Plan.  Subject to the terms of the PBGC Settlement Agreement, reserves for Plan Expenses shall initially total, to the extent of available Cash, $750,000 for Reorganized Revstone (excluding litigation expenses), $500,000 for Reorganized Spara (excluding litigation expenses), and up to $1,000,000 for the Revstone/Spara Litigation Trust, with any excess initial reserves  at Revstone or Spara (after payment of all Plan Expenses at Revstone or Spara, respectively) to be contributed to the Revstone/Spara Litigation Trust. Additional reserves for Plan Expenses as to each Debtor may be created out of the assets of such Debtor otherwise available for the payment of Allowed General Unsecured Claims in the

18

discretion of the Chief Restructuring Officer, upon approval of the Reorganized Revstone Board as to Reorganized Revstone.  Additional reserves for Plan Expenses as to the Revstone/Spara Litigation Trust may be created out of the Revstone/Spara Litigation Trust Assets otherwise available for distribution to Holders of Allowed General Unsecured Claims (through Reorganized Revstone and Reorganized Spara) and Holders of Allowed PBGC Claims in the discretion of the Revstone/Spara Litigation Trustee, upon approval of the Revstone/Spara Litigation Trust Committee, the Chief Restructuring Officer of Reorganized Spara, and the PBGC.

69.   "Plan Supplement" means the supplement to the Plan to be Filed by the Debtors with the Bankruptcy Court, which supplement shall contain forms of certain substantially final documents required for the implementation of the Plan, no later than ten (10) days prior to the Confirmation Hearing.

70.   "Priority Non-Tax Claim" means any Claim, other than a Tax Claim, to the extent entitled to priority under section 507(a) of the Bankruptcy Code.

71.   "Pro Rata" means proportionately, so that with respect to any distribution, the ratio of (a) (i) the amount of property to be distributed on account of a particular Claim or particular group of Claims to (ii) the amount of such particular Claim or group of Claims, is the same as the ratio of (b) (i) the amount of property to be distributed on account of all Claims or groups of Claims sharing in such distribution to (ii) the amount of all Claims or groups of Claims sharing in such distribution.

72.    "Professional Fee Account" has the meaning set forth in Article XIII.B.2 of this Plan.

73.    "Professional Fee Claim" shall mean an Administrative Expense of a Professional Person for compensation for services rendered and reimbursement of costs, expenses or other charges incurred on or after the Petition Date and on or before the Effective Date.

74.    "Professional Person" shall mean Persons retained or to be compensated pursuant to sections 326, 327, 328, 330, 503(b), and/or 1103 of the Bankruptcy Code.

75.    "Record Date" means the Effective Date.

76.    "Released Parties" has the meaning set forth in Article X.D of this Plan.

77.    "Releasor Affiliates" has the meaning set forth in Article X.F of this Plan.

78.    "Released Estate Parties" has the meaning set forth in Article X.E of this Plan.

79.    "Relevant Books and Records" means those books and records of Revstone and Spara with information concerning Revstone's and Spara's Retained Rights of Action and any rights of setoff associated therewith.

80.    "Reorganized Revstone Board" means Reorganized Revstone's board of managers, as defined in Article VI.F of the Plan.

81.    "Reorganized Debtors" means the Debtors on and after the Effective Date.

82.    "Reorganized Debtor Operating Agreements" means each Debtor's operating agreement, as it is amended and restated upon the Effective Date in accordance with this Plan.

83.    "Restructuring Committee" means the Restructuring Committee of the Board of Managers of Revstone and Spara, currently comprised of James B. Shein and Richard E. Newsted, who are the two independent managers of each such Debtor's Board of Managers.

84.    "Retained Rights of Action" means all Rights of Action belonging to each Debtor as of the Effective Date, including, without limitation, Avoidance Claims (including those disclosed in the Schedules), but excluding those Rights of Action specifically released under the Plan or subject to the exculpation provisions of the Plan.  The Retained Rights of Action include, without limitation, any and all rights of the Debtors to pursue any Rights of Action against third parties disclosed or referenced in the Schedules and/or listed in the Plan Supplement, subject to the provisions of the PBGC Settlement Agreement and excluding those Rights of Action specifically released under the Plan or subject to the exculpation provisions of the Plan, including, for the avoidance of doubt, those Rights of Action released or exculpated, as applicable, pursuant to Article X hereof.

85.    "Revstone" means Revstone Industries, LLC, either in its capacity as debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code in the Chapter 11 Cases or otherwise from and after the Effective Date.

86.    "Revstone/Spara Litigation Trust" means the litigation trust or trusts that may be created under this Plan solely for the benefit of Reorganized Revstone, Reorganized

Spara, and Holders of Allowed PBGC Claims, and governed by the Revstone/Spara Litigation Trust Agreement.

87.    "Revstone/Spara Litigation Trust Agreement" means the litigation trust agreement or agreements governing the Revstone/Spara Litigation Trust that shall be filed as part of the Plan Supplement.

88.    "Revstone/Spara Litigation Trust Assets" means the assets held by the Revstone/Spara Litigation Trust, which as of the Effective Date shall be composed of Revstone's and Spara's Retained Rights of Action (except as noted below), the Relevant Books and Records, and Cash reserves for Plan Expenses of the Revstone/Spara Litigation Trust, as set forth in the definition of "Plan Expenses" above and subject to the provisions of the PBGC Settlement Agreement.  Notwithstanding anything to the contrary herein, the Revstone/Spara Litigation Trust Assets shall not include:  (a) any Claim or cause of action exculpated or released pursuant to Article X hereof; or (b) unless otherwise agreed by Reorganized Revstone or Reorganized Spara, (i) the right to object to any Administrative Expenses, Tax Claims, Priority Non-Tax Claims, or Miscellaneous Secured Claims asserted against Revstone, or (ii) the right to object to any Claims asserted against Spara.

89.    "Revstone/Spara Litigation Trust Committee" means the Persons selected to fill the role of the supervisory committee of the Revstone/Spara Litigation Trust in accordance with the PBGC Settlement Agreement, the Revstone/Spara Litigation Trust Agreement, and this Plan.

90.    "Revstone/Spara Litigation Trustee" means the Person selected to fill the role of trustee of the Revstone/Spara Litigation Trust in accordance with the PBGC Settlement Agreement, the Revstone/Spara Litigation Trust Agreement, and this Plan.

91.    "Revstone/Spara Litigation Trust Interests" means the beneficial interests in the Revstone/Spara Litigation Trust and the Revstone/Spara Litigation Trust Assets, subject to the terms of the Revstone/Spara Litigation Trust Agreement.  The Revstone/Spara Litigation Trust Interests shall be uncertificated and non-transferable, except by operation of law.

92.    "Rights of Action" means any and all affirmative claims, demands, rights, actions, causes of action (including, without limitation, Avoidance Claims), and suits of any kind or character whatsoever, known or unknown, suspected or unsuspected, whether arising prior to, on or after the Petition Date, in contract or in tort, at law or in equity, or under any other theory of law, held by any Debtor against any other Person, and any proceeds thereof, including but not limited to:  (a) rights of setoff, counterclaim or recoupment relating to the foregoing affirmative claims; (b) rights to object to Claims or Interests relating to the foregoing affirmative claims; (c) any defenses or counterclaims relating to or arising out of the foregoing affirmative claims; (d) all claims or rights under Bankruptcy Code sections 542, 543, 544, 547, 548, 549, 550, 551, 552, and 553, all fraudulent-conveyance and fraudulent-transfer laws, all non-bankruptcy laws vesting in creditors' rights to avoid, rescind, or recover on account of transfers, all preference laws, the Uniform Fraudulent Transfer Act (as it may have been codified in any particular jurisdiction), the Uniform Fraudulent Conveyance Act (as it may have been codified in any particular jurisdiction), and all similar laws and statutes; and (e) any other claims which may be asserted

23

against affiliates or insiders of the Debtors that are not otherwise released under this Plan or subject to the exculpation provisions of this Plan.

93.     "Schedules" means the schedules of assets and liabilities and statement of financial affairs filed by each Debtor with the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been or may be amended from time to time.

94.     "Secured Claim" means any Claim of any Person (i) that is secured by a Lien on property in which the Debtors or their Estates have an interest, which Lien is valid, perfected and enforceable and not subject to avoidance under applicable law or by reason of a Final Order but only to the extent of the value, as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code, of any interest of the claimant in the property of the Estates securing such Claim or (ii) to the extent that such Person has a valid right of setoff under section 553 of the Bankruptcy Code.

95.     "Spara" means Spara, LLC, either in its capacity as debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code in the Chapter 11 Cases or otherwise from and after the Effective Date.

96.     "Tax" means any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any interest or additions attributable to, imposed on or with respect to such assessments.

97. "Tax Claim" means any Claim for any Tax to the extent that it is entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

98. "Timely Filed" means, with respect to a Claim, Interest, or Administrative Expense, that a proof of such Claim or Interest or request for payment of such Administrative Expense was filed with the Bankruptcy Court or the Claims Agent, as applicable, within such applicable period of time fixed by the Plan, statute, or pursuant to both Bankruptcy Rule 3003(c)(3) and a Final Order (including the Bar Date Order), or has otherwise been deemed timely filed by a Final Order of the Bankruptcy Court.

99. "Unclaimed Property" means all Cash deemed to be "Unclaimed Property" pursuant to Article VIII.E of the Plan.

100. "Unimpaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

101. "US Tool" means US Tool & Engineering, LLC, either in its capacity as debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code in the Chapter 11 Cases or otherwise from and after the Effective Date.

## III.

## TREATMENT OF ADMINISTRATIVE EXPENSES AND TAX CLAIMS

## A.  Introduction

As required by the Bankruptcy Code, Administrative Expenses and Tax Claims are not placed into voting Classes.  Instead, they are left unclassified, are not considered

25

Impaired, do not vote on the Plan, and receive treatment specified by statute or agreement of the parties. All postpetition payments by or on behalf of the Debtors in respect of an Administrative Expense or Tax Claim shall either reduce the Allowed amount thereof or reduce the amount to be paid under the Plan in respect of any Allowed amount thereof; provided that the method of application that is most beneficial to the Debtors' Estates shall be employed.

**B.        Administrative Expenses**

Under the Plan, on or as soon as practicable after the Effective Date (to the extent payable on the Effective Date), each Holder of an Allowed Administrative Expense against the Debtors shall receive, in full satisfaction, settlement, release, and extinguishment of such Allowed Administrative Expense, Cash from the applicable Reorganized Debtor equal to the full amount of such Allowed Administrative Expense, unless such Holder and the applicable Reorganized Debtor have mutually agreed in writing to other terms, or an order of the Bankruptcy Court provides for other terms; provided, however, that, unless otherwise agreed by the applicable Reorganized Debtor, (a) requests for payment of all Administrative Expenses must be Filed and served as described in Article XIII.B.3 of the Plan, and (b) certain different and additional requirements shall apply to the Administrative Expenses of Professional Persons as set forth in Article XIII.B.2 and 3 of the Plan; provided further, however, that no interest or penalties of any nature shall be paid in respect of an Allowed Administrative Expense.

As of the Effective Date, each Reorganized Debtor shall maintain a segregated reserve Cash account (the "Non-Professional Administrative Expense Account") for the purpose of funding future payments on account of asserted, accrued, and estimated Administrative

Expenses that have not yet been Allowed or are otherwise not yet payable as of the Effective

Date, to the extent such Administrative Expenses later become Allowed or otherwise payable, in

an aggregate amount to be determined by each Debtor in its business judgment, after

consultation with the Creditors' Committee.  A separate reserve account for the payment of

Professional Fee Claims shall be established by the Debtors as provided in Article XIII.B.2

below.

Notwithstanding anything to the contrary herein, pursuant to the PBGC

Settlement Agreement, BFG has an Allowed Administrative Expense against Revstone in the

amount of $700,000 and an Allowed Administrative Expense against Spara in the amount of

$500,000, which Allowed Administrative Expenses shall be paid upon the respective Effective

Date for each such Debtor.

In conjunction with the PBGC Settlement Agreement, certain Holders of

Professional Fee Claims against Revstone and/or Spara have agreed to accept reduced recoveries

out of available assets of each such Debtor in order to allow increased distributions to be made to

Holders of Allowed General Unsecured Claims against Revstone and/or Spara in accordance

with the PBGC Settlement Agreement.

Notwithstanding any of the foregoing, if an Administrative Expense represents an

obligation incurred in the ordinary course of business, such Administrative Expense will be paid

in the ordinary course by the applicable Reorganized Debtor in accordance with the terms of the

particular transaction and/or applicable agreement.

## C.    <u>Tax Claims</u>

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Tax Claims are not to be classified and thus Holders of Tax Claims are not entitled to vote to accept or reject the Plan.

As required by section 1129(a)(9) of the Bankruptcy Code, on or as soon as practicable after the Effective Date, each Holder of an Allowed Tax Claim against the Debtors shall receive, in full satisfaction, settlement, release, and extinguishment of such Allowed Tax Claim, Cash from the applicable Reorganized Debtor equal to the portion of the Allowed Tax Claim due and payable on or prior to the Effective Date according to applicable non-bankruptcy law; provided, however, each Debtor may in its discretion elect to make, pursuant to section 1129(a)(9)(C), regular quarterly installment payments in Cash of a total value, as of the Effective Date, equal to the amount of the Allowed Tax Claim over a period ending not later than five years after the Petition Date together with interest for the period after the Effective Date at the rate determined under non-bankruptcy law as of the calendar month in which the Plan is confirmed, subject at the sole option of the applicable Reorganized Debtor to prepay the entire amount of the Allowed Tax Claim.  Any Allowed Tax Claim (or portion thereof) against the Debtors not yet due and payable as of the Effective Date will be paid by the applicable Reorganized Debtor no later than when due and payable under applicable non-bankruptcy law without regard to the commencement of the Chapter 11 Case; provided that upon request of the applicable Reorganized Debtor, the Bankruptcy Court shall determine the amount of any Disputed Claim for, or issues pertaining to, a Tax.  Any Holder of a Tax Claim may agree to

accept different treatment as to which the applicable Reorganized Debtor and such Holder have agreed upon in writing.

## IV.

## CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

### A.    Summary

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes only to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for the classification of Claims and/or Interests as set forth below.  Administrative Expenses and Tax Claims have not been classified and are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code.

### B.    Classification and Treatment of Claims and Interests

The treatment of each Class of Claims and/or Interests is set forth below.  Each Class of Claims against each particular Debtor shall be treated as a sub-Class for all purposes

29

under this Plan.  Unless the Bankruptcy Court has specified otherwise prior to Confirmation, the

Debtors shall determine whether a postpetition payment by or on behalf of the Estates in respect

of a Claim either (x) shall reduce the Allowed amount thereof or (y) shall reduce the amount to

be paid under the Plan in respect of any Allowed amount thereof by considering which method is

most advantageous to the Debtors' Estates.

## 1.    Class 1 – Priority Non-Tax Claims

a.    Classification:  Class 1 consists of all Priority Non-Tax Claims

against the Debtors.

b.    Treatment:  At the election of the applicable Reorganized Debtor,

the Holder of each Priority Non-Tax Claim against each Debtor shall receive, in full satisfaction,

settlement, release, and extinguishment of such Priority Non-Tax Claim, on or as soon as

practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy

Court enters a Final Order determining or allowing such Claim, (a) a Cash payment from the

applicable Reorganized Debtor equal to the Allowed amount of such Claim, or (b) such other

treatment as otherwise agreed by the Holder of such Claim and the applicable Debtor or

Reorganized Debtor.

c.    Impairment/Voting:  Class 1 is Unimpaired.  Class 1 therefore is

conclusively presumed to have accepted the Plan and Holders of Claims in Class 1 are not

entitled to vote to accept or reject the Plan.

2.    **Class 2 – Miscellaneous Secured Claims**

a.    Classification:  Class 2 consists of all Miscellaneous Secured Claims (if any such Claims exist) against the Debtors.  Although all Miscellaneous Secured Claims have been placed in one Class for the purposes of nomenclature, each Miscellaneous Secured Claim, to the extent secured by a Lien on any property or interest in property of the Debtors different from that securing any other Miscellaneous Secured Claim, shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan

b.    Treatment:  Except to the extent that a holder of an Allowed Miscellaneous Secured Claim has been paid by the Debtors, in whole or in part, prior to the Effective Date, on the Effective Date, at the option of the applicable Reorganized Debtor, (i) each Allowed Miscellaneous Secured Claim shall be reinstated and Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each Holder of an Allowed Miscellaneous Secured Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Miscellaneous Secured Claim, (x) payment in full in Cash of the unpaid portion of such Allowed Miscellaneous Secured Claim, (y) surrender of the collateral securing such Claim or (z) such other treatment as may be agreed to by the Holder of such Claim and the applicable Debtor or Reorganized Debtor.  Prior to the Confirmation Hearing, the Debtor shall inform each Holder of a Miscellaneous Secured Claim if such Creditor's Secured Claim shall be treated as Unimpaired under the Plan.

DOCS_SF:84821.10 73864/001

c.      Impairment/Voting:  Class 2 is Unimpaired.  Class 2 therefore is conclusively presumed to have accepted the Plan and Holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

3.      **Class 3 – General Unsecured Claims**

a.      Classification:  Class 3 consists of all General Unsecured Claims.

b.      Treatment:  On or as soon as practicable after the Effective Date, each Holder of an Allowed General Unsecured Claim against a Debtor shall receive, as the sole distribution or dividend by the applicable Reorganized Debtor or its Estate under this Plan on account of such Allowed General Unsecured Claim, a Pro Rata share of:  (i) the Net Distributable Assets of the applicable Debtor (calculated as a percentage of all Allowed General Unsecured Claims against such Debtor, except as provided in the PBGC Settlement Agreement); and (ii) as to Revstone, to the extent that the sub-Class of Holders of Allowed General Unsecured Claims against Revstone votes in favor of the Plan, the sum of $3,000,000 which will be set aside from the proceeds of the disposition of non-debtor subsidiaries' assets otherwise available to the Holders of the PBGC Claims in order to provide an up-front recovery to the Holders of Allowed General Unsecured Claims against Revstone (excluding BFG).

Additionally, pursuant to and subject to the limitations of the PBGC Settlement Agreement and the intercompany settlement embodied herein, the Net Distributable Assets of Revstone shall include (i) twenty-five percent (25%) of the first $2,000,000 of litigation proceeds realized by the Revstone/Spara Litigation Trust and otherwise allocable to Holders of the PBGC Claims; and (ii) twenty-five percent (25%) of the remaining litigation

32

proceeds available to Revstone under the PBGC Settlement Agreement.  For the avoidance of doubt, the Net Distributable Assets of each Debtor are subject to any limitations otherwise imposed under the PBGC Settlement Agreement.  BFG shall not share in the distributions to Holders of Allowed General Unsecured Claims against Revstone out of the first $2,000,000 of litigation proceeds referenced in item (i) of the preceding sentence.  Thereafter, and with respect to any other Net Distributable Assets made available to Holders of Allowed General Unsecured Claims against Revstone (except for the sum of $3,000,000 set aside from the proceeds of the disposition of non-debtor subsidiaries' assets referenced in item (ii) of the preceding paragraph), BFG shall share in distributions to Holders of Allowed General Unsecured Claims against Revstone as follows:  10% for BFG if Allowed General Unsecured Claims against Revstone (including BFG) exceed $50,000,000, 15% for BFG if Allowed General Unsecured Claims against Revstone (including BFG) exceed $35,000,000 but are less than or equal to $50,000,000, and 20% for BFG if Allowed General Unsecured Claims against Revstone (including BFG) are $35,000,000 or less.

Aggregate distributions to each Holder of an Allowed General Unsecured Claim shall not exceed the full Allowed amount of such General Unsecured Claim.  Holders of Allowed General Unsecured Claims will not be entitled to the payment of postpetition interest under the Plan, unless excess Net Distributable Assets remain after all Allowed Claims and Administrative Expenses have been paid or otherwise satisfied in full (unless otherwise agreed to by the applicable Creditor) in accordance with the Plan.  In such case of excess Net Distributable Assets, then Holders of Allowed General Unsecured Claims shall receive on a Pro Rata basis

(calculated as a percentage of all Allowed General Unsecured Claims and all Allowed PBGC

Claims) postpetition interest at the Federal Judgment Rate, to the extent that sufficient excess

Net Distributable Assets (once all liquidated to Cash) exist and as required under the Bankruptcy

Code

     c. <u>Impairment/Voting</u>:  Class 3 is Impaired.  Holders of Claims in

Class 3 are therefore entitled to vote to accept or reject the Plan.

    **4.**  **<u>Class 4 – PBGC Claims</u>**

     a. <u>Classification</u>:  Class 4 consists of all PBGC Claims against the

Debtors.

     b. <u>Treatment</u>:  On or as soon as practicable after the Effective Date,

each Holder of an Allowed PBGC Claim shall receive the treatment provided by the PBGC

Settlement Agreement, including a share of the Revstone/Spara Litigation Trust Interests as

provided by the PBGC Settlement Agreement.  Holders of Allowed PBGC Claims against

Revstone and Spara shall not receive any distributions out of the Net Distributable Assets of such

Estates except to the extent that the PBGC Minimum Recovery (as defined in the PBGC

Settlement Agreement) is not reached, in which case Holders of the PBGC Claims shall receive

from the Revstone and/or Spara Hold Back/Escrows (as set forth in the PBGC Funding

Schedule), or as necessary, Reorganized Revstone or Reorganized Spara, funds sufficient  to

provide the Holders of the Allowed PBGC Claims with the PBGC Minimum Recovery in

accordance with the terms of the PBGC Settlement Agreement.  Further, pursuant to the PBGC

Settlement Agreement:  (i) the first $2,000,000 of litigation proceeds realized by the

<div align="center">34</div>

Revstone/Spara Litigation Trust and otherwise allocable to Holders of the PBGC Claims shall be

distributed to Reorganized Revstone and made available to Holders of Allowed General

Unsecured Claims against Revstone (excluding BFG) and Holders of Allowed Administrative

Expenses against Revstone in accordance with, and subject to the terms of, the PBGC Settlement

Agreement; and (ii) as noted above with respect to Class 3, to the extent that the sub-Class of

Holders of Allowed General Unsecured Claims against Revstone votes in favor of the Plan, the

sum of $3,000,000 will be set aside from the proceeds of the disposition of non-debtor

subsidiaries' assets otherwise available to the Holders of the PBGC Claims in order to provide an

up-front recovery to the Holders of Allowed General Unsecured Claims against Revstone

(excluding BFG).

> c.     Impairment/Voting:  Class 4 is Impaired.  Holders of Claims in

Class 4 are therefore entitled to vote to accept or reject the Plan.

> 5.     **Class 5 – Interests in the Debtors**

> a.     Classification:  Class 5 consists of all Interests in the Debtors.

> b.     Treatment:  The Holders of Interests shall receive no distributions

under the Plan, and on the Effective Date, all Interests shall be deemed suspended.  As of the

Effective Date, the Holders of Interests shall receive a contingent interest in the Net Distributable

Assets remaining, if any, after all Allowed Claims and Administrative Expenses have been paid

or otherwise satisfied in full (unless otherwise agreed to by the applicable Creditor) in

accordance with the Plan.  For the avoidance of doubt, no distribution of Net Distributable

Assets (once all liquidated to Cash) shall be made to Holders of Interests against any Debtor until

and unless all Holders of Allowed General Unsecured Claims against such Debtor receive

payment in full of such Allowed Claims, plus all accrued postpetition interest at the Federal

Judgment Rate.

        c.      <u>Impairment/Voting</u>:  Class 5 is Impaired.  Holders of Interests in

Class 5 are deemed to reject the Plan.

<p style="text-align:center"><b>V.</b></p>

<p style="text-align:center"><b><u>ACCEPTANCE OR REJECTION OF PLAN</u></b></p>

**A.**      **<u>Identification of Unimpaired Classes</u>**

        The following Classes are Unimpaired under the Plan.

        Class 1 – Priority Non-Tax Claims

        Class 2 – Miscellaneous Secured Claims

**B.**      **<u>Identification of Impaired Classes</u>**

        The following Classes of Claims and Interests are Impaired under the Plan.

        Class 3 – General Unsecured Claims

        Class 4 – PBGC Claims

        Class 5 – Interests in the Debtors

**C.**      **<u>Classes Permitted and Not Permitted to Vote</u>**

        Classes 1 and 2 are Unimpaired.  Holders of Claims in such Classes are

conclusively presumed pursuant to section 1126(f) of the Bankruptcy Code to have accepted the

Plan and therefore shall not be entitled to vote to accept or reject the Plan.  Classes 3 through 5

are Impaired.  Holders of Claims in Classes 3 and 4 are permitted to vote to accept or reject the

<p style="text-align:center">36</p>

Plan.  Holders of Interests in Class 5 are deemed to reject the Plan.  The Debtors reserve all rights with respect to the allowance of any Claims, except as otherwise expressly provided by the PBGC Settlement Agreement or this Plan.

An Impaired Class of Claims that votes shall have accepted the Plan if (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

**D.**      **Effect of Non-Voting**

If no Holder of a Claim eligible to vote in a particular Class timely votes to accept or reject the Plan, the Debtors may seek to have the Plan deemed **accepted** by the Holders of such Claims in such Class for purposes of section 1129(b) of the Bankruptcy Code.

**E.**      **Nonconsensual Confirmation**

In the event any Class of Claims votes to reject the Plan and given the deemed rejection of the Plan by the Holders of Interests, the Debtors request that the Bankruptcy Court confirm the Plan notwithstanding such rejection pursuant to section 1129(b) of the Bankruptcy Code on the basis that the Plan is fair and equitable and does not discriminate unfairly as to the Holders of any Class of Claims or Interests.

**F.**      **Postpetition Interest**

Nothing in the Plan or the Disclosure Statement shall be deemed to entitle the Holder of a Claim to receive postpetition interest on account of such Claim, except to the extent that the Plan expressly provides for postpetition interest on account of such Claim.

37

## VI.

## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.**     **PBGC Settlement**

The provisions of the Plan incorporate the terms of the PBGC Settlement

Agreement and the PBGC Settlement Order pursuant to section 1123(b)(3)(A) of the Bankruptcy

Code.  From and after the Effective Date, each and every provision of the PBGC Settlement

Agreement shall be binding on each of the Reorganized Debtors, as applicable.

**B.**     **No Substantive Consolidation**

Nothing in the Plan is intended to substantively consolidate, nor shall have the

effect of substantively consolidating, the Debtors or their Estates, and each Reorganized Debtor

shall maintain its separate corporate existence from and after the Effective Date.

**C.**     **Intercompany Settlement Between Revstone and Spara**

Upon the Effective Date, pursuant to section 1123(b)(3)(A) of the Bankruptcy

Code and Bankruptcy Rule 9019, each of the Reorganized Debtors and their respective

successors and assigns hereby agree that:  (a) Reorganized Revstone shall have an Allowed

General Unsecured Claim against Spara and its Estate in the amount of $10 million, which Claim

shall participate in distributions at Spara on a Pro Rata basis with other Holders of Allowed

General Unsecured Claims against Spara, and (b) each of the Reorganized Debtors, on behalf of

themselves and their non-debtor subsidiaries, hereby waive and release any and all other Claims

or Rights of Action held by such Reorganized Debtor or subsidiary against any of the Debtors,

their respective subsidiaries, or their respective successors; provided, however, that, subject to

DOCS_SF:84821.10 73864/001

Article X hereof, nothing herein shall be deemed a waiver or release of: (i) any rights of each Reorganized Debtor as a direct or indirect equity holder of a subsidiary; (ii) Revstone's claims against TPOP, LLC f/k/a Metavation, LLC, all of which such claims are preserved; (iii) Revstone's claims against its Debtor and non-debtor subsidiaries for payment of any restructuring or management fees; (iv) amounts otherwise payable to Revstone and/or Spara pursuant to the PBGC Settlement Agreement; (v) any claim of cause of action against any of the George Hofmeister Parties; or (vi) any claim or cause of action against MPI Products LLC, Monomoy Capital Partners, Monomoy Capital Partners II, LP, or any of their respective affiliates or successors.

**D.    Continued Corporate Existence and Vesting of Assets**

On and after the Effective Date, subject to the requirements of the Plan, each Reorganized Debtor will continue to exist as a separate limited liability company and shall retain all of the powers of limited liability companies under applicable non-bankruptcy law, as modified by this Plan, and without prejudice to any right to amend its operating agreement, dissolve, merge or convert into another form of business entity, or to alter or terminate its existence to the extent consistent with the Plan. The existing membership interests of the Debtors shall be deemed to be held by the Chief Restructuring Officer, and the Chief Restructuring Officer shall be deemed to have been admitted as the sole member of the Reorganized Debtors under applicable nonbankruptcy law and shall be authorized to exercise all of the rights and powers of a sole member as provided by the Plan, subject to the oversight of the Reorganized Revstone Board as to Reorganized Revstone.

DOCS_SF:84821.10 73864/001

Except as otherwise provided in the Plan and excluding the Revstone/Spara Litigation Trust Assets, on and after the Effective Date, all Distributable Assets and property of each Debtor and its Estate, including any interests in subsidiaries of each Debtor and as to Revstone and Spara, the Revstone/Spara Litigation Trust Interests, will vest in each Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances and Interests, except as provided by the PBGC Settlement Agreement.  None of the occurrence of the Effective Date, the effectiveness of this Plan, nor any provision of applicable non-bankruptcy law shall cause a dissolution of any Debtor, each of which such Debtor shall be continued as limited liability companies following the Effective Date.

On and after the Effective Date, subject to the requirements of the Plan and except as otherwise provided in this Plan, each Reorganized Debtor shall be permitted to conduct its business, reconcile Claims, use and dispose of assets, prosecute litigation, and otherwise take any and all actions reasonably necessary to implement the Plan without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules.  Each Reorganized Debtor shall be authorized, without limitation, to use and dispose of the Distributable Assets of such Debtor and its Estate, to investigate and pursue any Retained Rights of Action of such Debtor (other than Reorganized Revstone and Reorganized Spara, to the extent set forth in the Plan) as the representative of the applicable Reorganized Debtor's Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, to acquire and dispose of other property, and to otherwise administer its affairs.

E.      **Corporate Action**

On the Effective Date, the matters under the Plan involving or requiring limited liability company action of the Debtors, including but not limited to actions requiring a vote or other approval of the board of directors, shareholders, managers, or members of the Debtors or the execution of any documentation incident to or in furtherance of the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers, directors, managers, or members of the Debtors.

The Reorganized Debtor Operating Agreements shall be deemed to include a provision prohibiting the issuance of nonvoting equity securities and such other provisions as may be required pursuant to section 1123(a)(6) of the Bankruptcy Code.  The Reorganized Debtors may execute and/or file the Reorganized Debtor Operating Agreements with the Delaware Secretary of State and other state governmental authorities having jurisdiction over the Debtors as may be necessary or appropriate under applicable non-bankruptcy law to fully effectuate the terms of such documents.

On the Effective Date, the Debtors' operating agreements shall be deemed replaced and amended by the Reorganized Debtor Operating Agreements, which shall be in full force and effect from and after the Effective Date.  Revstone and Spara may amend and/or restate, or cause the amendment and/or restatement, of the operating agreements of any of their non-Debtor subsidiaries, direct or indirect, as may be necessary or appropriate under applicable

non-bankruptcy law to ensure consistency with or to fully implement or effectuate the provisions

of this Plan, provided that any such modifications are consistent with the terms of this Plan.

**F.**      **Corporate Governance**

From and after the Effective Date, subject to the terms of this Plan, the business,

affairs, and operation of the Reorganized Debtors shall be under the management of, and all

decisions on behalf of the Reorganized Debtors may be made by, the Chief Restructuring

Officer, who in the case of Reorganized Revstone shall report to and be subject to oversight by

the Reorganized Revstone Board (as defined below).  As to Reorganized Spara, Reorganized

Greenwood, and Reorganized U.S. Tool, the Chief Restructuring Officer shall be appointed as

the sole manager of each such Reorganized Debtor.  Without limitation to the foregoing, the

Chief Restructuring Officer shall be authorized to appoint such officers of the Reorganized

Debtors with such duties and responsibilities as he may deem necessary and appropriate in

furtherance of the affairs of the Reorganized Debtors; provided, however, that no George

Hofmeister Party may serve as an officer of the Reorganized Debtors.

On the Effective Date, each member of the Boards of Managers of the Debtors

shall be deemed to have resigned, the Restructuring Committee shall be dissolved, and new

Boards of Managers for Reorganized Revstone (the "Reorganized Revstone Board") shall be

constituted and formed.  The Chief Restructuring Officer of Reorganized Revstone may not be

removed except for cause by unanimous vote of the Reorganized Revstone Board.  In the event

that the Chief Restructuring Officer of Revstone is removed, such removal shall not have any

42

effect on the Chief Restructuring Officer's continuing role as Chief Restructuring Officer of the remaining Reorganized Debtors.

The Reorganized Revstone Board shall consist of one manager appointed by the Creditors' Committee (provided that such manager may not be BFG), one manager appointed by the PBGC, and one manager appointed by mutual agreement of the Creditors' Committee and the PBGC; provided however, no George Hofmeister Party shall serve on the Reorganized Revstone Board.  In the event that the Creditors' Committee and the PBGC are unable to agree upon the selection of the third manager of the Reorganized Revstone Board, the Creditors' Committee and the PBGC shall each provide the name of their choice as the third manager to the Chief Restructuring Officer who shall then select the third manager from these two names.

The specific individuals proposed to serve on the Reorganized Revstone Board shall be disclosed in the Plan Supplement.  Except as noted above with respect to the removal of the Chief Restructuring Officer of Reorganized Revstone, any actions taken by the vote or written consent of a majority of the Reorganized Revstone Board shall be deemed to constitute an action by the Reorganized Revstone Board.  Each manager shall serve on the Reorganized Revstone Board until the death, disability, or resignation of such manager or until entry of an order of the Bankruptcy Court for a final decree closing the Chapter 11 Cases.  Any vacancy on the Reorganized Revstone Board created by the death, disability, or resignation of a manager may be filled by the remaining members of the Reorganized Revstone Board (regardless of whether less than a majority) or by the Chief Restructuring Officer of Reorganized Revstone if

no agreement can be reached, provided that no George Hofmeister Party may serve as a manager.

Members of the Reorganized Revstone Board shall be entitled to reimbursement of reasonable and necessary expenses incurred in carrying out their duties as members of the Reorganized Revstone Board, all of which shall be paid from Reorganized Revstone.  In addition, members of the Reorganized Revstone Board shall be entitled to compensation, also payable from Reorganized Revstone, for time spent on the Reorganized Revstone Board in an amount up to $400 per hour (not to exceed $15,000 per year per member), but shall not be reimbursed for any fees or expenses of any professional retained by an individual member of the Reorganized Revstone Board.  There shall be customary indemnification by Reorganized Revstone of the Reorganized Revstone Board, as well as the Reorganized Debtors' officers and manager as of the Effective Date, including the Chief Restructuring Officer, as set forth in the Reorganized Debtor Operating Agreements.

On the Effective Date, the limited liability company agreements of the Debtors shall be amended and restated substantially in the form set forth in the Plan Supplement and, as so amended and restated, shall constitute the limited liability company agreements of the Reorganized Debtors.  The Reorganized Debtor Operating Agreements shall contain the following provisions (which shall remain in effect until such time as an order by the Bankruptcy Court for a final decree in the Chapter 11 Cases has been entered):  (i) a prohibition on the taking of any action on behalf of the Reorganized Debtors by any member thereof or the participation by any such member in the management of the business, affairs, or operations of the

44

Reorganized Debtors; (ii) a prohibition on service by any George Hofmeister Party as a manager

or officer of the Reorganized Debtors; (iii) a provision authorizing the Chief Restructuring

Officer, subject to the oversight of the Reorganized Revstone Board as to Reorganized Revstone,

to approve any sale, lease, or exchange of all or substantially all of the Reorganized Debtors'

properties and assets, any merger or dissolution of the Reorganized Debtors, any dissolution of

the Reorganized Debtors, or any other action contemplated under the Plan, any of which actions

may be taken without the consent of any member of the Reorganized Debtors; (iv) a prohibition

on any amendment or modification of the certificate of formation of the Reorganized Debtors or

the Reorganized Debtor Operating Agreements that is contrary to the terms of the Plan; and (v)

such other provisions as may be necessary or appropriate to ensure consistency with or to fully

implement or effectuate the provisions of the Plan.

## G.  **Chief Restructuring Officer Duties**

      Subject to the terms of the Plan, the Chief Restructuring Officer shall be tasked

with maximizing the value of the Reorganized Debtors' assets, reconciling Claims, making

distributions to Creditors in accordance with the Plan, satisfying post-Effective Date obligations

of the Reorganized Debtor, and taking other actions in order to implement the Plan, all without

need for approval of the Bankruptcy Court or notice to Creditors, provided that, as to

Reorganized Revstone only, the duties of the Chief Restructuring Officer shall be focused on the

following core tasks (the "CRO Core Tasks"):  (1) disposition of the assets or interests of

Revstone's non-debtor subsidiaries and maximizing recoveries therefrom by Reorganized

Revstone, (2) reconciliation and payment of Administrative Expenses, Priority Tax Claims,

45

Priority Non-Tax Claims, and any Secured Claims against Revstone pursuant to the Plan, and (3)

management, administration, and distribution of funds of Reorganized Revstone consistent with

the Plan, except as to distributions to Holders of Allowed General Unsecured Claims against

Revstone.  The CRO Core Tasks at Revstone shall not include reconciliation or payment of

Allowed General Unsecured Claims against Revstone, which tasks shall be handled by the

Reorganized Revstone Board or its designees and representatives, which may include current

general bankruptcy counsel to the Creditors' Committee.

   Except as noted above with respect to Reorganized Revstone, the Reorganized

Debtor Operating Agreements shall provide customary terms for the management of the

Reorganized Debtors by the Chief Restructuring Officer with appropriate oversight by the

Reorganized Revstone Board as to Reorganized Revstone, including, without limitation, the

powers and authority of the Chief Restructuring Officer to do the following without further

order, Court approval or notice unless expressly required otherwise under the Plan:  (i) manage,

withdraw, and administer funds of the Reorganized Debtors, cause to have distributions made

pursuant to the Plan, and incur obligations for expenses in connection with the management and

liquidation of the Reorganized Debtors' assets (except as to distributions to Holders of Allowed

General Unsecured Claims against Revstone); (ii) market and negotiate, enter into and perform

agreements for the sale or other disposition of the Reorganized Debtors' or their subsidiaries'

assets, including the dissolution of any subsidiaries; (iii) engage professionals, employees and

other agents (including current general bankruptcy counsel to the Debtor) to assist the Chief

Restructuring Officer with respect to his or her responsibilities; (iv) on behalf of the Reorganized

Debtors, prosecute, compromise and/or settle claims and causes of action and objections to

Claims (excluding the Revstone/Spara Litigation Trust Assets and General Unsecured Claims

against Revstone); (v) address general business issues involving the Reorganized Debtors,

including tax filings and post-Effective Date reporting with the Bankruptcy Court; (vi) execute

any documents relating to the foregoing on behalf of the Reorganized Debtors; and (vii) exercise

such other powers and authority as may be necessary and proper to carry out the provisions of

the Plan (provided that such other powers and authority are not inconsistent with the Plan).  The

Reorganized Debtor Operating Agreements shall not be modified or amended in any manner that

is inconsistent with the duties of the Chief Restructuring Officer set forth above.

Subject to the oversight of the Reorganized Revstone Board as to Reorganized

Revstone, as set forth in the Plan, the Chief Restructuring Officer shall administer the assets of

the Reorganized Debtors and determine whether to pursue or not to pursue any objections to

Claims, as he or she determines is in the best interests of the Creditors of the Reorganized

Debtors and consistent with the purposes of the Plan, and shall have no liability for the outcome

of his/her decisions, other than those decisions constituting gross negligence or willful

misconduct.  Any determination by the Chief Restructuring Officer as to what actions are in the

best interests of the Reorganized Debtors shall be conclusive.

## H.      <u>Source of Funding</u>

The source of all distributions and payments under this Plan shall be the

Distributable Assets and the proceeds thereof, including, without limitation, each Debtor's Cash

on hand and proceeds from the sale or other disposition of the remaining property of the Debtors

and their non-Debtor subsidiaries and prosecution of Retained Rights of Action, as set forth in the PBGC Funding Schedule and subject to the terms of the PBGC Settlement Agreement.

## I.      **Retained Rights of Action of the Debtors**

Unless a Right of Action of the Debtors (including the right to object to any Claim asserted against the Estate) is, in writing, expressly waived, relinquished, released, assigned, compromised, or settled in the Plan, or in a Final Order, all rights of the Estates from and after the Effective Date with respect to the Retained Rights of Action are expressly preserved for the benefit of, assigned to, and fully vested in, the applicable Reorganized Debtor or, as to the Revstone/Spara Litigation Trust Assets, the Revstone/Spara Litigation Trust.

Each Reorganized Debtor and, solely as to the Revstone/Spara Litigation Trust Assets, the Revstone/Spara Litigation Trustee shall have standing as the representative of such Debtor's Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to pursue, or decline to pursue, the Retained Rights of Action and objections to Claims, as appropriate, in the business judgment of such Debtor or Revstone/Spara Litigation Trustee, as applicable.  Each Reorganized Debtor or the Revstone/Spara Litigation Trustee, as applicable, may settle, release, sell, assign, otherwise transfer, or compromise, Retained Rights of Action and/or objections to Claims without need for notice or order of the Bankruptcy Court, provided that (i) Reorganized Revstone shall provide at least five (5) business days' written notice to the Revstone/Spara Litigation Trustee with regard to any compromise or settlement of:  (a) an Administrative Expense asserted against Revstone, if such Claim exceeds $250,000 in value (after accounting for any applicable defenses) or amount asserted, or (b) any Claim asserted by a George

48

Hofmeister Party; and (ii) in the event that the Revstone/Spara Litigation Trustee informs

Reorganized Revstone that it disagrees with any such compromise or settlement within such

period, and the Revstone/Spara Litigation Trustee and Reorganized Revstone are unable to reach

an agreement with respect to such compromise or settlement, then Reorganized Revstone shall

present such dispute to the Bankruptcy Court for resolution on at least five (5) business days'

notice and an opportunity to object to the Revstone/Spara Litigation Trustee.

**J.**     **Establishment of Revstone/Spara Litigation Trust and Vesting of Revstone/Spara Litigation Trust Assets**

On the Effective Date, each of Revstone and Spara shall take any and all actions

as may be necessary or appropriate to establish the Revstone/Spara Litigation Trust and to cause

the transfer and assignment of Revstone's and Spara's Retained Rights of Action, the Relevant

Books and Records, and a Cash reserve for Plan Expenses of the Revstone/Spara Litigation Trust

in an amount up to $1,000,000, as set forth in the definition of "Plan Expenses" herein and

subject to the terms of the PBGC Settlement Agreement, which together shall constitute the

initial Revstone/Spara Litigation Trust Assets.  Upon the Effective Date, the Revstone/Spara

Litigation Trust shall be vested with all right, title and interest in the Revstone/Spara Litigation

Trust Assets, and such property shall become the property of the Revstone/Spara Litigation Trust

free and clear of all Claims, Liens, charges, other encumbrances and interests, subject only to the

rights, in instances described in Article VI.M.5 below and the Revstone/Spara Litigation Trust

Agreement, of the Chief Restructuring Officer of Reorganized Spara consistent with the terms of

the Plan, the PBGC Settlement Agreement, and the Revstone/Spara Litigation Trust Agreement.

DOCS_SF:84821.10 73864/001

It is intended that the Revstone/Spara Litigation Trust qualify as a liquidating trust for federal income tax purposes.

The sole beneficiaries of the Revstone/Spara Litigation Trust shall be Reorganized Revstone, Reorganized Spara, and Holders of Allowed PBGC Claims under the Plan. Consistent with the PBGC Settlement Agreement, Reorganized Revstone and Reorganized Spara shall be entitled to one-half of the Revstone/Spara Litigation Trust Interests and the Holders of the PBGC Claims shall be entitled to the other one-half of the Revstone/Spara Litigation Trust Interests; provided, however that, pursuant to the PBGC Settlement Agreement, the first $2,000,000 of litigation proceeds realized by the Revstone/Spara Litigation Trust and otherwise allocable to Holders of the PBGC Claims shall be distributed to Reorganized Revstone and made available to Holders of Allowed General Unsecured Claims against Revstone (excluding BFG) and Holders of Allowed Administrative Expenses against Revstone in accordance with, and subject to the terms of, the PBGC Settlement Agreement. Any remaining litigation proceeds realized by the Revstone/Spara Litigation Trust shall be divided one-half to Reorganized Revstone and Reorganized Spara and one-half to the Holders of Allowed PBGC Claims, consistent with the division of the Revstone/Spara Litigation Trust Interests set forth herein and subject to the terms of the PBGC Settlement Agreement. As between Reorganized Revstone and Reorganized Spara, the Revstone/Spara Litigation Trust Interests shall be allocated ninety percent (90%) to Reorganized Revstone and ten percent (10%) to Reorganized Spara, provided that the first $250,000 of the proceeds of the Revstone/Spara Litigation Trust payable to Reorganized Revstone shall be distributed to Reorganized Spara.

For federal income tax purposes, the beneficiaries of the Revstone/Spara Litigation Trust shall be treated as the grantors of the Revstone/Spara Litigation Trust and deemed to be the owners of the assets of the Revstone/Spara Litigation Trust, and the transfer of the Revstone/Spara Litigation Trust Assets to the Revstone/Spara Litigation Trust shall be deemed a transfer to such beneficiaries by Revstone followed by a deemed transfer by such beneficiaries to the Revstone/Spara Litigation Trust.

**K.**     **Purpose of Revstone/Spara Litigation Trust**

The Revstone/Spara Litigation Trust shall be established for the primary purpose of prosecuting or otherwise liquidating and distributing the Revstone/Spara Litigation Trust Assets in accordance with Treasury Regulation section 301.7701-4(d).  In particular, this includes:  (i) reviewing and reconciling, including where appropriate objecting to, any General Unsecured Claims of Holders of Claims against Revstone, unless otherwise agreed by Reorganized Revstone and the Revstone/Spara Litigation Trust, (ii) reviewing, litigating, settling, dismissing or releasing Revstone's and Spara's Retained Rights of Action; and (iii) distributing the proceeds of any of Revstone's and Spara's Retained Rights of Action and any other Revstone/Spara Litigation Trust Assets in accordance with the Plan and the terms of the PBGC Settlement Agreement and the Revstone/Spara Litigation Trust Agreement.

The Revstone/Spara Litigation Trust shall have no objective to continue or engage in the conduct of a trade or business and shall not be deemed a successor-in-interest of either Revstone or Spara or their respective Estates for any purpose other than as specifically set forth herein.

**L.**     **Funding of Revstone/Spara Litigation Trust**

On the Effective Date, Revstone and Spara shall fund the Revstone/Spara Litigation Trust in the amount of up to $1,000,000, as set forth in the PBGC Settlement Agreement and the PBGC Funding Schedule, to be used on account of Plan Expenses of the Revstone/Spara Litigation Trust.  To the extent any portion of such funding is not used to pay the Plan Expenses of the Revstone/Spara Litigation Trust, such unused portion shall be distributed to Reorganized Revstone.  To the extent expenses of the Revstone/Spara Litigation Trust exceed $1,000,000, additional reserves for Plan Expenses as to the Revstone/Spara Litigation Trust may be created out of the Revstone/Spara Litigation Trust Assets otherwise available for distribution to Holders of Allowed General Unsecured Claims (through Reorganized Revstone and Reorganized Spara) and Holders of Allowed PBGC Claims in the discretion of the Revstone/Spara Litigation Trustee, upon approval of the Revstone/Spara Litigation Trust Committee, the Chief Restructuring Officer of Reorganized Spara, and the PBGC.

**M.**     **Revstone/Spara Litigation Trustee**

**1.**     **Generally**

The initial Revstone/Spara Litigation Trustee shall be selected prior to the Confirmation Hearing by the Persons who will be appointed as members of the Revstone/Spara Litigation Trust Committee.  Any successor Revstone/Spara Litigation Trustee shall be appointed pursuant to the Revstone/Spara Litigation Trust Agreement.  On the Effective Date and subject to the oversight of the Revstone/Spara Litigation Trust Committee, the Revstone/Spara Litigation Trustee shall be the sole authorized representative and signatory of the

52

Revstone/Spara Litigation Trust, with authority to render any and all services necessary to effectuate the terms of the Plan as they relate to the Revstone/Spara Litigation Trust.  From and after the Effective Date, the Revstone/Spara Litigation Trustee shall be deemed to have been appointed as the representative of Revstone's and Spara's Estates by the Bankruptcy Court pursuant to section 1123(b)(3)(B) of the Bankruptcy Code for purposes of the Revstone/Spara Litigation Trust Assets, specifically including Revstone's and Spara's Retained Rights of Action. The powers, authority, responsibilities, and duties of the Revstone/Spara Litigation Trustee shall be governed by the Plan, the Confirmation Order, and the Revstone/Spara Litigation Trust Agreement.  The Revstone/Spara Litigation Trustee may execute, deliver, file, or record such documents, instruments, releases and other agreements, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan as they relate to the Revstone/Spara Litigation Trust.

### 2.    <u>Responsibilities and Authority of Revstone/Spara Litigation Trustee</u>

The responsibilities and authority of the Revstone/Spara Litigation Trustee shall include (a) calculating and implementing all distributions from the Revstone/Spara Litigation Trust in accordance with the Plan; (b) filing all required tax returns and paying taxes and all other obligations on behalf of the Revstone/Spara Litigation Trust from funds held by the Revstone/Spara Litigation Trust; (c) periodic reporting to the beneficiaries of the Revstone/Spara Litigation Trust, including the Chief Restructuring Officer of Reorganized Spara, as frequently as the Revstone/Spara Litigation Trustee reasonably believes is appropriate; (d) distributing the assets of the Revstone/Spara Litigation Trust in accordance with the provisions of the Plan; (e)

retaining and paying at normal and customary rates (or on a contingency fee basis) professionals in connection with the Revstone/Spara Litigation Trustee's duties; (f) paying the reasonable expenses of the members of the Revstone/Spara Litigation Trust Committee, in accordance with the provisions of the Plan and the Revstone/Spara Litigation Trust Agreement; (g) reconciling and, if appropriate, objecting to General Unsecured Claims against Revstone, with authority to settle any objections; (h) analyzing Revstone's and Spara's Retained Rights of Action and deciding whether to abandon, pursue, litigate, or settle such claims; and (i) such other responsibilities as may be vested in the Revstone/Spara Litigation Trustee pursuant to the Plan, the Revstone/Spara Litigation Trust Agreement, or the Confirmation Order or as may be necessary and proper to carry out the provisions of the Plan.  The Revstone/Spara Litigation Trust, the Revstone/Spara Litigation Trustee, and the Revstone/Spara Litigation Trust Committee shall not be required to post a bond in favor of the United States.

### 3.      Powers of the Revstone/Spara Litigation Trustee

Subject to the oversight of the Revstone/Spara Litigation Trust Committee and, in instances described in Article VI.M.5 below and the Revstone/Spara Litigation Trust Agreement, the Chief Restructuring Officer of Reorganized Spara, as set forth in the Plan, the PBGC Settlement Agreement, and the Revstone/Spara Litigation Trust Agreement, the powers of the Revstone/Spara Litigation Trustee to administer the Revstone/Spara Litigation Trust shall, without any need for approval of the Bankruptcy Court in each of the following instances, include *inter alia*, (a) the power to invest Revstone/Spara Litigation Trust funds as permitted in the Revstone/Spara Litigation Trust Agreement, withdraw funds, make distributions and pay

54

taxes and other obligations owed by the Revstone/Spara Litigation Trust from funds held by the

Revstone/Spara Litigation Trustee in accordance with the Plan, the PBGC Settlement

Agreement, and the Revstone/Spara Litigation Trust Agreement, (b) the power to engage and

compensate, without prior Bankruptcy Court order or approval, employees and professionals to

assist the Revstone/Spara Litigation Trustee with respect to his or her responsibilities, (c) the

power to prosecute, compromise and settle Revstone's and Spara's Retained Rights of Action,

(d) the power to abandon, pursue, litigate, or settle any of Revstone's and Spara's Retained

Rights of Action, (e) the power to abandon or destroy any of the Relevant Books and Records (to

Reorganized Revstone or Reorganized Spara, as applicable) when they are no longer necessary

to administer the Revstone/Spara Litigation Trust, and (f) such other powers as may be vested in

or assumed by the Revstone/Spara Litigation Trustee pursuant to the Plan, the PBGC Settlement

Agreement, the Revstone/Spara Litigation Trust Agreement, order of the Bankruptcy Court, or as

may be necessary and proper to carry out the provisions of the Plan.  Subject to the oversight of

the Revstone/Spara Litigation Trust Committee and, in instances described in Article VI.M.5

below and the Revstone/Spara Litigation Trust Agreement, the Chief Restructuring Officer of

Reorganized Spara, as set forth in the Plan and the Revstone/Spara Litigation Trust Agreement,

the Revstone/Spara Litigation Trustee, on behalf of the Revstone/Spara Litigation Trust, shall

have absolute discretion to pursue or not to pursue any and all of Revstone's and Spara's

Retained Rights of Action and objections to Claims relating thereto, as he or she determines is in

the best interests of the beneficiaries and consistent with the purposes of the Revstone/Spara

Litigation Trust, and shall have no liability for the outcome of his/her decisions, other than those

decisions constituting gross negligence or willful misconduct.  Any determination by the

Revstone/Spara Litigation Trustee as to what actions are in the best interests of the

Revstone/Spara Litigation Trust shall be conclusive.

On the Revstone/Spara Litigation Trust, on the one hand, and Reorganized Revstone

and Reorganized Spara, on the other hand, shall coordinate with each other, to the extent

feasible, regarding the reconciliation of Claims.  For the avoidance of doubt, the Revstone/Spara

Litigation Trust shall be responsible for addressing any General Unsecured Claims asserted by

Creditors against Revstone, and Reorganized Revstone and Reorganized Spara shall be

responsible for addressing all remaining Claims against such Debtors, unless otherwise agreed

by the applicable Debtor and the Revstone/Spara Litigation Trust.

On and after the Effective Date, the Revstone/Spara Litigation Trustee, on behalf

of the Revstone/Spara Litigation Trust, shall have standing as the representative of Revstone's

and Spara's Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to commence and

prosecute any of Revstone's and Spara's Retained Rights of Action and/or objections to Claims

relating thereto on behalf of Revstone's and Spara's Estates without need for notice or order of

the Bankruptcy Court.

**4.      Compensation of Revstone/Spara Litigation Trustee and Professionals**

The Revstone/Spara Litigation Trustee shall serve on (i) the terms, conditions and

rights set forth in the Plan, the PBGC Settlement Agreement, the Confirmation Order and the

Revstone/Spara Litigation Trust Agreement, or (ii) such terms, conditions and rights as otherwise

agreed to by the Revstone/Spara Litigation Trustee and the Revstone/Spara Litigation Trust

56

Committee.  The compensation for the Revstone/Spara Litigation Trustee shall be set forth in the Revstone/Spara Litigation Trust Agreement or otherwise disclosed in a filing with the Bankruptcy Court.  The Revstone/Spara Litigation Trustee shall not be required to file a Fee Application to receive compensation, but the Revstone/Spara Litigation Trustee's fees shall be subject to the oversight of the Revstone/Spara Litigation Trust Committee.  The Revstone/Spara Litigation Trustee shall have the right to retain the services of attorneys, accountants, and other professionals and agents in the discretion of the Revstone/Spara Litigation Trustee to assist and advise the Revstone/Spara Litigation Trustee in the performance of his/her duties and compensate such professionals from the assets of the Revstone/Spara Litigation Trust, subject to the oversight of the Revstone/Spara Litigation Trust Committee and, in instances described in Article VI.M.5 below and the Revstone/Spara Litigation Trust Agreement, the Chief Restructuring Officer of Reorganized Spara.  Any professionals retained by the Revstone/Spara Litigation Trustee shall not be required to file a Fee Application to receive compensation.

### 5. Limitations on Revstone/Spara Litigation Trustee

The Revstone/Spara Litigation Trustee, in such capacity, shall not at any time:  (a) enter into or engage in any trade or business (other than the management and disposition of the Revstone/Spara Litigation Trust Assets), and no part of the Revstone/Spara Litigation Trust Assets or the proceeds, revenue or income therefrom shall be used or disposed of by the Revstone/Spara Litigation Trust in furtherance of any trade or business, or (b) except as provided below, reinvest any Revstone/Spara Litigation Trust Assets.

With regard to any sale, disposition, release, modification or waiver of existing rights as to an asset of the Revstone/Spara Litigation Trust or compromise or settlement of a controverted matter, if the asset or matter at issue exceeds $500,000 in value (after accounting for any applicable defenses) or amount asserted, the Revstone/Spara Litigation Trustee must consult with, and obtain approval from, the Revstone/Spara Litigation Trust Committee and the Chief Restructuring Officer of Reorganized Spara, with respect to any such transaction or, in the absence of such approval, an order of the Bankruptcy Court approving such transaction (*provided that* the Revstone/Spara Litigation Trust Committee and Chief Restructuring Officer of Reorganized Spara shall be deemed to have approved if such parties fail to object thereto in a writing received by the Revstone/Spara Litigation Trustee within five (5) business days following written notification by the Revstone/Spara Litigation Trustee of the intended transaction).

Other than as provided in the Plan, the PBGC Settlement Agreement, and the Revstone/Spara Litigation Trust Agreement, the Revstone/Spara Litigation Trustee is not empowered to incur indebtedness.

The Revstone/Spara Litigation Trustee may only invest funds held in the Revstone/Spara Litigation Trust consistent with the requirements of the Revstone/Spara Litigation Trust Agreement, the Bankruptcy Code or any order of the Bankruptcy Court modifying such requirements and, provided that the Revstone/Spara Litigation Trustee does so, he or she shall have no liability in the event of insolvency of any institution in which he or she has invested any funds of the Revstone/Spara Litigation Trust.  Notwithstanding the above, the

Revstone/Spara Litigation Trustee may only invest funds in the Revstone/Spara Litigation Trust in investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

The Revstone/Spara Litigation Trustee shall hold, collect, conserve, protect and administer the Revstone/Spara Litigation Trust in accordance with the provisions of the Plan, the PBGC Settlement Agreement, and the Revstone/Spara Litigation Trust Agreement, and pay and distribute amounts as set forth herein for the purposes set forth in the Plan, the PBGC Settlement Agreement, and the Revstone/Spara Litigation Trust Agreement.  Any determination by the Revstone/Spara Litigation Trustee as to what actions are in the best interests of the Revstone/Spara Litigation Trust shall be conclusive.

## N.    **Revstone/Spara Litigation Trust Committee**

### 1.    **Generally**

The Revstone/Spara Litigation Trust Committee shall be created on the Effective Date consistent with the terms of the Revstone/Spara Litigation Trust Agreement.  The Revstone/Spara Litigation Trust Committee shall consist of no more than three (3) Persons initially selected as follows:  one Person by the Creditors' Committee, one Person by the PBGC, and one Person appointed by mutual agreement of the Creditors' Committee and the PBGC; provided however, no George Hofmeister Party shall serve on the Revstone/Spara Litigation Trust Committee.  In the event that the Creditors' Committee and the PBGC are unable to agree upon the selection of the third member of the Revstone/Spara Litigation Trust Committee, the

59

Creditors' Committee and the PBGC shall each provide two names of their choice as the member and the Bankruptcy Court shall then select the third member from these four names.

## 2.   Duties of Revstone/Spara Litigation Trust Committee

The Revstone/Spara Litigation Trust Committee shall generally monitor the status and progress of the Revstone/Spara Litigation Trust and approve certain material transactions in accordance with Article VI.M.5 of the Plan.  The Revstone/Spara Litigation Trust Committee may meet and/or consult periodically with the Revstone/Spara Litigation Trustee and keep itself apprised of the affairs of the Revstone/Spara Litigation Trust.  As set forth in the Revstone/Spara Litigation Trust Agreement, each member of the Revstone/Spara Litigation Trust Committee shall exercise his/her best judgment, to the end that the affairs of the Revstone/Spara Litigation Trust shall be properly managed and the interests of all beneficiaries of the Revstone/Spara Litigation Trust are safeguarded; but each member of the Revstone/Spara Litigation Trust Committee shall not incur any responsibility or liability by reason of any error of law or of any matter or thing done or suffered or omitted to be done under the Revstone/Spara Litigation Agreement, unless such member of the Revstone/Spara Litigation Trust Committee has acted with recklessness, fraud or willful misconduct.

## 3.   Reimbursement of Expenses of Revstone/Spara Litigation Trust Committee

Members of the Revstone/Spara Litigation Trust Committee shall be entitled to reimbursement of reasonable and necessary expenses incurred in carrying out their duties as members of the Revstone/Spara Litigation Trust Committee, all of which shall be paid from the Revstone/Spara Litigation Trust.  In addition, members of the Revstone/Spara Litigation Trust

Committee shall be entitled to compensation, also payable from the Revstone/Spara Litigation Trust, for time spent on the Revstone/Spara Litigation Trust Committee in an amount up to $400 per hour (not to exceed $15,000 per year per member), but shall not be reimbursed for any fees or expenses of any professional retained by an individual member of the Revstone/Spara Litigation Trust Committee.  The Revstone/Spara Litigation Trust shall provide an indemnity to members of the Revstone/Spara Litigation Trust Committee for all suits, demands, actions, claims, losses and liabilities such members may suffer or incur other than to the extent arising from such member's willful misconduct or gross negligence.

**O.**     **Interests in Affiliates and Subsidiaries**

As of the Effective Date, except as expressly provided in the Plan or by separate order of the Bankruptcy Court, each Reorganized Debtor shall retain any stock or interests that it may hold in its non-Debtor affiliates or subsidiaries and retain any rights to which such stock or interests may be entitled under applicable law with respect to such shares or other interests. After the Effective Date, the Reorganized Debtors may sell, transfer, assign or otherwise dispose of such shares or interests as permitted by applicable law.

**P.**     **Payment of Plan Expenses**

Each Reorganized Debtor and the Revstone/Spara Litigation Trust, as applicable, may pay all reasonable Plan Expenses without further notice to Creditors or Holders of Interests or approval of the Bankruptcy Court.

**Q.      Dissolution of Creditors' Committee**

As of the Effective Date, the Creditors' Committee shall be dissolved. Notwithstanding such dissolution, the Creditors' Committee's professionals may seek payment of any unpaid Administrative Expenses pursuant to the Plan.

**R.      Final Decree**

At any time following the Effective Date, each Reorganized Debtor shall be authorized to file a motion for the entry of a final decree closing its Chapter 11 Case pursuant to section 350 of the Bankruptcy Code.

<div align="center">

**VII.**

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

</div>

**A.      Rejection of Executory Contracts and Unexpired Leases**

Except for any executory contracts or unexpired leases:  (i) that previously were assumed or rejected by an order of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code; (ii) that are listed for assumption by the Debtors as of the Effective Date in a Plan Supplement to be filed and served on affected non-Debtor counterparties; (iii) as to which a motion for approval of the assumption or rejection of such contract or lease has been Filed and served prior to the Effective Date; (iv) that constitute contracts of insurance in favor of, or that benefit, the Debtors or the Estates; or (v) that were previously sold, conveyed or otherwise assigned pursuant to Final Order, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to section 365 of the Bankruptcy Code as of the

<div align="center">62</div>

Effective Date.  Without limiting the foregoing, the indemnification obligations in favor of the Debtors' Independent Managers and applicable Huron Parties shall be assumed as of the Effective Date and shall constitute obligations of the Reorganized Debtors.  All other pre-Effective Date indemnification obligations of the Debtors shall be deemed rejected as of the Effective Date to the extent that such obligations are contained in executory contracts within the meaning of section 365 of the Bankruptcy Code, but only to the extent not inconsistent with any existing insurance obligations.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions or rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

## B.    <u>Bar Date for Rejection Damages</u>

If the rejection of an executory contract or unexpired lease pursuant to the Plan or otherwise gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors or the Estates unless a proof of Claim is Filed and served on the Debtors and their counsel within thirty (30) days after the earlier of (a) Effective Date or (b) service of a notice that the executory contract or unexpired lease has been rejected.  All such Claims for which proofs of Claim are required to be Filed, if Allowed, will be, and will be treated as, General Unsecured Claims, subject to the provisions of the Plan.

# VIII.

## DISTRIBUTIONS AND RELATED MATTERS

A.      **Dates of Distribution**

The sections of the Plan on treatment of Administrative Expenses, Claims, and Interests specify the times for distributions.  Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, by the applicable Reorganized Debtor (or its agent) on the immediately following Business Day.  Distributions due on the Effective Date will be paid on such date or as soon as practicable thereafter, provided that if other provisions of the Plan require the surrender of securities or establish other conditions precedent to receiving a distribution, the distribution may be delayed until such surrender occurs or conditions are satisfied.

If, under the terms of the Plan, the resolution of a particular Disputed Claim (*e.g.*, it is Disallowed) entitles other Holders of Claims to a further distribution, either (a) the Reorganized Debtors may make such further distribution as soon as practicable after the resolution of the Disputed Claim or (b) if the further distribution is determined in good faith by the Reorganized Debtors to be less than $100 for any Creditor, then, in order to afford an opportunity to minimize costs and aggregate such distributions, the Reorganized Debtors may make such further distribution any time or with the next distribution, in the discretion of the Reorganized Debtors.

**B.**  **Cash Distributions**

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable, except that Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**C.**  **Rounding of Payments**

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.  To the extent Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as "Unclaimed Property" under the Plan.

**D.**  **Disputed Claims**

Notwithstanding all references in the Plan to Claims that are Allowed, solely for the purpose of calculating the amount or number of distributions to be made on account of Allowed Claims or Allowed Administrative Expenses under the Plan, such calculations shall be made as if each Disputed Claim were an Allowed Claim or Allowed Administrative Expense, except that if the Bankruptcy Court estimates the likely portion of a Disputed Claim to be Allowed or authorized or otherwise determines the amount or number which would constitute a sufficient reserve for a Disputed Claim (which estimates and determinations may be requested by the Reorganized Debtors or the Revstone/Spara Litigation Trustee, as applicable), such amount

or number as determined by the Bankruptcy Court shall be used for calculations as to such Disputed Claim.

All distributions due in respect of a Disputed Claim shall be held and not made pending resolution of the Disputed Claim.

If an objection to a Disputed Claim is withdrawn, resolved by agreement, or determined by Final Order, the distributions due on account of any resulting Allowed Claim or Allowed Administrative Expense shall be made by the Reorganized Debtors.  No interest shall be due to a Holder of a Disputed Claim based on the delay attendant to determining the allowance of such Claim, Interest or Administrative Expense.

**E.**    **Undeliverable and Unclaimed Distributions**

If any distribution under the Plan is returned to the Reorganized Debtors as undeliverable or the check or other similar instrument or distribution by the Reorganized Debtors remains uncashed or unclaimed, as applicable, for ninety (90) days, such Cash shall be deemed to be Unclaimed Property.  Upon property becoming Unclaimed Property, it immediately shall be revested in the Reorganized Debtors.

Once there becomes Unclaimed Property for a Holder, no subsequent distributions for such Holder which may otherwise be due under the Plan will accrue or be held for such Holder, provided that, if the applicable agent is notified in writing of such Holder's then-current address and status as a Holder under the Plan, thereafter, the Holder will become entitled to its share of distributions, if any, which first become due after such notification.

**F.**    **Compliance with Tax Requirements**

The Reorganized Debtors and the Revstone/Spara Litigation Trust, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state or local taxing authorities in connection with making distributions pursuant to the Plan.

In connection with each distribution with respect to which the filing of an information return (such as an IRS Form 1099 or 1042) or withholding is required, the Reorganized Debtors and the Revstone/Spara Litigation Trust, as applicable, shall file such information return with the IRS and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law.

**G.**    **Record Date in Respect to Distributions**

Except as set forth below, the record date and time for the purpose of determining which Persons are entitled to receive any and all distributions on account of any Allowed Claims or Interests, irrespective of the date of or number of distributions, shall be the same as the Record Date.

**H.**    **Reserves**

In making any distributions in respect of Claims under this Plan, the Reorganized Debtors shall reserve an appropriate and adequate amount of Cash on account of any unresolved Disputed Claims.  The Reorganized Debtors shall make a corrective distribution following the successful resolution of any Disputed Claim on the next regularly scheduled distribution date.

# IX.

## LITIGATION, OBJECTIONS TO CLAIMS, AND DETERMINATION OF TAXES

### A.    Litigation; Objections to Claims; Objection Deadline

Except as may be expressly provided otherwise in the Plan, from and after the Effective Date, the Reorganized Debtors and the Revstone/Spara Litigation Trust, as applicable, shall be responsible for pursuing Retained Rights of Action, any objection to the allowance of any Claim, and the determination of Tax issues and liabilities.

From and after the Effective Date, the Reorganized Debtors and the Revstone/Spara Litigation Trust, as applicable, shall have exclusive authority to file objections, settle, compromise, withdraw or litigate to judgment objections to Claims; provided, however, parties in interest may file objections to Claims to the extent permitted by Bankruptcy Code section 502(a).  Unless another date is established by the Bankruptcy Court *sua sponte* (which may so act without notice or hearing) or is established by other provisions of the Plan, any objection to a Claim or Interest shall be filed with the Bankruptcy Court and served on the Person holding such Claim or Interest within one hundred eighty (180) days after the Effective Date (as may be extended pursuant to this section, the "Objection Deadline"), provided that the Reorganized Debtors and the Revstone/Spara Litigation Trust, as applicable, may seek extension(s) thereof subject to Bankruptcy Court approval and with notice only to parties that have requested such notice pursuant to Bankruptcy Rule 2002.

In addition to any other available remedies or procedures with respect to Tax issues or liabilities or rights to Tax refunds, the Reorganized Debtors may utilize (and receive the

68

benefits of) section 505 of the Bankruptcy Code with respect to: (1) any Tax issue or liability or right to a Tax refund relating to an act or event occurring prior to the Effective Date; or (2) any Tax liability or right to a Tax refund arising prior to the Effective Date.  If the Reorganized Debtors utilize section 505(b) of the Bankruptcy Code: (1) the Bankruptcy Court shall determine the amount of the subject Tax liability or right to a Tax refund in the event that the appropriate governmental entity timely determines a Tax to be due in excess of the amount indicated on the subject return; and (2) if the prerequisites are met for obtaining a discharge of Tax liability in accordance with section 505(b) of the Bankruptcy Code, the Reorganized Debtors shall be entitled to such discharge which shall apply to any and all Taxes relating to the period covered by such return.

**B.**     **Temporary or Permanent Resolution of Disputed Claims**

The Reorganized Debtors or the Revstone/Spara Litigation Trustee, as applicable, may request, at any time prior to the Effective Date or on and after the Effective Date, that the Bankruptcy Court estimate any contingent or unliquidated Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, irrespective of whether any party has previously objected to such Disputed Claim.  The Bankruptcy Court will retain jurisdiction to estimate any contingent or unliquidated Disputed Claim at any time during litigation concerning any objection to the Disputed Claim.  If the Bankruptcy Court estimates any contingent or unliquidated Disputed Claim, that estimated amount would constitute either the Allowed amount of such Disputed Claim or a maximum limitation on such Disputed Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Disputed Claim, the

Reorganized Debtors or the Revstone/Spara Litigation Trustee, as applicable, may elect from and after the Effective Date to pursue any supplemental proceedings to object to any ultimate payment on account of such Disputed Claim against the Debtors.

In addition, the Reorganized Debtors or the Revstone/Spara Litigation Trustee, as applicable, may resolve or adjudicate any Disputed Claim from and after the Effective Date in the manner in which the amount of such Claim, Interest or Administrative Expense and the rights of the Holder of such Claim, Interest or Administrative Expense would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced. All of the aforementioned objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

**C.      Setoffs**

The Reorganized Debtors and the Revstone/Spara Litigation Trust as applicable may, but shall not be required to, setoff against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against the Holder of such Claim; provided, however, neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors or the Revstone/Spara Litigation Trust of any such claim that the Reorganized Debtors or the Revstone/Spara Litigation Trust may have against such Holder, unless otherwise agreed to in writing by such Holder and the Reorganized Debtors or the Revstone/Spara Litigation Trust as applicable.

**D.**    **Preservation of Retained Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable, and each of their successors or assigns will retain and may exclusively enforce any Retained Rights of Action and the Confirmation Order shall be deemed a *res judicata* determination of such rights to retain and exclusively enforce such Retained Rights of Action.  Absent such express waiver or release, the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable, and each of their successors or assigns shall have standing as the representatives of the Debtors' Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to pursue Retained Rights of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable (or each of their successors or assigns).  The Retained Rights of Action may be asserted or prosecuted before or after solicitation of votes on the Plan or before or after the Effective Date.

Absent an express waiver or release set forth in the Plan (including, for the avoidance of doubt, pursuant to Article X hereof), nothing in the Plan shall (or is intended to) prevent, estop or be deemed to preclude the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable, from utilizing, pursuing, prosecuting or otherwise acting upon all or any of their Retained Rights of Action and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Rights of Action upon or after Confirmation or Consummation.

DOCS_SF:84821.10 73864/001

## X.

## RELEASES, INJUNCTIONS AND EXCULPATION PROVISIONS

A.    **Injunctions**

    1.    **Generally**

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions and stays provided for in the Chapter 11 Cases pursuant to sections 105 and 362 of the Bankruptcy Code or otherwise in effect on the Confirmation Date, shall remain in full force and effect until the Effective Date.  From and after the Effective Date, all Persons are permanently enjoined from, and restrained against, commencing or continuing in any court any suit, action or other proceeding, or otherwise asserting any claim or interest, seeking to hold (i) the Reorganized Debtors, their Estates, the Revstone/Spara Litigation Trust, or (ii) the property of the Debtors, their Estates, the Revstone/Spara Litigation Trust, liable for any Claim, obligation, right, interest, debt or liability that has been released pursuant to the Plan.

    2.    **Injunction Related to Rights of Action and Claims, Administrative Expenses and Interests**

*Except as provided in the Plan or in the Confirmation Order, as of the Confirmation Date, all Entities that have held, currently hold or may hold a Claim, Administrative Expense, Interest or other debt or liability against or in the Debtors  are permanently enjoined from taking any of the following actions against property of the Debtors, their Estates, the Revstone/Spara Litigation Trust, or the Reorganized Debtors on account of all or such portion of any such Claims, Administrative Expenses, Interests, debts or liabilities:  (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b)*

*enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or*

*order, (c) creating, perfecting or enforcing any lien or encumbrance; and (d) commencing or*

*continuing, in any manner or in any place, any action that does not comply with or is*

*inconsistent with the provisions of the Plan.*

## B.    Discharge of the Debtors

Except as otherwise provided in the Plan or in the Confirmation Order, rights

afforded in, and all consideration distributed under, this Plan shall be in exchange for, and in

complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever

against the Debtors or any of their assets or properties.  Upon the Effective Date, the Debtors

shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code

from any and all Claims, including, without limitation, demands and liabilities that arose before

the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of

the Bankruptcy Code, whether or not (a) a Claim based upon such debt is Allowed under section

501 of the Bankruptcy Code, or (b) a Claim based upon such debt is Allowed under section 502

of the Bankruptcy Code, or (c) the Holder of a Claim based upon such debt accepted this Plan.

## C.    Exculpation

As of and subject to the occurrence of the Effective Date, for good and valuable

consideration, including the consideration provided under the Plan, (i) the Debtors, (ii) the

Debtors' independent managers, Messrs. James B. Shein and Richard E. Newsted (solely in their

respective capacity as managers of the Debtors, including in their respective role as the members

of the Restructuring Committee) (the "Independent Managers"), (iii) the Debtors' postpetition

73

attorneys and other professionals retained with the approval of the Bankruptcy Court (solely in their respective capacity as professionals of the Debtors) (the "Debtor Retained Professionals"), (iv) the attorneys and professionals retained by the Restructuring Committee (solely in their capacity as such), (v) the Huron Parties (solely with respect to services rendered for the Debtors, including as officers, representatives, professionals for, and/or agent of the Debtors), (vi) the former and current members of the Creditors' Committee (solely acting in such capacity), (vii) the Creditors' Committee's attorneys and other Professional Persons (solely acting in the capacity as professionals of the Creditors' Committee), (viii) BFG, (ix) PBGC, and (x) the respective successors or assigns of the foregoing parties, shall neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken, on or after the Petition Date, in connection with, or related to, the formulation, preparation, dissemination, implementation, administration, Confirmation or Consummation of the Plan or any contract, instrument, waiver, release or other agreement or document created or entered into, in connection with the Plan, or any other act taken or omitted to be taken in connection with the Chapter 11 Cases up to and including the Effective Date; provided, however, that the foregoing provisions of this subsection shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud.  For the avoidance of doubt, the scope of the exculpation provided under this Article X.C does not cover:  (i) Mayer Brown LLP, (ii) Richards Layton & Finger LLP, (iii) MPI Products LLC, Monomoy Capital Partners, Monomoy Capital Partners II, LP, or any of their respective affiliates or successors, or (iv) any of the George Hofmeister Parties or the

74

former and current officers, managers or representatives of the Debtors (other than the

Independent Managers, the Debtor Retained Professionals, the attorneys and professionals

retained by the Restructuring Committee, and the Huron Parties expressly exculpated above).

**D.      Debtors' Release of CRO, Independent Managers, Creditors' Committee and Other Parties**

As of and subject to the occurrence of the Effective Date, for good and valuable

consideration, the Debtors, for themselves and the Estates, hereby irrevocably, unconditionally

and generally release (i) the Independent Managers, (ii) the Debtor Retained Professionals, (iii)

the attorneys and professionals retained by the Restructuring Committee (solely in their capacity

as such), (iv) the Huron Parties (solely with respect to services rendered for the Debtors,

including as officers, representatives, professionals for, and/or agent of the Debtors), (v) the

former and current members of the Creditors' Committee (solely acting in such capacity), (vi)

the Creditors' Committee's attorneys and other Professional Persons (solely acting in the

capacity as professionals of the Creditors' Committee), (vii) BFG, (viii) PBGC, and (ix) the

respective successors or assigns of the foregoing parties (collectively, the "Released Parties"),

from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities,

whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or

contingent, matured or unmatured, in law or equity or otherwise, based on or relating to in any

way the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement, other than claims

or liabilities arising out of or relating to any act or omission of the Released Parties that

constitutes willful misconduct, gross negligence or fraud; provided that such released claims,

obligations, rights, suits, damages, causes of action, and liabilities relate to (a) acts or omissions

on or after the Petition Date and prior to the Effective Date or (b) prepetition acts or omissions relating to the commencement of the Chapter 11 Cases; provided further that the foregoing release shall be without prejudice to any objections to claims, including counter-claims or setoffs, relating to Claims asserted by any of the Released Parties against the Debtors that the Debtors or the Reorganized Debtors may assert against the Released Parties. For the avoidance of doubt, the scope of the release provided under this Article X.D does not cover: (i) Mayer Brown LLP, (ii) Richards Layton & Finger LLP, (iii) MPI Products LLC, Monomoy Capital Partners, Monomoy Capital Partners II, LP, or any of their respective affiliates or successors, or (iv) any of the George Hofmeister Parties or the former and current officers, managers or representatives of the Debtors (other than the Independent Managers, the Debtor Retained Professionals, the attorneys and professionals retained by the Restructuring Committee, and the Huron Parties expressly released above).

**E.    Release by Creditors**

**As of and subject to the occurrence of the Effective Date, for good and valuable consideration, each holder of a Claim (the "Creditor-Releasors"), for itself and its respective present or former officers, directors, managers, shareholders, trustees, partners and partnerships, members, agents, employees, representatives, attorneys, accountants, professionals, and successors or assigns, in each case solely in their capacity as such, shall be deemed to have completely, conclusively, unconditionally and irrevocably released (i) the Debtors, (ii) the Estates, (iii) the Independent Managers, (iv) the Debtor Retained Professionals, (v) the attorneys and professionals retained by the Restructuring Committee**

76

(solely in their capacity as such), (vi) the Huron Parties (solely with respect to services rendered for the Debtors, including as officers, representatives, professionals for, and/or agent of the Debtors), (vii) the former and current members of the Creditors' Committee (solely acting in such capacity), (viii) the Creditors' Committee's attorneys and other Professional Persons (solely acting in the capacity as professionals of the Creditors' Committee), (ix) BFG, (x) PBGC, and (xi) the respective successors or assigns of the foregoing parties (the "<u>Released Estate Parties</u>"), from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, in law or equity or otherwise, based on or relating to in any way the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement, arising prior to the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of the Released Estate Parties that constitutes willful misconduct or gross negligence; provided, however, the foregoing shall not constitute a waiver or release of any right of the Holder of an Allowed Claim to payment under the Plan on account of such Allowed Claim.  For the avoidance of doubt, the Released Estate Parties do not include:  (i) Mayer Brown LLP, (ii) Richards Layton & Finger LLP, (iii) MPI Products LLC, Monomoy Capital Partners, Monomoy Capital Partners II, LP, or any of their respective affiliates or successors, or (iv) any of the George Hofmeister Parties or the former and current officers, managers or representatives of the Debtors (other than the Independent Managers, the Debtor Retained

**Professionals, the attorneys and professionals retained by the Restructuring Committee, and the Huron Parties expressly released above).**

**F.      Release by Debtors' Non-Debtor Affiliates of the Restructuring Committee**

**Except as otherwise specifically provided in the Plan, for good and valuable consideration, as of the Effective Date, all of the non-debtor, direct or indirect corporate subsidiaries of the Debtors (the "Releasor Affiliates") shall conclusively, absolutely, unconditionally, irrevocably and forever release and discharge the Released Estate Parties from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities whatsoever, arising prior to the Effective Date and directly or indirectly arising from or relating to, in whole or in part, the Debtors and/or the Chapter 11 Cases. For the avoidance of doubt, the Releasor Affiliates do not include TPOP, LLC f/k/a Metavation, LLC.**

## NO REGULATED RATE CHANGE WITHOUT GOVERNMENT APPROVAL

The Debtors do not charge any rates for purposes of section 1129(a)(6) that are regulated by any governmental regulatory commission with jurisdiction under applicable non-bankruptcy law.

## XII.

## EXEMPTION FROM CERTAIN TRANSFER TAXES

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers by the Debtors pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance

fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar Tax or governmental assessment.

## XIII.

## RETENTION OF JURISDICTION AND MISCELLANEOUS MATTERS

### A.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and any of the proceedings related to the Chapter 11 Cases pursuant to section 1142 of the Bankruptcy Code and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the purpose and intent of the Plan are carried out.  Without limiting the generality of the foregoing, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(1)    establish the priority or secured or unsecured status of, allow, disallow, determine, liquidate, classify, or estimate any Claim, Administrative Expense or Interest (including, without limitation and by example only, determination of Tax issues or liabilities in accordance with section 505 of the Bankruptcy Code), resolve any objections to the allowance or priority of Claims, Administrative Expenses or Interests, or resolve any dispute as to the treatment necessary to reinstate a Claim, Administrative Expense or Interest pursuant to the Plan;

(2)    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(3)    resolve any matters related to the rejection of any executory contract or unexpired lease to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims or Administrative Expenses arising therefrom;

(4)    ensure that distributions to Holders of Allowed Claims, Administrative Expenses or Interests are made pursuant to the provisions of the Plan, and to effectuate performance of the provisions of the Plan;

(5)    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending before the Effective Date or that may be commenced thereafter as provided in the Plan;

(6)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Confirmation Order or in the Plan, including, without limitation, any stay orders as may be appropriate in the event that the Confirmation Order is for any reason reversed, stayed, revoked, modified, supplemented or amended;

(7)    resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Confirmation Order;

(8)    subject to the restrictions on modifications provided in any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

(9)    issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan or the Confirmation Order,

(10)    consider and act on the compromise and settlement of any Claim against, or Retained Right of Action of the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable;

(11)     decide or resolve any Retained Rights of Action under the Bankruptcy Code;

(12)     enter such orders as may be necessary or appropriate in connection with the recovery of the assets of the Reorganized Debtors wherever located;

(13)     hear and decide any objections to Claims brought by the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable;

(14)     hear and decide any litigation brought by the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable;

(15)     hear and determine any motions or contested matters involving Tax Claims or Taxes either arising prior (or for periods including times prior) to the Effective Date or relating to the administration of the Chapter 11 Cases, including, without limitation (i) matters involving federal, state and local Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, (ii) matters concerning Tax refunds due for any period including times prior to the Effective Date, and (iii) any matters arising prior to the Effective Date affecting Tax attributes of the Debtors;

(16)     determine such other matters as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(17)     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings issued or entered in connection with the Chapter 11 Cases or the Plan;

(18)     remand to state court any claim, cause of action, or proceeding involving the Debtors that was removed to federal court, in whole or in part in reliance upon 28 U.S.C. § 1334;

(19)     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Plan;

(20)     determine any other matter not inconsistent with the Bankruptcy Code; and

(21)     enter an order or final decree concluding the Chapter 11 Cases.

**B.      Miscellaneous Matters**

      **1.      Headings**

The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

      **2.      Services by and Fees for Professionals and Certain Parties**

Notwithstanding any other provision herein, to the extent not previously paid, Professional Fee Claims shall be paid in accordance with the terms of the order(s) authorizing such payments as promptly as possible on the Effective Date for any outstanding amounts due as of the Effective Date, and as soon as practicable thereafter as such obligation to pay becomes due unless otherwise agreed upon by the applicable Professional.

In conjunction with the PBGC Settlement Agreement, certain Holders of Professional Fee Claims against Revstone and/or Spara have agreed to accept reduced recoveries out of available assets of each such Debtor in order to allow increased distributions to be made to Holders of Allowed General Unsecured Claims against Revstone and/or Spara in accordance with, and subject to the terms of, the PBGC Settlement Agreement.

Prior to or on the Effective Date, the Debtors shall establish an escrow account (the "Professional Fee Account") for the purpose of funding future payments on account of accrued and estimated Professional Fee Claims (estimated up to the Effective Date) that will not have been paid on the Effective Date as provided in the preceding paragraph, in an aggregate amount to be determined by the Debtors (in consultation with the Creditors' Committee) in their

82

business judgment.  From and after the Effective Date, the Professional Fee Account shall be

free and clear of all Liens and Claims and any other interests and encumbrances, and shall be

funded out of Net Distributable Assets in accordance with the terms of the PBGC Settlement

Agreement and consistent with the PBGC Funding Schedule.

From and after the Effective Date, the Reorganized Debtors or the Revstone/Spara

Litigation Trust, as applicable, shall in the ordinary course of business and without the necessity

for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professionals

thereafter incurred by the Reorganized Debtors or the Revstone/Spara Litigation Trust, as

applicable, provided that such payments shall be limited by the reserves for Plan Expenses

provided by this Plan and the PBGC Settlement Agreement.

### 3.  Bar Date for Administrative Expenses

Requests for payment of all Administrative Expenses, other than for those for

which a Bar Date was previously set or for which a request and/or proof of Claim has previously

been filed, must be Filed and served on the Reorganized Debtors and the United States Trustee

by no later than thirty (30) days after the Effective Date.  The Reorganized Debtors shall have

until one hundred eighty (180) days after the Effective Date to bring an objection to a Timely

Filed request for payment of an Administrative Expense (as may be extended pursuant to this

section, the "Administrative Expense Objection Deadline"), provided that the Reorganized

Debtors may seek extension(s) thereof subject to Bankruptcy Court approval and with notice

only to parties that have requested such notice pursuant to Bankruptcy Rule 2002.  Nothing in

the Plan shall prohibit the Reorganized Debtors from paying Administrative Expenses in the

ordinary course in accordance with applicable law during or after the Chapter 11 Cases, but after

the Effective Date, the Reorganized Debtors' obligation to pay an Administrative Expense will

depend upon the claimant's compliance with this section and such Administrative Expense being

Allowed under the provisions of the Plan.

Notwithstanding the foregoing provisions of this Article XIII.B.3, but except as

may be expressly provided in other sections of the Plan, Professional Persons requesting

compensation or reimbursement of expenses incurred after the Petition Date and prior to the

Effective Date must file and serve, on all parties entitled to notice thereof, a Fee Application for

final allowance of compensation and reimbursement of expenses in accordance with the various

orders of the Bankruptcy Court establishing procedures for submission and review of such

applications; provided that, if no last date is set in such procedures for filing such applications,

they must be filed no later than sixty (60) days after the Effective Date and any objections to

such applications must be made in accordance with applicable rules of the Bankruptcy Court.

### 4.    Notices

All notices and requests in connection with the Plan shall be in writing and shall

be hand delivered or sent by mail addressed to:

PACHULSKI STANG ZIEHL & JONES LLP
Attn:   Laura Davis Jones, Esq.
        David M. Bertenthal, Esq.
        Maxim B. Litvak, Esq.
919 North Market Street, 17th Floor
Wilmington, DE 19899
Telephone:  (302) 652-4100
Facsimile: (302) 652-4400

All notices and requests to any Person of record holding any Claim, Administrative Expense or Interest shall be sent to such Person at the Person's last known address or to the last known address of the Person's attorney of record. Any such Person may designate in writing any other address for purposes of this section of the Plan, which designation will be effective on receipt.

### 5. <u>Successors and Assigns</u>

The rights, duties and obligations of any Person named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person.

### 6. <u>Severability of Plan Provisions</u>

If, prior to Confirmation, any non-material term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to their terms.

DOCS_SF:84821.10 73864/001

7.    **No Waiver**

Neither the failure of the Debtors to list a Claim in the Debtors' Schedules, the failure of the Debtors to object to any Claim or Interest for purposes of voting, the failure of the Debtors to object to a Claim, Administrative Expense or Interest prior to Confirmation or the Effective Date, the failure of the Debtors to assert a Retained Right of Action prior to Confirmation or the Effective Date, the absence of a proof of Claim having been filed with respect to a Claim, nor any action or inaction of the Debtors, the Reorganized Debtors, or the Revstone/Spara Litigation Trust or Trustee, or any other party with respect to a Claim, Administrative Expense, Interest or Retained Right of Action other than a legally effective express waiver or release shall be deemed a waiver or release of the right of the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable, or each of their successors, before or after solicitation of votes on the Plan or before or after Confirmation or the Effective Date to: (a) object to or examine such Claim, Administrative Expense or Interest, in whole or in part or (b) retain and either assign or exclusively assert, pursue, prosecute, utilize, otherwise act or otherwise enforce any Rights of Action.

8.    **Inconsistencies**

In the event the terms or provisions of the Plan are inconsistent with the terms and provisions of the exhibits to the Plan or documents executed in connection with the Plan, the terms of the Plan shall control.

**9.** **U.S. Trustee Fees**

All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date. From and after the Effective Date, the Reorganized Debtors shall pay the fees assessed against its Estate until such time as the particular Chapter 11 Case is closed, dismissed or converted. In addition, the Reorganized Debtors shall file post-confirmation quarterly reports in conformity with the U.S. Trustee guidelines until entry of an order closing or converting the Chapter 11 Cases.

**10.** **Plan Supplement**

No later than ten (10) days prior to the Confirmation Hearing, the Debtors shall File with the Bankruptcy Court the Plan Supplement, which shall contain such substantially final agreements, other documents and information as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. Holders of Claims or Interests may obtain a copy of the Plan Supplement upon written request to the Claims Agent.

**11.** **Preservation of Insurance**

The Debtors' release from and payment of Claims as provided in the Plan shall not diminish or impair the enforceability of any insurance policy that may cover any Claims, including, without limitation, any Claims on account of the Debtors' officers or managers.

12.     **Waiver of Stay**

The Debtors request as part of the Confirmation Order a waiver from the

Bankruptcy Court of the fourteen (14) day stay of Bankruptcy Rule 3020(e) and, to the extent

applicable, a waiver of the fourteen (14) day stay of Bankruptcy Rule 6004(h).

13.     **Choice of Law**

Except to the extent a rule of law or procedures is supplied by federal law

(including but not limited to the Bankruptcy Code and the Bankruptcy Rules), this Plan shall be

governed by, and construed in accordance with, the laws of the State of Delaware applicable to

contracts executed in and to be performed in that State.

## XIV.

## CONDITIONS TO EFFECTIVENESS

The Plan will not be consummated and the Effective Date will not occur unless

and until (A) the Confirmation Order is in a form acceptable to the Debtors and the Creditors'

Committee, which approval shall not be unreasonably withheld; (B) all documents to be

provided in the Plan Supplement are in form and substance acceptable to the Debtors and the

Creditors' Committee, which approval shall not be unreasonably withheld; (C) the Confirmation

Order shall be a Final Order; (D) the Debtors determine in their reasonable business judgment

that they have sufficient Cash to pay all Allowed Administrative Expenses, Allowed Tax Claims

and Allowed Priority Non-Tax Claims, as of the Effective Date, to the extent the holders thereof

are entitled to payment as of such date under the Plan and unless otherwise agreed by such

holders, and (E) the Debtors determine in their reasonable business judgment that the Debtors

DOCS_SF:84821.10 73864/001

have sufficient Cash to pay all asserted, accrued and estimated Administrative Expenses that

have not yet been Allowed or are otherwise not yet payable as of the Effective Date, but which

such Administrative Expenses are anticipated by the Debtor in the exercise of its business

judgment to be later Allowed or otherwise payable and the holders of any such Administrative

Expenses have not agreed to alternative treatment.  Any of the foregoing conditions, other than

conditions (D) and (E) and those conditions requiring approval of the Creditors' Committee, may

be waived by the Debtors and such waiver shall not require any notice, Bankruptcy Court order,

or any further action.

## XV.

## EFFECT OF CONFIRMATION

### A.      Binding Effect of Confirmation

Confirmation will bind the Debtors, all Holders of Claims, Administrative

Expenses, or Interests and other parties in interest to the provisions of the Plan whether or not the

Claim, Administrative Expense, or Interest of such Holder is Impaired under the Plan and

whether or not the Holder of such Claim, Administrative Expense, or Interest has accepted the

Plan.

### B.      Good Faith

Confirmation of the Plan shall constitute a finding that:  (i) the Plan has been

proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code;

and (ii) all Persons' solicitations of acceptances or rejections of the Plan and the offer, issuance,

sale, or purchase of a security offered or sold under the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

## C.   No Limitations on Effect of Confirmation

Nothing contained in the Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

## XVI.

## MODIFICATION OR WITHDRAWAL OF PLAN

## A.   Modification of Plan

The Debtors (following consultation with the Creditors' Committee) may seek to amend or modify the Plan at any time prior to its Confirmation in the manner provided by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise order, and except as otherwise set forth herein, the Debtors (following consultation with the Creditors' Committee) reserve the right to amend the terms of the Plan or waive any conditions to its Confirmation, effectiveness or consummation (subject to the approval of the Creditors' Committee, as applicable), if the Debtors determine that such amendments or waivers are necessary or desirable to confirm, effectuate or consummate the Plan.

After Confirmation of the Plan, but prior to the Effective Date, the Debtors may, pursuant to section 1127 of the Bankruptcy Code, (following consultation with the Creditors' Committee) seek to modify the Plan.  After the Effective Date, the Reorganized Debtors or the

90

Revstone/Spara Litigation Trust, as applicable, may apply to the Bankruptcy Court to remedy defects or omissions in the Plan or to reconcile inconsistencies in the Plan.

**B.**      **Withdrawal of Plan**

The Debtors reserve the right to revoke and withdraw the Plan at any time prior to the Effective Date, in which case the Plan will be deemed to be null and void.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (if any), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests or Claims by the Debtors against any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

*[Remainder of Page Intentionally Left Blank]*

## XVII.

### CONFIRMATION REQUEST

The Debtors request that the Bankruptcy Court confirm the Plan and that it do so, if applicable, pursuant to section 1129(b) of the Bankruptcy Code notwithstanding the rejection of the Plan by any Impaired Class.

December 10, 2014

John C. DiDonato
Chief Restructuring Officer of the Debtors and Debtors in
Possession

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Maxim B. Litvak (CA Bar No. 215852)
919 Market Street, 17th Floor | P.O. Box 8705
Wilmington, Delaware  19899-8705
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:        ljones@pszjlaw.com
                    dbertenthal@pszjlaw.com
                    mlitvak@pszjlaw.com

Counsel to Debtors and Debtors in Possession

DOCS_SF:84821.10 73864/001

# **EXHIBIT A**

## **PBGC Settlement Agreement**

## MODIFICATION OF PBGC SETTLEMENT AGREEMENT AND GLOBAL RESOLUTION OF DISPUTES

This *Modification of PBGC Settlement Modification Agreement and Global Resolution of Disputes* (this "Modification Agreement") is made and entered into as of May 1, 2014 by and among the following "Parties":    (a) Revstone Industries, LLC ("Revstone"), Spara, LLC ("Spara"), US Tool & Engineering, LLC ("US Tool"), Greenwood Forgings, LLC ("Greenwood"), and TPOP, LLC f/k/a Metavation, LLC ("TPOP" together with Revstone, Spara, US Tool, and Greenwood, the "Debtors"), (b) the Official Committee of Unsecured Creditors in Revstone's case (the "Committee"), (c) Boston Finance Group, LLC ("BFG"), (d) the Pension Benefit Guaranty Corporation (the "PBGC"), and (e) any other required parties as determined by the foregoing Parties as reflected in the signature page(s) attached hereto.

## RECITALS

WHEREAS, the Debtors each commenced chapter 11 cases (the "Bankruptcy Cases") under title 11 of the United States Code (the "Bankruptcy Code") that are presently pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  The Bankruptcy Cases of all Debtors except TPOP are jointly administered.

WHEREAS, on December 18, 2012, the United States Trustee appointed the Committee in Revstone's Bankruptcy Case.  No committee has been appointed in the Bankruptcy Cases of Spara, Greenwood, US Tool, or TPOP.  No trustee or examiner has been appointed in any of the Bankruptcy Cases.  BFG and the PBGC are both members of the Committee.

WHEREAS, BFG asserts various claims against the Debtors, excluding TPOP.

WHEREAS, the PBGC asserts various claims against the Debtors and their non-debtor affiliates.

WHEREAS, the Debtors, certain of their non-debtor subsidiaries, and the PBGC entered into that certain *Settlement Agreement* dated as of February 11, 2014 (the "PBGC Settlement Agreement"), which is currently pending before the Bankruptcy Court.  Capitalized terms not defined herein shall have the meanings set forth in the PBGC Settlement Agreement.

WHEREAS, on February 14, 2014, the Debtors sought approval of the PBGC Settlement Agreement by the Bankruptcy Court through the filing of the following:  (a) *Motion of Revstone Industries, LLC, et al. for Order Pursuant to 11 U.S.C. §§ 105 & 363 and Bankruptcy Rule 9019 Authorizing and Approving Settlement Agreement With Pension Benefit Guaranty Corporation* [Docket No. 1322], and (b) *Motion of TPOP, LLC for Order Pursuant to 11 U.S.C. §§ 105 & 363 and Bankruptcy Rule 9019 Authorizing and Approving Settlement Agreement With Pension Benefit Guaranty Corporation* [Docket No. 402] (together, the "PBGC Settlement Motions"). The PBGC Settlement Motions are currently set for hearing before the Bankruptcy Court on May 15, 2014.

WHEREAS, the Committee and BFG have objected to the PBGC Settlement Motions in the Bankruptcy Cases.

WHEREAS, there are disputes amongst the Parties as to the PBGC Settlement Agreement, the amount and extent of BFG's and the PBGC's claims against the Debtors' estates, and various other matters.

WHEREAS, on May 1, 2014, the Debtors filed a notice of modifications to the PBGC Settlement Agreement [Docket No. 1477 (Revstone); Docket No. 476 (TPOP)], which incorporated a *Global Resolution Term Sheet* (the "Term Sheet") executed by the Debtors, the Committee, BFG, and the PBGC that modifies the PBGC Settlement Agreement, subject to the execution of definitive documentation.

WHEREAS, in accordance with the Term Sheet, the Parties have reached an agreement to resolve their disputes through a modification to the PBGC Settlement Agreement on the terms set forth herein.

## MODIFICATION AGREEMENT

NOW, THEREFORE, after good faith, arms' length negotiations without collusion, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to modify the PBGC Settlement Agreement pursuant to the following terms:

1. <u>Effective Date</u>. The term "Effective Date" as used herein shall mean the first date by which each of the following conditions has occurred: (a) this Modification Agreement is executed by each of the Parties; (b) the Bankruptcy Court enters orders in each of the Bankruptcy Cases (the "Approval Orders") approving the PBGC Settlement Agreement, as modified by this Modification Agreement, in a form acceptable to the Parties, provided that no such orders have been stayed; and (c) the PBGC Settlement Agreement, as modified by this Modification Agreement, goes into effect, which shall be a date no later than the date that the Approval Orders are entered.

2. <u>Modification of PBGC Settlement Agreement</u>. Subject to the occurrence of the Effective Date, this Modification Agreement modifies in certain respects the provisions of the PBGC Settlement Agreement. To the extent of any inconsistency between the PBGC Settlement Agreement and this Modification Agreement, it is intended by the Parties that this Modification Agreement shall govern. Except as specifically modified hereby, the PBGC Settlement Agreement remains in full force and effect. The original PBGC Settlement Agreement is attached hereto as **Exhibit A**.

3. <u>Consensual Resolution Terms</u>.

(a) Subject to the occurrence of the Effective Date, the Parties hereby agree to and incorporate herein the consensual resolution terms set forth in **Exhibit B** attached hereto (the "Summary of Terms"), including the modified Funding Schedule. Upon the Effective Date, the modified Funding Schedule shall supersede the Funding Schedule attached to the PBGC Settlement Agreement.

(b) Pursuant to this Modification Agreement and the Summary of Terms, without limitation as to the remaining provisions of the Summary of Terms, the Parties have agreed to the following principal modifications to the PBGC Settlement Agreement: (a)

- 2 -

although the Allowed PBGC Bankruptcy Claim shall remain at $95,000,000, the target for the PBGC Recovery will be reduced from $82,000,000 to $77,000,000 and the PBGC Minimum Recovery will be reduced from $80,000,000 to $75,000,000; (b) the first $3,000,000 from the non-Debtors' sale proceeds otherwise payable to the PBGC under the PBGC Settlement Agreement will be utilized to provide an up-front recovery under a chapter 11 plan to Revstone's general unsecured creditors, other than BFG; and (c) the first $2,000,000 of litigation proceeds otherwise payable to the PBGC under the PBGC Settlement Agreement will be distributed to the Revstone estate under a chapter 11 plan for the benefit of administrative claimants (who will receive $1,500,000) and general unsecured creditors (who will receive $500,000), other than BFG.

4.    BFG Claim and Recovery.

(a)    Within two (2) business days following the Effective Date, BFG shall be paid the sum of $7,300,000 (the "BFG Settlement Payment") out of the existing "Revstone Escrows" specified in the "PBGC" column of the modified Funding Schedule (attached to the Summary of Terms). The PBGC consents to the use of its share of the "Revstone Escrows" for purposes of making the BFG Settlement Payment. The BFG Settlement Payment shall be in full and final resolution of any and all claims of BFG against Spara, except as set forth in section 4(b) below. Upon receipt of the BFG Settlement Payment, BFG shall have no further claims against Spara, except as set forth in section 4(b) below.

(b)    Upon the Effective Date, BFG shall be deemed to have an allowed administrative expense claim against Spara in the amount of $500,000 and an allowed administrative expense claim against Revstone in the amount of $700,000. Such administrative expense claims will be payable in full upon the effective date of a chapter 11 plan or plans for the Debtors (the "Plan"). BFG shall have no other administrative expense claims against any of the Debtors.

(c)    Upon the Effective Date, BFG shall be deemed to have an allowed non-priority unsecured claim against Revstone in the amount of $8,500,000 (the "Allowed BFG Revstone Claim"). BFG agrees to waive any recovery on account of the Allowed BFG Revstone Claim from: (a) the Revstone Unsecured Guarantee Reserve (as defined in the Summary of Terms), and (b) the Revstone general unsecured creditors' portion of a carveout in the amount of $2,000,000 from litigation proceeds to be released by the PBGC with respect to the PBGC's rights in such litigation proceeds (the "PBGC Carve Out Proceeds"). BFG shall be entitled to receive distributions on account of the Allowed BFG Revstone Claim made to unsecured creditors of Revstone in excess of the Revstone Unsecured Guarantee Reserve and the general unsecured creditors' portion of the PBGC Carve Out Proceeds in a percentage to be agreed upon between the Committee and BFG. Except as set forth in section 4(b) above, BFG shall have no allowed claims against Revstone other than the Allowed BFG Revstone Claim.

5.    Litigation Budget and Allocation of Proceeds. Subject to the occurrence of the Effective Date, the Parties will agree in good faith upon appropriate budgeting and fee arrangements with respect to the prosecution of litigation prior to the effective date of the Plan, and thereafter, any litigation will be handled through the litigation trust consistent with the Summary of Terms. As set forth in the Summary of Terms, the allocation of litigation proceeds

Case 12-13262-BLS    Doc 1868    Filed 12/10/14    Page 101 of 142

between the Revstone and Spara estates will be addressed by agreement amongst the Debtors and the Committee in connection with the effective date of the Plan.

6.  <u>Management of the Debtors.</u>  Subject to the occurrence of the Effective Date, the Parties agree that existing management of the Debtors will remain in place through the effective date of the Plan. Following the effective date of the Plan, existing management of Spara, TPOP, and the remaining Debtors (except Revstone) will remain in place. Revstone's management following the effective date of the Plan is addressed in the Summary of Terms.

7.  <u>Cessation of Litigation and Plan Support.</u>  Immediately upon execution of this Modification Agreement and through the date of entry of the Approval Orders, all litigation and objections involving the Parties and in connection with the Debtors' bankruptcy proceedings shall cease and the Parties shall take any and all reasonable means to support and obtain approval of the terms of the PBGC Settlement Agreement, as modified by this Modification Agreement, and confirmation of the Plan consistent with the terms hereof. Any pending litigation matters or objections shall be withdrawn without prejudice or otherwise taken off calendar pending entry of the Approval Orders. Upon the Effective Date and BFG's receipt of the BFG Settlement Payment in accordance with section 4(a) hereof, any litigation matters or objections involving the Parties and in connection with the Debtors' bankruptcy proceedings shall be deemed withdrawn with prejudice, including without limitation, the Committee's and BFG's objections to the PBGC Settlement Motions, the Committee's motion to appoint a chapter 11 trustee in Revstone's case, and the Parties' objections to the retention and compensation of the Debtors' and the Committee's professionals. The Parties shall jointly seek an order of the Bankruptcy Court discharging the fee auditor appointed in the Bankruptcy Cases from further responsibilities in the Bankruptcy Cases. Revstone shall pay any allowed fees or expenses incurred by the fee auditor in the Bankruptcy Cases in the ordinary course. Further, upon the Effective Date, the Committee and BFG shall provide such documentation as the Debtors may reasonably request in connection with seeking the release of an escrow created in connection with the sale of assets of Contech Castings, LLC and Contech Castings Real Estate Holdings, LLC to Shiloh Die Cast Midwest LLC under that certain *Asset Purchase Agreement* dated June 11, 2013, as amended.

8.  <u>Release and Exculpation.</u>  Upon the occurrence of the Effective Date, the Parties agree that the Plan shall contain releases and exculpation provisions consistent with the *First Amended Chapter 11 Plan of Reorganization for Revstone Industries, LLC, as Modified*, filed in Revstone's Bankruptcy Case on August 28, 2013 [Docket No. 985].

9.  <u>Additional BFG Claims.</u>  To the extent that BFG acquires any additional claims in any of the Debtors' Bankruptcy Cases, the terms hereof shall apply in all respects with regard to such claim(s), if any, provided that BFG shall be entitled to any unsecured creditor recoveries to which such claim(s) are otherwise entitled and BFG shall be entitled to defend such claim(s) in the event of any objections thereto.

10.  <u>Party Representations.</u>  Each Party hereby represents and warrants that: (a) such Party and the signatory hereto has the power and authority to execute, deliver and perform this Modification Agreement; (b) such Party has taken all necessary actions to authorize the execution, delivery and performance of this Modification Agreement; (c) this Modification Agreement has been duly executed and delivered by such Party and, subject to the occurrence of the Effective Date, constitutes the legal, valid, and binding obligations of such Party, enforceable

- 4 -

DOCS_SF:85161.3 73864/001

against it in accordance with their respective terms; (d) such Party's execution, delivery, and performance of this Modification Agreement does not and will not conflict with, or constitute a violation or breach of, or constitute a default under any obligation of such Party and will not violate any applicable law, or any order or decree of any court or government instrumentality applicable to such Party; and (e) such Party has entered into this Modification Agreement in reliance on its own independent investigation and analysis of the facts underlying the subject matter of this Modification Agreement, and no representations, warranties, or promises of any kind have been made directly or indirectly to induce it to execute this Modification Agreement other than those that are expressly set forth in this Modification Agreement.

11.     <u>Continuing Bankruptcy Court Jurisdiction</u>.    Each Party agrees that, with respect to disputes involving the Debtors, the Bankruptcy Court shall have exclusive jurisdiction over any disputes regarding the validity, interpretation, or performance of this Modification Agreement so long as the Bankruptcy Cases are pending, and each of the Parties consents to personal jurisdiction and venue in the Bankruptcy Court in connection with any such disputes; <u>provided</u>, <u>however</u>, that if the Bankruptcy Cases are no longer pending, or if the Bankruptcy Court cannot or does not exercise jurisdiction, such jurisdiction and venue shall belong to the federal courts in the District of Delaware. Each Party further agrees that, with respect to disputes solely involving non-Debtors, the federal courts in the District of Delaware shall have exclusive jurisdiction over any disputes regarding the validity, interpretation, or performance of this Modification Agreement.

12.     <u>Specific Performance; Damages</u>.    The exact nature and extent of damages resulting from a breach of this Modification Agreement are uncertain at the time of entering into this Modification Agreement and breach of this Modification Agreement would result in damages that would be difficult to determine with certainty.  Money damages would not be a sufficient remedy for any breach of this Modification Agreement, and the Parties shall each be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach.  Notwithstanding anything to the contrary set forth above, the remedy of specific performance shall not be the exclusive remedy of the Parties under this Modification Agreement in the event of a breach of this Modification Agreement by another Party hereto.

13.     <u>Voluntary Agreement</u>.    Each Party acknowledges that it has read all of the terms of this Modification Agreement, has had an opportunity to consult with counsel of its own choosing or voluntarily waived such right and enters into this Modification Agreement voluntarily and without duress.

14.     <u>Further Assurances</u>.    Each Party agrees, without further consideration, to execute and deliver such other documents and to take such other action as may be necessary to consummate the purposes of this Modification Agreement.

15.     <u>No Admission</u>.  This Modification Agreement is for settlement purposes only and shall not be construed or deemed an admission by any Party to this Modification Agreement of wrongdoing, liability, fault, or the validity of any claims.

16.     <u>Valid Provisions Remain Effective</u>.    If any provision in this Modification Agreement shall be invalid, inoperative or unenforceable, the remaining provisions of this Modification Agreement shall remain in effect if both the economic and legal substance of the

DOCS_SF:85161.3 73864/001

terms contemplated hereby are not materially affected in any manner adverse to any Party. Otherwise, the Parties shall negotiate in good faith to rewrite any such provision so as to, as nearly and fairly as possible, approach the economic and legal substance originally intended.

17.     Construction. The language used in this Modification Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against either Party. Nor will any rule of construction that favors a non-draftsman be applied. A reference to any statute will be deemed also to refer to all rules and regulations promulgated under the statute, unless the context requires otherwise. Unless specifically otherwise provided or the context otherwise requires, the singular includes the plural and the plural the singular; the word "or" is deemed to include "and/or", the words "including", "includes" and "include" are deemed to be followed by the words "without limitation", and references to sections are to those of this Modification Agreement. Headings in this Modification Agreement are included for convenience of reference only and do not constitute a part of this Modification Agreement for any other purpose.

18.     Advice of Counsel. Each Party represents that it has had the opportunity to obtain advice of counsel in connection with this Modification Agreement and all matters covered hereby, and that each Party has been fully advised by those attorneys with respect to its rights and obligations under this Modification Agreement.

19.     Counterparts. This Modification Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Modification Agreement. Delivery of a signature page to this Modification Agreement by facsimile or other electronic means shall be effective as delivery of the original signature page to this Modification Agreement.

20.     Joint Drafting. This Modification Agreement shall be deemed to have been jointly drafted by the Parties, and in construing and interpreting this Modification Agreement, no provision shall be construed and interpreted for or against any Party because such provision or any other provision of the Modification Agreement as a whole is purportedly prepared or requested by such Party.

21.     Applicable Law.    The validity, interpretation, and performance of this Modification Agreement shall be construed and interpreted according to the laws of the State of Delaware, except to the extent that (a) provisions of the Bankruptcy Code apply, in which event the Bankruptcy Code shall control, or (b) applicable federal law preempts state law.

22.     Attorneys' Fees, Costs and Expenses. Each Party agrees to bear its own costs and expenses, including attorneys' fees, arising out of the matters addressed by this Modification Agreement.

23.     Entire Agreement. This document contains the entire agreement between the Parties as to the modifications to be made to the PBGC Settlement Agreement, and may only be modified in writing signed by the Parties or their duly appointed agents. All prior agreements and understandings between the Parties concerning the subject matter hereof are superseded by the terms of this Modification Agreement. Except as specifically modified hereby, the PBGC Settlement Agreement remains in full force and effect.

24.  Inconsistency.  As noted above, to the extent of any inconsistency between the PBGC Settlement Agreement and this Modification Agreement, it is intended by the Parties that this Modification Agreement shall govern.

25.  Successors and Assigns.  This Modification Agreement shall be binding on and inure to the benefit of the Parties and their respective agents, employees, affiliates, successors, and, with the consent of all Parties, assigns.

26.  Notices.  All notices, consents, waivers, and other communications under this Modification Agreement must be in writing and shall be deemed to have been duly given when: (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of receipt), or (c) received by the addressee, if sent by email, in each case to the appropriate addresses, representative (if applicable) or if sent by telecopier to telecopier numbers set forth in the signature page(s) attached hereto (or to such other addresses, representative and telecopier numbers as a Party may designate by notice to the other Parties in accordance with this paragraph).

[signature page follows]

DOCS_SF:85161.3 73864/001

IN WITNESS WHEREOF, the Parties have executed this Modification Agreement as of the date written in the opening paragraph hereof.

**Revstone Industries, LLC**
**Spara, LLC**
**Greenwood Forgings, LLC**
**US Tool & Engineering, LLC**
**TPOP, LLC f/k/a Metavation, LLC**

John C. DiDonato
Chief Restructuring Officer

c/o Pachulski Stang Ziehl & Jones, LLP
Attn: Laura Davis Jones, Esq.
919 North Market Street, 17th Floor
Wilmington, DE 19801
Fax: (302) 652-4400
Email: ljones@pszjlaw.com

**Official Committee of Unsecured**
**Creditors of Revstone Industries, LLC**

Mark L. Desgrosseilliers, Esq.
Counsel for the Committee

c/o Womble Carlyle Sandridge & Rice, LLP
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Fax: (302) 252-4330
Email: mdesgrosseilliers@wcsr.com

**Boston Finance Group, LLC**

Jonathan Golden
Vice President
c/o DLA Piper LLP
Atten: Gregg M. Galardi

1251 Avenue of the Americas
New York, NY 10020-1104
Fax: (212) 884-8540
Email: gregg.galardi@dlapiper.com

**Pension Benefit Guaranty Corporation**

Dana Cann
Corporate Finance and Restructuring
Department

1200 K Street NW, Suite 340
Washington, D.C. 20005
Fax: (202) 326-4112
Email: cann.dana@pbgc.gov

- 8 -

IN WITNESS WHEREOF, the Parties have executed this Modification Agreement as of the date written in the opening paragraph hereof.

**Revstone Industries, LLC**
**Spara, LLC**
**Greenwood Forgings, LLC**
**US Tool & Engineering, LLC**
**TPOP, LLC f/k/a Metavation, LLC**

**Official Committee of Unsecured**
**Creditors of Revstone Industries, LLC**

_____
John C. DiDonato
Chief Restructuring Officer

_____
Mark L. Desgrosseilliers, Esq. & Matthew P. Ward, Esq.
Counsel for the Committee

c/o Pachulski Stang Ziehl & Jones, LLP
Attn:  Laura Davis Jones, Esq.
919 North Market Street, 17th Floor
Wilmington, DE 19801
Fax:  (302) 652-4400
Email:  ljones@pszjlaw.com

c/o Womble Carlyle Sandridge & Rice, LLP
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Fax:  (302) 252-4330
Email:  mdesgrosseilliers@wcsr.com
       maward@wcsr.com

**Boston Finance Group, LLC**

_____
Jonathan Golden
Vice President

**Pension Benefit Guaranty Corporation**

_____
Sanford Rich
[CNR]

c/o DLA Piper LLP
Atten:  Gregg M. Galardi
1251 Avenue of the Americas
New York, NY 10020-1104
Fax: (212) 884-8540
Email: gregg.galardi@dlapiper.com

1200 K Street NW, Suite 340
Washington, D.C. 20005
Fax: (202) 326-4112
Email: _____

- 8 -

## EXHIBIT A

**PBGC SETTLEMENT AGREEMENT**

## SETTLEMENT AGREEMENT

This Settlement Agreement (this "Agreement") is made and entered into as of February 11, 2014 by and among the following "Parties": (a) Revstone Industries, LLC ("Revstone"), Spara, LLC ("Spara"), TPOP, LLC f/k/a Metavation, LLC ("Metavation"), Fairfield Castings, LLC ("Fairfield"), (b) chapter 11 debtors U.S. Tool & Engineering LLC ("U.S. Tool") and Greenwood Forgings, LLC ("Greenwood" and together with chapter 11 debtors Revstone, Spara, Metavation, and U.S. Tool, the "Debtors"), (c) those subsidiaries of Revstone and Spara as reflected in the signature page(s) attached hereto (together with the Debtors and Fairfield, the "PBGC Obligors"), (d) the Pension Benefit Guaranty Corporation (the "PBGC"), and (e) any other required parties as determined by the foregoing Parties as reflected in the signature page(s) attached hereto.

## RECITALS

WHEREAS, the Debtors each commenced chapter 11 cases (the "Bankruptcy Cases") under title 11 of the United States Code (the "Bankruptcy Code") that are presently pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Bankruptcy Cases of all Debtors except Metavation are being jointly administered.

WHEREAS, the PBGC has filed proofs of claims in the Bankruptcy Cases relating to the Hillsdale Hourly Pension Plan, the Hillsdale Salaried Pension Plan, and the Revstone Casting Fairfield GMP Local 359 Pension Plan (together, the "Pension Plans").

WHEREAS, the PBGC has filed an action against Metavation and Fairfield, styled *Pension Benefit Guaranty Corporation v. Metavation LLC et al.*, No. 5:13-cv-273 (E.D. Ky. filed Aug. 23, 2013) (the "PBGC Litigation"), seeking termination of the Pension Plans.

WHEREAS, the PBGC has asserted or may assert liens on behalf of the Pension Plans under section 430(k) of the Internal Revenue Code of 1986, as amended, against certain assets of the PBGC Obligors (the "430(k) Liens").

WHEREAS, the PBGC has asserted or may assert claims against the PBGC Obligors relating to unpaid contributions due to the Pension Plans, the Pension Plans' unfunded benefit liabilities, and termination premiums.

WHEREAS, in the litigation styled *Perez v. Hofmeister*, No. 12-cv-250 (E.D.Ky. filed Aug. 9, 2012) and the lawsuits consolidated therewith (*Perez v. Hofmeister et. al.*, no. 13-cv-156 (E.D.Ky. filed May 30, 2013) (the "DOL Litigation"), the United States Department of Labor ("DOL") has asserted against certain of the PBGC Obligors and others, claims relating to, *inter alia*, the management and administration of the Pension Plans, the transfer, use, and investment of the Pension Plans' assets, and the payment and allocation of fees and expenses.

WHEREAS, there are disputes amongst the Parties as to the PBGC's claims against the PBGC Obligors, and the allegations the PBGC and the DOL asserted in the PBGC Litigation and the DOL Litigation.

WHEREAS, the Parties have reached an agreement to resolve their disputes on the terms set forth herein.

## AGREEMENT

NOW, THEREFORE, after good faith, arms' length negotiations without collusion, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the following terms:

1.     Effective Date. The term "Effective Date" shall mean the first date by which each of the following conditions has occurred: (a) this Agreement is executed by each of the Parties; (b) the Bankruptcy Court enters orders in each of the Bankruptcy Cases approving this Agreement in a form acceptable to the Parties, provided that no such orders have been stayed; and (c) the satisfaction of all obligations in paragraph 14(a) of this Agreement. Within five (5) business days following execution of this Agreement, the Debtors shall file motions with the Bankruptcy Court in each of their Bankruptcy Cases requesting approval of this Agreement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

2.     Allowed PBGC Claim and Claims against Non-Debtor PBGC Obligors. On the Effective Date, (a) subject to paragraph 7 below, the PBGC shall have an allowed general unsecured, non-priority claim against each of the Debtors in the amount of $95,000,000 (the "Allowed PBGC Bankruptcy Claim"), and (b) the PBGC shall have undisputed joint and several claims in the amount of $95,000,000 against all non-Debtor PBGC Obligors that are organized in the United States (the "Undisputed PBGC Non-Debtor Claim", and collectively with the Allowed PBGC Bankruptcy Claim, the "Allowed PBGC Claim"). For the avoidance of doubt, the Allowed PBGC Claim is $95,000,000.

3.     PBGC Recovery. Subject to the provisions of paragraph 7 below, total distributions on account of the Allowed PBGC Claim (the "PBGC Recovery") are targeted at $82,000,000, but shall in no event be less than $80,000,000 (the "PBGC Minimum Recovery"), or more than the Allowed PBGC Claim (the "PBGC Maximum Recovery") in the aggregate.

4.     Distributions to the Parties. Distributions to the PBGC, Revstone, and Spara shall be made in accordance with the Funding Schedule attached hereto as **Exhibit A** and incorporated herein by reference. Payments will be made to the PBGC or the Pension Plans, as directed by the PBGC, and to Revstone and Spara, as directed by their bankruptcy estates or any successors thereto. The term "Net Proceeds", as the term is used in this Agreement, refers to the projected "Net Proceeds for PBGC & Estates" specified in the first column of the Funding Schedule and as defined therein.

(a)     The amounts specified in the Funding Schedule columns designated "PBGC" and "Revstone" and the rows captioned "Revstone Escrows" shall be paid to or as directed by the PBGC or Revstone, as applicable, within five (5) business days of the Effective Date.

(b)     The amounts specified in the Funding Schedule columns designated "PBGC," "Revstone," and "Spara" and the rows captioned "Revstone Sales in Process" and "Spara Sales to be Initiated" shall be paid to or as directed by the PBGC, Revstone, or Spara, as

applicable, at the closing of each sale. Revstone and Spara shall use their best efforts to close on such sales of substantially all of their subsidiaries' assets as expeditiously as possible.

(c)    Funds in Metavation's estate shall be distributed in accordance with the Bankruptcy Code and the Funding Schedule. All amounts paid to the PBGC or the Pension Plans from Metavation's estate, regardless of whether such payments are made with respect to claims filed by the PBGC, the DOL, or the Pension Plans, shall be credited toward the PBGC Minimum Recovery.

(d)    If the actual amount of Net Proceeds differs from the amounts specified in the first column of the Funding Schedule captioned "Net Proceeds for PBGC & Estates," the proceeds shall be allocated to the distributees in the remaining columns in the same proportion as the amounts specified.

(e)    Upon the final reconciliation described in paragraph 9 below, to the extent aggregate actual Net Proceeds are less than projected in the Funding Schedule by up to $2,000,000, distributions to the PBGC shall be reduced dollar for dollar, but in no event to less than the PBGC Minimum Recovery. *See* **Exhibit B**, Example 1.

(f)    If aggregate actual Net Proceeds are less than projected in the Funding Schedule by more than $2,000,000, the PBGC shall be paid from the "Hold Back/Escrows" specified in the last two columns of the Funding Schedule up to the PBGC Minimum Recovery.

(g)    If the Hold Back/Escrows do not have sufficient assets for the PBGC to reach the PBGC Minimum Recovery, Revstone's and Spara's estates shall be jointly and severally liable for paying the PBGC such deficiency unless and until PBGC receives the PBGC Minimum Recovery.

5.    Credit Against PBGC Minimum Recovery. Amounts paid or caused to be paid to the Pension Plans subsequent to Revstone's bankruptcy petition by the PBGC Obligors, by any other person or entity within the controlled group (as described in 29 U.S.C. § 1301(a)(14)) of Metavation or Fairfield, or by other third parties on account of payments directed to the Pension Plans or the PBGC on behalf of the Pension Plans shall be credited toward the PBGC Minimum Recovery. To date, this amount is $21,693,767 in the aggregate. Accordingly, as of the date of this Agreement, the additional amount necessary to reach the PBGC Minimum Recovery is $58,306,233.

6.    PBGC Upside Recovery. As set forth in the Funding Schedule, total Net Proceeds are targeted at $113,500,000 in the aggregate. If actual Net Proceeds exceed this amount by up to $2,500,000, such excess shall be distributed entirely to the Revstone and Spara estates and allocated amongst them based on the estate generating the excess proceeds. If actual Net Proceeds exceed $116,000,000, then any such excess proceeds shall be distributed fifty percent (50%) to the PBGC (the "PBGC Upside Recovery") and fifty percent (50%) to the Revstone and Spara estates and allocated amongst the estates based on the estate generating the excess proceeds. Any PBGC Upside Recovery will be in addition to the PBGC Minimum

- 3 -

Recovery.  In no case will the PBGC Upside Recovery and the PBGC Minimum Recovery, together, exceed the PBGC Maximum Recovery.  *See* **Exhibit B**, Example 2.

      7.      <u>PBGC Consent.</u>

      (a)      Subject to <u>paragraph 7(b)</u>, the PBGC agrees to allow distributions to be made to Revstone's and Spara's bankruptcy estates consistent with the Funding Schedule, and for Revstone and Spara to utilize such distributions for the payment of allowed creditor claims against their respective estates (other than the Allowed PBGC Bankruptcy Claim), except to the extent necessary to:  (a) compensate the PBGC consistent with <u>paragraph 3</u> as it relates to the PBGC Minimum Recovery and <u>paragraph 6</u> as it relates to the PBGC Upside Recovery, and (b) allow the Allowed PBGC Claim to participate in net litigation recoveries (as described in paragraph 12 below).

      (b)      Until the PBGC receives the PBGC Minimum Recovery, the estates of Revstone and Spara shall retain 50 percent of the amount that would otherwise be distributed to those estates' general unsecured creditors in accordance with the Funding Schedule, but in in no event less than $2.072 million at Revstone and $0.928 million at Spara.  After such time as PBGC receives the PBGC Minimum Recovery, the amount retained by the estates under the previous sentence can be distributed to the general unsecured creditors of the Revstone and Spara bankruptcy estates as is consistent with the Funding Schedule and the Bankruptcy Code.

      (c)      So long as there is no material breach of the terms of this Agreement, the PBGC will take no action in the Bankruptcy Cases that is inconsistent with this Agreement.  The PBGC will take such steps, in the Bankruptcy Cases and otherwise, as are reasonably necessary to give effect to the terms hereof.

      8.      <u>PBGC Lien Release.</u>  Following the Effective Date, the PBGC shall:  (a) promptly file a withdrawal of notice of federal lien with respect to each filed 430(k) Lien, (b) not assert any non-filed 430(k) Lien against the assets of any PBGC Obligor, and (c) not assert any additional liens against the assets of any of the PBGC Obligors.  The PBGC shall also provide any releases reasonably requested by the PBGC Obligors that are necessary to consummate asset sales.

      9.      <u>Final Reconciliation.</u>  Once the material assets of the PBGC Obligors have been liquidated and the amount of actual Net Proceeds determined, the Parties shall reconcile the amounts distributed, and/or to be distributed, to the Parties consistent with the recoveries to the PBGC, Revstone, and Spara required by this Agreement and the Funding Schedule.  Any funds not needed to provide the PBGC with the PBGC Minimum Recovery, or the PBGC Upside Recovery, as applicable, shall be immediately distributed from the HoldBack/Escrow to the Revstone and Spara estates in a manner consistent with the Funding Schedule.  In the event that the PBGC receives distributions out of the Hold Back/Escrow or the Revstone or Spara estates in order to reach the PBGC Minimum Recovery, any subsequent asset recoveries, will be distributed to the Revstone and Spara estates up to the amount distributed to the PBGC out of the Hold Back/Escrow or from the estates, subject to full payment of the PBGC Minimum Recovery.

      10.      <u>Pension Plan Terminations.</u>  On the Effective Date, Metavation and Fairfield shall consent to immediate termination of the Pension Plans by executing agreements acceptable

to the PBGC effecting (a) termination of the Hillsdale Hourly Plan and Hillsdale Salaried Plan with a termination date under 29 U.S.C. § 1348 of March 1, 2013 and of the Revstone Casting Fairfield GMP Local 359 Pension Plan with a termination date under 29 U.S.C. § 1348 of August 29, 2013, and (b) the PBGC trusteeship of the Pension Plans pursuant to 29 U.S.C. § 1342. Promptly after execution of such agreements, the PBGC will dismiss the PBGC Litigation, with each Party bearing its own fees and costs. The Parties shall take any and all appropriate actions to effectuate the foregoing terminations and dismissal. Upon such terminations of the Pension Plans under 29 U.S.C. § 1342, any claims filed by the Pension Plans against the Debtors' bankruptcy estates shall be deemed withdrawn. For the avoidance of doubt, the preceding sentence does not apply to, or affect the validity of, the Allowed PBGC Claim.

11.     <u>Payment of Administrative and Priority Claims</u>. From and after the Effective Date, each of the Debtors may use available cash in their respective estates to satisfy any allowed administrative or priority claims, including funding of the Reserves (as defined below) at Revstone and Spara.

12.     <u>Plan/Litigation Reserves</u>.

(a)     The chapter 11 plan or plans in the Revstone and Spara bankruptcies as described in <u>paragraph 16</u> below will provide that the following reserves (the "<u>Reserves</u>") shall be created to the extent of available cash:

    (1)     at Revstone, a reserve for post-effective date administrative expenses (excluding litigation expenses) in the amount of $1,000,000;

    (2)     at Spara, a reserve for post-effective date administrative expenses (excluding litigation expenses) in the amount of $750,000;

    (3)     at Revstone, a reserve for litigation expenses in the amount of $1,500,000; and

    (4)     at Spara, a reserve for litigation expenses in the amount of $500,000.

(b)     Creation of Reserves.

    (1)     The reserves described in <u>clauses 12(a)(1) and (2)</u> will be created on the effective date of the chapter 11 plan(s).

    (2)     The reserves described in <u>clauses 12(a)(3) and (4)</u> will be created either:

        (i) subject to <u>clause 12(b)(2)(ii)</u>, on the effective date of a chapter 11 plan or plans in the Revstone and Spara bankruptcies as described in <u>paragraph 16</u> below, or

        (ii) if such funds are not available on the effective date of such chapter 11 plan or plans, then (A) 50% of the applicable reserve amount on the date that the applicable Revstone or Spara estate receives 75% of its recoveries contemplated by the Funding Schedule, and (B) the remaining 50% of the applicable reserve

amount on the date that the applicable Revstone or Spara estate receives 85% of its recoveries contemplated by the Funding Schedule.

(c)     Subject to the payment of any amounts required under the last sentence of paragraph 9 hereof, any net recoveries on litigation claims prosecuted by the Revstone or Spara estates, including the post-confirmation estates, shall be distributed fifty percent (50%) to the PBGC, up to the PBGC Maximum Recovery, and fifty percent (50%) to the Revstone and Spara estates and allocated amongst the estates based on the estate generating such litigation recoveries.

13.     PBGC Releases and Exculpation.  The following release shall be effective (a) as to each PBGC Obligor that has already sold its assets and whose proceeds are currently in escrow as reflected in the Funding Schedule, upon the Effective Date, (b) as to each PBGC Obligor that has assets to sell as reflected in the Funding Schedule, upon the consummation of the sale of such assets and distribution to the PBGC of the proceeds in accordance with the Funding Schedule and this Agreement, and (c) as to the remaining PBGC Obligors, upon the consummation of the sale of the assets reflected on the Funding Schedule and distribution to the PBGC of the proceeds in accordance with the Funding Schedule and this Agreement (as to each PBGC Obligor as applicable, the "Applicable Release Date").  Upon the Applicable Release Date, except as to the Allowed PBGC Claim and the other rights and obligations of the Parties under this Agreement, the PBGC, on behalf of itself and the Pension Plans following the PBGC trusteeship (the "PBGC Releasors"), shall be deemed to have irrevocably waived, released and discharged all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, causes of action, and liabilities that the PBGC Releasors have, may have or are entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity, or otherwise, against each applicable PBGC Releasee (as defined below), based in whole or in part upon any act or omission, transaction, or occurrence taking place on or prior to the Effective Date with respect to the Pension Plans or the Bankruptcy Cases, excluding any claims arising under Title I of ERISA.

The term "PBGC Releasee" means, except as otherwise provided herein, each of the PBGC Obligors, and each of their respective employees, directors, officers, members, agents, advisors or counsel (each in their capacity as such).  Notwithstanding anything to the contrary in this Agreement, the PBGC Releasees do not include (a) George Hofmeister; (b) any relatives of George Hofmeister (by blood or otherwise); (c) any affiliates or trusts of George Hofmeister or such relatives (other than the PBGC Obligors); and (d) any person or entity, other than a PBGC Obligor, that is named as a defendant in DOL Litigation.  As will be further provided in the Plan Support Agreement described in paragraph 16 below, the Parties will support a chapter 11 plan or plans for each of the Debtors that will include customary exculpatory provisions for the respective officers, directors, employees, members, agents, representatives and professionals of each of the Debtors from any matters arising out of or relating to the Pension Plans or the Bankruptcy Cases, excluding the persons and entities described in the preceding sentence.

14.     Resolution of DOL Litigation.

(a)     The DOL, Metavation, and Fairfield shall seek entry of consent judgments in the DOL Litigation, which shall state the amounts each of Metavation and Fairfield owes to the Pension Plans, concluding the litigation as to those two defendants only, and releasing

- 6 -

all DOL claims against those two defendants, except as necessary to give effect to the consent judgments and this Agreement  The consent judgments shall be acceptable in form and substance to all other Parties hereto.

(b)       Upon the Effective Date, the DOL shall have an allowed general unsecured claim in the Metavation bankruptcy in the amount set forth in the consent judgment. In addition, the DOL shall retain the right to (1) file a subordinated penalty claim in the Metavation bankruptcy under 29 U.S.C. § 502(l), and (2) assess a penalty under 29 U.S.C. § 502(l) against Fairfield.

(c)       Any amounts recovered by the DOL against any of the PBGC Obligors, including any section 502(l) penalty paid by Fairfield, will reduce, dollar for dollar, the PBGC Minimum Recovery. Further, the consent judgments shall provide that the DOL shall withdraw, and shall not assert, any objections to the Debtors' efforts to sell assets or to confirm a chapter 11 plan(s) consistent with this Agreement.

15.       <u>Management of Debtors</u>.  The PBGC shall support the continued management of the Debtors by the current Chief Restructuring Officer and the Restructuring Committee through the effective date of a chapter 11 plan or plans, and thereafter through the designees or successors thereto proposed by the Debtors in a chapter 11 plan or plans.

16.       <u>Plan Support Agreement</u>.  Upon the Effective Date, the Parties shall execute a Plan Support Agreement in substantially the form attached hereto as **<u>Exhibit C</u>** (the "<u>Plan Support Agreement</u>"), which reflects the Parties' support of the chapter 11 plan that was previously filed by Revstone in the Bankruptcy Cases in all material respects, as such plan shall be amended to the extent necessary to be consistent with this Agreement, or as otherwise may be modified by Revstone or supplemented by separate plans of Spara or the other Debtors in conformity with this Agreement. The Parties agree to support the Debtors' proposed chapter 11 plan or plans so long as such plan(s) are consistent with this Agreement.

17.       <u>Sources and Uses</u>.  Prior to the closing of each such sale, the entity selling its assets will provide to PBGC a schedule of sources and uses in connection with that sale.

18.       <u>Withdrawal of PBGC Motions</u>.   Upon the Debtors' filing of motions to approve this Agreement as described in <u>paragraph 1</u> above, the PBGC shall promptly withdraw its: (a) motion to convert Metavation's chapter 11 case to chapter 7, (b) joinder to the motion of the Official Committee of Unsecured Creditors to appoint a chapter 11 trustee in Revstone's case, and (c) objections to any fee requests of the Debtors' professionals. Further, the PBGC shall take such other action as reasonably necessary to support the Debtors' efforts to obtain approval of this Agreement and to confirm a chapter 11 plan or plans consistent with this Agreement.

19.       <u>Party Representations</u>.   Each Party hereby represents and warrants that: (a) such Party and the signatory hereto has the power and authority to execute, deliver and perform this Agreement; (b) such Party has taken all necessary actions to authorize the execution, delivery and performance of this Agreement; (c) this Agreement has been duly executed and delivered by such Party and, subject to the occurrence of the Effective Date, constitutes the legal, valid, and binding obligations of such Party, enforceable against it in

accordance with their respective terms; (d) such Party's execution, delivery, and performance of this Agreement does not and will not conflict with, or constitute a violation or breach of, or constitute a default under any obligation of such Party and will not violate any applicable law, or any order or decree of any court or government instrumentality applicable to such Party; and (e) such Party has entered into this Agreement in reliance on its own independent investigation and analysis of the facts underlying the subject matter of this Agreement, and no representations, warranties, or promises of any kind have been made directly or indirectly to induce it to execute this Agreement other than those that are expressly set forth in this Agreement.

20.    <u>Further Representation and Warranty</u>.    Each Party hereby represents and warrants that, to the best of its knowledge, each of the Pension Plans have no outstanding liabilities other than to the plan participants, to PBGC or to the plan professionals.

21.    <u>Continuing Bankruptcy Court Jurisdiction</u>.    Each Party agrees that, with respect to disputes involving the Debtors, the Bankruptcy Court shall have exclusive jurisdiction over any disputes regarding the validity, interpretation, or performance of this Agreement so long as the Bankruptcy Cases are pending, and each of the Parties consents to personal jurisdiction and venue in the Bankruptcy Court in connection with any such disputes; <u>provided, however,</u> that if the Bankruptcy Cases are no longer pending, or if the Bankruptcy Court cannot or does not exercise jurisdiction, such jurisdiction and venue shall belong to the federal courts in the District of Delaware. Each Party further agrees that, with respect to disputes solely involving non-Debtors, the federal courts in the District of Delaware shall have exclusive jurisdiction over any disputes regarding the validity, interpretation, or performance of this Agreement.

22.    <u>Specific Performance; Damages</u>.    The exact nature and extent of damages resulting from a breach of this Agreement are uncertain at the time of entering into this Agreement and breach of this Agreement would result in damages that would be difficult to determine with certainty. Money damages would not be a sufficient remedy for any breach of this Agreement, and the Parties shall each be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach. Notwithstanding anything to the contrary set forth above, the remedy of specific performance shall not be the exclusive remedy of the Parties under this Agreement in the event of a breach of this Agreement by another Party hereto.

23.    <u>Voluntary Agreement</u>.    Each Party acknowledges that it has read all of the terms of this Agreement, has had an opportunity to consult with counsel of its own choosing or voluntarily waived such right and enters into this Agreement voluntarily and without duress.

24.    <u>Further Assurances</u>.    Each Party agrees, without further consideration, to execute and deliver such other documents and to take such other action as may be necessary to consummate the purposes of this Agreement.

25.    <u>No Admission</u>.    This Agreement is for settlement purposes only and shall not be construed or deemed an admission by any Party to this Agreement of wrongdoing, liability, fault, or the validity of any claims.

26.    <u>Valid Provisions Remain Effective</u>.    If any provision in this Agreement shall be invalid, inoperative or unenforceable, the remaining provisions of this Agreement shall remain in

effect if both the economic and legal substance of the terms contemplated hereby are not materially affected in any manner adverse to any Party. Otherwise, the Parties shall negotiate in good faith to rewrite any such provision so as to, as nearly and fairly as possible, approach the economic and legal substance originally intended.

27.    Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against either Party. Nor will any rule of construction that favors a non-draftsman be applied. A reference to any statute will be deemed also to refer to all rules and regulations promulgated under the statute, unless the context requires otherwise. Unless specifically otherwise provided or the context otherwise requires, the singular includes the plural and the plural the singular; the word "or" is deemed to include "and/or", the words "including", "includes" and "include" are deemed to be followed by the words "without limitation", and references to sections are to those of this Agreement. Headings in this Agreement are included for convenience of reference only and do not constitute a part of this Agreement for any other purpose.

28.    Advice of Counsel. Each Party represents that it has had the opportunity to obtain advice of counsel in connection with this Agreement and all matters covered hereby, and that each Party has been fully advised by those attorneys with respect to its rights and obligations under this Agreement.

29.    Counterparts. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement. Delivery of a signature page to this Agreement by facsimile or other electronic means shall be effective as delivery of the original signature page to this Agreement.

30.    Joint Drafting. This Agreement shall be deemed to have been jointly drafted by the Parties, and in construing and interpreting this Agreement, no provision shall be construed and interpreted for or against any Party because such provision or any other provision of the Agreement as a whole is purportedly prepared or requested by such Party.

31.    Applicable Law. The validity, interpretation, and performance of this Agreement shall be construed and interpreted according to the laws of the State of Delaware, except to the extent that (a) provisions of the Bankruptcy Code apply, in which event the Bankruptcy Code shall control, or (b) applicable federal law preempts state law.

32.    Attorneys' Fees, Costs and Expenses. Each Party agrees to bear its own costs and expenses, including attorneys' fees, arising out of the matters addressed by this Agreement.

33.    Entire Agreement. This document contains the entire Agreement between the Parties as to the matters addressed herein, and may only be modified in writing signed by the Parties or their duly appointed agents. All prior agreements and understandings between the Parties concerning the subject matter hereof are superseded by the terms of this Agreement.

34.    Inconsistency. In the event of any inconsistency between this Agreement and the Plan Support Agreement, the terms of this Agreement shall govern.

35.    <u>Successors and Assigns</u>.  This Agreement shall be binding on and inure to the benefit of the Parties and their respective agents, employees, affiliates, successors, and, with the consent of all Parties, assigns.

36.    <u>Notices</u>.  All notices, consents, waivers, and other communications under this Agreement must be in writing and shall be deemed to have been duly given when:  (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of receipt), or (c) received by the addressee, if sent by email, in each case to the appropriate addresses, representative (if applicable) or if sent by telecopier to telecopier numbers set forth in the signature page(s) attached hereto (or to such other addresses, representative and telecopier numbers as a Party may designate by notice to the other Parties in accordance with this paragraph).

[signature page(s) follow]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date written in the opening paragraph hereof.

**Revstone Industries, LLC**
**Spara, LLC**
**TPOP, LLC f/k/a Metavation, LLC**
**Greenwood Forgings, LLC**
**US Tool & Engineering, LLC**

_____
John C. DiDonato
Chief Restructuring Officer
c/o Huron Consulting Group Inc.

599 Lexington Ave., 25th Floor
New York, NY 10022
Fax: (212) 785-1313
Email: jdidonato@huronconsultinggroup.com


**Pension Benefit Guaranty Corporation**

_____
Dana Cann
Acting Deputy Director
Corporate Finance and Restructuring
Department
1200 K Street NW, Suite 340
Washington, D.C. 20005
Fax: (202) 326-4112
Email: Cann.dana@pbgc.gov


**Fairfield Castings, LLC**
**T Cast Holdings, LLC**

By:    Spara, LLC,
       A Delaware limited liability company

By:    _____
       John C. DiDonato
       Chief Restructuring Officer

- 11 -

DOCS_SF:84697.2 73864/001

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date written in the opening paragraph hereof.

**Revstone Industries, LLC**            **Pension Benefit Guaranty Corporation**
**Spara, LLC**
**TPOP, LLC f/k/a Metavation, LLC**
**Greenwood Forgings, LLC**
**US Tool & Engineering, LLC**

_____        _____
John C. DiDonato                           Dana Cann
Chief Restructuring Officer              Acting Deputy Director
c/o Huron Consulting Group Inc.        Corporate Finance and Restructuring
                                    Department
                                    1200 K Street NW, Suite 340
599 Lexington Ave., 25th Floor         Washington, D.C. 20005
New York, NY 10022                  Fax: (202) 326-4112
Fax: (212) 785-1313                Email: _____
Email: jdidonato@huronconsultinggroup.com


**Fairfield Castings, LLC**
**T Cast Holdings, LLC**

By:    Spara, LLC,
        A Delaware limited liability company


By:   _____
      John C. DiDonato
      Chief Restructuring Officer

- 11 -

**Revstone Transportation, LLC**
**Revstone Tool & Engineering, LLC**

_____
John C. DiDonato
Chief Restructuring Officer


**MWTDC, Inc. f/k/a MW Texas Die Casting, Inc.,**
A Delaware corporation


_____
Daniel V. Smith
Secretary


**CC Liquidation, LLC f/k/a Contech Castings, LLC,**
A Delaware limited liability company

By:    Revstone Transportation, LLC,
       A Delaware limited liability company,
       Its Sole Member

By:    _____
       John C. DiDonato
       Chief Restructuring Officer


**CCREH Liquidation, LLC f/k/a/ Contech Castings Real Estate Holdings, LLC,**
A Delaware limited liability company

By:    CC Liquidation, LLC f/k/a Contech Castings, LLC
       A Delaware limited liability company,
       Its Sole Member

       By:    Revstone Transportation, LLC,
              A Delaware limited liability company,
              Its Sole Member

       By:    _____
              John C. DiDonato
              Chief Restructuring Officer

- 12 -

**MWTDC, Inc. f/k/a MW Texas Die Casting, Inc.,**
A Delaware corporation

Daniel V. Smith
Secretary


**CC Liquidation, LLC f/k/a Contech Castings, LLC,**
A Delaware limited liability company

By:    Revstone Transportation, LLC,
       A Delaware limited liability company,
       Its Sole Member


       By:
              John C. DiDonato
              Chief Restructuring Officer


**CCREH Liquidation, LLC f/k/a/ Contech Castings Real Estate Holdings, LLC,**
A Delaware limited liability company

By:    CC Liquidation, LLC f/k/a Contech Castings, LLC
       A Delaware limited liability company,
       Its Sole Member

       By:    Revstone Transportation, LLC,
              A Delaware limited liability company,
              Its Sole Member

              By:
                     John C. DiDonato
                     Chief Restructuring Officer

**Revstone Lighting, LLC,**
A Delaware limited liability company

By:    Revstone Industries, LLC,
       A Delaware limited liability company,
       Its Sole Member


       By:
              John C. DiDonato
              Chief Restructuring Officer

12

**Revstone Lighting, LLC,**
A Delaware limited liability company

By:     Revstone Industries, LLC,
        A Delaware limited liability company,
        Its Sole Member

        By:   _____
              John C. DiDonato
              Chief Restructuring Officer


**Creative Lighting Solutions, LLC,**
A Delaware limited liability company


By:     Revstone Lighting, LLC
        A Delaware limited liability company,
        Its Sole Member

        By:   Revstone Industries, LLC,
              A Delaware limited liability company,
              Its Sole Member

              By:   _____
                    John C. DiDonato
                    Chief Restructuring Officer


**MPI, LLC,**
A Delaware limited liability company

By:     Revstone Transportation, LLC,
        A Delaware limited liability company,
        Its Sole Member

        By:   _____
              John C. DiDonato
              Chief Restructuring Officer

**Reystone Wallaceburg Canada Inc.**

Joseph Bianco
President

Mary Van Santvoort
Secretary -Treasurer

**Aarkel Tool & Die Inc.**

Joseph Bianco
President

Mary Van Santvoort
Secretary-Treasurer

**Eptec S.A. De C.V.**

Robert Carney
Sole Administrator

- 14 -

**Revstone Wallaceburg Canada Inc.**

_____

Joseph Bianco
President

_____

Mary Van Santvoort
Secretary -Treasurer

**Aarkel Tool & Die Inc.**

_____

Joseph Bianco
President

_____

Mary Van Santvoort
Secretary-Treasurer

**Eptec S.A. De C.V.**

_____

Robert Carney
Sole Administrator

- 14 -

# EXHIBIT A

## Funding Schedule

## EXHIBIT A - Funding Schedule

| Recovery Source | Net Proceeds For PBGC & Estates | Distribution of Net Proceeds | | | | |
| | | PBGC | Estates | | Hold Back/Escrow | |
| | | | Revstone | Spara | Revstone | Spara |
|---|---|---|---|---|---|---|
| **Plan Funding** | $ 21,694 | $ 21,694 | - | - | - | - |
| | | | | | | |
| **Revstone Escrows** | | | | | | |
| Contech PBGC Escrow | 12,263 | 4,905 | 4,905 | - | 2,453 | - |
| Contech General Escrow | 613 | 245 | 245 | - | 123 | - |
| Texas Die PBGC Escrow | 2,399 | 960 | 960 | - | 480 | - |
| Texas Die Cash on Hand | 379 | 151 | 151 | - | 76 | - |
| CLS PBGC Escrow | 2,609 | 1,044 | 1,044 | - | 522 | - |
| Dowagiac | - | - | - | - | - | - |
| Subtotal | 18,263 | 7,305 | 7,305 | - | 3,653 | - |
| Allocation % | | 40% | 40% | 0% | 20% | 0% |
| | | | | | | |
| **Revstone Industries Surplus** | 2,123 | 849 | 849 | - | 425 | - |
| Allocation % | | 40% | 40% | 0% | 20% | 0% |
| Interim Recovery Total | $ 93,860 | $ 60,155 | $ 17,183 | $ 4,718 | $ 7,087 | $ 4,718 |
| | | | | | | |
| **TPOP f/k/a Metavation** | | | | | | |
| PBGC Recovery | 19,000 | 19,000 | - | - | - | - |
| Allocation | | 100% | 0% | 0% | 0% | 0% |
| Revstone Industries GUC Recovery | 639 | 256 | 256 | - | 128 | - |
| Allocation % | | 40% | 40% | 0% | 20% | 0% |
| Subtotal | 19,640 | 19,256 | 256 | - | 128 | - |
| | | | | | | |
| Pre-Escrow Disribution Recovery | 113,500 | $ 79,411 | $ 17,439 | $ 4,718 | $ 7,215 | $ 4,718 |
| | | | | | | |
| **Baseline Target Recovery** | $ 113,500 | $ 82,000 | $ 24,131 | 7,369 | $ - | $ - |
| Excess (Shortfall) | - | (2,589) | (6,692) | (2,652) | 7,215 | 4,718 |
| | | | | | | |
| Target Adjusted for Excess (Shortfall) | | - | - | - | | |
| Revised Target | | 82,000 | 24,131 | 7,369 | | |
| Excess (Shortfall) to Revised Target | | (2,589) | (6,692) | (2,652) | 7,215 | 4,718 |
| | | | | | | |
| Assumed Escrow Distribution "true up" | | | | | | |
| Spara Entity Escrows | | 2,066 | | 2,652 | | (4,718) |
| Revstone Entity Escrows | | 523 | 6,692 | | (7,215) | |
| | | | | | | |
| **Recovery** | | $ 82,000 | $24,131 | $ 7,369 | $ - | $ - |

**ESTIMATED ALLOCATION OF ESTATE PROCEEDS:**

| | Net Proceeds for Estates | Litigation Reserve | Post Eff Reserve | Admin/Priority Est. | | Unsecured Est. | |
| | | | | Claim | Distri | Claim | Distr |
|---|---|---|---|---|---|---|---|
| Revstone | $ 24,131 | $ 1,500 | $ 1,000 | $ 20,349 | $ 17,297 | $ 33,000 | $ 4,334 |
| Recovery % | | | | | 85.0% | | 13% |
| Spara | $ 7,369 | $ 500 | $ 750 | $ 4,749 | $ 4,179 | $ 8,400 | $ 1,940 |
| Recovery % | | | | | 88.0% | | 23% |

Notes:

"Net Proceeds For PBGC & Estates" means sale proceeds net of reasonable and ordinary transaction costs, payments to non-PBGC creditors at the non-debtors, and payments of post-petition professional fees at TPOP f/k/a Metavation.

Estimated distributions to unsecured creditors reflected above are subject to the terms of a confirmed chapter 11 plans proposed by the Debtors. Distributions to unsecured creditors are also subject to reduction by 50% pending receipt of the PBGC Minimum Recovery.

**EXHIBIT B – Example 1**

Net Proceeds result in $10 million less than Target Scenario

| | Net Proceeds For PBGC & Estates | Distribution of Net Proceeds | | | | | |
|---|---|---|---|---|---|---|---|
| | | PBGC | Revstone | | Spara | | |
| | | | Estate | Escrow | Estate | Escrow | |
| Plan Funding to Date | $ 21,694 | $ 21,694 | $ - | $ - | $ - | $ - | |
| Revstone Net Proceeds | 49,064 | 29,411 | 13,689 | 5,965 | - | - | |
| Spara Net Proceeds | 32,742 | 24,556 | - | - | 4,093 | 4,093 | |
| True Up | - | 4,339 | 4,501 | (5,965) | 1,217 | (4,093) | |
| Total | $ 103,500 | $ 80,000 | $ 18,190 | $ - | $ 5,310 | $ - | |

**ESTIMATED ALLOCATION OF ESTATE PROCEEDS:**

| | Net Proceeds for Estates | Litigation Reserve | Post Eff Reserve | Admin/Priority Est. | | Unsecured Est. | |
|---|---|---|---|---|---|---|---|
| | | | | Claim | Distri | Claim | Distr |
| Revstone | $ 18,190 | $ 1,500 | $ 1,000 | $ 20,349 | $ 15,690 | $ 33,000 | $ - |
| Recovery % | | | | | 77.1% | | 0% |
| Spara | $ 5,310 | $ 500 | $ 750 | $ 4,749 | $ 4,060 | $ 8,400 | $ - |
| Recovery % | | | | | 85.5% | | 0% |

Notes:

"Net Proceeds For PBGC & Estates" means sale proceeds net of reasonable and ordinary transaction costs, payments to non-PBGC creditors of the non-debtors, and payments of post-petition professional fees at TPOP f/k/a Metavation.

Estimated distributions to unsecured creditors reflected above are subject to the terms of a confirmed chapter 11 plans proposed by the Debtors. Distributions to unsecured creditors are also subject to reduction by 50% pending receipt of the PBGC Minimum Recovery.

EHXHIBIT B – Example 2

Net Proceeds result in $10 million more than the Target Scenario

| | Net Proceeds For PBGC & Estates | Distribution of Net Proceeds | | | | |
| | | PBGC | Revstone | | Spara | |
| | | | Estate | Escrow | Estate | Escrow |
|---|---|---|---|---|---|---|
| Plan Funding to Date | $    21,694 | $    21,694 | $          - | $          - | $          - | $          - |
| Revstone Net Proceeds | 59,064 | 29,411 | 21,189 | 8,465 | - | - |
| Spara Net Proceeds | 42,742 | 32,056 | - | - | 5,343 | 5,343 |
| True Up | - | 2,589 | 7,484 | (8,465) | 3,734 | (5,343) |
| Total | $    123,500 | $    85,750 | $    28,673 | $          - | $    9,077 | $          - |

ESTIMATED ALLOCATION OF ESTATE PROCEEDS:

| | Net Proceeds for Estates | Litigation Reserve | Post Eff Reserve | Admin/Priority Est. | | Unsecured Est. | |
| | | | | Claim | Distri | Claim | Distr |
|---|---|---|---|---|---|---|---|
| Revstone | $    28,673 | $    1,500 | $    1,000 | $    20,349 | $    20,349 | $    33,000 | $    5,824 |
| Recovery % | | | | | 100.0% | | 18% |
| Spara | $    9,077 | $    500 | $    750 | $    4,749 | $    4,749 | $    8,400 | $    3,078 |
| Recovery % | | | | | 100.0% | | 37% |

Notes:

"Net Proceeds For PBGC & Estates" means sale proceeds net of reasonable and ordinary transaction costs, payments to non-PBGC creditors at the non-debtors, and payments of post-petition professional fees at TPOP f/k/a Metavation.

Estimated distributions to unsecured creditors reflected above are subject to the terms of a confirmed chapter 11 plans proposed by the Debtors.  Distributions to unsecured creditors are also subject to reduction by 50% pending receipt of the PBGC Minimum Recovery.

## **EXHIBIT C**

**Plan Support Agreement**

## PLAN SUPPORT AGREEMENT

This *Plan Support Agreement* (this "Agreement"), dated as of _____, 2014 is entered into by and among Revstone Industries, LLC ("Revstone"), Spara, LLC, TPOP, LLC f/k/a Metavation, LLC, U.S. Tool & Engineering LLC, and Greenwood Forgings, LLC (together, the "Debtors"), on the one hand, and the Pension Benefit Guaranty Corporation (the "PBGC"), on the other hand.  The Debtors and the PBGC are referred to herein as the "Parties" and each individually as a "Party."

**THIS AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF VOTES WITH RESPECT TO ANY CHAPTER 11 PLAN.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  ACCEPTANCES OR REJECTIONS WITH RESPECT TO A CHAPTER 11 PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

### RECITALS

A.    The Debtors each commenced chapter 11 cases (the "Bankruptcy Cases") under title 11 of the United States Code (the "Bankruptcy Code") that are presently pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

B.    On February 10, 2014, the Parties (along with other signatories) executed that certain Settlement Agreement (the "Settlement Agreement") resolving various disputes amongst the Parties.  Pursuant to an order dated _____, 2014, the Bankruptcy Court approved the Settlement Agreement under Rule 9019 of the Federal Rules of Bankruptcy Procedure.

C.    Pursuant to the Settlement Agreement, the PBGC has agreed to support the amended chapter 11 plan that will be filed by Revstone in the Bankruptcy Cases in all material respects, provided that such shall amended plan is consistent with the Settlement Agreement, or as otherwise may be modified by Revstone or supplemented by separate plans of the other Debtors in conformity with the Settlement Agreement and to reflect the circumstances, including governance, relating to such other Debtors.  Such chapter 11 plan or plans proposed, or to be proposed, by the Debtors together or individually are collectively referred to herein as the "Proposed Plan," and the disclosure statement or disclosure statements in support thereof are collectively referred to herein as the "Disclosure Statement."

D.    The Parties have agreed to facilitate confirmation and consummation of the Proposed Plan and the transactions described therein.

E.    To ensure an orderly confirmation process, the Parties are prepared to perform their obligations hereunder subject to the terms and conditions of this Agreement, including, without limitation, to support the Debtors' efforts to:  (a) seek the Bankruptcy Court's approval of the Disclosure Statement prior to soliciting votes on the Proposed Plan in accordance with section 1125 of the Bankruptcy Code; (b) obtain Bankruptcy Court approval and confirmation of

the Proposed Plan; and (c) achieve the applicable effective date provided for under the Proposed Plan.

F.    In expressing their support for the Proposed Plan (pursuant to the terms and conditions of this Agreement), the Parties do not desire and do not intend in any way to derogate or diminish the solicitation requirements of applicable securities or bankruptcy law, nor the respective fiduciary, statutory, or other duties of the Parties.

## AGREEMENT

In consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    Recitals.    The Recitals set forth above are incorporated herein and form an integrated part of this Agreement.

2.    Effectiveness of Agreement.    Subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, upon the execution of this Agreement by the Parties, this Agreement will constitute a legally binding and enforceable agreement of the Parties, effective as of the date first written above.

3.    Agreements.    The Parties agree to the following:

(a)    Proposed Plan.    The Parties agree to all material terms in the Proposed Plan, as such plan may be modified or supplemented, and to support confirmation and consummation of the Proposed Plan, *provided* that the Proposed Plan is in conformity with the Settlement Agreement.

(b)    Further Modifications.    The Parties agree to any modifications or amendments made by the Debtors with respect to the Proposed Plan, and to support confirmation and consummation thereof, *provided* that such modifications and amendments do not materially and adversely affect the rights and benefits under the Settlement Agreement of any Party that does not expressly consent thereto.    All commitments and obligations arising under this Agreement with respect to the Proposed Plan shall also be effective and binding as to any amendments to the Proposed Plan that comply with the requirements of this paragraph 3(b).

(c)    Bankruptcy Filings.    All material pleadings and other documents that the Debtors file in connection with the Chapter 11 Cases with the Bankruptcy Court shall be consistent in all material respects with this Agreement, the Settlement Agreement, and the Proposed Plan.

(d)    Disclosure Statement.    The Parties will support entry of the order of the Bankruptcy Court approving the Disclosure Statement, *provided* that such order is in form and substance consistent with this Agreement, the Settlement Agreement, and the Proposed Plan.

4.      Further Support.  Provided that the Proposed Plan and the information in the Disclosure Statement have not been modified, altered, amended, or supplemented in a manner that would materially and adversely affect the rights, recoveries, or obligations of the Parties under the Settlement Agreement, each Party hereto will:

(a)      support entry of the order approving the Disclosure Statement and (after thereof) the Confirmation Order;

(b)      not withhold, withdraw, qualify, or modify its approval of the Proposed Plan;

(c)      not commence any proceeding or prosecute, join in, or otherwise support any action to oppose or object to approval of the Proposed Plan or the Disclosure Statement or (after approval thereof) the Confirmation Order (provided the Disclosure Statement is consistent in all material respects with the Proposed Plan);

(d)      not encourage any other person or entity to object to, delay, impede, appeal, or take any other action to interfere with entry of the Disclosure Statement Order or (after approval thereof) the Confirmation Order;

(e)      not seek, solicit, negotiate, support, or enter into an agreement related to any other chapter 11 plan in these chapter 11 cases (an "Alternative Plan") unless the Parties have agreed, in writing, to pursue such Alternative Plan; or

(f)      not seek to materially modify, revise, amend or renegotiate the terms of the Proposed Plan without the consent of the Parties.

5.      Appearing in the Bankruptcy Court.  Nothing in this Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Bankruptcy Court so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement or the Settlement Agreement.

6.      Common Interest and Confidentiality.  The Parties have, on and following January 31, 2014, shared and exchanged, and will continue to share and exchange, documents and information pertaining to the formulation, funding and confirmation of the Proposed Plan ("Confidences") among themselves and their respective counsel for purposes of their common interest and joint defense in support of such plan.  The Parties have agreed to reveal certain Confidences within this arrangement upon the express condition that no Party or its counsel will disclose to any third party, other than as expressly provided for herein, any Confidences without the written consent, in advance, of the Parties to this Agreement.  This Agreement shall not extend to Confidences which are now in, or hereafter enter, the public domain, or are not otherwise protected from disclosure, except that it shall continue to apply to any Confidences disclosed by wrongful act or in violation of this Agreement.  Notwithstanding anything herein to the contrary, PBGC may disclose the Confidences to the Executive Branch of the United States, the PBGC and PBGC Board of Directors, officials, advisors, consultants, and representatives who have a need to know the information as part of their job responsibilities, and to others as

required by law or as may be necessary in connection with any court or administrative proceedings, request of Congress or any committee, joint committee or subcommittee thereof, or request of the Comptroller General.

7.    <u>Representations and Warranties of the Parties</u>.    Each Party represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(a)    it has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and, subject to any necessary Bankruptcy Court approval, carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of the Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(b)    the execution, delivery, and, subject to any necessary Bankruptcy Court approval, performance by such Party of this Agreement does not and shall not violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(c)    the execution, delivery, and performance by such Party of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body; and

(d)    this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms.

8.    <u>Termination of this Agreement</u>.  This Agreement shall automatically terminate if:

(a)    all Parties agree in writing to terminate this Agreement;

(b)    any of the Chapter 11 Cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, but the termination of this Agreement shall only extend to those Debtors that have had their cases dismissed on converted;

(c)    the Bankruptcy Court has entered an order in any of the Chapter 11 Cases appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, but the termination of this Agreement shall only extend to those Debtors that have had a trustee appointed;

(d)    the Bankruptcy Court denies confirmation of the Proposed Plan with prejudice and without leave to amend, but the termination of this Agreement shall only extend to those Debtors that have had confirmation denied in their respective cases; or

(e)    the Bankruptcy Court has not entered an order confirming the Proposed Plan by August 15, 2014, provided that such outside date shall be extended so long as the Proposed Plan is pending and the Bankruptcy Court has not denied confirmation with prejudice.

Each event described in items (a) through (e) above shall be a "Termination Event." The foregoing Termination Events are intended solely for the benefit of the Parties to this Agreement; provided that no Party may seek to terminate this Agreement based upon a material breach or a failure of a condition (if any) in this Agreement arising out of its own actions or omissions. Upon occurrence of a Termination Event, this Agreement shall be of no further force and effect and each Party hereto shall be released from its commitments, undertakings, and agreements under or related to this Agreement; provided, however, that no such termination shall relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the date of termination.

9.    Cooperation; Further Assurances; Acknowledgment; Definitive Documents. The Parties shall cooperate with each other and shall coordinate their activities (to the extent practicable and consistent with each of the Parties' respective fiduciary or statutory duties) in respect of all actions commercially reasonably necessary to timely consummate the Proposed Plan. The Parties shall execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be commercially reasonably appropriate or necessary, from time to time, to effectuate the Proposed Plan.

10.    Amendments. This Agreement may not be modified, amended or supplemented except in a writing signed by the Parties hereto.

11.    GOVERNING LAW; JURISDICTION. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE AND THE BANKRUPTCY CODE, AS APPLICABLE, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER, OR ARISING OUT OF, OR IN CONNECTION WITH, THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT, OR PROCEEDING.

12.    Specific Performance; Damages. The exact nature and extent of damages resulting from a breach of this Agreement are uncertain at the time of entering into this Agreement and breach of this Agreement would result in damages that would be difficult to determine with certainty. Money damages would not be a sufficient remedy for any breach of

this Agreement, and the Parties shall each be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach. Notwithstanding anything to the contrary set forth above, the remedy of specific performance shall not be the exclusive remedy of the Parties under this Agreement in the event of a breach of this Agreement by another Party hereto.

13. <u>Headings</u>. The headings of the Sections, paragraphs and subsections of this Agreement are inserted for convenience only, and shall not affect the interpretation hereof.

14. <u>Assignment; Successors and Assigns; Severability; Several Obligations</u>. No rights or obligations of the Parties under this Agreement may be assigned or transferred to any other entity. This Agreement is intended to, and shall, bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives. The invalidity or unenforceability at any time of any provision hereof shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof.

15. <u>No Third-Party Beneficiaries</u>. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall have any right hereunder.

16. <u>Prior Negotiations; Entire Agreement</u>. This Agreement (along with the Settlement Agreement) constitutes the entire agreement of the Parties related to the Proposed Plan, and supersedes all other prior negotiations with respect to the subject matter hereof, except that the Parties agree and acknowledge that the Proposed Plan shall continue in full force and effect, subject to entry of an order confirming the Proposed Plan.

17. <u>Counterparts</u>. This Agreement and any amendments, joinders, consents or supplements hereto, may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement. Facsimile or scanned signatures on this Agreement shall be treated as originals for all purposes.

18. <u>Construction; Consideration</u>. This Agreement shall be deemed to have been negotiated and prepared at the joint request, direction and construction of the Parties, at arm's length and be interpreted without favor to any Party. The Parties hereby acknowledge that no consideration, other than that specifically described herein and in the Settlement Agreement and the Proposed Plan shall be due or paid to any of the Parties for their agreement to support confirmation of the Proposed Plan in accordance with the terms and conditions of this Agreement.

19. <u>Time of the Essence</u>. Time shall be of the essence with respect to each and every of the various undertakings and obligations set forth in this Agreement.

20. <u>Notices</u>. All notices, consents, waivers and other communications under this Agreement must be in writing and shall be deemed to have been duly given when: (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of receipt), or (c) received by the addressee, if sent by email, in each case to the appropriate addresses, representative (if applicable) and telecopier numbers set forth in the signature page attached hereto (or to such other addresses, representative and telecopier numbers as a Party may designate by notice to the other Parties in accordance with this paragraph).

21.    <u>Acknowledgement</u>. THIS AGREEMENT, THE PROPOSED PLAN, AND THE TRANSACTIONS CONTEMPLATED HEREIN AND THEREIN, ARE THE PRODUCT OF NEGOTIATIONS    BETWEEN    THE    PARTIES    AND    THEIR    RESPECTIVE REPRESENTATIVES.    EACH    PARTY    HEREBY    ACKNOWLEDGES    THAT    THIS AGREEMENT IS NOT AND SHALL NOT BE DEEMED TO BE A SOLICITATION OF VOTES FOR THE ACCEPTANCE OF A CHAPTER 11 PLAN FOR THE PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR OTHERWISE.    THE DEBTORS WILL NOT SOLICIT ACCEPTANCES OF THE PROPOSED PLAN FROM ANY PERSON OR ENTITY UNTIL THE PERSON OR ENTITY HAS BEEN PROVIDED WITH A COPY OF A DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. EACH PARTY FURTHER ACKNOWLEDGES THAT NO SECURITIES OF ANY DEBTOR ARE BEING OFFERED OR SOLD HEREBY AND THAT THIS AGREEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OF ANY DEBTOR. NOTWITHSTANDING THE FOREGOING PROVISIONS, NOTHING IN THIS AGREEMENT SHALL REQUIRE ANY PARTY TO TAKE ANY ACTION PROHIBITED BY THE BANKRUPTCY CODE, THE SECURITIES ACT OF 1933 (AS AMENDED), THE SECURITIES EXCHANGE ACT OF 1934 (AS AMENDED), ANY RULE OR REGULATIONS PROMULGATED THEREUNDER, OR BY ANY OTHER APPLICABLE LAW OR REGULATION OR BY AN ORDER OR DIRECTION OF ANY COURT OR ANY STATE OR FEDERAL GOVERNMENTAL AUTHORITY.

22.    <u>Agreement Not a Plan</u>.    This Agreement does not constitute a plan of reorganization or confirmation thereof under the Bankruptcy Code.  Any plan will not become effective unless and until the Bankruptcy Court enters a confirmation order and the Proposed Plan becomes effective in accordance with its terms.

23.    <u>No Waiver of Participation and Preservation of Rights</u>.    If the transactions contemplated by this Agreement or otherwise set forth in the Proposed Plan are not consummated as provided herein or therein, or if this Agreement is terminated for any reason, except as otherwise provided for herein, the Parties each fully reserve any and all of their respective rights, remedies and interests.

[signature page follows]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date written in the opening paragraph hereof.

| | |
|---|---|
| **Revstone Industries, LLC**<br>**Spara, LLC**<br>**TPOP, LLC f/k/a Metavation, LLC**<br>**Greenwood Forgings, LLC**<br>**US Tool & Engineering, LLC** | **Pension Benefit Guaranty Corporation** |

| | |
|---|---|
| John C. DiDonato<br>Chief Restructuring Officer<br>c/o Huron Consulting Group Inc. | Dana Cann<br>Acting Deputy Director<br>Corporate Finance and Restructuring<br>Department<br>1200 K Street NW, Suite 340<br>Washington, D.C. 20005<br>Fax: (202) 326-4112<br>Email: _____ |
| 599 Lexington Ave., 25th Floor<br>New York, NY 10022<br>Fax: (212) 785-1313<br>Email: jdidonato@huronconsultinggroup.com | |

# EXHIBIT B

# SUMMARY OF TERMS

| | |
|---|---|
| **PBGC Allowed Claim and Recovery** | • Allowed Claim of $95 million.<br>• Target recovery of $77 million with minimum of $75 M. First $2.0 million of litigation proceeds which otherwise would have been distributed to the PBGC, instead payable to Revstone estate, $1.5 million apportioned to administrative creditors and $500,000 to non-BFG general unsecured creditors. See attached modified Funding Schedule, which is incorporated herein. All other litigation proceeds available to the estate will be split 75% to the administrative claimants and 25% to general unsecured creditors. The general unsecureds' allocation to be agreed upon between BFG and the Committee. |
| **Baseline Revstone GUC Recovery** | • See attached modified Funding Schedule. |
| **Downside Protection (relative to estate funding baseline)** | • $3.0 million PBGC carve out from non-debtors' sale proceeds ($3.0 million equates to 12.4% on an estimated claims pool of $24.1 million) that provides up-front recovery to Revstone non-BFG general unsecured creditors pursuant to the Plan (the "Revstone Unsecured Guarantee Reserve"). TPOP would file a stand-alone plan.<br>• To the extent permissible under applicable law, the carve out will only be made available under the Plan to the class of Revstone general unsecured creditors provided the class votes in favor of the plan.<br>• Downside allocated 75% to Revstone general unsecured creditors / 25% to administrative claimants subject to the $3.0 million PBGC carve out of proceeds for non-BFG general unsecured creditors.<br>• General unsecured creditors would not recover additional dollars beyond the $3.0 million carve out until the administrative creditors recover $14.845 million. See attached modified Funding Schedule. $3.0 million carve out shall be made available for distribution upon the effective date of the Plan. |
| **Upside Potential From Non-Litigation Assets (relative to estate funding baseline)** | • First $2.0 million of upside from non-litigation assets allocated 75% to administrative claimants / 25% to general unsecured creditors.<br>• Additional upside allocated 50% to administrative claimants / 50% to general unsecured creditors. |
| **Debtors' Professionals Revstone Recovery** | • 15% permanent reduction in Revstone fees (Huron and PSZJ).<br>• Any deduction in fees through objection to fee application and/or fee examiner review would be |

| | |
|---|---|
| | credited against the agreed upon 15% reduction, as well as the expected fees to be deferred. |
| **Committee Professionals Revstone Recovery** | • Consensual substantial contribution claim for Committee counsel (WCSR) against TPOP in the amount of $250,000.<br>• 15% permanent reduction in claims of WCSR.<br>• Any deduction in fees through objection to fee application and/or fee examiner review would be credited against the agreed upon 15% reduction, as well as the expected fees to be deferred. |
| **Intercompany Resolution** | • In connection with the effective date of the Plan, the Debtors and the Committee will agree upon an appropriate resolution of intercompany issues, including allocation of related proceeds. |
| **Plan Post-Effective Date Governance** | • One manager appointed by Committee.  The Committee designee may not be BFG.<br>• One manager appointed by PBGC.<br>• Third manager who is mutually agreed upon by the Committee and the PBGC jointly.  If no such agreement can be reached, the Committee and the PBGC will each provide the name of their choice as the third manager and the CRO will select the third manager from these two names.<br>• Except as noted below, manager-level decisions will be made by majority vote of the managers. |
| **Plan Post-Effective Date Management** | • John DiDonato to remain the Revstone CRO.<br>• The CRO can be replaced for cause, by unanimous vote of the post-effective board of managers.  The parties will agree upon an appropriate allocation of responsibilities among professionals following the effective date of the Plan.  The Committee will have responsibility for addressing Revstone general unsecured creditor claims.<br>• Plan post-effective date governance only applies to Revstone.  All non Revstone debtors are expected to retain existing management following the effective date of the Plan. |
| **Plan Post-Effective Date Reserve Funding** | • $750,000 for Revstone, subject to a budget with any excess remaining to be contributed to the Revstone litigation trust. |
| **Litigation Trust Governance** | • One trust committee member appointed by Committee.  The Committee designee may be BFG.<br>• One trust committee member appointed by PBGC.<br>• Third trust committee member who is mutually agreed upon by the Committee and the PBGC jointly.  If no such agreement can be reached, the Committee and the PBGC will each provide two names for their choice as the third committee member and the Bankruptcy Court will select the third manager from these four names.<br>• Trust committee decisions will be made by majority |

| | |
|---|---|
| | vote of the trust committee members. |
| **Litigation Trust Funding** | • Single litigation trust to be established. Total litigation reserve funding of $1.0 million. See attached modified Funding Schedule. |
| **Litigation Trust Causes of Action** | • Allocation of proceeds of causes of action between Revstone and Spara estates will be addressed by consensual agreement amongst the Debtors and the Committee in connection with the effective date of the Plan. |
| **PBGC Participation in Litigation Trust** | • After first $2.0 million of litigation proceeds otherwise payable to PBGC as addressed in "PBGC Allowed Claim and Recovery" above, litigation proceeds to be split 50% to the estates / 50% to PBGC, up to the full recovery on PBGC's allowed claim, except for claims held by the Pension Plans.<br>• Subject to PBGC Agreement:<br>PBGC will bring all causes of action held by the Pension Plan, even if another party "finds" the claim. Any recovery realized from claims held by the Pension Plans (i.e., claims arising under ERISA) will go to PBGC as statutory trustee for the Pension Plans. In that event, an equal amount of subsequent recoveries on non-Pension Plan claims will go to the estate, up to the amount of recovery realized by PBGC on the Pension Plan claim. Thereafter, recoveries on non-Pension Plan claims will be split 50/50 as described in the first point above.<br>• PBGC will respond to Committee request regarding questioned assets recoveries. |
| **Releases and Exculpation** | • Outstanding Plan issues (e.g., releases and exculpation for professionals and independent managers) to be consistent with the plan previously filed by Revstone. |
| **TPOP and Other Non-Revstone Debtors** | • See response above to "Plan Post-Effective Date Management" limited to TPOP and Spara. |
| **Pending Litigation** | • All litigation ceases/all objections are dropped in connection with the Debtors' bankruptcy proceedings.<br>• To the extent there are fee objections remaining from third parties, funds for payment of such fees would be appropriately reserved. |
| **Plan Process** | • The Parties will move forward expeditiously to obtain Bankruptcy Court approval of the PBGC settlement, as modified hereby and by the global resolution term sheet, and to execute a plan confirmation process.<br>• The Parties will use best efforts to obtain confirmation of the plan by end of July 2014, subject to Court's availability and timing of approval of the settlement. |

## MODIFIED FUNDING SCHEDULE

**[See Attached]**

## TARGET RECOVERY SCENARIO FUNDING SCHEDULE

$'s in 000

| Recovery Source | Net Proceeds For PBGC & Estates | Distribution of Net Proceeds | | | | |
|---|---|---|---|---|---|---|
| | | | | Estates | Hold Back/Escrow | |
| | | PBGC | Revstone | Spara | Revstone | Spara |
| Plan Funding | $ 21,694 | $ 21,694 | | | | |
| | | | | | | |
| **Revstone Escrows** | | | | | | |
| Contech PBGC Escrow | 12,263 | 7,800 | 2,011 | - | 2,453 | - |
| Contech General Escrow | 613 | - | 491 | - | 123 | - |
| Texas Die PBGC Escrow | 2,399 | - | 1,919 | - | 480 | - |
| Texas Die Cash on Hand | 379 | - | 303 | - | 76 | - |
| CLS PBGC Escrow | 2,609 | - | 2,087 | - | 522 | - |
| Dowagiac | - | - | - | - | - | - |
| Subtotal | 18,263 | 7,800 | 6,810 | - | 3,653 | - |
| Allocation % | | 43% | 37% | 0% | 20% | 0% |
| Interim Recovery Total | $ 39,957 | $ 29,494 | $ 6,810 | $ - | $ 3,653 | $ - |



| | | | | | | |
|---|---|---|---|---|---|---|
| Revstone Industries Surplus | 2,123 | 531 | 1,168 | - | 425 | - |
| Allocation % | | 25% | 55% | 0% | 20% | 0% |
| Interim Recovery Total | $ 93,860 | $ 62,955 | $ 16,270 | $ 2,831 | $ 7,087 | $ 4,718 |
| | | | | | | |
| **TPOP f/k/a Metavation** | | | | | | |
| PBGC Recovery | 19,000 | 19,000 | - | - | - | - |
| Allocation % | | 100% | 0% | 0% | 0% | 0% |
| Revstone Industries GUC Recovery | 639 | 128 | 384 | - | 128 | - |
| Allocation % | | 20% | 60% | 0% | 20% | 0% |
| Subtotal | 19,640 | 19,128 | 384 | - | 128 | - |
| | | | | | | |
| BFG Settlement funded by agreement of parties from existing PBGC escrow accounts | - | (7,800) | - | 7,800 | - | - |
| Pre-Escrow Distribution Recovery | $ 113,500 | $ 74,283 | $ 16,653 | $ 10,631 | $ 7,215 | $ 4,718 |
| | | | | | | |
| Baseline Target Recovery | $ 113,500 | $ 77,000 | $ 22,478 | $ 14,022 | $ - | $ - |
| Excess (Shortfall) | - | (2,717) | (5,824) | (3,391) | 7,215 | 4,718 |
| | | | | | | |
| **Assumed Escrow Distribution "true up"** | | | | | | |
| Spara Entity Escrows | | 1,326 | | 3,391 | | (4,718) |
| Revstone Entity Escrows | | 1,391 | 5,824 | | (7,215) | |
| Recovery | | $ 77,000 | $ 22,478 | $ 14,022 | | |

**ESTIMATED ALLOCATION OF ESTATE PROCEEDS:**

| | Net Proceeds for Estates | To Litigation Reserve | Post Eff Reserve | BFG | Admin/Priority Est. | | Non-BFG GUCs | | BFG GUC | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Claim | Distr | Claim | Distr | Claim | Distr |
| Revstone | $ 22,478 | $ 750 | $ 750 | $ 700 | $ 22,067 | $ 15,453 | $ 24,122 | $ 4,459 | $ 8,500 | $ 365 |
| Recovery % | | | | | | 70.0% | | 18.5% | | 4.3% |
| Spara | $ 14,022 | $ 250 | $ 500 | $ 7,800 | $ 5,033 | $ 4,929 | $ 2,800 | $ 543 | | |
| Recovery % | | | | | | 97.9% | | 19.4% | | |
| Litigation Reserve | $ 1,000 | | | | | | | | | |

Notes:

"Net Proceeds For PBGC & Estates" means sale proceeds net of reasonable and ordinary transaction costs, payments to non-PBGC creditors of the non-debtors, and payments of post-petition professional fees at TPOP f/k/a Metavation.

Estimated distributions to unsecured creditors reflected above are subject to the terms of a confirmed chapter 11 plans proposed by the Debtors and the terms of the Global Resolution Term Sheet and the Consensual Resolution Terms attached thereto.

Allocation of the funding for the litigation trust is subject to change based on the terms of the final settlement agreement or plan.