IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVSTONE INDUSTRIES, LLC, et al.,[1] | ) | Case No. 12-13262 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

_____

**DISCLOSURE STATEMENT IN RESPECT OF
DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**
_____

**IMPORTANT DATES**

- Date by which Ballots must be received: **February 20, 2015 at 5:00 p.m. (prevailing Eastern time)**

- Date by which objections to Confirmation of the Plan must be filed and served: **February 20, 2015 at 4:00 p.m. (prevailing Eastern time)**

- Hearing on Confirmation of the Plan: **March 5, 2015 at 10:00 a.m. (prevailing Eastern time)**

Dated: January 20, 2015

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Maxim B. Litvak (CA Bar No. 215852)
919 Market Street, 17th Floor | P.O. Box 8705
Wilmington, Delaware  19899-8705
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400

Counsel to Debtors and Debtors in Possession

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's federal tax identification numbers are:  Revstone Industries, LLC (7222); Spara, LLC (6613); Greenwood Forgings, LLC (9285); and US Tool and Engineering, LLC (6450).  The location of the Debtors' headquarters and the service address for each of the Debtors is: Revstone Industries, LLC, et al., c/o Huron Consulting Group Inc., 900 Wilshire Drive, Suite 270, Troy, MI 48084.

# TABLE OF CONTENTS

**Page**

I. PREFATORY STATEMENT AND DEFINITIONS.................................................. 1

II. INTRODUCTION AND OVERVIEW .............................................................. 1

    A.    Introduction ................................................................................................ 1

    B.    Disclaimers ................................................................................................ 2

    C.    An Overview of the Chapter 11 Process .................................................... 3

    D.    Plan Overview ............................................................................................ 4

    E.    Voting on the Plan ..................................................................................... 9

            1.    Who May Vote ............................................................................... 9

            2.    How to Vote ................................................................................... 9

    F.    Confirmation of the Plan .......................................................................... 10

            1.    Generally ...................................................................................... 10

            2.    Objections to Confirmation.......................................................... 10

            3.    Hearing on Confirmation ............................................................. 10

III. HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTORS ........................... 10

    A.    General Description of the Debtors' Businesses and Operations ........................ 10

    B.    Corporate/Organizational Structure and Governance........................................ 11

    C.    Debtors' Assets and Liabilities ................................................................. 12

            1.    Revstone.......................................................................................... 12

            2.    Spara .............................................................................................. 14

            3.    US Tool ......................................................................................... 15

            4.    Greenwood .................................................................................... 15

    D.    Circumstances Leading to the Commencement of the Debtors' Cases ................ 16

    E.    Significant Events Since the Petition Date ........................................................ 18

            1.    First Day Motions and Other Post-Petition Motions ............................... 18

            2.    Retention of Debtors' Professional Persons ............................... 22

            3.    Ordinary Course Professionals .................................................... 22

            4.    Compensation of Professionals.................................................... 22

            5.    Appointment of the Creditors' Committee and Its Employment of Professionals .......................................................................... 22

            6.    Retention of Special Counsel to the Restructuring Committee ................ 23

            7.    Committee's Motions to Appoint Chapter 11 Trustee; Case Milestones . 23

            8.    PBGC's TPOP Conversion Motion and Subsequent Global Settlement By and Among Debtors, PBGC, Creditors' Committee and BFG ................ 24

            9.    Plan Exclusivity; Committee's Proposed Plan ......................................... 26

            10.    Sale/Disposition of Assets of US Tool ...................................... 27

            11.    Sale of Greenwood Assets .......................................................... 28

            12.    Sale of Certain Assets of Contech ............................................... 29

            13.    The Customer Support Agreement and Related Subsequent Settlement.. 29

            14.    General Motors Motion for Payment............................................ 30

            15.    Sale of Revstone's Equity Interest in Revstone Wallaceburg Canada ..... 31

            16.    Debtors' Sale of Other Non-Debtor Assets ................................. 33

|  | 17. | Hofmeister Children's Trusts' Motions for Order Directing CRO to Refrain from Selling Spara's Assets and for Responsible Person in Debtors' Cases | 34 |
|  | 18. | Revstone Committee's Motion to Reconstitute Committee | 34 |
|  | 19. | Debtors' Adversary Proceedings | 34 |
|  | 20. | BFG Motion to Convert Greenwood and US Tool Cases to Chapter 7 Proceedings | 36 |
|  | 21. | BFG's Stay Relief Motion Re: Lexington | 37 |
|  | 22. | Bar Date for Filing Proofs of Claim and Administrative Expense Requests | 37 |
|  | 23. | Filing of Schedules and Statements of Financial Affairs | 37 |
|  | 24. | Removal of Actions | 38 |
|  | 25. | Assumption and/or Rejection of Non-Residential Real Property Leases and Executory Contracts | 38 |
|  | 26. | Fee Examiner | 39 |

**IV. DESCRIPTION OF THE PLAN** ............................................................. 39

A. Treatment of Administrative Expenses and Tax Claims ..................... 39
1. Introduction ................................................................... 39
2. Administrative Expenses ................................................. 40
3. Tax Claims .................................................................... 41

B. Classification and Treatment of Classified Claims and Interests ........ 41
1. Summary ...................................................................... 41
2. Classification and Treatment of Claims and Interests ........... 42
3. Class 1 – Priority Non-Tax Claims .................................. 42
4. Class 2 – Miscellaneous Secured Claims .......................... 42
5. Class 3 –General Unsecured Claims ................................. 43
6. Class 4 – PBGC Claims .................................................. 44
7. Class 5 – Interests in the Debtors .................................... 45

C. Acceptance or Rejection of Plan .................................................. 45
1. Identification of Unimpaired Classes ............................... 45
2. Identification of Impaired Classes ................................... 45
Class 3 – General Unsecured Claims ........................................ 45
Class 4 – PBGC Claims ........................................................... 45
Class 5 – Interests in the Debtors ............................................. 45
3. Classes Permitted and Not Permitted to Vote .................... 45
4. Effect of Non-Voting ..................................................... 46
5. Nonconsensual Confirmation ......................................... 46
6. Postpetition Interest ...................................................... 46

D. Means for Implementation of the Plan .......................................... 46
1. PBGC Settlement ........................................................... 46
2. No Substantive Consolidation ......................................... 46
3. Intercompany Settlement Between Revstone and Spara ........ 46
4. Continued Corporate Existence and Vesting of Assets ......... 48
5. Corporate Action ........................................................... 48
6. Corporate Governance .................................................... 49
7. Chief Restructuring Officer Duties .................................. 51

8. Source of Funding.................................................................... 52
9. Retained Rights of Action of the Debtors................................. 52
10. Establishment of Revstone/Spara Litigation Trust and Vesting of Revstone/Spara Litigation Trust Assets....................................... 53
11. Purpose of Revstone/Spara Litigation Trust ............................. 54
12. Funding of Revstone/Spara Litigation Trust............................. 54
13. Revstone/Spara Litigation Trustee........................................... 54
14. Interests in Affiliates and Subsidiaries .................................... 59
15. Payment of Plan Expenses ....................................................... 59
16. Dissolution of Creditors' Committee........................................ 59
17. Final Decree ............................................................................. 59

E. Treatment of Executory Contracts and Unexpired Leases ................................. 60
1. Rejection of Executory Contracts and Unexpired Leases......................... 60
2. Bar Date for Rejection Damages ............................................. 60

F. Distributions and Related Matters .................................................... 60
1. Dates of Distribution............................................................... 60
2. Cash Distributions................................................................... 61
3. Rounding of Payments............................................................. 61
4. Disputed Claims...................................................................... 61
5. Undeliverable and Unclaimed Distributions............................ 62
6. Compliance with Tax Requirements........................................ 62
7. Record Date in Respect to Distributions.................................. 62
8. Reserves .................................................................................. 62

G. Litigation, Objections to Claims, and Determination of Taxes ......................... 63
1. Litigation, Objections to Claims, and Objection Deadline ...................... 63
2. Temporary or Permanent Resolution of Disputed Claims ...................... 63
3. Setoffs ..................................................................................... 64
4. Preservation of Retained Rights of Action .............................. 64

H. Releases, Injunctions and Exculpation Provisions............................................ 65
1. Injunctions............................................................................... 65
2. Discharge of the Debtors ......................................................... 65
3. Exculpation ............................................................................. 66
4. Debtors' Release of CRO, Independent Managers, Creditors' Committee and Other Parties....................................................................... 66
5. Release by Creditors ............................................................... 67
6. Release by Debtors' Non-Debtor Affiliates of the Restructuring Committee................................................................................. 68

I. No Regulated Rate Change Without Government Approval................................. 68
J. Exemption from Certain Transfer Taxes ........................................................... 68
K. Retention of Jurisdiction ................................................................................... 68
L. Services By and Fees for Professionals; Bar Date for Administrative Expenses . 69
M. No Waiver.......................................................................................................... 70
N. U.S. Trustee Fees ............................................................................................... 70
O. Preservation of Insurance................................................................................... 70
P. Waiver of Stay ................................................................................................... 70
Q. Conditions to Effective Date and Effects of Confirmation................................ 71

  R.  Modification or Withdrawal of Plan and Disclosure Statement ............................ 71
V. REQUIREMENTS FOR CONFIRMATION ........................................................................... 72
  A.  Acceptances Necessary to Confirm Plan ................................................................. 72
  B.  Best Interest of Creditors Test ................................................................................ 72
  C.  Feasibility of Plan .................................................................................................. 74
  D.  Classification .......................................................................................................... 74
  E.  Confirmation of Plan Without Necessary Acceptances; Cramdown .................... 74
VI. EFFECT OF CONFIRMATION ........................................................................................... 76
  A.  Binding Effect of Confirmation .............................................................................. 76
  B.  Good Faith .............................................................................................................. 76
  C.  No Limitations on Effect of Confirmation .............................................................. 76
VII. RISK FACTORS ................................................................................................................. 77
VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................... 77
  A.  Federal Taxation Issues Related to Pass-Through Entities in General ................. 79
  B.  Consequences to Creditors .................................................................................... 80
    1.  Holders of Claims in General ................................................................. 80
    2.  Non-United States Persons ...................................................................... 81
  C.  U.S. Federal Income Tax Consequences in Relation to the Revstone/Spara
    Litigation Trust and Beneficiaries Thereof ............................................................ 81
  D.  Importance of Obtaining Professional Tax Assistance .......................................... 84
IX. SECURITIES LAW MATTERS ........................................................................................... 84
  A.  In General ............................................................................................................... 84
  B.  Initial Issuance ....................................................................................................... 85
  C.  Resales ................................................................................................................... 86
  D.  Exchange Act Compliance ...................................................................................... 86
  E.  Investment Company Act ........................................................................................ 86
  F.  Compliance If Required .......................................................................................... 86
X. ALTERNATIVES TO PLAN AND MISCELLANEOUS MATTERS .................................. 87
  A.  Alternatives to Debtors' Proposed Plan ................................................................ 87
    1.  Liquidation Under Chapter 7 ................................................................. 87
    2.  Dismissal ................................................................................................ 87
    3.  Alternative Plan ..................................................................................... 87
  B.  No *Res Judicata* Effect ....................................................................................... 88
XI. CONCLUSION ..................................................................................................................... 89

<u>EXHIBITS</u>
1 - Debtors' Joint Chapter 11 Plan of Reorganization
2 - Disclosure Statement Order
3 - Corporate/Organizational Chart

# I.

## PREFATORY STATEMENT AND DEFINITIONS

Pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Revstone Industries, LLC ("Revstone"), Spara, LLC ("Spara"), Greenwood Forgings, LLC ("Greenwood") and US Tool & Engineering, LLC ("US Tool" and together with Revstone, Spara and Greenwood, the "Debtors"), hereby submit this disclosure statement (the "Disclosure Statement") in support of the *Debtors' Joint Chapter 11 Plan of Reorganization* (as may be amended or modified, the "Plan"). The definitions contained in the Bankruptcy Code are incorporated herein by this reference. The definitions set forth in Article II of the Plan will also apply to capitalized terms used herein that are not otherwise defined.

# II.

## INTRODUCTION AND OVERVIEW

### A.    Introduction

On December 3, 2012 (the "Petition Date"), Revstone commenced the above-referenced bankruptcy case by filing a voluntary petition under chapter 11 of the Bankruptcy Code. Also on the Petition Date, the Debtor's affiliate, Spara, commenced a chapter 11 bankruptcy case of its own before the Bankruptcy Court. Subsequently, on January 7, 2013, two of Revstone's indirect subsidiaries, Greenwood and US Tool, commenced chapter 11 bankruptcy cases before the Bankruptcy Court. Further, on July 22, 2013, TPOP, LLC (f/k/a Metavation, LLC) ("TPOP"), another indirect subsidiary of Revstone, filed its chapter 11 petition before the Bankruptcy Court. The Plan applies to Debtors Revstone, Spara, Greenwood, and US Tool, but does not apply to TPOP.[2]

This Disclosure Statement, submitted in accordance with section 1125 of the Bankruptcy Code, contains information regarding the Plan proposed by the Debtors. A copy of the Plan is attached to the Disclosure Statement as Exhibit 1. The Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan.

The Disclosure Statement contains information concerning, among other matters: (1) the Debtors' background; (2) the assets available for distribution under the Plan; and (3) a summary of the Plan. The Debtors strongly urge you to review carefully the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

Following a hearing on January 15, 2015, the Bankruptcy Court approved this Disclosure Statement as containing sufficient information to enable a hypothetical reasonable investor to make an informed judgment about the Plan. A copy of the order approving the Disclosure Statement is attached hereto as Exhibit 2 (the "Disclosure Statement Order"). Under section

---

[2] TPOP filed its *Chapter 11 Plan of Liquidation* (the "TPOP Plan") contemporaneously with the filing of the Plan. *See* Case No. 13-11831 [Docket No. 778].

1125 of the Bankruptcy Code, this approval enabled the Debtors to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not considered for approval the Plan itself or conducted a detailed investigation into the contents of this Disclosure Statement.

Your vote on the Plan is important. Absent acceptance of the Plan, there may be protracted delays or a chapter 7 liquidation. These alternatives may not provide for distribution of as much value to Holders of Allowed Claims as does the Plan. Accordingly, the Debtors urge you to accept the Plan by completing and returning the enclosed ballot(s) no later than February 20, 2015. **The Official Committee of Unsecured Creditors in Revstone's case, the Pension Benefit Guaranty Corporation ("PBGC"), and Boston Finance Group, LLC ("BFG") support the Plan and also urge you to accept the Plan and complete and return the enclosed ballot.**

## B.    Disclaimers

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS' PROPOSED PLAN. PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND THE DEBTORS' BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

NO REPRESENTATIONS CONCERNING THE DEBTORS' FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. YOU SHOULD NOT RELY UPON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT IN ARRIVING AT YOUR DECISION.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED. MOREOVER, BECAUSE OF THE DEBTORS' FINANCIAL DIFFICULTIES, AS WELL AS THE COMPLEXITY OF THE DEBTORS' FINANCIAL MATTERS, THE BOOKS AND RECORDS OF THE DEBTORS, UPON WHICH THIS DISCLOSURE STATEMENT IN PART IS BASED, MAY BE INCOMPLETE OR INACCURATE. HOWEVER, REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

PACHULSKI STANG ZIEHL & JONES LLP ("PSZ&J") IS GENERAL BANKRUPTCY COUNSEL TO THE DEBTORS.  PSZ&J HAS RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT.  ALTHOUGH PSZ&J HAS PERFORMED CERTAIN LIMITED DUE DILIGENCE IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT, PSZ&J HAS NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED HEREIN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE.  EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

## C.    An Overview of the Chapter 11 Process

Chapter 11 of the Bankruptcy Code contains numerous provisions, the general effect of which is to provide the debtor with "breathing space" within which to propose a restructuring of its obligations to third parties.  The filing of a chapter 11 bankruptcy petition creates a bankruptcy "estate" comprising all of the property interests of the debtor.  Unless a trustee is appointed by the Bankruptcy Court for cause (no trustee has been appointed in these Chapter 11 Cases), a debtor remains in possession and control of all its assets as a "debtor in possession." The debtor may continue to operate its business in the ordinary course on a day-to-day basis without Bankruptcy Court approval.  Bankruptcy Court approval is only required for various statutorily enumerated kinds of transactions (such as certain financing transactions) and transactions out of the ordinary course of a debtor's business.  The filing of the bankruptcy petition gives rise to what is known as the "automatic stay" which, generally, enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of a chapter 11 case.  The Bankruptcy Court can grant relief from the automatic stay under certain specified conditions or for cause.

The Bankruptcy Code authorizes the creation of one or more official committees to protect the interests of some or all creditors or interest holders.  The fees and expenses of counsel and other professionals employed by such official committees and approved by the Bankruptcy Court are generally borne by a bankruptcy estate.  One committee -- the Official Committee of Unsecured Creditors of Revstone Industries, LLC (the "Creditors' Committee" or "Revstone Committee") -- has been appointed in the Chapter 11 Case of Revstone, which represents the collective interests of general unsecured creditors of Revstone.  No committees have been appointed in the remaining Debtors' cases.

A chapter 11 debtor emerges from bankruptcy by successfully confirming a plan of reorganization.  Alternatively, the assets of a debtor may be sold and the proceeds distributed to creditors through a plan of liquidation.  A plan may be either consensual or non-consensual and provide, among other things, for the treatment of the claims of creditors and interests of shareholders and holders of options or warrants.  The provisions of the Debtors' Plan are summarized below.

D.    **Plan Overview**

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan.

The Plan effectuates a reorganization of the Debtors.  Under the Plan, each of the Debtors will be revested with its respective assets, excluding litigation claims in Revstone's and Spara's cases that will be transferred to a newly-created Revstone/Spara Litigation Trust.  The Plan incorporates the Bankruptcy Court-approved settlement between the Debtors and each of their respective debtor and non-debtor subsidiaries (except TPOP), the PBGC, the Creditors' Committee, and BFG, and a separate intercompany settlement among Revstone and Spara and each of their respective debtor and non-debtor subsidiaries (except TPOP).  The Plan does not contemplate a substantive consolidation of the Debtors.  Creditors with Allowed Claims against each of the Debtors will receive distributions on account of such claims out of available assets of each of the Debtors' respective estates, subject to the priorities of the Bankruptcy Code and, to the extent applicable, subject to and in accordance with the terms of the PBGC Settlement Agreement and the Plan.

Aside from the Revstone/Spara Litigation Trust Assets, which include Revstone's and Spara's litigation claims, all assets of each Debtor, including interests in any non-debtor subsidiaries, will be liquidated or retained for the benefit of creditors under the supervision of the Chief Restructuring Office, as set forth in the Plan.  The Chief Restructuring Officer under the Plan will be John C. DiDonato, who is also the current Chief Restructuring Officer of the Debtors.  As to Reorganized Revstone, the Chief Restructuring Officer will be primarily responsible for certain core tasks as outlined in the Plan and will act under the supervision of the Reorganized Revstone Board.

Revstone's and Spara's litigation claims will be vested in the Revstone/Spara Litigation Trust and prosecuted or otherwise liquidated under the supervision of the Revstone/Spara Litigation Trustee, the Revstone/Spara Litigation Trust Committee and, in instances described in Article VI.M.5 of the Plan and the Revstone/Spara Litigation Trust Agreement, the Chief Restructuring Officer of Reorganized Spara.  Reorganized Revstone, Reorganized Spara, and Holders of Allowed PBGC Claims will be the sole beneficiaries of the Revstone/Spara Litigation Trust.

Under the Plan, except as otherwise set forth in the Plan, all Holders of Allowed Administrative Expenses, Priority Non-Tax Claims, and Tax Claims against the Debtors will be paid in full on the Effective Date out of cash on hand (unless otherwise agreed by applicable claimants consistent with the PBGC Settlement Agreement and, as provided in the Plan, the applicable Debtor elects to provide payment over time as to Allowed Tax Claims).  Holders of Miscellaneous Secured Claims, if any, will receive the benefit of their collateral.

After the payment of or reserve for higher priority claims, Holders of Allowed General Unsecured Claims against each Debtor (other than intercompany claims that are released pursuant to Article VI.C of the Plan) will receive their respective *pro rata* share of available net proceeds of the applicable Debtor's assets consistent with the PBGC Settlement Agreement, including for Holders of Allowed General Unsecured Claims against Revstone and Spara and

4

Holders of Allowed PBGC Claims a share of the proceeds of the Revstone/Spara Litigation Trust as set forth in the Plan.  Pursuant to the PBGC Settlement Agreement:  (1) to the extent that the sub-Class of Holders of Allowed General Unsecured Claims against Revstone votes in favor of the Plan, the sum of $3.0 million will be set aside from the proceeds of the disposition of non-debtor subsidiaries' assets in order to provide an up-front recovery to the Holders of Allowed General Unsecured Claims against Revstone (excluding BFG); (2) the first $2.0 million of litigation proceeds realized by the Revstone/Spara Litigation Trust and otherwise allocable to the PBGC will be distributed to Reorganized Revstone and made available to Holders of Allowed General Unsecured Claims against Revstone (excluding BFG) and Holders of Allowed Administrative Expenses against Revstone, in accordance with and subject to the terms of the PBGC Settlement Agreement; and (3) certain Holders of Professional Fee Claims have agreed to accept reduced recoveries out of available assets in order to allow increased distributions to be made to creditors under the Plan consistent with the PBGC Settlement Agreement.  BFG will share in distributions to Holders of Allowed General Unsecured Claims against Revstone to the extent provided in the PBGC Settlement Agreement.  BFG does not have any remaining General Unsecured Claims against Spara.  Holders of Allowed PBGC Claims will receive the treatment provided by the PBGC Settlement Agreement.

All membership interests in the Debtors, and any associated management rights held by interest holders, will be suspended and of no force and effect as of the Effective Date; interest holders against each Debtor will have a contingent interest in any remaining cash (if any) after all allowed claims and administrative expenses have been paid or otherwise satisfied in full by such Debtor (unless otherwise agreed to by the applicable creditor) in accordance with the Plan.

The Plan provides for the classification and treatment of Claims against and Interests in the Debtors.  The Plan designates four (4) Classes of Claims and one (1) Class of Interests.  These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests.

The following chart briefly summarizes the treatment of Creditors and Interest Holders under the Plan.[3]  Amounts listed below are estimated.[4]  Actual Claims and distributions will vary, including in the case of distributions to Holders of Allowed General Unsecured Claims whose recoveries will depend upon, among other things, the amount of Net Distributable Assets of the applicable Debtor.

---

[3]  This chart is only a summary of the classification and treatment of Claims and Interests under the Plan.  References should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.

[4]  The claims estimates set forth in the chart above are the Debtors' best estimate of allowed claims as of the Effective Date based on their continuing review of claims filed to date.  The claims could be materially higher or lower.

a.      Unclassified Claims

| Description | Estimated Allowed Claims | Estimated Recovery Percentage | Treatment |
|---|---|---|---|
| Administrative Expenses | Revstone: $15,413,000 Spara: $5,083,000 US Tool: $0 Greenwood: $1,215,000 | 100%[5] | Paid in full in Cash on the Effective Date or as soon thereafter as the Administrative Expense is Allowed, subject to certain agreed upon reductions. Notwithstanding any of the foregoing, if an Administrative Expense represents an obligation incurred in the ordinary course of business, such Administrative Expense will be paid in the ordinary course by the applicable Reorganized Debtor in accordance with the terms of the particular transaction and/or applicable agreement. |
| Tax Claims | Revstone: $100,000 Spara: $0 US Tool: $90,000 Greenwood: $170,000 | 100% | On or as soon as practicable after the Effective Date, each Holder of an Allowed Tax Claim will receive Cash from the applicable Reorganized Debtor equal to the Allowed Tax Claim; provided, however, each Debtor may in its discretion elect to make regular quarterly installment payments in Cash of a total value, as of the Effective Date, equal to the amount of the Allowed Tax Claim over a period ending not later than five years after the Petition Date. |

b.      Classified Claims

| Class No. | Description | Estimated Allowed Claims | Estimated Recovery Percentage[6] | Treatment |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Revstone: $60,000 Spara: $0 US Tool: $0 Greenwood: $0 | 100% | **Unimpaired; deemed to accept.** At the election of the applicable Reorganized Debtor, the Holder of each Priority Non-Tax Claim against each Debtor will receive on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, (a) a Cash payment from the applicable Reorganized Debtor equal to the Allowed amount of such Claim, or (b) such other treatment as otherwise agreed by the Holder of such Claim and the applicable Debtor or Reorganized Debtor. |

---

[5]  Professionals are expected to agree to accept reduced recoveries to the extent of available assets consistent with the terms of the PBGC Settlement Agreement.
[6]  Estimated Recovery Percentage does not include any potential recoveries from litigation.

| Class No. | Description | Estimated Allowed Claims | Estimated Recovery Percentage[6] | Treatment |
|---|---|---|---|---|
| 2 | Miscellaneous Secured Claims[7] | Revstone: $0 Spara: $0 US Tool: $0 Greenwood: $0 | Value of collateral | **Unimpaired; deemed to accept.** Except to the extent that a holder of an Allowed Miscellaneous Secured Claim has been paid by the Debtors, in whole or in part, prior to the Effective Date, on the Effective Date, at the option of the applicable Reorganized Debtor, (i) each Allowed Miscellaneous Secured Claim will be reinstated and Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each Holder of an Allowed Miscellaneous Secured Claim will receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Miscellaneous Secured Claim, (x) payment in full in Cash of the unpaid portion of such Allowed Miscellaneous Secured Claim, (y) surrender of the collateral securing such Claim or (z) such other treatment as may be agreed to by the holder and the applicable Debtor or Reorganized Debtor. |
| 3 | General Unsecured Claims | Revstone: $24,500,000 to $41,500,000, plus $8,500,000 for BFG Spara: $12,500,000 to $13,100,000 US Tool: $5,400,000 Greenwood: $8,000,000 | Revstone: (non-BFG) 7.2%-12.2% (BFG) 0% Spara: 4.1%-4.3% US Tool: 0% Greenwood: 0% | **Impaired; entitled to vote.** On or as soon as practicable after the Effective Date, each Holder of an Allowed General Unsecured Claim will receive a Pro Rata share of: (i) the Net Distributable Assets of the applicable Debtor (calculated as a percentage of all Allowed General Unsecured Claims against such Debtor, except as provided in the PBGC Settlement Agreement); and (ii) as to Revstone, to the extent that the sub-Class of Holders of Allowed General Unsecured Claims against Revstone votes in favor of the Plan, the sum of $3.0 million which will be set aside from the proceeds of the disposition of non-debtor subsidiaries' assets otherwise available to the Holders of the PBGC Claims in order to provide an up-front recovery to the Holders of Allowed General Unsecured Claims against Revstone (excluding BFG). Holders of Allowed General Unsecured Claims will otherwise receive the treatment to which they are entitled under the PBGC Settlement Agreement. |
| 4 | PBGC Claims | $95,000,000 at each Debtor | 0% at each Debtor (recoveries expected at subsidiary levels) | **Impaired; entitled to vote.** On or as soon as practicable after the Effective Date, each Holder of an Allowed PBGC Claim will receive the treatment provided by the PBGC Settlement Agreement, including a share of the Revstone/Spara Litigation Trust Interests as provided by the PBGC Settlement Agreement. Holders of Allowed PBGC Claims against Revstone and Spara will not receive any distributions out of the Net Distributable Assets of such Estates except to the extent that the PBGC |

---

[7]  Although all Miscellaneous Secured Claims have been placed in one Class for the purposes of nomenclature, each Miscellaneous Secured Claim, to the extent secured by a Lien on any property or interest in property of the Debtors different from that securing any other Miscellaneous Secured Claim, will be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

| Class No. | Description | Estimated Allowed Claims | Estimated Recovery Percentage[6] | Treatment |
|---|---|---|---|---|
| | | | | Minimum Recovery (as defined in the PBGC Settlement Agreement) is not reached, in which case Holders of the PBGC Claims shall receive from the Revstone and/or Spara Hold Back/Escrows (as set forth in the PBGC Funding Schedule), or as necessary, Reorganized Revstone or Reorganized Spara, funds sufficient to provide the Holders of the Allowed PBGC Claims with the PBGC Minimum Recovery in accordance with the terms of the PBGC Settlement Agreement. Further, pursuant to the PBGC Settlement Agreement: (i) the first $2.0 million of litigation proceeds realized by the Revstone/Spara Litigation Trust and otherwise allocable to Holders of the PBGC Claims will be distributed to Reorganized Revstone and made available to Holders of Allowed General Unsecured Claims against Revstone (excluding BFG) and Holders of Allowed Administrative Expenses against Revstone; and (ii) as noted above with respect to Class 3, to the extent that the sub-Class of Holders of Allowed General Unsecured Claims against Revstone votes in favor of the Plan, the sum of $3.0 million will be set aside from the proceeds of the disposition of non-debtor subsidiaries' assets otherwise available to the Holders of the PBGC Claims in order to provide an up-front recovery to the Holders of Allowed General Unsecured Claims against Revstone (excluding BFG). |
| 5 | Interests in Debtors | N/A | N/A | **Impaired; deemed to reject.** The Holders of Interests will receive no distributions under the Plan, and on the Effective Date, all Interests will be deemed suspended. As of the Effective Date, the Holders of Interests will receive a contingent interest in the Net Distributable Assets remaining, if any, after all Allowed Claims and Administrative Expenses have been paid or otherwise satisfied in full (unless otherwise agreed to by the applicable Creditor) in accordance with the Plan. |

The Plan contemplates the release by each holder of a Claim of certain third parties identified in section X.E. of the Plan from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, in law or equity or otherwise, based on or relating to in any way the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement, arising prior to the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of the Released Estate Parties that constitutes willful misconduct or gross negligence. This proposed release does not constitute a waiver or release of any right that a Holder of an Allowed Claim has to payment under the Plan on account of such Allowed Claim.

8

E.    **Voting on the Plan**

1.    **Who May Vote**

The Plan divides Allowed Claims and Interests into multiple Classes.  Under the Bankruptcy Code, only Classes that are "impaired" by the Plan are entitled to vote (unless the Class receives no compensation or payment, in which event the Class is conclusively deemed not to have accepted the Plan).  A Class is Impaired if legal, equitable or contractual rights attaching to the Claims or Interests in the Class are modified, other than by curing defaults and reinstating maturities.  Under the Plan, Administrative Claims and Priority Tax Claims are unclassified and are not entitled to vote.  Classes 1 and 2 are Unimpaired and are therefore conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote on the Plan.  Classes 3 and 4 are Impaired and entitled to vote to accept or reject the Plan.  Class 5 is Impaired but deemed to reject the Plan, and thus is not entitled to vote.  Only those votes cast by Holders of Allowed Claims will be counted in determining whether a sufficient number of acceptances have been received to obtain Plan Confirmation.  <u>If no Holder of a Claim eligible to vote in a particular Class timely votes to accept or reject the Plan, the Debtors may seek to have the Plan deemed **accepted** by the Holders of such Claims in such Class for purposes of section 1129(b) of the Bankruptcy Code.</u>

2.    **How to Vote**

All votes to accept or to reject the Plan must be cast by using the appropriate form of ballot.  No votes other than ones using such ballots will be counted except to the extent ordered otherwise by the Bankruptcy Court.  A form of ballot is being provided to Holders of Claims in Classes 3 and 4 by which Creditors in such Classes may vote their acceptance or rejection of the Plan.  The ballot for voting on the Plan gives Holders of Claims in Classes 3 and 4 an important choice to make with respect to the Plan – you can vote for or against the Plan.  To vote on the Plan, after carefully reviewing the Plan and this Disclosure Statement, please complete the ballot (1) by indicating on the enclosed ballot that (a) you accept the Plan or (b) you reject the Plan and (2) by signing your name and mailing the ballot in the envelope provided for this purpose.  Rust Consulting / Omni Bankruptcy ("<u>Rust Omni</u>"), as the Balloting Agent, will count the ballots.

IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND RECEIVED BY THE BALLOTING AGENT, RUST OMNI, NO LATER THAN **5:00 p.m. prevailing Eastern time on February 20, 2015** AT THE FOLLOWING ADDRESS:

Revstone Industries, LLC
c/o Rust Consulting / Omni Bankruptcy
5955 De Soto Avenue, Suite 100
Woodland Hills, CA 91367

IF YOUR BALLOT IS NOT PROPERLY COMPLETED, SIGNED AND RECEIVED AS DESCRIBED, IT WILL NOT BE COUNTED.  IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY REQUEST A REPLACEMENT BY MAKING A WRITTEN REQUEST TO THE ADDRESS SHOWN ABOVE.  FACSIMILE OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE COUNTED.

**F.      Confirmation of the Plan**

1.      **Generally**

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation.  The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed in Article V below.

2.      **Objections to Confirmation**

Any objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on counsel for the Debtors, the Creditors' Committee, and the United States Trustee on or before the date set forth in the notice of the Confirmation Hearing sent to you with this Disclosure Statement and the Plan.  Bankruptcy Rule 3007 governs the form of any such objection.

3.      **Hearing on Confirmation**

The Bankruptcy Court has set **March 5, 2015 at 10:00 a.m. (prevailing Eastern time)** for a hearing (the "Confirmation Hearing") to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for confirmation of the Plan have been satisfied.  The Confirmation Hearing will be held before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 6th Floor, Courtroom 1, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time and day to day without further notice.  If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order.

**III.**

**HISTORY, ORGANIZATION AND
ACTIVITIES OF THE DEBTORS**

**A.      General Description of the Debtors' Businesses and Operations**

Revstone, together with its direct and indirect subsidiaries including Greenwood and US Tool (collectively, the "Revstone Companies"), was a premier designer and manufacturer of highly engineered components for automotive and other industrial sectors focusing on cast and formed metals, tooling and high-performance products and processes.  Certain subsidiaries specialized in, among other things, forging, casting, fabricating and forming of various types of ferrous and non-ferrous metals, as well as the performance of precision machining and fabrication.  More specifically, prior to the Petition Date, Debtor Greenwood was a designer and manufacturer of aluminum forgings to the automotive and powersports markets; as discussed below, Debtor US Tool ceased all operations prior to the Petition Date.

Beginning in 2008, the Revstone Companies began an active acquisition program with the goal of becoming a stable supplier that offered complete value stream solutions to original equipment manufacturers ("OEM's") and Tier 1 companies.  Amid the broad market downturn in 2008, the Revstone Companies were able to select and acquire certain high-quality assets,

10

technologically advanced manufacturing operations with strong customer relationships and well-regarded brands, at historically low valuations.

As of the Petition Date, the Revstone Companies' portfolio of products included components and assemblies for automotive powertrains, drivetrains and engine transmissions, as well as for suspension, structural and exhaust systems.  Many of the Revstone Companies' products were sole-sourced by their customers, directly into the manufacturing process and supply chain, making the Revstone Companies (prior to the Petition Date) valued, long-term preferred providers of unique components, and integral, trusted partners with their customers in the assembly process.

Debtor Spara is a holding company with no employees or operations.  Spara's primary assets are its interests in certain non-Debtor operating subsidiaries: T Cast Holdings, LLC ("T Cast"), Fairfield Castings, LLC ("Fairfield"), Lexington Logistics, LLC ("Lexington"), and RPM-Tec, LLC.  Prior to the Petition Date, Spara, together with its direct and indirect subsidiaries (collectively, the "Spara Companies"), was a premier designer and manufacturer of highly engineered components, primarily for non-automotive industrial sectors focusing on cast, formed and machined metals, high-performance products and processes, and thermoformed plastic products for the logistics and transportation industries.

## B.    Corporate/Organizational Structure and Governance

Revstone is a limited liability company formed under Delaware law, and its sole member is Ascalon Enterprises, LLC ("Ascalon").  Revstone, in turn, is the direct or indirect parent of approximately thirty-two (32) subsidiaries, including Debtors Greenwood and US Tool (each a Delaware limited liability company).  Debtor Spara, also a Delaware limited liability company, is the sister company of Revstone; Spara's sole member is Ascalon.  Attached hereto as Exhibit 3 are corporate charts showing the corporate structure of the Debtors.  The current principal place of business of each of the Debtors is located in Troy, Michigan at the offices of Huron Consulting Group Inc.

Prior to the Petition Date, Revstone and Spara were governed by their respective operating agreements with the Megan G. Hofmeister Irrevocable Trust, the Scott R. Hofmeister Irrevocable Trust and the Jamie S. Hofmeister Irrevocable Trust (collectively, the "Trusts").  On or about July 1, 2011, each of the Trusts assigned its membership interests in Revstone and Spara to Ascalon, which the Debtors understand is directly or indirectly controlled by George Hofmeister (who is or was the chairman of Ascalon's board of managers).  Mr. Hofmeister has been the subject of various litigation claims, and is also a defendant in adversary proceedings filed by certain of the Debtors in the Chapter 11 Cases.  As of January 17, 2013, Ascalon amended and restated Revstone's and Spara's operating agreements to, among other things, appoint John C. DiDonato as the President and Chief Restructuring Officer of these Debtors and appointed two independent managers, James Shein and Richard Newsted, to these Debtors' boards of managers.  The two independent managers make up a restructuring committee (the "Restructuring Committee") that is designated with authority over the Debtors' bankruptcy decisions and the restructuring efforts of the Debtors and their subsidiaries, including asset sales.

C.    **Debtors' Assets and Liabilities**

1.    **Revstone**

As reflected in its Schedules, Revstone's primary assets are its equity interests in various direct and indirect subsidiaries. Revstone's other assets include Cash, accounts receivable (primarily owed by the Debtors' affiliates), potential claims/counterclaims, and limited amounts of equipment. Revstone estimated the value of its personal property at $29.0 million in its Schedules; Revstone has no real property. Anticipated recoveries from Revstone's assets are set forth herein. *See* Article II.D above.

In the Schedules, Revstone scheduled the prepetition secured claims of $17.3 million (contingent amount), approximately $0.9 million in priority claims (including debts owed to employees, employee benefit plans and taxing authorities), and approximately $16.8 million in general unsecured claims (which includes intercompany claims).

As set forth herein, subject to all the assumptions and notes set forth in the PBGC Funding Schedule, Revstone estimates that, as of the Effective Date, there will be approximately $15.4 million of administrative and priority claims and $24.5 million to $41.5 million of general unsecured claims (plus $8.5 million on account of BFG's claims subject to the terms of a settlement with the Debtors) against Revstone's estate. Pursuant to the settlement with the PBGC, the PBGC also has an allowed general unsecured claim in the amount of $95.0 million, which claim is to be treated in accordance with the terms of the settlement. Revstone is not aware of any valid secured claims. While Revstone is reviewing the proofs of claim filed against it, Revstone believes that the aggregate amounts of proofs of claim filed against Revstone overstate the amounts of liabilities that will be ultimately Allowed against Revstone.

With respect to the PBGC's claims, certain of Revstone's affiliates sponsor pension plans (the "Pension Plans"). Specifically, TPOP sponsored the Hillsdale Hourly Pension Plan and the Hillsdale Salaried Pension Plan (collectively, the "Hillsdale Pension Plans"), Fairfield sponsored the Revstone Casting Fairfield GMP Local 359 Pension Plan (the "Fairfield Pension Plan"), and Fourslides, Inc. sponsored the Fourslides, Inc. Pension Plan.

The PBGC has asserted that under 29 U.S.C. § 1082, the sponsor of a pension plan and members of its controlled group are financially responsible for the pension plan. The PBGC has further asserted that the responsibilities of the plan sponsor and controlled-group members to a pension plan include, *inter alia*: (1) paying the statutorily required minimum funding contributions to the pension plan; (2) paying insurance premiums to PBGC; and (3) paying any unfunded benefit liabilities to PBGC if the pension plan terminates. The PBGC has asserted that liabilities of the plan sponsor and controlled-group members with regard to the pension plan are joint and several.

On or about June 26, 2013, PBGC filed 13 proofs of claim against Revstone and its affiliates as follows: (1) four claims related to the due and unpaid minimum funding contributions under 26 U.S.C. §§ 412, 430 and 29 U.S.C. § 1082 due to the Pension Plans in the amounts of $3.4 million, $1.1 million, an unliquidated amount and $0.6 million, (2) four claims

related to premiums due to the PBGC under 29 U.S.C. § 1307 in the amounts of $4.3 million, $1.4 million, $0.2 million and $1.2 million, (3) four claims related to the unfunded benefit liabilities under 29 U.S.C. § 1362 and 1368 of the Pension Plans in the amounts of $38.6 million, $7.8 million, $0.1 million and $8.9 million, and (4) a claim for unpaid obligations due to the Hillsdale Plans under certain promissory notes made by Greenwood in an unliquidated amount.

Also, on August 23, 2013, PBGC filed a complaint in the United States District Court for the Eastern District of Kentucky seeking to terminate the Hillsdale Hourly Pension Plan, the Hillsdale Salaried Pension Plan, and the Revstone Casting Fairfield GMP Local 359 Pension Plan.

The Department of Labor (the "DOL") has also asserted three proofs of claims on behalf of certain Pension Plans against Revstone totaling $41.5 million for alleged breach of fiduciary duty obligations and prohibited transactions under ERISA [Claim Nos. 498, 499, 501]. Specifically, the Department of Labor has asserted (i) on behalf of the Hillsdale Hourly Pension Plan, an unsecured claim in the amount of $5.9 million and a secured claim in the amount of $18.7 million [Claim No. 498]; (ii) on behalf of the Hillsdale Salaried Pension Plan, an unsecured claim in the amount of $3.6 million and a secured claim in the amount of $8.9 million [Claim No. 499]; and (iii) on behalf of the Revstone Casting Fairfield GMP Local 359 Pension Plan, an unsecured claim in the amount of $1.5 million and a secured claim in the amount of $2.8 million [Claim No. 501].  In addition, the Department of Labor has asserted: (i) on behalf of the Ascalon Enterprises, LLC employee medical benefits plan, an unliquidated claim for unpaid medical claims [Claim No. 282]; and (ii) on behalf of the Revstone 401(k) Plan, a priority claim of $1.9 million and a general unsecured claim of $12,446 for employee payroll withholdings [Claim No. 283].  The Department of Labor later amended Claim No. 283 by filing Claim No. 553, which reduced the priority claim and unsecured claim asserted on behalf of the Revstone 401(k) Plan to $119,430.64 and $4,582.02, respectively.

The Hillsdale Pension Plans also filed claims in respect of the Hillsdale Pension Plans. Specifically, the Hillsdale Pension Plans have filed claims for unpaid contributions, including: (i) a priority proof of claim for $1.7 million [Claim No. 242]; (ii) a priority proof of claim of $0.7 million [Claim No. 247]; (iii) an administrative expense claim for unpaid minimum contributions in the amount of $1.5 million [Docket No. 712[8]]; and (iv) an administrative expense claim for unpaid minimum contributions $0.3 million [Docket No. 713].  The Hillsdale Pension Plans also filed two contingent termination claims for underfunding in the event that the Hillsdale Pension Plans are terminated in the aggregate amount of $46.1 million [Docket Nos. 712, 713].

The Hillsdale Pension Plans have asserted that the claims asserted by the Hillsdale Pension Plans are joint and several as to liability with respect to all of the entities within the controlled group.  Accordingly, to the extent that the Hillsdale Pension Plans are terminated, the Hillsdale Pension Plans assert that the liabilities would become fixed and liquidated in respect of all entities within the controlled group.

---

[8]  Unless otherwise stated, all references herein to docket entries are to the docket entries in Revstone's Chapter 11 Case, Case No. 12-13262.

As discussed below, Revstone, the other Debtors, TPOP, certain other affiliates, the Creditors' Committee, BFG, and the PBGC reached a comprehensive global settlement that addressed the PBGC and DOL claims with respect to the Pension Plans, which settlement was approved by the Bankruptcy Court. *See* Article III.E.8 below. The DOL, as part of the Global Settlement, shall have a general unsecured claim against TPOP in the amount of $32,064,375.8 (the "TPOP Judgment Amount"). The DOL has also agreed to file an amended proof of claim or claims equal to the TPOP Judgment Amount in the TPOP bankruptcy case and shall withdraw the proofs of claims filed against Revstone, Spara and Greenwood. The DOL also retained the right to file a subordinated penalty claim in the TPOP bankruptcy case under 29 U.S.C. § 502(1).

2.    **Spara**

As reflected in its Schedules, Spara's primary assets are its equity interests in various direct and indirect subsidiaries. Spara's other assets include potential claims/counterclaims against BFG as discussed in more detail herein. As of the Petition Date, Spara placed an aggregate estimate of approximately $5.0 million for such personal property in its Schedules; Spara has no real property. Anticipated recoveries from Spara's assets are set forth herein. *See* Article II.D. above.

In its Schedules, Spara scheduled the claim of Cole Taylor Bank ("CTB") as a contingent unliquidated secured claim of $1.4 million,[9] no priority claims, and approximately $10.7 million in general unsecured claims. CTB's claim was subsequently satisfied.

As set forth in herein, subject to all the assumptions and notes set forth in the PBGC Funding Schedule, Spara estimates that, as of the Effective Date, there will be approximately $5.1 million of administrative and priority claims and $12.5 million to 13.1 million of general unsecured claims against the estate. Pursuant to the settlement with the PBGC, the PBGC also has an allowed general unsecured claim in the amount of $95.0 million, which claim is to be treated in accordance with the terms of the settlement. Spara is not aware of any valid secured claims. While Spara is reviewing the proofs of claim filed against it, it believes that the aggregate amounts of proofs of claim filed against it overstate the amounts of liabilities that will be ultimately Allowed against Spara.

On or about June 26, 2013, PBGC filed 12 proofs of claim against Spara as follows: (1) four claims related to the due and unpaid minimum funding contributions under 26 U.S.C. §§ 412, 430 and 29 U.S.C. § 1082 due to the Pension Plans in the amounts of $3.4 million, $1.1 million, an unliquidated amount and $0.6 million, (2) four claims related to premiums due to the PBGC under 29 U.S.C. § 1307 in the amounts of $4.3 million, $1.4 million, $0.2 million and $1.2 million, and (3) four claims related to the unfunded benefit liabilities under 29 U.S.C. § 1362 and 1368 of the Pension Plans in the amounts of $38.6 million, $7.8 million, $0.1 million and $8.9 million.

---

[9]  Spara's non-debtor subsidiary, T Cast, was a borrower under that certain Credit and Security Agreement dated October 28, 2010 in favor of CTB. In connection with that agreement, Spara entered into a Membership Interests Pledge Agreement dated March 29, 2011, whereby Spara pledged its membership interests in T Cast in favor of CTB.

As discussed below, Spara, the other Debtors, TPOP, certain other affiliates, the Creditors' Committee, BFG, and the PBGC reached a comprehensive global settlement that addressed the PBGC and DOL claims with respect to the Pension Plans, which settlement was approved by the Bankruptcy Court.  *See* Article III.E.8 below.

3.    **US Tool**

As reflected in its Schedules, US Tool's primary assets, as of the Petition Date, were equipment, machinery and fixtures, with a total scheduled value of approximately $0.9 million. As discussed below, BFG foreclosed upon such assets during the Chapter 11 Case.  US Tool scheduled an approximately $4.9 million secured claim of BFG (scheduled as contingent and disputed), approximately $0.3 million in priority federal and state payroll tax claims and priority employee medical benefit claims, and approximately $5.1 million in general unsecured claims (including intercompany claims).

US Tool does not currently have any liquid assets.  US Tool does not expect to have any allowed priority claims against its estate.  There are administrative claims asserted against US Tool, primarily consisting of Professional Fees, that are expected to be reduced or waived to the extent of available assets.

US Tool estimates that, as of the Effective Date, there will be approximately $90,000 of administrative claims and $5.4 million of general unsecured claims against the estate.   Pursuant to the settlement with the PBGC, the PBGC also has an allowed general unsecured claim in the amount of $95.0 million, which claim is to be treated in accordance with the terms of the settlement.  US Tool is not aware of any valid priority or secured claims.  While US Tool is reviewing the proofs of claim filed against it, it believes that the aggregate amounts of proofs of claim filed against it overstate the amounts of liabilities that will be ultimately Allowed against US Tool.

As discussed below, US Tool, the other Debtors, TPOP, certain other affiliates, the Creditors' Committee, BFG, and the PBGC reached a comprehensive global settlement that addressed the PBGC and DOL claims with respect to the Pension Plans, which settlement was approved by the Bankruptcy Court.  *See* Article III.E.8 below.  The Debtors do not believe that there will be any funds to satisfy other Allowed Claims of unsecured creditors of US Tool.

4.    **Greenwood**

As reflected in its Schedules, Greenwood's primary assets, as of the Petition Date, were equipment, machinery and fixtures, with a total scheduled value of approximately $5.6 million and intercompany amounts due from Revstone.  Greenwood scheduled, among other debts, an approximately $5.5 million secured claim of BFG (scheduled as contingent and disputed), a $0.3 million secured factoring obligation owed to Bridgeport Capital, approximately $3.4 million in secured promissory notes owed in relation to the Hillsdale Pension Plans, approximately $0.3 million in priority claims, and approximately $1.6 million in general unsecured claims.

Greenwood currently has approximately $1.1 million of cash on hand to satisfy creditor claims. The bulk of such funds will be utilized to satisfy administrative expenses, primarily consisting of Professional Fees, in accordance with the Global Settlement.

Greenwood estimates that, as of the Effective Date, there will be approximately $1.4 million of administrative and priority claims and $8.0 million of general unsecured claims against the estate. Pursuant to the settlement with the PBGC, the PBGC also has an allowed general unsecured claim in the amount of $95.0 million, which claim is to be treated in accordance with the terms of the settlement. Greenwood is not aware of any valid priority or secured claims. While Greenwood is reviewing the proofs of claim filed against it, it believes that the aggregate amounts of proofs of claim filed against it overstate the amounts of liabilities that will be ultimately Allowed against Greenwood.

As discussed below, Greenwood, the other Debtors, TPOP, certain other affiliates, the Creditors' Committee, BFG, and the PBGC reached a comprehensive global settlement that addressed the PBGC and DOL claims with respect to the Pension Plans, which settlement was approved by the Bankruptcy Court. *See* Article III.E.8 below. The Debtors do not believe that there will be any funds to satisfy other Allowed Claims of unsecured creditors of Greenwood.

## D.   Circumstances Leading to the Commencement of the Debtors' Cases

### 1.   General

Even though Revstone and its affiliates were strategically placed to be a key supplier of parts to tomorrow's cars, the reverberations and transitions in the automobile industry since 2008 have had a lasting impact on operations. Revstone and certain of its affiliates were negatively impacted by the continued lack of liquidity in the credit market for middle market borrowers. As a result, Revstone and its affiliates were only able to obtain one-off financings at relatively high interest rates to fund operations, as opposed to having a global financing facility that would encompass all holdings and would dramatically lower overall financing costs for Revstone. The one-off forms of financings (i) came with extremely restrictive covenants, (ii) required substantial pledges of assets by certain affiliates, and (iii) required guarantees by Revstone. Revstone often experienced covenant defaults that, in turn, exacerbated Revstone's liquidity issues, led to disputes with key lenders, and, in certain instances, led to litigation that resulted in a significant judgment against the Debtors and other affiliates, including, as discussed further below, the judgments of BFG.

Moreover, as became apparent after the filing of the Bankruptcy Cases and as asserted in the Hofmeister Adversary Proceedings (as defined in Article II.E.19), the Debtors' business was significantly impacted by the fraudulent or otherwise improper conduct of Mr. Hofmeister and the Children's Trusts. Among other things, such parties caused the underfunding of the Pension Plans, used assets of the Debtors or their subsidiaries for personal purposes, and used funds from the medical and/or dental plans sponsored by Ascalon for Mr. Hofmeister's personal purposes.

### 2.    Wells Fargo

On or about July 23, 2010, four affiliates Contech Castings, LLC ("Contech"), TPOP, MPI, LLC and MW Texas Die Casting, Inc. (the "Primary Wells Obligors") entered into a Credit Agreement with Wells Fargo Capital Finance, LLC ("Wells") that provided revolving credit facilities in the original aggregate principal amount of up to $45.0 million (as amended, modified or supplemented from time to time, the "Pre-Petition Wells Credit Agreement," which created the "Pre-Petition Wells Facilities").  The obligations of the Primary Well Obligors under the Pre-Petition Wells Facilities were purportedly secured by (i) certain guarantees of 11 other affiliates (the "Wells Guarantors" and together with the Primary Wells Obligors, the "Wells Obligors") and (ii) that certain Security Agreement, originally entered into on or about July 23, 2010, by the Wells Obligors, which purportedly created liens on, and security interests in, substantially all of the unencumbered assets of the Wells Obligors.

To further secure the Pre-Petition Wells Facilities, on or about July 23, 2010, Revstone entered into (i) that certain Limited Recourse Guaranty and (ii) Pledge and Security Agreement in which Revstone pledged its membership interest in its subsidiary, Revstone Transportation LLC ("Revstone Transportation").  In addition, as of the Petition Date, Revstone was purportedly the primary obligor on four promissory notes and contingently liable on fourteen or more other affiliate transactions as to which it had provided guarantees.  Revstone's obligations to Wells in connection with the Pre-Petition Wells Facilities have been satisfied.

### 3.    BFG Judgments and Subsequent Events

Prior to the Petition Date, each of the Debtors entered into financing arrangements and/or other agreements in connection therewith with BFG.  Among other agreements, US Tool entered into a loan and security agreement and related documents dated March 26, 2010 with BFG; Greenwood entered into a loan and security agreement and related documents dated September 30, 2010 with BFG; the Debtors and certain other affiliates entered into a master loan and security agreement dated May 1, 2010 with BFG; Spara entered into a loan arrangement dated June 21, 2011 with BFG; and Revstone provided certain guarantees to BFG.

On January 10, 2012, BFG filed a Complaint in the State Court of Michigan, Circuit Court for the County of Grand Traverse [Case No. 12-28975-CK] against the Debtors and certain non-Debtor affiliates as a result of alleged defaults under various loan documents.  On April 9, 2012, the Michigan court entered final judgments (the "BFG Judgments"), among other things, declaring Spara and certain affiliates jointly and severally liable to BFG in the liquidated amount of $6.7 million plus costs on account of the Spara/BFG loan and related loan documents, and Revstone and other affiliates in an aggregate amount of $26.7 million plus interest.

Notwithstanding the above-referenced operational and liquidity challenges, the Revstone Companies embarked on a process of sales and financings in order to enable them to restructure.  In this regard, affiliate MPI, LLC sold certain of its assets pursuant to that certain Asset Purchase Agreement, dated October 19, 2012 to MPI Products LLC.  Completion of this transaction allowed the Revstone Companies to make payments inter alia, to Wells in the amount of approximately $13.8 million and Icon Agent LLC in the amount of approximately $42.0 million.

Furthermore, on November 30, 2012, additional amounts were generated by a financing provided by Utica LeaseCo, LLC to Contech (the "Contech Financing").

From the proceeds of the Contech Financing, an aggregate amount of approximately $7.8 million was used to pay BFG on December 3, 2012 in satisfaction of the BFG Judgments to defease the liabilities of Revstone Transportation, Power-Tec Manufacturing, LLC, a Michigan limited liability company, Power-Tec Manufacturing, LLC, a Delaware limited liability company, and Saleen, LLC (as well as that of Revstone with respect to those portions of the BFG Judgments) on account of such BFG Judgments.  BFG thereafter sought to seize certain assets and enforce post-judgment remedies, including seeking the appointment of a receiver.

### 4.    Commencement of the Chapter 11 Cases

On December 3, 2012, Revstone and Spara commenced their Chapter 11 Cases in order to maximize the value of their respective assets and restructure their affairs in an orderly fashion. On January 7, 2013, Greenwood and US Tool, indirect subsidiaries of Revstone, also commenced their own Chapter 11 Cases.   On July 23, 2013, another affiliate, TPOP, commenced its chapter 11 case before the Bankruptcy Court to facilitate a sale of substantially all of its operating assets.  As noted herein, the Plan applies solely in respect to Revstone, Spara, Greenwood, and US Tool, and does not apply to TPOP.

### E.    Significant Events Since the Petition Date

### 1.    First Day Motions and Other Post-Petition Motions

The Debtors sought approval from the Bankruptcy Court of certain motions and applications (collectively, the "First Day Motions"), which the Debtors filed simultaneously with, or shortly after, their respective voluntary petition.  The Debtors sought such relief to minimize disruption of the Debtors' business as a result of the filing of the Chapter 11 Cases, to establish procedures regarding the administration of the Chapter 11 Cases and to facilitate the Debtors' reorganization efforts.  Specifically, the First Day Motions addressed the following issues, among others:

### a.    Revstone Employee Wages/Benefits

On December 5, 2012, Revstone filed the *Motion for Interim and Final Orders Under Sections 105, 363, and 507 of the Bankruptcy Code (I) Authorizing Payment of Prepetition Wages, Salaries, and Employee Benefits, (II) Authorizing Continuation of Employee Benefit Plans and Programs Postpetition, and (III) Directing All Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations* [Docket No. 7] (the "Wages Motion").  As of the Petition Date, Revstone employed approximately 58 employees (the "Employees"), all of whom were salaried employees.  On December 6, 2012, the Bankruptcy Court entered its interim order granting the relief requested by Revstone in the Wages Motion [Docket No. 36].  On January 10, 2013, the Bankruptcy Court entered its final order authorizing the payment of certain prepetition Employee related claims and the continuation of certain Employee benefits postpetition [Docket No. 101].

18

b.    Revstone Cash Management

On December 5, 2013, Revstone filed the *Motion for Interim and Final Orders Authorizing Debtor to (I) Maintain Existing Cash Management System and Bank Account, (II) Continue Use of Existing Checks and Business Forms, (III) Obtain Limited Waiver of Section 345(b), and (IV) Continue Intercompany Transactions* (the "Cash Management Motion") [Docket No. 6].  The prepetition cash management system utilized by Revstone was a single bank account maintained at Bank of America.  Revstone is entitled to receive funds from certain affiliates in consideration of Revstone's provision of actual, necessary, and reasonable out-of-pocket legal, accounting, insurance, marketing, payroll, general and administrative, and management services, as well as other services of a similar nature (the "Management Fees").  Revstone continues to receive such Management Fees from certain of its affiliates during the Chapter 11 Cases.

On December 11, 2012, the Bankruptcy Court entered the interim order granting the relief requested by Revstone in the Cash Management Motion [Docket No. 56].  The Bankruptcy Court entered its final order granting the relief requested by Revstone in the Cash Management Motion on January 10, 2013 [Docket No. 102].  Upon request of Revstone, on June 28, 2013, the Bankruptcy Court entered an amended order granting the Cash Management Motion, which incorporated a resolution of the response filed by the Creditors' Committee [Docket No. 711].  Subsequently, upon the Creditors' Committee's motion, the cash management order was further amended in relation to payments to George Hofmeister and his family members pursuant to an order entered on October 28, 2013 [Docket No. 1134 ].

c.    Utilities

On December 5, 2012, the Debtors filed the *Motion for Interim and Final Orders to (I) Prohibit Utility Companies from Discontinuing, Altering, or Refusing Service, (II) Deem Utility Companies Adequately Assured of Future Payment, and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance* (the "Utility Motion") [Docket No. 9].  On December 6, 2012, the Bankruptcy Court entered the interim order approving the procedures requested and setting the Utility Motion for a final hearing [Docket No. 38].  The Bankruptcy Court, on October 17, 2011, entered the final order [Docket No. 99] implementing the proposed procedures to ensure adequate assurance of future payment to utility service providers pursuant to section 366 of the Bankruptcy Code.

d.    Insurance Programs

On December 5, 2012, Revstone filed a *Motion for Authorization to (I) Continue Prepetition Insurance  Program and (II) Pay Any Prepetition Premiums and Related Obligations* (the "Insurance Motion") [Docket No. 8].  On December 6, 2012, the Bankruptcy Court entered an interim order authorizing, but not requiring, Revstone to (i) maintain its insurance program in accordance with its prepetition practice, (ii) pay any fee owed to broker(s) necessary to continue the administration of the insurance program, and (iii) pay any insurance premium obligations or broker's fees that may have been due before the commencement of the Chapter 11 Case.  On

January 10, 2013, the Bankruptcy Court entered its final order granting the relief requested in the Insurance Motion [Docket No. 100].

e.    Greenwood First Day Motions

On January 9, 2013, Greenwood filed its (i) *Motion for Interim and Final Orders Authorizing Debtor to (I) Maintain Existing Cash Management System and Bank Account, (II) Continue Use of Existing Checks and Business Forms, (III) Obtain Limited Waiver of Section 345(b), and (IV) Continue Intercompany Transactions* [Docket No. 3 in Case No. 13-10027]; (ii) *Motion of Debtor for Interim and Final Order Under Sections 105, 363, and 507 of the Bankruptcy Code (I) Authorizing Payment of Prepetition Wages, Salaries, and Employee Benefits, (II) Authorizing Continuation of Employee Benefit Plans and Programs Postpetition, and (III) Directing All Banks to Honor Prepetition Checks for Payment or Prepetition Employee Obligations* [Docket No. 4 in Case No. 13-10027]; (iii) *Motion for Authorization to (I) Continue Prepetition Insurance Program and (II) Pay any Prepetition Premiums and Related Obligations* [Docket No. 5 in Case No. 13-10027]; and (iv) *Motion for an Interim and Final Order to (I) Prohibit Utility Companies from Discontinuing, Altering, or Refusing Service, (II) Deem Utility Companies Adequately Assured of Future Payment, and (III) Establish Procedures for Determining Requests for Additional Adequate Assurance* [Docket No. 6 in Case No. 13-10027]. The Bankruptcy Court granted these motions (with certain modifications in some cases) pursuant to various orders: (i) cash management orders, Docket No. 14 in Case No. 13-10027 and Docket No. 714 in Case No. 12-13262, and amended order relating to payments to George Hofmeister and his family members, Docket No. 1134 in Case No. 12-13262; (ii) employee wages/benefits orders, Docket Nos. 15 & 80 in Case No. 13-10027; (iii) insurance program orders, Docket Nos. 16 & 82 in in Case No. 13-10027]; and (iv) utility orders, Docket Nos. 17 & 81 in Case No. 13-10027.

On January 9, 2013, Greenwood also filed *Debtor's Motion for Interim and Final Orders: (A) Authorizing Debtor to Use Cash Collateral Pursuant to 11 U.S.C. Sections 105 and 363(c)(2); (B) Granting Adequate Protection Pursuant to 11 U.S.C. Section 361; (C) Modifying the Automatic Stay Pursuant to 11 U.S.C. Section 362; and (D) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* [Docket No. 8 in Case No. 13-10027], seeking authority to use the cash collateral of Bridgeport Capital Funding LLC ("Bridgeport"), Greenwood's prepetition secured lender, to meet payroll and other obligations, with Bridgeport to be provided, among other adequate protection, replacement liens, a superpriority administrative expense claim and section 506(a) surcharge waiver.  The Bankruptcy Court entered an interim order authorizing the use of the cash collateral of Bridgeport on January 14, 2013 [Docket No. 20 in Case No. 13-10027], and a series of additional interim orders pending the sale of Greenwood's assets in its chapter 11 case (discussed further below).

In addition to the First Day Motions, the Debtors filed a number of other motions after the Petition Date to, among other things, help stabilize operations, appoint a Chief Restructuring Officer and establish procedures for the Chapter 11 Cases:

(1)      Joint Administration

On January 28, 2013, the Debtors filed the *Motion of the Debtors for Order Directing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only* [Docket No. 140] (the "Joint Administration Motion").  The Joint Administration Motion sought authority to utilize a single general docket for the Chapter 11 Cases of the Debtors and combine notices to creditors of the Debtors' respective estates and other parties in interest, which would result in significant savings to the estates.  On February 6, 2013, the Bankruptcy Court entered its order directing joint administration of these Chapter 11 Cases [Docket No. 173].

(2)      Noticing and Claims Agent

Because of the size of these Chapter 11 Cases (there are more than 200 creditors and other parties in interest listed on the mailing matrix filed with the chapter 11 petitions), pursuant to Rule 2002-1(f) of the Local Rules of Bankruptcy Procedure for the District of Delaware (the "Local Rules"), the Debtors were required to retain a noticing and claims agent.  On February 28, 2013, the Debtors filed the *Application of Debtors Pursuant to 28 U.S.C. § 156(c) and Local Rule 2012-1(f) for an Order Authorizing the Retention of Rust Consulting/Omni Bankruptcy as Claims and Noticing Agent for the Debtors* [Docket No. 305].  Rust Omni's retention as claims and noticing agent was approved by the Bankruptcy Court by order entered on March 20, 2013 [Docket No. 413].  In addition, on February 28, 2013, the Debtors filed the *Application for Order Authorizing the Debtors to Employ and Retain Rust Consulting/Omni Bankruptcy to Provide Administrative Services to the Debtors Pursuant to Sections 327(e), 328 and 1107(b) of the Bankruptcy Code and Bankruptcy Rule 2014* [Docket No. 305] to seek approval for Rust Omni to serve as balloting agent and to provide other administrative services in the Chapter 11 Cases.  Rust Omni's retention to provide administrative services was approved by the Bankruptcy Court by order entered on March 20, 2013 [Docket No. 414].  Rust Omni maintains the claims register in the Chapter 11 Cases and will serve as the balloting agent to receive and tabulate the ballots on the Plan.

(3)      Employment of Chief Restructuring Officer and Related Matters

On February 13, 2013, the Debtors filed the *Motion of the Debtors to Employ and Retain Huron Consulting Services LLC to: (I) Provide a Chief Restructuring Officer and Additional Personnel for the Debtors Pursuant to 11 U.S.C. Section 363(b), Nunc Pro Tunc to January 17, 2013; and (II) Provide Financial Advisory Services to the Debtors Pursuant to 11 U.S.C. Section 327(a), Nunc Pro Tunc to the Period Between December 17, 2012 and January 16, 2013* (the "CRO Motion") [Docket No. 210] seeking approval of John C. DiDonato to serve as Chief Restructuring Officer (the "CRO") and related relief.

A key issue during the first months of the Chapter 11 Cases was the governance of the Debtors.  As noted above, the operating agreements of Revstone and Spara were amended as of January 17, 2013 to appoint the CRO and two independent managers who also serve on a restructuring committee.  The Creditors' Committee and BFG challenged the level of independence of the CRO and the independent managers.  After significant litigation, the

Bankruptcy Court approved the CRO Motion by order entered on March 21, 2013 [Docket No. 428].

2.    **Retention of Debtors' Professional Persons**

On January 17, 2013, the Debtors substituted PSZ&J as bankruptcy counsel in place of Mayer Brown LLP and Richards, Layton & Finger, P.A. [Docket No. 131].  On February 13, 2013, the Debtors sought to employ PSZ&J as their bankruptcy counsel with regard to prosecution of their Chapter 11 Cases by filing the *Application Pursuant to Section 327(a) of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure and Local Rule 2014-1 for Authorization to Employ and Retain Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtors and Debtors in Possession Nunc Pro Tunc to January 17, 2013* [Docket No. 197].  An order was entered authorizing that retention, effective as of January 17, 2013, on March 20, 2013 [Docket No. 417].  Debtor Greenwood also employed Angle Advisors LLC as investment bankers pursuant to an order entered on May 30, 2013 [Docket No. 635].

3.    **Ordinary Course Professionals**

On February 28, 2013, the Debtors filed a *Motion of the Debtors Pursuant to Sections 105(a), 327, 328 and 330 of the Bankruptcy Code for an Order Authorizing the Debtors to Retain, Employ and Compensation Certain Professionals Utilized by the Debtors in the Ordinary Court of Business* ("Ordinary Course Professionals Motion") [Docket No. 302] seeking authority to employ and compensate certain professionals utilized in the ordinary course of the Debtors' business, such as state court litigation counsel and tax and accounting providers, to name a few. On March 20, 2013, the Bankruptcy Court entered an order granting the Ordinary Course Professionals Motion subject to certain modifications [Docket No. 416], notwithstanding the objections of the Creditors' Committee and BFG.

4.    **Compensation of Professionals**

On February 28, 2013, the Debtors filed a *Motion of the Debtors Pursuant to Section 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a) and Local Rule 2016-2 for Order Authorizing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 303] seeking entry of an order establishing the orderly and regular process for the allowance and payment of interim compensation and reimbursement of expenses for attorneys and other professionals retained in the Debtors' Chapter 11 Cases.  On March 20, 2013, the Bankruptcy Court entered an Order granting this motion [Docket No. 415].

5.    **Appointment of the Creditors' Committee and Its Employment of Professionals**

On December 18, 2012, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee" or "Revstone Committee") as the representative of Revstone's general unsecured creditor constituency in Revstone's Chapter 11 Case.  No creditors' committee or other statutory committee has been appointed in the other Debtors' cases.  The Revstone Committee is currently composed of the following members:

BFG, Patrick J. O'Mara, Thule Holding, Inc., the PBGC, and Kerry Capital Advisors, Inc. Schoeller Arca Systems, Inc. was a member of the Creditors' Committee until it resigned in May 2013, and Kerry Capital Advisors, Inc. was appointed as a member on or about February 4, 2014.  The Creditors' Committee retained Womble Carlyle Sandridge & Rice LLP (the "Womble Firm") as its counsel and FTI Consulting, Inc. as its financial advisor.  George Hofmeister objected to the employment of the Womble Firm, and appealed the order approving such employment; the Creditors' Committee cross-appealed.  This appeal is pending before the District Court for the District of Delaware.

6.      **Retention of Special Counsel to the Restructuring Committee**

On May 6, 2013, the Debtors filed a motion seeking authorization to pay the fees and costs incurred by Kirkland & Ellis LLP ("Kirkland"), as special counsel to the Restructuring Committee.  As noted above, an independent Restructuring Committee was appointed for the boards of managers of the Debtors.  On May 29, 2013, the Bankruptcy Court entered an order approving the retention of Kirkland.

7.      **Committee's Motions to Appoint Chapter 11 Trustee; Case Milestones**

On February 4, 2013, the Creditors' Committee filed the *Motion of the Official Committee of Unsecured Creditors to Appoint a Chapter 11 Trustee Pursuant to 11 U.S.C. §§ 1104(a)(1) and 1104(a)(2)* (the "First Trustee Motion") [Docket Nos. 163 & 164].  Through the First Trustee Motion, the Creditors' Committee sought to appoint a chapter 11 trustee in Revstone's case on the basis of purported malfeasance by Mr. George Hofmeister, the principal of Ascalon who previously controlled Revstone, including allegations relating to Mr. Hofmeister's (a) transfers of assets to or from his children's trusts, (b) misuse of pension funds that are currently the subject of a DOL investigation (involving TPOP which was a non-debtor at that point), (c) objections to BFG's collection actions; and (d) efforts to dispose of assets of Revstone's subsidiaries and affiliates in what the Creditors' Committee characterized as a self-interested move to defraud creditors and repay pension shortfalls.  The Creditors' Committee also alleged that there was a lack of independence between the CRO, the Restructuring Committee, and Mr. Hofmeister.  The Debtors and Creditors' Committee resolved the First Trustee Motion based on the parties' agreement (which is sealed) as to certain milestones for the Chapter 11 Cases, with deadlines and other terms relating to the disposition of assets and development of a chapter 11 plan (the "Milestones") [*see* Docket No. 573].

On November 20, 2013, the Creditors' Committee filed its second motion to appoint a chapter 11 trustee in Revstone's case or alternatively, to convert said case to a chapter 7 proceeding (the "Second Trustee Motion") [Docket No. 1167], asserting, among other things, that there was cause for the appointment of a trustee in light of the continued acrimony between the Debtors, Committee, PBGC and other creditors.  Revstone filed an opposition [Docket No. 1203], asserting, among other things, that Revstone's and the Creditors' Committee's goals in the case were virtually identical to each other, the remaining necessary work could be completed most efficiently and competently by current management and counsel, and no benefits to the estate would come from the appointment of a trustee.

The Second Trustee Motion was resolved as part of the global settlement with the PBGC describe below.

8.    **PBGC's TPOP Conversion Motion and Subsequent Global Settlement By and Among Debtors, PBGC, Creditors' Committee and BFG**

On November 20, 2013, the PBGC filed its *Motion of Pension Benefit Guaranty Corporation for the Entry of an Order Pursuant to 11 U.S.C. § 1112(B) Converting the Bankruptcy Case of TPOP, LLC from Chapter 11 of the Bankruptcy Code to a Case Under Chapter 7 of the Bankruptcy Code* [TPOP Docket No. 307] (the "TPOP Conversion Motion"). The PBGC also joined (the "PBGC Trustee Joinder") in the Creditors' Committee's Second Trustee Motion (discussed above).  On February 10, 2014, in light of the PBGC Settlement Agreement (defined below), the PBGC withdrew the TPOP Conversion Motion and the PBGC Trustee Joinder.

On February 14, 2014, the Debtors filed the *Motion of Revstone Industries, LLC, et al. for Order Pursuant to 11 U.S.C. §§ 105 & 363 and Bankruptcy Rule 9019 Authorizing and Approving Settlement Agreement With Pension Benefit Guaranty Corporation* (the "PBGC Settlement Motion") [Docket No. 1322; *see also* Docket No. 1323], seeking approval of that certain Settlement Agreement dated as of February 11, 2014 (the "Initial PBGC Settlement Agreement", a copy of which was attached to the PBGC Settlement Motion) by and among the Debtors, non-Debtor Fairfield, TPOP, and certain other non-debtor subsidiaries of Revstone and Spara (together with the Debtors, TPOP, and Fairfield, the "PBGC Obligors"), and the PBGC.  As described in the PBGC Settlement Motion, after several months of extensive negotiation, the Debtors and the PBGC reached agreement on a global resolution of the PBGC's substantial claims in excess of $95.0 million against each of the Debtors and their non-debtor affiliates within the controlled group (which claims dwarf the other claims against the estates) that would provide for the release of funds from subsidiary levels to the Revstone and Spara estates and a path to a confirmable chapter 11 plan (or plans) that is expected to yield meaningful recoveries by unsecured creditors.  The PBGC's claims are structurally senior to other claims asserted at the Revstone and Spara parent levels, and given the size of these claims, the PBGC would swamp the creditor pool at every level of Revstone's and Spara's organizational structure.  Along with addressing the PBGC's claims and related non-bankruptcy pension litigation, the Initial PBGC Settlement Agreement would address pension-related claims asserted by the DOL against TPOP and Fairfield, and provide the framework for the payment of allowed administrative expenses and priority claims, and the means for distributions to be made to unsecured creditors in the Revstone and Spara bankruptcy cases pursuant to a chapter 11 plan.

The highlights of the Initial PBGC Settlement Agreement included: (i) the PBGC would have an allowed general unsecured claim against the Debtors and their domestic affiliates in the amount of $95.0 million; (ii) the PBGC would accept a projected recovery of $82.0 million on account of the allowed PBGC claim, but in no event less than $80.0 million; (iii) distributions would be made to the PBGC, on the one hand, and Revstone and Spara, as applicable, on the other hand, or into an escrow, out of the net available proceeds realized from asset sales at various Revstone and Spara subsidiaries in accordance with an agreed funding schedule, and the PBGC would agree to allow payments to be made to the Revstone and Spara estates so that

creditors of these estates (other than the PBGC) can receive distributions; (iv) all pending bankruptcy litigation between the parties would be dismissed with prejudice, and the PBGC would agree to support Revstone's amended chapter 11 plan (as well as plans for the other debtors), which would incorporate the terms of the Initial PBGC Settlement Agreement; (v) TPOP and Fairfield would consent to termination of the Pensions Plans (as defined in the PBGC Settlement Motion) and the PBGC's trusteeship of the Pension Plans, and upon termination of the Pension Plans under 29 U.S.C. § 1342, any claims filed by the Pension Plans against the bankruptcy estates would be deemed withdrawn; and (vi) the DOL, TPOP, and Fairfield would seek entry of consent judgments in certain DOL litigation, which would state the amounts each of TPOP and Fairfield owes to the Pension Plans, concluding the litigation as to those two defendants, and releasing all DOL claims against those two defendants, except as necessary to give effect to the consent judgments and the PBGC Settlement.  As explained in the PBGC Settlement Motion, the Debtors believed that approval of the PBGC Settlement was in the best interests of the Debtors' estates in that the settlement:  (a) would resolve the claims of the PBGC, the key creditor in these cases, (b) would settle and avoid further litigation over various pension liabilities, and (c) would provide for distributions to unsecured creditors through a chapter 11 plan that would have the support of the PBGC.

Objections to the PBGC Settlement Motion were filed by the Revstone Committee [Docket No. 1378], BFG [Docket Nos. 1334 & 1377], and Ascalon [Docket No. 1375], and the Debtors filed an omnibus reply [Docket No. 1432].  BFG and the Creditors' Committee then objected to the PBGC Claims.  After negotiations with the Revstone Committee and BFG, on May 1, 2014, the Debtors and TPOP filed with the Bankruptcy Court and sought approval of certain modifications to the Initial PBGC Settlement Agreement as set forth in a *Global Resolution Term Sheet* that includes and incorporates the *Consensual Resolution of Terms to Global Resolution Term Sheet* and the *Modified Funding Schedule* related thereto (collectively, the "Term Sheet") [Docket No. 1477; TPOP Docket No. 471].  The Term Sheet reflected a global settlement resolving the principal pending litigation in these chapter 11 cases and providing a definite exit strategy for the Debtors and their estates.  With the assistance and agreement of the PBGC, the settlement enhanced creditor recoveries beyond those contemplated by the Initial PBGC Settlement Agreement, while at the same time addressing BFG's claims against the Revstone and Spara related entities through a combination of claim allowance and distribution of certain available cash at non-Debtor subsidiary levels.

After a hearing held on May 9, 2014, the Bankruptcy Court entered an order granting the Debtors' and TPOP's respective motions, as modified, and approving the Initial PBGC Settlement Agreement as modified by the Term Sheet (the "Global Settlement" or the "PBGC Settlement Agreement") [Docket No. 1494].  The Global Settlement went into effect on the same day.  The highlights of the approved settlement include:

      (i)     Although the PBGC will continue to have an allowed general unsecured, non-priority claim against each of the Debtors and their domestic affiliates in the amount of $95.0 million pursuant to the Initial PBGC Settlement Agreement, the PBGC's projected recovery will be reduced from $82.0 million to $77.0 million, and the PBGC's minimum recovery will be reduced from $80.0 million to $75.0 million, allowing an additional $5.0 million of proceeds to be made available to the estates' other creditor constituents.

25

(ii)     The PBGC has agreed to a carve-out of $3.0 million from the non-Debtors' sale proceeds otherwise payable to the PBGC under the Initial PBGC Settlement Agreement in order to provide an up-front recovery under a chapter 11 plan to Revstone's general unsecured creditors, other than BFG.

(iii)     The PBGC has agreed that the first $2.0 million of litigation proceeds otherwise payable to the PBGC under the Initial PBGC Settlement Agreement to be distributed to the Revstone estate under a chapter 11 plan for the benefit of administrative claimants ($1.5 million) and general unsecured creditors ($0.5 million), other than BFG.

(iv)     BFG was paid the sum of $7.3 million out of existing Revstone subsidiary sale escrows otherwise attributable to the PBGC under the Initial PBGC Settlement Agreement. Such payment was in full and final resolution of all claims of BFG against Spara, except as noted below.

(v)     BFG will have an allowed administrative expense claim against Spara in the amount of $0.5 million and an allowed administrative expense claim against Revstone in the amount of $0.7 million, which claims will be payable upon the effective date of a chapter 11 plan.

(vi)     BFG will have an allowed general unsecured claim against Revstone in the amount of $8.5 million. Such claim will not be payable out of the $3.0 million PBGC carve-out of non-Debtor sale proceeds addressed above or the $2.0 million of initial PBGC litigation proceeds addressed above. The terms relating to payment of BFG's remaining unsecured claim are reflected in the PBGC Settlement Agreement and the Plan.

(vii)     The parties have agreed to certain professional fee reductions, governance provisions, both before and following the effective date of a chapter 11 plan or plans, and various other terms, including release and exculpation provisions, which are customarily included within a plan, each of which will be incorporated as part of the Debtors' plan confirmation process.

The Debtors' Plan and the proposed plan of TPOP conform to the applicable plan related terms of the Global Settlement. Consistent with the requirements of the Global Settlement, BFG has been paid $7.3 million. BFG's remaining administrative claims against Revstone and Spara will be paid on the Effective Date of the Plan. The Plan is also supported by the Creditors' Committee, BFG, and the PBGC.

9.     **Plan Exclusivity; Committee's Proposed Plan**

On April 1, 2013, the Debtors filed a *Motion for an Order Pursuant to 11 U.S.C. § 1121(d) Extending the Time Periods During Which the Debtors Have the Exclusive Right to File a Plan and Solicit Acceptances Thereof* (the "Exclusivity Motion") [Docket No. 446], seeking to extend the period during which the Debtors have the exclusive right to (i) file a chapter 11 plan from early April 2013 through and including July 31, 2013, and (ii) solicit acceptances of a chapter 11 plan from early June 2013 through and including September 30,

2013.  On May 16, 2013 the Bankruptcy Court entered an order (the "Exclusivity Order") [Docket No. 578] granting these requested extensions, subject to certain modifications, including that in the event that Revstone breaches any of the Milestones and fails to timely cure such breach, Revstone's exclusive filing period and exclusive solicitation period would terminate with respect to the Creditors' Committee (upon expiration of the applicable grace period to cure), and the Revstone Committee would have the immediate right to file and solicit a plan of reorganization.

On July 30, 2013, the Debtors filed a motion, as to all parties other than the Creditors' Committee, to further extend the exclusive filing period from July 31, 2013 to October 31, 2013 and the exclusive solicitation period from September 30, 2013 to December 31, 2013.  This motion was approved by the Bankruptcy Court pursuant to an order entered on August 19, 2013. Pursuant to an order entered on February 24, 2014 [Docket No. 1349], upon the Debtors' motion and prior adjournment thereof, the Bankruptcy Court extended the Debtors' exclusive period to file a plan to March 30, 2014 and the Debtors' exclusive solicitation period to May 31, 2014 as to all parties except for the Creditors' Committee.

On March 18, 2014, the Bankruptcy Court entered another order [Docket No. 1389] further extending the Debtors' exclusive filing period to April 8, 2014 and exclusive solicitation period to June 8, 2014, other than as to the Creditors' Committee.  On April 7, 2014, the Bankruptcy Court entered an order [Docket No. 1423] further extending until May 6, 2014 and July 6, 2014 the Debtors' exclusive filing period and exclusive solicitation period, respectively, as to all parties other than the Creditors' Committee.  On May 5, 2014, the Bankruptcy Court entered an order [Docket No. 1485] extending until May 15, 2014 and July 15, 2014 the Debtors' exclusive filing period and exclusive solicitation period, respectively, as to all parties other than the Creditors' Committee.  On May 27, 2014, the Bankruptcy Court entered an order [Docket No. 1540] further extending until June 3, 2014 and August 1, 2014 the Debtors' exclusive filing period and exclusive solicitation period, respectively, as to all parties other than the Creditors' Committee.

As discussed further below, on July 8, 2013, the Creditors' Committee filed a proposed plan of reorganization and accompanying disclosure statement with respect to Revstone, asserting that Revstone failed to meet certain Milestones and cure such breaches.  On August 27, 2013, the Creditors' Committee filed an amended, redacted disclosure statement, to which was attached an amended plan [Docket No. 983].  The hearing on requested approval of the Creditors' Committee's disclosure statement was adjourned.  Pursuant to the Global Settlement, the Creditors' Committee's plan will be withdrawn in favor of the Debtors' Plan.  As discussed in Article X.A.3, the Debtors believe that any alternative plan would not result in as favorable of treatment of Claims and Interests as proposed under the Debtors' Plan.

10.    **Sale/Disposition of Assets of US Tool**

Substantially all of US Tool's assets have been disposed of during its Chapter 11 Case. On February 21, 2013, Debtor US Tool filed a motion for authority to conduct an auction of its personal property assets and to sell such assets to the successful bidder, free and clear of all liens and encumbrances [Docket No. 241] (the "US Tool Sale Motion").  Prior to filing a voluntary

petition under chapter 11 of the Bankruptcy Code, US Tool ceased all operations.  As of the Petition Date, US Tool's leasehold facility in Lansing, Michigan was under the management of a court-appointed receiver, and thus, US Tool's principal remaining asset was its equipment.  The Debtors received a bid from Myron Bowling Auctioneers, Inc., PPL Group LLC, and Maynard Industries (1991) Inc. to acquire all the assets located at the US Tool facility for $0.675 million (the amount guaranteed was $0.6 million) [Docket No. 384].  BFG asserted a lien against the US Tool equipment and a claim against Revstone in an amount exceeding $4.5 million.  On February 4, 2013, BFG filed a motion requesting modification of the automatic stay and adequate protection [Case No. 13-10028, Docket No. 21].  On March 20, 2013, the Bankruptcy Court entered an order resolving the stay relief/adequate protection motion and US Tool Sale Motion [Docket No. 412].  The order denied the US Tool Sale Motion and permitted BFG to credit bid, but conditioned upon BFG's agreement with US Tool to reduce BFG's claim against US Tool and Revstone (*i.e.*, an unsecured guarantee claim) by no less than $0.675 million.  BFG exercised its state-law remedies, and foreclosed upon its collateral and disposed of the equipment.

11.    **Sale of Greenwood Assets**

Debtor Greenwood has sold substantially all of its assets during its Chapter 11 Case.  On April 12, 2013, Debtor Greenwood filed its *Motion for Order (A) Approving Bid Procedures for the Sale of the Assets of Debtor Greenwood Forgings, LLC, (B) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notice Related Thereto; (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Contracts, Including Notice of Proposed Cure Amounts; (D) Approving Certain Expense Reimbursement Provisions and Breakup Fee; and (E) Granting Other Related Relief* [Docket No. 474] (the "Greenwood Bid Procedures Motion"), seeking, *inter alia*, approval of certain stalking horse bidder protections in the event that a stalking horse bidder was identified.  On April 17, 2013, the Bankruptcy Court approved the Greenwood Bid Procedures Motion [Docket No. 496].  On May 7, 2013, Debtor Greenwood filed its *Motion for an Order (A) Approving Asset Purchase Agreement and Authorizing the Sale of Assets of Debtor Greenwood Forgings, LLC Outside the Ordinary Course of Business, (B) Authorizing the Sale of Greenwood's Assets Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code; (C) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (D) Granting Related Relief* [Docket No. 558] (the "Greenwood Sale Motion").  Subsequently, on May 19, 2013, American Axle & Manufacturing, Inc. was identified as the stalking horse bidder [Docket No. 585], and an auction was conducted on May 29, 2013.  Angstrom Automotive Group, LLC ("Angstrom") submitted the highest and best offer at the auction, and on May 30, 2013, the Bankruptcy Court approved the sale of Greenwood's assets to Angstrom [Docket No. 634].  This sale closed on or about May 31, 2013.  Pursuant to the sale order, the Bankruptcy Court-approved bid protections were paid from the sale proceeds, and the remainder of such proceeds were distributed to BFG, except for the sum of $0.575 million, which was retained by Greenwood as satisfaction of any claims it may have against BFG arising under Bankruptcy Code section 506(c).  As a result, BFG agreed to release any liens on Greenwood's assets (including cash collateral) and further agreed to waive any administrative claims against Greenwood.

12.     **Sale of Certain Assets of Contech**

On June 11, 2013, the Debtors filed a *Motion for Order (A) Authorizing Debtor Revstone Industries, LLC to (I) Consent to and (II) Take Actions that It Determines are Reasonably Necessary to Consummate the Sale of Certain Assets of Its Non-Debtor Indirect Subsidiaries Contech Castings, LLC and Contech Castings Real Estate Holdings, LLC; and (B) Granting Related Relief* (the "Contech Sale Motion") [Docket No. 652].  The Contech Sale Motion sought the limited relief of authorization for Revstone to consent to and take actions that it determines are reasonably necessary to consummate the sale of certain assets comprising or relating to the lightweight die cast automotive components business of Contech Castings, LLC and Contech Castings Real Estate Holdings, LLC (collectively, "Contech"), indirect non-Debtor affiliates of Revstone, to Shiloh Die Cast Midwest, LLC, or the highest or otherwise best bidder or bidders. The Contech Sale Motion also requested that the order provide that Revstone's consent to the sale and the consummation of the sale by Contech is a proper exercise of Revstone's business judgment.  At the hearing on the motion, the Bankruptcy Court determined that it did not need to rule on the motion, given the matter did not involve assets of the estate and for the other reasons stated on the record.  Subsequently, this sale transaction was consummated.

13.     **The Customer Support Agreement and Related Subsequent Settlement**

Pursuant to the Automotive Sale Transactions Support Agreement (the "Sale Support Agreement"), General Motors, LLC ("GM") and Chrysler Motors, LLC ("Chrysler", together with GM, the "Supporting Customers"), agreed to support the proposed sale of certain of Revstone's subsidiaries and affiliates, including TPOP, Contech, Eptec, Aarkel Tool & Die Inc. and Creative Lighting Solutions, LLC, by agreeing to continue providing necessary funding that would allow the companies to continue to produce component parts for the Supporting Customers and enable the closing of proposed sales.  In turn, the sale of such entities would maximize the value of the estates.  Additionally, the Supporting Customers agreed to purchase participation interests in TPOP's proposed DIP financing and to forgive portions of prior financial accommodations provided to TPOP and Contech.  Revstone believes that the Supporting Customers agreed to the provisions of the Sale Support Agreement so that they could avoid the catastrophic costs of production line shut-downs and resourcing while preserving going concern operations pending the sales referenced above.

In consideration of the accommodations summarized above, subject to and limited by the terms and conditions of the Sale Support Agreement, the applicable members of the Revstone Group (i) were required to repay only (a) certain retained participation interests which include loans previously provided that are not being forgiven, and (b) a portion of the sale support payments provided by the Supporting Customers secured by proceeds of the asset sales and certain equipment and real estate interests, and (ii) agreed to provide the Supporting Customers various supply protection assurances.  Revstone believes each of the foregoing obligations has been satisfied and/or the applicable members of the Revstone Group have no further obligation to repay any amounts to the Supporting Customers.

Revstone, together with TPOP, filed a motion to approve the Customer Support Agreement on July 22, 2013 (the "Approval Motion").  The Approval Motion and Customer

Support Agreement were filed under seal.  The Approval Motion sought an interim order ("Interim Order") approving the Customer Support Agreement as to TPOP.  Following entry of the Interim Order, the Bankruptcy Court scheduled a final hearing on the Customer Support Agreement for August 21, 2013.  At the initial hearing on the Approval Motion, the Bankruptcy Court also instructed Revstone and TPOP to file an amended Approval Motion that provided a comprehensive summary of the Customer Support Agreement and set forth a process by which interested parties could receive an unsealed copy of the Customer Support Agreement upon the execution of an acceptable confidentiality agreement.  The amended Approval Motion was filed on July 29, 2013.  The Revstone Committee, BFG, and the United States Trustee objected to the amended Approval Motion.  The United States Trustee's objection was resolved and reflected in a revised final order approving the Customer Support Agreement.

After testimony spread out over two days, the Bankruptcy Court overruled the Revstone Committee and BFG objections and issued a ruling approving the Customer Support Agreement as to Revstone and TPOP on August 22, 2013.  Immediately following the Bankruptcy Court's ruling, the Revstone Committee sought a stay pending appeal, which requested relief was denied by the Bankruptcy Court.  On August 23, 2013, following the entry of the Final Order on the Bankruptcy Court's docket, the Revstone Committee appealed the Final Order to the District Court.  [Docket No. 963]  The Revstone Committee's appeal has been resolved as part of the Global Settlement.

On March 28, 2014, Revstone filed a motion under Bankruptcy Code section 363 and Bankruptcy Rule 9019 [Docket No. 1408] for approval of a Settlement and Release Agreement (attached to the motion) by and among Revstone, TPOP, certain of Revstone's non-debtor affiliates, and Chrysler.  In order to resolve the outstanding financial and other accommodations remaining under the Customer Support Agreement, the foregoing parties agreed to enter into the settlement agreement that globally resolves and terminates the parties' remaining obligations.  Among other things, as described in the motion, (i) purported events of default that Chrysler may assert exist and for which members of the Revstone Group may be liable under the Customer Support Agreement were resolved, and (ii) millions of dollars in indebtedness potentially due (and subject to dispute) on account of postpetition and other financing provided by Chrysler to TPOP and certain indirect non-debtor subsidiaries of Revstone was forgiven.  The Bankruptcy Court entered an order on May 14, 2014 [Docket No. 1513] granting this motion.

### 14.    **General Motors Motion for Payment**

On April 22, 2014, GM filed its *Motion to Compel Immediate Payment of First Priority Secured Claim of General Motors LLC* in TPOP's bankruptcy case (the "GM Motion") [Docket No. 471], pursuant to which GM sought the immediate payment of its asserted first priority secured claims granted pursuant to the final financing order in TPOP's case.  GM asserted that its claims against TPOP exceed $10.3 million, and are secured by, among other assets, a restricted and segregated cash collateral account consisting of the sale proceeds of TPOP's assets (the "Segregated Account").

On May 9, 2014, TPOP filed a preliminary objection to the GM Motion [Docket No. 490] wherein TPOP raised various defenses and issues including the following:  First and foremost, TPOP owes nothing to GM under the Sale Support Agreement.  The Sale Support Agreement

required TPOP and certain affiliates to sell the assets of TPOP and Contech by certain dates, at which time TPOP's obligations to GM would be forgiven, with the exception of certain retained loan participations. This forgiveness became effective when Eptec, CLS and Aarkel were sold. The retained participations, to the extent owed, were satisfied by certain of the proceeds of TPOP's assets and certain unused assets of Contech that were paid to GM. In addition, TPOP believes that discovery will show that GM may have interfered with the marketing process of certain asset sales required under the Sale Support Agreement. If so, GM's actions substantially harmed TPOP and certain affiliates, and thus, TPOP and its affiliates may have significant damage claims against GM, which would exceed anything that might be owed to GM (as noted, TPOP believes nothing is owed given GM's obligation to provide the second installment of the sale support payment and express forgiveness of debt under the Sale Support Agreement). Further, GM's contention that immediate payment is required in order for GM's interests to be protected in light of the PBGC settlement is false. Proceeds are not earmarked for the PBGC. By the approved settlement, PBGC's claim amount has been resolved; the settlement does not provide for any payment to the PBGC from the Segregated Account. Instead, such claim will be paid in accordance with a confirmed plan (or other further Court order). In addition to the preliminary objection to the GM Motion, TPOP also served its First Set of Requests for Production to General Motors, LLC and notices of deposition for certain employees of GM. GM refused to the respond to TPOP's discovery requests or schedule the depositions of its employees.

On July 31, 2014, the Bankruptcy Court directed that TPOP and GM meet and confer to develop a procedure to enable the Bankruptcy Court to conduct a preliminary hearing on the Payment Motion. TPOP and GM have entered into a stipulation that divides the dispute over the Payment Motion into two stages with (i) GM's contractual claims addressed at the preliminary hearing on a date acceptable to the Bankruptcy Court following the conclusion of the briefing schedule set forth in the stipulation and (ii) TPOP's affirmative defenses to those contractual claims adjudicated at the preliminary hearing and all other matters in dispute adjudicated, if necessary, at a later date subject to an acceptable briefing schedule (the "TPOP/GM Stipulation") [Docket No. 684 (TPOP)]. On October 20, 2014, GM filed its *Amended Motion to Compel Immediate Payment of First Priority Secured Claim of General Motors LLC* [Docket No. 689]. On November 10, 2014, TPOP filed its *Objection to Amended Motion to Compel Immediate Payment of First Priority Secured Claim of General Motors, LLC* [Docket No. 704] (the "Objection to Motion to Compel"). GM filed its reply to the Objection to Motion to Compel on November 25, 2014 [Docket No. 721]. The preliminary hearing on the Amended GM Motion was held on December 4, 2014 and the Bankruptcy Court reserved decision.

The outcome of the Amended GM Motion would impact recoveries by Revstone on account of its intercompany claim against TPOP. This matter is pending before the Bankruptcy Court.

15.    **Sale of Revstone's Equity Interest in Revstone Wallaceburg Canada**

On April 21, 2014, Revstone filed (a) a motion [Docket No. 1457] for entry of an order (i) approving that certain Share Purchase Agreement dated March 13, 2014 between Revstone as seller and Zynik Capital Corporation as buyer (a copy of which agreement is attached to the motion), authorizing the sale of the equity of Revstone Wallaceburg Canada, Inc. ("RWCI")

owned by Revstone to the stalking horse bidder (or overbidder), (ii) authorizing the sale of the equity of RWCI free and clear of all liens and encumbrances pursuant to Bankruptcy Code section 363 (with such liens to attach to the sale proceeds), and (iii) granting related relief, and (b) a related motion for approval of bid procedures, a break-up fee and related matters [Docket No. 1456].  RWCI is a subsidiary of Revstone that conducts no active business; it is a holding company that owns 25,953,128 shares of Aarkel, which is a leading manufacturer of diecast tooling, plastic injection tooling and aluminum production/prototype tooling products.  Pursuant to the stalking horse agreement, Revstone was required to obtain an order approving the bid procedures by May 16, 2014, conduct an auction within 45 days of the filing of the bid procedures motion, obtain an order approving the sale within three business days after the auction, and close such sale within 14 days after entry of the sale order.  As discussed in Revstone's sale motion, significant efforts were undertaken to market both Revstone's equity interest and the assets of Aarkel, including by the investment bank Stout Risius Ross, Inc. ("SRR") (an application for Revstone's retention of SRR was filed and approved by the Bankruptcy Court [Docket Nos. 1458 & 1512]).  The proposed purchase price is $14.1 million less certain items and plus certain amounts, as further described in the sale motion and stalking horse agreement.  Revstone believes that the proposed sale to the stalking horse bidder (or successful bidder) will provide its creditors and other stakeholders with the best opportunity possible for maximizing Revstone's interest in RWCI and, indirectly, Aarkel through the sale of such interest in Aarkel's parent, RWCI.  The Bankruptcy Court entered an order approving certain bid and sale procedures, approving the break-up fee, and granting related relief on May 14, 2014 [Docket No. 1514].  Because no qualified overbids were received, the auction was cancelled in accordance with the terms of the bid procedures.

On May 4, 2014, GM filed a limited objection and reservation of rights (the "GM Limited Objection") [Docket No. 1559] in response to Revstone's motion for the sale of the equity of RWCI, due to GM's belief that this transaction represented a sale of GM's collateral under the Sales Support Agreement.  The sale hearing was originally scheduled to be held on June 9, 2014 but was rescheduled for June 11, 2014 at the direction of the Bankruptcy Court.  Following an initial sale hearing held on June 11, 2014 which was continued to June 25, 2014 to allow Revstone and GM to resolve GM's limited objection, the Bankruptcy Court entered the Order approving the Share Purchase Agreement and authorizing the sale of the equity of RWCI to Zynik Capital Corporation (the "RWCI Sale Order") [Docket No. 1584].   To resolve the GM Limited Objection and the buyer's requirement of a release of claims by GM against RWCI and Aarkel, the RWCI Sale Order provided, among other things, that (i) Revstone segregate from the proceeds of the sale of the RWCI shares and place into a segregated, interest bearing account the principal amount of  $6.4 million (together with any interest earned on such principal sum, the "GM Claim Funds") to be held pursuant to the terms of the RWCI Sale Order; (ii) the RWCI Sale Order would also be entered in the bankruptcy case of TPOP, LLC; (iii) upon entry of the RWCI Sale Order, GM, RWCI, Aarkel and Zynik Capital Corporation agreed to deliver to an escrow agent a mutual release of any and all claims arising under the Sales Support Agreement, which such mutual release would be released to Zynik Capital Corporation after the expiration of a five (5) business day objection period; and (iv) the Debtor, TPOP, RWCI and certain other non-debtor affiliates and subsidiaries, subject to the terms and limitations of the RWCI Sale Order, including a reservation of certain defenses available under the Sales Support Agreement, agreed to a limited release of claims against GM related to the Aarkel sale to Zynik

Capital Corporation.  No objections to the GM Limited Release (as defined in the RWCI Sale Order) were filed.  The sale of the equity of RWCI closed on July 4, 2014.

On September 10, 2014, Revstone filed a motion seeking an order authorizing the release of the GM Claim Funds (the "Motion to Release Sale Proceeds") [Docket No. 1750].  Revstone sought to disburse the escrowed GM Claim Funds on the basis that (i) GM does not have a lien on the GM Claim Funds or (ii) if GM does have a lien on the GM Claim Funds, there are more than sufficient funds available at the TPOP estate to fully satisfy GM's alleged claims.  GM filed its opposition on to the Motion to Release Sale Proceeds on September 24, 2014 [Docket No. 1761].  The hearing on the Motion to Release Sale Proceeds took place on October 1, 2014 at which time the Bankruptcy Court reserved decision on the requested relief.  On October 6, 2014, the Bankruptcy Court entered the Order approving the Motion to Release Sale Proceeds [Docket No. 1781] which directed the release of the GM Claim Funds to Revstone.

### 16.    **Debtors' Sale of Other Non-Debtor Assets**

The Debtors, directly or through their subsidiaries, have been marketing, selling or otherwise properly disposing assets of non-Debtor affiliates, the net proceeds of which may be paid to one or more of the Debtors.  For example, certain assets of affiliates Contech (described above), MW Texas Die Casting, Inc., and Creative Lighting Solutions, LLC, have been sold to third party purchasers.  No subsidiaries of Spara or the assets thereof have yet been sold during the course of these bankruptcy cases, except for the sale of Lexington's assets, which was effectuated through a Wisconsin state court receiver.  Sales of the assets of Fairfield and T Cast are contemplated to occur after the Effective Date of the Plan.

Further, on July 22, 2013, TPOP filed its *Motion for Order (A) Approving Asset Purchase Agreement and Authorizing the Sale of Assets Outside the Ordinary Course of Business; (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Rights, Encumbrances and Other Interests Pursuant to Bankruptcy Code Sections 105, 363(b), 363(f) and 363(m); (C) Authorizing the Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases Pursuant to Bankruptcy Code Sections 363 and 365; and (D) Granting Related Relief* [Docket No. 18 in TPOP's bankruptcy case], seeking the entry of an order (i) approving the sale of substantially all of TPOP's operating assets related to its business of manufacturing precision machined components and assemblies, including dampers, engine components, knuckles and driveline products for the automotive industry (the "US Acquired Assets"), free and clear of liens, claims, and interests other than certain permitted liens, which together with certain damper-business related assets held by a non-debtor Mexican affiliate, Eptec, would be sold to Dayco Products, LLC and Dayco Products S.A. de C.V. ("Dayco") for $25.1 million, subject to certain adjustments set forth in the parties' asset purchase agreement, in addition to Dayco's assumption of certain liabilities, (ii) approving the TPOP's entry into the Agreement with Dayco, (iii) authorizing the assumption/assignment of certain executory contracts/leases to Dayco pursuant to sections 363 and 365 and in accordance with the APA, and (iv) granting related relief.  After a hearing held on August 30, 2013, the Bankruptcy Court entered an order approving the sale of the US Acquired Assets to Dayco and granting related relief [Docket No. 216 in TPOP's bankruptcy case].  The sale was consummated on or about September 9, 2013.

17. **Hofmeister Children's Trusts' Motions for Order Directing CRO to Refrain from Selling Spara's Assets and for Responsible Person in Debtors' Cases**

In November 2013, Homer McClarty ("McClarty"), trustee for the "Hofmeister Children's Trusts" – the equity holders owning 100% of Debtors Revstone and Spara through direct ownership of Ascalon – filed (i) a motion ("Spara Injunction Motion") [Docket No. 1160] for an order directing John DiDonato, President and CRO of Spara, to refrain from selling Spara's assets (Fairfield Casting, T Cast, Tech Fab, and Valley Towing) pending the filing of a plan, and (ii) a motion ("Responsible Person Motion") [Docket No. 1169] requesting the employment of Ramaekers Group, LLC to provide a person responsible for the Debtors and the termination of Huron's employment.  Among other objecting parties, the Debtors filed an opposition to the Spara Injunction Motion [Docket No. 1204], contending that the motion was procedurally, factually and substantively unfounded; among other defects in the motion, Spara's CRO is authorized to make all bankruptcy related decisions and will appropriately exercise his business judgment and if Court approval is required, Spara will certainly seek such approval. Among other objecting parties, the Debtors also objected to the Responsible Person Motion [Docket No. 1202], contending that the motion was a transparent attempt by George Hofmeister to try to improperly reassert control over the Debtors and pointing out various infirmities including the Trusts' lack of standing.  Objections and/or joinders were also filed by the Creditors' Committee, BFG, and the PBGC [Docket Nos. 1194, 1196, 1197, 1199, 1200 & 1201].  On July 7, 2014, counsel for McClarty withdrew the Responsible Person Motion [Docket No. 1618], with a full reservation of rights.

18. **Revstone Committee's Motion to Reconstitute Committee**

On April 9, 2014, the Revstone Committee filed a motion [Docket No. 1427] seeking an order directing the U.S. Trustee to reconstitute the Revstone Committee by removing the PBGC as a member, pursuant to Bankruptcy Code section 1102(a)(4), on the basis of the PBGC's purported conflicts of interest (in light of the PBGC Settlement Agreement, which as noted above, was objected to by the Revstone Committee).  This motion has been withdrawn in accordance with the Global Settlement.

19. **Debtors' Adversary Proceedings**

Revstone has commenced certain adversary proceedings in the Chapter 11 Cases, including an action filed on January 27, 2014 against Ascalon Enterprises, LLC and George Hofmeister (Adv. Proc. No. 14-50031), alleging, *inter alia*, violations of the Employee Retirement Income Security Act (ERISA), breach of contract, conversion and breach of fiduciary duty.  Among other improper acts, during 2012 and 2013, Hofmeister caused Ascalon – plan sponsor and plan administrator of the "Ascalon Enterprises Medical Benefits Plan," a self-funded healthcare plan in which employees of Revstone and its affiliates participate – to transfer hundreds of thousands of dollars in assets to third parties for purposes unrelated to the payment of plan benefits and plan administrative expenses.

On January 27, 2014, Revstone also commenced an adversary proceeding against George Hofmeister and numerous other parties (Adv. Proc. No. 14-50033 and together with Adv. Proc. No. 14-50031, the "Hofmeister Adversary Proceedings"), seeking, *inter alia*, the recovery of fraudulent transfers and damages for breach of fiduciary duty.  Generally, Revstone seeks to recover for the benefit of the estate various cash transfers that were made by its former manager Hofmeister for his personal purposes or for the benefit of entities owned ultimately by trusts established for his children.

On April 8, 2014, Revstone sought leave to amend the complaints in the Hofmeister Adversary Proceedings to add Homer W. McClarty, trustee of the Megan G. Hofmeister Irrevocable Trust, the Scott R. Hofmeister Irrevocable Trust, and the Jamie S. Hofmeister Irrevocable Trust (collectively, the "Children's Trusts").   On June 12, 2014, the Bankruptcy Court entered order in each of the Hofmeister Adversary Proceedings granting Revstone leave to amend the complaints and add Homer W. McClarty, trustee of the Children's Trusts as a defendant.

On March 31, 2014, Fasig-Tipton Company, Inc. and Keeneland Association, Inc., defendants in Adv. Pro. No. 14-50033, filed a joint motion to sever their claims from the other joined claims and to transfer venue to the Eastern District of Kentucky.  Similar motions to sever were later filed by defendants Nelson E. Clemmens, James H. Limbright and Henry J. Limbright, JJ Seville LLC, JMP Industries, Inc. and Holmes, Hollister & Co.  Defendant Clemmens also filed a motion to transfer venue to the Eastern District of Kentucky.  Revstone filed objections to each of the defendants' motions to sever and transfer venue.  A hearing was held on the Fasig-Tipton/Keeneland and Clemmens motions to sever and transfer venue on June 11, 2014.  On July 18, 2014, the Bankruptcy Court entered its Memorandum and Order granting the Keeneland/Fasig Motion to Sever.  On August 1, 2014, the Bankruptcy Court entered its Memorandum and Order granting the JJ Seville and JMP Industries motions to sever.  The Bankruptcy Court has not issued a decision on the Fasig-Tipton/Keeneland or Clemmens' motion to transfer venue.

On August 14, 2014, after reviewing the Bankruptcy Court's recent decisions on the motion to sever, the remaining motions to sever, requests to sever from certain defendants that did not initially seek to sever their claims, and for purposes of judicial economy and to avoid unnecessary cost and expense to this estate, Revstone submitted a Certification of Counsel requesting entry of an Order Severing Remaining Joined Claims Set Forth in the Second Amended Complaint (the "Order to Sever").  The Order to Sever was entered by the Bankruptcy Court on August 14, 2014.  Pursuant to the Order to Sever, the remaining joined claims were each severed into new, separate adversary proceedings (the "Severed Adversary Proceedings").  Pursuant to the Order to Sever, Revstone filed a Third Amended Complaint in Adv. Pro. No. 14-50033 and amended complaints in each of the Severed Adversary Proceedings.

On June 30, 2014, defendants Ascalon Enterprises, LLC, George S. Hofmeister, and Homer W. McClarty moved to dismiss the complaint in Adv. Pro. No. 14-50031.  Revstone filed its opposition to the motion to dismiss on July 14, 2014.  To date, no decision has been issued by the Bankruptcy Court addressing the motion to dismiss the complaint.

On August 30, 2014, defendants JJ Seville, LLC and DFB Holdings, Inc. moved to dismiss Revstone's Second Amended Complaint in Adversary Proceeding No. 14-50522, and defendant JMP Industries, Inc. moved to dismiss Revstone's Second Amended Complaint in Adversary Proceeding No. 14-50523. Revstone filed a joint opposition in response to the motions to dismiss. To date, no decision has been issued by the Bankruptcy Court addressing the motions to dismiss the complaint filed by JJ Seville, LLC, DFB Holdings, Inc. and JMP Industries, Inc.

On December 2, 2014, Revstone sought leave to amend one of the Hofmeister Adversary Proceedings (Adv. Pro. No. 14-50033) and certain of the Severed Adversary Proceedings (Adv. Pro. No.'s 14-50650, 14-50652, 14-50654, and 14-50655). The motions to amend seek leave to add additional claims fraudulent transfer claims to each of the complaints. Additionally, pursuant to stipulations with the relevant defendants, Revstone also filed amended complaints in Adv. Pro. No.'s 14-50522, 14-50648, and 14-50651 that added additional fraudulent transfer claims. On December 2, 2014, Revstone and Spara also commenced ten new adversary proceedings in the Chapter 11 Cases seeking to recover transfers that were made by Mr. Hofmeister, for his personal purposes, for the benefit of the Children's Trusts and/or for the benefit of entities owned by the Children's Trusts. The Hofmeister Adversary Proceedings and the Severed Adversary Proceedings remain pending before the Bankruptcy Court. No scheduling order has been entered by the Bankruptcy Court in the Hofmeister Adversary Proceedings or the Severed Adversary Proceedings as of this date.

The Debtors reserve all of their rights, claims, causes of action and/or other rights of action against or in respect to Mr. Hofmeister and any and all of his direct or indirect affiliates and all other defendants in the Hofmeister Adversary Proceedings (including, but not limited to, all rights, causes of action and/or other rights of action raised in the Hofmeister Adversary Proceedings), and except as otherwise expressly provided in the Plan, any and all such rights, claims, causes of action and/or other rights of action of the Debtors and Estates, from and after the Effective Date, are preserved.

### 20.   **BFG Motion to Convert Greenwood and US Tool Cases to Chapter 7 Proceedings**

On July 16, 2013, BFG filed a motion [Docket No. 760], pursuant to Bankruptcy Code section 1112(b), to convert Greenwood's and US Tool's chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, asserting, among other things, that these estates were diminishing in value and there was no likelihood of rehabilitation. The Debtors filed a preliminary response [Docket No. 881] and opposition [Docket No. 936], asserting that conversion of the cases would in fact decrease the size of the estates, for the benefit of a single creditor (BFG) that has no financial interest in maximizing their value and that improperly seeks to prevent the Debtors from investigating potential estate claims against BFG. The Bankruptcy Court denied, without prejudice, BFG's motion pursuant to an order entered on September 17, 2013 [Docket No. 1052].

Case 12-13262-BLS    Doc 1942    Filed 01/20/15    Page 42 of 252

21.     **BFG's Stay Relief Motion Re: Lexington**

On January 10, 2013, BFG filed a *Motion for Modification of the Automatic Stay and for Adequate Protection* [Case No. 12-23623, Docket No. 33] (the "BFG Stay Relief Motion") to foreclose on its asserted lien in the membership interests of Lexington (which asserted lien is discussed above). In the BFG Stay Relief Motion, BFG asserted that Lexington was indebted to Fifth Third Bank ("Fifth Third") in an amount in excess of $24.0 million. Further, BFG asserted that Lexington was in default under its obligations to Fifth Third. On January 31, 2013, Spara filed a preliminary objection to BFG's motion [Case No. 12-23623, Docket No. 60]. In its objection, Spara disputed BFG's assertion that Spara's estate does not have any equity in Lexington for the reasons set forth in the objection. Spara and BFG exchanged discovery requests related to the assertions made in the BFG Stay Relief Motion. Spara and BFG also conferred several times after the February 6, 2013 hearing to seek a resolution of the issues raised in the BFG Stay Relief Motion. Ultimately, on March 14, 2013, BFG withdrew the BFG Stay Relief Motion due to developments involving Fifth Third.

Fifth Third subsequently sought and obtained a receiver for Lexington in Wisconsin who later sold substantially all of Lexington's operating assets, apparently including litigation claims against Schoeller Arca. Spara does not expect to realize any value out of its interests in Lexington.

22.     **Bar Date for Filing Proofs of Claim and Administrative Expense Requests**

On April 23, 2013, the Bankruptcy Court entered its order [Docket No. 523] establishing June 28, 2013, as the deadline for filing claims against the Debtors that arose prior to the Petition Date (the "General Bar Date"), July 8, 2013, as the bar date for Governmental Units, and June 28, 2013, as the deadline for filing requests for allowance of administrative claims (i) arising between the Petition Date and May 31, 2013, and (ii) whenever arising under section 503(b)(9) of the Bankruptcy Code. A schedule of filed proofs of claim is maintained by Rust Omni, the Debtors' claims agent.

23.     **Filing of Schedules and Statements of Financial Affairs**

On December 14, 2012, Revstone filed a motion seeking an extension of its initial deadline under Local Rule 1007-1(b) to file Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "Schedules and Statements") to January 16, 2013 [Docket No. 66]. The Bankruptcy Court approved that request by its order entered on January 10, 2013 [Docket No. 103]. On January 16, 2013, Revstone filed its Schedules and Statements [Docket Nos. 129 and 130]. Pursuant to the Bankruptcy Court's order [Docket No. 38 in Case No. 12-13263], Spara's deadline to file its Schedules and Statements was extended to January 10, 2013, and on that date, Spara filed its Schedules and Statements [Docket Nos. 39 & 40 in Case No. 12-13263], and on August 6, 2013, Spara filed amended Schedules F and H [Docket No. 896], and on March 19, 2014, it filed an amendment to its Statements, Question #3(c) [Docket No. 1396]. Pursuant to orders entered on February 21, 2013 and February 25, 2013, respectively [Docket Nos. 248 & 271], upon the respective Debtor's motion, the Bankruptcy Court extended the time for Debtors Greenwood and US Tool to file their respective Schedules and Statements to March

37

15, 2013.  On March 13, 2013, Greenwood and US Tool filed their respective Schedules and Statements [Docket Nos. 365, 366, 367 & 368].  The Debtors reserve their rights to make amendments to the respective Schedules and Statements.

24.    **Removal of Actions**

On February 28, 2013, the Debtors filed a *Motion for Order Extending the Period Within Which Debtors May Remove Actions Pursuant to 28 U.S.C. § 1452 and Federal Rule of Bankruptcy Procedure 9027* [Docket No. 306], seeking an extension of time, by which civil actions pending as of the Petition Date can be removed to the Bankruptcy Court's jurisdiction, from March 4, 2013 to June 28, 2013.  On March 15, 2013, the Bankruptcy Court entered an order granting the Debtors' requested extension of time [Docket No. 382].  Upon subsequent motions, the Bankruptcy Court has entered orders further extending this time until June 30, 2014 [Docket Nos. 835 & 1280].  On June 27, 2014, the Debtor filed an additional motion seeking a further extension by which civil actions pending as of the Petition Date can be removed to the Bankruptcy Court's jurisdiction to December 31, 2014 [Docket No. 1600].  On July 29, 2014, the Bankruptcy Court entered an order further extending the date by which civil actions pending as of the Petition Date can be removed to the Bankruptcy Court's jurisdiction.  [Docket No. 1672].

25.    **Assumption and/or Rejection of Non-Residential Real Property Leases and Executory Contracts**

On February 28, 2013, Revstone and Spara filed a *Motion of Revstone Industries, LLC and Spara, LLC for Order Extending Deadline to Assume or Reject Unexpired Leases of Nonresidential Real Property Pursuant to Section 365(d)(4) of Bankruptcy Code* [Docket No. 307], seeking and extension of time by which said Debtors must assume or reject unexpired leases of non-residential real property from April 2, 2013 through July 1, 2013.  On March 15, 2013, the Bankruptcy Court entered an order granting the requested extension of time [Docket No. 383].  On June 28, 2013, the Bankruptcy Court entered the *Order Approving Stipulation By and Between Debtor Revstone Industries, LLC and Hilltop Properties, L.L.C. Extending the Section 365(d)(4) Deadline* [Docket No. 715] further extending the deadline for Revstone to assume or reject its executory lease agreement with Hilltop Properties, L.L.C. through and including October 31, 2013.

On March 27, 2013, Debtors Greenwood and US Tool filed a motion to extend the time for said Debtors to assume or reject non-residential real property leases, from May 7, 2013 until August 5, 2013 [Docket No. 438], which motion was granted by the Bankruptcy Court pursuant to an order entered on April 18, 2013 [Docket No. 504].

On October 23, 2013, Revstone filed a motion for authority to reject a non-residential real property lease and various executory contracts [Docket No. 1128], which motion was granted by the Bankruptcy Court pursuant to an order entered on November 12, 2013 [Docket No. 1156].

26.    **Fee Examiner**

Pursuant to an order entered on October 22, 2013, *nunc pro tunc* to December 3, 2012 (the "Fee Examiner Order") [Docket No. 1122], the Bankruptcy Court appointed Stuart Maue as the fee examiner (the "Fee Examiner") in the Chapter 11 Cases of the Debtors, as well as TPOP, in respect to all professionals employed in the cases under Bankruptcy Code sections 327, 328 or 1103, all members of the Revstone Committee, and any claims for reimbursement of professional fees/expenses under section 503(b).  The Fee Examiner has been filing reports regarding the subject fee applications pursuant to the Fee Examiner Order.  Upon the request of the Debtors, TPOP, the Revstone Committee and BFG, the Bankruptcy Court entered an order on May 12, 2014 [Docket No. 1501] staying the activities and duties of the Fee Examiner pending the filing and the Bankruptcy Court's consideration of a motion to terminate the Fee Examiner's services.  On July 18, 2014, the Debtors filed the Motion to Terminate Appointment of Fee Examiner and Related Procedures for Compensation and Reimbursement of Expenses for Professionals and Consideration of Fee Applications (the "Motion to Terminate") [Docket No. 1636].  On July 31, 2014, the Bankruptcy Court entered an order granting the Motion to Terminate.

On July 23, 2014, the Fee Examiner filed the Second Interim and Final Fee Application of Stuart Maue, Fee Examiner to the Court, for Allowance of Compensation and Reimbursement of Expenses Incurred for the Interim Period January 1, 2014 through May 9, 2014 and the Final Period from September 12, 2013 through May 9, 2014 [Docket No. 1653]

**IV.**

**DESCRIPTION OF THE PLAN**

A DISCUSSION OF THE PRINCIPAL PROVISIONS OF THE PLAN AS THEY RELATE TO THE TREATMENT OF CLASSES OF ALLOWED CLAIMS AND INTERESTS IS SET FORTH IN THE FOLLOWING SECTIONS.  THE DISCUSSION OF THE PLAN THAT FOLLOWS CONSTITUTES A SUMMARY ONLY, AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES.  YOU ARE URGED TO READ THE PLAN IN FULL IN EVALUATING WHETHER TO ACCEPT OR REJECT THE DEBTORS' PROPOSED PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THIS SUMMARY AND THE PLAN, THE TERMS OF THE PLAN CONTROL.  ALL CAPITALIZED TERMS NOT OTHERWISE DEFINED HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.

A.    **Treatment of Administrative Expenses and Tax Claims**

1.    **Introduction**

As required by the Bankruptcy Code, Administrative Expenses and Tax Claims are not placed into voting Classes.  Instead, they are left unclassified, are not considered Impaired, do not vote on the Plan, and receive treatment specified by statute or agreement of the parties.  All postpetition payments by or on behalf of the Debtors in respect of an Administrative Expense or Tax Claim will either reduce the Allowed amount thereof or reduce the amount to be paid under the Plan in respect of any Allowed amount thereof; provided that the method of application that is most beneficial to the Debtors' Estates will be employed.

2.    **Administrative Expenses**

Under the Plan, on or as soon as practicable after the Effective Date (to the extent payable on the Effective Date), each Holder of an Allowed Administrative Expense against the Debtors will receive, in full satisfaction, settlement, release, and extinguishment of such Allowed Administrative Expense, Cash from the applicable Reorganized Debtor equal to the full amount of such Allowed Administrative Expense, unless such Holder and the applicable Reorganized Debtor have mutually agreed in writing to other terms, or an order of the Bankruptcy Court provides for other terms; provided, however, that, unless otherwise agreed by the applicable Reorganized Debtor, (a) requests for payment of all Administrative Expenses must be Filed and served as described in Article XIII.B.3 of the Plan, and (b) certain different and additional requirements will apply to the Administrative Expenses of Professional Persons as set forth in Article XIII.B.2 and 3 of the Plan; provided further, however, that no interest or penalties of any nature will be paid in respect of an Allowed Administrative Expense.

As of the Effective Date, each Reorganized Debtor will maintain a segregated reserve Cash account (the "Non-Professional Administrative Expense Account") for the purpose of funding future payments on account of asserted, accrued, and estimated Administrative Expenses that have not yet been Allowed or are otherwise not yet payable as of the Effective Date, to the extent such Administrative Expenses later become Allowed or otherwise payable, in an aggregate amount to be determined by each Debtor in its business judgment, after consultation with the Creditors' Committee. A separate reserve account for the payment of Professional Fee Claims will be established by the Debtors as provided in Article XIII.B.2 of the Plan.

Notwithstanding anything to the contrary herein, pursuant to the PBGC Settlement Agreement, BFG has an Allowed Administrative Expense against Revstone in the amount of $0.7 million and an Allowed Administrative Expense against Spara in the amount of $0.5 million, which Allowed Administrative Expenses shall be paid upon the Effective Date.

In conjunction with the PBGC Settlement Agreement, certain Holders of Professional Fee Claims against Revstone and/or Spara have agreed to accept reduced recoveries out of available assets of each such Debtor in order to allow increased distributions to be made to Holders of Allowed General Unsecured Claims against Revstone and/or Spara in accordance with the PBGC Settlement Agreement. Professionals of US Tool and Greenwood are also expected to accept recoveries to the extent of available assets.

Notwithstanding any of the foregoing, if an Administrative Expense represents an obligation incurred in the ordinary course of business, such Administrative Expense will be paid in the ordinary course by the applicable Reorganized Debtor in accordance with the terms of the particular transaction and/or applicable agreement.

The Debtors estimate that unpaid Allowed Administrative Expenses will total approximately $15,413,000 at Revstone, $5,083,000 at Spara, $0 at US Tool, and $1,215,000 at Greenwood, as of the Effective Date.

3.    **Tax Claims**

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Tax Claims are not to be classified and thus Holders of Tax Claims are not entitled to vote to accept or reject the Plan.

As required by section 1129(a)(9) of the Bankruptcy Code, on or as soon as practicable after the Effective Date, each Holder of an Allowed Tax Claim against the Debtors will receive, in full satisfaction, settlement, release, and extinguishment of such Allowed Tax Claim, Cash from the applicable Reorganized Debtor equal to the portion of the Allowed Tax Claim due and payable on or prior to the Effective Date according to applicable non-bankruptcy law; provided, however, each Debtor may in its discretion elect to make, pursuant to section 1129(a)(9)(C), regular quarterly installment payments in Cash of a total value, as of the Effective Date, equal to the amount of the Allowed Tax Claim over a period ending not later than five years after the Petition Date together with interest for the period after the Effective Date at the rate determined under non-bankruptcy law as of the calendar month in which the Plan is confirmed, subject at the sole option of the applicable Reorganized Debtor to prepay the entire amount of the Allowed Tax Claim.  Any Allowed Tax Claim (or portion thereof) against the Debtors not yet due and payable as of the Effective Date will be paid by the applicable Reorganized Debtor no later than when due and payable under applicable non-bankruptcy law without regard to the commencement of the Chapter 11 Case; provided that upon request of the applicable Reorganized Debtor, the Bankruptcy Court will determine the amount of any Disputed Claim for, or issues pertaining to, a Tax.  Any Holder of a Tax Claim may agree to accept different treatment as to which the applicable Reorganized Debtor and such Holder have agreed upon in writing.

The Debtors estimate that Allowed Tax Claims will total approximately $100,000 at Revstone, $0 at Spara, $90,000 at US Tool, and $170,0000 at Greenwood, as of the Effective Date.

B.    **Classification and Treatment of Classified Claims and Interests**

1.    **Summary**

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes only to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for the classification of Claims and/or Interests as set forth below.  Administrative Expenses and Tax Claims have not been classified and are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code.

41

2.     **Classification and Treatment of Claims and Interests**

The treatment of each Class of Claims and/or Interests is set forth below.  Each Class of Claims against each particular Debtor will be treated as a sub-Class for all purposes under the Plan.  Unless the Bankruptcy Court has specified otherwise prior to Confirmation and unless otherwise stated in the PBGC Settlement Agreement, the Debtors will determine whether a postpetition payment by or on behalf of the Estates in respect of a Claim either (x) will reduce the Allowed amount thereof or (y) will reduce the amount to be paid under the Plan in respect of any Allowed amount thereof by considering which method is most advantageous to the Debtors' Estates.

3.     **Class 1 – Priority Non-Tax Claims**

a.     <u>Classification</u>:  Class 1 consists of all Priority Non-Tax Claims against the Debtors.  The Debtors estimate that Allowed Priority Non-Tax Claims will total approximately $60,000 at Revstone, $0 at Spara, $0 at US Tool, and $0 at Greenwood, as of the Effective Date.

b.     <u>Treatment</u>:  At the election of the applicable Reorganized Debtor, the Holder of each Priority Non-Tax Claim against each Debtor will receive, in full satisfaction, settlement, release, and extinguishment of such Priority Non-Tax Claim, on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, (a) a Cash payment from the applicable Reorganized Debtor equal to the Allowed amount of such Claim, or (b) such other treatment as otherwise agreed by the Holder of such Claim and the applicable Debtor or Reorganized Debtor.

c.     <u>Impairment/Voting</u>:  Class 1 is Unimpaired.  Class 1 therefore is conclusively presumed to have accepted the Plan and Holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

4.     **Class 2 – Miscellaneous Secured Claims**

a.     <u>Classification</u>:  Class 2 consists of all Miscellaneous Secured Claims (if any such Claims exist) against the Debtors. Although all Miscellaneous Secured Claims have been placed in one Class for the purposes of nomenclature, each Miscellaneous Secured Claim, to the extent secured by a Lien on any property or interest in property of the Debtors different from that securing any other Miscellaneous Secured Claim, will be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.  The Debtors are not aware of any outstanding Miscellaneous Secured Claims.

b.     <u>Treatment</u>:  Except to the extent that a holder of an Allowed Miscellaneous Secured Claim has been paid by the Debtors, in whole or in part, prior to the Effective Date, on the Effective Date, at the option of the applicable Reorganized Debtor, (i) each Allowed Miscellaneous Secured Claim will be reinstated and Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each Holder of an Allowed Miscellaneous Secured Claim will receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Miscellaneous Secured Claim, (x) payment in full in Cash of the unpaid

portion of such Allowed Miscellaneous Secured Claim, (y) surrender of the collateral securing such Claim or (z) such other treatment as may be agreed to by the Holder of such Claim and the applicable Debtor or Reorganized Debtor.  Prior to the Confirmation Hearing, the Debtor will inform each Holder of a Miscellaneous Secured Claim if such Creditor's Secured Claim will be treated as Unimpaired under the Plan.

      c.    <u>Impairment/Voting</u>:  Class 2 is Unimpaired.  Class 2 therefore is conclusively presumed to have accepted the Plan and Holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

     5.    **Class 3 –General Unsecured Claims**

      a.    <u>Classification</u>:  Class 3 consists of all General Unsecured Claims.  The Debtors estimate that Allowed General Unsecured Claims will total approximately $24,500,000 to 41,500,000, plus $8,500,000, at Revstone, $12,500,000 to 13,100,000 at Spara, $5,400,000 at US Tool, and $8,000,000 at Greenwood, as of the Effective Date.

      b.    <u>Treatment</u>:  On or as soon as practicable after the Effective Date, each Holder of an Allowed General Unsecured Claim against a Debtor will receive, as the sole distribution or dividend by the applicable Reorganized Debtor or its Estate under the Plan on account of such Allowed General Unsecured Claim, a Pro Rata share of:  (i) the Net Distributable Assets of the applicable Debtor (calculated as a percentage of all Allowed General Unsecured Claims against such Debtor, except as provided in the PBGC Settlement Agreement); and (ii) as to Revstone, to the extent that the sub-Class of Holders of Allowed General Unsecured Claims against Revstone votes in favor of the Plan, the sum of $3.0 million which will be set aside from the proceeds of the disposition of non-debtor subsidiaries' assets otherwise available to the Holders of the PBGC Claims in order to provide an up-front recovery to the Holders of Allowed General Unsecured Claims against Revstone (excluding BFG).

     Additionally, pursuant to and subject to the limitations of the PBGC Settlement Agreement and the intercompany settlement embodied in the Plan, the Net Distributable Assets of Revstone will include (i) twenty-five percent (25%) of the first $2.0 million of litigation proceeds realized by the Revstone/Spara Litigation Trust and otherwise allocable to Holders of the PBGC Claims; and (ii) twenty-five percent (25%) of the remaining litigation proceeds available to Revstone under the PBGC Settlement Agreement.  For the avoidance of doubt, the Net Distributable Assets of each Debtor are subject to any limitations otherwise imposed under the PBGC Settlement Agreement.  BFG will not share in the distributions to Holders of Allowed General Unsecured Claims against Revstone out of the first $2.0 million of litigation proceeds referenced in item (i) of the preceding sentence.  Thereafter, and with respect to any other Net Distributable Assets made available to Holders of Allowed General Unsecured Claims against Revstone (except for the sum of $3.0 million set aside from the proceeds of the disposition of non-debtor subsidiaries' assets referenced in item (ii) of the preceding paragraph), BFG will share in distributions to Holders of Allowed General Unsecured Claims against Revstone as follows:  10% for BFG if Allowed General Unsecured Claims against Revstone (including BFG) exceed $50.0 million, 15% for BFG if Allowed General Unsecured Claims against Revstone (including BFG) exceed $35.0 million but are less than or equal to $50.0 million, and 20% for

BFG if Allowed General Unsecured Claims against Revstone (including BFG) are $35.0 million or less.

Aggregate distributions to each Holder of an Allowed General Unsecured Claim will not exceed the full Allowed amount of such General Unsecured Claim.  Holders of Allowed General Unsecured Claims will not be entitled to the payment of postpetition interest under the Plan, unless excess Net Distributable Assets remain after all Allowed Claims and Administrative Expenses have been paid or otherwise satisfied in full (unless otherwise agreed to by the applicable Creditor) in accordance with the Plan.  In such case of excess Net Distributable Assets, then Holders of Allowed General Unsecured Claims will receive on a Pro Rata basis (calculated as a percentage of all Allowed General Unsecured Claims and all Allowed PBGC Claims) postpetition interest at the Federal Judgment Rate, to the extent that sufficient excess Net Distributable Assets (once all liquidated to Cash) exist and as required under the Bankruptcy Code.

c.      Impairment/Voting:  Class 3 is Impaired.  Holders of Claims in Class 3 are therefore entitled to vote to accept or reject the Plan.

6.      **Class 4 – PBGC Claims**

a.      Classification:  Class 4 consists of all PBGC Claims against the Debtors. Pursuant to the Global Settlement, the PBGC Claims total $95.0 million against each Debtor.

b.      Treatment:  On or as soon as practicable after the Effective Date, each Holder of an Allowed PBGC Claim shall receive the treatment provided by the PBGC Settlement Agreement, including a share of the Revstone/Spara Litigation Trust Interests as provided by the PBGC Settlement Agreement.  Holders of Allowed PBGC Claims against Revstone and Spara shall not receive any distributions out of the Net Distributable Assets of such Estates except to the extent that the PBGC Minimum Recovery (as defined in the PBGC Settlement Agreement) is not reached, in which case Holders of the PBGC Claims shall receive from the Revstone and/or Spara Hold Back/Escrows (as set forth in the PBGC Funding Schedule), or as necessary, Reorganized Revstone or Reorganized Spara, funds sufficient  to provide the Holders of the Allowed PBGC Claims with the PBGC Minimum Recovery in accordance with the terms of the PBGC Settlement Agreement.  Further, pursuant to the PBGC Settlement Agreement:  (i) the first $2,000,000 of litigation proceeds realized by the Revstone/Spara Litigation Trust and otherwise allocable to Holders of the PBGC Claims shall be distributed to Reorganized Revstone and made available to Holders of Allowed General Unsecured Claims against Revstone (excluding BFG) and Holders of Allowed Administrative Expenses against Revstone in accordance with, and subject to the terms of, the PBGC Settlement Agreement; and (ii) as noted above with respect to Class 3, to the extent that the sub-Class of Holders of Allowed General Unsecured Claims against Revstone votes in favor of the Plan, the sum of $3,000,000 will be set aside from the proceeds of the disposition of non-debtor subsidiaries' assets otherwise available to the Holders of the PBGC Claims in order to provide an up-front recovery to the Holders of Allowed General Unsecured Claims against Revstone (excluding BFG).

c.      Impairment/Voting:  Class 4 is Impaired.  Holders of Claims in Class 4 are therefore entitled to vote to accept or reject the Plan.

44

7. **Class 5 – Interests in the Debtors**

a. <u>Classification</u>:  Class 5 consists of all Interests in the Debtors.

b. <u>Treatment</u>:  The Holders of Interests will receive no distributions under the Plan, and on the Effective Date, all Interests will be deemed suspended.  As of the Effective Date, the Holders of Interests will receive a contingent interest in the Net Distributable Assets remaining, if any, after all Allowed Claims and Administrative Expenses have been paid or otherwise satisfied in full (unless otherwise agreed to by the applicable Creditor) in accordance with the Plan.  For the avoidance of doubt, no distribution of Net Distributable Assets (once all liquidated to Cash) will be made to Holders of Interests against any Debtor until and unless all Holders of Allowed General Unsecured Claims against such Debtor receive payment in full of such Allowed Claims, plus all accrued postpetition interest at the Federal Judgment Rate.

c. <u>Impairment/Voting</u>:  Class 5 is Impaired.  Holders of Interests in Class 5 are deemed to reject the Plan.

C. **<u>Acceptance or Rejection of Plan</u>**

1. **<u>Identification of Unimpaired Classes</u>**

The following Classes of Claims and Interests are Unimpaired under the Plan:

Class 1 - Priority Non-Tax Claims

Class 2 – Miscellaneous Secured Claims

2. **<u>Identification of Impaired Classes</u>**

The following Classes of Claims and Interests are Impaired under the Plan:

Class 3 – General Unsecured Claims

Class 4 – PBGC Claims

Class 5 – Interests in the Debtors

3. **<u>Classes Permitted and Not Permitted to Vote</u>**

Classes 1 and 2 are Unimpaired.  Holders of Claims in these Classes are conclusively presumed pursuant to section 1126(f) of the Bankruptcy Code to have accepted the Plan and therefore will not be entitled to vote to accept or reject the Plan.

Classes 3 through 5 are Impaired.  Holders of Claims in Classes 3 and 4 are permitted to vote to accept or reject the Plan, while Holders of Interests in Class 5 are deemed to reject the Plan.  The Debtors reserve all rights with respect to the allowance of any Claims, except as otherwise expressly provided by the PBGC Settlement Agreement or the Plan.

An Impaired Class of Claims that votes will have accepted the Plan if (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

4. **Effect of Non-Voting**

If no Holder of a Claim eligible to vote in a particular Class timely votes to accept or reject the Plan, the Debtors may seek to have the Plan deemed **accepted** by the Holders of such Claims in such Class for purposes of section 1129(b) of the Bankruptcy Code.

5. **Nonconsensual Confirmation**

In the event any Class of Claims votes to reject the Plan and given the deemed rejection of the Plan by the Holders of Interests, the Debtors request that the Bankruptcy Court confirm the Plan notwithstanding such rejection pursuant to section 1129(b) of the Bankruptcy Code on the basis that the Plan is fair and equitable and does not discriminate unfairly as to the Holders of any Class of Claims or Interests.

6. **Postpetition Interest**

Nothing in the Plan or the Disclosure Statement will be deemed to entitle the Holder of a Claim to receive postpetition interest on account of such Claim, except to the extent that the Plan expressly provides for postpetition interest on account of such Claim.

**D.** **Means for Implementation of the Plan**

1. **PBGC Settlement**

The provisions of the Plan incorporate the terms of the PBGC Settlement Agreement and the PBGC Settlement Order pursuant to section 1123(b)(3)(A) of the Bankruptcy Code.  From and after the Effective Date, each and every provision of the PBGC Settlement Agreement will be binding on each of the Reorganized Debtors, as applicable.

2. **No Substantive Consolidation**

Nothing in the Plan is intended to substantively consolidate, nor will have the effect of substantively consolidating, the Debtors or their Estates, and each Reorganized Debtor will maintain its separate corporate existence from and after the Effective Date.

3. **Intercompany Settlement Between Revstone and Spara**

Upon the Effective Date, pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, each of the Reorganized Debtors and their respective successors and assigns hereby agree that:  (a) Reorganized Revstone shall have an Allowed General Unsecured Claim against Spara and its Estate in the amount of $10 million, which Claim shall participate in distributions at Spara on a Pro Rata basis with other Holders of Allowed General Unsecured Claims against Spara, and (b) each of the Reorganized Debtors, on behalf of themselves and their non-debtor subsidiaries, hereby waive and release any and all other Claims or Rights of Action

46

held by such Reorganized Debtor or subsidiary against any of the Debtors, their respective subsidiaries, or their respective successors; provided, however, that nothing herein shall be deemed a waiver or release of:  (i) any rights of each Reorganized Debtor as a direct or indirect equity holder of a subsidiary; (ii) Revstone's claims against TPOP, LLC f/k/a Metavation, LLC, all of which such claims are preserved; (iii) Revstone's claims against its Debtor and non-debtor subsidiaries for payment of any restructuring or management fees; (iv) amounts otherwise payable to Revstone and/or Spara pursuant to the PBGC Settlement Agreement; (v) any claim of cause of action against any of the George Hofmeister Parties; or (vi) any claim or cause of action against MPI Products LLC, Monomoy Capital Partners, Monomoy Capital Partners II, LP, or any of their respective affiliates or successors.

The standard for approval of a compromise is generally governed by four factors: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors.  The Debtors believe that the proposed intercompany settlement incorporated in the Plan is a more than reasonable compromise that satisfies the applicable standards and should be approved.

As between Revstone and Spara, the settlement resolves potential claims that the Revstone Committee has asserted exist against Spara primarily based upon:  (a) the assignment of the membership interests in Fairfield by a subsidiary of Revstone to Spara sometime in 2011 for inadequate consideration (the value of such equity interests in Fairfield at the time has been alleged to be $22.0 million); (b) the payment of certain of Spara's obligations to BFG by Contech, an indirect subsidiary of Revstone (such payments are alleged to have totaled $11.2 million), and (c) the payment of certain of Fairfield's pension plan obligations by Contech (such payments are alleged to have totaled $1.0 million).  In addition, Revstone is owed and has not been paid management fees by Spara since Spara's inception in August 2010.  Such management fees total approximately $2.9 million.

The foregoing claims are subject to dispute and the resolution of such claims is unclear. Most significantly, given the existence of the PBGC claims at all levels of the Debtors' and non-Debtors' capital structure, it is uncertain whether any equity value existed for the benefit of Revstone's estate in either Fairfield, prior to its transfer to Spara, or Contech, prior to the payments that were made to BFG or for the benefit of Fairfield.  The settlement under the Plan resolves these issues, and avoids the cost, expense, and delay of litigation, through the allowance of a stipulated general unsecured claim by Revstone against Spara in the amount of $10 million. Given the extent of the PBGC's claims against each of the Debtors and non-Debtors and in the interests of efficiency and finality, the settlement also resolves all other intercompany claims amongst the Debtors and non-Debtors, except for Revstone's claims against TPOP and ordinary course management fees payable to Revstone.

The Debtors submit that the intercompany settlement represents a reasonable resolution of intercompany disputes and is supported by the paramount interests of creditors.

4.        **Continued Corporate Existence and Vesting of Assets**

On and after the Effective Date, subject to the requirements of the Plan, each Reorganized Debtor will continue to exist as a separate limited liability company and will retain all of the powers of limited liability companies under applicable non-bankruptcy law, as modified by the Plan, and without prejudice to any right to amend its operating agreement, dissolve, merge or convert into another form of business entity, or to alter or terminate its existence to the extent consistent with the Plan.  The existing membership interests of the Debtors will be deemed to be held by the Chief Restructuring Officer, and the Chief Restructuring Officer will be deemed to have been admitted as the sole member of the Reorganized Debtors under applicable nonbankruptcy law and will be authorized to exercise all of the rights and powers of a sole member as provided by the Plan, subject to the oversight of the Reorganized Revstone Board as to Reorganized Revstone.

Except as otherwise provided in the Plan and excluding the Revstone/Spara Litigation Trust Assets, on and after the Effective Date, all Distributable Assets and property of each Debtor and its Estate, including any interests in subsidiaries of each Debtor and as to Revstone and Spara, the Revstone/Spara Litigation Trust Interests, will vest in each Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances and Interests, except as provided by the PBGC Settlement Agreement.  None of the occurrence of the Effective Date, the effectiveness of the Plan, nor any provision of applicable non-bankruptcy law shall cause a dissolution of any Debtor, each of which such Debtor shall be continued as limited liability companies following the Effective Date.

On and after the Effective Date, subject to the requirements of the Plan and except as otherwise provided in the Plan, each Reorganized Debtor shall be permitted to conduct its business, reconcile Claims, use and dispose of assets, prosecute litigation, and otherwise take any and all actions reasonably necessary to implement the Plan without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules.  Each Reorganized Debtor shall be authorized, without limitation, to use and dispose of the Distributable Assets of such Debtor and its Estate, to investigate and pursue any Retained Rights of Action of such Debtor (other than Reorganized Revstone and Reorganized Spara, to the extent set forth in the Plan) as the representative of the applicable Reorganized Debtor's Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, to acquire and dispose of other property, and to otherwise administer its affairs.

5.        **Corporate Action**

On the Effective Date, the matters under the Plan involving or requiring limited liability company action of the Debtors, including but not limited to actions requiring a vote or other approval of the board of directors, shareholders, managers, or members of the Debtors or the execution of any documentation incident to or in furtherance of the Plan, will be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers, directors, managers, or members of the Debtors.

The Reorganized Debtor Operating Agreements will be deemed to include a provision prohibiting the issuance of nonvoting equity securities and such other provisions as may be required pursuant to section 1123(a)(6) of the Bankruptcy Code. The Reorganized Debtors may execute and/or file the Reorganized Debtor Operating Agreements with the Delaware Secretary of State and other state governmental authorities having jurisdiction over the Debtors as may be necessary or appropriate under applicable non-bankruptcy law to fully effectuate the terms of such documents.

On the Effective Date, the Debtors' operating agreements will be deemed replaced and amended by the Reorganized Debtor Operating Agreements, which will be in full force and effect from and after the Effective Date. Revstone and Spara may amend and/or restate, or cause the amendment and/or restatement, of the operating agreements of any of their non-Debtor subsidiaries, direct or indirect, as may be necessary or appropriate under applicable non-bankruptcy law to ensure consistency with or to fully implement or effectuate the provisions of the Plan, provided that any such modifications are consistent with the terms of the Plan.

6.    **Corporate Governance**

From and after the Effective Date, and except as otherwise set forth in the Reorganized Debtor Operating Agreements, the business, affairs, and operation of the Reorganized Debtors will be under the management of, and all decisions on behalf of the Reorganized Debtors may be made by, the Chief Restructuring Officer, who in the case of Reorganized Revstone will report to and be subject to oversight by the Reorganized Revstone Board (as defined below). As to Reorganized Spara, Reorganized Greenwood, and Reorganized U.S. Tool, the Chief Restructuring Officer will be appointed as the sole manager of each such Reorganized Debtor. Without limitation to the foregoing, the Chief Restructuring Officer will be authorized to appoint such officers of the Reorganized Debtors with such duties and responsibilities as he may deem necessary and appropriate in furtherance of the affairs of the Reorganized Debtors; provided, however, that no George Hofmeister Party may serve as an officer of the Reorganized Debtors.

On the Effective Date, each member of the Boards of Managers of the Debtors will be deemed to have resigned, the Restructuring Committee will be dissolved, and new Boards of Managers for Reorganized Revstone (the "Reorganized Revstone Board") will be constituted and formed. In the event that the Chief Restructuring Officer of Revstone is removed, such removal will not have any effect on the Chief Restructuring Officer's continuing role as Chief Restructuring Officer of the remaining Reorganized Debtors.

The Reorganized Revstone Board will consist of one manager appointed by the Creditors' Committee (provided that such manager may not be BFG), one manager appointed by the PBGC, and one manager appointed by mutual agreement of the Creditors' Committee and the PBGC; provided however, no George Hofmeister Party will serve on the Reorganized Revstone Board. In the event that the Creditors' Committee and the PBGC are unable to agree upon the selection of the third manager of the Reorganized Revstone Board, the Creditors' Committee and the PBGC will each provide the name of their choice as the third manager to the Chief Restructuring Officer who will then select the third manager from these two names.

The specific individuals proposed to serve on the Reorganized Revstone Board will be disclosed in the Plan Supplement. Except as noted above with respect to the removal of the Chief Restructuring Officer of Reorganized Revstone, any actions taken by the vote or written consent of a majority of the Reorganized Revstone Board will be deemed to constitute an action by the Reorganized Revstone Board. Each manager will serve on the Reorganized Revstone Board until the death, disability, or resignation of such manager or until entry of an order of the Bankruptcy Court for a final decree closing the Chapter 11 Cases. Any vacancy on the Reorganized Revstone Board created by the death, disability, or resignation of a manager may be filled by the remaining members of the Reorganized Revstone Board (regardless of whether less than a majority) or by the Chief Restructuring Officer of Reorganized Revstone if no agreement can be reached, provided that no George Hofmeister Party may serve as a manager.

Members of the Reorganized Revstone Board shall be entitled to reimbursement of reasonable and necessary expenses incurred in carrying out their duties as members of the Reorganized Revstone Board, all of which shall be paid from Reorganized Revstone. In addition, members of the Reorganized Revstone Board shall be entitled to compensation, also payable from Reorganized Revstone, for time spent on the Reorganized Revstone Board in an amount up to $400 per hour (not to exceed $15,000 per year per member), but shall not be reimbursed for any fees or expenses of any professional retained by an individual member of the Reorganized Revstone Board. There will be customary indemnification by Reorganized Revstone of the Reorganized Revstone Board, as well as the Reorganized Debtors' officers and manager as of the Effective Date, including the Chief Restructuring Officer, as set forth in the Reorganized Debtor Operating Agreements.

On the Effective Date, the limited liability company agreements of the Debtors will be amended and restated substantially in the form set forth in the Plan Supplement and, as so amended and restated, will constitute the limited liability company agreements of the Reorganized Debtors. The Reorganized Debtor Operating Agreements will contain the following provisions (which will remain in effect until such time as an order by the Bankruptcy Court for a final decree in the Chapter 11 Cases has been entered): (i) a prohibition on the taking of any action on behalf of the Reorganized Debtors by any member thereof or the participation by any such member in the management of the business, affairs, or operations of the Reorganized Debtors; (ii) a prohibition on service by any George Hofmeister Party as a manager or officer of the Reorganized Debtors; (iii) a provision authorizing the Chief Restructuring Officer, subject to the oversight of the Reorganized Revstone Board as to Reorganized Revstone, to approve any sale, lease, or exchange of all or substantially all of the Reorganized Debtors' properties and assets, any merger or dissolution of the Reorganized Debtors, any dissolution of the Reorganized Debtors, or any other action contemplated under the Plan, any of which actions may be taken without the consent of any member of the Reorganized Debtors; (iv) a prohibition on any amendment or modification of the certificate of formation of the Reorganized Debtors or the Reorganized Debtor Operating Agreements that is contrary to the terms of the Plan; and (v) such other provisions as may be necessary or appropriate to ensure consistency with or to fully implement or effectuate the provisions of the Plan.

7.        **Chief Restructuring Officer Duties**

Subject to the terms of the Reorganized Debtor Operating Agreements and excluding the Revstone/Spara Litigation Trust Assets, the Chief Restructuring Officer will be tasked with maximizing the value of the Reorganized Debtors' assets, reconciling Claims, making distributions to Creditors in accordance with the Plan, satisfying post-Effective Date obligations of the Reorganized Debtor, and taking other actions in order to implement the Plan, all without need for approval of the Bankruptcy Court or notice to Creditors, provided that, as to Reorganized Revstone only, the duties of the Chief Restructuring Officer will be focused on the following core tasks (the "CRO Core Tasks"):  (1) disposition of the assets or interests of Revstone's non-debtor subsidiaries and maximizing recoveries therefrom by Reorganized Revstone, (2) reconciliation and payment of Administrative Expenses, Priority Tax Claims, Priority Non-Tax Claims, and any Secured Claims against Revstone pursuant to the Plan, and (3) management, administration, and distribution of funds of Reorganized Revstone consistent with the Plan, except as to distributions to Holders of Allowed General Unsecured Claims against Revstone.  The CRO Core Tasks at Revstone will not include reconciliation or payment of Allowed General Unsecured Claims against Revstone, which tasks will be handled by the Reorganized Revstone Board or its designees and representatives, which may include current general bankruptcy counsel to the Creditors' Committee.

Except as noted above with respect to Reorganized Revstone, the Reorganized Debtor Operating Agreements will provide customary terms for the management of the Reorganized Debtors by the Chief Restructuring Officer with appropriate oversight by the Reorganized Revstone Board as to Reorganized Revstone, including, without limitation, the powers and authority of the Chief Restructuring Officer to do the following without further order, Court approval or notice unless expressly required otherwise under the Plan:  (i) manage, withdraw, and administer funds of the Reorganized Debtors, cause to have distributions made pursuant to the Plan, and incur obligations for expenses in connection with the management and liquidation of the Reorganized Debtors' assets (except as to distributions to Holders of Allowed General Unsecured Claims against Revstone); (ii) market and negotiate, enter into and perform agreements for the sale or other disposition of the Reorganized Debtors' or their subsidiaries' assets, including the dissolution of any subsidiaries; (iii) engage professionals, employees and other agents (including current general bankruptcy counsel to the Debtor) to assist the Chief Restructuring Officer with respect to his or her responsibilities; (iv) on behalf of the Reorganized Debtors, prosecute, compromise and/or settle claims and causes of action and objections to Claims (excluding the Revstone/Spara Litigation Trust Assets and General Unsecured Claims against Revstone); (v) address general business issues involving the Reorganized Debtors, including tax filings and post-Effective Date reporting with the Bankruptcy Court; (vi) execute any documents relating to the foregoing on behalf of the Reorganized Debtors; and (vii) exercise such other powers and authority as may be necessary and proper to carry out the provisions of the Plan (provided that such other powers and authority are not inconsistent with the Plan).  The Reorganized Debtor Operating Agreements will not be modified or amended in any manner that is inconsistent with the duties of the Chief Restructuring Officer set forth above.

Subject to the oversight of the Reorganized Revstone Board as to Reorganized Revstone, as set forth in the Plan, the Chief Restructuring Officer shall administer the assets of the Reorganized Debtors and determine whether to pursue or not to pursue any objections to Claims, as he or she determines is in the best interests of the Creditors of the Reorganized Debtors and consistent with the purposes of the Plan, and will have no liability for the outcome of his/her decisions, other than those decisions constituting gross negligence or willful misconduct.  Any determination by the Chief Restructuring Officer as to what actions are in the best interests of the Reorganized Debtors shall be conclusive.

8.    **Source of Funding**

The source of all distributions and payments under the Plan shall be the Distributable Assets and the proceeds thereof, including, without limitation, each Debtor's Cash on hand and proceeds from the sale or other disposition of the remaining property of the Debtors and their non-Debtor subsidiaries and prosecution of Retained Rights of Action, as set forth in the PBGC Funding Schedule and subject to the terms of the PBGC Settlement Agreement.

9.    **Retained Rights of Action of the Debtors**

Unless a Right of Action of the Debtors (including the right to object to any Claim asserted against the Estate) is, in writing, expressly waived, relinquished, released, assigned, compromised, or settled in the Plan, or in a Final Order, all rights of the Estates from and after the Effective Date with respect to the Retained Rights of Action are expressly preserved for the benefit of, assigned to, and fully vested in, the applicable Reorganized Debtor or, as to the Revstone/Spara Litigation Trust Assets, the Revstone/Spara Litigation Trust.

Each Reorganized Debtor and, solely as to the Revstone/Spara Litigation Trust Assets, the Revstone/Spara Litigation Trustee will have standing as the representative of such Debtor's Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to pursue, or decline to pursue, the Retained Rights of Action and objections to Claims, as appropriate, in the business judgment of such Debtor or Revstone/Spara Litigation Trustee, as applicable.  Each Reorganized Debtor or the Revstone/Spara Litigation Trustee, as applicable, may settle, release, sell, assign, otherwise transfer, or compromise, Retained Rights of Action and/or objections to Claims without need for notice or order of the Bankruptcy Court, provided that (i) Reorganized Revstone shall provide at least five (5) business days' written notice to the Revstone/Spara Litigation Trustee with regard to any compromise or settlement of:  (a) an Administrative Expense asserted against Revstone, if such Claim exceeds $250,000 in value (after accounting for any applicable defenses) or amount asserted, or (b) any Claim asserted by a George Hofmeister Party; and (ii) in the event that the Revstone/Spara Litigation Trustee informs Reorganized Revstone that it disagrees with any such compromise or settlement within such period, and the Revstone/Spara Litigation Trustee and Reorganized Revstone are unable to reach an agreement with respect to such compromise or settlement, then Reorganized Revstone shall present such dispute to the Bankruptcy Court for resolution on at least five (5) business days' notice and an opportunity to object to the Revstone/Spara Litigation Trustee.

For the avoidance of doubt, as defined in the Plan, the term "Retained Rights of Action" means all Rights of Action belonging to each Debtor as of the Effective Date, including, without limitation, Avoidance Claims (including those disclosed in the Schedules), but excluding those Rights of Action specifically released under the Plan.  The Retained Rights of Action include, without limitation, any and all rights of the Debtors to pursue any Rights of Action against third parties disclosed or referenced in the Schedules and/or listed in the Plan Supplement, subject to the provisions of the PBGC Settlement Agreement and excluding those Rights of Action specifically released under the Plan

10.    **Establishment of Revstone/Spara Litigation Trust and Vesting of Revstone/Spara Litigation Trust Assets**

On the Effective Date, each of Revstone and Spara will take any and all actions as may be necessary or appropriate to establish the Revstone/Spara Litigation Trust and to cause the transfer and assignment of Revstone's and Spara's Retained Rights of Action, the Relevant Books and Records, and a Cash reserve for Plan Expenses of the Revstone/Spara Litigation Trust in an amount up to $1.0 million, as set forth in the definition of "Plan Expenses" herein and subject to the terms of the PBGC Settlement Agreement, which together will constitute the initial Revstone/Spara Litigation Trust Assets.  Upon the Effective Date, the Revstone/Spara Litigation Trust will be vested with all right, title and interest in the Revstone/Spara Litigation Trust Assets, and such property will become the property of the Revstone/Spara Litigation Trust free and clear of all Claims, Liens, charges, other encumbrances and interests, subject only to the rights, in instances described in Article VI.M.5 of the Plan and the Revstone/Spara Litigation Trust Agreement, of the Chief Restructuring Officer of Reorganized Spara consistent with the terms of the Plan, the PBGC Settlement Agreement, and the Revstone/Spara Litigation Trust Agreement. It is intended that the Revstone/Spara Litigation Trust qualify as a liquidating trust for federal income tax purposes.

The sole beneficiaries of the Revstone/Spara Litigation Trust will be Reorganized Revstone, Reorganized Spara, and Holders of Allowed PBGC Claims under the Plan.  Consistent with the PBGC Settlement Agreement, Reorganized Revstone and Reorganized Spara will be entitled to one-half of the Revstone/Spara Litigation Trust Interests and the Holders of the PBGC Claims will be entitled to the other one-half of the Revstone/Spara Litigation Trust Interests; provided, however that, pursuant to the PBGC Settlement Agreement, the first $2.0 million of litigation proceeds realized by the Revstone/Spara Litigation Trust and otherwise allocable to Holders of the PBGC Claims will be distributed to Reorganized Revstone and made available to Holders of Allowed General Unsecured Claims against Revstone (excluding BFG) and Holders of Allowed Administrative Expenses against Revstone.  Any remaining litigation proceeds realized by the Revstone/Spara Litigation Trust will be divided one-half to Reorganized Revstone and Reorganized Spara and one-half to the Holders of Allowed PBGC Claims, consistent with the division of the Revstone/Spara Litigation Trust Interests set forth in the Plan and subject to the terms of the PBGC Settlement Agreement.  As between Reorganized Revstone and Reorganized Spara, the Revstone/Spara Litigation Trust Interests shall be allocated ninety percent (90%) to Reorganized Revstone and ten percent (10%) to Reorganized Spara, provided that the first $250,000 of the proceeds of the Revstone/Spara Litigation Trust payable to Reorganized Revstone shall be distributed to Reorganized Spara.

For federal income tax purposes, the beneficiaries of the Revstone/Spara Litigation Trust will be treated as the grantors of the Revstone/Spara Litigation Trust and deemed to be the owners of the assets of the Revstone/Spara Litigation Trust, and the transfer of the Revstone/Spara Litigation Trust Assets to the Revstone/Spara Litigation Trust will be deemed a transfer to such beneficiaries by Revstone followed by a deemed transfer by such beneficiaries to the Revstone/Spara Litigation Trust.

11.    **Purpose of Revstone/Spara Litigation Trust**

The Revstone/Spara Litigation Trust will be established for the primary purpose of prosecuting or otherwise liquidating and distributing the Revstone/Spara Litigation Trust Assets in accordance with Treasury Regulation section 301.7701-4(d).  In particular, this includes:  (i) reviewing and reconciling, including where appropriate objecting to, any General Unsecured Claims of Holders of Claims against Revstone, unless otherwise agreed by Reorganized Revstone and the Revstone/Spara Litigation Trust, (ii) reviewing, litigating, settling, dismissing or releasing Revstone's and Spara's Retained Rights of Action; and (iii) distributing the proceeds of any of Revstone's and Spara's Retained Rights of Action and any other Revstone/Spara Litigation Trust Assets in accordance with the Plan and the terms of the PBGC Settlement Agreement and the Revstone/Spara Litigation Trust Agreement.

 The Revstone/Spara Litigation Trust will have no objective to continue or engage in the conduct of a trade or business and will not be deemed a successor-in-interest of either Revstone or Spara or their respective Estates for any purpose other than as specifically set forth in the Plan.

12.    **Funding of Revstone/Spara Litigation Trust**

On the Effective Date, Revstone and Spara shall fund the Revstone/Spara Litigation Trust in the amount of up to $1,000,000, as set forth in the PBGC Settlement Agreement and the PBGC Funding Schedule, to be used on account of Plan Expenses of the Revstone/Spara Litigation Trust.  To the extent any portion of such funding is not used to pay the Plan Expenses of the Revstone/Spara Litigation Trust, such unused portion shall be distributed to Reorganized Revstone.  To the extent expenses of the Revstone/Spara Litigation Trust exceed $1,000,000, additional reserves for Plan Expenses as to the Revstone/Spara Litigation Trust may be created out of the Revstone/Spara Litigation Trust Assets otherwise available for distribution to Holders of Allowed General Unsecured Claims (through Reorganized Revstone and Reorganized Spara) and Holders of Allowed PBGC Claims in the discretion of the Revstone/Spara Litigation Trustee, upon approval of the Revstone/Spara Litigation Trust Committee, the Chief Restructuring Officer of Reorganized Spara, and the PBGC.

13.    **Revstone/Spara Litigation Trustee**

a.    <u>Generally</u>

The initial Revstone/Spara Litigation Trustee shall be selected prior to the Confirmation Hearing by the Persons who will be appointed as members of the Revstone/Spara Litigation Trust Committee.  Any successor Revstone/Spara Litigation Trustee will be appointed pursuant to the Revstone/Spara Litigation Trust Agreement.  On the Effective Date and subject to the

oversight of the Revstone/Spara Litigation Trust Committee, the Revstone/Spara Litigation Trustee will be the sole authorized representative and signatory of the Revstone/Spara Litigation Trust, with authority to render any and all services necessary to effectuate the terms of the Plan as they relate to the Revstone/Spara Litigation Trust.  From and after the Effective Date, the Revstone/Spara Litigation Trustee will be deemed to have been appointed as the representative of Revstone's and Spara's Estates by the Bankruptcy Court pursuant to section 1123(b)(3)(B) of the Bankruptcy Code for purposes of the Revstone/Spara Litigation Trust Assets, specifically including Revstone's and Spara's Retained Rights of Action.  The powers, authority, responsibilities, and duties of the Revstone/Spara Litigation Trustee will be governed by the Plan, the Confirmation Order, and the Revstone/Spara Litigation Trust Agreement.  The Revstone/Spara Litigation Trustee may execute, deliver, file, or record such documents, instruments, releases and other agreements, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan as they relate to the Revstone/Spara Litigation Trust.

b.      Responsibilities and Authority of Revstone/Spara Litigation Trustee

The responsibilities and authority of the Revstone/Spara Litigation Trustee will include (a) calculating and implementing all distributions from the Revstone/Spara Litigation Trust in accordance with the Plan; (b) filing all required tax returns and paying taxes and all other obligations on behalf of the Revstone/Spara Litigation Trust from funds held by the Revstone/Spara Litigation Trust; (c) periodic reporting to the beneficiaries of the Revstone/Spara Litigation Trust, including the Chief Restructuring Officer of Reorganized Spara, as frequently as the Revstone/Spara Litigation Trustee reasonably believes is appropriate; (d) distributing the assets of the Revstone/Spara Litigation Trust in accordance with the provisions of the Plan; (e) retaining and paying at normal and customary rates (or on a contingency fee basis) professionals in connection with the Revstone/Spara Litigation Trustee's duties; (f) paying the reasonable expenses of the members of the Revstone/Spara Litigation Trust Committee, in accordance with the provisions of the Plan and the Revstone/Spara Litigation Trust Agreement; (g) reconciling and, if appropriate, objecting to General Unsecured Claims against Revstone, with authority to settle any objections; (h) analyzing Revstone's and Spara's Retained Rights of Action and deciding whether to abandon, pursue, litigate, or settle such claims; and (i) such other responsibilities as may be vested in the Revstone/Spara Litigation Trustee pursuant to the Plan, the Revstone/Spara Litigation Trust Agreement, or the Confirmation Order or as may be necessary and proper to carry out the provisions of the Plan.  None of the Revstone/Spara Litigation Trust, the Revstone/Spara Litigation Trustee, or the Revstone/Spara Litigation Trust Committee shall be required to post a bond in favor of the United States.

c.      Powers of the Revstone/Spara Litigation Trustee

Subject to the oversight of the Revstone/Spara Litigation Trust Committee and, in instances described in Article VI.M.5 of the Plan and the Revstone/Spara Litigation Trust Agreement, the Chief Restructuring Officer of Reorganized Spara, as set forth in the Plan, the PBGC Settlement Agreement, and the Revstone/Spara Litigation Trust Agreement, the powers of the Revstone/Spara Litigation Trustee to administer the Revstone/Spara Litigation Trust will, without any need for approval of the Bankruptcy Court in each of the following instances, include *inter alia*, (a) the power to invest Revstone/Spara Litigation Trust funds as permitted in

the Revstone/Spara Litigation Trust Agreement, withdraw funds, make distributions and pay taxes and other obligations owed by the Revstone/Spara Litigation Trust from funds held by the Revstone/Spara Litigation Trustee in accordance with the Plan, the PBGC Settlement Agreement, and the Revstone/Spara Litigation Trust Agreement, (b) the power to engage and compensate, without prior Bankruptcy Court order or approval, employees and professionals to assist the Revstone/Spara Litigation Trustee with respect to his or her responsibilities, (c) the power to prosecute, compromise and settle Revstone's and Spara's Retained Rights of Action, (d) the power to abandon, pursue, litigate, or settle any of Revstone's and Spara's Retained Rights of Action, (e) the power to abandon or destroy any of the Relevant Books and Records (to Reorganized Revstone or Reorganized Spara, as applicable) when they are no longer necessary to administer the Revstone/Spara Litigation Trust, and (f) such other powers as may be vested in or assumed by the Revstone/Spara Litigation Trustee pursuant to the Plan, the PBGC Settlement Agreement, the Revstone/Spara Litigation Trust Agreement, order of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of the Plan.  Subject to the oversight of the Revstone/Spara Litigation Trust Committee and, in instances described in Article VI.M.5 of the Plan and the Revstone/Spara Litigation Trust Agreement, the Chief Restructuring Officer of Reorganized Spara, as set forth in the Plan and the Revstone/Spara Litigation Trust Agreement, the Revstone/Spara Litigation Trustee, on behalf of the Revstone/Spara Litigation Trust, will have absolute discretion to pursue or not to pursue any and all of Revstone's and Spara's Retained Rights of Action and objections to Claims relating thereto, as he or she determines is in the best interests of the beneficiaries and consistent with the purposes of the Revstone/Spara Litigation Trust, and will have no liability for the outcome of his/her decisions, other than those decisions constituting gross negligence or willful misconduct.  Any determination by the Revstone/Spara Litigation Trustee as to what actions are in the best interests of the Revstone/Spara Litigation Trust will be conclusive.

The Revstone/Spara Litigation Trust, on the one hand, and Reorganized Revstone and Reorganized Spara, on the other hand, will coordinate with each other, to the extent feasible, regarding the reconciliation of Claims.  For the avoidance of doubt, the Revstone/Spara Litigation Trust will be responsible for addressing any General Unsecured Claims asserted by Creditors against Revstone, and Reorganized Revstone and Reorganized Spara will be responsible for addressing all remaining Claims against such Debtors, unless otherwise agreed by the applicable Debtor and the Revstone/Spara Litigation Trust.

On and after the Effective Date, the Revstone/Spara Litigation Trustee, on behalf of the Revstone/Spara Litigation Trust, will have standing as the representative of Revstone's and Spara's Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to commence and prosecute any of Revstone's and Spara's Retained Rights of Action and/or objections to Claims relating thereto on behalf of Revstone's and Spara's Estates without need for notice or order of the Bankruptcy Court.

d.    <u>Compensation of Revstone/Spara Litigation Trustee and Professionals</u>

The Revstone/Spara Litigation Trustee will serve on (i) the terms, conditions and rights set forth in the Plan, the PBGC Settlement Agreement, the Confirmation Order and the Revstone/Spara Litigation Trust Agreement, or (ii) such terms, conditions and rights as otherwise agreed to by the Revstone/Spara Litigation Trustee and the Revstone/Spara Litigation Trust

Committee.  The compensation for the Revstone/Spara Litigation Trustee will be set forth in the Revstone/Spara Litigation Trust Agreement or otherwise disclosed in a filing with the Bankruptcy Court.  The Revstone/Spara Litigation Trustee will not be required to file a Fee Application to receive compensation, but the Revstone/Spara Litigation Trustee's fees will be subject to the oversight of the Revstone/Spara Litigation Trust Committee.  The Revstone/Spara Litigation Trustee will have the right to retain the services of attorneys, accountants, and other professionals and agents in the discretion of the Revstone/Spara Litigation Trustee to assist and advise the Revstone/Spara Litigation Trustee in the performance of his/her duties and compensate such professionals from the assets of the Revstone/Spara Litigation Trust, subject to the oversight of the Revstone/Spara Litigation Trust Committee and, in instances described in Article VI.M.5 of the Plan and the Revstone/Spara Litigation Trust Agreement, the Chief Restructuring Officer of Reorganized Spara.  Any professionals retained by the Revstone/Spara Litigation Trustee will not be required to file a Fee Application to receive compensation.

> e.    Limitations on Revstone/Spara Litigation Trustee

The Revstone/Spara Litigation Trustee, in such capacity, will not at any time:  (a) enter into or engage in any trade or business (other than the management and disposition of the Revstone/Spara Litigation Trust Assets), and no part of the Revstone/Spara Litigation Trust Assets or the proceeds, revenue or income therefrom will be used or disposed of by the Revstone/Spara Litigation Trust in furtherance of any trade or business, or (b) except as provided below, reinvest any Revstone/Spara Litigation Trust Assets.

With regard to any sale, disposition, release, modification or waiver of existing rights as to an asset of the Revstone/Spara Litigation Trust or compromise or settlement of a controverted matter, if the asset or matter at issue exceeds $0.5 million in value (after accounting for any applicable defenses) or amount asserted, the Revstone/Spara Litigation Trustee must consult with, and obtain approval from, the Revstone/Spara Litigation Trust Committee and the Chief Restructuring Officer of Reorganized Spara, with respect to any such transaction or, in the absence of such approval, an order of the Bankruptcy Court approving such transaction (*provided that* the Revstone/Spara Litigation Trust Committee and Chief Restructuring Officer of Reorganized Spara will be deemed to have approved if such parties fail to object thereto in a writing received by the Revstone/Spara Litigation Trustee within five (5) business days following written notification by the Revstone/Spara Litigation Trustee of the intended transaction).

Other than as provided in the Plan, the PBGC Settlement Agreement, and the Revstone/Spara Litigation Trust Agreement, the Revstone/Spara Litigation Trustee is not empowered to incur indebtedness.

The Revstone/Spara Litigation Trustee may only invest funds held in the Revstone/Spara Litigation Trust consistent with the requirements of the Revstone/Spara Litigation Trust Agreement, the Bankruptcy Code or any order of the Bankruptcy Court modifying such requirements and, provided that the Revstone/Spara Litigation Trustee does so, he or she will have no liability in the event of insolvency of any institution in which he or she has invested any funds of the Revstone/Spara Litigation Trust.  Notwithstanding the above, the Revstone/Spara Litigation Trustee may only invest funds in the Revstone/Spara Litigation Trust in investments

permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

The Revstone/Spara Litigation Trustee will hold, collect, conserve, protect and administer the Revstone/Spara Litigation Trust in accordance with the provisions of the Plan, the PBGC Settlement Agreement, and the Revstone/Spara Litigation Trust Agreement, and pay and distribute amounts as set forth herein for the purposes set forth in the Plan, the PBGC Settlement Agreement, and the Revstone/Spara Litigation Trust Agreement. Any determination by the Revstone/Spara Litigation Trustee as to what actions are in the best interests of the Revstone/Spara Litigation Trust will be conclusive

f.    <u>Revstone/Spara Litigation Trust Committee</u>

(1)    Generally

The Revstone/Spara Litigation Trust Committee will be created on the Effective Date consistent with the terms of the Revstone/Spara Litigation Trust Agreement. The Revstone/Spara Litigation Trust Committee will consist of no more than three (3) Persons initially selected as follows: one Person by the Creditors' Committee, one Person by the PBGC, and one Person appointed by mutual agreement of the Creditors' Committee and the PBGC; provided however, no George Hofmeister Party will serve on the Revstone/Spara Litigation Trust Committee. In the event that the Creditors' Committee and the PBGC are unable to agree upon the selection of the third member of the Revstone/Spara Litigation Trust Committee, the Creditors' Committee and the PBGC will each provide two names of their choice as the member and the Bankruptcy Court will then select the third member from these four names.

(2)    Duties of Revstone/Spara Litigation Trust Committee

The Revstone/Spara Litigation Trust Committee will generally monitor the status and progress of the Revstone/Spara Litigation Trust and approve certain material transactions in accordance with Article VI.M.5 of the Plan. The Revstone/Spara Litigation Trust Committee may meet and/or consult periodically with the Revstone/Spara Litigation Trustee and keep itself apprised of the affairs of the Revstone/Spara Litigation Trust. As set forth in the Revstone/Spara Litigation Trust Agreement, each member of the Revstone/Spara Litigation Trust Committee shall exercise his/her best judgment, to the end that the affairs of the Revstone/Spara Litigation Trust shall be properly managed and the interests of all beneficiaries of the Revstone/Spara Litigation Trust are safeguarded; but each member of the Revstone/Spara Litigation Trust Committee shall not incur any responsibility or liability by reason of any error of law or of any matter or thing done or suffered or omitted to be done under the Revstone/Spara Litigation Agreement, unless such member of the Revstone/Spara Litigation Trust Committee has acted with recklessness, fraud or willful misconduct.

    (3)  Reimbursement of Expenses of Revstone/Spara Litigation Trust Committee

   Members of the Revstone/Spara Litigation Trust Committee shall be entitled to reimbursement of reasonable and necessary expenses incurred in carrying out their duties as members of the Revstone/Spara Litigation Trust Committee, all of which shall be paid from the Revstone/Spara Litigation Trust.  In addition, members of the Revstone/Spara Litigation Trust Committee shall be entitled to compensation, also payable from the Revstone/Spara Litigation Trust, for time spent on the Revstone/Spara Litigation Trust Committee in an amount up to $400 per hour (not to exceed $15,000 per year per member), but shall not be reimbursed for any fees or expenses of any professional retained by an individual member of the Revstone/Spara Litigation Trust Committee.  The Revstone/Spara Litigation Trust shall provide an indemnity to members of the Revstone/Spara Litigation Trust Committee for all suits, demands, actions, claims, losses and liabilities such members may suffer or incur other than to the extent arising from such member's willful misconduct or gross negligence.

   14.  **Interests in Affiliates and Subsidiaries**

   As of the Effective Date, except as expressly provided in the Plan or by separate order of the Bankruptcy Court, each Reorganized Debtor will retain any stock or interests that it may hold in its non-Debtor affiliates or subsidiaries and retain any rights to which such stock or interests may be entitled under applicable law with respect to such shares or other interests.  After the Effective Date, the Reorganized Debtors may sell, transfer, assign or otherwise dispose of such shares or interests as permitted by applicable law.

   15.  **Payment of Plan Expenses**

   Each Reorganized Debtor and the Revstone/Spara Litigation Trust, as applicable, may pay all reasonable Plan Expenses without further notice to Creditors or Holders of Interests or approval of the Bankruptcy Court.

   16.  **Dissolution of Creditors' Committee**

   As of the Effective Date, the Creditors' Committee will be dissolved. Notwithstanding such dissolution, the Creditors' Committee's professionals shall be permitted to seek payment of any unpaid fees and expenses pursuant to the Plan.

   17.  **Final Decree**

   At any time following the Effective Date, each Reorganized Debtor will be authorized to file a motion for the entry of a final decree closing its Chapter 11 Case pursuant to section 350 of the Bankruptcy Code.

**E.**     **Treatment of Executory Contracts and Unexpired Leases**

    1.     **Rejection of Executory Contracts and Unexpired Leases**

Except for any executory contracts or unexpired leases:  (i) that previously were assumed or rejected by an order of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code; (ii) that are listed for assumption by the Debtors as of the Effective Date in a Plan Supplement to be filed and served on affected non-Debtor counterparties; (iii) as to which a motion for approval of the assumption or rejection of such contract or lease has been Filed and served prior to the Effective Date; (iv) that constitute contracts of insurance in favor of, or that benefit, the Debtors or the Estates; or (v) that were previously sold, conveyed or otherwise assigned pursuant to Final Order, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be deemed rejected pursuant to section 365 of the Bankruptcy Code as of the Effective Date. Without limiting the foregoing, the indemnification obligations in favor of the Debtors' independent managers and applicable Huron Parties will be assumed as of the Effective Date, and all other pre-Effective Date indemnification obligations of the Debtors will be deemed rejected as of the Effective Date to the extent that such obligations are contained in executory contracts within the meaning of section 365 of the Bankruptcy Code, but only to the extent not inconsistent with any existing insurance obligations.  The Confirmation Order will constitute an order of the Bankruptcy Court approving such assumptions or rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

    2.     **Bar Date for Rejection Damages**

If the rejection of an executory contract or unexpired lease pursuant to the Plan or otherwise gives rise to a Claim by the other party or parties to such contract or lease, such Claim will be forever barred and will not be enforceable against the Debtors or the Estates unless a proof of Claim is Filed and served on the Debtors and their counsel within thirty (30) days after the earlier of (a) Effective Date or (b) service of a notice that the executory contract or unexpired lease has been rejected.  All such Claims for which proofs of Claim are required to be Filed, if Allowed, will be, and will be treated as, General Unsecured Claims, subject to the provisions of the Plan.

**F.**     **Distributions and Related Matters**

    1.     **Dates of Distribution**

The sections of the Plan on treatment of Administrative Expenses, Claims, and Interests specify the times for distributions.  Whenever any payment or distribution to be made under the Plan will be due on a day other than a Business Day, such payment or distribution will instead be made, without interest, by the applicable Reorganized Debtor (or its agent) on the immediately following Business Day.  Distributions due on the Effective Date will be paid on such date or as soon as practicable thereafter, provided that if other provisions of the Plan require the surrender of securities or establish other conditions precedent to receiving a distribution, the distribution may be delayed until such surrender occurs or conditions are satisfied.

If, under the terms of the Plan, the resolution of a particular Disputed Claim (*e.g.*, it is Disallowed) entitles other Holders of Claims to a further distribution, either (a) the Reorganized Debtors may make such further distribution as soon as practicable after the resolution of the Disputed Claim or (b) if the further distribution is determined in good faith by the Reorganized Debtors to be less than $100 for any Creditor, then, in order to afford an opportunity to minimize costs and aggregate such distributions, the Reorganized Debtors may make such further distribution any time prior to sixty (60) days after the Final Resolution Date or with the next distribution, in the discretion of the Reorganized Debtors.

2.    **Cash Distributions**

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable, except that Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

3.    **Rounding of Payments**

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment will reflect a rounding down of such fraction to the nearest whole cent.  To the extent Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash will be treated as "Unclaimed Property" under the Plan.

4.    **Disputed Claims**

Notwithstanding all references in the Plan to Claims that are Allowed, solely for the purpose of calculating the amount or number of distributions to be made on account of Allowed Claims or Allowed Administrative Expenses under the Plan, such calculations will be made as if each Disputed Claim were an Allowed Claim or Allowed Administrative Expense, except that if the Bankruptcy Court estimates the likely portion of a Disputed Claim to be Allowed or authorized or otherwise determines the amount or number which would constitute a sufficient reserve for a Disputed Claim (which estimates and determinations may be requested by the Reorganized Debtors or the Revstone/Spara Litigation Trustee, as applicable), such amount or number as determined by the Bankruptcy Court will be used for calculations as to such Disputed Claim.

All distributions due in respect of a Disputed Claim will be held and not made pending resolution of the Disputed Claim.

If an objection to a Disputed Claim is withdrawn, resolved by agreement, or determined by Final Order, the distributions due on account of any resulting Allowed Claim or Allowed Administrative Expense will be made by the Reorganized Debtors.  Such distribution will be made within forty-five (45) days of the date that the Disputed Claim becomes an Allowed Claim or Allowed Administrative Expense or as soon thereafter as reasonably practicable.  No interest will be due to a Holder of a Disputed Claim based on the delay attendant to determining the allowance of such Claim, Interest or Administrative Expense.

5.        **Undeliverable and Unclaimed Distributions**

If any distribution under the Plan is returned to the Reorganized Debtors as undeliverable or the check or other similar instrument or distribution by the Reorganized Debtors remains uncashed or unclaimed, as applicable, for ninety (90) days, such Cash will be deemed to be Unclaimed Property.  Upon property becoming Unclaimed Property, it immediately will be revested in the Reorganized Debtors.

Once there becomes Unclaimed Property for a Holder, no subsequent distributions for such Holder which may otherwise be due under the Plan will accrue or be held for such Holder, provided that, if the applicable agent is notified in writing of such Holder's then-current address and status as a Holder under the Plan, thereafter, the Holder will become entitled to its share of distributions, if any, which first become due after such notification.

6.        **Compliance with Tax Requirements**

The Reorganized Debtors and the Revstone/Spara Litigation Trust, as applicable, will comply with all withholding and reporting requirements imposed by federal, state or local taxing authorities in connection with making distributions pursuant to the Plan.

In connection with each distribution with respect to which the filing of an information return (such as an IRS Form 1099 or 1042) or withholding is required, the Reorganized Debtors and the Revstone/Spara Litigation Trust, as applicable, will file such information return with the IRS and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law.  With respect to any Person from whom a tax identification number, certified tax identification number or other tax information required by law to avoid withholding has not been received, the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable, may withhold the amount required and distribute the balance to such Person or decline to make such distribution until the information is received; provided, however, that the Reorganized Debtors and the Revstone/Spara Litigation Trust, as applicable, will not be obligated to liquidate any securities to perform such withholding.

7.        **Record Date in Respect to Distributions**

Except as set forth below, the record date and time for the purpose of determining which Persons are entitled to receive any and all distributions on account of any Allowed Claims or Interests, irrespective of the date of or number of distributions, will be the same as the Record Date.

8.        **Reserves**

In making any distributions in respect of Claims under the Plan, the Reorganized Debtors will reserve an appropriate and adequate amount of Cash on account of any unresolved Disputed Claims.  The Reorganized Debtors will make a corrective distribution following the successful resolution of any Disputed Claim on the next regularly scheduled distribution date.

### G.    Litigation, Objections to Claims, and Determination of Taxes

#### 1.    Litigation, Objections to Claims, and Objection Deadline

Except as may be expressly provided otherwise in the Plan, from and after the Effective Date, the Reorganized Debtors and the Revstone/Spara Litigation Trust, as applicable, will be responsible for pursuing Retained Rights of Action, any objection to the allowance of any Claim, and the determination of Tax issues and liabilities.

From and after the Effective Date, the Reorganized Debtors and the Revstone/Spara Litigation Trust, as applicable, will have exclusive authority to file objections, settle, compromise, withdraw or litigate to judgment objections to Claims; provided, however, parties in interest may file objections to Claims to the extent permitted by Bankruptcy Code section 502(a). Unless another date is established by the Bankruptcy Court *sua sponte* (which may so act without notice or hearing) or is established by other provisions of the Plan, any objection to a Claim or Interest will be filed with the Bankruptcy Court and served on the Person holding such Claim or Interest within one hundred eighty (180) days after the Effective Date (as may be extended pursuant to this section, the "Objection Deadline"), provided that the Reorganized Debtors and the Revstone/Spara Litigation Trust, as applicable, may seek extension(s) thereof subject to Bankruptcy Court approval and with notice only to parties that have requested such notice pursuant to Bankruptcy Rule 2002.

In addition to any other available remedies or procedures with respect to Tax issues or liabilities or rights to Tax refunds, the Reorganized Debtors may utilize (and receive the benefits of) section 505 of the Bankruptcy Code with respect to: (1) any Tax issue or liability or right to a Tax refund relating to an act or event occurring prior to the Effective Date; or (2) any Tax liability or right to a Tax refund arising prior to the Effective Date. If the Reorganized Debtors utilize section 505(b) of the Bankruptcy Code: (1) the Bankruptcy Court will determine the amount of the subject Tax liability or right to a Tax refund in the event that the appropriate governmental entity timely determines a Tax to be due in excess of the amount indicated on the subject return; and (2) if the prerequisites are met for obtaining a discharge of Tax liability in accordance with section 505(b) of the Bankruptcy Code, the Reorganized Debtors will be entitled to such discharge which will apply to any and all Taxes relating to the period covered by such return.

#### 2.    Temporary or Permanent Resolution of Disputed Claims

The Reorganized Debtors or the Revstone/Spara Litigation Trustee, as applicable, may request, at any time prior to the Effective Date or on and after the Effective Date, that the Bankruptcy Court estimate any contingent or unliquidated Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, irrespective of whether any party has previously objected to such Disputed Claim. The Bankruptcy Court will retain jurisdiction to estimate any contingent or unliquidated Disputed Claim at any time during litigation concerning any objection to the Disputed Claim. If the Bankruptcy Court estimates any contingent or unliquidated Disputed Claim, that estimated amount would constitute either the Allowed amount of such Disputed Claim or a maximum limitation on such Disputed Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Disputed Claim, the

Reorganized Debtors or the Revstone/Spara Litigation Trustee, as applicable, may elect from and after the Effective Date to pursue any supplemental proceedings to object to any ultimate payment on account of such Disputed Claim against the Debtors.

In addition, the Reorganized Debtors or the Revstone/Spara Litigation Trustee, as applicable, may resolve or adjudicate any Disputed Claim from and after the Effective Date in the manner in which the amount of such Claim, Interest or Administrative Expense and the rights of the Holder of such Claim, Interest or Administrative Expense would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

3.      **Setoffs**

The Reorganized Debtors and the Revstone/Spara Litigation Trust as applicable may, but shall not be required to, setoff against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against the Holder of such Claim; provided, however, neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors or the Revstone/Spara Litigation Trust of any such claim that the Reorganized Debtors or the Revstone/Spara Litigation Trust may have against such Holder, unless otherwise agreed to in writing by such Holder and the Reorganized Debtors or the Revstone/Spara Litigation Trust as applicable.

4.      **Preservation of Retained Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable, and each of their successors or assigns will retain and may exclusively enforce any Retained Rights of Action and the Confirmation Order will be deemed a *res judicata* determination of such rights to retain and exclusively enforce such Retained Rights of Action.  Absent such express waiver or release, the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable, and each of their successors or assigns will have standing as the representatives of the Debtors' Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to pursue Retained Rights of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable (or each of their successors or assigns).  The Retained Rights of Action may be asserted or prosecuted before or after solicitation of votes on the Plan or before or after the Effective Date.

Absent an express waiver or release set forth in the Plan, nothing in the Plan will (or is intended to) prevent, estop or be deemed to preclude the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable, from utilizing, pursuing, prosecuting or otherwise acting upon all or any of their Retained Rights of Action and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such Retained Rights of Action upon or after Confirmation or Consummation.

H.     **Releases, Injunctions and Exculpation Provisions**

1.     **Injunctions**

a.     Generally

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions and stays provided for in the Chapter 11 Cases pursuant to sections 105 and 362 of the Bankruptcy Code or otherwise in effect on the Confirmation Date, will remain in full force and effect until the Effective Date.  From and after the Effective Date, all Persons are permanently enjoined from, and restrained against, commencing or continuing in any court any suit, action or other proceeding, or otherwise asserting any claim or interest, seeking to hold (i) the Reorganized Debtors, their Estates, the Revstone/Spara Litigation Trust, or (ii) the property of the Debtors, their Estates, the Revstone/Spara Litigation Trust, liable for any Claim, obligation, right, interest, debt or liability that has been released pursuant to the Plan.

b.     Injunction Related to Rights of Action and Claims, Administrative Expenses and Interests

*Except as provided in the Plan or in the Confirmation Order, as of the Confirmation Date, all Entities that have held, currently hold or may hold a Claim, Administrative Expense, Interest or other debt or liability against or in the Debtors  are permanently enjoined from taking any of the following actions against property of the Debtors, their Estates, the Revstone/Spara Litigation Trust, or the Reorganized Debtors on account of all or such portion of any such Claims, Administrative Expenses, Interests, debts or liabilities:  (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order, (c) creating, perfecting or enforcing any lien or encumbrance; and (d) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan.*

2.     **Discharge of the Debtors**

Except as otherwise provided in the Plan or in the Confirmation Order, rights afforded in, and all consideration distributed under, the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties.  Upon the Effective Date, the Debtors will be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, without limitation, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Claim based upon such debt is Allowed under section 501 of the Bankruptcy Code, or (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based upon such debt accepted the Plan.

3.    **Exculpation**

As of and subject to the occurrence of the Effective Date, for good and valuable consideration, including the consideration provided under the Plan, (i) the Debtors, (ii) the Debtors' independent managers, Messrs. James B. Shein and Richard E. Newsted (solely in their respective capacity as managers of the Debtors, including in their respective role as the members of the Restructuring Committee) (the "Independent Managers"), (iii) the Debtors' postpetition attorneys and other professionals retained with the approval of the Bankruptcy Court (solely in their respective capacity as professionals of the Debtors) (the "Debtor Retained Professionals"), (iv) the attorneys and professionals retained by the Restructuring Committee (solely in their capacity as such), (v) the Huron Parties (solely with respect to services rendered for the Debtors, including as officers, representatives, professionals for, and/or agent of the Debtors), (vi) the former and current members of the Creditors' Committee (solely acting in such capacity), (vii) the Creditors' Committee's attorneys and other Professional Persons (solely acting in the capacity as professionals of the Creditors' Committee), (viii) BFG, (ix) PBGC, and (x) the respective successors or assigns of the foregoing parties, will neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken, on or after the Petition Date, in connection with, or related to, the formulation, preparation, dissemination, implementation, administration, Confirmation or Consummation of the Plan or any contract, instrument, waiver, release or other agreement or document created or entered into, in connection with the Plan, or any other act taken or omitted to be taken in connection with the Chapter 11 Cases up to and including the Effective Date; provided, however, that the foregoing provisions of this subsection will have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud.  For the avoidance of doubt, the scope of the exculpation provided under Article X.C of the Plan does not cover:  (i) Mayer Brown LLP, (ii) Richards Layton & Finger LLP, (iii) MPI Products LLC, Monomoy Capital Partners, Monomoy Capital Partners II, LP, or any of their respective affiliates or successors, or (iv) any of the George Hofmeister Parties or the former and current officers, managers or representatives of the Debtors (other than the Independent Managers, the Debtor Retained Professionals, the attorneys and professionals retained by the Restructuring Committee, and the Huron Parties expressly exculpated above).

4.    **Debtors' Release of CRO, Independent Managers, Creditors' Committee and Other Parties**

As of and subject to the occurrence of the Effective Date, for good and valuable consideration, the Debtors, for themselves and the Estates, irrevocably, unconditionally and generally release (i) the Independent Managers, (ii) the Debtor Retained Professionals, (iii) the attorneys and professionals retained by the Restructuring Committee (solely in their capacity as such), (iv) the Huron Parties (solely with respect to services rendered for the Debtors, including as officers, representatives, professionals for, and/or agent of the Debtors), (v) the former and current members of the Creditors' Committee (solely acting in such capacity), (vi) the Creditors' Committee's attorneys and other Professional Persons (solely acting in the capacity as professionals of the Creditors' Committee), (vii) BFG, (viii) PBGC, and (ix) the respective successors or assigns of the foregoing parties (collectively, the "Released Parties"), from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities, whether known or

unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, in law or equity or otherwise, based on or relating to in any way the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement, other than claims or liabilities arising out of or relating to any act or omission of the Released Parties that constitutes willful misconduct, gross negligence or fraud; provided that such released claims, obligations, rights, suits, damages, causes of action, and liabilities relate to (a) acts or omissions on or after the Petition Date and prior to the Effective Date or (b) prepetition acts or omissions relating to the commencement of the Chapter 11 Cases; provided further that the foregoing release will be without prejudice to any objections to claims, including counter-claims or setoffs, relating to Claims asserted by any of the Released Parties against the Debtors that the Debtors or Reorganized Debtors may assert against the Released Parties.  For the avoidance of doubt, the scope of the release provided under Article X.D of the Plan does not cover:  (i) Mayer Brown LLP, (ii) Richards Layton & Finger LLP, (iii) MPI Products LLC, Monomoy Capital Partners, Monomoy Capital Partners II, LP, or any of their respective affiliates or successors, or (iv) any of the George Hofmeister Parties or the former and current officers, managers or representatives of the Debtors (other than the Independent Managers, the Debtor Retained Professionals, the attorneys and professionals retained by the Restructuring Committee, and the Huron Parties expressly released above).

5.      **Release by Creditors**

**As of and subject to the occurrence of the Effective Date, for good and valuable consideration, each holder of a Claim that votes to accept the Plan (the "Creditor-Releasors"), for itself and its respective present or former officers, directors, managers, shareholders, trustees, partners and partnerships, members, agents, employees, representatives, attorneys, accountants, professionals, and successors or assigns, in each case solely in their capacity as such, shall be deemed to have completely, conclusively, unconditionally and irrevocably released (i) the Debtors, (ii) the Estates, (iii) the Independent Managers, (iv) the Debtor Retained Professionals, (v) the attorneys and professionals retained by the Restructuring Committee (solely in their capacity as such), (vi) the Huron Parties (solely with respect to services rendered for the Debtors, including as officers, representatives, professionals for, and/or agent of the Debtors), (vii) the former and current members of the Creditors' Committee (solely acting in such capacity), (viii) the Creditors' Committee's attorneys and other Professional Persons (solely acting in the capacity as professionals of the Creditors' Committee), (ix) BFG, (x) PBGC, and (xi) the respective successors or assigns of the foregoing parties (the "Released Estate Parties"), from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, in law or equity or otherwise, based on or relating to in any way the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement, arising prior to the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of the Released Estate Parties that constitutes willful misconduct or gross negligence; provided, however, the foregoing shall not constitute a waiver or release of any right of the Holder of an Allowed Claim to payment under the Plan on account of such Allowed Claim.  For the avoidance of doubt, the Released Estate Parties do not include:  (i) Mayer Brown LLP, (ii) Richards Layton & Finger LLP, (iii) MPI Products LLC,**

**Monomoy Capital Partners, Monomoy Capital Partners II, LP, or any of their respective affiliates or successors, or (iv) any of the George Hofmeister Parties or the former and current officers, managers or representatives of the Debtors (other than the Independent Managers, the Debtor Retained Professionals, the attorneys and professionals retained by the Restructuring Committee, and the Huron Parties expressly released above).**

6.   **Release by Debtors' Non-Debtor Affiliates of the Restructuring Committee**

**Except as otherwise specifically provided in the Plan, for good and valuable consideration, as of the Effective Date, all of the non-debtor, direct or indirect corporate subsidiaries of the Debtors (the "Releasor Affiliates") will conclusively, absolutely, unconditionally, irrevocably and forever release and discharge the Released Estate Parties from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities whatsoever, arising prior to the Effective Date and directly or indirectly arising from or relating to, in whole or in part, the Debtors and/or the Chapter 11 Cases.  For the avoidance of doubt, the Releasor Affiliates do not include TPOP, LLC f/k/a Metavation, LLC.**

**I.   No Regulated Rate Change Without Government Approval**

The Debtors do not charge any rates for purposes of section 1129(a)(6) that are regulated by any governmental regulatory commission with jurisdiction under applicable non-bankruptcy law.

**J.   Exemption from Certain Transfer Taxes**

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers by the Debtors pursuant to the Plan will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar Tax or governmental assessment.

**K.   Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction over the Chapter 11 Cases and any of the proceedings related to the Chapter 11 Cases pursuant to section 1142 of the Bankruptcy Code and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the purpose and intent of the Plan are carried out.  Without limiting the generality of the foregoing, the Bankruptcy Court will retain jurisdiction for the purposes specifically identified in Article XII.A of the Plan.

**L.**      **Services By and Fees for Professionals; Bar Date for Administrative Expenses**

Notwithstanding any other provision herein or in the Plan, Professional Fee Claims will be paid in accordance with the terms of the order(s) authorizing such payments as promptly as possible on the Effective Date for any outstanding amounts due as of the Effective Date, and as soon as practicable thereafter as such obligation to pay becomes due unless otherwise agreed upon by the applicable Professional.

In conjunction with the PBGC Settlement Agreement, certain Holders of Professional Fee Claims against Revstone and/or Spara have agreed to accept reduced recoveries out of available assets of each such Debtor in order to allow increased distributions to be made to Holders of Allowed General Unsecured Claims against Revstone and/or Spara in accordance with the PBGC Settlement Agreement. Professionals of US Tool and Greenwood are also expected to accept recoveries to the extent of available assets.

Prior to or on the Effective Date, the Debtors shall establish an escrow account (the "Professional Fee Account") for the purpose of funding future payments on account of accrued and estimated Professional Fee Claims (estimated up to the Effective Date) that will not have been paid on the Effective Date as provided in the preceding paragraph, in an aggregate amount to be determined by the Debtors (in consultation with the Creditors' Committee) in their business judgment. From and after the Effective Date, the Professional Fee Account shall be free and clear of all Liens and Claims and any other interests and encumbrances, and shall be funded out of Net Distributable Assets in accordance with the terms of the PBGC Settlement Agreement and consistent with the PBGC Funding Schedule.

From and after the Effective Date, the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable, shall in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professionals thereafter incurred by the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable, provided that such payments shall be limited by the reserves for Plan Expenses provided by the Plan and the PBGC Settlement Agreement.

Requests for payment of all Administrative Expenses, other than for those for which a Bar Date was previously set or for which a request and/or proof of Claim has previously been filed, must be Filed and served on the Reorganized Debtors and the United States Trustee by no later than thirty (30) days after the Effective Date. The Reorganized Debtors will have until ninety (90) days after the Effective Date to bring an objection to a Timely Filed request for payment of an Administrative Expense (as may be extended pursuant to this section, the "Administrative Expense Objection Deadline"), provided that the Reorganized Debtors may seek extension(s) thereof subject to Bankruptcy Court approval and with notice only to parties that have requested such notice pursuant to Bankruptcy Rule 2002. Nothing in the Plan will prohibit the Reorganized Debtors from paying Administrative Expenses in the ordinary course in accordance with applicable law during or after the Chapter 11 Cases, but after the Effective Date, the Reorganized Debtors' obligation to pay an Administrative Expense will depend upon the claimant's compliance with this section and such Administrative Expense being Allowed under the provisions of the Plan.

Notwithstanding the foregoing provisions of Article XIII.B.3 of the Plan, but except as may be expressly provided in other sections of the Plan, Professional Persons requesting compensation or reimbursement of expenses incurred after the Petition Date and prior to the Effective Date must file and serve, on all parties entitled to notice thereof, a Fee Application for final allowance of compensation and reimbursement of expenses in accordance with the various orders of the Bankruptcy Court establishing procedures for submission and review of such applications; provided that, if no last date is set in such procedures for filing such applications, they must be filed no later than sixty (60) days after the Effective Date and any objections to such applications must be made in accordance with applicable rules of the Bankruptcy Court

## M.    No Waiver

Neither the failure of the Debtors to list a Claim in the Debtors' Schedules, the failure of the Debtors to object to any Claim or Interest for purposes of voting, the failure of the Debtors to object to a Claim, Administrative Expense or Interest prior to Confirmation or the Effective Date, the failure of the Debtors to assert a Retained Right of Action prior to Confirmation or the Effective Date, the absence of a proof of Claim having been filed with respect to a Claim, nor any action or inaction of the Debtors or any other party with respect to a Claim, Administrative Expense, Interest or Retained Right of Action other than a legally effective express waiver or release will be deemed a waiver or release of the right of the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable, or each of their successors, before or after solicitation of votes on the Plan or before or after Confirmation or the Effective Date to:  (a) object to or examine such Claim, Administrative Expense or Interest, in whole or in part or (b) retain and either assign or exclusively assert, pursue, prosecute, utilize, otherwise act or otherwise enforce any Rights of Action.

## N.    U.S. Trustee Fees

All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code will be paid by the Debtors on or before the Effective Date.  From and after the Effective Date, the Reorganized Debtors will pay the fees assessed against its Estate until such time as the particular Chapter 11 Case is closed, dismissed or converted.  In addition, the Reorganized Debtors will file post-confirmation quarterly reports in conformity with the U.S. Trustee guidelines until entry of an order closing or converting the Chapter 11 Cases.

## O.    Preservation of Insurance

The Debtors' release from and payment of Claims as provided in the Plan will not diminish or impair the enforceability of any insurance policy that may cover any Claims, including, without limitation, any Claims on account of the Debtors' officers or managers.

## P.    Waiver of Stay

The Debtors request as part of the Confirmation Order a waiver from the Bankruptcy Court of the fourteen (14) day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the fourteen (14) day stay of Bankruptcy Rule 6004(h).

**Q.      Conditions to Effective Date and Effects of Confirmation**

The Plan will not be consummated and the Effective Date will not occur unless and until (A) the Confirmation Order is in a form acceptable to the Debtors and the Creditors Committee which approval shall not be unreasonably withheld; (B) all documents to be provided in the Plan Supplement are in form and substance acceptable to the Debtors and the Creditors Committee which approval shall not be unreasonably withheld; (C) the Confirmation Order will be a Final Order; (D) the Debtors determine in their reasonable business judgment that they have sufficient Cash to pay all Allowed Administrative Expenses, Allowed Tax Claims and Allowed Priority Non-Tax Claims, as of the Effective Date, to the extent the holders thereof are entitled to payment as of such date under the Plan and unless otherwise agreed by such holders, and (E) the Debtors determine in their reasonable business judgment that the Debtors have sufficient Cash to pay all asserted, accrued and estimated Administrative Expenses that have not yet been Allowed or are otherwise not yet payable as of the Effective Date, but which such Administrative Expenses are anticipated to be later Allowed or otherwise payable and the holders of any such Administrative Expenses have not agreed to alternative treatment.  Any of the foregoing conditions, other than conditions (D) and (E) and those conditions requiring approval of the Creditors' Committee, may be waived by the Debtors and such waiver will not require any notice, Bankruptcy Court order, or any further action.

Confirmation will bind the Debtors, all Holders of Claims, Administrative Expenses, or Interests and other parties in interest to the provisions of the Plan whether or not the Claim, Administrative Expense, or Interest of such Holder is Impaired under the Plan and whether or not the Holder of such Claim, Administrative Expense, or Interest has accepted the Plan.

Confirmation of the Plan will constitute a finding that:  (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) all Persons' solicitations of acceptances or rejections of the Plan and the offer, issuance, sale, or purchase of a security offered or sold under the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.  Nothing contained in the Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

**R.      Modification or Withdrawal of Plan and Disclosure Statement**

The Debtors (following consultation with the Creditors' Committee) may seek to amend or modify the Plan at any time prior to its Confirmation in the manner provided by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise order, and except as otherwise set forth herein, the Debtors (following consultation with the Creditors' Committee) reserve the right to amend the terms of the Plan or waive any conditions to its Confirmation, effectiveness or consummation (subject to the approval of the Creditors' Committee, as applicable), if the Debtors determine that such amendments or waivers are necessary or desirable to confirm, effectuate or consummate the Plan.

After Confirmation of the Plan, but prior to the Effective Date, the Debtors may, pursuant to section 1127 of the Bankruptcy Code, (following consultation with the Creditors' Committee) seek to modify the Plan.  After the Effective Date, the Reorganized Debtors or the

Revstone/Spara Litigation Trust, as applicable, may apply to the Bankruptcy Court to remedy defects or omissions in the Plan or to reconcile inconsistencies in the Plan.

The Debtors reserve the right to revoke and withdraw the Plan at any time prior to the Effective Date, in which case the Plan will be deemed to be null and void.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (i) the Plan will be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (if any), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan, will be deemed null and void; and (iii) nothing contained in the Plan will:  (a) constitute a waiver or release of any Claims or Interests or Claims by the Debtors against any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

**V.**

**REQUIREMENTS FOR CONFIRMATION**

**A.**     **Acceptances Necessary to Confirm Plan**

Voting rights are set forth as follows:

| Class | Status | Voting Rights |
|---|---|---|
| Class 1 – Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote |
| Class 2 – Miscellaneous Secured Claims | Unimpaired | Not Entitled to Vote |
| Class 3 – General Unsecured Claims | Impaired | Entitled to Vote |
| Class 4 – PBGC Claims | Impaired | Entitled to Vote |
| Class 5 – Interests in the Debtor | Impaired | Not Entitled to Vote |

If no Holder of a Claim eligible to vote in a particular Class timely votes to accept or reject the Plan, the Debtors will seek to have the Plan deemed **accepted** by the Holders of such Claims in such Class for purposes of section 1129(b) of the Bankruptcy Code.

**B.**     **Best Interest of Creditors Test**

Confirmation requires, among other things, that each Holder of a Claim in an Impaired Class and each Holder of an Interest either:  (a) accepts the Plan; or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. This requirement is commonly referred to as the "best interests test."

**a.**     **Chapter 7**

To determine the value that the Holders of Impaired Claims and Interests would receive if the Debtors were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  Section 704 of the Bankruptcy Code requires a chapter 7 trustee to collect

72

and reduce to money the property of the estate as expeditiously as is compatible with the best interests of parties in interest.

Here, the Cash available in a chapter 7 case for satisfaction of Allowed Claims would consist of the Cash proceeds resulting from the liquidation of the Debtors' remaining assets, augmented by the Cash, if any, held by the Debtors at the time of the commencement of the chapter 7 case. Any such Cash amount would then be reduced by the amount of any Claims secured by such assets such as the Miscellaneous Secured Claims (if any), the costs and expenses of the liquidation of any remaining assets, including the costs of prosecution of any pending litigation and Avoidance Claims, and such additional Administrative Claims and other Priority Claims that may be incurred during the chapter 7 cases.

The costs of liquidation under chapter 7 would include fees payable to the chapter 7 trustee and his or her attorneys and other professionals and agents, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases that would be entitled to priority in the chapter 7 cases (such as compensation for Professional Persons and costs and expenses of the Debtors and the Creditors' Committee). Such Administrative Expenses arising during the chapter 7 and 11 cases would have to be paid in Cash in full from the liquidation proceeds before the balance of those proceeds could be made available to pay prepetition claims.

### b.    Liquidation Alternative

Pursuant to Bankruptcy Code section 1129(a)(7), if an Impaired Class does not accept the Plan, the Debtors must demonstrate, and the Bankruptcy Court must determine that with respect to such Class, each Holder of a Claim in the applicable Class will receive property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the Plan.

The Plan is expected to provide a greater recovery to the Holders of Allowed Claims than such Holders would receive under a liquidation under chapter 7 primarily (i) because pursuant to the Plan, the Reorganized Debtors and the proposed Plan Administrator (the Debtors' current CRO) is familiar with the operations, businesses and assets of the direct and indirect subsidiaries of Revstone and Spara and will play a role in such subsidiaries' sale efforts, with excess proceeds to be distributed to Reorganized Revstone and Reorganized Spara to fund distributions to Creditors, and (ii) due to the benefits of the PBGC Settlement Agreement, which has been incorporated into the Plan.

As to each of the Debtors, a newly appointed chapter 7 trustee would require substantial time, effort and money to be able to "get up to speed" on sources of Plan funding and attendant circumstances, and during such period, potential transactions that may result in residual value for the Estates may be jeopardized. The Reorganized Debtors, under the Plan, will be able to efficiently maximize the value of the Debtors' assets, redounding to the benefit of Creditors of the Estates.

Moreover, in a chapter 7 case, the chapter 7 trustee would be entitled to seek a sliding scale commission based upon the funds distributed by such trustee. Some residual value resulting from the Debtors' efforts prior to the chapter 7 trustee's appointment may be

subsequently transferred to the Estates, and the chapter 7 trustee may be able to assert a commission for such funds even though they are the result of prior efforts. It is also anticipated that a chapter 7 liquidation would result in delay in distributions to Creditors. Among other things, a chapter 7 case would trigger a new bar date for filing claims that would be more than 90 days following conversion of the cases to chapter 7. Fed. R. Bankr. P. 3002(c). Hence, a chapter 7 liquidation would not only delay distributions, but raise the prospect of additional claims that were not asserted in the Chapter 11 Cases. Based on the foregoing, the Plan provides an opportunity to bring the greatest return to Creditors.

**C.    Feasibility of Plan**

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation, that the Bankruptcy Court find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed under the Plan. This requirement is called "feasibility."

The Plan is feasible because the Debtors anticipate they will have sufficient funds available as of the Effective Date, subject to the terms of the PBGC Settlement Agreement, together with the proceeds of Distributable Assets, as set forth in PBGC Funding Schedule, to satisfy all of the Debtors' projected obligations under the Plan. The Debtors have previously described how Allowed Claims will be satisfied through the distribution of Distributable Assets to the Holders of Allowed Claims. Therefore, the Debtors believe that Confirmation of the Plan is not likely to be followed by the need for a further bankruptcy relief by the Reorganized Debtors. However, pursuant to the terms of the PBGC Settlement Agreement, certain Administrative Expenses may not be paid in full, or payment may be delayed, as agreed by the holders of such Claims.

**D.    Classification**

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for the classification of Claims. Section 1122(a) permits a plan to place a claim or equity interest in a particular class only if the claim or equity interest is substantially similar to the other claims or interests in that class. The Debtors believe that the classification of Claims and Interests under the Plan is appropriate and consistent with applicable law.

**E.    Confirmation of Plan Without Necessary Acceptances; Cramdown**

A COURT MAY CONFIRM A PLAN, EVEN IF IT IS NOT ACCEPTED BY ALL IMPAIRED CLASSES, IF THE PLAN HAS BEEN ACCEPTED BY AT LEAST ONE IMPAIRED CLASS OF CLAIMS, AND THE PLAN MEETS THE "CRAMDOWN" REQUIREMENTS SET FORTH IN SECTION 1129(b) OF THE BANKRUPTCY CODE. SECTION 1129(b) OF THE BANKRUPTCY CODE REQUIRES THAT THE BANKRUPTCY COURT FIND THAT A PLAN IS "FAIR AND EQUITABLE," AND DOES NOT "DISCRIMINATE UNFAIRLY" WITH RESPECT TO EACH NON-ACCEPTING IMPAIRED CLASS OF CLAIMS OR INTERESTS. IN THE EVENT THAT ANY IMPAIRED CLASS REJECTS THE PLAN, IN ACCORDANCE WITH SECTION 1129(a)(8) OF THE BANKRUPTCY CODE, AND AT LEAST ONE IMPAIRED CLASS HAS VOTED TO

ACCEPT THE PLAN, THE DEBTORS INTEND TO REQUEST THAT THE BANKRUPTCY COURT CONFIRM THE PLAN IN ACCORDANCE WITH THE "CRAMDOWN" PROVISION OF SECTION 1129(b) OF THE BANKRUPTCY CODE, OR MODIFY THE PLAN IN ACCORDANCE WITH THE TERMS THEREOF.

The Plan provides for the possibility of invoking the "cramdown" provisions as defined in section 1129(a) of the Bankruptcy Code.  Under this provision, the Bankruptcy Court has the authority to confirm the Plan even though a Class of Claims that is Impaired does not vote to accept the Plan, if another Class of Claims, which is also Impaired, votes to accept the Plan. This provision takes into account the possibility that one large claimant or several claimants may arbitrarily vote not to accept the Plan and that those arbitrary votes could be detrimental to other Creditors.  In this instance, the Bankruptcy Court, notwithstanding the negative vote of an Impaired Class, in the interest of being "fair and equitable," may confirm the Plan if another Impaired Class has accepted the Plan.  Such determination, if necessary, would be addressed at the Confirmation Hearing.

### a.    No Unfair Discrimination

The Debtors believe that under the Plan:  (i) all Impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests with which their legal rights are intertwined, if any; and (ii) no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class.  The Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class.

### b.    Fair and Equitable Test

With respect to a dissenting class of Claims and Interests, the "fair and equitable" standard requires that the Plan provide that either the Claims or Interests in each Class received everything to which they are legally entitled or that Classes junior in priority to the Class receive nothing.  The strict requirement of the allocation of full value to dissenting classes before any junior class can receive distribution is known as the "absolute priority rule."

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims, unsecured claims and interests as follows:

### (i)    Secured Claims

Either:  (i) each holder of a secured claim (x) retains the lien securing its secured claim and receives on account of its allowed secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, or (y) realizes the "indubitable equivalent" of its allowed secured claim; or (ii) the property securing the claim is sold free and clear of liens, with such liens attaching to the proceeds, and the liens against such proceeds are treated in accordance with clause (i).

(ii)     Unsecured Claims

Either:  (i) each holder of an unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim; or (ii) the holders of claims and interests that are junior to the claims or the non-accepting class do not receive any property under the plan on account of such claims and interests.

(iii)     Equity Interests

Either:  (i) such holder of an interest receives or retains property of a value equal to the greater of any fixed liquidation preference or fixed redemption price to which such holder is entitled, or the value of the interest; or (ii) the holder of any interests junior to the interests in the impaired class will not receive or retain any property under the plan.

The cramdown provisions of the Bankruptcy Code are complex and this summary is not intended to be a complete statement of the law in this area.

## VI.

## EFFECT OF CONFIRMATION

**A.**     **Binding Effect of Confirmation**

Confirmation will bind the Debtors, all Holders of Claims, Administrative Expenses, or Interests and other parties in interest to the provisions of the Plan whether or not the Claim, Administrative Expense, or Interest of such Holder is Impaired under the Plan and whether or not the Holder of such Claim, Administrative Expense, or Interest has accepted the Plan.

**B.**     **Good Faith**

Confirmation of the Plan will constitute a finding that:  (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) all Persons' solicitations of acceptances or rejections of the Plan and the offer, issuance, sale, or purchase of a security offered or sold under the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

**C.**     **No Limitations on Effect of Confirmation**

Nothing contained in the Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

## VII.

## RISK FACTORS

There is a risk under the Plan that Allowed Administrative Expenses, Tax Claims and Priority Non-Tax Claims will materially exceed the Debtors' estimates.  The process of reconciling all such Claims has not been completed and outstanding disputes remain that will need to be litigated or otherwise resolved.

Further, the Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any or all such conditions will be satisfied (or waived).   Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

Further, there is a risk that the Debtors will not be able to realize the recoveries projected herein and in the PBGC Funding Schedule from the assets presently available to the Estates (including any value that may be distributed to Revstone and Spara by their respective direct and indirect subsidiaries and net proceeds, if any, from the prosecution of the Revstone/Spara Litigation Trust Assets), which may have an adverse impact on distributions to Creditors.

Additionally, there is a risk that the Plan may not be confirmed by the Bankruptcy Court, either because the requisite votes in favor of the Plan are not received or the Bankruptcy Court decides not to confirm the Plan on some other basis.

Notwithstanding the risks, however, the Debtors believe that the same risks described herein are present in and greater to Creditors in a chapter 7 case.  Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Finally, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.

## VIII.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan to Holders of Claims against the Debtors.  This discussion is based on the Internal Revenue Code (the "Tax Code"), Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof.  Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims (including Claims within the same Class), the Holder's status and method of accounting (including Holders within the same Class) and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are subject to significant uncertainties.  No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be

requested from the IRS with respect to the any of the issues discussed below.  Further, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the Holders of Claims.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or the Holders of Claims in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers and dealers in securities, traders that mark-to-market their securities, mutual funds, insurance companies, other financial institutions, real estate investment trusts, tax-exempt organizations, small business investment companies, regulated investment companies, foreign taxpayers, persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax, and persons holding Claims or Interests as part of a "straddle," "hedge," "constructive sale" or "conversion transaction" with other investments).  This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue.  No aspect of foreign, state, local or estate and gift taxation is addressed.

The U.S. federal income tax consequences of the distributions contemplated by the Plan to the Holders of Claims that are U.S. Persons will depend upon a number of factors.  For purposes of the following discussion, a "U.S. Person" is any person or entity (1) who is a citizen or resident of the United States, (2) that is a corporation or partnership created or organized in or under the laws of the United States or any state thereof, (3) that is an estate, the income of which is subject to U.S. federal income taxation regardless of its source or (4) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more U.S. persons have the authority to control; or (b) that has in effect a valid election to continue to be treated as a U.S. Person for U.S. federal income tax purposes.  In the case of a partnership, the tax treatment of its partners will depend on the status of the partner and the activities of the partnership.  U.S. Persons who are partners in a partnership should consult their tax advisors.  A "Non-U.S. Person" is any person or entity that is not a U.S. Person.  For purposes of the following discussion and unless otherwise noted below, the term "Holder" will mean a Holder of a Claim that is a U.S. Person.

Except where otherwise indicated, this discussion assumes that the Claims are held as capital assets within the meaning of section 1221 of the Tax Code.

THE FOLLOWING SUMMARY IS NOT INTENDED TO CONSTITUTE ADVICE TO ANY PARTY, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PERSONAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM.  EACH HOLDER OF A CLAIM, AS WELL AS EACH HOLDER OF AN INTEREST, IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

*IRS Circular 230 Notice. To ensure compliance with IRS Circular 230, Holders of Claims and Interests are hereby notified that: (a) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by Holders of Claims and Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) Holders of Claims and Interests should seek advice based on their particular circumstances from an independent tax advisor.*

## A.   <u>Federal Taxation Issues Related to Pass-Through Entities in General</u>

For U.S. federal income tax law purposes, an entity can be organized as a corporation, a partnership, or a hybrid entity (otherwise known as S corporations and limited liability companies).  The two primary differences between corporations and partnerships are how the entity's earnings are taxed and whether or not the shareholder/owners are shielded from the liabilities of the entity.  Generally, corporations are treated as independent tax-paying entities, unaffected by the personal characteristics of their shareholders or changes in their composition as a result of transfers of stock from old shareholders to new ones, giving rise to the potential for double taxation.  Because corporations are treated independently, corporate income is taxed to a corporation as it is received or accrued, and is taxed at the shareholder level when and if the corporation distributes earnings to the shareholders or they sell their stock.  Partnerships, however, are not entities subject to income tax.  Instead, the partners are taxed directly on partnership income whether or not it is actually distributed to them.

Hybrid entities, on the other hand, combine the two primary differences between corporations and partnerships.  As to S corporations, shareholders are shielded from entity level liability similar to that of a corporation; however, generally, the earnings of the entity are taxed at the ownership level similar to that of a partnership.  As to limited liability companies, member-owners are shielded from entity level liability similar to that of a corporation; however, unique to the LLC, an option exists to be taxed as a corporation or taxed as a partnership, provided that the LLC has at least two member-owners, as set forth under Treasury Regulations Section 301.7701-3.

Debtors Revstone and Spara each have one member-owner (Ascalon).  Debtors Greenwood and US Tool also each have one member-owner (Revstone Tool & Engineering LLC, the single member-owner of which is Revstone).  However, there are certain restrictions imposed in Revstone's and Spara's operating agreements.  Each entity is currently manager-managed.

Generally, an LLC wholly-owned by a single member (single member LLC, or "<u>SMLLC</u>") may elect to be classified and taxed as a corporation.  Absent an election to be taxed as a corporation, however, a SMLLC will be classified as a "disregarded entity", the assets, obligations and operations of which are the direct rights of the single member owner and will be reported with and taxed similarly to, the single member owner's items of income, deductions, gains, losses and other information.

Revstone and Spara were classified as disregarded entities at least through tax year 2012. The Debtors recently learned that Ascalon purported to make an election of behalf of Revstone in July 2013 in an effort to alter the disregarded tax status of this entity. The Debtors are attempting to confirm whether the same election was purported to have been made on behalf of Spara. The Debtors reserve all rights to challenge the validity of such election and reserve all rights and claims against McClarty, the Children's Trusts, Ascalon and George S. Hofmeister on account of any such purported election.

Generally, pass-through entities are subject to a single layer of tax on their earnings at the ownership level (partner, member, or shareholder depending on entity type). Taxable income of pass-through entities is computed at the entity level (generally each type of entity will file a tax return showing no tax liability at the entity level); however, each owner is taxed separately on his, her, or its distributive share of income, gain, loss, deduction, and/or credit, as applicable. The character of the items included in taxable income is determined at the entity level with no regard to the owners' individual characteristics. With respect to tax attributes, pass-through entities are generally not allowed to maintain certain tax attributes, such as net operating losses, given such entities are not directly taxable. These tax attributes pass-through to the owners, and usage, carryback, or carryforward of these attributes is determined at the ownership level.

BECAUSE THE FINAL TAX TREATMENT OUTCOME DEPENDS ON A PARTY'S SPECIFIC SITUATION, PARTIES IN INTEREST ARE URGED TO CONSULT WITH THEIR TAX ADVISORS REGARDING THE TAX IMPLICATIONS TO THEM WITH RESPECT TO THE TRANSACTIONS CONTEMPLATED UNDER OR IN CONNECTION WITH THE PLAN AND THEIR SPECIFIC SITUATION, AND NOTHING HEREIN IS INTENDED TO CONSTITUTE ADVICE TO ANY PARTY.

**B.**    **Consequences to Creditors**

1.    **Holders of Claims in General**

Generally, a holder of a Claim should in most, but not all circumstances, recognize gain or loss equal to the difference between the "amount realized" by such holder in exchange for its Claim and such holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a holder's Claim. The tax basis of a holder in a Claim will generally be equal to the holder's cost therefore. To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Claim in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period of the Claim, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the holder has held such Claim for more than one year.

A Holder who received Cash in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its

Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim.  A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.

Under the Plan, the Holders of Class 3 and Class 4 Claims may receive only a partial distribution of their Allowed Claims.  As discussed herein, members of Class 3 and Class 4 also will receive the Revstone/Spara Litigation Trust Interests, which is discussed further below. Whether the Holder of such Claims will recognize a loss or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the Holder and its Claims. Creditors should consult their own tax advisors.

2.    **Non-United States Persons**

A Holder of a Claim that is a Non-U.S. Person generally will not be subject to United States federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for United States federal income tax purposes, or (ii) if such Holder is an individual, such Holder is present in the United States for one hundred and eighty-three (183) days or more during the taxable year of the exchange and certain other requirements are met.

C.    **U.S. Federal Income Tax Consequences in Relation to the Revstone/Spara Litigation Trust and Beneficiaries Thereof**

As of the Effective Date, the Revstone/Spara Litigation Trust will be established for the benefit of Reorganized Revstone, Reorganized Spara, and Holders of Allowed PBGC Claims. The tax consequences of the Plan in relation to the Revstone/Spara Litigation Trust and the beneficiaries thereof are subject to uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law.

Allocations of taxable income of the Revstone/Spara Litigation Trust (other than taxable income allocable to the Revstone/Spara Litigation Trust's claims reserves) among holders of Claims will be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Revstone/Spara Litigation Trust had distributed all of its assets (valued at their tax book value) to the holders of the beneficial interests in the Revstone/Spara Litigation Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Revstone/Spara Litigation Trust.  Similarly, taxable loss of the Revstone/Spara Litigation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining trust assets.

The tax book value of the trust assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. Uncertainties with regard to federal income tax consequences of the Plan may arise due to the inherent nature of estimates of value that will impact tax liability determinations.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an IRS private letter ruling if the Revstone/Spara Litigation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Revstone/Spara Litigation Trustee), the Revstone/Spara Litigation Trustee may (a) elect to treat any trust assets allocable to, or retained on account of, Disputed Claims (the "Trust Claims Reserve") as a "disputed ownership fund" governed by Treasury Regulation Section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, any Trust Claims Reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the trust assets in such reserves, and all distributions from such reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Revstone/Spara Litigation Trustee and the holders of beneficial interests in the Revstone/Spara Litigation Trust) will be required to report for tax purposes consistently with the foregoing.

The Revstone/Spara Litigation Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (*i.e.*, a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994.28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Revstone/Spara Litigation Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, *supra*, all parties (including the Revstone/Spara Litigation Trustee and the holders of beneficial interests in the Revstone/Spara Litigation Trust) are required to treat for federal income tax purposes, the Revstone/Spara Litigation Trust as a grantor trust of which the holders of the applicable Allowed Claims are the owners and grantors. While the following discussion assumes that the Revstone/Spara Litigation Trust would be so treated for federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the Revstone/Spara Litigation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Revstone/Spara Litigation Trust as a grantor trust. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Revstone/Spara Litigation Trust and the beneficiaries thereof could materially vary from those discussed herein.

In general, each beneficiary of the Revstone/Spara Litigation Trust will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such beneficiary in satisfaction of its applicable Allowed Claim, and (ii) such beneficiary's adjusted tax basis in such Claim. The "amount realized" by a beneficiary will equal the sum of cash and the aggregate fair market value of the property received by such party pursuant to the Plan (such as a beneficiary's undivided beneficial interest in the assets transferred to the

Revstone/Spara Litigation Trust).  Where gain or loss is recognized by a beneficiary in respect of its Allowed Claim, the character of such gain or loss (*i.e.*, long-term or short-term capital, or ordinary income) will be determined by a number of factors including the tax status of the party, whether the Claim constituted a capital asset in the hands of the party and how long it had been held, whether the Claim was originally issued at a discount or acquired at a market discount and whether and to what extent the party had previously claimed a bad debt deduction in respect of the Claim.

After the Effective Date, any amount that a beneficiary receives as a distribution from the Revstone/Spara Litigation Trust in respect of its beneficial interest in the Revstone/Spara Litigation Trust should not be included, for federal income tax purposes, in the party's amount realized in respect of its Allowed Claim, but should be separately treated as a distribution received in respect of such party's beneficial interest in the Revstone/Spara Litigation Trust.

In general, a beneficiary's aggregate tax basis in its undivided beneficial interest in the assets transferred to the Revstone/Spara Litigation Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the beneficiary's holding period in such assets will begin the day following the Effective Date.  Distributions to any beneficiary will be allocated first to the original principal portion of the beneficiary's Allowed Claim as determined for federal tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim.  However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.

For all federal income tax purposes, all parties (including the Revstone/Spara Litigation Trustee and the Holders of beneficial interests in the Revstone/Spara Litigation Trust) will treat the transfer of assets to the Revstone/Spara Litigation Trust, in accordance with the terms of the Plan, as a transfer of those assets directly to the Holders of the applicable Allowed Claims followed by the transfer of such assets by such Holders to the Revstone/Spara Litigation Trust. Consistent therewith, all parties will treat the Revstone/Spara Litigation Trust as a grantor trust of which such Holders are to be owners and grantors.  Thus, such Holders (and any subsequent Holders of interests in the Revstone/Spara Litigation Trust) will be treated as the direct owners of an undivided beneficial interest in the assets of the Revstone/Spara Litigation Trust for all federal income tax purposes.  Accordingly, each Holder of a beneficial interest in the Revstone/Spara Litigation Trust will be required to report on its federal income tax return(s) the Holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Revstone/Spara Litigation Trust.

The Revstone/Spara Litigation Trust's taxable income will be allocated to the Holders of beneficial interests in the Revstone/Spara Litigation Trust in accordance with each such Holder's pro rata share.  The character of items of income, deduction and credit to any Holder and the ability of such Holder to benefit from any deductions or losses may depend on the particular situation of such Holder.

The federal income tax reporting obligation of a Holder of a beneficial interest in the Revstone/Spara Litigation Trust is not dependent upon the Revstone/Spara Litigation Trust distributing any cash or other proceeds.  Therefore, a Holder of a beneficial interest in the Revstone/Spara Litigation Trust may incur a federal income tax liability regardless of the fact

that the Revstone/Spara Litigation Trust has not made, or will not make, any concurrent or subsequent distributions to the Holder.  If a Holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its beneficial interests in the Revstone/Spara Litigation Trust it holds, the Holder may be allowed a subsequent or offsetting loss.

The Revstone/Spara Litigation Trustee will file with the IRS returns for the Revstone/Spara Litigation Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a).  The Revstone/Spara Litigation Trust will also send to each Holder of a beneficial interest in the Revstone/Spara Litigation Trust a separate statement setting forth the Holder's share of items of income, gain, loss, deduction or credit and will instruct the Holder to report such items on its federal income tax return.

Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could also change the federal income tax consequences of the Plan and the transactions contemplated thereunder.

D.      **Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S OR INTEREST HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, CLAIM AND INTEREST HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## IX.

## SECURITIES LAW MATTERS

A.      **In General**

The Plan provides for the establishment of the Revstone/Spara Litigation Trust and for the issuance of beneficial interests therein.  Beneficial interests in trusts may be deemed to be "securities" under applicable federal and state securities laws.  However, as discussed herein, the Debtors do not believe that the Revstone/Spara Litigation Trust Interests constitute "securities" for purposes of applicable nonbankruptcy law.  Alternatively, even if the Revstone/Spara Litigation Trust Interests constitute "securities," the Debtors believe that these would be exempt from registration pursuant to Bankruptcy Code section 1145(a)(1).  Finally, the Debtors do not believe that the Investment Company Act of 1940, as amended (the "Investment Company Act"), is applicable in that the Revstone/Spara Litigation Trust will not be, and is not controlled by, an "investment company" for purposes of that Act.

**B.**        **Initial Issuance**

Unless an exemption is available, the offer and sale of a security generally is subject to registration with the United States Securities and Exchange Commission (the "SEC") under Section 5 of the Securities Act of 1933, as amended (the "Securities Act").  In the opinion of the Debtors, the Revstone/Spara Litigation Trust Interests do not constitute "securities" within the definition of Section 2(11) of the Securities Act and corresponding definitions under state securities laws and regulations ("Blue Sky Laws") because generally they are non-transferable. Accordingly, the Revstone/Spara Litigation Trust Interests should be issuable in accordance with the Plan without registration under the Securities Act or any Blue Sky Law.

Alternatively, in the event that the Revstone/Spara Litigation Trust Interests are deemed to constitute securities, section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and Blue Sky Laws if three principal requirements are satisfied:

A.        the securities are offered and sold under a plan of reorganization and are securities of the debtor, of an affiliate of the debtor participating in a joint plan with the debtor, or of a successor to the debtor under the plan;

B.        the recipients of the securities hold a pre-petition or administrative claim against the debtor or an interest in the debtor; and

C.        the securities are issued entirely in exchange for recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property.

If and to the extent that the Revstone/Spara Litigation Trust Interests may constitute securities, the Debtor believes that these beneficial interests issued in respect of Allowed Claims will qualify as securities "of the debtor … or of a successor to the debtor" pursuant to section 1145(a)(1).  In addition, the Trust Interests will be issued entirely in exchange for Claims.  Thus, the Debtors believe that the issuance of the Revstone/Spara Litigation Trust Interests pursuant to the Plan will satisfy the applicable requirements of section 1145(a)(1) of the Bankruptcy Code, and that such issuance should be exempt from registration under the Securities Act and any applicable Blue Sky Law.

The Debtors believe that their reliance upon the foregoing exemptions in respect of the issuance of the Revstone/Spara Litigation Trust Interests is consistent with positions taken by the SEC with respect to similar transactions and arrangements by other chapter 11 debtors in possession.  However, the Debtors have not sought any "no-action" letter by the SEC with respect to any such matters, and therefore no assurance can be given regarding the availability of any exemptions from registration with respect to any securities, if any, issued pursuant to the Plan.

C.      **Resales**

The Revstone/Spara Litigation Trust Interests will be subject to transfer restrictions under the terms of the Revstone/Spara Litigation Trust Agreement.  As provided in said agreement, generally, the Revstone/Spara Litigation Trust Interests cannot be assigned or transferred other than by operation of law, and will not be represented by certificates.

D.      **Exchange Act Compliance**

Section 12(g) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), applies only to a company that has both (i) total assets in excess of $10.0 million and (ii) a class of equity securities held of record by more than 2,000 persons or 500 persons who are not accredited investors (within 120 days after the last day of the company's fiscal year).  The Debtors believe it highly unlikely conditions (i) and (ii) will be deemed satisfied in respect to the Revstone/Spara Litigation Trust, and in any event, the Revstone/Spara Litigation Trust should not be required to register under Section 12(g) of the Exchange Act.  The Debtors have been advised that the staff of the SEC has issued no-action letters with respect to the non-necessity of Exchange Act registration of a bankruptcy plan trust when the following are true:

A.      the beneficial interests in the trust are not represented by certificates or, if they are, the certificates bear a legend stating that the certificates are transferable only upon death or by operation of law;

B.      the trust exists only to effect a liquidation and will terminate within a reasonable period of time; and

C.      the trust will issue annual unaudited financial information to all beneficiaries.

Based on the foregoing, the Debtors believe that the Revstone/Spara Litigation Trust will not be subject to registration under the Exchange Act.  However, the views of the SEC on the matter have not been sought by the Debtors and, therefore, no assurance can be given regarding this matter.

E.      **Investment Company Act**

As the assets of the Revstone/Spara Litigation Trust do not consist of securities issued by the Debtors or any other person, and this trust is organized as a liquidating entity in the process of liquidation, the Debtors do not believe that the Revstone/Spara Litigation Trust falls within the definition of "investment company" in any manner requiring such entity to register under the Investment Company Act.

F.      **Compliance If Required**

Notwithstanding the preceding discussion, if the Revstone/Spara Litigation Trustee determines, with the advice of counsel, that the Revstone/Spara Liquidating Trust is required to comply with the registration and reporting requirements of the Exchange Act or the Investment Company Act, then prior to the registration of the Revstone/Spara Litigation Trust under the Exchange Act or the Investment Company Act, the Revstone/Spara

86

Litigation Trustee (subject to the terms of the Revstone/Spara Litigation Trust Agreement) will seek to amend the Revstone/Spara Litigation Trust Agreement to make such changes as are deemed necessary or appropriate to ensure that the Revstone/Spara Litigation Trust is not subject to registration or reporting requirements of the Exchange Act, or the Investment Company Act, and the Revstone/Spara Litigation Trust Agreement, as so amended, will be effective after notice and opportunity for a hearing, and the entry of a Final Order of the Bankruptcy Court. If the Revstone/Spara Litigation Trust Agreement, as amended, is not approved by Final Order of the Bankruptcy Court or the Bankruptcy Court otherwise determines in a Final Order that registration under one or both of the Exchange Act or Investment Company Act is required, then the Revstone/Spara Litigation Trustee will take such actions as may be required to satisfy the registration and reporting requirements of the Exchange Act and/or the Investment Company Act, as applicable.

**X.**

**ALTERNATIVES TO PLAN AND MISCELLANEOUS MATTERS**

**A.**     **Alternatives to Debtors' Proposed Plan**

The Debtors believe that if the Plan is not confirmed, or is not confirmable, the alternatives to the Plan include: (a) conversion of the Chapter 11 Cases to cases under chapter 7; (b) dismissal of the Debtors' cases; or (c) an alternative plan of reorganization or liquidation which, in the Debtors' view, would offer less favorable treatment to creditors than that proposed under the Plan.

    1.     **Liquidation Under Chapter 7**

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code. For the reasons previously discussed above, the Debtors believe that Confirmation of the Plan will provide Creditors with a recovery that is expected to be more than could be achieved in a liquidation under chapter 7 of the Bankruptcy Code.

    2.     **Dismissal**

Dismissal of the Chapter 11 Cases would result in each individual creditor having to protect its own rights through legal action, likely resulting in, among other things, numerous suits and other proceedings being commenced and actions being taken by secured creditors to protect or foreclose upon their collateral, requiring the Debtors to expend substantial time and resources to respond to and address such matters. The Debtors believe that dismissal of the Chapter 11 Cases would result in disparate, delayed and potentially smaller recoveries by creditors.

    3.     **Alternative Plan**

On July 8, 2013, the Creditors' Committee filed a proposed disclosure statement (the "Committee's Proposed Disclosure Statement") describing its proposed plan of reorganization in this case (the "Committee's Proposed Plan"). The Creditors' Committee stated in its Proposed

87

Disclosure Statement that the Creditors' Committee was authorized to file the Revstone Committee's Proposed Plan because Revstone purportedly breached one or more Milestones and failed to cure such breaches, and in accordance with the Exclusivity Order, Revstone's exclusivity periods terminated with respect to the Creditors' Committee.  Following the approval of the Global Settlement, the Creditors Committee has adjourned the hearing on its Proposed Plan while the Debtor and Creditors' Committee cooperate in the drafting of an amended plan to be filed by the Debtor.  The Debtors anticipate that the Creditors' Committee will shortly withdraw the Committee's Proposed Plan in accordance with the Global Settlement.  Each of the Debtors has filed a plan in these Chapter 11 Cases, all of which have been superseded by the Debtors' Plan.

The Debtors believe that any alternative plan would not result in as favorable of treatment of Claims and Interests as proposed under the Debtors' Plan.  As discussed herein, the Debtors' Plan will allow the Reorganized Debtors to maximize the value of their remaining assets, including maximizing the value that may be upstreamed to Revstone and Spara, for the benefit of their respective Creditors.

**B.**      **No *Res Judicata* Effect**

Notwithstanding anything to the contrary in the Plan, or in this Disclosure Statement, the provisions of this Disclosure Statement and the Plan permits the Debtors to enter into settlements and compromises of any potential litigation, will not have and are not intended to have any *res judicata* effect with respect to any prepetition Claims and causes of action that are not otherwise treated under the Plan, and will not be deemed a bar to asserting such Claims and causes of action.

XI.

<u>CONCLUSION</u>

The Debtors believe that the Plan is in the best interest of Creditors and urge Creditors to vote to accept the Plan.

January 20, 2015

John C. DiDonato
Chief Restructuring Officer of the Debtors and Debtors in Possession

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Maxim B. Litvak (CA Bar No. 215852)
919 Market Street, 17th Floor | P.O. Box 8705
Wilmington, Delaware  19899-8705
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:      ljones@pszjlaw.com
                 dbertenthal@pszjlaw.com
                 mlitvak@pszjlaw.com

Counsel to Debtors and Debtors in Possession

**<u>Exhibit 1</u>**

**Plan**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVSTONE INDUSTRIES, LLC, et al.,[1] | ) | Case No. 12-13262 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date:  March 5, 2015 at 10:00 a.m.** |
| | | **(prevailing Eastern time)** |

## DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION

---

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Maxim B. Litvak (CA Bar No. 215852)
919 Market Street, 17th Floor | P.O. Box 8705
Wilmington, Delaware  19899-8705
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

Counsel to Debtors and Debtors in Possession

---

Dated:  January 20, 2015

---

[1]  The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's federal tax identification numbers are:  Revstone Industries, LLC (7222); Spara, LLC (6613); Greenwood Forgings, LLC (9285); and US Tool and Engineering, LLC (6450).  The location of the Debtors' headquarters and the service address for each of the Debtors is: Revstone Industries, LLC, et al., c/o Huron Consulting Group Inc., 900 Wilshire Drive, Suite 270, Troy, MI 48084.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................ 1

II. DEFINED TERMS, RULES OF INTERPRETATION,  COMPUTATION OF TIME, AND GOVERNING LAW .................................................................................... 4

    A.    Rules of Interpretation, Computation of Time, and Governing Law ..................... 4

    B.    Defined Terms ....................................................................... 6

III. TREATMENT OF ADMINISTRATIVE EXPENSES AND TAX CLAIMS ...................... 25

    A.    Introduction .......................................................................... 25

    B.    Administrative Expenses .......................................................... 26

    C.    Tax Claims ........................................................................... 28

IV. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS 29

    A.    Summary ............................................................................. 29

    B.    Classification and Treatment of Claims and Interests .......................... 29

V. ACCEPTANCE OR REJECTION OF PLAN ...................................................... 36

    A.    Identification of Unimpaired Classes ............................................. 36

    B.    Identification of Impaired Classes ................................................ 36

    C.    Classes Permitted and Not Permitted to Vote ................................... 36

    D.    Effect of Non-Voting ............................................................... 37

    E.    Nonconsensual Confirmation ...................................................... 37

    F.    Postpetition Interest ................................................................ 37

VI. MEANS FOR IMPLEMENTATION OF THE PLAN ............................................ 38

    A.    PBGC Settlement .................................................................... 38

    B.    No Substantive Consolidation ..................................................... 38

    C.    Intercompany Settlement Between Revstone and Spara ....................... 38

    D.    Continued Corporate Existence and Vesting of Assets ........................ 39

    E.    Corporate Action .................................................................... 41

    F.    Corporate Governance ............................................................. 42

G.      Chief Restructuring Officer Duties ........................................................ 45

H.      Source of Funding ................................................................................. 47

I.      Retained Rights of Action of the Debtors ............................................. 48

J.      Establishment of Revstone/Spara Litigation Trust and Vesting of Revstone/Spara Litigation Trust Assets ........................................................................... 49

K.      Purpose of Revstone/Spara Litigation Trust ......................................... 51

L.      Funding of Revstone/Spara Litigation Trust .......................................... 52

M.      Revstone/Spara Litigation Trustee ........................................................ 52

N.      Revstone/Spara Litigation Trust Committee ......................................... 59

O.      Interests in Affiliates and Subsidiaries ................................................. 61

P.      Payment of Plan Expenses .................................................................... 61

Q.      Dissolution of Creditors' Committee ..................................................... 62

R.      Final Decree .......................................................................................... 62

VII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............. 62

A.      Rejection of Executory Contracts and Unexpired Leases ..................... 62

B.      Bar Date for Rejection Damages .......................................................... 63

VIII. DISTRIBUTIONS AND RELATED MATTERS ........................................................... 64

A.      Dates of Distribution ............................................................................. 64

B.      Cash Distributions ................................................................................. 65

C.      Rounding of Payments .......................................................................... 65

D.      Disputed Claims .................................................................................... 65

E.      Undeliverable and Unclaimed Distributions ......................................... 66

F.      Compliance with Tax Requirements ...................................................... 67

G.      Record Date in Respect to Distributions ............................................... 67

H.      Reserves ................................................................................................. 67

IX. LITIGATION, OBJECTIONS TO CLAIMS, AND DETERMINATION OF TAXES ........ 68

A.      Litigation; Objections to Claims; Objection Deadline ......................... 68

B.      Temporary or Permanent Resolution of Disputed Claims .................... 69

DOCS_SF:84821.11 73864/001

C.      Setoffs .................................................................................... 70

D.      Preservation of Retained Rights of Action ........................................... 71

X. RELEASES, INJUNCTIONS AND EXCULPATION PROVISIONS ................................. 72

A.      Injunctions ................................................................................. 72

B.      Discharge of the Debtors ................................................................ 73

C.      Exculpation ................................................................................ 73

D.      Debtors' Release of CRO, Independent Managers, Creditors' Committee and
        Other Parties ............................................................................... 75

E.      Release by Creditors ..................................................................... 76

F.      Release by Debtors' Non-Debtor Affiliates of the Restructuring Committee ...... 78

XI. NO REGULATED RATE CHANGE WITHOUT GOVERNMENT APPROVAL .............. 78

XII. EXEMPTION FROM CERTAIN TRANSFER TAXES ..................................................... 78

XIII. RETENTION OF JURISDICTION AND MISCELLANEOUS MATTERS ..................... 79

A.      Retention of Jurisdiction ................................................................ 79

B.      Miscellaneous Matters ................................................................... 82

XIV. CONDITIONS TO EFFECTIVENESS ................................................................. 88

XV. EFFECT OF CONFIRMATION ......................................................................... 89

A.      Binding Effect of Confirmation ........................................................ 89

B.      Good Faith ................................................................................. 89

C.      No Limitations on Effect of Confirmation ............................................ 90

XVI. MODIFICATION OR WITHDRAWAL OF PLAN ......................................................... 90

A.      Modification of Plan ..................................................................... 90

B.      Withdrawal of Plan ....................................................................... 91

XVII. CONFIRMATION REQUEST ......................................................................... 92


EXHIBIT A – PBGC Settlement Agreement

The above-captioned debtors and debtors in possession hereby propose the following *Debtors' Joint Chapter 11 Plan of Reorganization* pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*.  This Plan supersedes all prior chapter 11 plans filed by Revstone Industries, LLC and Spara, LLC in these cases.  Capitalized terms used in this Plan shall have the meanings set forth in Article II hereof.

## I.

## <u>INTRODUCTION</u>

The Plan effectuates a reorganization of the Debtors.  Under the Plan, each of the Debtors will be revested with its respective assets, excluding litigation claims in Revstone's and Spara's cases that will be transferred to a newly-created Revstone/Spara Litigation Trust.  The Plan incorporates the Court-approved settlement between the Debtors and each of their respective debtor and non-debtor subsidiaries, the PBGC, the Creditors' Committee, and BFG, and a separate intercompany settlement among Revstone and Spara and each of their respective debtor and non-debtor subsidiaries.  The Plan does not contemplate a substantive consolidation of the Debtors.  Creditors with Allowed Claims against each of the Debtors will receive distributions on account of such claims out of available assets of each of the Debtors' respective estates, subject to the priorities of the Bankruptcy Code and, to the extent applicable, subject to and in accordance with the terms of the PBGC Settlement Agreement and this Plan.

Aside from the Revstone/Spara Litigation Trust Assets, which include Revstone's and Spara's litigation claims, all assets of each Debtor, including interests in any non-debtor subsidiaries, will be liquidated or retained for the benefit of creditors under the supervision of the

Chief Restructuring Officer, as set forth herein.  The initial Chief Restructuring Officer under the

Plan will be John C. DiDonato, who is also the current Chief Restructuring Officer of the

Debtors.  As to Reorganized Revstone, the Chief Restructuring Officer will be primarily

responsible for certain core tasks as outlined in the Plan and will act under the supervision of the

Reorganized Revstone Board.

Revstone's and Spara's litigation claims will be vested in the Revstone/Spara

Litigation Trust and prosecuted or otherwise liquidated under the supervision of the

Revstone/Spara Litigation Trustee, the Revstone/Spara Litigation Trust Committee and, in

instances described in Article VI.M.5 below and the Revstone/Spara Litigation Trust Agreement,

the Chief Restructuring Officer of Reorganized Spara.  Reorganized Revstone, Reorganized

Spara, and Holders of Allowed PBGC Claims will be the sole beneficiaries of the

Revstone/Spara Litigation Trust.

Under the Plan, except as otherwise set forth in the Plan, all Holders of Allowed

Administrative Expenses, Priority Non-Tax Claims, and Tax Claims against the Debtors will be

paid in full on the Effective Date out of cash on hand (unless otherwise agreed by applicable

claimants consistent with the PBGC Settlement Agreement and, as provided in the Plan, the

applicable Debtor elects to provide payment over time as to Allowed Tax Claims).  Holders of

Miscellaneous Secured Claims, if any, will receive the benefit of their collateral.

After the payment of or reserve for higher priority claims, Holders of Allowed

General Unsecured Claims against each Debtor (other than intercompany claims that are released

pursuant to Article VI.C below) will receive their respective *pro rata* share of available net

2

proceeds of the applicable Debtor's assets consistent with the PBGC Settlement Agreement, including for Holders of Allowed General Unsecured Claims against Revstone and Spara and Holders of Allowed PBGC Claims a share of the proceeds of the Revstone/Spara Litigation Trust as set forth herein.  Pursuant to the PBGC Settlement Agreement:  (1) to the extent that the sub-Class of Holders of Allowed General Unsecured Claims against Revstone votes in favor of the Plan, the sum of $3,000,000 will be set aside from the proceeds of the disposition of non-debtor subsidiaries' assets in order to provide an up-front recovery to the Holders of Allowed General Unsecured Claims against Revstone (excluding BFG); (2) the first $2,000,000 of litigation proceeds realized by the Revstone/Spara Litigation Trust and otherwise allocable to the PBGC will be distributed to Reorganized Revstone and made available to Holders of Allowed General Unsecured Claims against Revstone (excluding BFG) and Holders of Allowed Administrative Expenses against Revstone in accordance with, and subject to the terms of, the PBGC Settlement Agreement; and (3) certain Holders of Professional Fee Claims have agreed to accept reduced recoveries out of available assets in order to allow increased distributions to be made to creditors under the Plan consistent with the PBGC Settlement Agreement.

BFG will share in distributions to Holders of Allowed General Unsecured Claims against Revstone to the extent provided in the PBGC Settlement Agreement.   BFG does not have any General Unsecured Claims against Spara.

Holders of Allowed PBGC Claims will receive the treatment provided by the PBGC Settlement Agreement.

3

All membership interests in the Debtors, and any associated management rights held by interest holders, will be suspended and of no force and effect as of the Effective Date; interest holders against each Debtor will have a contingent interest in any remaining cash (if any) after all allowed claims and administrative expenses have been paid or otherwise satisfied in full by such Debtor (unless otherwise agreed to by the applicable creditor) in accordance with the Plan.

The Disclosure Statement, distributed with this Plan, contains a discussion of the Debtors' history, a summary of the Debtors' assets and liabilities, a summary of what Holders of Claims and Interests will receive under the Plan, a discussion of certain alternatives to the Plan, and a summary of the procedures and voting requirements necessary for Confirmation of the Plan. The Disclosure Statement is intended to provide Holders of Claims and Interests with information sufficient to enable such Holders to vote on the Plan. All Claim Holders entitled to vote on this Plan are encouraged to carefully read the Disclosure Statement and this Plan before voting to accept or reject this Plan. No solicitation materials, other than the Disclosure Statement and related materials transmitted therewith and approved by the Bankruptcy Court, have been authorized for use in soliciting acceptance or rejection of this Plan.

## II.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

**A.** **Rules of Interpretation, Computation of Time, and Governing Law**

For purposes of the Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural,

and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or exhibit Filed, or to be Filed, shall mean such document or exhibit, as it may have been or may be amended, modified or supplemented; (d) unless otherwise specified, all references in the Plan to sections and exhibits are references to sections and exhibits of or to the Plan; (e) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form in the Plan that is not defined in the Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning set forth in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

Except to the extent that the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, and subject to the provisions of the Plan or any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in

5

accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

**B.**    **Defined Terms**

The following definitions shall apply to capitalized terms used in the Plan:

1.      "Administrative Expense" means an unpaid administrative expense of the kind described in sections 503(b) and 507(a)(2) of the Bankruptcy Code against each Debtor, including, without limitation, (i) the actual, necessary costs and expenses of preserving the Estate of each Debtor, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Cases, (ii) compensation and reimbursement of expenses of professionals to the extent allowable under sections 327, 328, 330(a), 331, 503(b) and/or 1103 of the Bankruptcy Code and actually Allowed pursuant to a Final Order of the Bankruptcy Court, and (iii) all fees and charges assessed against each Estate under 28 U.S.C. § 1930, including the fees, if any, due to the United States Trustee.

2.      "Administrative Expense Objection Deadline" has the meaning set forth in Article XIII.B.3 of this Plan.

3.      "Allowed" means with respect to any Claim, Administrative Expense or Interest, except as otherwise provided herein:  (a) a Claim that has been scheduled by each Debtor in its Schedules as other than disputed, contingent or unliquidated which has not been superseded by a filed proof of claim and which scheduled Claim has not been amended; (b) a Claim or Administrative Expense that has been allowed by a Final Order; (c) a Claim that is allowed by each Reorganized Debtor, as the case may be, on or after the Effective Date and, if

6

and to the extent necessary, approved by the Bankruptcy Court; (d) a Claim or Administrative Expense that has been timely filed by the applicable Bar Date for which no objection has been filed by the applicable Objection Deadline or the Administrative Expense Objection Deadline; or (e) a Claim or Administrative Expense that is allowed pursuant to the terms of this Plan.

4.      "Avoidance Claims" means any Rights of Action for the recovery of avoidable transfers arising under chapter 5 of the Bankruptcy Code or applicable federal or state law and the proceeds thereof.

5.      "Ballot" means the form distributed to each Holder of an Impaired Claim entitled to vote on the Plan, on which is to be indicated, among other things, acceptance or rejection of the Plan.

6.      "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended, as set forth in title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as now in effect or hereafter amended.

7.      "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or such other court of competent jurisdiction as may be administering the Chapter 11 Cases or any part thereof.

8.      "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure promulgated pursuant to 28 U.S.C. § 2075, as now in effect or hereinafter amended, together with the Local Rules of the Bankruptcy Court.

9.      "Bar Date" means (i) June 28, 2013, for General Unsecured Claims and those Administrative Expenses covered by the Bar Date Order, (ii) July 8, 2013, for Claims of

Governmental Units; or (iii) such other date as the Bankruptcy Court may set by Order for other Administrative Expenses or any other Claims not covered in the Bar Date Order.

10.     "Bar Date Order" means the order of the Bankruptcy Court at docket number 523 in the Chapter 11 Cases.

11.     "BFG" means Boston Finance Group, LLC, and any successors thereto or assigns thereof.

12.     "Business Day" means any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

13.     "Cash" means currency of the United States of America and cash equivalents, including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire transfers and other similar forms of payment.

14.     "Chapter 11 Cases" means the jointly-administered cases commenced under chapter 11 of the Bankruptcy Code by the Debtors on the applicable Petition Date and pending before the Bankruptcy Court.

15.     "Chief Restructuring Officer" means John C. DiDonato, or any successor thereto appointed pursuant to the Reorganized Debtor Operating Agreement.

16.     "Claim" means any claim against each Debtor within the meaning of section 101(5) of the Bankruptcy Code that is not an Administrative Expense, including, without limitation, claims of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code.

17.     "Claims Agent" means Rust Consulting/Omni Bankruptcy in its capacity as claims agent for the Debtors.

18.     "Class" means each category of Claims or Interests classified in Article IV of the Plan pursuant to section 1122 of the Bankruptcy Code.

19.     "Confirmation" means the approval by the Bankruptcy Court of the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code, as effectuated by the Confirmation Order.

20.     "Confirmation Date" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

21.     "Confirmation Hearing" means the hearing(s) on Confirmation of the Plan, to be held on the date or dates established by the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code, as it may be adjourned or continued from time to time.

22.     "Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code, in form and substance reasonably acceptable to the Debtors.

23.     "Consummation" means substantial consummation of the Plan as that term is used in section 1127(b) of the Bankruptcy Code.

24.     "Creditor" means any Person who is the Holder of a Claim or an Administrative Expense against the Debtors.

25.     "Creditor-Releasor" has the meaning set forth in Article X.E of this Plan.

26.    "Creditors' Committee" means the Official Committee of Unsecured Creditors appointed in Revstone's Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code.

27.    "CRO Core Tasks" has the meaning set forth in Article VI.G of this Plan.

28.    "Debtor Retained Professionals" has the meaning set forth in Article X.C of this Plan.

29.    "Debtors" means Revstone, Spara, Greenwood, and US Tool, either in each entity's capacity as debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code in the Chapter 11 Cases or otherwise from and after the Effective Date.

30.    "Disallowed" means, with respect to a Claim, Interest, Administrative Expense, or portion thereof, that is either a Disputed Claim, or it is determined that the Claim, Interest, Administrative Expense, or portion thereof is not allowed under the Bankruptcy Code by any of a Final Order, the Plan, or a stipulation or settlement with the Debtors, the Reorganized Debtors, or the Revstone/Spara Litigation Trust, as applicable.

31.    "Disclosure Statement" means the *Disclosure Statement in Respect of Debtors' Joint Chapter 11 Plan of Reorganization*, as it may be amended, modified or supplemented from time to time, submitted pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances of the Plan.

32.    "Disputed Claim" means (i) a Claim, Interest or Administrative Expense that is subject to a pending objection filed by the Objection Deadline or the Administrative Expense Objection Deadline, as applicable, or for which the Bankruptcy Court's order allowing

10

or disallowing such Claim, Interest or Administrative Expense is on appeal; (ii) a Claim, on account of which a proof of Claim was filed or which has been otherwise asserted, (a) for which a corresponding Claim has not been listed in the Debtors' Schedules or for which the corresponding Claim is listed in the Debtors' Schedules with a lower amount, with a differing classification, or as disputed, contingent, or unliquidated, and (b) which has not been allowed either by a Final Order, the Plan, or under a stipulation or settlement with the Debtors, the Reorganized Debtors, or the Revstone/Spara Litigation Trust, as applicable; (iii) any contingent or unliquidated Claim; or (iv) a Claim that is not Allowed.

33.    "Distributable Assets" means, except as otherwise noted below, any and all real or personal property of the Debtors of any nature, including, without limitation, any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, work in process, inventory, accounts, chattel paper, Cash (including Cash that may be upstreamed or paid to the Debtors or the Reorganized Debtors by the Debtors' direct and indirect subsidiaries and other corporate affiliates, derived from the sale or other disposition of such entities' assets), deposit accounts, reserves, deposits, contractual rights, intellectual property rights, Claims, Retained Rights of Action, books and records, any other general intangibles of the Debtors, and any and all proceeds of the foregoing, as the case may be, of any nature whatsoever (whether liquidated or unliquidated, matured or unmatured, or fixed or contingent), including, without limitation, property of the Estates within the scope of section 541 of the Bankruptcy Code.  Notwithstanding

11

the foregoing, the term "Distributable Assets" does not include any property that has been abandoned by the Estates pursuant to a Final Order of the Bankruptcy Court.

34.    "Effective Date" means the first Business Day after the Confirmation Date immediately following the first day upon which all of the conditions to the occurrence of the Effective Date as to each Debtor have been satisfied or waived in accordance with the Plan.  The Effective Date need not occur on the same day as to each Debtor.  Each Debtor shall have the right to declare the Effective Date as to such Debtor whenever such Debtor determines that such declaration is appropriate under this Plan.

35.    "Entity" and "Entities" mean an entity as defined in section 101(5) of the Bankruptcy Code or more than one thereof.

36.    "Equity Security" means any equity security as defined in section 101(16) of the Bankruptcy Code in a Debtor.

37.    "Estates" means the estates created pursuant to section 541(a) of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

38.    "Federal Judgment Rate" means the interest rate on federal judgments, in effect for the calendar week of the Petition Date, and is based on the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System.

39.    "Fee Applications" mean applications of Professional Persons under sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Chapter 11 Cases.

40.    "File" or "Filed" means filed of record and entered on the docket in the Chapter 11 Cases or, in the case of a proof of claim, delivered to the Claims Agent.

41.    "Final Order" means a judgment, order, ruling or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal which judgment, order, ruling or other decree has not been reversed, stayed, revoked, modified, supplemented or amended and as to which (a) the time to appeal or petition for review, rehearing or certiorari has expired and as to which no appeal or petition for review, rehearing or certiorari is pending, or (b) any appeal or petition for review, rehearing or certiorari has been finally decided and no further appeal or petition for review, rehearing or certiorari can be taken or granted.

42.    "Final Resolution Date" means the date on which all Disputed Claims of Creditors shall have been resolved by Final Order or otherwise finally determined.

43.    "General Unsecured Claim" means a Claim against any of the Debtors other than (a) an Administrative Expense, (b) a Tax Claim, (c) a Priority Non-Tax Claim, (d) a Miscellaneous Secured Claim, or (e) a PBGC Claim.  For the avoidance of doubt, a General Unsecured Claim includes any intercompany claims asserted against the Debtors by another Debtor or any non-debtor affiliates of the Debtors, which claims are subject to the intercompany settlement set forth in Article VI.C below.  BFG will share in distributions to Holders of Allowed General Unsecured Claims against Revstone to the extent provided in the PBGC Settlement Agreement and this Plan.  BFG does not have any General Unsecured Claims against Spara.

44.     "George Hofmeister Parties" means (i) George S. Hofmeister, (ii) George

S. Hofmeister's immediate and extended family members, (iii) The George S. Hofmeister Family

Trust FBO Megan G. Hofmeister, (iv) The George S. Hofmeister Family Trust FBO Scott R.

Hofmeister, (v) The George S. Hofmeister Family Trust FBO Jamie S. Hofmeister, (vi) The

Megan G. Hofmeister Irrevocable Trust, (vii) The Scott R. Hofmeister Irrevocable Trust, (viii)

The Jamie S. Hofmeister Irrevocable Trust, (ix) Ascalon Enterprises, LLC, and (x) each of the

foregoing party's respective trustees, managers, affiliates, successors, or assigns (other than the

Debtors and their direct and indirect subsidiaries and the Restructuring Committee thereof).

45.     "Governmental Unit" has the meaning set forth in section 101(27) of the

Bankruptcy Code.

46.     "Greenwood" means Greenwood Forgings, LLC, either in its capacity as

debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code in the Chapter 11

Cases or otherwise from and after the Effective Date.

47.     "Holder" means the beneficial owner of any Claim, Interest, or

Administrative Expense.

48.     "Huron" means Huron Consulting Services LLC.

49.     "Huron Parties" means those employees and other personnel of Huron,

who have been or may be provided by Huron prior to the Effective Date to provide services and

support to the Debtors, including, without limitation, John C. DiDonato in his capacity as Chief

Restructuring Officer of the Debtors, Laura A. Marcero in her capacity as Deputy Chief

Restructuring Officer, James M. Lukenda in his capacity as Deputy Chief Restructuring Officer,

14

Brian M. Linscott in his capacity as Interim Chief Financial Officer, Geoffrey S. Frankel in his capacity as Vice President, John M. Owens in his capacity as Interim Treasurer, and John A. Hemingway in his capacity as Interim Assistant Treasurer.

50.     "Independent Managers" has the meaning set forth in Article X.B of this Plan.

51.     "Impaired" has the meaning set forth in section 1124 of the Bankruptcy Code.

52.     "Interest" means (i) any Equity Security, including all membership interests, shares or similar securities, whether or not transferable or denominated "stock" and whether issued, unissued, authorized or outstanding; (ii) any warrant, option, or contractual right to purchase, sell, subscribe or acquire such Equity Securities at any time and all rights arising with respect thereto; and (iii) any similar interest in the Debtors.

53.     "IRS" means the Internal Revenue Service.

54.     "Lien" means any charge against or interest in property to secure payment or performance of a Claim, debt, or obligation.

55.     "Miscellaneous Secured Claim" means any Secured Claim.

56.     "Net Distributable Assets" means the Distributable Assets of each of the Debtors from and after the Effective Date, including as to Revstone and Spara, the Revstone/Spara Litigation Trust Interests consistent with the terms of the PBGC Settlement Agreement, once all such assets have been reduced to Cash, net of amounts necessary to fund the payment of Allowed Administrative Expenses (except as otherwise agreed by the Holders of

15

Allowed Administrative Expenses or provided by the PBGC Settlement Agreement), Tax

Claims, Priority Non-Tax Claims, Miscellaneous Secured Claims, and Plan Expenses of each

Debtor and the Revstone/Spara Litigation Trust, as applicable, and/or reserves established for

any of the foregoing, and excluding those Distributable Assets of the Debtors that are subject to

any Liens until such time that such Liens are satisfied in full.  Pursuant to and subject to the

limitations of the PBGC Settlement Agreement and the intercompany settlement embodied

herein, the Net Distributable Assets of Revstone shall include (a) twenty-five percent (25%) of

the first $2,000,000 of litigation proceeds realized by the Revstone/Spara Litigation Trust and

otherwise allocable to Holders of the PBGC Claims; and (b) twenty-five percent (25%) of the

remaining litigation proceeds available to Revstone under the PBGC Settlement Agreement.  The

remaining seventy-five (75%) of each of the foregoing categories of litigation proceeds shall be

allocated to the payment of Allowed Administrative Expenses, until paid in full, in accordance

with the terms of the PBGC Settlement Agreement.

57.    "Non-Professional Administrative Expense Account" has the meaning set

forth in Article III.B of this Plan.

58.    "Objection Deadline" means the deadline to object to Claims and/or

Interests specified in Article IX.A of the Plan, as may be extended pursuant thereto.

59.    "PBGC" means the Pension Benefit Guaranty Corporation, and any

successors thereto or assigns thereof.

60.    "PBGC Claims" means any Claim asserted by PBGC against any of the

Debtors in accordance with the terms of the PBGC Settlement Agreement.  The PBGC Claims

16

consist of non-priority, unsecured claims in the amount of $95 million against each of the

Debtors, which shall be treated in accordance with the terms of the PBGC Settlement

Agreement, plus to the extent that the PBGC Minimum Recovery (as defined in the PBGC

Settlement Agreement) is not reached, joint and several claims against the Revstone and Spara

Estates for any deficiency, all in accordance with the terms of the PBGC Settlement Agreement.

61.    "PBGC Funding Schedule" means that certain *Modified Funding Schedule*

attached as Exhibit B to the PBGC Modification Agreement, subject to upward or downward

adjustment based on actual sale results consistent with the PBGC Settlement Agreement.

62.    "PBGC Modification Agreement" means that certain *Modification of*

*PBGC Settlement Agreement and Global Resolution of Disputes* dated as of May 1, 2014,

between the Debtors, the PBGC, the Creditors' Committee, and BFG.

63.    "PBGC Settlement Agreement" means that certain *Settlement Agreement*

dated as of February 11, 2014, between the Debtors, certain subsidiaries of Revstone and Spara,

and the PBGC, as modified by the PBGC Modification Agreement, including the PBGC Funding

Schedule, which was approved by the Bankruptcy Court pursuant to the PBGC Settlement Order.

The PBGC Settlement Agreement is attached as **Exhibit A** to this Plan.

64.    "PBGC Settlement Order" means the order of the Bankruptcy Court dated

May 9, 2014 at docket number 1494, approving the PBGC Settlement Agreement.

65.    "Person" means an individual, partnership, corporation, limited liability

company, business trust, joint stock company, trust, unincorporated association, joint venture,

governmental authority, governmental unit or other entity of whatever nature.

17

66.    "Petition Date" means the date on which each Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code.

67.    "Plan" means this *Debtors' Joint Chapter 11 Plan of Reorganization*, as it may be further amended or modified from time to time.

68.    "Plan Expenses" means the expenses incurred or payable by each Reorganized Debtor or the Revstone/Spara Litigation Trust, as applicable, following the Effective Date (including the reasonable fees and costs of attorneys and other professionals) relating to implementation of the Plan, which as to Reorganized Revstone shall be set forth in a budget filed as part of the Plan Supplement, as such budget may be amended by the Chief Restructuring Officer following the Effective Date subject to the approval of the Reorganized Revstone Board, for the purpose of (i) monetizing any assets of the Debtors; (ii) prosecuting the Retained Rights of Action, (iii) resolving Claims and effectuating distributions to Creditors under the Plan, (iv) otherwise implementing the Plan and closing the Chapter 11 Cases, or (v) undertaking any other matter relating to the Plan.  Subject to the terms of the PBGC Settlement Agreement, reserves for Plan Expenses shall initially total, to the extent of available Cash, $750,000 for Reorganized Revstone (excluding litigation expenses), $500,000 for Reorganized Spara (excluding litigation expenses), and up to $1,000,000 for the Revstone/Spara Litigation Trust, with any excess initial reserves  at Revstone or Spara (after payment of all Plan Expenses at Revstone or Spara, respectively) to be contributed to the Revstone/Spara Litigation Trust. Additional reserves for Plan Expenses as to each Debtor may be created out of the assets of such Debtor otherwise available for the payment of Allowed General Unsecured Claims in the

18

discretion of the Chief Restructuring Officer, upon approval of the Reorganized Revstone Board as to Reorganized Revstone. Additional reserves for Plan Expenses as to the Revstone/Spara Litigation Trust may be created out of the Revstone/Spara Litigation Trust Assets otherwise available for distribution to Holders of Allowed General Unsecured Claims (through Reorganized Revstone and Reorganized Spara) and Holders of Allowed PBGC Claims in the discretion of the Revstone/Spara Litigation Trustee, upon approval of the Revstone/Spara Litigation Trust Committee, the Chief Restructuring Officer of Reorganized Spara, and the PBGC.

69.    "Plan Supplement" means the supplement to the Plan to be Filed by the Debtors with the Bankruptcy Court, which supplement shall contain forms of certain substantially final documents required for the implementation of the Plan, no later than ten (10) days prior to the Confirmation Hearing.

70.    "Priority Non-Tax Claim" means any Claim, other than a Tax Claim, to the extent entitled to priority under section 507(a) of the Bankruptcy Code.

71.    "Pro Rata" means proportionately, so that with respect to any distribution, the ratio of (a) (i) the amount of property to be distributed on account of a particular Claim or particular group of Claims to (ii) the amount of such particular Claim or group of Claims, is the same as the ratio of (b) (i) the amount of property to be distributed on account of all Claims or groups of Claims sharing in such distribution to (ii) the amount of all Claims or groups of Claims sharing in such distribution.

72.     "Professional Fee Account" has the meaning set forth in Article XIII.B.2 of this Plan.

73.     "Professional Fee Claim" shall mean an Administrative Expense of a Professional Person for compensation for services rendered and reimbursement of costs, expenses or other charges incurred on or after the Petition Date and on or before the Effective Date.

74.     "Professional Person" shall mean Persons retained or to be compensated pursuant to sections 326, 327, 328, 330, 503(b), and/or 1103 of the Bankruptcy Code.

75.     "Record Date" means the Effective Date.

76.     "Released Parties" has the meaning set forth in Article X.D of this Plan.

77.     "Releasor Affiliates" has the meaning set forth in Article X.F of this Plan.

78.     "Released Estate Parties" has the meaning set forth in Article X.E of this Plan.

79.     "Relevant Books and Records" means those books and records of Revstone and Spara with information concerning Revstone's and Spara's Retained Rights of Action and any rights of setoff associated therewith.

80.     "Reorganized Revstone Board" means Reorganized Revstone's board of managers, as defined in Article VI.F of the Plan.

81.     "Reorganized Debtors" means the Debtors on and after the Effective Date.

82.    "Reorganized Debtor Operating Agreements" means each Debtor's operating agreement, as it is amended and restated upon the Effective Date in accordance with this Plan.

83.    "Restructuring Committee" means the Restructuring Committee of the Board of Managers of Revstone and Spara, currently comprised of James B. Shein and Richard E. Newsted, who are the two independent managers of each such Debtor's Board of Managers.

84.    "Retained Rights of Action" means all Rights of Action belonging to each Debtor as of the Effective Date, including, without limitation, Avoidance Claims (including those disclosed in the Schedules), but excluding those Rights of Action specifically released under the Plan or subject to the exculpation provisions of the Plan.  The Retained Rights of Action include, without limitation, any and all rights of the Debtors to pursue any Rights of Action against third parties disclosed or referenced in the Schedules and/or listed in the Plan Supplement, subject to the provisions of the PBGC Settlement Agreement and excluding those Rights of Action specifically released under the Plan or subject to the exculpation provisions of the Plan, including, for the avoidance of doubt, those Rights of Action released or exculpated, as applicable, pursuant to Article X hereof.

85.    "Revstone" means Revstone Industries, LLC, either in its capacity as debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code in the Chapter 11 Cases or otherwise from and after the Effective Date.

86.    "Revstone/Spara Litigation Trust" means the litigation trust or trusts that may be created under this Plan solely for the benefit of Reorganized Revstone, Reorganized

21

Spara, and Holders of Allowed PBGC Claims, and governed by the Revstone/Spara Litigation Trust Agreement.

87.    "Revstone/Spara Litigation Trust Agreement" means the litigation trust agreement or agreements governing the Revstone/Spara Litigation Trust that shall be filed as part of the Plan Supplement.

88.    "Revstone/Spara Litigation Trust Assets" means the assets held by the Revstone/Spara Litigation Trust, which as of the Effective Date shall be composed of Revstone's and Spara's Retained Rights of Action (except as noted below), the Relevant Books and Records, and Cash reserves for Plan Expenses of the Revstone/Spara Litigation Trust, as set forth in the definition of "Plan Expenses" above and subject to the provisions of the PBGC Settlement Agreement.  Notwithstanding anything to the contrary herein, the Revstone/Spara Litigation Trust Assets shall not include:  (a) any Claim or cause of action exculpated or released pursuant to Article X hereof; or (b) unless otherwise agreed by Reorganized Revstone or Reorganized Spara, (i) the right to object to any Administrative Expenses, Tax Claims, Priority Non-Tax Claims, or Miscellaneous Secured Claims asserted against Revstone, or (ii) the right to object to any Claims asserted against Spara.

89.    "Revstone/Spara Litigation Trust Committee" means the Persons selected to fill the role of the supervisory committee of the Revstone/Spara Litigation Trust in accordance with the PBGC Settlement Agreement, the Revstone/Spara Litigation Trust Agreement, and this Plan.

90.    "Revstone/Spara Litigation Trustee" means the Person selected to fill the

role of trustee of the Revstone/Spara Litigation Trust in accordance with the PBGC Settlement

Agreement, the Revstone/Spara Litigation Trust Agreement, and this Plan.

91.    "Revstone/Spara Litigation Trust Interests" means the beneficial interests

in the Revstone/Spara Litigation Trust and the Revstone/Spara Litigation Trust Assets, subject to

the terms of the Revstone/Spara Litigation Trust Agreement.  The Revstone/Spara Litigation

Trust Interests shall be uncertificated and non-transferable, except by operation of law.

92.    "Rights of Action" means any and all affirmative claims, demands, rights,

actions, causes of action (including, without limitation, Avoidance Claims), and suits of any kind

or character whatsoever, known or unknown, suspected or unsuspected, whether arising prior to,

on or after the Petition Date, in contract or in tort, at law or in equity, or under any other theory

of law, held by any Debtor against any other Person, and any proceeds thereof, including but not

limited to:  (a) rights of setoff, counterclaim or recoupment relating to the foregoing affirmative

claims; (b) rights to object to Claims or Interests relating to the foregoing affirmative claims; (c)

any defenses or counterclaims relating to or arising out of the foregoing affirmative claims; (d)

all claims or rights under Bankruptcy Code sections 542, 543, 544, 547, 548, 549, 550, 551, 552,

and 553, all fraudulent-conveyance and fraudulent-transfer laws, all non-bankruptcy laws vesting

in creditors' rights to avoid, rescind, or recover on account of transfers, all preference laws, the

Uniform Fraudulent Transfer Act (as it may have been codified in any particular jurisdiction),

the Uniform Fraudulent Conveyance Act (as it may have been codified in any particular

jurisdiction), and all similar laws and statutes; and (e) any other claims which may be asserted

23

against affiliates or insiders of the Debtors that are not otherwise released under this Plan or subject to the exculpation provisions of this Plan.

93.    "Schedules" means the schedules of assets and liabilities and statement of financial affairs filed by each Debtor with the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been or may be amended from time to time.

94.    "Secured Claim" means any Claim of any Person (i) that is secured by a Lien on property in which the Debtors or their Estates have an interest, which Lien is valid, perfected and enforceable and not subject to avoidance under applicable law or by reason of a Final Order but only to the extent of the value, as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code, of any interest of the claimant in the property of the Estates securing such Claim or (ii) to the extent that such Person has a valid right of setoff under section 553 of the Bankruptcy Code.

95.    "Spara" means Spara, LLC, either in its capacity as debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code in the Chapter 11 Cases or otherwise from and after the Effective Date.

96.    "Tax" means any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any interest or additions attributable to, imposed on or with respect to such assessments.

97.    "Tax Claim" means any Claim for any Tax to the extent that it is entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

98.    "Timely Filed" means, with respect to a Claim, Interest, or Administrative Expense, that a proof of such Claim or Interest or request for payment of such Administrative Expense was filed with the Bankruptcy Court or the Claims Agent, as applicable, within such applicable period of time fixed by the Plan, statute, or pursuant to both Bankruptcy Rule 3003(c)(3) and a Final Order (including the Bar Date Order), or has otherwise been deemed timely filed by a Final Order of the Bankruptcy Court.

99.    "Unclaimed Property" means all Cash deemed to be "Unclaimed Property" pursuant to Article VIII.E of the Plan.

100.    "Unimpaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

101.    "US Tool" means US Tool & Engineering, LLC, either in its capacity as debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code in the Chapter 11 Cases or otherwise from and after the Effective Date.

## III.

## TREATMENT OF ADMINISTRATIVE EXPENSES AND TAX CLAIMS

**A.    Introduction**

As required by the Bankruptcy Code, Administrative Expenses and Tax Claims are not placed into voting Classes.  Instead, they are left unclassified, are not considered

25

Impaired, do not vote on the Plan, and receive treatment specified by statute or agreement of the parties.  All postpetition payments by or on behalf of the Debtors in respect of an Administrative Expense or Tax Claim shall either reduce the Allowed amount thereof or reduce the amount to be paid under the Plan in respect of any Allowed amount thereof; provided that the method of application that is most beneficial to the Debtors' Estates shall be employed.

**B.**     **Administrative Expenses**

Under the Plan, on or as soon as practicable after the Effective Date (to the extent payable on the Effective Date), each Holder of an Allowed Administrative Expense against the Debtors shall receive, in full satisfaction, settlement, release, and extinguishment of such Allowed Administrative Expense, Cash from the applicable Reorganized Debtor equal to the full amount of such Allowed Administrative Expense, unless such Holder and the applicable Reorganized Debtor have mutually agreed in writing to other terms, or an order of the Bankruptcy Court provides for other terms; provided, however, that, unless otherwise agreed by the applicable Reorganized Debtor, (a) requests for payment of all Administrative Expenses must be Filed and served as described in Article XIII.B.3 of the Plan, and (b) certain different and additional requirements shall apply to the Administrative Expenses of Professional Persons as set forth in Article XIII.B.2 and 3 of the Plan; provided further, however, that no interest or penalties of any nature shall be paid in respect of an Allowed Administrative Expense.

As of the Effective Date, each Reorganized Debtor shall maintain a segregated reserve Cash account (the "Non-Professional Administrative Expense Account") for the purpose of funding future payments on account of asserted, accrued, and estimated Administrative

26

Expenses that have not yet been Allowed or are otherwise not yet payable as of the Effective

Date, to the extent such Administrative Expenses later become Allowed or otherwise payable, in

an aggregate amount to be determined by each Debtor in its business judgment, after

consultation with the Creditors' Committee.  A separate reserve account for the payment of

Professional Fee Claims shall be established by the Debtors as provided in Article XIII.B.2

below.

Notwithstanding anything to the contrary herein, pursuant to the PBGC

Settlement Agreement, BFG has an Allowed Administrative Expense against Revstone in the

amount of $700,000 and an Allowed Administrative Expense against Spara in the amount of

$500,000, which Allowed Administrative Expenses shall be paid upon the respective Effective

Date for each such Debtor.

In conjunction with the PBGC Settlement Agreement, certain Holders of

Professional Fee Claims against Revstone and/or Spara have agreed to accept reduced recoveries

out of available assets of each such Debtor in order to allow increased distributions to be made to

Holders of Allowed General Unsecured Claims against Revstone and/or Spara in accordance

with the PBGC Settlement Agreement.

Notwithstanding any of the foregoing, if an Administrative Expense represents an

obligation incurred in the ordinary course of business, such Administrative Expense will be paid

in the ordinary course by the applicable Reorganized Debtor in accordance with the terms of the

particular transaction and/or applicable agreement.

### C.    Tax Claims

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Tax Claims are not to be classified and thus Holders of Tax Claims are not entitled to vote to accept or reject the Plan.

As required by section 1129(a)(9) of the Bankruptcy Code, on or as soon as practicable after the Effective Date, each Holder of an Allowed Tax Claim against the Debtors shall receive, in full satisfaction, settlement, release, and extinguishment of such Allowed Tax Claim, Cash from the applicable Reorganized Debtor equal to the portion of the Allowed Tax Claim due and payable on or prior to the Effective Date according to applicable non-bankruptcy law; provided, however, each Debtor may in its discretion elect to make, pursuant to section 1129(a)(9)(C), regular quarterly installment payments in Cash of a total value, as of the Effective Date, equal to the amount of the Allowed Tax Claim over a period ending not later than five years after the Petition Date together with interest for the period after the Effective Date at the rate determined under non-bankruptcy law as of the calendar month in which the Plan is confirmed, subject at the sole option of the applicable Reorganized Debtor to prepay the entire amount of the Allowed Tax Claim.  Any Allowed Tax Claim (or portion thereof) against the Debtors not yet due and payable as of the Effective Date will be paid by the applicable Reorganized Debtor no later than when due and payable under applicable non-bankruptcy law without regard to the commencement of the Chapter 11 Case; provided that upon request of the applicable Reorganized Debtor, the Bankruptcy Court shall determine the amount of any Disputed Claim for, or issues pertaining to, a Tax.  Any Holder of a Tax Claim may agree to

accept different treatment as to which the applicable Reorganized Debtor and such Holder have agreed upon in writing.

**IV.**

## CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**A.**    **Summary**

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes only to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for the classification of Claims and/or Interests as set forth below.  Administrative Expenses and Tax Claims have not been classified and are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code.

**B.**    **Classification and Treatment of Claims and Interests**

The treatment of each Class of Claims and/or Interests is set forth below.  Each Class of Claims against each particular Debtor shall be treated as a sub-Class for all purposes

29

under this Plan.  Unless the Bankruptcy Court has specified otherwise prior to Confirmation, the

Debtors shall determine whether a postpetition payment by or on behalf of the Estates in respect

of a Claim either (x) shall reduce the Allowed amount thereof or (y) shall reduce the amount to

be paid under the Plan in respect of any Allowed amount thereof by considering which method is

most advantageous to the Debtors' Estates.

1.    **Class 1 – Priority Non-Tax Claims**

a.    Classification:  Class 1 consists of all Priority Non-Tax Claims

against the Debtors.

b.    Treatment:  At the election of the applicable Reorganized Debtor,

the Holder of each Priority Non-Tax Claim against each Debtor shall receive, in full satisfaction,

settlement, release, and extinguishment of such Priority Non-Tax Claim, on or as soon as

practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy

Court enters a Final Order determining or allowing such Claim, (a) a Cash payment from the

applicable Reorganized Debtor equal to the Allowed amount of such Claim, or (b) such other

treatment as otherwise agreed by the Holder of such Claim and the applicable Debtor or

Reorganized Debtor.

c.    Impairment/Voting:  Class 1 is Unimpaired.  Class 1 therefore is

conclusively presumed to have accepted the Plan and Holders of Claims in Class 1 are not

entitled to vote to accept or reject the Plan.

2.      **Class 2 – Miscellaneous Secured Claims**

a.      Classification:  Class 2 consists of all Miscellaneous Secured

Claims (if any such Claims exist) against the Debtors.  Although all Miscellaneous Secured

Claims have been placed in one Class for the purposes of nomenclature, each Miscellaneous

Secured Claim, to the extent secured by a Lien on any property or interest in property of the

Debtors different from that securing any other Miscellaneous Secured Claim, shall be treated as

being in a separate sub-Class for the purpose of receiving distributions under the Plan

b.      Treatment:  Except to the extent that a holder of an Allowed

Miscellaneous Secured Claim has been paid by the Debtors, in whole or in part, prior to the

Effective Date, on the Effective Date, at the option of the applicable Reorganized Debtor, (i)

each Allowed Miscellaneous Secured Claim shall be reinstated and Unimpaired in accordance

with section 1124 of the Bankruptcy Code or (ii) each Holder of an Allowed Miscellaneous

Secured Claim shall receive, in full satisfaction, settlement, release and discharge of, and in

exchange for, such Miscellaneous Secured Claim, (x) payment in full in Cash of the unpaid

portion of such Allowed Miscellaneous Secured Claim, (y) surrender of the collateral securing

such Claim or (z) such other treatment as may be agreed to by the Holder of such Claim and the

applicable Debtor or Reorganized Debtor.  Prior to the Confirmation Hearing, the Debtor shall

inform each Holder of a Miscellaneous Secured Claim if such Creditor's Secured Claim shall be

treated as Unimpaired under the Plan.

31

c.      <u>Impairment/Voting</u>:  Class 2 is Unimpaired.  Class 2 therefore is

conclusively presumed to have accepted the Plan and Holders of Claims in Class 2 are not

entitled to vote to accept or reject the Plan.

**3.      <u>Class 3 – General Unsecured Claims</u>**

a.      <u>Classification</u>:  Class 3 consists of all General Unsecured Claims.

b.      <u>Treatment</u>:  On or as soon as practicable after the Effective Date,

each Holder of an Allowed General Unsecured Claim against a Debtor shall receive, as the sole

distribution or dividend by the applicable Reorganized Debtor or its Estate under this Plan on

account of such Allowed General Unsecured Claim, a Pro Rata share of:  (i) the Net

Distributable Assets of the applicable Debtor (calculated as a percentage of all Allowed General

Unsecured Claims against such Debtor, except as provided in the PBGC Settlement Agreement);

and (ii) as to Revstone, to the extent that the sub-Class of Holders of Allowed General

Unsecured Claims against Revstone votes in favor of the Plan, the sum of $3,000,000 which will

be set aside from the proceeds of the disposition of non-debtor subsidiaries' assets otherwise

available to the Holders of the PBGC Claims in order to provide an up-front recovery to the

Holders of Allowed General Unsecured Claims against Revstone (excluding BFG).

Additionally, pursuant to and subject to the limitations of the PBGC

Settlement Agreement and the intercompany settlement embodied herein, the Net Distributable

Assets of Revstone shall include (i) twenty-five percent (25%) of the first $2,000,000 of

litigation proceeds realized by the Revstone/Spara Litigation Trust and otherwise allocable to

Holders of the PBGC Claims; and (ii) twenty-five percent (25%) of the remaining litigation

proceeds available to Revstone under the PBGC Settlement Agreement.  For the avoidance of doubt, the Net Distributable Assets of each Debtor are subject to any limitations otherwise imposed under the PBGC Settlement Agreement.  BFG shall not share in the distributions to Holders of Allowed General Unsecured Claims against Revstone out of the first $2,000,000 of litigation proceeds referenced in item (i) of the preceding sentence.  Thereafter, and with respect to any other Net Distributable Assets made available to Holders of Allowed General Unsecured Claims against Revstone (except for the sum of $3,000,000 set aside from the proceeds of the disposition of non-debtor subsidiaries' assets referenced in item (ii) of the preceding paragraph), BFG shall share in distributions to Holders of Allowed General Unsecured Claims against Revstone as follows:  10% for BFG if Allowed General Unsecured Claims against Revstone (including BFG) exceed $50,000,000, 15% for BFG if Allowed General Unsecured Claims against Revstone (including BFG) exceed $35,000,000 but are less than or equal to $50,000,000, and 20% for BFG if Allowed General Unsecured Claims against Revstone (including BFG) are $35,000,000 or less.

Aggregate distributions to each Holder of an Allowed General Unsecured Claim shall not exceed the full Allowed amount of such General Unsecured Claim.  Holders of Allowed General Unsecured Claims will not be entitled to the payment of postpetition interest under the Plan, unless excess Net Distributable Assets remain after all Allowed Claims and Administrative Expenses have been paid or otherwise satisfied in full (unless otherwise agreed to by the applicable Creditor) in accordance with the Plan.  In such case of excess Net Distributable Assets, then Holders of Allowed General Unsecured Claims shall receive on a Pro Rata basis

33

(calculated as a percentage of all Allowed General Unsecured Claims and all Allowed PBGC Claims) postpetition interest at the Federal Judgment Rate, to the extent that sufficient excess Net Distributable Assets (once all liquidated to Cash) exist and as required under the Bankruptcy Code

   c. <u>Impairment/Voting</u>:  Class 3 is Impaired.  Holders of Claims in Class 3 are therefore entitled to vote to accept or reject the Plan.

   **4.** **<u>Class 4 – PBGC Claims</u>**

   a. <u>Classification</u>:  Class 4 consists of all PBGC Claims against the Debtors.

   b. <u>Treatment</u>:  On or as soon as practicable after the Effective Date, each Holder of an Allowed PBGC Claim shall receive the treatment provided by the PBGC Settlement Agreement, including a share of the Revstone/Spara Litigation Trust Interests as provided by the PBGC Settlement Agreement.  Holders of Allowed PBGC Claims against Revstone and Spara shall not receive any distributions out of the Net Distributable Assets of such Estates except to the extent that the PBGC Minimum Recovery (as defined in the PBGC Settlement Agreement) is not reached, in which case Holders of the PBGC Claims shall receive from the Revstone and/or Spara Hold Back/Escrows (as set forth in the PBGC Funding Schedule), or as necessary, Reorganized Revstone or Reorganized Spara, funds sufficient  to provide the Holders of the Allowed PBGC Claims with the PBGC Minimum Recovery in accordance with the terms of the PBGC Settlement Agreement.  Further, pursuant to the PBGC Settlement Agreement:  (i) the first $2,000,000 of litigation proceeds realized by the

Revstone/Spara Litigation Trust and otherwise allocable to Holders of the PBGC Claims shall be

distributed to Reorganized Revstone and made available to Holders of Allowed General

Unsecured Claims against Revstone (excluding BFG) and Holders of Allowed Administrative

Expenses against Revstone in accordance with, and subject to the terms of, the PBGC Settlement

Agreement; and (ii) as noted above with respect to Class 3, to the extent that the sub-Class of

Holders of Allowed General Unsecured Claims against Revstone votes in favor of the Plan, the

sum of $3,000,000 will be set aside from the proceeds of the disposition of non-debtor

subsidiaries' assets otherwise available to the Holders of the PBGC Claims in order to provide an

up-front recovery to the Holders of Allowed General Unsecured Claims against Revstone

(excluding BFG).

       c.     <u>Impairment/Voting</u>:  Class 4 is Impaired.  Holders of Claims in

Class 4 are therefore entitled to vote to accept or reject the Plan.

     **5.**     **<u>Class 5 – Interests in the Debtors</u>**

       a.     <u>Classification</u>:  Class 5 consists of all Interests in the Debtors.

       b.     <u>Treatment</u>:  The Holders of Interests shall receive no distributions

under the Plan, and on the Effective Date, all Interests shall be deemed suspended.  As of the

Effective Date, the Holders of Interests shall receive a contingent interest in the Net Distributable

Assets remaining, if any, after all Allowed Claims and Administrative Expenses have been paid

or otherwise satisfied in full (unless otherwise agreed to by the applicable Creditor) in

accordance with the Plan.  For the avoidance of doubt, no distribution of Net Distributable

Assets (once all liquidated to Cash) shall be made to Holders of Interests against any Debtor until

and unless all Holders of Allowed General Unsecured Claims against such Debtor receive

payment in full of such Allowed Claims, plus all accrued postpetition interest at the Federal

Judgment Rate.

        c.    <u>Impairment/Voting</u>:  Class 5 is Impaired.  Holders of Interests in

Class 5 are deemed to reject the Plan.

**V.**

**<u>ACCEPTANCE OR REJECTION OF PLAN</u>**

**A.**    **<u>Identification of Unimpaired Classes</u>**

       The following Classes are Unimpaired under the Plan.

       Class 1 – Priority Non-Tax Claims

       Class 2 – Miscellaneous Secured Claims

**B.**    **<u>Identification of Impaired Classes</u>**

       The following Classes of Claims and Interests are Impaired under the Plan.

       Class 3 – General Unsecured Claims

       Class 4 – PBGC Claims

       Class 5 – Interests in the Debtors

**C.**    **<u>Classes Permitted and Not Permitted to Vote</u>**

       Classes 1 and 2 are Unimpaired.  Holders of Claims in such Classes are

conclusively presumed pursuant to section 1126(f) of the Bankruptcy Code to have accepted the

Plan and therefore shall not be entitled to vote to accept or reject the Plan.  Classes 3 through 5

are Impaired.  Holders of Claims in Classes 3 and 4 are permitted to vote to accept or reject the

36

Plan.  Holders of Interests in Class 5 are deemed to reject the Plan.  The Debtors reserve all rights with respect to the allowance of any Claims, except as otherwise expressly provided by the PBGC Settlement Agreement or this Plan.

An Impaired Class of Claims that votes shall have accepted the Plan if (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

**D.      Effect of Non-Voting**

If no Holder of a Claim eligible to vote in a particular Class timely votes to accept or reject the Plan, the Debtors may seek to have the Plan deemed **accepted** by the Holders of such Claims in such Class for purposes of section 1129(b) of the Bankruptcy Code.

**E.      Nonconsensual Confirmation**

In the event any Class of Claims votes to reject the Plan and given the deemed rejection of the Plan by the Holders of Interests, the Debtors request that the Bankruptcy Court confirm the Plan notwithstanding such rejection pursuant to section 1129(b) of the Bankruptcy Code on the basis that the Plan is fair and equitable and does not discriminate unfairly as to the Holders of any Class of Claims or Interests.

**F.      Postpetition Interest**

Nothing in the Plan or the Disclosure Statement shall be deemed to entitle the Holder of a Claim to receive postpetition interest on account of such Claim, except to the extent that the Plan expressly provides for postpetition interest on account of such Claim.

# VI.

## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.**     **PBGC Settlement**

The provisions of the Plan incorporate the terms of the PBGC Settlement Agreement and the PBGC Settlement Order pursuant to section 1123(b)(3)(A) of the Bankruptcy Code.  From and after the Effective Date, each and every provision of the PBGC Settlement Agreement shall be binding on each of the Reorganized Debtors, as applicable.

**B.**     **No Substantive Consolidation**

Nothing in the Plan is intended to substantively consolidate, nor shall have the effect of substantively consolidating, the Debtors or their Estates, and each Reorganized Debtor shall maintain its separate corporate existence from and after the Effective Date.

**C.**     **Intercompany Settlement Between Revstone and Spara**

Upon the Effective Date, pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, each of the Reorganized Debtors and their respective successors and assigns hereby agree that:  (a) Reorganized Revstone shall have an Allowed General Unsecured Claim against Spara and its Estate in the amount of $10 million, which Claim shall participate in distributions at Spara on a Pro Rata basis with other Holders of Allowed General Unsecured Claims against Spara, and (b) each of the Reorganized Debtors, on behalf of themselves and their non-debtor subsidiaries, hereby waive and release any and all other Claims or Rights of Action held by such Reorganized Debtor or subsidiary against any of the Debtors, their respective subsidiaries, or their respective successors; provided, however, that, subject to

38

Article X hereof, nothing herein shall be deemed a waiver or release of: (i) any rights of each

Reorganized Debtor as a direct or indirect equity holder of a subsidiary; (ii) Revstone's claims

against TPOP, LLC f/k/a Metavation, LLC, all of which such claims are preserved; (iii)

Revstone's claims against its Debtor and non-debtor subsidiaries for payment of any

restructuring or management fees; (iv) amounts otherwise payable to Revstone and/or Spara

pursuant to the PBGC Settlement Agreement; (v) any claim of cause of action against any of the

George Hofmeister Parties; or (vi) any claim or cause of action against MPI Products LLC,

Monomoy Capital Partners, Monomoy Capital Partners II, LP, or any of their respective affiliates

or successors.

### D.    <u>Continued Corporate Existence and Vesting of Assets</u>

On and after the Effective Date, subject to the requirements of the Plan, each

Reorganized Debtor will continue to exist as a separate limited liability company and shall retain

all of the powers of limited liability companies under applicable non-bankruptcy law, as

modified by this Plan, and without prejudice to any right to amend its operating agreement,

dissolve, merge or convert into another form of business entity, or to alter or terminate its

existence to the extent consistent with the Plan. The existing membership interests of the

Debtors shall be deemed to be held by the Chief Restructuring Officer, and the Chief

Restructuring Officer shall be deemed to have been admitted as the sole member of the

Reorganized Debtors under applicable nonbankruptcy law and shall be authorized to exercise all

of the rights and powers of a sole member as provided by the Plan, subject to the oversight of the

Reorganized Revstone Board as to Reorganized Revstone.

Except as otherwise provided in the Plan and excluding the Revstone/Spara Litigation Trust Assets, on and after the Effective Date, all Distributable Assets and property of each Debtor and its Estate, including any interests in subsidiaries of each Debtor and as to Revstone and Spara, the Revstone/Spara Litigation Trust Interests, will vest in each Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances and Interests, except as provided by the PBGC Settlement Agreement.  None of the occurrence of the Effective Date, the effectiveness of this Plan, nor any provision of applicable non-bankruptcy law shall cause a dissolution of any Debtor, each of which such Debtor shall be continued as limited liability companies following the Effective Date.

On and after the Effective Date, subject to the requirements of the Plan and except as otherwise provided in this Plan, each Reorganized Debtor shall be permitted to conduct its business, reconcile Claims, use and dispose of assets, prosecute litigation, and otherwise take any and all actions reasonably necessary to implement the Plan without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules.  Each Reorganized Debtor shall be authorized, without limitation, to use and dispose of the Distributable Assets of such Debtor and its Estate, to investigate and pursue any Retained Rights of Action of such Debtor (other than Reorganized Revstone and Reorganized Spara, to the extent set forth in the Plan) as the representative of the applicable Reorganized Debtor's Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, to acquire and dispose of other property, and to otherwise administer its affairs.

**E.**     **Corporate Action**

On the Effective Date, the matters under the Plan involving or requiring limited liability company action of the Debtors, including but not limited to actions requiring a vote or other approval of the board of directors, shareholders, managers, or members of the Debtors or the execution of any documentation incident to or in furtherance of the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers, directors, managers, or members of the Debtors.

The Reorganized Debtor Operating Agreements shall be deemed to include a provision prohibiting the issuance of nonvoting equity securities and such other provisions as may be required pursuant to section 1123(a)(6) of the Bankruptcy Code.  The Reorganized Debtors may execute and/or file the Reorganized Debtor Operating Agreements with the Delaware Secretary of State and other state governmental authorities having jurisdiction over the Debtors as may be necessary or appropriate under applicable non-bankruptcy law to fully effectuate the terms of such documents.

On the Effective Date, the Debtors' operating agreements shall be deemed replaced and amended by the Reorganized Debtor Operating Agreements, which shall be in full force and effect from and after the Effective Date.  Revstone and Spara may amend and/or restate, or cause the amendment and/or restatement, of the operating agreements of any of their non-Debtor subsidiaries, direct or indirect, as may be necessary or appropriate under applicable

41

non-bankruptcy law to ensure consistency with or to fully implement or effectuate the provisions

of this Plan, provided that any such modifications are consistent with the terms of this Plan.

**F.**      **Corporate Governance**

From and after the Effective Date, subject to the terms of this Plan, the business,

affairs, and operation of the Reorganized Debtors shall be under the management of, and all

decisions on behalf of the Reorganized Debtors may be made by, the Chief Restructuring

Officer, who in the case of Reorganized Revstone shall report to and be subject to oversight by

the Reorganized Revstone Board (as defined below).  As to Reorganized Spara, Reorganized

Greenwood, and Reorganized U.S. Tool, the Chief Restructuring Officer shall be appointed as

the sole manager of each such Reorganized Debtor.  Without limitation to the foregoing, the

Chief Restructuring Officer shall be authorized to appoint such officers of the Reorganized

Debtors with such duties and responsibilities as he may deem necessary and appropriate in

furtherance of the affairs of the Reorganized Debtors; provided, however, that no George

Hofmeister Party may serve as an officer of the Reorganized Debtors.

On the Effective Date, each member of the Boards of Managers of the Debtors

shall be deemed to have resigned, the Restructuring Committee shall be dissolved, and new

Boards of Managers for Reorganized Revstone (the "Reorganized Revstone Board") shall be

constituted and formed.  The Chief Restructuring Officer of Reorganized Revstone may not be

removed except for cause by unanimous vote of the Reorganized Revstone Board.  In the event

that the Chief Restructuring Officer of Revstone is removed, such removal shall not have any

42

effect on the Chief Restructuring Officer's continuing role as Chief Restructuring Officer of the remaining Reorganized Debtors.

The Reorganized Revstone Board shall consist of one manager appointed by the Creditors' Committee (provided that such manager may not be BFG), one manager appointed by the PBGC, and one manager appointed by mutual agreement of the Creditors' Committee and the PBGC; provided however, no George Hofmeister Party shall serve on the Reorganized Revstone Board. In the event that the Creditors' Committee and the PBGC are unable to agree upon the selection of the third manager of the Reorganized Revstone Board, the Creditors' Committee and the PBGC shall each provide the name of their choice as the third manager to the Chief Restructuring Officer who shall then select the third manager from these two names.

The specific individuals proposed to serve on the Reorganized Revstone Board shall be disclosed in the Plan Supplement. Except as noted above with respect to the removal of the Chief Restructuring Officer of Reorganized Revstone, any actions taken by the vote or written consent of a majority of the Reorganized Revstone Board shall be deemed to constitute an action by the Reorganized Revstone Board. Each manager shall serve on the Reorganized Revstone Board until the death, disability, or resignation of such manager or until entry of an order of the Bankruptcy Court for a final decree closing the Chapter 11 Cases. Any vacancy on the Reorganized Revstone Board created by the death, disability, or resignation of a manager may be filled by the remaining members of the Reorganized Revstone Board (regardless of whether less than a majority) or by the Chief Restructuring Officer of Reorganized Revstone if

no agreement can be reached, provided that no George Hofmeister Party may serve as a manager.

Members of the Reorganized Revstone Board shall be entitled to reimbursement of reasonable and necessary expenses incurred in carrying out their duties as members of the Reorganized Revstone Board, all of which shall be paid from Reorganized Revstone.  In addition, members of the Reorganized Revstone Board shall be entitled to compensation, also payable from Reorganized Revstone, for time spent on the Reorganized Revstone Board in an amount up to $400 per hour (not to exceed $15,000 per year per member), but shall not be reimbursed for any fees or expenses of any professional retained by an individual member of the Reorganized Revstone Board.  There shall be customary indemnification by Reorganized Revstone of the Reorganized Revstone Board, as well as the Reorganized Debtors' officers and manager as of the Effective Date, including the Chief Restructuring Officer, as set forth in the Reorganized Debtor Operating Agreements.

On the Effective Date, the limited liability company agreements of the Debtors shall be amended and restated substantially in the form set forth in the Plan Supplement and, as so amended and restated, shall constitute the limited liability company agreements of the Reorganized Debtors.  The Reorganized Debtor Operating Agreements shall contain the following provisions (which shall remain in effect until such time as an order by the Bankruptcy Court for a final decree in the Chapter 11 Cases has been entered):  (i) a prohibition on the taking of any action on behalf of the Reorganized Debtors by any member thereof or the participation by any such member in the management of the business, affairs, or operations of the

44

Reorganized Debtors; (ii) a prohibition on service by any George Hofmeister Party as a manager or officer of the Reorganized Debtors; (iii) a provision authorizing the Chief Restructuring Officer, subject to the oversight of the Reorganized Revstone Board as to Reorganized Revstone, to approve any sale, lease, or exchange of all or substantially all of the Reorganized Debtors' properties and assets, any merger or dissolution of the Reorganized Debtors, any dissolution of the Reorganized Debtors, or any other action contemplated under the Plan, any of which actions may be taken without the consent of any member of the Reorganized Debtors; (iv) a prohibition on any amendment or modification of the certificate of formation of the Reorganized Debtors or the Reorganized Debtor Operating Agreements that is contrary to the terms of the Plan; and (v) such other provisions as may be necessary or appropriate to ensure consistency with or to fully implement or effectuate the provisions of the Plan.

## G.    **Chief Restructuring Officer Duties**

Subject to the terms of the Plan, the Chief Restructuring Officer shall be tasked with maximizing the value of the Reorganized Debtors' assets, reconciling Claims, making distributions to Creditors in accordance with the Plan, satisfying post-Effective Date obligations of the Reorganized Debtor, and taking other actions in order to implement the Plan, all without need for approval of the Bankruptcy Court or notice to Creditors, provided that, as to Reorganized Revstone only, the duties of the Chief Restructuring Officer shall be focused on the following core tasks (the "CRO Core Tasks"):  (1) disposition of the assets or interests of Revstone's non-debtor subsidiaries and maximizing recoveries therefrom by Reorganized Revstone, (2) reconciliation and payment of Administrative Expenses, Priority Tax Claims,

45

Priority Non-Tax Claims, and any Secured Claims against Revstone pursuant to the Plan, and (3)

management, administration, and distribution of funds of Reorganized Revstone consistent with

the Plan, except as to distributions to Holders of Allowed General Unsecured Claims against

Revstone.  The CRO Core Tasks at Revstone shall not include reconciliation or payment of

Allowed General Unsecured Claims against Revstone, which tasks shall be handled by the

Reorganized Revstone Board or its designees and representatives, which may include current

general bankruptcy counsel to the Creditors' Committee.

   Except as noted above with respect to Reorganized Revstone, the Reorganized

Debtor Operating Agreements shall provide customary terms for the management of the

Reorganized Debtors by the Chief Restructuring Officer with appropriate oversight by the

Reorganized Revstone Board as to Reorganized Revstone, including, without limitation, the

powers and authority of the Chief Restructuring Officer to do the following without further

order, Court approval or notice unless expressly required otherwise under the Plan:  (i) manage,

withdraw, and administer funds of the Reorganized Debtors, cause to have distributions made

pursuant to the Plan, and incur obligations for expenses in connection with the management and

liquidation of the Reorganized Debtors' assets (except as to distributions to Holders of Allowed

General Unsecured Claims against Revstone); (ii) market and negotiate, enter into and perform

agreements for the sale or other disposition of the Reorganized Debtors' or their subsidiaries'

assets, including the dissolution of any subsidiaries; (iii) engage professionals, employees and

other agents (including current general bankruptcy counsel to the Debtor) to assist the Chief

Restructuring Officer with respect to his or her responsibilities; (iv) on behalf of the Reorganized

Debtors, prosecute, compromise and/or settle claims and causes of action and objections to

Claims (excluding the Revstone/Spara Litigation Trust Assets and General Unsecured Claims

against Revstone); (v) address general business issues involving the Reorganized Debtors,

including tax filings and post-Effective Date reporting with the Bankruptcy Court; (vi) execute

any documents relating to the foregoing on behalf of the Reorganized Debtors; and (vii) exercise

such other powers and authority as may be necessary and proper to carry out the provisions of

the Plan (provided that such other powers and authority are not inconsistent with the Plan).  The

Reorganized Debtor Operating Agreements shall not be modified or amended in any manner that

is inconsistent with the duties of the Chief Restructuring Officer set forth above.

Subject to the oversight of the Reorganized Revstone Board as to Reorganized

Revstone, as set forth in the Plan, the Chief Restructuring Officer shall administer the assets of

the Reorganized Debtors and determine whether to pursue or not to pursue any objections to

Claims, as he or she determines is in the best interests of the Creditors of the Reorganized

Debtors and consistent with the purposes of the Plan, and shall have no liability for the outcome

of his/her decisions, other than those decisions constituting gross negligence or willful

misconduct.  Any determination by the Chief Restructuring Officer as to what actions are in the

best interests of the Reorganized Debtors shall be conclusive.

## H.    <u>Source of Funding</u>

The source of all distributions and payments under this Plan shall be the

Distributable Assets and the proceeds thereof, including, without limitation, each Debtor's Cash

on hand and proceeds from the sale or other disposition of the remaining property of the Debtors

and their non-Debtor subsidiaries and prosecution of Retained Rights of Action, as set forth in
the PBGC Funding Schedule and subject to the terms of the PBGC Settlement Agreement.

## I.        **Retained Rights of Action of the Debtors**

Unless a Right of Action of the Debtors (including the right to object to any
Claim asserted against the Estate) is, in writing, expressly waived, relinquished, released,
assigned, compromised, or settled in the Plan, or in a Final Order, all rights of the Estates from
and after the Effective Date with respect to the Retained Rights of Action are expressly
preserved for the benefit of, assigned to, and fully vested in, the applicable Reorganized Debtor
or, as to the Revstone/Spara Litigation Trust Assets, the Revstone/Spara Litigation Trust.

Each Reorganized Debtor and, solely as to the Revstone/Spara Litigation Trust
Assets, the Revstone/Spara Litigation Trustee shall have standing as the representative of such
Debtor's Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to pursue, or decline
to pursue, the Retained Rights of Action and objections to Claims, as appropriate, in the business
judgment of such Debtor or Revstone/Spara Litigation Trustee, as applicable.  Each Reorganized
Debtor or the Revstone/Spara Litigation Trustee, as applicable, may settle, release, sell, assign,
otherwise transfer, or compromise, Retained Rights of Action and/or objections to Claims
without need for notice or order of the Bankruptcy Court, provided that (i) Reorganized
Revstone shall provide at least five (5) business days' written notice to the Revstone/Spara
Litigation Trustee with regard to any compromise or settlement of:  (a) an Administrative
Expense asserted against Revstone, if such Claim exceeds $250,000 in value (after accounting
for any applicable defenses) or amount asserted, or (b) any Claim asserted by a George

48

Hofmeister Party; and (ii) in the event that the Revstone/Spara Litigation Trustee informs

Reorganized Revstone that it disagrees with any such compromise or settlement within such

period, and the Revstone/Spara Litigation Trustee and Reorganized Revstone are unable to reach

an agreement with respect to such compromise or settlement, then Reorganized Revstone shall

present such dispute to the Bankruptcy Court for resolution on at least five (5) business days'

notice and an opportunity to object to the Revstone/Spara Litigation Trustee.

**J.**     **Establishment of Revstone/Spara Litigation Trust and Vesting of Revstone/Spara Litigation Trust Assets**

On the Effective Date, each of Revstone and Spara shall take any and all actions

as may be necessary or appropriate to establish the Revstone/Spara Litigation Trust and to cause

the transfer and assignment of Revstone's and Spara's Retained Rights of Action, the Relevant

Books and Records, and a Cash reserve for Plan Expenses of the Revstone/Spara Litigation Trust

in an amount up to $1,000,000, as set forth in the definition of "Plan Expenses" herein and

subject to the terms of the PBGC Settlement Agreement, which together shall constitute the

initial Revstone/Spara Litigation Trust Assets.  Upon the Effective Date, the Revstone/Spara

Litigation Trust shall be vested with all right, title and interest in the Revstone/Spara Litigation

Trust Assets, and such property shall become the property of the Revstone/Spara Litigation Trust

free and clear of all Claims, Liens, charges, other encumbrances and interests, subject only to the

rights, in instances described in Article VI.M.5 below and the Revstone/Spara Litigation Trust

Agreement, of the Chief Restructuring Officer of Reorganized Spara consistent with the terms of

the Plan, the PBGC Settlement Agreement, and the Revstone/Spara Litigation Trust Agreement.

49

It is intended that the Revstone/Spara Litigation Trust qualify as a liquidating trust for federal income tax purposes.

The sole beneficiaries of the Revstone/Spara Litigation Trust shall be Reorganized Revstone, Reorganized Spara, and Holders of Allowed PBGC Claims under the Plan. Consistent with the PBGC Settlement Agreement, Reorganized Revstone and Reorganized Spara shall be entitled to one-half of the Revstone/Spara Litigation Trust Interests and the Holders of the PBGC Claims shall be entitled to the other one-half of the Revstone/Spara Litigation Trust Interests; provided, however that, pursuant to the PBGC Settlement Agreement, the first $2,000,000 of litigation proceeds realized by the Revstone/Spara Litigation Trust and otherwise allocable to Holders of the PBGC Claims shall be distributed to Reorganized Revstone and made available to Holders of Allowed General Unsecured Claims against Revstone (excluding BFG) and Holders of Allowed Administrative Expenses against Revstone in accordance with, and subject to the terms of, the PBGC Settlement Agreement. Any remaining litigation proceeds realized by the Revstone/Spara Litigation Trust shall be divided one-half to Reorganized Revstone and Reorganized Spara and one-half to the Holders of Allowed PBGC Claims, consistent with the division of the Revstone/Spara Litigation Trust Interests set forth herein and subject to the terms of the PBGC Settlement Agreement. As between Reorganized Revstone and Reorganized Spara, the Revstone/Spara Litigation Trust Interests shall be allocated ninety percent (90%) to Reorganized Revstone and ten percent (10%) to Reorganized Spara, provided that the first $250,000 of the proceeds of the Revstone/Spara Litigation Trust payable to Reorganized Revstone shall be distributed to Reorganized Spara.

50

For federal income tax purposes, the beneficiaries of the Revstone/Spara Litigation Trust shall be treated as the grantors of the Revstone/Spara Litigation Trust and deemed to be the owners of the assets of the Revstone/Spara Litigation Trust, and the transfer of the Revstone/Spara Litigation Trust Assets to the Revstone/Spara Litigation Trust shall be deemed a transfer to such beneficiaries by Revstone followed by a deemed transfer by such beneficiaries to the Revstone/Spara Litigation Trust.

**K.**     **Purpose of Revstone/Spara Litigation Trust**

The Revstone/Spara Litigation Trust shall be established for the primary purpose of prosecuting or otherwise liquidating and distributing the Revstone/Spara Litigation Trust Assets in accordance with Treasury Regulation section 301.7701-4(d).  In particular, this includes:  (i) reviewing and reconciling, including where appropriate objecting to, any General Unsecured Claims of Holders of Claims against Revstone, unless otherwise agreed by Reorganized Revstone and the Revstone/Spara Litigation Trust, (ii) reviewing, litigating, settling, dismissing or releasing Revstone's and Spara's Retained Rights of Action; and (iii) distributing the proceeds of any of Revstone's and Spara's Retained Rights of Action and any other Revstone/Spara Litigation Trust Assets in accordance with the Plan and the terms of the PBGC Settlement Agreement and the Revstone/Spara Litigation Trust Agreement.

The Revstone/Spara Litigation Trust shall have no objective to continue or engage in the conduct of a trade or business and shall not be deemed a successor-in-interest of either Revstone or Spara or their respective Estates for any purpose other than as specifically set forth herein.

51

**L.**      **Funding of Revstone/Spara Litigation Trust**

On the Effective Date, Revstone and Spara shall fund the Revstone/Spara Litigation Trust in the amount of up to $1,000,000, as set forth in the PBGC Settlement Agreement and the PBGC Funding Schedule, to be used on account of Plan Expenses of the Revstone/Spara Litigation Trust.  To the extent any portion of such funding is not used to pay the Plan Expenses of the Revstone/Spara Litigation Trust, such unused portion shall be distributed to Reorganized Revstone.  To the extent expenses of the Revstone/Spara Litigation Trust exceed $1,000,000, additional reserves for Plan Expenses as to the Revstone/Spara Litigation Trust may be created out of the Revstone/Spara Litigation Trust Assets otherwise available for distribution to Holders of Allowed General Unsecured Claims (through Reorganized Revstone and Reorganized Spara) and Holders of Allowed PBGC Claims in the discretion of the Revstone/Spara Litigation Trustee, upon approval of the Revstone/Spara Litigation Trust Committee, the Chief Restructuring Officer of Reorganized Spara, and the PBGC.

**M.**      **Revstone/Spara Litigation Trustee**

**1.**      **Generally**

The initial Revstone/Spara Litigation Trustee shall be selected prior to the Confirmation Hearing by the Persons who will be appointed as members of the Revstone/Spara Litigation Trust Committee.  Any successor Revstone/Spara Litigation Trustee shall be appointed pursuant to the Revstone/Spara Litigation Trust Agreement.  On the Effective Date and subject to the oversight of the Revstone/Spara Litigation Trust Committee, the Revstone/Spara Litigation Trustee shall be the sole authorized representative and signatory of the

52

Revstone/Spara Litigation Trust, with authority to render any and all services necessary to effectuate the terms of the Plan as they relate to the Revstone/Spara Litigation Trust.  From and after the Effective Date, the Revstone/Spara Litigation Trustee shall be deemed to have been appointed as the representative of Revstone's and Spara's Estates by the Bankruptcy Court pursuant to section 1123(b)(3)(B) of the Bankruptcy Code for purposes of the Revstone/Spara Litigation Trust Assets, specifically including Revstone's and Spara's Retained Rights of Action. The powers, authority, responsibilities, and duties of the Revstone/Spara Litigation Trustee shall be governed by the Plan, the Confirmation Order, and the Revstone/Spara Litigation Trust Agreement.  The Revstone/Spara Litigation Trustee may execute, deliver, file, or record such documents, instruments, releases and other agreements, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan as they relate to the Revstone/Spara Litigation Trust.

## 2.        Responsibilities and Authority of Revstone/Spara Litigation Trustee

The responsibilities and authority of the Revstone/Spara Litigation Trustee shall include (a) calculating and implementing all distributions from the Revstone/Spara Litigation Trust in accordance with the Plan; (b) filing all required tax returns and paying taxes and all other obligations on behalf of the Revstone/Spara Litigation Trust from funds held by the Revstone/Spara Litigation Trust; (c) periodic reporting to the beneficiaries of the Revstone/Spara Litigation Trust, including the Chief Restructuring Officer of Reorganized Spara, as frequently as the Revstone/Spara Litigation Trustee reasonably believes is appropriate; (d) distributing the assets of the Revstone/Spara Litigation Trust in accordance with the provisions of the Plan; (e)

53

retaining and paying at normal and customary rates (or on a contingency fee basis) professionals in connection with the Revstone/Spara Litigation Trustee's duties; (f) paying the reasonable expenses of the members of the Revstone/Spara Litigation Trust Committee, in accordance with the provisions of the Plan and the Revstone/Spara Litigation Trust Agreement; (g) reconciling and, if appropriate, objecting to General Unsecured Claims against Revstone, with authority to settle any objections; (h) analyzing Revstone's and Spara's Retained Rights of Action and deciding whether to abandon, pursue, litigate, or settle such claims; and (i) such other responsibilities as may be vested in the Revstone/Spara Litigation Trustee pursuant to the Plan, the Revstone/Spara Litigation Trust Agreement, or the Confirmation Order or as may be necessary and proper to carry out the provisions of the Plan.  The Revstone/Spara Litigation Trust, the Revstone/Spara Litigation Trustee, and the Revstone/Spara Litigation Trust Committee shall not be required to post a bond in favor of the United States.

### 3.    <u>Powers of the Revstone/Spara Litigation Trustee</u>

Subject to the oversight of the Revstone/Spara Litigation Trust Committee and, in instances described in Article VI.M.5 below and the Revstone/Spara Litigation Trust Agreement, the Chief Restructuring Officer of Reorganized Spara, as set forth in the Plan, the PBGC Settlement Agreement, and the Revstone/Spara Litigation Trust Agreement, the powers of the Revstone/Spara Litigation Trustee to administer the Revstone/Spara Litigation Trust shall, without any need for approval of the Bankruptcy Court in each of the following instances, include *inter alia*, (a) the power to invest Revstone/Spara Litigation Trust funds as permitted in the Revstone/Spara Litigation Trust Agreement, withdraw funds, make distributions and pay

54

taxes and other obligations owed by the Revstone/Spara Litigation Trust from funds held by the

Revstone/Spara Litigation Trustee in accordance with the Plan, the PBGC Settlement

Agreement, and the Revstone/Spara Litigation Trust Agreement, (b) the power to engage and

compensate, without prior Bankruptcy Court order or approval, employees and professionals to

assist the Revstone/Spara Litigation Trustee with respect to his or her responsibilities, (c) the

power to prosecute, compromise and settle Revstone's and Spara's Retained Rights of Action,

(d) the power to abandon, pursue, litigate, or settle any of Revstone's and Spara's Retained

Rights of Action, (e) the power to abandon or destroy any of the Relevant Books and Records (to

Reorganized Revstone or Reorganized Spara, as applicable) when they are no longer necessary

to administer the Revstone/Spara Litigation Trust, and (f) such other powers as may be vested in

or assumed by the Revstone/Spara Litigation Trustee pursuant to the Plan, the PBGC Settlement

Agreement, the Revstone/Spara Litigation Trust Agreement, order of the Bankruptcy Court, or as

may be necessary and proper to carry out the provisions of the Plan.  Subject to the oversight of

the Revstone/Spara Litigation Trust Committee and, in instances described in Article VI.M.5

below and the Revstone/Spara Litigation Trust Agreement, the Chief Restructuring Officer of

Reorganized Spara, as set forth in the Plan and the Revstone/Spara Litigation Trust Agreement,

the Revstone/Spara Litigation Trustee, on behalf of the Revstone/Spara Litigation Trust, shall

have absolute discretion to pursue or not to pursue any and all of Revstone's and Spara's

Retained Rights of Action and objections to Claims relating thereto, as he or she determines is in

the best interests of the beneficiaries and consistent with the purposes of the Revstone/Spara

Litigation Trust, and shall have no liability for the outcome of his/her decisions, other than those

decisions constituting gross negligence or willful misconduct.  Any determination by the Revstone/Spara Litigation Trustee as to what actions are in the best interests of the Revstone/Spara Litigation Trust shall be conclusive.

The Revstone/Spara Litigation Trust, on the one hand, and Reorganized Revstone and Reorganized Spara, on the other hand, shall coordinate with each other, to the extent feasible, regarding the reconciliation of Claims.  For the avoidance of doubt, the Revstone/Spara Litigation Trust shall be responsible for addressing any General Unsecured Claims asserted by Creditors against Revstone, and Reorganized Revstone and Reorganized Spara shall be responsible for addressing all remaining Claims against such Debtors, unless otherwise agreed by the applicable Debtor and the Revstone/Spara Litigation Trust.

On and after the Effective Date, the Revstone/Spara Litigation Trustee, on behalf of the Revstone/Spara Litigation Trust, shall have standing as the representative of Revstone's and Spara's Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to commence and prosecute any of Revstone's and Spara's Retained Rights of Action and/or objections to Claims relating thereto on behalf of Revstone's and Spara's Estates without need for notice or order of the Bankruptcy Court.

**4.**      **Compensation of Revstone/Spara Litigation Trustee and Professionals**

The Revstone/Spara Litigation Trustee shall serve on (i) the terms, conditions and rights set forth in the Plan, the PBGC Settlement Agreement, the Confirmation Order and the Revstone/Spara Litigation Trust Agreement, or (ii) such terms, conditions and rights as otherwise agreed to by the Revstone/Spara Litigation Trustee and the Revstone/Spara Litigation Trust

56

Committee.  The compensation for the Revstone/Spara Litigation Trustee shall be set forth in the Revstone/Spara Litigation Trust Agreement or otherwise disclosed in a filing with the Bankruptcy Court.  The Revstone/Spara Litigation Trustee shall not be required to file a Fee Application to receive compensation, but the Revstone/Spara Litigation Trustee's fees shall be subject to the oversight of the Revstone/Spara Litigation Trust Committee.  The Revstone/Spara Litigation Trustee shall have the right to retain the services of attorneys, accountants, and other professionals and agents in the discretion of the Revstone/Spara Litigation Trustee to assist and advise the Revstone/Spara Litigation Trustee in the performance of his/her duties and compensate such professionals from the assets of the Revstone/Spara Litigation Trust, subject to the oversight of the Revstone/Spara Litigation Trust Committee and, in instances described in Article VI.M.5 below and the Revstone/Spara Litigation Trust Agreement, the Chief Restructuring Officer of Reorganized Spara.  Any professionals retained by the Revstone/Spara Litigation Trustee shall not be required to file a Fee Application to receive compensation.

## 5.      Limitations on Revstone/Spara Litigation Trustee

The Revstone/Spara Litigation Trustee, in such capacity, shall not at any time:  (a) enter into or engage in any trade or business (other than the management and disposition of the Revstone/Spara Litigation Trust Assets), and no part of the Revstone/Spara Litigation Trust Assets or the proceeds, revenue or income therefrom shall be used or disposed of by the Revstone/Spara Litigation Trust in furtherance of any trade or business, or (b) except as provided below, reinvest any Revstone/Spara Litigation Trust Assets.

With regard to any sale, disposition, release, modification or waiver of existing rights as to an asset of the Revstone/Spara Litigation Trust or compromise or settlement of a controverted matter, if the asset or matter at issue exceeds $500,000 in value (after accounting for any applicable defenses) or amount asserted, the Revstone/Spara Litigation Trustee must consult with, and obtain approval from, the Revstone/Spara Litigation Trust Committee and the Chief Restructuring Officer of Reorganized Spara, with respect to any such transaction or, in the absence of such approval, an order of the Bankruptcy Court approving such transaction (*provided that* the Revstone/Spara Litigation Trust Committee and Chief Restructuring Officer of Reorganized Spara shall be deemed to have approved if such parties fail to object thereto in a writing received by the Revstone/Spara Litigation Trustee within five (5) business days following written notification by the Revstone/Spara Litigation Trustee of the intended transaction).

Other than as provided in the Plan, the PBGC Settlement Agreement, and the Revstone/Spara Litigation Trust Agreement, the Revstone/Spara Litigation Trustee is not empowered to incur indebtedness.

The Revstone/Spara Litigation Trustee may only invest funds held in the Revstone/Spara Litigation Trust consistent with the requirements of the Revstone/Spara Litigation Trust Agreement, the Bankruptcy Code or any order of the Bankruptcy Court modifying such requirements and, provided that the Revstone/Spara Litigation Trustee does so, he or she shall have no liability in the event of insolvency of any institution in which he or she has invested any funds of the Revstone/Spara Litigation Trust.  Notwithstanding the above, the

Revstone/Spara Litigation Trustee may only invest funds in the Revstone/Spara Litigation Trust

in investments permitted to be made by a liquidating trust within the meaning of Treasury

Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines,

rulings, or other controlling authorities.

The Revstone/Spara Litigation Trustee shall hold, collect, conserve, protect and

administer the Revstone/Spara Litigation Trust in accordance with the provisions of the Plan, the

PBGC Settlement Agreement, and the Revstone/Spara Litigation Trust Agreement, and pay and

distribute amounts as set forth herein for the purposes set forth in the Plan, the PBGC Settlement

Agreement, and the Revstone/Spara Litigation Trust Agreement.  Any determination by the

Revstone/Spara Litigation Trustee as to what actions are in the best interests of the

Revstone/Spara Litigation Trust shall be conclusive.

N.      **Revstone/Spara Litigation Trust Committee**

1.      **Generally**

The Revstone/Spara Litigation Trust Committee shall be created on the Effective

Date consistent with the terms of the Revstone/Spara Litigation Trust Agreement.  The

Revstone/Spara Litigation Trust Committee shall consist of no more than three (3) Persons

initially selected as follows:  one Person by the Creditors' Committee, one Person by the PBGC,

and one Person appointed by mutual agreement of the Creditors' Committee and the PBGC;

provided however, no George Hofmeister Party shall serve on the Revstone/Spara Litigation

Trust Committee.  In the event that the Creditors' Committee and the PBGC are unable to agree

upon the selection of the third member of the Revstone/Spara Litigation Trust Committee, the

Creditors' Committee and the PBGC shall each provide two names of their choice as the member and the Bankruptcy Court shall then select the third member from these four names.

### 2. Duties of Revstone/Spara Litigation Trust Committee

The Revstone/Spara Litigation Trust Committee shall generally monitor the status and progress of the Revstone/Spara Litigation Trust and approve certain material transactions in accordance with Article VI.M.5 of the Plan. The Revstone/Spara Litigation Trust Committee may meet and/or consult periodically with the Revstone/Spara Litigation Trustee and keep itself apprised of the affairs of the Revstone/Spara Litigation Trust. As set forth in the Revstone/Spara Litigation Trust Agreement, each member of the Revstone/Spara Litigation Trust Committee shall exercise his/her best judgment, to the end that the affairs of the Revstone/Spara Litigation Trust shall be properly managed and the interests of all beneficiaries of the Revstone/Spara Litigation Trust are safeguarded; but each member of the Revstone/Spara Litigation Trust Committee shall not incur any responsibility or liability by reason of any error of law or of any matter or thing done or suffered or omitted to be done under the Revstone/Spara Litigation Agreement, unless such member of the Revstone/Spara Litigation Trust Committee has acted with recklessness, fraud or willful misconduct.

### 3. Reimbursement of Expenses of Revstone/Spara Litigation Trust Committee

Members of the Revstone/Spara Litigation Trust Committee shall be entitled to reimbursement of reasonable and necessary expenses incurred in carrying out their duties as members of the Revstone/Spara Litigation Trust Committee, all of which shall be paid from the Revstone/Spara Litigation Trust. In addition, members of the Revstone/Spara Litigation Trust

60

Committee shall be entitled to compensation, also payable from the Revstone/Spara Litigation Trust, for time spent on the Revstone/Spara Litigation Trust Committee in an amount up to $400 per hour (not to exceed $15,000 per year per member), but shall not be reimbursed for any fees or expenses of any professional retained by an individual member of the Revstone/Spara Litigation Trust Committee.  The Revstone/Spara Litigation Trust shall provide an indemnity to members of the Revstone/Spara Litigation Trust Committee for all suits, demands, actions, claims, losses and liabilities such members may suffer or incur other than to the extent arising from such member's willful misconduct or gross negligence.

**O.**      **Interests in Affiliates and Subsidiaries**

As of the Effective Date, except as expressly provided in the Plan or by separate order of the Bankruptcy Court, each Reorganized Debtor shall retain any stock or interests that it may hold in its non-Debtor affiliates or subsidiaries and retain any rights to which such stock or interests may be entitled under applicable law with respect to such shares or other interests. After the Effective Date, the Reorganized Debtors may sell, transfer, assign or otherwise dispose of such shares or interests as permitted by applicable law.

**P.**      **Payment of Plan Expenses**

Each Reorganized Debtor and the Revstone/Spara Litigation Trust, as applicable, may pay all reasonable Plan Expenses without further notice to Creditors or Holders of Interests or approval of the Bankruptcy Court.

**Q.** **Dissolution of Creditors' Committee**

As of the Effective Date, the Creditors' Committee shall be dissolved. Notwithstanding such dissolution, the Creditors' Committee's professionals may seek payment of any unpaid Administrative Expenses pursuant to the Plan.

**R.** **Final Decree**

At any time following the Effective Date, each Reorganized Debtor shall be authorized to file a motion for the entry of a final decree closing its Chapter 11 Case pursuant to section 350 of the Bankruptcy Code.

## VII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.** **Rejection of Executory Contracts and Unexpired Leases**

Except for any executory contracts or unexpired leases:  (i) that previously were assumed or rejected by an order of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code; (ii) that are listed for assumption by the Debtors as of the Effective Date in a Plan Supplement to be filed and served on affected non-Debtor counterparties; (iii) as to which a motion for approval of the assumption or rejection of such contract or lease has been Filed and served prior to the Effective Date; (iv) that constitute contracts of insurance in favor of, or that benefit, the Debtors or the Estates; or (v) that were previously sold, conveyed or otherwise assigned pursuant to Final Order, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to section 365 of the Bankruptcy Code as of the

62

Effective Date.  Without limiting the foregoing, the indemnification obligations in favor of the Debtors' Independent Managers and applicable Huron Parties shall be assumed as of the Effective Date and shall constitute obligations of the Reorganized Debtors.  All other pre-Effective Date indemnification obligations of the Debtors shall be deemed rejected as of the Effective Date to the extent that such obligations are contained in executory contracts within the meaning of section 365 of the Bankruptcy Code, but only to the extent not inconsistent with any existing insurance obligations.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions or rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

## B.    **Bar Date for Rejection Damages**

If the rejection of an executory contract or unexpired lease pursuant to the Plan or otherwise gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors or the Estates unless a proof of Claim is Filed and served on the Debtors and their counsel within thirty (30) days after the earlier of (a) Effective Date or (b) service of a notice that the executory contract or unexpired lease has been rejected.  All such Claims for which proofs of Claim are required to be Filed, if Allowed, will be, and will be treated as, General Unsecured Claims, subject to the provisions of the Plan.

63

# VIII.

# DISTRIBUTIONS AND RELATED MATTERS

A.    **Dates of Distribution**

The sections of the Plan on treatment of Administrative Expenses, Claims, and Interests specify the times for distributions.  Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, by the applicable Reorganized Debtor (or its agent) on the immediately following Business Day.  Distributions due on the Effective Date will be paid on such date or as soon as practicable thereafter, provided that if other provisions of the Plan require the surrender of securities or establish other conditions precedent to receiving a distribution, the distribution may be delayed until such surrender occurs or conditions are satisfied.

If, under the terms of the Plan, the resolution of a particular Disputed Claim (*e.g.*, it is Disallowed) entitles other Holders of Claims to a further distribution, either (a) the Reorganized Debtors may make such further distribution as soon as practicable after the resolution of the Disputed Claim or (b) if the further distribution is determined in good faith by the Reorganized Debtors to be less than $100 for any Creditor, then, in order to afford an opportunity to minimize costs and aggregate such distributions, the Reorganized Debtors may make such further distribution any time or with the next distribution, in the discretion of the Reorganized Debtors.

**B.**    **Cash Distributions**

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable, except that Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**C.**    **Rounding of Payments**

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.  To the extent Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as "Unclaimed Property" under the Plan.

**D.**    **Disputed Claims**

Notwithstanding all references in the Plan to Claims that are Allowed, solely for the purpose of calculating the amount or number of distributions to be made on account of Allowed Claims or Allowed Administrative Expenses under the Plan, such calculations shall be made as if each Disputed Claim were an Allowed Claim or Allowed Administrative Expense, except that if the Bankruptcy Court estimates the likely portion of a Disputed Claim to be Allowed or authorized or otherwise determines the amount or number which would constitute a sufficient reserve for a Disputed Claim (which estimates and determinations may be requested by the Reorganized Debtors or the Revstone/Spara Litigation Trustee, as applicable), such amount

or number as determined by the Bankruptcy Court shall be used for calculations as to such Disputed Claim.

All distributions due in respect of a Disputed Claim shall be held and not made pending resolution of the Disputed Claim.

If an objection to a Disputed Claim is withdrawn, resolved by agreement, or determined by Final Order, the distributions due on account of any resulting Allowed Claim or Allowed Administrative Expense shall be made by the Reorganized Debtors.  No interest shall be due to a Holder of a Disputed Claim based on the delay attendant to determining the allowance of such Claim, Interest or Administrative Expense.

**E.**       **Undeliverable and Unclaimed Distributions**

If any distribution under the Plan is returned to the Reorganized Debtors as undeliverable or the check or other similar instrument or distribution by the Reorganized Debtors remains uncashed or unclaimed, as applicable, for ninety (90) days, such Cash shall be deemed to be Unclaimed Property.  Upon property becoming Unclaimed Property, it immediately shall be revested in the Reorganized Debtors.

Once there becomes Unclaimed Property for a Holder, no subsequent distributions for such Holder which may otherwise be due under the Plan will accrue or be held for such Holder, provided that, if the applicable agent is notified in writing of such Holder's then-current address and status as a Holder under the Plan, thereafter, the Holder will become entitled to its share of distributions, if any, which first become due after such notification.

66

**F.**     **Compliance with Tax Requirements**

The Reorganized Debtors and the Revstone/Spara Litigation Trust, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state or local taxing authorities in connection with making distributions pursuant to the Plan.

In connection with each distribution with respect to which the filing of an information return (such as an IRS Form 1099 or 1042) or withholding is required, the Reorganized Debtors and the Revstone/Spara Litigation Trust, as applicable, shall file such information return with the IRS and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law.

**G.**     **Record Date in Respect to Distributions**

Except as set forth below, the record date and time for the purpose of determining which Persons are entitled to receive any and all distributions on account of any Allowed Claims or Interests, irrespective of the date of or number of distributions, shall be the same as the Record Date.

**H.**     **Reserves**

In making any distributions in respect of Claims under this Plan, the Reorganized Debtors shall reserve an appropriate and adequate amount of Cash on account of any unresolved Disputed Claims.  The Reorganized Debtors shall make a corrective distribution following the successful resolution of any Disputed Claim on the next regularly scheduled distribution date.

DOCS_SF:84821.11 73864/001

## IX.

## <u>LITIGATION, OBJECTIONS TO CLAIMS, AND DETERMINATION OF TAXES</u>

### A.    <u>Litigation; Objections to Claims; Objection Deadline</u>

Except as may be expressly provided otherwise in the Plan, from and after the Effective Date, the Reorganized Debtors and the Revstone/Spara Litigation Trust, as applicable, shall be responsible for pursuing Retained Rights of Action, any objection to the allowance of any Claim, and the determination of Tax issues and liabilities.

From and after the Effective Date, the Reorganized Debtors and the Revstone/Spara Litigation Trust, as applicable, shall have exclusive authority to file objections, settle, compromise, withdraw or litigate to judgment objections to Claims; provided, however, parties in interest may file objections to Claims to the extent permitted by Bankruptcy Code section 502(a).  Unless another date is established by the Bankruptcy Court *sua sponte* (which may so act without notice or hearing) or is established by other provisions of the Plan, any objection to a Claim or Interest shall be filed with the Bankruptcy Court and served on the Person holding such Claim or Interest within one hundred eighty (180) days after the Effective Date (as may be extended pursuant to this section, the "<u>Objection Deadline</u>"), provided that the Reorganized Debtors and the Revstone/Spara Litigation Trust, as applicable, may seek extension(s) thereof subject to Bankruptcy Court approval and with notice only to parties that have requested such notice pursuant to Bankruptcy Rule 2002.

In addition to any other available remedies or procedures with respect to Tax issues or liabilities or rights to Tax refunds, the Reorganized Debtors may utilize (and receive the

68

benefits of) section 505 of the Bankruptcy Code with respect to: (1) any Tax issue or liability or right to a Tax refund relating to an act or event occurring prior to the Effective Date; or (2) any Tax liability or right to a Tax refund arising prior to the Effective Date.  If the Reorganized Debtors utilize section 505(b) of the Bankruptcy Code: (1) the Bankruptcy Court shall determine the amount of the subject Tax liability or right to a Tax refund in the event that the appropriate governmental entity timely determines a Tax to be due in excess of the amount indicated on the subject return; and (2) if the prerequisites are met for obtaining a discharge of Tax liability in accordance with section 505(b) of the Bankruptcy Code, the Reorganized Debtors shall be entitled to such discharge which shall apply to any and all Taxes relating to the period covered by such return.

### B.      Temporary or Permanent Resolution of Disputed Claims

The Reorganized Debtors or the Revstone/Spara Litigation Trustee, as applicable, may request, at any time prior to the Effective Date or on and after the Effective Date, that the Bankruptcy Court estimate any contingent or unliquidated Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, irrespective of whether any party has previously objected to such Disputed Claim.  The Bankruptcy Court will retain jurisdiction to estimate any contingent or unliquidated Disputed Claim at any time during litigation concerning any objection to the Disputed Claim.  If the Bankruptcy Court estimates any contingent or unliquidated Disputed Claim, that estimated amount would constitute either the Allowed amount of such Disputed Claim or a maximum limitation on such Disputed Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Disputed Claim, the

Reorganized Debtors or the Revstone/Spara Litigation Trustee, as applicable, may elect from and after the Effective Date to pursue any supplemental proceedings to object to any ultimate payment on account of such Disputed Claim against the Debtors.

In addition, the Reorganized Debtors or the Revstone/Spara Litigation Trustee, as applicable, may resolve or adjudicate any Disputed Claim from and after the Effective Date in the manner in which the amount of such Claim, Interest or Administrative Expense and the rights of the Holder of such Claim, Interest or Administrative Expense would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

**C.     Setoffs**

The Reorganized Debtors and the Revstone/Spara Litigation Trust as applicable may, but shall not be required to, setoff against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against the Holder of such Claim; provided, however, neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors or the Revstone/Spara Litigation Trust of any such claim that the Reorganized Debtors or the Revstone/Spara Litigation Trust may have against such Holder, unless otherwise agreed to in writing by such Holder and the Reorganized Debtors or the Revstone/Spara Litigation Trust as applicable.

**D.**    **Preservation of Retained Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable, and each of their successors or assigns will retain and may exclusively enforce any Retained Rights of Action and the Confirmation Order shall be deemed a *res judicata* determination of such rights to retain and exclusively enforce such Retained Rights of Action.  Absent such express waiver or release, the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable, and each of their successors or assigns shall have standing as the representatives of the Debtors' Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to pursue Retained Rights of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable (or each of their successors or assigns).  The Retained Rights of Action may be asserted or prosecuted before or after solicitation of votes on the Plan or before or after the Effective Date.

Absent an express waiver or release set forth in the Plan (including, for the avoidance of doubt, pursuant to Article X hereof), nothing in the Plan shall (or is intended to) prevent, estop or be deemed to preclude the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable, from utilizing, pursuing, prosecuting or otherwise acting upon all or any of their Retained Rights of Action and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Rights of Action upon or after Confirmation or Consummation.

71

# X.

## RELEASES, INJUNCTIONS AND EXCULPATION PROVISIONS

A.      **Injunctions**

       1.      **Generally**

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions and stays provided for in the Chapter 11 Cases pursuant to sections 105 and 362 of the Bankruptcy Code or otherwise in effect on the Confirmation Date, shall remain in full force and effect until the Effective Date.  From and after the Effective Date, all Persons are permanently enjoined from, and restrained against, commencing or continuing in any court any suit, action or other proceeding, or otherwise asserting any claim or interest, seeking to hold (i) the Reorganized Debtors, their Estates, the Revstone/Spara Litigation Trust, or (ii) the property of the Debtors, their Estates, the Revstone/Spara Litigation Trust, liable for any Claim, obligation, right, interest, debt or liability that has been released pursuant to the Plan.

       2.      **Injunction Related to Rights of Action and Claims, Administrative Expenses and Interests**

*Except as provided in the Plan or in the Confirmation Order, as of the Confirmation Date, all Entities that have held, currently hold or may hold a Claim, Administrative Expense, Interest or other debt or liability against or in the Debtors  are permanently enjoined from taking any of the following actions against property of the Debtors, their Estates, the Revstone/Spara Litigation Trust, or the Reorganized Debtors on account of all or such portion of any such Claims, Administrative Expenses, Interests, debts or liabilities:  (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b)*

*enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or*

*order, (c) creating, perfecting or enforcing any lien or encumbrance; and (d) commencing or*

*continuing, in any manner or in any place, any action that does not comply with or is*

*inconsistent with the provisions of the Plan.*

**B.      Discharge of the Debtors**

Except as otherwise provided in the Plan or in the Confirmation Order, rights

afforded in, and all consideration distributed under, this Plan shall be in exchange for, and in

complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever

against the Debtors or any of their assets or properties.  Upon the Effective Date, the Debtors

shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code

from any and all Claims, including, without limitation, demands and liabilities that arose before

the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of

the Bankruptcy Code, whether or not (a) a Claim based upon such debt is Allowed under section

501 of the Bankruptcy Code, or (b) a Claim based upon such debt is Allowed under section 502

of the Bankruptcy Code, or (c) the Holder of a Claim based upon such debt accepted this Plan.

**C.      Exculpation**

As of and subject to the occurrence of the Effective Date, for good and valuable

consideration, including the consideration provided under the Plan, (i) the Debtors, (ii) the

Debtors' independent managers, Messrs. James B. Shein and Richard E. Newsted (solely in their

respective capacity as managers of the Debtors, including in their respective role as the members

of the Restructuring Committee) (the "Independent Managers"), (iii) the Debtors' postpetition

attorneys and other professionals retained with the approval of the Bankruptcy Court (solely in their respective capacity as professionals of the Debtors) (the "Debtor Retained Professionals"), (iv) the attorneys and professionals retained by the Restructuring Committee (solely in their capacity as such), (v) the Huron Parties (solely with respect to services rendered for the Debtors, including as officers, representatives, professionals for, and/or agent of the Debtors), (vi) the former and current members of the Creditors' Committee (solely acting in such capacity), (vii) the Creditors' Committee's attorneys and other Professional Persons (solely acting in the capacity as professionals of the Creditors' Committee), (viii) BFG, (ix) PBGC, and (x) the respective successors or assigns of the foregoing parties, shall neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken, on or after the Petition Date, in connection with, or related to, the formulation, preparation, dissemination, implementation, administration, Confirmation or Consummation of the Plan or any contract, instrument, waiver, release or other agreement or document created or entered into, in connection with the Plan, or any other act taken or omitted to be taken in connection with the Chapter 11 Cases up to and including the Effective Date; provided, however, that the foregoing provisions of this subsection shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud.  For the avoidance of doubt, the scope of the exculpation provided under this Article X.C does not cover:  (i) Mayer Brown LLP, (ii) Richards Layton & Finger LLP, (iii) MPI Products LLC, Monomoy Capital Partners, Monomoy Capital Partners II, LP, or any of their respective affiliates or successors, or (iv) any of the George Hofmeister Parties or the

74

former and current officers, managers or representatives of the Debtors (other than the

Independent Managers, the Debtor Retained Professionals, the attorneys and professionals

retained by the Restructuring Committee, and the Huron Parties expressly exculpated above).

**D.      Debtors' Release of CRO, Independent Managers, Creditors' Committee and Other Parties**

As of and subject to the occurrence of the Effective Date, for good and valuable

consideration, the Debtors, for themselves and the Estates, hereby irrevocably, unconditionally

and generally release (i) the Independent Managers, (ii) the Debtor Retained Professionals, (iii)

the attorneys and professionals retained by the Restructuring Committee (solely in their capacity

as such), (iv) the Huron Parties (solely with respect to services rendered for the Debtors,

including as officers, representatives, professionals for, and/or agent of the Debtors), (v) the

former and current members of the Creditors' Committee (solely acting in such capacity), (vi)

the Creditors' Committee's attorneys and other Professional Persons (solely acting in the

capacity as professionals of the Creditors' Committee), (vii) BFG, (viii) PBGC, and (ix) the

respective successors or assigns of the foregoing parties (collectively, the "Released Parties"),

from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities,

whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or

contingent, matured or unmatured, in law or equity or otherwise, based on or relating to in any

way the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement, other than claims

or liabilities arising out of or relating to any act or omission of the Released Parties that

constitutes willful misconduct, gross negligence or fraud; provided that such released claims,

obligations, rights, suits, damages, causes of action, and liabilities relate to (a) acts or omissions

on or after the Petition Date and prior to the Effective Date or (b) prepetition acts or omissions

relating to the commencement of the Chapter 11 Cases; provided further that the foregoing

release shall be without prejudice to any objections to claims, including counter-claims or

setoffs, relating to Claims asserted by any of the Released Parties against the Debtors that the

Debtors or the Reorganized Debtors may assert against the Released Parties.  For the avoidance

of doubt, the scope of the release provided under this Article X.D does not cover:  (i) Mayer

Brown LLP, (ii) Richards Layton & Finger LLP, (iii) MPI Products LLC, Monomoy Capital

Partners, Monomoy Capital Partners II, LP, or any of their respective affiliates or successors, or

(iv) any of the George Hofmeister Parties or the former and current officers, managers or

representatives of the Debtors (other than the Independent Managers, the Debtor Retained

Professionals, the attorneys and professionals retained by the Restructuring Committee, and the

Huron Parties expressly released above).

**E.**     <u>**Release by Creditors**</u>

       **As of and subject to the occurrence of the Effective Date, for good and**

**valuable consideration, each holder of a Claim that votes to accept the Plan (the "<u>Creditor-</u>**

**<u>Releasors</u>"), for itself and its respective present or former officers, directors, managers,**

**shareholders, trustees, partners and partnerships, members, agents, employees,**

**representatives, attorneys, accountants, professionals, and successors or assigns, in each**

**case solely in their capacity as such, shall be deemed to have completely, conclusively,**

**unconditionally and irrevocably released (i) the Debtors, (ii) the Estates, (iii) the**

**Independent Managers, (iv) the Debtor Retained Professionals, (v) the attorneys and**

76

professionals retained by the Restructuring Committee (solely in their capacity as such),
(vi) the Huron Parties (solely with respect to services rendered for the Debtors, including as
officers, representatives, professionals for, and/or agent of the Debtors), (vii) the former
and current members of the Creditors' Committee (solely acting in such capacity), (viii) the
Creditors' Committee's attorneys and other Professional Persons (solely acting in the
capacity as professionals of the Creditors' Committee), (ix) BFG, (x) PBGC, and (xi) the
respective successors or assigns of the foregoing parties (the "Released Estate Parties"),
from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities,
whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or
contingent, matured or unmatured, in law or equity or otherwise, based on or relating to in
any way the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement, arising
prior to the Effective Date, other than claims or liabilities arising out of or relating to any
act or omission of the Released Estate Parties that constitutes willful misconduct or gross
negligence; provided, however, the foregoing shall not constitute a waiver or release of any
right of the Holder of an Allowed Claim to payment under the Plan on account of such
Allowed Claim.  For the avoidance of doubt, the Released Estate Parties do not include:  (i)
Mayer Brown LLP, (ii) Richards Layton & Finger LLP, (iii) MPI Products LLC,
Monomoy Capital Partners, Monomoy Capital Partners II, LP, or any of their respective
affiliates or successors, or (iv) any of the George Hofmeister Parties or the former and
current officers, managers or representatives of the Debtors (other than the Independent

Managers, the Debtor Retained Professionals, the attorneys and professionals retained by the Restructuring Committee, and the Huron Parties expressly released above).

**F.      Release by Debtors' Non-Debtor Affiliates of the Restructuring Committee**

Except as otherwise specifically provided in the Plan, for good and valuable consideration, as of the Effective Date, all of the non-debtor, direct or indirect corporate subsidiaries of the Debtors (the "Releasor Affiliates") shall conclusively, absolutely, unconditionally, irrevocably and forever release and discharge the Released Estate Parties from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities whatsoever, arising prior to the Effective Date and directly or indirectly arising from or relating to, in whole or in part, the Debtors and/or the Chapter 11 Cases.  For the avoidance of doubt, the Releasor Affiliates do not include TPOP, LLC f/k/a Metavation, LLC.

## NO REGULATED RATE CHANGE WITHOUT GOVERNMENT APPROVAL

The Debtors do not charge any rates for purposes of section 1129(a)(6) that are regulated by any governmental regulatory commission with jurisdiction under applicable non-bankruptcy law.

## XII.

## EXEMPTION FROM CERTAIN TRANSFER TAXES

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers by the Debtors pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance

fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar Tax or governmental assessment.

## XIII.

## RETENTION OF JURISDICTION AND MISCELLANEOUS MATTERS

### A.   Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and any of the proceedings related to the Chapter 11 Cases pursuant to section 1142 of the Bankruptcy Code and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the purpose and intent of the Plan are carried out.  Without limiting the generality of the foregoing, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(1)     establish the priority or secured or unsecured status of, allow, disallow, determine, liquidate, classify, or estimate any Claim, Administrative Expense or Interest (including, without limitation and by example only, determination of Tax issues or liabilities in accordance with section 505 of the Bankruptcy Code), resolve any objections to the allowance or priority of Claims, Administrative Expenses or Interests, or resolve any dispute as to the treatment necessary to reinstate a Claim, Administrative Expense or Interest pursuant to the Plan;

(2)     grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(3)     resolve any matters related to the rejection of any executory contract or unexpired lease to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims or Administrative Expenses arising therefrom;

79

(4)     ensure that distributions to Holders of Allowed Claims, Administrative Expenses or Interests are made pursuant to the provisions of the Plan, and to effectuate performance of the provisions of the Plan;

(5)     decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending before the Effective Date or that may be commenced thereafter as provided in the Plan;

(6)     enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Confirmation Order or in the Plan, including, without limitation, any stay orders as may be appropriate in the event that the Confirmation Order is for any reason reversed, stayed, revoked, modified, supplemented or amended;

(7)     resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Confirmation Order;

(8)     subject to the restrictions on modifications provided in any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

(9)     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan or the Confirmation Order,

(10)     consider and act on the compromise and settlement of any Claim against, or Retained Right of Action of the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable;

(11)    decide or resolve any Retained Rights of Action under the Bankruptcy Code;

(12)    enter such orders as may be necessary or appropriate in connection with the recovery of the assets of the Reorganized Debtors wherever located;

(13)    hear and decide any objections to Claims brought by the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable;

(14)    hear and decide any litigation brought by the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable;

(15)    hear and determine any motions or contested matters involving Tax Claims or Taxes either arising prior (or for periods including times prior) to the Effective Date or relating to the administration of the Chapter 11 Cases, including, without limitation (i) matters involving federal, state and local Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, (ii) matters concerning Tax refunds due for any period including times prior to the Effective Date, and (iii) any matters arising prior to the Effective Date affecting Tax attributes of the Debtors;

(16)    determine such other matters as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(17)    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings issued or entered in connection with the Chapter 11 Cases or the Plan;

(18)    remand to state court any claim, cause of action, or proceeding involving the Debtors that was removed to federal court, in whole or in part in reliance upon 28 U.S.C. § 1334;

(19)    determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Plan;

(20)    determine any other matter not inconsistent with the Bankruptcy Code; and

(21)    enter an order or final decree concluding the Chapter 11 Cases.

**B.**     **Miscellaneous Matters**

    **1.**     **Headings**

The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

    **2.**     **Services by and Fees for Professionals and Certain Parties**

Notwithstanding any other provision herein, to the extent not previously paid, Professional Fee Claims shall be paid in accordance with the terms of the order(s) authorizing such payments as promptly as possible on the Effective Date for any outstanding amounts due as of the Effective Date, and as soon as practicable thereafter as such obligation to pay becomes due unless otherwise agreed upon by the applicable Professional.

In conjunction with the PBGC Settlement Agreement, certain Holders of Professional Fee Claims against Revstone and/or Spara have agreed to accept reduced recoveries out of available assets of each such Debtor in order to allow increased distributions to be made to Holders of Allowed General Unsecured Claims against Revstone and/or Spara in accordance with, and subject to the terms of, the PBGC Settlement Agreement.

Prior to or on the Effective Date, the Debtors shall establish an escrow account (the "Professional Fee Account") for the purpose of funding future payments on account of accrued and estimated Professional Fee Claims (estimated up to the Effective Date) that will not have been paid on the Effective Date as provided in the preceding paragraph, in an aggregate amount to be determined by the Debtors (in consultation with the Creditors' Committee) in their

business judgment.  From and after the Effective Date, the Professional Fee Account shall be

free and clear of all Liens and Claims and any other interests and encumbrances, and shall be

funded out of Net Distributable Assets in accordance with the terms of the PBGC Settlement

Agreement and consistent with the PBGC Funding Schedule.

From and after the Effective Date, the Reorganized Debtors or the Revstone/Spara

Litigation Trust, as applicable, shall in the ordinary course of business and without the necessity

for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professionals

thereafter incurred by the Reorganized Debtors or the Revstone/Spara Litigation Trust, as

applicable, provided that such payments shall be limited by the reserves for Plan Expenses

provided by this Plan and the PBGC Settlement Agreement.

### 3.      Bar Date for Administrative Expenses

Requests for payment of all Administrative Expenses, other than for those for

which a Bar Date was previously set or for which a request and/or proof of Claim has previously

been filed, must be Filed and served on the Reorganized Debtors and the United States Trustee

by no later than thirty (30) days after the Effective Date.  The Reorganized Debtors shall have

until one hundred eighty (180) days after the Effective Date to bring an objection to a Timely

Filed request for payment of an Administrative Expense (as may be extended pursuant to this

section, the "Administrative Expense Objection Deadline"), provided that the Reorganized

Debtors may seek extension(s) thereof subject to Bankruptcy Court approval and with notice

only to parties that have requested such notice pursuant to Bankruptcy Rule 2002.  Nothing in

the Plan shall prohibit the Reorganized Debtors from paying Administrative Expenses in the

83

ordinary course in accordance with applicable law during or after the Chapter 11 Cases, but after

the Effective Date, the Reorganized Debtors' obligation to pay an Administrative Expense will

depend upon the claimant's compliance with this section and such Administrative Expense being

Allowed under the provisions of the Plan.

Notwithstanding the foregoing provisions of this Article XIII.B.3, but except as

may be expressly provided in other sections of the Plan, Professional Persons requesting

compensation or reimbursement of expenses incurred after the Petition Date and prior to the

Effective Date must file and serve, on all parties entitled to notice thereof, a Fee Application for

final allowance of compensation and reimbursement of expenses in accordance with the various

orders of the Bankruptcy Court establishing procedures for submission and review of such

applications; provided that, if no last date is set in such procedures for filing such applications,

they must be filed no later than sixty (60) days after the Effective Date and any objections to

such applications must be made in accordance with applicable rules of the Bankruptcy Court.

### 4. Notices

All notices and requests in connection with the Plan shall be in writing and shall

be hand delivered or sent by mail addressed to:

> PACHULSKI STANG ZIEHL & JONES LLP
> Attn:   Laura Davis Jones, Esq.
>           David M. Bertenthal, Esq.
>           Maxim B. Litvak, Esq.
> 919 North Market Street, 17th Floor
> Wilmington, DE 19899
> Telephone:  (302) 652-4100
> Facsimile: (302) 652-4400

All notices and requests to any Person of record holding any Claim, Administrative Expense or Interest shall be sent to such Person at the Person's last known address or to the last known address of the Person's attorney of record.  Any such Person may designate in writing any other address for purposes of this section of the Plan, which designation will be effective on receipt.

### 5.   **Successors and Assigns**

The rights, duties and obligations of any Person named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person.

### 6.   **Severability of Plan Provisions**

If, prior to Confirmation, any non-material term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to their terms.

7.      **No Waiver**

Neither the failure of the Debtors to list a Claim in the Debtors' Schedules, the failure of the Debtors to object to any Claim or Interest for purposes of voting, the failure of the Debtors to object to a Claim, Administrative Expense or Interest prior to Confirmation or the Effective Date, the failure of the Debtors to assert a Retained Right of Action prior to Confirmation or the Effective Date, the absence of a proof of Claim having been filed with respect to a Claim, nor any action or inaction of the Debtors, the Reorganized Debtors, or the Revstone/Spara Litigation Trust or Trustee, or any other party with respect to a Claim, Administrative Expense, Interest or Retained Right of Action other than a legally effective express waiver or release shall be deemed a waiver or release of the right of the Reorganized Debtors or the Revstone/Spara Litigation Trust, as applicable, or each of their successors, before or after solicitation of votes on the Plan or before or after Confirmation or the Effective Date to: (a) object to or examine such Claim, Administrative Expense or Interest, in whole or in part or (b) retain and either assign or exclusively assert, pursue, prosecute, utilize, otherwise act or otherwise enforce any Rights of Action.

8.      **Inconsistencies**

In the event the terms or provisions of the Plan are inconsistent with the terms and provisions of the exhibits to the Plan or documents executed in connection with the Plan, the terms of the Plan shall control.

### 9.      U.S. Trustee Fees

All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date.  From and after the Effective Date, the Reorganized Debtors shall pay the fees assessed against its Estate until such time as the particular Chapter 11 Case is closed, dismissed or converted.  In addition, the Reorganized Debtors shall file post-confirmation quarterly reports in conformity with the U.S. Trustee guidelines until entry of an order closing or converting the Chapter 11 Cases.

### 10.     Plan Supplement

No later than ten (10) days prior to the Confirmation Hearing, the Debtors shall File with the Bankruptcy Court the Plan Supplement, which shall contain such substantially final agreements, other documents and information as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  Holders of Claims or Interests may obtain a copy of the Plan Supplement upon written request to the Claims Agent.

### 11.     Preservation of Insurance

The Debtors' release from and payment of Claims as provided in the Plan shall not diminish or impair the enforceability of any insurance policy that may cover any Claims, including, without limitation, any Claims on account of the Debtors' officers or managers.

12.     **Waiver of Stay**

The Debtors request as part of the Confirmation Order a waiver from the Bankruptcy Court of the fourteen (14) day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the fourteen (14) day stay of Bankruptcy Rule 6004(h).

13.     **Choice of Law**

Except to the extent a rule of law or procedures is supplied by federal law (including but not limited to the Bankruptcy Code and the Bankruptcy Rules), this Plan shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts executed in and to be performed in that State.

## XIV.

## CONDITIONS TO EFFECTIVENESS

The Plan will not be consummated and the Effective Date will not occur unless and until (A) the Confirmation Order is in a form acceptable to the Debtors and the Creditors' Committee, which approval shall not be unreasonably withheld; (B) all documents to be provided in the Plan Supplement are in form and substance acceptable to the Debtors and the Creditors' Committee, which approval shall not be unreasonably withheld; (C) the Confirmation Order shall be a Final Order; (D) the Debtors determine in their reasonable business judgment that they have sufficient Cash to pay all Allowed Administrative Expenses, Allowed Tax Claims and Allowed Priority Non-Tax Claims, as of the Effective Date, to the extent the holders thereof are entitled to payment as of such date under the Plan and unless otherwise agreed by such holders, and (E) the Debtors determine in their reasonable business judgment that the Debtors

88

have sufficient Cash to pay all asserted, accrued and estimated Administrative Expenses that have not yet been Allowed or are otherwise not yet payable as of the Effective Date, but which such Administrative Expenses are anticipated by the Debtor in the exercise of its business judgment to be later Allowed or otherwise payable and the holders of any such Administrative Expenses have not agreed to alternative treatment.  Any of the foregoing conditions, other than conditions (D) and (E) and those conditions requiring approval of the Creditors' Committee, may be waived by the Debtors and such waiver shall not require any notice, Bankruptcy Court order, or any further action.

## XV.

## EFFECT OF CONFIRMATION

### A.      Binding Effect of Confirmation

Confirmation will bind the Debtors, all Holders of Claims, Administrative Expenses, or Interests and other parties in interest to the provisions of the Plan whether or not the Claim, Administrative Expense, or Interest of such Holder is Impaired under the Plan and whether or not the Holder of such Claim, Administrative Expense, or Interest has accepted the Plan.

### B.      Good Faith

Confirmation of the Plan shall constitute a finding that:  (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) all Persons' solicitations of acceptances or rejections of the Plan and the offer, issuance,

sale, or purchase of a security offered or sold under the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

## C.        No Limitations on Effect of Confirmation

Nothing contained in the Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

## XVI.

## MODIFICATION OR WITHDRAWAL OF PLAN

## A.        Modification of Plan

The Debtors (following consultation with the Creditors' Committee) may seek to amend or modify the Plan at any time prior to its Confirmation in the manner provided by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise order, and except as otherwise set forth herein, the Debtors (following consultation with the Creditors' Committee) reserve the right to amend the terms of the Plan or waive any conditions to its Confirmation, effectiveness or consummation (subject to the approval of the Creditors' Committee, as applicable), if the Debtors determine that such amendments or waivers are necessary or desirable to confirm, effectuate or consummate the Plan.

After Confirmation of the Plan, but prior to the Effective Date, the Debtors may, pursuant to section 1127 of the Bankruptcy Code, (following consultation with the Creditors' Committee) seek to modify the Plan. After the Effective Date, the Reorganized Debtors or the

Revstone/Spara Litigation Trust, as applicable, may apply to the Bankruptcy Court to remedy defects or omissions in the Plan or to reconcile inconsistencies in the Plan.

**B.**      **Withdrawal of Plan**

The Debtors reserve the right to revoke and withdraw the Plan at any time prior to the Effective Date, in which case the Plan will be deemed to be null and void.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (if any), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests or Claims by the Debtors against any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

*[Remainder of Page Intentionally Left Blank]*

## XVII.

### CONFIRMATION REQUEST

The Debtors request that the Bankruptcy Court confirm the Plan and that it do so, if applicable, pursuant to section 1129(b) of the Bankruptcy Code notwithstanding the rejection of the Plan by any Impaired Class.

January 20, 2015

John C. DiDonato
Chief Restructuring Officer of the Debtors and Debtors in Possession

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Maxim B. Litvak (CA Bar No. 215852)
919 Market Street, 17th Floor | P.O. Box 8705
Wilmington, Delaware  19899-8705
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:      ljones@pszjlaw.com
             dbertenthal@pszjlaw.com
             mlitvak@pszjlaw.com

Counsel to Debtors and Debtors in Possession

# **EXHIBIT A**

**PBGC Settlement Agreement**

## MODIFICATION OF PBGC SETTLEMENT AGREEMENT AND GLOBAL RESOLUTION OF DISPUTES

This *Modification of PBGC Settlement Modification Agreement and Global Resolution of Disputes* (this "Modification Agreement") is made and entered into as of May 1, 2014 by and among the following "Parties":    (a) Revstone Industries, LLC ("Revstone"), Spara, LLC ("Spara"), US Tool & Engineering, LLC ("US Tool"), Greenwood Forgings, LLC ("Greenwood"), and TPOP, LLC f/k/a Metavation, LLC ("TPOP" together with Revstone, Spara, US Tool, and Greenwood, the "Debtors"), (b) the Official Committee of Unsecured Creditors in Revstone's case (the "Committee"), (c) Boston Finance Group, LLC ("BFG"), (d) the Pension Benefit Guaranty Corporation (the "PBGC"), and (e) any other required parties as determined by the foregoing Parties as reflected in the signature page(s) attached hereto.

## RECITALS

WHEREAS, the Debtors each commenced chapter 11 cases (the "Bankruptcy Cases") under title 11 of the United States Code (the "Bankruptcy Code") that are presently pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Bankruptcy Cases of all Debtors except TPOP are jointly administered.

WHEREAS, on December 18, 2012, the United States Trustee appointed the Committee in Revstone's Bankruptcy Case. No committee has been appointed in the Bankruptcy Cases of Spara, Greenwood, US Tool, or TPOP. No trustee or examiner has been appointed in any of the Bankruptcy Cases. BFG and the PBGC are both members of the Committee.

WHEREAS, BFG asserts various claims against the Debtors, excluding TPOP.

WHEREAS, the PBGC asserts various claims against the Debtors and their non-debtor affiliates.

WHEREAS, the Debtors, certain of their non-debtor subsidiaries, and the PBGC entered into that certain *Settlement Agreement* dated as of February 11, 2014 (the "PBGC Settlement Agreement"), which is currently pending before the Bankruptcy Court. Capitalized terms not defined herein shall have the meanings set forth in the PBGC Settlement Agreement.

WHEREAS, on February 14, 2014, the Debtors sought approval of the PBGC Settlement Agreement by the Bankruptcy Court through the filing of the following:  (a) *Motion of Revstone Industries, LLC, et al. for Order Pursuant to 11 U.S.C. §§ 105 & 363 and Bankruptcy Rule 9019 Authorizing and Approving Settlement Agreement With Pension Benefit Guaranty Corporation* [Docket No. 1322], and (b) *Motion of TPOP, LLC for Order Pursuant to 11 U.S.C. §§ 105 & 363 and Bankruptcy Rule 9019 Authorizing and Approving Settlement Agreement With Pension Benefit Guaranty Corporation* [Docket No. 402] (together, the "PBGC Settlement Motions"). The PBGC Settlement Motions are currently set for hearing before the Bankruptcy Court on May 15, 2014.

WHEREAS, the Committee and BFG have objected to the PBGC Settlement Motions in the Bankruptcy Cases.

WHEREAS, there are disputes amongst the Parties as to the PBGC Settlement Agreement, the amount and extent of BFG's and the PBGC's claims against the Debtors' estates, and various other matters.

WHEREAS, on May 1, 2014, the Debtors filed a notice of modifications to the PBGC Settlement Agreement [Docket No. 1477 (Revstone); Docket No. 476 (TPOP)], which incorporated a *Global Resolution Term Sheet* (the "Term Sheet") executed by the Debtors, the Committee, BFG, and the PBGC that modifies the PBGC Settlement Agreement, subject to the execution of definitive documentation.

WHEREAS, in accordance with the Term Sheet, the Parties have reached an agreement to resolve their disputes through a modification to the PBGC Settlement Agreement on the terms set forth herein.

## MODIFICATION AGREEMENT

NOW, THEREFORE, after good faith, arms' length negotiations without collusion, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to modify the PBGC Settlement Agreement pursuant to the following terms:

1.      Effective Date.  The term "Effective Date" as used herein shall mean the first date by which each of the following conditions has occurred:  (a) this Modification Agreement is executed by each of the Parties; (b) the Bankruptcy Court enters orders in each of the Bankruptcy Cases (the "Approval Orders") approving the PBGC Settlement Agreement, as modified by this Modification Agreement, in a form acceptable to the Parties, provided that no such orders have been stayed; and (c) the PBGC Settlement Agreement, as modified by this Modification Agreement, goes into effect, which shall be a date no later than the date that the Approval Orders are entered.

2.      Modification of PBGC Settlement Agreement.  Subject to the occurrence of the Effective Date, this Modification Agreement modifies in certain respects the provisions of the PBGC Settlement Agreement.  To the extent of any inconsistency between the PBGC Settlement Agreement and this Modification Agreement, it is intended by the Parties that this Modification Agreement shall govern.  Except as specifically modified hereby, the PBGC Settlement Agreement remains in full force and effect.  The original PBGC Settlement Agreement is attached hereto as **Exhibit A**.

3.      Consensual Resolution Terms.

(a)      Subject to the occurrence of the Effective Date, the Parties hereby agree to and incorporate herein the consensual resolution terms set forth in **Exhibit B** attached hereto (the "Summary of Terms"), including the modified Funding Schedule.  Upon the Effective Date, the modified Funding Schedule shall supersede the Funding Schedule attached to the PBGC Settlement Agreement.

(b)      Pursuant to this Modification Agreement and the Summary of Terms, without limitation as to the remaining provisions of the Summary of Terms, the Parties have agreed to the following principal modifications to the PBGC Settlement Agreement:  (a)

although the Allowed PBGC Bankruptcy Claim shall remain at $95,000,000, the target for the PBGC Recovery will be reduced from $82,000,000 to $77,000,000 and the PBGC Minimum Recovery will be reduced from $80,000,000 to $75,000,000; (b) the first $3,000,000 from the non-Debtors' sale proceeds otherwise payable to the PBGC under the PBGC Settlement Agreement will be utilized to provide an up-front recovery under a chapter 11 plan to Revstone's general unsecured creditors, other than BFG; and (c) the first $2,000,000 of litigation proceeds otherwise payable to the PBGC under the PBGC Settlement Agreement will be distributed to the Revstone estate under a chapter 11 plan for the benefit of administrative claimants (who will receive $1,500,000) and general unsecured creditors (who will receive $500,000), other than BFG.

4.    <u>BFG Claim and Recovery</u>.

(a)    Within two (2) business days following the Effective Date, BFG shall be paid the sum of $7,300,000 (the "<u>BFG Settlement Payment</u>") out of the existing "Revstone Escrows" specified in the "PBGC" column of the modified Funding Schedule (attached to the Summary of Terms). The PBGC consents to the use of its share of the "Revstone Escrows" for purposes of making the BFG Settlement Payment. The BFG Settlement Payment shall be in full and final resolution of any and all claims of BFG against Spara, except as set forth in section 4(b) below. Upon receipt of the BFG Settlement Payment, BFG shall have no further claims against Spara, except as set forth in section 4(b) below.

(b)    Upon the Effective Date, BFG shall be deemed to have an allowed administrative expense claim against Spara in the amount of $500,000 and an allowed administrative expense claim against Revstone in the amount of $700,000. Such administrative expense claims will be payable in full upon the effective date of a chapter 11 plan or plans for the Debtors (the "<u>Plan</u>"). BFG shall have no other administrative expense claims against any of the Debtors.

(c)    Upon the Effective Date, BFG shall be deemed to have an allowed non-priority unsecured claim against Revstone in the amount of $8,500,000 (the "<u>Allowed BFG Revstone Claim</u>"). BFG agrees to waive any recovery on account of the Allowed BFG Revstone Claim from: (a) the Revstone Unsecured Guarantee Reserve (as defined in the Summary of Terms), and (b) the Revstone general unsecured creditors' portion of a carveout in the amount of $2,000,000 from litigation proceeds to be released by the PBGC with respect to the PBGC's rights in such litigation proceeds (the "<u>PBGC Carve Out Proceeds</u>"). BFG shall be entitled to receive distributions on account of the Allowed BFG Revstone Claim made to unsecured creditors of Revstone in excess of the Revstone Unsecured Guarantee Reserve and the general unsecured creditors' portion of the PBGC Carve Out Proceeds in a percentage to be agreed upon between the Committee and BFG. Except as set forth in section 4(b) above, BFG shall have no allowed claims against Revstone other than the Allowed BFG Revstone Claim.

5.    <u>Litigation Budget and Allocation of Proceeds</u>. Subject to the occurrence of the Effective Date, the Parties will agree in good faith upon appropriate budgeting and fee arrangements with respect to the prosecution of litigation prior to the effective date of the Plan, and thereafter, any litigation will be handled through the litigation trust consistent with the Summary of Terms. As set forth in the Summary of Terms, the allocation of litigation proceeds

between the Revstone and Spara estates will be addressed by agreement amongst the Debtors and the Committee in connection with the effective date of the Plan.

6.     Management of the Debtors.  Subject to the occurrence of the Effective Date, the Parties agree that existing management of the Debtors will remain in place through the effective date of the Plan.  Following the effective date of the Plan, existing management of Spara, TPOP, and the remaining Debtors (except Revstone) will remain in place.  Revstone's management following the effective date of the Plan is addressed in the Summary of Terms.

7.     Cessation of Litigation and Plan Support.  Immediately upon execution of this Modification Agreement and through the date of entry of the Approval Orders, all litigation and objections involving the Parties and in connection with the Debtors' bankruptcy proceedings shall cease and the Parties shall take any and all reasonable means to support and obtain approval of the terms of the PBGC Settlement Agreement, as modified by this Modification Agreement, and confirmation of the Plan consistent with the terms hereof.  Any pending litigation matters or objections shall be withdrawn without prejudice or otherwise taken off calendar pending entry of the Approval Orders.  Upon the Effective Date and BFG's receipt of the BFG Settlement Payment in accordance with section 4(a) hereof, any litigation matters or objections involving the Parties and in connection with the Debtors' bankruptcy proceedings shall be deemed withdrawn with prejudice, including without limitation, the Committee's and BFG's objections to the PBGC Settlement Motions, the Committee's motion to appoint a chapter 11 trustee in Revstone's case, and the Parties' objections to the retention and compensation of the Debtors' and the Committee's professionals.  The Parties shall jointly seek an order of the Bankruptcy Court discharging the fee auditor appointed in the Bankruptcy Cases from further responsibilities in the Bankruptcy Cases.  Revstone shall pay any allowed fees or expenses incurred by the fee auditor in the Bankruptcy Cases in the ordinary course.  Further, upon the Effective Date, the Committee and BFG shall provide such documentation as the Debtors may reasonably request in connection with seeking the release of an escrow created in connection with the sale of assets of Contech Castings, LLC and Contech Castings Real Estate Holdings, LLC to Shiloh Die Cast Midwest LLC under that certain *Asset Purchase Agreement* dated June 11, 2013, as amended.

8.     Release and Exculpation.  Upon the occurrence of the Effective Date, the Parties agree that the Plan shall contain releases and exculpation provisions consistent with the *First Amended Chapter 11 Plan of Reorganization for Revstone Industries, LLC, as Modified*, filed in Revstone's Bankruptcy Case on August 28, 2013 [Docket No. 985].

9.     Additional BFG Claims.  To the extent that BFG acquires any additional claims in any of the Debtors' Bankruptcy Cases, the terms hereof shall apply in all respects with regard to such claim(s), if any, provided that BFG shall be entitled to any unsecured creditor recoveries to which such claim(s) are otherwise entitled and BFG shall be entitled to defend such claim(s) in the event of any objections thereto.

10.    Party Representations.  Each Party hereby represents and warrants that: (a) such Party and the signatory hereto has the power and authority to execute, deliver and perform this Modification Agreement; (b) such Party has taken all necessary actions to authorize the execution, delivery and performance of this Modification Agreement; (c) this Modification Agreement has been duly executed and delivered by such Party and, subject to the occurrence of the Effective Date, constitutes the legal, valid, and binding obligations of such Party, enforceable

- 4 -

against it in accordance with their respective terms; (d) such Party's execution, delivery, and performance of this Modification Agreement does not and will not conflict with, or constitute a violation or breach of, or constitute a default under any obligation of such Party and will not violate any applicable law, or any order or decree of any court or government instrumentality applicable to such Party; and (e) such Party has entered into this Modification Agreement in reliance on its own independent investigation and analysis of the facts underlying the subject matter of this Modification Agreement, and no representations, warranties, or promises of any kind have been made directly or indirectly to induce it to execute this Modification Agreement other than those that are expressly set forth in this Modification Agreement.

11.    <u>Continuing Bankruptcy Court Jurisdiction</u>.    Each Party agrees that, with respect to disputes involving the Debtors, the Bankruptcy Court shall have exclusive jurisdiction over any disputes regarding the validity, interpretation, or performance of this Modification Agreement so long as the Bankruptcy Cases are pending, and each of the Parties consents to personal jurisdiction and venue in the Bankruptcy Court in connection with any such disputes; <u>provided</u>, <u>however</u>, that if the Bankruptcy Cases are no longer pending, or if the Bankruptcy Court cannot or does not exercise jurisdiction, such jurisdiction and venue shall belong to the federal courts in the District of Delaware. Each Party further agrees that, with respect to disputes solely involving non-Debtors, the federal courts in the District of Delaware shall have exclusive jurisdiction over any disputes regarding the validity, interpretation, or performance of this Modification Agreement.

12.    <u>Specific Performance; Damages</u>.    The exact nature and extent of damages resulting from a breach of this Modification Agreement are uncertain at the time of entering into this Modification Agreement and breach of this Modification Agreement would result in damages that would be difficult to determine with certainty. Money damages would not be a sufficient remedy for any breach of this Modification Agreement, and the Parties shall each be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach. Notwithstanding anything to the contrary set forth above, the remedy of specific performance shall not be the exclusive remedy of the Parties under this Modification Agreement in the event of a breach of this Modification Agreement by another Party hereto.

13.    <u>Voluntary Agreement</u>.    Each Party acknowledges that it has read all of the terms of this Modification Agreement, has had an opportunity to consult with counsel of its own choosing or voluntarily waived such right and enters into this Modification Agreement voluntarily and without duress.

14.    <u>Further Assurances</u>.    Each Party agrees, without further consideration, to execute and deliver such other documents and to take such other action as may be necessary to consummate the purposes of this Modification Agreement.

15.    <u>No Admission</u>.    This Modification Agreement is for settlement purposes only and shall not be construed or deemed an admission by any Party to this Modification Agreement of wrongdoing, liability, fault, or the validity of any claims.

16.    <u>Valid Provisions Remain Effective</u>.    If any provision in this Modification Agreement shall be invalid, inoperative or unenforceable, the remaining provisions of this Modification Agreement shall remain in effect if both the economic and legal substance of the

terms contemplated hereby are not materially affected in any manner adverse to any Party. Otherwise, the Parties shall negotiate in good faith to rewrite any such provision so as to, as nearly and fairly as possible, approach the economic and legal substance originally intended.

17.    Construction. The language used in this Modification Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against either Party. Nor will any rule of construction that favors a non-draftsman be applied. A reference to any statute will be deemed also to refer to all rules and regulations promulgated under the statute, unless the context requires otherwise. Unless specifically otherwise provided or the context otherwise requires, the singular includes the plural and the plural the singular; the word "or" is deemed to include "and/or", the words "including", "includes" and "include" are deemed to be followed by the words "without limitation", and references to sections are to those of this Modification Agreement. Headings in this Modification Agreement are included for convenience of reference only and do not constitute a part of this Modification Agreement for any other purpose.

18.    Advice of Counsel. Each Party represents that it has had the opportunity to obtain advice of counsel in connection with this Modification Agreement and all matters covered hereby, and that each Party has been fully advised by those attorneys with respect to its rights and obligations under this Modification Agreement.

19.    Counterparts. This Modification Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Modification Agreement. Delivery of a signature page to this Modification Agreement by facsimile or other electronic means shall be effective as delivery of the original signature page to this Modification Agreement.

20.    Joint Drafting. This Modification Agreement shall be deemed to have been jointly drafted by the Parties, and in construing and interpreting this Modification Agreement, no provision shall be construed and interpreted for or against any Party because such provision or any other provision of the Modification Agreement as a whole is purportedly prepared or requested by such Party.

21.    Applicable Law.    The validity, interpretation, and performance of this Modification Agreement shall be construed and interpreted according to the laws of the State of Delaware, except to the extent that (a) provisions of the Bankruptcy Code apply, in which event the Bankruptcy Code shall control, or (b) applicable federal law preempts state law.

22.    Attorneys' Fees, Costs and Expenses. Each Party agrees to bear its own costs and expenses, including attorneys' fees, arising out of the matters addressed by this Modification Agreement.

23.    Entire Agreement. This document contains the entire agreement between the Parties as to the modifications to be made to the PBGC Settlement Agreement, and may only be modified in writing signed by the Parties or their duly appointed agents. All prior agreements and understandings between the Parties concerning the subject matter hereof are superseded by the terms of this Modification Agreement. Except as specifically modified hereby, the PBGC Settlement Agreement remains in full force and effect.

24.     Inconsistency.  As noted above, to the extent of any inconsistency between the PBGC Settlement Agreement and this Modification Agreement, it is intended by the Parties that this Modification Agreement shall govern.

25.     Successors and Assigns.  This Modification Agreement shall be binding on and inure to the benefit of the Parties and their respective agents, employees, affiliates, successors, and, with the consent of all Parties, assigns.

26.     Notices.  All notices, consents, waivers, and other communications under this Modification Agreement must be in writing and shall be deemed to have been duly given when: (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of receipt), or (c) received by the addressee, if sent by email, in each case to the appropriate addresses, representative (if applicable) or if sent by telecopier to telecopier numbers set forth in the signature page(s) attached hereto (or to such other addresses, representative and telecopier numbers as a Party may designate by notice to the other Parties in accordance with this paragraph).

[signature page follows]

DOCS_SF:85161.3 73864/001

IN WITNESS WHEREOF, the Parties have executed this Modification Agreement as of the date written in the opening paragraph hereof.

**Revstone Industries, LLC**
**Spara, LLC**
**Greenwood Forgings, LLC**
**US Tool & Engineering, LLC**
**TPOP, LLC f/k/a Metavation, LLC**

_____
John C. DiDonato
Chief Restructuring Officer

c/o Pachulski Stang Ziehl & Jones, LLP
Attn: Laura Davis Jones, Esq.
919 North Market Street, 17th Floor
Wilmington, DE 19801
Fax: (302) 652-4400
Email: ljones@pszjlaw.com


**Official Committee of Unsecured**
**Creditors of Revstone Industries, LLC**

_____
Mark L. Desgrosseilliers, Esq.
Counsel for the Committee

c/o Womble Carlyle Sandridge & Rice, LLP
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Fax: (302) 252-4330
Email: mdesgrosseilliers@wcsr.com


**Boston Finance Group, LLC**

_____
Jonathan Golden
Vice President
c/o DLA Piper LLP
Atten: Gregg M. Galardi

1251 Avenue of the Americas
New York, NY 10020-1104
Fax: (212) 884-8540
Email: gregg.galardi@dlapiper.com


**Pension Benefit Guaranty Corporation**

_____
Dana Cann
Corporate Finance and Restructuring
Department

1200 K Street NW, Suite 340
Washington, D.C. 20005
Fax: (202) 326-4112
Email: cann.dana@pbgc.gov

IN WITNESS WHEREOF, the Parties have executed this Modification Agreement as of the date written in the opening paragraph hereof.

**Revstone Industries, LLC**
**Spara, LLC**
**Greenwood Forgings, LLC**
**US Tool & Engineering, LLC**
**TPOP, LLC f/k/a Metavation, LLC**

**Official Committee of Unsecured**
**Creditors of Revstone Industries, LLC**

_____
John C. DiDonato
Chief Restructuring Officer

Mark L. Desgrosseilliers, Esq. _& Matthew P. Ward, Esq._
Counsel for the Committee

c/o Pachulski Stang Ziehl & Jones, LLP
Attn: Laura Davis Jones, Esq.
919 North Market Street, 17th Floor
Wilmington, DE 19801
Fax: (302) 652-4400
Email: ljones@pszjlaw.com

c/o Womble Carlyle Sandridge & Rice, LLP
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Fax: (302) 252-4330
Email: mdesgrosseilliers@wcsr.com
        maward@wcsr.com

**Boston Finance Group, LLC**

**Pension Benefit Guaranty Corporation**

_____
Jonathan Golden
Vice President

_____
Sanford Rich
[CNR]

c/o DLA Piper LLP
Atten: Gregg M. Galardi
1251 Avenue of the Americas
New York, NY 10020-1104
Fax: (212) 884-8540
Email: gregg.galardi@dlapiper.com

1200 K Street NW, Suite 340
Washington, D.C. 20005
Fax: (202) 326-4112
Email: _____

- 8 -

## EXHIBIT A

**PBGC SETTLEMENT AGREEMENT**

# SETTLEMENT AGREEMENT

This Settlement Agreement (this "Agreement") is made and entered into as of February 11, 2014 by and among the following "Parties": (a) Revstone Industries, LLC ("Revstone"), Spara, LLC ("Spara"), TPOP, LLC f/k/a Metavation, LLC ("Metavation"), Fairfield Castings, LLC ("Fairfield"), (b) chapter 11 debtors U.S. Tool & Engineering LLC ("U.S. Tool") and Greenwood Forgings, LLC ("Greenwood" and together with chapter 11 debtors Revstone, Spara, Metavation, and U.S. Tool, the "Debtors"), (c) those subsidiaries of Revstone and Spara as reflected in the signature page(s) attached hereto (together with the Debtors and Fairfield, the "PBGC Obligors"), (d) the Pension Benefit Guaranty Corporation (the "PBGC"), and (e) any other required parties as determined by the foregoing Parties as reflected in the signature page(s) attached hereto.

# RECITALS

WHEREAS, the Debtors each commenced chapter 11 cases (the "Bankruptcy Cases") under title 11 of the United States Code (the "Bankruptcy Code") that are presently pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Bankruptcy Cases of all Debtors except Metavation are being jointly administered.

WHEREAS, the PBGC has filed proofs of claims in the Bankruptcy Cases relating to the Hillsdale Hourly Pension Plan, the Hillsdale Salaried Pension Plan, and the Revstone Casting Fairfield GMP Local 359 Pension Plan (together, the "Pension Plans").

WHEREAS, the PBGC has filed an action against Metavation and Fairfield, styled *Pension Benefit Guaranty Corporation v. Metavation LLC et al.*, No. 5:13-cv-273 (E.D. Ky. filed Aug. 23, 2013) (the "PBGC Litigation"), seeking termination of the Pension Plans.

WHEREAS, the PBGC has asserted or may assert liens on behalf of the Pension Plans under section 430(k) of the Internal Revenue Code of 1986, as amended, against certain assets of the PBGC Obligors (the "430(k) Liens").

WHEREAS, the PBGC has asserted or may assert claims against the PBGC Obligors relating to unpaid contributions due to the Pension Plans, the Pension Plans' unfunded benefit liabilities, and termination premiums.

WHEREAS, in the litigation styled *Perez v. Hofmeister*, No. 12-cv-250 (E.D.Ky. filed Aug. 9, 2012) and the lawsuits consolidated therewith (*Perez v. Hofmeister et. al.*, no. 13-cv-156 (E.D.Ky. filed May 30, 2013) (the "DOL Litigation"), the United States Department of Labor ("DOL") has asserted against certain of the PBGC Obligors and others, claims relating to, *inter alia*, the management and administration of the Pension Plans, the transfer, use, and investment of the Pension Plans' assets, and the payment and allocation of fees and expenses.

WHEREAS, there are disputes amongst the Parties as to the PBGC's claims against the PBGC Obligors, and the allegations the PBGC and the DOL asserted in the PBGC Litigation and the DOL Litigation.

WHEREAS, the Parties have reached an agreement to resolve their disputes on the terms set forth herein.

## AGREEMENT

NOW, THEREFORE, after good faith, arms' length negotiations without collusion, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the following terms:

1.        Effective Date.  The term "Effective Date" shall mean the first date by which each of the following conditions has occurred:  (a) this Agreement is executed by each of the Parties; (b) the Bankruptcy Court enters orders in each of the Bankruptcy Cases approving this Agreement in a form acceptable to the Parties, provided that no such orders have been stayed; and (c) the satisfaction of all obligations in paragraph 14(a) of this Agreement.  Within five (5) business days following execution of this Agreement, the Debtors shall file motions with the Bankruptcy Court in each of their Bankruptcy Cases requesting approval of this Agreement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

2.        Allowed PBGC Claim and Claims against Non-Debtor PBGC Obligors.  On the Effective Date, (a) subject to paragraph 7 below, the PBGC shall have an allowed general unsecured, non-priority claim against each of the Debtors in the amount of $95,000,000 (the "Allowed PBGC Bankruptcy Claim"), and (b) the PBGC shall have undisputed joint and several claims in the amount of $95,000,000 against all non-Debtor PBGC Obligors that are organized in the United States (the "Undisputed PBGC Non-Debtor Claim", and collectively with the Allowed PBGC Bankruptcy Claim, the "Allowed PBGC Claim").  For the avoidance of doubt, the Allowed PBGC Claim is $95,000,000.

3.        PBGC Recovery.  Subject to the provisions of paragraph 7 below, total distributions on account of the Allowed PBGC Claim (the "PBGC Recovery") are targeted at $82,000,000, but shall in no event be less than $80,000,000 (the "PBGC Minimum Recovery"), or more than the Allowed PBGC Claim (the "PBGC Maximum Recovery") in the aggregate.

4.        Distributions to the Parties.  Distributions to the PBGC, Revstone, and Spara shall be made in accordance with the Funding Schedule attached hereto as **Exhibit A** and incorporated herein by reference.  Payments will be made to the PBGC or the Pension Plans, as directed by the PBGC, and to Revstone and Spara, as directed by their bankruptcy estates or any successors thereto.  The term "Net Proceeds", as the term is used in this Agreement, refers to the projected "Net Proceeds for PBGC & Estates" specified in the first column of the Funding Schedule and as defined therein.

(a)        The amounts specified in the Funding Schedule columns designated "PBGC" and "Revstone" and the rows captioned "Revstone Escrows" shall be paid to or as directed by the PBGC or Revstone, as applicable, within five (5) business days of the Effective Date.

(b)        The amounts specified in the Funding Schedule columns designated "PBGC," "Revstone," and "Spara" and the rows captioned "Revstone Sales in Process" and "Spara Sales to be Initiated" shall be paid to or as directed by the PBGC, Revstone, or Spara, as

applicable, at the closing of each sale. Revstone and Spara shall use their best efforts to close on such sales of substantially all of their subsidiaries' assets as expeditiously as possible.

(c)    Funds in Metavation's estate shall be distributed in accordance with the Bankruptcy Code and the Funding Schedule. All amounts paid to the PBGC or the Pension Plans from Metavation's estate, regardless of whether such payments are made with respect to claims filed by the PBGC, the DOL, or the Pension Plans, shall be credited toward the PBGC Minimum Recovery.

(d)    If the actual amount of Net Proceeds differs from the amounts specified in the first column of the Funding Schedule captioned "Net Proceeds for PBGC & Estates," the proceeds shall be allocated to the distributees in the remaining columns in the same proportion as the amounts specified.

(e)    Upon the final reconciliation described in paragraph 9 below, to the extent aggregate actual Net Proceeds are less than projected in the Funding Schedule by up to $2,000,000, distributions to the PBGC shall be reduced dollar for dollar, but in no event to less than the PBGC Minimum Recovery. *See* **Exhibit B**, Example 1.

(f)    If aggregate actual Net Proceeds are less than projected in the Funding Schedule by more than $2,000,000, the PBGC shall be paid from the "Hold Back/Escrows" specified in the last two columns of the Funding Schedule up to the PBGC Minimum Recovery.

(g)    If the Hold Back/Escrows do not have sufficient assets for the PBGC to reach the PBGC Minimum Recovery, Revstone's and Spara's estates shall be jointly and severally liable for paying the PBGC such deficiency unless and until PBGC receives the PBGC Minimum Recovery.

5.    Credit Against PBGC Minimum Recovery. Amounts paid or caused to be paid to the Pension Plans subsequent to Revstone's bankruptcy petition by the PBGC Obligors, by any other person or entity within the controlled group (as described in 29 U.S.C. § 1301(a)(14)) of Metavation or Fairfield, or by other third parties on account of payments directed to the Pension Plans or the PBGC on behalf of the Pension Plans shall be credited toward the PBGC Minimum Recovery. To date, this amount is $21,693,767 in the aggregate. Accordingly, as of the date of this Agreement, the additional amount necessary to reach the PBGC Minimum Recovery is $58,306,233.

6.    PBGC Upside Recovery. As set forth in the Funding Schedule, total Net Proceeds are targeted at $113,500,000 in the aggregate. If actual Net Proceeds exceed this amount by up to $2,500,000, such excess shall be distributed entirely to the Revstone and Spara estates and allocated amongst them based on the estate generating the excess proceeds. If actual Net Proceeds exceed $116,000,000, then any such excess proceeds shall be distributed fifty percent (50%) to the PBGC (the "PBGC Upside Recovery") and fifty percent (50%) to the Revstone and Spara estates and allocated amongst the estates based on the estate generating the excess proceeds. Any PBGC Upside Recovery will be in addition to the PBGC Minimum

Recovery. In no case will the PBGC Upside Recovery and the PBGC Minimum Recovery, together, exceed the PBGC Maximum Recovery. *See* **Exhibit B**, Example 2.

7.    PBGC Consent.

(a)    Subject to paragraph 7(b), the PBGC agrees to allow distributions to be made to Revstone's and Spara's bankruptcy estates consistent with the Funding Schedule, and for Revstone and Spara to utilize such distributions for the payment of allowed creditor claims against their respective estates (other than the Allowed PBGC Bankruptcy Claim), except to the extent necessary to: (a) compensate the PBGC consistent with paragraph 3 as it relates to the PBGC Minimum Recovery and paragraph 6 as it relates to the PBGC Upside Recovery, and (b) allow the Allowed PBGC Claim to participate in net litigation recoveries (as described in paragraph 12 below).

(b)    Until the PBGC receives the PBGC Minimum Recovery, the estates of Revstone and Spara shall retain 50 percent of the amount that would otherwise be distributed to those estates' general unsecured creditors in accordance with the Funding Schedule, but in in no event less than $2.072 million at Revstone and $0.928 million at Spara. After such time as PBGC receives the PBGC Minimum Recovery, the amount retained by the estates under the previous sentence can be distributed to the general unsecured creditors of the Revstone and Spara bankruptcy estates as is consistent with the Funding Schedule and the Bankruptcy Code.

(c)    So long as there is no material breach of the terms of this Agreement, the PBGC will take no action in the Bankruptcy Cases that is inconsistent with this Agreement. The PBGC will take such steps, in the Bankruptcy Cases and otherwise, as are reasonably necessary to give effect to the terms hereof.

8.    PBGC Lien Release. Following the Effective Date, the PBGC shall: (a) promptly file a withdrawal of notice of federal lien with respect to each filed 430(k) Lien, (b) not assert any non-filed 430(k) Lien against the assets of any PBGC Obligor, and (c) not assert any additional liens against the assets of any of the PBGC Obligors. The PBGC shall also provide any releases reasonably requested by the PBGC Obligors that are necessary to consummate asset sales.

9.    Final Reconciliation. Once the material assets of the PBGC Obligors have been liquidated and the amount of actual Net Proceeds determined, the Parties shall reconcile the amounts distributed, and/or to be distributed, to the Parties consistent with the recoveries to the PBGC, Revstone, and Spara required by this Agreement and the Funding Schedule. Any funds not needed to provide the PBGC with the PBGC Minimum Recovery, or the PBGC Upside Recovery, as applicable, shall be immediately distributed from the HoldBack/Escrow to the Revstone and Spara estates in a manner consistent with the Funding Schedule. In the event that the PBGC receives distributions out of the Hold Back/Escrow or the Revstone or Spara estates in order to reach the PBGC Minimum Recovery, any subsequent asset recoveries, will be distributed to the Revstone and Spara estates up to the amount distributed to the PBGC out of the Hold Back/Escrow or from the estates, subject to full payment of the PBGC Minimum Recovery.

10.    Pension Plan Terminations. On the Effective Date, Metavation and Fairfield shall consent to immediate termination of the Pension Plans by executing agreements acceptable

- 4 -

to the PBGC effecting (a) termination of the Hillsdale Hourly Plan and Hillsdale Salaried Plan with a termination date under 29 U.S.C. § 1348 of March 1, 2013 and of the Revstone Casting Fairfield GMP Local 359 Pension Plan with a termination date under 29 U.S.C. § 1348 of August 29, 2013, and (b) the PBGC trusteeship of the Pension Plans pursuant to 29 U.S.C. § 1342.   Promptly after execution of such agreements, the PBGC will dismiss the PBGC Litigation, with each Party bearing its own fees and costs. The Parties shall take any and all appropriate actions to effectuate the foregoing terminations and dismissal.   Upon such terminations of the Pension Plans under 29 U.S.C. § 1342, any claims filed by the Pension Plans against the Debtors' bankruptcy estates shall be deemed withdrawn. For the avoidance of doubt, the preceding sentence does not apply to, or affect the validity of, the Allowed PBGC Claim.

11.     <u>Payment of Administrative and Priority Claims</u>. From and after the Effective Date, each of the Debtors may use available cash in their respective estates to satisfy any allowed administrative or priority claims, including funding of the Reserves (as defined below) at Revstone and Spara.

12.     <u>Plan/Litigation Reserves</u>.

(a)     The chapter 11 plan or plans in the Revstone and Spara bankruptcies as described in <u>paragraph 16</u> below will provide that the following reserves (the "<u>Reserves</u>") shall be created to the extent of available cash:

(1)     at Revstone, a reserve for post-effective date administrative expenses (excluding litigation expenses) in the amount of $1,000,000;

(2)     at Spara, a reserve for post-effective date administrative expenses (excluding litigation expenses) in the amount of $750,000;

(3)     at Revstone, a reserve for litigation expenses in the amount of $1,500,000; and

(4)     at Spara, a reserve for litigation expenses in the amount of $500,000.

(b)     Creation of Reserves.

(1)     The reserves described in <u>clauses 12(a)(1) and (2)</u> will be created on the effective date of the chapter 11 plan(s).

(2)     The reserves described in <u>clauses 12(a)(3) and (4)</u> will be created either:

(i) subject to <u>clause 12(b)(2)(ii),</u> on the effective date of a chapter 11 plan or plans in the Revstone and Spara bankruptcies as described in <u>paragraph 16</u> below, or

(ii) if such funds are not available on the effective date of such chapter 11 plan or plans, then (A) 50% of the applicable reserve amount on the date that the applicable Revstone or Spara estate receives 75% of its recoveries contemplated by the Funding Schedule, and (B) the remaining 50% of the applicable reserve

- 5 -

amount on the date that the applicable Revstone or Spara estate receives 85% of its recoveries contemplated by the Funding Schedule.

(c)     Subject to the payment of any amounts required under the last sentence of paragraph 9 hereof, any net recoveries on litigation claims prosecuted by the Revstone or Spara estates, including the post-confirmation estates, shall be distributed fifty percent (50%) to the PBGC, up to the PBGC Maximum Recovery, and fifty percent (50%) to the Revstone and Spara estates and allocated amongst the estates based on the estate generating such litigation recoveries.

13.     PBGC Releases and Exculpation.  The following release shall be effective (a) as to each PBGC Obligor that has already sold its assets and whose proceeds are currently in escrow as reflected in the Funding Schedule, upon the Effective Date, (b) as to each PBGC Obligor that has assets to sell as reflected in the Funding Schedule, upon the consummation of the sale of such assets and distribution to the PBGC of the proceeds in accordance with the Funding Schedule and this Agreement, and (c) as to the remaining PBGC Obligors, upon the consummation of the sale of the assets reflected on the Funding Schedule and distribution to the PBGC of the proceeds in accordance with the Funding Schedule and this Agreement (as to each PBGC Obligor as applicable, the "Applicable Release Date").  Upon the Applicable Release Date, except as to the Allowed PBGC Claim and the other rights and obligations of the Parties under this Agreement, the PBGC, on behalf of itself and the Pension Plans following the PBGC trusteeship (the "PBGC Releasors"), shall be deemed to have irrevocably waived, released and discharged all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, causes of action, and liabilities that the PBGC Releasors have, may have or are entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity, or otherwise, against each applicable PBGC Releasee (as defined below), based in whole or in part upon any act or omission, transaction, or occurrence taking place on or prior to the Effective Date with respect to the Pension Plans or the Bankruptcy Cases, excluding any claims arising under Title I of ERISA.

The term "PBGC Releasee" means, except as otherwise provided herein, each of the PBGC Obligors, and each of their respective employees, directors, officers, members, agents, advisors or counsel (each in their capacity as such).  Notwithstanding anything to the contrary in this Agreement, the PBGC Releasees do not include (a) George Hofmeister; (b) any relatives of George Hofmeister (by blood or otherwise); (c) any affiliates or trusts of George Hofmeister or such relatives (other than the PBGC Obligors); and (d) any person or entity, other than a PBGC Obligor, that is named as a defendant in DOL Litigation.  As will be further provided in the Plan Support Agreement described in paragraph 16 below, the Parties will support a chapter 11 plan or plans for each of the Debtors that will include customary exculpatory provisions for the respective officers, directors, employees, members, agents, representatives and professionals of each of the Debtors from any matters arising out of or relating to the Pension Plans or the Bankruptcy Cases, excluding the persons and entities described in the preceding sentence.

14.     Resolution of DOL Litigation.

(a)     The DOL, Metavation, and Fairfield shall seek entry of consent judgments in the DOL Litigation, which shall state the amounts each of Metavation and Fairfield owes to the Pension Plans, concluding the litigation as to those two defendants only, and releasing

- 6 -

all DOL claims against those two defendants, except as necessary to give effect to the consent judgments and this Agreement   The consent judgments shall be acceptable in form and substance to all other Parties hereto.

(b)     Upon the Effective Date, the DOL shall have an allowed general unsecured claim in the Metavation bankruptcy in the amount set forth in the consent judgment. In addition, the DOL shall retain the right to (1) file a subordinated penalty claim in the Metavation bankruptcy under 29 U.S.C. § 502(l), and (2) assess a penalty under 29 U.S.C. § 502(l) against Fairfield.

(c)     Any amounts recovered by the DOL against any of the PBGC Obligors, including any section 502(l) penalty paid by Fairfield, will reduce, dollar for dollar, the PBGC Minimum Recovery.  Further, the consent judgments shall provide that the DOL shall withdraw, and shall not assert, any objections to the Debtors' efforts to sell assets or to confirm a chapter 11 plan(s) consistent with this Agreement.

15.     <u>Management of Debtors</u>.  The PBGC shall support the continued management of the Debtors by the current Chief Restructuring Officer and the Restructuring Committee through the effective date of a chapter 11 plan or plans, and thereafter through the designees or successors thereto proposed by the Debtors in a chapter 11 plan or plans.

16.     <u>Plan Support Agreement</u>.  Upon the Effective Date, the Parties shall execute a Plan Support Agreement in substantially the form attached hereto as **<u>Exhibit C</u>** (the "<u>Plan Support Agreement</u>"), which reflects the Parties' support of the chapter 11 plan that was previously filed by Revstone in the Bankruptcy Cases in all material respects, as such plan shall be amended to the extent necessary to be consistent with this Agreement, or as otherwise may be modified by Revstone or supplemented by separate plans of Spara or the other Debtors in conformity with this Agreement.  The Parties agree to support the Debtors' proposed chapter 11 plan or plans so long as such plan(s) are consistent with this Agreement.

17.     <u>Sources and Uses</u>.  Prior to the closing of each such sale, the entity selling its assets will provide to PBGC a schedule of sources and uses in connection with that sale.

18.     <u>Withdrawal of PBGC Motions</u>.  Upon the Debtors' filing of motions to approve this Agreement as described in paragraph 1 above, the PBGC shall promptly withdraw its: (a) motion to convert Metavation's chapter 11 case to chapter 7, (b) joinder to the motion of the Official Committee of Unsecured Creditors to appoint a chapter 11 trustee in Revstone's case, and (c) objections to any fee requests of the Debtors' professionals.  Further, the PBGC shall take such other action as reasonably necessary to support the Debtors' efforts to obtain approval of this Agreement and to confirm a chapter 11 plan or plans consistent with this Agreement.

19.     <u>Party Representations</u>.  Each Party hereby represents and warrants that: (a) such Party and the signatory hereto has the power and authority to execute, deliver and perform this Agreement; (b) such Party has taken all necessary actions to authorize the execution, delivery and performance of this Agreement; (c) this Agreement has been duly executed and delivered by such Party and, subject to the occurrence of the Effective Date, constitutes the legal, valid, and binding obligations of such Party, enforceable against it in

accordance with their respective terms; (d) such Party's execution, delivery, and performance of this Agreement does not and will not conflict with, or constitute a violation or breach of, or constitute a default under any obligation of such Party and will not violate any applicable law, or any order or decree of any court or government instrumentality applicable to such Party; and (e) such Party has entered into this Agreement in reliance on its own independent investigation and analysis of the facts underlying the subject matter of this Agreement, and no representations, warranties, or promises of any kind have been made directly or indirectly to induce it to execute this Agreement other than those that are expressly set forth in this Agreement.

20.　　Further Representation and Warranty.　Each Party hereby represents and warrants that, to the best of its knowledge, each of the Pension Plans have no outstanding liabilities other than to the plan participants, to PBGC or to the plan professionals.

21.　　Continuing Bankruptcy Court Jurisdiction.　Each Party agrees that, with respect to disputes involving the Debtors, the Bankruptcy Court shall have exclusive jurisdiction over any disputes regarding the validity, interpretation, or performance of this Agreement so long as the Bankruptcy Cases are pending, and each of the Parties consents to personal jurisdiction and venue in the Bankruptcy Court in connection with any such disputes; provided, however, that if the Bankruptcy Cases are no longer pending, or if the Bankruptcy Court cannot or does not exercise jurisdiction, such jurisdiction and venue shall belong to the federal courts in the District of Delaware. Each Party further agrees that, with respect to disputes solely involving non-Debtors, the federal courts in the District of Delaware shall have exclusive jurisdiction over any disputes regarding the validity, interpretation, or performance of this Agreement.

22.　　Specific Performance; Damages.　The exact nature and extent of damages resulting from a breach of this Agreement are uncertain at the time of entering into this Agreement and breach of this Agreement would result in damages that would be difficult to determine with certainty. Money damages would not be a sufficient remedy for any breach of this Agreement, and the Parties shall each be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach. Notwithstanding anything to the contrary set forth above, the remedy of specific performance shall not be the exclusive remedy of the Parties under this Agreement in the event of a breach of this Agreement by another Party hereto.

23.　　Voluntary Agreement.　Each Party acknowledges that it has read all of the terms of this Agreement, has had an opportunity to consult with counsel of its own choosing or voluntarily waived such right and enters into this Agreement voluntarily and without duress.

24.　　Further Assurances.　Each Party agrees, without further consideration, to execute and deliver such other documents and to take such other action as may be necessary to consummate the purposes of this Agreement.

25.　　No Admission.　This Agreement is for settlement purposes only and shall not be construed or deemed an admission by any Party to this Agreement of wrongdoing, liability, fault, or the validity of any claims.

26.　　Valid Provisions Remain Effective.　If any provision in this Agreement shall be invalid, inoperative or unenforceable, the remaining provisions of this Agreement shall remain in

- 8 -

effect if both the economic and legal substance of the terms contemplated hereby are not materially affected in any manner adverse to any Party. Otherwise, the Parties shall negotiate in good faith to rewrite any such provision so as to, as nearly and fairly as possible, approach the economic and legal substance originally intended.

27.     Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against either Party. Nor will any rule of construction that favors a non-draftsman be applied. A reference to any statute will be deemed also to refer to all rules and regulations promulgated under the statute, unless the context requires otherwise. Unless specifically otherwise provided or the context otherwise requires, the singular includes the plural and the plural the singular; the word "or" is deemed to include "and/or", the words "including", "includes" and "include" are deemed to be followed by the words "without limitation", and references to sections are to those of this Agreement. Headings in this Agreement are included for convenience of reference only and do not constitute a part of this Agreement for any other purpose.

28.     Advice of Counsel. Each Party represents that it has had the opportunity to obtain advice of counsel in connection with this Agreement and all matters covered hereby, and that each Party has been fully advised by those attorneys with respect to its rights and obligations under this Agreement.

29.     Counterparts. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement. Delivery of a signature page to this Agreement by facsimile or other electronic means shall be effective as delivery of the original signature page to this Agreement.

30.     Joint Drafting. This Agreement shall be deemed to have been jointly drafted by the Parties, and in construing and interpreting this Agreement, no provision shall be construed and interpreted for or against any Party because such provision or any other provision of the Agreement as a whole is purportedly prepared or requested by such Party.

31.     Applicable Law. The validity, interpretation, and performance of this Agreement shall be construed and interpreted according to the laws of the State of Delaware, except to the extent that (a) provisions of the Bankruptcy Code apply, in which event the Bankruptcy Code shall control, or (b) applicable federal law preempts state law.

32.     Attorneys' Fees, Costs and Expenses. Each Party agrees to bear its own costs and expenses, including attorneys' fees, arising out of the matters addressed by this Agreement.

33.     Entire Agreement. This document contains the entire Agreement between the Parties as to the matters addressed herein, and may only be modified in writing signed by the Parties or their duly appointed agents. All prior agreements and understandings between the Parties concerning the subject matter hereof are superseded by the terms of this Agreement.

34.     Inconsistency. In the event of any inconsistency between this Agreement and the Plan Support Agreement, the terms of this Agreement shall govern.

DOCS_SF:84697.2 73864/001

35.      Successors and Assigns.  This Agreement shall be binding on and inure to the benefit of the Parties and their respective agents, employees, affiliates, successors, and, with the consent of all Parties, assigns.

36.      Notices.  All notices, consents, waivers, and other communications under this Agreement must be in writing and shall be deemed to have been duly given when:  (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of receipt), or (c) received by the addressee, if sent by email, in each case to the appropriate addresses, representative (if applicable) or if sent by telecopier to telecopier numbers set forth in the signature page(s) attached hereto (or to such other addresses, representative and telecopier numbers as a Party may designate by notice to the other Parties in accordance with this paragraph).

[signature page(s) follow]

DOCS_SF:84697.2 73864/001

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date written in the opening paragraph hereof.

**Revstone Industries, LLC**
**Spara, LLC**
**TPOP, LLC f/k/a Metavation, LLC**
**Greenwood Forgings, LLC**
**US Tool & Engineering, LLC**

John C. DiDonato
Chief Restructuring Officer
c/o Huron Consulting Group Inc.

599 Lexington Ave., 25th Floor
New York, NY 10022
Fax: (212) 785-1313
Email: jdidonato@huronconsultinggroup.com

**Pension Benefit Guaranty Corporation**

Dana Cann
Acting Deputy Director
Corporate Finance and Restructuring
Department
1200 K Street NW, Suite 340
Washington, D.C. 20005
Fax: (202) 326-4112
Email: Cann.dana@pbgc.gov

**Fairfield Castings, LLC**
**T Cast Holdings, LLC**

By:     Spara, LLC,
        A Delaware limited liability company

By:

John C. DiDonato
Chief Restructuring Officer

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date written in the opening paragraph hereof.

**Revstone Industries, LLC**
**Spara, LLC**
**TPOP, LLC f/k/a Metavation, LLC**
**Greenwood Forgings, LLC**
**US Tool & Engineering, LLC**

**Pension Benefit Guaranty Corporation**

_____
John C. DiDonato
Chief Restructuring Officer
c/o Huron Consulting Group Inc.

_____
Dana Cann
Acting Deputy Director
Corporate Finance and Restructuring
Department
1200 K Street NW, Suite 340
Washington, D.C. 20005
Fax: (202) 326-4112
Email: _____

599 Lexington Ave., 25th Floor
New York, NY 10022
Fax: (212) 785-1313
Email: jdidonato@huronconsultinggroup.com

**Fairfield Castings, LLC**
**T Cast Holdings, LLC**

By:     Spara, LLC,
        A Delaware limited liability company

By:     _____
        John C. DiDonato
        Chief Restructuring Officer

- 11 -

**Revstone Transportation, LLC**
**Revstone Tool & Engineering, LLC**

John C. DiDonato
Chief Restructuring Officer


**MWTDC, Inc. f/k/a MW Texas Die Casting, Inc.,**
A Delaware corporation


Daniel V. Smith
Secretary


**CC Liquidation, LLC f/k/a Contech Castings, LLC,**
A Delaware limited liability company

By:   Revstone Transportation, LLC,
      A Delaware limited liability company,
      Its Sole Member

By:   _____
      John C. DiDonato
      Chief Restructuring Officer


**CCREH Liquidation, LLC f/k/a/ Contech Castings Real Estate Holdings, LLC,**
A Delaware limited liability company

By:   CC Liquidation, LLC f/k/a Contech Castings, LLC
      A Delaware limited liability company,
      Its Sole Member

      By:   Revstone Transportation, LLC,
            A Delaware limited liability company,
            Its Sole Member

            By:   _____
                  John C. DiDonato
                  Chief Restructuring Officer

- 12 -

**MWTDC, Inc. f/k/a MW Texas Die Casting, Inc.,**
A Delaware corporation

Daniel V. Smith
Secretary


**CC Liquidation, LLC f/k/a Contech Castings, LLC,**
A Delaware limited liability company

By:    Revstone Transportation, LLC,
        A Delaware limited liability company,
        Its Sole Member


        By:
            John C. DiDonato
            Chief Restructuring Officer


**CCREH Liquidation, LLC f/k/a/ Contech Castings Real Estate Holdings, LLC,**
A Delaware limited liability company

By:    CC Liquidation, LLC f/k/a Contech Castings, LLC
        A Delaware limited liability company,
        Its Sole Member

        By:    Revstone Transportation, LLC,
            A Delaware limited liability company,
            Its Sole Member

            By:
                John C. DiDonato
                Chief Restructuring Officer

**Revstone Lighting, LLC,**
A Delaware limited liability company

By:    Revstone Industries, LLC,
        A Delaware limited liability company,
        Its Sole Member


        By:
            John C. DiDonato
            Chief Restructuring Officer

12

**Revstone Lighting, LLC,**
A Delaware limited liability company

By:    Revstone Industries, LLC,
        A Delaware limited liability company,
        Its Sole Member

        By:    _____
              John C. DiDonato
              Chief Restructuring Officer


**Creative Lighting Solutions, LLC,**
A Delaware limited liability company


By:    Revstone Lighting, LLC
        A Delaware limited liability company,
        Its Sole Member

        By:    Revstone Industries, LLC,
              A Delaware limited liability company,
              Its Sole Member

              By:    _____
                   John C. DiDonato
                   Chief Restructuring Officer


**MPI, LLC,**
A Delaware limited liability company

By:    Revstone Transportation, LLC,
        A Delaware limited liability company,
        Its Sole Member

        By:    _____
              John C. DiDonato
               Chief Restructuring Officer

DOCS_SF:84697.2 73864/001

**Reystone Wallaceburg Canada Inc.**

Joseph Bianco
President

Mary Van Santvoort
Secretary -Treasurer

**Aarkel Tool & Die Inc.**

Joseph Bianco
President

Mary Van Santvoort
Secretary-Treasurer

**Eptec S.A. De C.V.**

Robert Carney
Sole Administrator

- 14 -

DOCS_SF:84697.2 73864/001

**Revstone Wallaceburg Canada Inc.**

_____

Joseph Bianco
President

_____

Mary Van Santvoort
Secretary -Treasurer

**Aarkel Tool & Die Inc.**

_____

Joseph Bianco
President

_____

Mary Van Santvoort
Secretary-Treasurer

**Eptec S.A. De C.V.**

_____

Robert Carney
Sole Administrator

- 14 -

# **EXHIBIT A**

**Funding Schedule**

**EXHIBIT A - Funding Schedule**

| Recovery Source | Net Proceeds For PBGC & Estates | Distribution of Net Proceeds | | | | |
|---|---|---|---|---|---|---|
| | | PBGC | Estates | | Hold Back/Escrow | |
| | | | Revstone | Spara | Revstone | Spara |
| **Plan Funding** | $ 21,694 | $ 21,694 | - | - | - | - |
| **Revstone Escrows** | | | | | | |
| Contech PBGC Escrow | 12,263 | 4,905 | 4,905 | - | 2,453 | - |
| Contech General Escrow | 613 | 245 | 245 | - | 123 | - |
| Texas Die PBGC Escrow | 2,399 | 960 | 960 | - | 480 | - |
| Texas Die Cash on Hand | 379 | 151 | 151 | - | 76 | - |
| CLS PBGC Escrow | 2,609 | 1,044 | 1,044 | - | 522 | - |
| Dowagiac | - | - | - | - | - | - |
| Subtotal | 18,263 | 7,305 | 7,305 | - | 3,653 | - |
| Allocation % | | 40% | 40% | 0% | 20% | 0% |
| Revstone Industries Surplus | 2,123 | 849 | 849 | - | 425 | - |
| Allocation % | | 40% | 40% | 0% | 20% | 0% |
| Interim Recovery Total | $ 93,860 | $ 60,155 | $ 17,183 | $ 4,718 | $ 7,087 | $ 4,718 |
| **TPOP f/k/a Metavation** | | | | | | |
| PBGC Recovery | 19,000 | 19,000 | - | - | - | - |
| Allocation | | 100% | 0% | 0% | 0% | 0% |
| Revstone Industries GUC Recovery | 639 | 256 | 256 | - | 128 | - |
| Allocation % | | 40% | 40% | 0% | 20% | 0% |
| Subtotal | 19,640 | 19,256 | 256 | - | 128 | - |
| Pre-Escrow Disribution Recovery | 113,500 | $ 79,411 | $ 17,439 | $ 4,718 | $ 7,215 | $ 4,718 |
| **Baseline Target Recovery** | $ 113,500 | $ 82,000 | $ 24,131 | 7,369 | $ - | $ - |
| Excess (Shortfall) | - | (2,589) | (6,692) | (2,652) | 7,215 | 4,718 |
| Target Adjusted for Excess (Shortfall) | | - | - | - | | |
| Revised Target | | 82,000 | 24,131 | 7,369 | | |
| Excess (Shortfall) to Revised Target | | (2,589) | (6,692) | (2,652) | 7,215 | 4,718 |
| **Assumed Escrow Distribution "true up"** | | | | | | |
| Spara Entity Escrows | | 2,066 | | 2,652 | | (4,718) |
| Revstone Entity Escrows | | 523 | 6,692 | | (7,215) | |
| **Recovery** | | $ 82,000 | $ 24,131 | $ 7,369 | $ - | $ - |

**ESTIMATED ALLOCATION OF ESTATE PROCEEDS:**

| | Net Proceeds for Estates | Litigation Reserve | Post Eff Reserve | Admin/Priority Est. | | Unsecured Est. | |
|---|---|---|---|---|---|---|---|
| | | | | Claim | Distri | Claim | Distr |
| Revstone | $ 24,131 | $ 1,500 | $ 1,000 | $ 20,349 | $ 17,297 | $ 33,000 | $ 4,334 |
| Recovery % | | | | | 85.0% | | 13% |
| Spara | $ 7,369 | $ 500 | $ 750 | $ 4,749 | $ 4,179 | $ 8,400 | $ 1,940 |
| Recovery % | | | | | 88.0% | | 23% |

Notes:

"Net Proceeds For PBGC & Estates" means sale proceeds net of reasonable and ordinary transaction costs, payments to non-PBGC creditors at the non-debtors, and payments of post-petition professional fees at TPOP f/k/a Metavation.

Estimated distributions to unsecured creditors reflected above are subject to the terms of a confirmed chapter 11 plans proposed by the Debtors.  Distributions to unsecured creditors are also subject to reduction by 50% pending receipt of the PBGC Minimum Recovery.

**EXHIBIT B – Example 1**

Net Proceeds result in $10 million less than Target Scenario

| | Net Proceeds For PBGC & Estates | Distribution of Net Proceeds | | | | |
| | | PBGC | Revstone | | Spara | |
| | | | Estate | Escrow | Estate | Escrow |
|---|---|---|---|---|---|---|
| Plan Funding to Date | $ 21,694 | $ 21,694 | $ - | $ - | $ - | $ - |
| Revstone Net Proceeds | 49,064 | 29,411 | 13,689 | 5,965 | - | - |
| Spara Net Proceeds | 32,742 | 24,556 | - | - | 4,093 | 4,093 |
| True Up | - | 4,339 | 4,501 | (5,965) | 1,217 | (4,093) |
| Total | $ 103,500 | $ 80,000 | $ 18,190 | $ - | $ 5,310 | $ - |

**ESTIMATED ALLOCATION OF ESTATE PROCEEDS:**

| | Net Proceeds for Estates | Litigation Reserve | Post Eff Reserve | Admin/Priority Est. | | Unsecured Est. | |
| | | | | Claim | Distri | Claim | Distr |
|---|---|---|---|---|---|---|---|
| Revstone | $ 18,190 | $ 1,500 | $ 1,000 | $ 20,349 | $ 15,690 | $ 33,000 | $ - |
| Recovery % | | | | | 77.1% | | 0% |
| Spara | $ 5,310 | $ 500 | $ 750 | $ 4,749 | $ 4,060 | $ 8,400 | $ - |
| Recovery % | | | | | 85.5% | | 0% |

Notes:
"Net Proceeds For PBGC & Estates" means sale proceeds net of reasonable and ordinary transaction costs, payments to non-PBGC creditors of the non-debtors, and payments of post-petition professional fees at TPOP f/k/a Metavation.

Estimated distributions to unsecured creditors reflected above are subject to the terms of a confirmed chapter 11 plans proposed by the Debtors.  Distributions to unsecured creditors are also subject to reduction by 50% pending receipt of the PBGC Minimum Recovery.

EHXHIBIT B – Example 2

Net Proceeds result in $10 million more than the Target Scenario

| | Net Proceeds For PBGC & Estates | Distribution of Net Proceeds | | | | |
| | | PBGC | Revstone | | Spara | |
| | | | Estate | Escrow | Estate | Escrow |
|---|---|---|---|---|---|---|
| Plan Funding to Date | $ 21,694 | $ 21,694 | $ - | $ - | $ - | $ - |
| Revstone Net Proceeds | 59,064 | 29,411 | 21,189 | 8,465 | - | - |
| Spara Net Proceeds | 42,742 | 32,056 | - | - | 5,343 | 5,343 |
| True Up | - | 2,589 | 7,484 | (8,465) | 3,734 | (5,343) |
| Total | $ 123,500 | $ 85,750 | $ 28,673 | $ - | $ 9,077 | $ - |

ESTIMATED ALLOCATION OF ESTATE PROCEEDS:

| | Net Proceeds for Estates | Litigation Reserve | Post Eff Reserve | Admin/Priority Est. | | Unsecured Est. | |
| | | | | Claim | Distri | Claim | Distr |
|---|---|---|---|---|---|---|---|
| Revstone | $ 28,673 | $ 1,500 | $ 1,000 | $ 20,349 | $ 20,349 | $ 33,000 | $ 5,824 |
| Recovery % | | | | | 100.0% | | 18% |
| Spara | $ 9,077 | $ 500 | $ 750 | $ 4,749 | $ 4,749 | $ 8,400 | $ 3,078 |
| Recovery % | | | | | 100.0% | | 37% |

Notes:
"Net Proceeds For PBGC & Estates" means sale proceeds net of reasonable and ordinary transaction costs, payments to non-PBGC creditors of the non-debtors, and payments of post-petition professional fees at TPOP f/k/a Metavation.

Estimated distributions to unsecured creditors reflected above are subject to the terms of a confirmed chapter 11 plans proposed by the Debtors. Distributions to unsecured creditors are also subject to reduction by 50% pending receipt of the PBGC Minimum Recovery.

## **EXHIBIT C**

**Plan Support Agreement**

## PLAN SUPPORT AGREEMENT

This *Plan Support Agreement* (this "Agreement"), dated as of _____, 2014 is entered into by and among Revstone Industries, LLC ("Revstone"), Spara, LLC, TPOP, LLC f/k/a Metavation, LLC, U.S. Tool & Engineering LLC, and Greenwood Forgings, LLC (together, the "Debtors"), on the one hand, and the Pension Benefit Guaranty Corporation (the "PBGC"), on the other hand.  The Debtors and the PBGC are referred to herein as the "Parties" and each individually as a "Party."

**THIS AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF VOTES WITH RESPECT TO ANY CHAPTER 11 PLAN.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS WITH RESPECT TO A CHAPTER 11 PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

### RECITALS

A.      The Debtors each commenced chapter 11 cases (the "Bankruptcy Cases") under title 11 of the United States Code (the "Bankruptcy Code") that are presently pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

B.      On February 10, 2014, the Parties (along with other signatories) executed that certain Settlement Agreement (the "Settlement Agreement") resolving various disputes amongst the Parties.  Pursuant to an order dated _____, 2014, the Bankruptcy Court approved the Settlement Agreement under Rule 9019 of the Federal Rules of Bankruptcy Procedure.

C.      Pursuant to the Settlement Agreement, the PBGC has agreed to support the amended chapter 11 plan that will be filed by Revstone in the Bankruptcy Cases in all material respects, provided that such shall amended plan is consistent with the Settlement Agreement, or as otherwise may be modified by Revstone or supplemented by separate plans of the other Debtors in conformity with the Settlement Agreement and to reflect the circumstances, including governance, relating to such other Debtors.  Such chapter 11 plan or plans proposed, or to be proposed, by the Debtors together or individually are collectively referred to herein as the "Proposed Plan," and the disclosure statement or disclosure statements in support thereof are collectively referred to herein as the "Disclosure Statement."

D.      The Parties have agreed to facilitate confirmation and consummation of the Proposed Plan and the transactions described therein.

E.      To ensure an orderly confirmation process, the Parties are prepared to perform their obligations hereunder subject to the terms and conditions of this Agreement, including, without limitation, to support the Debtors' efforts to:  (a) seek the Bankruptcy Court's approval of the Disclosure Statement prior to soliciting votes on the Proposed Plan in accordance with section 1125 of the Bankruptcy Code; (b) obtain Bankruptcy Court approval and confirmation of

the Proposed Plan; and (c) achieve the applicable effective date provided for under the Proposed Plan.

F.     In expressing their support for the Proposed Plan (pursuant to the terms and conditions of this Agreement), the Parties do not desire and do not intend in any way to derogate or diminish the solicitation requirements of applicable securities or bankruptcy law, nor the respective fiduciary, statutory, or other duties of the Parties.

## AGREEMENT

In consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.     Recitals.  The Recitals set forth above are incorporated herein and form an integrated part of this Agreement.

2.     Effectiveness of Agreement.  Subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, upon the execution of this Agreement by the Parties, this Agreement will constitute a legally binding and enforceable agreement of the Parties, effective as of the date first written above.

3.     Agreements.  The Parties agree to the following:

(a)     Proposed Plan.  The Parties agree to all material terms in the Proposed Plan, as such plan may be modified or supplemented, and to support confirmation and consummation of the Proposed Plan, *provided* that the Proposed Plan is in conformity with the Settlement Agreement.

(b)     Further Modifications.  The Parties agree to any modifications or amendments made by the Debtors with respect to the Proposed Plan, and to support confirmation and consummation thereof, *provided* that such modifications and amendments do not materially and adversely affect the rights and benefits under the Settlement Agreement of any Party that does not expressly consent thereto.  All commitments and obligations arising under this Agreement with respect to the Proposed Plan shall also be effective and binding as to any amendments to the Proposed Plan that comply with the requirements of this paragraph 3(b).

(c)     Bankruptcy Filings.  All material pleadings and other documents that the Debtors file in connection with the Chapter 11 Cases with the Bankruptcy Court shall be consistent in all material respects with this Agreement, the Settlement Agreement, and the Proposed Plan.

(d)     Disclosure Statement.  The Parties will support entry of the order of the Bankruptcy Court approving the Disclosure Statement, *provided* that such order is in form and substance consistent with this Agreement, the Settlement Agreement, and the Proposed Plan.

4.    <u>Further Support</u>.  Provided that the Proposed Plan and the information in the Disclosure Statement have not been modified, altered, amended, or supplemented in a manner that would materially and adversely affect the rights, recoveries, or obligations of the Parties under the Settlement Agreement, each Party hereto will:

(a)    support entry of the order approving the Disclosure Statement and (after thereof) the Confirmation Order;

(b)    not withhold, withdraw, qualify, or modify its approval of the Proposed Plan;

(c)    not commence any proceeding or prosecute, join in, or otherwise support any action to oppose or object to approval of the Proposed Plan or the Disclosure Statement or (after approval thereof) the Confirmation Order (provided the Disclosure Statement is consistent in all material respects with the Proposed Plan);

(d)    not encourage any other person or entity to object to, delay, impede, appeal, or take any other action to interfere with entry of the Disclosure Statement Order or (after approval thereof) the Confirmation Order;

(e)    not seek, solicit, negotiate, support, or enter into an agreement related to any other chapter 11 plan in these chapter 11 cases (an "<u>Alternative Plan</u>") unless the Parties have agreed, in writing, to pursue such Alternative Plan; or

(f)    not seek to materially modify, revise, amend or renegotiate the terms of the Proposed Plan without the consent of the Parties.

5.    <u>Appearing in the Bankruptcy Court</u>.  Nothing in this Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Bankruptcy Court so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement or the Settlement Agreement.

6.    <u>Common Interest and Confidentiality</u>.  The Parties have, on and following January 31, 2014, shared and exchanged, and will continue to share and exchange, documents and information pertaining to the formulation, funding and confirmation of the Proposed Plan ("<u>Confidences</u>") among themselves and their respective counsel for purposes of their common interest and joint defense in support of such plan.  The Parties have agreed to reveal certain Confidences within this arrangement upon the express condition that no Party or its counsel will disclose to any third party, other than as expressly provided for herein, any Confidences without the written consent, in advance, of the Parties to this Agreement.  This Agreement shall not extend to Confidences which are now in, or hereafter enter, the public domain, or are not otherwise protected from disclosure, except that it shall continue to apply to any Confidences disclosed by wrongful act or in violation of this Agreement.  Notwithstanding anything herein to the contrary, PBGC may disclose the Confidences to the Executive Branch of the United States, the PBGC and PBGC Board of Directors, officials, advisors, consultants, and representatives who have a need to know the information as part of their job responsibilities, and to others as

required by law or as may be necessary in connection with any court or administrative proceedings, request of Congress or any committee, joint committee or subcommittee thereof, or request of the Comptroller General.

      7.    <u>Representations and Warranties of the Parties</u>.  Each Party represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

      (a)    it has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and, subject to any necessary Bankruptcy Court approval, carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of the Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

      (b)    the execution, delivery, and, subject to any necessary Bankruptcy Court approval, performance by such Party of this Agreement does not and shall not violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

      (c)    the execution, delivery, and performance by such Party of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body; and

      (d)    this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms.

      8.    <u>Termination of this Agreement</u>.  This Agreement shall automatically terminate if:

      (a)    all Parties agree in writing to terminate this Agreement;

      (b)    any of the Chapter 11 Cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, but the termination of this Agreement shall only extend to those Debtors that have had their cases dismissed on converted;

      (c)    the Bankruptcy Court has entered an order in any of the Chapter 11 Cases appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, but the termination of this Agreement shall only extend to those Debtors that have had a trustee appointed;

      (d)    the Bankruptcy Court denies confirmation of the Proposed Plan with prejudice and without leave to amend, but the termination of this Agreement shall only extend to those Debtors that have had confirmation denied in their respective cases; or

(e)     the Bankruptcy Court has not entered an order confirming the Proposed Plan by August 15, 2014, provided that such outside date shall be extended so long as the Proposed Plan is pending and the Bankruptcy Court has not denied confirmation with prejudice.

Each event described in items (a) through (e) above shall be a "Termination Event." The foregoing Termination Events are intended solely for the benefit of the Parties to this Agreement; provided that no Party may seek to terminate this Agreement based upon a material breach or a failure of a condition (if any) in this Agreement arising out of its own actions or omissions. Upon occurrence of a Termination Event, this Agreement shall be of no further force and effect and each Party hereto shall be released from its commitments, undertakings, and agreements under or related to this Agreement; provided, however, that no such termination shall relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the date of termination.

9.      Cooperation; Further Assurances; Acknowledgment; Definitive Documents. The Parties shall cooperate with each other and shall coordinate their activities (to the extent practicable and consistent with each of the Parties' respective fiduciary or statutory duties) in respect of all actions commercially reasonably necessary to timely consummate the Proposed Plan. The Parties shall execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be commercially reasonably appropriate or necessary, from time to time, to effectuate the Proposed Plan.

10.     Amendments. This Agreement may not be modified, amended or supplemented except in a writing signed by the Parties hereto.

11.     GOVERNING LAW; JURISDICTION. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE AND THE BANKRUPTCY CODE, AS APPLICABLE, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER, OR ARISING OUT OF, OR IN CONNECTION WITH, THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT, OR PROCEEDING.

12.     Specific Performance; Damages. The exact nature and extent of damages resulting from a breach of this Agreement are uncertain at the time of entering into this Agreement and breach of this Agreement would result in damages that would be difficult to determine with certainty. Money damages would not be a sufficient remedy for any breach of

this Agreement, and the Parties shall each be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach. Notwithstanding anything to the contrary set forth above, the remedy of specific performance shall not be the exclusive remedy of the Parties under this Agreement in the event of a breach of this Agreement by another Party hereto.

13.    Headings. The headings of the Sections, paragraphs and subsections of this Agreement are inserted for convenience only, and shall not affect the interpretation hereof.

14.    Assignment; Successors and Assigns; Severability; Several Obligations. No rights or obligations of the Parties under this Agreement may be assigned or transferred to any other entity. This Agreement is intended to, and shall, bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives. The invalidity or unenforceability at any time of any provision hereof shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof.

15.    No Third-Party Beneficiaries. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall have any right hereunder.

16.    Prior Negotiations; Entire Agreement. This Agreement (along with the Settlement Agreement) constitutes the entire agreement of the Parties related to the Proposed Plan, and supersedes all other prior negotiations with respect to the subject matter hereof, except that the Parties agree and acknowledge that the Proposed Plan shall continue in full force and effect, subject to entry of an order confirming the Proposed Plan.

17.    Counterparts. This Agreement and any amendments, joinders, consents or supplements hereto, may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement. Facsimile or scanned signatures on this Agreement shall be treated as originals for all purposes.

18.    Construction; Consideration. This Agreement shall be deemed to have been negotiated and prepared at the joint request, direction and construction of the Parties, at arm's length and be interpreted without favor to any Party. The Parties hereby acknowledge that no consideration, other than that specifically described herein and in the Settlement Agreement and the Proposed Plan shall be due or paid to any of the Parties for their agreement to support confirmation of the Proposed Plan in accordance with the terms and conditions of this Agreement.

19.    Time of the Essence. Time shall be of the essence with respect to each and every of the various undertakings and obligations set forth in this Agreement.

20.    Notices. All notices, consents, waivers and other communications under this Agreement must be in writing and shall be deemed to have been duly given when: (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of receipt), or (c) received by the addressee, if sent by email, in each case to the appropriate addresses, representative (if applicable) and telecopier numbers set forth in the signature page attached hereto (or to such other addresses, representative and telecopier numbers as a Party may designate by notice to the other Parties in accordance with this paragraph).

21.     Acknowledgement.  THIS AGREEMENT, THE PROPOSED PLAN, AND THE TRANSACTIONS CONTEMPLATED HEREIN AND THEREIN, ARE THE PRODUCT OF NEGOTIATIONS   BETWEEN   THE   PARTIES   AND   THEIR   RESPECTIVE REPRESENTATIVES.     EACH   PARTY   HEREBY   ACKNOWLEDGES   THAT   THIS AGREEMENT IS NOT AND SHALL NOT BE DEEMED TO BE A SOLICITATION OF VOTES FOR THE ACCEPTANCE OF A CHAPTER 11 PLAN FOR THE PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR OTHERWISE.  THE DEBTORS WILL NOT SOLICIT ACCEPTANCES OF THE PROPOSED PLAN FROM ANY PERSON OR ENTITY UNTIL THE PERSON OR ENTITY HAS BEEN PROVIDED WITH A COPY OF A DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. EACH PARTY FURTHER ACKNOWLEDGES THAT NO SECURITIES OF ANY DEBTOR ARE BEING OFFERED OR SOLD HEREBY AND THAT THIS AGREEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OF ANY DEBTOR.  NOTWITHSTANDING THE FOREGOING PROVISIONS, NOTHING IN THIS AGREEMENT SHALL REQUIRE ANY PARTY TO TAKE ANY ACTION PROHIBITED BY THE BANKRUPTCY CODE, THE SECURITIES ACT OF 1933 (AS AMENDED), THE SECURITIES EXCHANGE ACT OF 1934 (AS AMENDED), ANY RULE OR REGULATIONS PROMULGATED THEREUNDER, OR BY ANY OTHER APPLICABLE LAW OR REGULATION OR BY AN ORDER OR DIRECTION OF ANY COURT OR ANY STATE OR FEDERAL GOVERNMENTAL AUTHORITY.

22.     Agreement Not a Plan.   This Agreement does not constitute a plan of reorganization or confirmation thereof under the Bankruptcy Code.  Any plan will not become effective unless and until the Bankruptcy Court enters a confirmation order and the Proposed Plan becomes effective in accordance with its terms.

23.     No Waiver of Participation and Preservation of Rights.   If the transactions contemplated by this Agreement or otherwise set forth in the Proposed Plan are not consummated as provided herein or therein, or if this Agreement is terminated for any reason, except as otherwise provided for herein, the Parties each fully reserve any and all of their respective rights, remedies and interests.

[signature page follows]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date written in the opening paragraph hereof.

**Revstone Industries, LLC**
**Spara, LLC**
**TPOP, LLC f/k/a Metavation, LLC**
**Greenwood Forgings, LLC**
**US Tool & Engineering, LLC**

**Pension Benefit Guaranty Corporation**

_____

John C. DiDonato
Chief Restructuring Officer
c/o Huron Consulting Group Inc.

599 Lexington Ave., 25th Floor
New York, NY 10022
Fax: (212) 785-1313
Email: jdidonato@huronconsultinggroup.com

_____

Dana Cann
Acting Deputy Director
Corporate Finance and Restructuring
Department
1200 K Street NW, Suite 340
Washington, D.C. 20005
Fax: (202) 326-4112
Email: _____

# EXHIBIT B

# SUMMARY OF TERMS

| | |
|---|---|
| **PBGC Allowed Claim and Recovery** | • Allowed Claim of $95 million.<br>• Target recovery of $77 million with minimum of $75 M. First $2.0 million of litigation proceeds which otherwise would have been distributed to the PBGC, instead payable to Revstone estate, $1.5 million apportioned to administrative creditors and $500,000 to non-BFG general unsecured creditors. See attached modified Funding Schedule, which is incorporated herein. All other litigation proceeds available to the estate will be split 75% to the administrative claimants and 25% to general unsecured creditors. The general unsecureds' allocation to be agreed upon between BFG and the Committee. |
| **Baseline Revstone GUC Recovery** | • See attached modified Funding Schedule. |
| **Downside Protection (relative to estate funding baseline)** | • $3.0 million PBGC carve out from non-debtors' sale proceeds ($3.0 million equates to 12.4% on an estimated claims pool of $24.1 million) that provides up-front recovery to Revstone non-BFG general unsecured creditors pursuant to the Plan (the "<u>Revstone Unsecured Guarantee Reserve</u>"). TPOP would file a stand-alone plan.<br>• To the extent permissible under applicable law, the carve out will only be made available under the Plan to the class of Revstone general unsecured creditors provided the class votes in favor of the plan.<br>• Downside allocated 75% to Revstone general unsecured creditors / 25% to administrative claimants subject to the $3.0 million PBGC carve out of proceeds for non-BFG general unsecured creditors.<br>• General unsecured creditors would not recover additional dollars beyond the $3.0 million carve out until the administrative creditors recover $14.845 million. See attached modified Funding Schedule. $3.0 million carve out shall be made available for distribution upon the effective date of the Plan. |
| **Upside Potential From Non-Litigation Assets (relative to estate funding baseline)** | • First $2.0 million of upside from non-litigation assets allocated 75% to administrative claimants / 25% to general unsecured creditors.<br>• Additional upside allocated 50% to administrative claimants / 50% to general unsecured creditors. |
| **Debtors' Professionals Revstone Recovery** | • 15% permanent reduction in Revstone fees (Huron and PSZJ).<br>• Any deduction in fees through objection to fee application and/or fee examiner review would be |

|  |  |
| --- | --- |
|  | credited against the agreed upon 15% reduction, as well as the expected fees to be deferred. |
| **Committee Professionals Revstone Recovery** | • Consensual substantial contribution claim for Committee counsel (WCSR) against TPOP in the amount of $250,000.<br>• 15% permanent reduction in claims of WCSR.<br>• Any deduction in fees through objection to fee application and/or fee examiner review would be credited against the agreed upon 15% reduction, as well as the expected fees to be deferred. |
| **Intercompany Resolution** | • In connection with the effective date of the Plan, the Debtors and the Committee will agree upon an appropriate resolution of intercompany issues, including allocation of related proceeds. |
| **Plan Post-Effective Date Governance** | • One manager appointed by Committee.  The Committee designee may not be BFG.<br>• One manager appointed by PBGC.<br>• Third manager who is mutually agreed upon by the Committee and the PBGC jointly.  If no such agreement can be reached, the Committee and the PBGC will each provide the name of their choice as the third manager and the CRO will select the third manager from these two names.<br>• Except as noted below, manager-level decisions will be made by majority vote of the managers. |
| **Plan Post-Effective Date Management** | • John DiDonato to remain the Revstone CRO.<br>• The CRO can be replaced for cause, by unanimous vote of the post-effective board of managers.  The parties will agree upon an appropriate allocation of responsibilities among professionals following the effective date of the Plan.  The Committee will have responsibility for addressing Revstone general unsecured creditor claims.<br>• Plan post-effective date governance only applies to Revstone.  All non Revstone debtors are expected to retain existing management following the effective date of the Plan. |
| **Plan Post-Effective Date Reserve Funding** | • $750,000 for Revstone, subject to a budget with any excess remaining to be contributed to the Revstone litigation trust. |
| **Litigation Trust Governance** | • One trust committee member appointed by Committee.  The Committee designee may be BFG.<br>• One trust committee member appointed by PBGC.<br>• Third trust committee member who is mutually agreed upon by the Committee and the PBGC jointly.  If no such agreement can be reached, the Committee and the PBGC will each provide two names for their choice as the third committee member and the Bankruptcy Court will select the third manager from these four names.<br>• Trust committee decisions will be made by majority |

|  | vote of the trust committee members. |
|---|---|
| **Litigation Trust Funding** | • Single litigation trust to be established. Total litigation reserve funding of $1.0 million. See attached modified Funding Schedule. |
| **Litigation Trust Causes of Action** | • Allocation of proceeds of causes of action between Revstone and Spara estates will be addressed by consensual agreement amongst the Debtors and the Committee in connection with the effective date of the Plan. |
| **PBGC Participation in Litigation Trust** | • After first $2.0 million of litigation proceeds otherwise payable to PBGC as addressed in "PBGC Allowed Claim and Recovery" above, litigation proceeds to be split 50% to the estates / 50% to PBGC, up to the full recovery on PBGC's allowed claim, except for claims held by the Pension Plans.<br>• Subject to PBGC Agreement:<br>PBGC will bring all causes of action held by the Pension Plan, even if another party "finds" the claim. Any recovery realized from claims held by the Pension Plans (i.e., claims arising under ERISA) will go to PBGC as statutory trustee for the Pension Plans. In that event, an equal amount of subsequent recoveries on non-Pension Plan claims will go to the estate, up to the amount of recovery realized by PBGC on the Pension Plan claim. Thereafter, recoveries on non-Pension Plan claims will be split 50/50 as described in the first point above.<br>• PBGC will respond to Committee request regarding questioned assets recoveries. |
| **Releases and Exculpation** | • Outstanding Plan issues (e.g., releases and exculpation for professionals and independent managers) to be consistent with the plan previously filed by Revstone. |
| **TPOP and Other Non-Revstone Debtors** | • See response above to "Plan Post-Effective Date Management" limited to TPOP and Spara. |
| **Pending Litigation** | • All litigation ceases/all objections are dropped in connection with the Debtors' bankruptcy proceedings.<br>• To the extent there are fee objections remaining from third parties, funds for payment of such fees would be appropriately reserved. |
| **Plan Process** | • The Parties will move forward expeditiously to obtain Bankruptcy Court approval of the PBGC settlement, as modified hereby and by the global resolution term sheet, and to execute a plan confirmation process.<br>• The Parties will use best efforts to obtain confirmation of the plan by end of July 2014, subject to Court's availability and timing of approval of the settlement. |

# MODIFIED FUNDING SCHEDULE

**[See Attached]**

## TARGET RECOVERY SCENARIO FUNDING SCHEDULE

$'s in 000

| Recovery Source | Net Proceeds For PBGC & Estates | Distribution of Net Proceeds | | | | |
|---|---|---|---|---|---|---|
| | | PBGC | Estates | | Hold Back/Escrow | |
| | | | Revstone | Spara | Revstone | Spara |
| Plan Funding | $ 21,694 | $ 21,694 | | | | |
| **Revstone Escrows** | | | | | | |
| Contech PBGC Escrow | 12,263 | 7,800 | 2,011 | - | 2,453 | - |
| Contech General Escrow | 613 | - | 491 | - | 123 | - |
| Texas Die PBGC Escrow | 2,399 | - | 1,919 | - | 480 | - |
| Texas Die Cash on Hand | 379 | - | 303 | - | 76 | - |
| CLS PBGC Escrow | 2,609 | - | 2,087 | - | 522 | - |
| Dowagiac | - | - | - | - | - | - |
| Subtotal | 18,263 | 7,800 | 6,810 | - | 3,653 | - |
| Allocation % | | 43% | 37% | 0% | 20% | 0% |
| Interim Recovery Total | $ 39,957 | $ 29,494 | $ 6,810 | $ - | $ 3,653 | $ - |



| | | | | | | |
|---|---|---|---|---|---|---|
| Revstone Industries Surplus | 2,123 | 531 | 1,168 | - | 425 | - |
| Allocation % | | 25% | 55% | 0% | 20% | 0% |
| Interim Recovery Total | $ 93,860 | $ 62,955 | $ 16,270 | $ 2,831 | $ 7,087 | $ 4,718 |
| **TPOP f/k/a Metavation** | | | | | | |
| PBGC Recovery | 19,000 | 19,000 | - | - | - | - |
| Allocation % | | 100% | 0% | 0% | 0% | 0% |
| Revstone Industries GUC Recovery | 639 | 128 | 384 | - | 128 | - |
| Allocation % | | 20% | 60% | 0% | 20% | 0% |
| Subtotal | 19,640 | 19,128 | 384 | - | 128 | - |
| BFG Settlement funded by agreement of parties from existing PBGC escrow accounts | - | (7,800) | - | 7,800 | - | - |
| Pre-Escrow Disribution Recovery | $ 113,500 | $ 74,283 | $ 16,653 | $ 10,631 | $ 7,215 | $ 4,718 |
| Baseline Target Recovery | $ 113,500 | $ 77,000 | $ 22,478 | $ 14,022 | $ - | $ - |
| Excess (Shortfall) | - | (2,717) | (5,824) | (3,391) | 7,215 | 4,718 |
| **Assumed Escrow Distribution "true up"** | | | | | | |
| Spara Entity Escrows | | 1,326 | | 3,391 | | (4,718) |
| Revstone Entity Escrows | | 1,391 | 5,824 | | (7,215) | |
| Recovery | | $ 77,000 | $ 22,478 | $ 14,022 | | |

ESTIMATED ALLOCATION OF ESTATE PROCEEDS:

| | Net Proceeds for Estates | To Litigation Reserve | Post Eff Reserve | BFG | Admin/Priority Est. | | Non-BFG GUCs | | BFG GUC | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Claim | Distr | Claim | Distr | Claim | Distr |
| Revstone | $ 22,478 | $ 750 | $ 750 | $ 700 | $ 22,067 | $ 15,453 | $ 24,122 | $ 4,459 | $ 8,500 | $ 365 |
| Recovery % | | | | | | 70.0% | | 18.5% | | 4.3% |
| Spara | $ 14,022 | $ 250 | $ 500 | $ 7,800 | $ 5,033 | $ 4,929 | $ 2,800 | $ 543 | | |
| Recovery % | | | | | | 97.9% | | 19.4% | | |
| Litigation Reserve | $ 1,000 | | | | | | | | | |

Notes:

"Net Proceeds For PBGC & Estates" means sale proceeds net of reasonable and ordinary transaction costs, payments to non-PBGC creditors of the non-debtors, and payments of post-petition professional fees at TPOP f/k/a Metavation.

Estimated distributions to unsecured creditors reflected above are subject to the terms of a confirmed chapter 11 plans proposed by the Debtors and the terms of the Global Resolution Term Sheet and the Consensual Resolution Terms attached thereto.

Allocation of the funding for the litigation trust is subject to change based on the terms of the final settlement agreement or plan.

**<u>Exhibit 2</u>**

**Disclosure Statement Order**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Revstone Industries, LLC, *et al.*,[1] | ) Case No.: 12-13262 (BLS) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |

**Related to Docket Nos. 1868 and 1869**

**ORDER (I) APPROVING DISCLOSURE STATEMENT; (II) SCHEDULING
CONFIRMATION HEARING; (III) APPROVING FORM AND MANNER OF
NOTICE OF CONFIRMATION HEARING; (IV) ESTABLISHING PROCEDURES
FOR SOLICITATION AND TABULATION OF VOTES TO ACCEPT OR REJECT
PLANS, INCLUDING (A) APPROVING FORM AND CONTENTS OF SOLICITATION
PACKAGE; (B) ESTABLISHING RECORD DATE AND APPROVING PROCEDURES
FOR DISTRIBUTION OF SOLICITATION PACKAGES; (C) APPROVING FORMS OF
BALLOTS; (D) ESTABLISHING VOTING DEADLINE FOR RECEIPT OF BALLOTS
AND (E) APPROVING PROCEDURES FOR VOTE TABULATIONS;
(V) ESTABLISHING DEADLINE AND PROCEDURES FOR FILING OBJECTIONS
TO CONFIRMATION OF PLANS; AND (VI) GRANTING RELATED RELIEF**

This matter coming before the Court on the *Disclosure Statement in Respect of*

*Debtors' Joint Chapter 11 Plan of Reorganization* (the "<u>Disclosure Statement</u>") [Docket No.

1869] and the *Debtors' Motion for an Order (i) Approving the Disclosure Statement (ii)*

*Scheduling the Confirmation Hearing; (iii) Approving Form and Manner of Notice of*

*Confirmation Hearing; (iv) Establishing Procedures for Solicitation and Tabulation of Votes to*

*Accept or Reject Plan, Including (a) Approving the Form and Contents of the Solicitation*

*Package; (b) Establishing Record Date and Approving Procedures for Distributing Solicitation*

*Packages; (c) Approving the Forms of Ballots; (d) Establishing Voting Deadline for Receipt of*

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtors' federal tax identification numbers are: Revstone Industries, LLC (7222); Spara, LLC (6613); Greenwood Forgings, LLC (9285); and US Tool & Engineering, LLC (6450). The location of the Debtors' headquarters and the service address for each Debtor is: Revstone Industries, LLC, et al., c/o Huron Consulting Group Inc., 900 Wilshire Drive, Suite 270, Troy, MI 48084, Attn: John C. DiDonato, Chief Restructuring Officer.

*Ballots; and (e) Approving Procedures for Vote Tabulations; (v) Establishing the Deadline and Procedures for Filing Objections to Confirmation of Plan; and (vi) Granting Related Relief* (the "Motion")[2] filed by Revstone Industries, LLC, Spara, LLC, Greenwood Forgings, LLC, and US Tool & Engineering, LLC (collectively, the "Debtors"); and after considering objections to the Motion, if any; and upon the record and after due deliberation thereon; and the Court finding that proper and adequate notice of the hearing on approval of the Disclosure Statement and of the Motion has been given to all parties in interest, and no other or further notice or hearing being necessary; and after due deliberation thereon and sufficient cause appearing therefor; IT IS HEREBY FOUND, ORDERED AND ADJUDGED as follows:[3]

     1.    The Motion is GRANTED as provided herein.

### Approval of Disclosure Statement

     2.    The Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code regarding the *Debtors' Joint Chapter 11 Plan of Reorganization* [Docket No. 1868] (including all exhibits thereto and as amended, modified or supplemented, the "Plan"). Therefore, the Disclosure Statement is approved pursuant to section 1125(b) of the Bankruptcy Code and Bankruptcy Rule 3017(b).

     3.    All objections to the adequacy of the Disclosure Statement, if any, are, to the extent not consensually resolved as set forth herein, OVERRULED in their entirety.

---

[2] Terms not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. Fed. R. Bank. P. 7052.

**Confirmation Hearing**

4.     The hearing to consider confirmation of the Plan shall commence on _

*March 5* , 2015 at ~~10:00 AM~~ **10:00 AM** (prevailing Eastern time) (the "Confirmation Hearing").  The

Confirmation Hearing may be continued from time to time by announcing such continuance in

open court or otherwise, all without further notice to parties in interest, and the Plan may be

modified, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during, or as a

result of, the Confirmation Hearing, without further notice to interested parties.

**Approval of Solicitation Packages**

5.     The Debtors shall transmit, or cause to be transmitted, the Solicitation

Packages, no later than *January 23* , 2015 by first class, United States mail (or by

international courier if the addresses are not located in the United States) or by CD-Rom, to

holders of Class 3 and Class 4 claims, the only classes entitled to vote on the Plan (collectively,

the "Voting Classes").

6.     To avoid duplication and reduce expenses, the Debtors shall serve only

one Solicitation Package to each creditor who has more than one claim, but shall include the

appropriate Ballots for each class of claim.

7.     Pursuant to Bankruptcy Rule 3017(d), the Debtors are not required to

transmit a Solicitation Package to the Non-Voting Classes.  The Debtors shall transmit or cause

to be transmitted no later than *January 23* , 2015, by first class, United States mail (or by

international courier if the addresses are not located in the United States), to each holder of a

claim or interest in the Non-Voting Classes, at its address to which notices are required to be sent

pursuant to Bankruptcy Rule 2002(g), a notice substantially in the form attached to the Motion as

Exhibit B (the "Non-Voting Class Notice"). The Non-Voting Class Notice will indicate that

Accepting Non-Voting Classes are entitled to receive a copy of the Plan and Disclosure

Statement, in electronic format unless specifically requested otherwise, at the expense of the

Debtors upon request. The Non-Voting Class Notice shall be deemed a summary of the Plan for

purposes of compliance with Bankruptcy Rule 3017(d).

## Approval of Form and Manner of Notice of the Confirmation Hearing

8.      The Confirmation Hearing Notice, in substantially the form attached to the

Motion as Exhibit A, as modified consistent with revisions to the Plan, is approved. As set forth

above, the Confirmation Hearing Notice shall be included as part of the Solicitation Package and

sent via regular mail to all creditors and parties in interest entitled to vote on the Plan. In

addition, the Debtors shall serve the Confirmation Hearing Notice upon (a) the Internal Revenue

Service; (b) the Office of the United States Trustee; (c) the Creditors' Committee; and (d) those

parties that have requested service under Bankruptcy Rule 2002.

## Record Date and Approval of Procedures for Distribution of Solicitation Packages

9.      **January 15, 2015** shall be the record date (the "Record Date") for

purposes of determining which parties are entitled to receive the Solicitation Packages or the

Non-Voting Class Notice and, where applicable, vote on the Plan.

10.     Rust Consulting/Omni Bankruptcy ("Rust/Omni" or the "Solicitation

Agent") shall serve the Solicitation Package and notices regarding the Confirmation Hearing,

inspect, monitor and supervise the solicitation process, serve as the tabulator of the ballots and

certify to the Court the results of the balloting.

11.     The Debtors and/or the Solicitation Agent, as applicable, are permitted to dispense with the mailing of Solicitation Packages or Non-Voting Class Notices to addresses and entities to which the notice of the Disclosure Statement hearing was returned by the United States Postal Service. The Debtors and/or the Solicitation Agent are further relieved of any obligation to attempt to locate the correct address and resend prior to the Voting Deadline the Solicitation Packages or the Non-Voting Class Notice that are returned as undeliverable.

12.     In cases where a party has executed a Ballot in accordance with the terms of this Order, and has indicated corrections or updates to the mailing address used in the service of the Solicitation Package, either physically on the face of the Ballot or otherwise separately enclosed with the Ballot, the corrected or updated mailing address shall be used to reflect the mailing address of the creditor on the official docket of Claims against the Debtors.

### Approval of Forms of Ballots

13.     The Ballots, substantially in the form attached to the Motion as Exhibits C1 through C2, as modified consistent with revisions to the Plan, are approved.

### Deadline for Receipt of Ballots

14.     Unless extended by the Debtors or its counsel in writing, Ballots accepting or rejecting the Plan must be <u>received</u> on or **before** *February* **20, 2015 at 5:00 p.m. (Prevailing Eastern Time)** (the "<u>Voting Deadline</u>"), by Rust/Omni at the following address:

> Revstone Industries, LLC
> Rust Consulting/Omni Bankruptcy
> 5955 DeSoto Avenue, Suite #100
> Woodland Hills, CA 91367

15.     Ballots received via facsimile, electronic mail or other electronic transmission will not be counted unless approved by the Debtors.

## Procedures for Vote Tabulation

16.     Votes may not be changed after the Voting Deadline unless the Court, for

cause, permits such change after notice and hearing pursuant to Bankruptcy Rule 3018(a).

17.     Ballots must be properly executed and counted. Any Ballot that is

illegible or contains insufficient information to permit the identification of the holder of a Class 3

or Class 4 Claim will not be counted.

18.     The following tabulation procedures are approved solely for purposes of

voting on the Plan:

      (a) If an objection has not been filed to a Claim, the amount of such Claim for voting purposes shall be the non-contingent, liquidated and undisputed Claim amount contained on a timely filed Proof of Claim or, if no timely filed Proof of Claim was filed, the non-contingent, liquidated and undisputed amount of such Claim listed in the Debtors' Schedules of Assets and Liabilities;

      (b) If a Claim for which a Proof of Claim has been timely filed is wholly contingent, unliquidated, disputed, undetermined or unknown in amount, such claim shall be temporarily allowed in the amount of $1.00 for voting purposes only, but not for purposes of allowance or distribution;

      (c) If a Claim is partially liquidated and partially unliquidated, such Claim shall be allowed for voting purposes only in the liquidated amount;

      (d) If a holder of a Claim in a Voting Class casts a Ballot with respect to a claim that is the subject of an objection filed no later than **twenty-one (21) days** prior to the Confirmation Hearing, the Debtors request, in accordance with Bankruptcy Rule 3018, that the party's Ballot not be counted, unless the Court temporarily allows such claim for purposes of voting to accept or reject the Plan, and that such creditor be required to file a motion for such relief (the "Rule 3018 Motion") no later than a date that is **fourteen (14) days** before the Confirmation Hearing, and that the Court schedule a hearing on such motion for a date on or prior to the Confirmation Hearing. Notwithstanding the foregoing, if the Debtors file an objection to a claim and requests that such claim be allowed in a specific amount, such creditor's ballot shall be counted in such specified amount;

      (e) Holders of Proofs of Claim filed for $0.00 are not entitled to vote;

(f) Notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased one or more duplicate Claims within the same Class shall be provided with only one Solicitation Package and one Ballot for voting a single Claim in such Class, regardless of whether the Debtors have objected to such duplicate Claims;

(g) If a Claim is the subject of an amended Proof of Claim, the originally filed Proof of Claim shall be deemed superseded by the later filed amended Proof of Claim, regardless of whether or not the Debtors have objected to such Claim, and only the amending Proof of Claim shall be used for the purpose of determining voting eligibility in accordance with the provisions herein;

(h) For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single Creditor in a particular Class shall be aggregated as if such Creditor held one Claim against the Debtors in such Class, and the votes related to such Claims shall be treated as a single vote to accept or reject the Plan;

(i) If a Claim has been disallowed by agreement of the applicable creditor or order of the Court at any time before the Voting Deadline, such Claim shall also be disallowed for voting purposes; and

(j) If a Claim has been estimated or otherwise allowed for voting purposes by order of the Court, such Claim shall be temporarily allowed in the amount so estimated or allowed by the Court for voting purposes only, and not for purposes of allowance or distribution.

19. The following voting procedures and standard assumptions shall be used in tabulating the Ballots:

a. Except to the extent the Debtors otherwise determine, or as permitted by the Court, Ballots received after the Voting Deadline will not be accepted or counted by the Debtors in connection with the confirmation of the Plan;

b. Claims shall not be split for purposes of voting; thus, each Creditor must vote the full amount of its Claim(s) within each class to either accept or reject the Plan. If a creditor attempts to split such vote on their Ballot, such Ballot will not be counted for voting purposes;

c. Any executed Ballot that does not indicate an acceptance or rejection shall not be counted;

d. Any executed Ballot that indicates both an acceptance and rejection of the Plan shall not be counted;

e. Votes cast pursuant to a Ballot that is not signed or does not contain an original signature shall not be counted, unless the Court orders otherwise;

f. Parties holding Claims in more than one Class under the Plan may receive more than one Ballot coded for each different Class;

g. The method of delivery of Ballots to be sent to the Solicitation Agent is at the election and risk of each holder of a Claim, but, except as otherwise provided in the Disclosure Statement, such delivery will be deemed made only when the original, executed Ballot is actually received by the Solicitation Agent;

h. Delivery of the original executed Ballot to the Solicitation Agent on or before the Voting Deadline is required. Delivery of a Ballot by facsimile, email or any other electronic means will not be accepted unless otherwise ordered by the Court;

i. No Ballot sent to the Debtors, or the Debtors' financial or legal advisors, shall be accepted or counted;

j. The Debtors expressly reserve the right, subject to the consent of the Court, to amend at any time and from time to time the terms of the Plan (subject to compliance with section 1127 of the Bankruptcy Code and the terms of the Plan regarding modification). If the Debtors make material changes in the terms of the Plan the Debtors will disseminate additional solicitation materials and will extend the solicitation, in each case to the extent directed by the Court;

k. If multiple Ballots are received from or on behalf of an individual holder of a Claim with respect to the same Claim prior to the Voting Deadline, the last properly completed Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any prior Ballot;

l. If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested by the Debtors, must submit proper evidence, satisfactory to the Debtors, of such person's authority to so act in such capacity;

m. The Debtors, in their sole discretion, subject to contrary order of the Court, may waive any defect in any Ballot at any time, either before or after the close of voting, and without notice. Except as otherwise provided herein, the Debtors may, in their sole discretion, reject such defective Ballot as invalid and, therefore, not count it in connection with confirmation of the Plan;

n. Unless otherwise ordered by the Court, all questions as to the validity, eligibility (including time of receipt) and revocation or withdrawal of Ballots will be determined by the Debtors, in their sole discretion, which determination shall be final and binding;

o.  If a designation is requested under section 1126(e) of the Bankruptcy Code, any vote to accept or reject the Plan cast with respect to such Claim will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Court orders otherwise;

p.  Any holder of a Claim who has delivered a valid Ballot voting on the Plan may withdraw such vote solely in accordance with Bankruptcy Rule 3018(a);

q.  Unless waived or as otherwise ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured by the Voting Deadline, and unless otherwise ordered by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not been cured or waived by the Voting Deadline) will not be counted;

r.  Neither the Debtors, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to the delivery of Ballots, nor will any of them incur any liability for failure to provide such notification;

s.  No fees or commissions or other remuneration will be payable to any broker, dealer or other person for soliciting Ballots to accept the Plan;

t.  The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan; and

u.  The Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of a Claim or Interest.

20.     If no Holder of a Claim or Interest eligible to vote in a particular Class timely votes to accept or reject the Plan, the Debtors may seek to have the Plan deemed **accepted** by the Holders of such Claims or Interests in such Class for purposes of section 1129(b) of the Bankruptcy Code.

21.     The Solicitation Agent shall file with the Bankruptcy Court, no later than three (3) business days prior to the Confirmation Hearing an affidavit regarding the results of the tabulation of the Ballots received on the Plan.

22.     The Ballot does not constitute, and shall not be deemed to be, a proof of Claim or an assertion or admission of a Claim.

**Deadline and Procedures for Filing**
**Objections to Confirmation of the Plan and the Confirmation Brief**

23.    All objections to confirmation of the Plan, including any supporting

memoranda, must be in writing, be filed with the Clerk of the United States Bankruptcy Court

for the District of Delaware, Third Floor, 824 Market Street, Wilmington, Delaware 19801

together with proof of service, and shall (a) state the name and address of the objecting party and

the amount of its Claim or the nature of its interest in the Debtors' chapter 11 cases, (b) state

with particularity the provision or provisions of the Plan objected to and, for any objection

asserted, the legal and factual basis for such objection, and (c) be served upon the following

parties (the "Notice Parties") so as to be received on or before **February 20      , 2015 at 4:00**

**p.m. (Prevailing Eastern Time)** (the "Plan Objection Deadline"):  (a) counsel to the Debtors,

Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE

19899-8705, Attn:  Laura Davis Jones, Esq.; (b) counsel to the Office of the United States

Trustee, J. Caleb Boggs Federal Building, 844 N. King Street, Suite 2207, Lock Box 35,

Wilmington, DE 19801, Attn: Jane Leamy, Esq.; and (c) counsel to the Official Committee of

Unsecured Creditors of Revstone Industries, LLC, Womble Carlyle Sandridge & Rice, LLP, 222

Delaware Avenue, Suite 1501, Wilmington, DE  19801, Attn: Mark L. Desgrosseilliers, Esq. and

Matthew P. Ward, Esq.

24.    All objections not timely filed and served in accordance with the

provisions of this Order are hereby deemed waived and will not be considered by this Court.

25.    The Debtors may file at least **three (3) business days** before the

Confirmation Hearing a brief supporting confirmation of the Plan (including any supporting

memoranda) and replying to any objections or responses.  If the Debtors file any such brief, the

Debtors shall serve the brief on the parties that filed objections or responses to the Plan, the

Office of the United States Trustee, counsel for the Creditors' Committee and all parties who

have requested notice in these cases pursuant to Bankruptcy Rule 2002.

26.     Prior to mailing the Disclosure Statement, the Solicitation Packages or the

Non-Voting Class Notice, the Debtors may fill in any missing dates and other information,

correct any typographical errors and make such other non-material, non-substantive changes as

they deem necessary.

27.     The Debtors and the Solicitation Agent are authorized and empowered to

take such steps, expend such monies, and perform such acts as may be necessary to implement

and effectuate the terms of this Order.


28.     This Court retains jurisdiction over any and all matters arising out of or

related to the interpretation or implementation of this Order.

Dated: January 15, 2015

                                        Honorable Brendan L. Shannon
                                        Chief United States Bankruptcy Judge

**<u>Exhibit 3</u>**

**Corporate/Organizational Chart**

# Revstone Industries, LLC Organizational Chart



(Note: all entities formed in Delaware unless otherwise indicated.)
(Certain non-operating subsidiaries are omitted from this Organizational Chart)

(Note: all entities formed in Delaware unless otherwise indicated.)



**Spara, LLC Organizational Chart**

Scott R. Hofmeister Irrevocable Trust

Megan G. Hofmeister Irrevocable Trust

Jamie S. Hofmeister Irrevocable Trust

Ascalon Enterprises, LLC

Spara, LLC

Spara Tactical Mobility, LLC

T Cast Holdings, LLC

DIDS, LLC

Fairfield Castings, LLC

Lexington Logistics, LLC

Saleen Distribution & Sales, LLC

RPM-Tec, LLC

Saleen, LLC

RPM Towing, LLC

RPM Retail Sales, LLC

Power-Tec Manufacturing, LLC

Power-Tec Manufacturing, LLC (Michigan Entity)